NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 20-1317 (consolidated with Nos. 20-1318, 20-1431, & 21-1009)

─────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

─────────────

SIERRA CLUB, et al.,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*.

─────────────

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
UNITED STATES DEPARTMENT OF TRANSPORTATION

─────────────

**STATUTORY AND REGULATORY ADDENDUM OF
ENVIRONMENTAL PETITIONERS**

─────────────

BRADLEY MARSHALL
JORDAN LUEBKEMANN
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee FL, 32301
850-681-0031
bmarshall@earthjustice.org
jluebkemann@earthjustice.org

*Counsel for Sierra Club, Center for Biological
Diversity, Clean Air Council, Delaware
Riverkeeper Network, Environmental
Confederation of Southwest Florida, and
Mountain Watershed Association.*

Dated: October 13, 2023

# TABLE OF CONTENTS

**Title**                                          **Page #**

<u>Statutory Provisions</u>
5 U.S.C. § 706                                     ADD-1
49 U.S.C. § 108                                    ADD-2
49 U.S.C. § 5101                                   ADD-5
49 U.S.C. § 5103                                   ADD-8
49 U.S.C. § 20114                                  ADD-12

<u>Regulatory Provisions</u>
49 C.F.R. § 172.820                                ADD-14

<u>Other</u>
DOT White Paper: "Tankcars - Maximizing Safety    ADD-18
and Weight"

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Pub. L. 102–240, title III, §3004(a), (b), Dec. 18, 1991, 105 Stat. 2088, provided that:

''(a) REDESIGNATION OF UMTA.—The Urban Mass Transportation Administration of the Department of Transportation shall be known and designated as the 'Federal Transit Administration'.

''(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the Urban Mass Transportation Administration shall be deemed to be a reference to the 'Federal Transit Administration'.''

## § 108. Pipeline and Hazardous Materials Safety Administration

(a) IN GENERAL.—The Pipeline and Hazardous Materials Safety Administration shall be an administration in the Department of Transportation.

(b) SAFETY AS HIGHEST PRIORITY.—In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in pipeline transportation and hazardous materials transportation.

(c) ADMINISTRATOR.—The head of the Administration shall be the Administrator who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be an individual with professional experience in pipeline safety, hazardous materials safety, or other transportation safety. The Administrator shall report directly to the Secretary of Transportation.

(d) DEPUTY ADMINISTRATOR.—The Administration shall have a Deputy Administrator who shall be appointed by the Secretary. The Deputy Administrator shall carry out duties and powers prescribed by the Administrator.

(e) CHIEF SAFETY OFFICER.—The Administration shall have an Assistant Administrator for Pipeline and Hazardous Materials Safety appointed in the competitive service by the Secretary. The Assistant Administrator shall be the Chief Safety Officer of the Administration. The Assistant Administrator shall carry out the duties and powers prescribed by the Administrator.

(f) DUTIES AND POWERS OF THE ADMINISTRATOR.—The Administrator shall carry out—

(1) duties and powers related to pipeline and hazardous materials transportation and safety vested in the Secretary by chapters 51, 57, 61, 601, and 603; and

(2) other duties and powers prescribed by the Secretary.

(g) LIMITATION.—A duty or power specified in subsection (f)(1) may be transferred to another part of the Department of Transportation or another government entity only if specifically provided by law.

(Pub. L. 97–449, §1(b), Jan. 12, 1983, 96 Stat. 2417; Pub. L. 103–272, §4(j)(4), July 5, 1994, 108 Stat. 1365; Pub. L. 108–426, §2(a), Nov. 30, 2004, 118 Stat. 2423.)

HISTORICAL AND REVISION NOTES
PUB. L. 97–449

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 108(a) ......... | 49:1655(b)(1), (2). | Oct. 15, 1966, Pub. L. 89–670, §§3(e)(3) (related to USCG), 6(b)(1), (2), 80 Stat. 932, 938. |
| 108(b) ......... | 49:1652(e)(3) (related to USCG). | |

Subsection (a) reflects the transfer of the Coast Guard to the Department of Transportation as provided by the source provisions and 14:1. The words ''Except when operating as a service of the Navy'' are substituted for 49:1655(b)(2) because of 14:3. The words ''The Secretary of Transportation exercises . . . vested in the Secretary of the Treasury . . . immediately before April 1, 1967'' are substituted for ''and there are hereby transferred to and vested in the Secretary . . . of the Secretary of the Treasury'' to reflect the transfer of duties and powers to the Secretary of Transportation on April 1, 1967, the effective date of the Department of Transportation Act (Pub. L. 89–670, 80 Stat. 931).

In subsection (b), the first sentence is included to provide the name of the officer in charge of the Coast Guard, as reflected in 14:44. In the 2d sentence, the words ''carrying out the duties and powers specified by law'' are substituted for ''such functions, powers, and duties as are specified in this chapter to be carried out'', and the words ''carry out duties and powers prescribed'' are substituted for ''carry out such additional functions, powers, and duties as'', for consistency.

PUB. L. 103–272

Section 4(j)(4) amends 49:108(a) to reflect the intent of 49 App.:1655(b)(2), on which 49:108(a) was based.

### Editorial Notes

AMENDMENTS

2004—Pub. L. 108–426 amended section catchline and text generally, substituting provisions relating to Pipeline and Hazardous Materials Safety Administration for provisions relating to Coast Guard.

1994—Subsec. (a). Pub. L. 103–272 designated existing provisions as par. (1), substituted ''The Coast Guard'' for ''Except when operating as a service in the Navy, the Coast Guard'', and added par. (2).

**Statutory Notes and Related Subsidiaries**

SAVINGS PROVISIONS

Pub. L. 108–426, §5, Nov. 30, 2004, 118 Stat. 2426, as amended by Pub. L. 110–244, title III, §302(h), June 6, 2008, 122 Stat. 1618, provided that:

''(a) TRANSFER OF ASSETS AND PERSONNEL.—Personnel, property, and records employed, used, held, available, or to be made available in connection with functions transferred within the Department of Transportation by this Act [see Short Title of 2004 Amendment note set out under section 101 of this title] shall be transferred for use in connection with the functions transferred, and unexpended balances of appropriations, allocations, and other funds (including funds of any predecessor entity) shall also be transferred accordingly.

''(b) LEGAL DOCUMENTS.—All orders (including delegations by the Secretary of Transportation), determinations, rules, regulations, permits, grants, loans, contracts, settlements, agreements, certificates, licenses, and privileges—

''(1) that have been issued, made, granted, or allowed to become effective by any officer or employee, or any other Government official, or by a court of competent jurisdiction, in the performance of any function that is transferred by this Act; and

''(2) that are in effect on the effective date of such transfer (or become effective after such date pursuant to their terms as in effect on such effective date),

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the Department, any other authorized official, a court of competent jurisdiction, or operation of law.

''(c) PROCEEDINGS.—The provisions of this Act shall not affect any proceedings, including administrative enforcement actions, pending before this Act takes effect, insofar as those functions are transferred by this Act; but such proceedings, to the extent that they relate to functions so transferred, shall proceed in accordance with applicable law and regulations. Nothing in this subsection shall be deemed to prohibit the conclusion or modification of any proceeding described in this subsection under the same terms and conditions and to the same extent that such proceeding could have been concluded or modified if this Act had not been enacted. The Secretary of Transportation is authorized to provide for the orderly transfer of pending proceedings.

''(d) SUITS.—

''(1) IN GENERAL.—This Act shall not affect suits commenced before the date of enactment of this Act [Nov. 30, 2004], except as provided in paragraphs (2) and (3). In all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted.

''(2) SUITS BY OR AGAINST DEPARTMENT.—Any suit by or against the Department begun before the date of enactment of this Act, shall proceed in accordance with applicable law and regulations, insofar as it involves a function retained and transferred under this Act.

''(3) PROCEDURES FOR REMANDED CASES.—If the court in a suit described in paragraph (1) remands a case, subsequent proceedings related to such case shall proceed under procedures that are in accordance with applicable law and regulations as in effect at the time of such subsequent proceedings.

''(e) CONTINUANCE OF ACTIONS AGAINST OFFICERS.—No suit, action, or other proceeding commenced by or against any officer in his or her official capacity shall abate by reason of the enactment of this Act.

''(f) EXERCISE OF AUTHORITIES.—An officer or employee of the Department, for purposes of performing a function transferred by this Act, may exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date of the transfer of the function by this Act.

''(g) REFERENCES.—A reference relating to an agency, officer, or employee affected by this Act in any Federal law, Executive order, rule, regulation, or delegation of authority, or in any document pertaining to an officer or employee, is deemed to refer, as appropriate, to the agency, officer, or employee who succeeds to the functions transferred by this Act.

''(h) DEFINITION.—In this section, the term 'this Act' includes the amendments made by this Act.''

WORKFORCE MANAGEMENT

Pub. L. 114–183, §9, June 22, 2016, 130 Stat. 520, provided that:

''(a) REVIEW.—Not later than 1 year after the date of the enactment of this Act [June 22, 2016], the Inspector General of the Department of Transportation shall submit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate, a review of Pipeline and Hazardous Materials Safety Administration staff resource management, including—

''(1) geographic allocation plans, hiring and time-to-hire challenges, and expected retirement rates and recruitment and retention strategies;

''(2) an identification and description of any previous periods of macroeconomic and pipeline industry conditions under which the Pipeline and Hazardous Materials Safety Administration has encountered dif-

ficulty in filling vacancies, and the degree to which special hiring authorities, including direct hiring authority authorized by the Office of Personnel Management, could have ameliorated such difficulty; and

''(3) recommendations to address hiring challenges, training needs, and any other identified staff resource challenges.

''(b) DIRECT HIRING.—Upon identification of a period described in subsection (a)(2), the Administrator of the Pipeline and Hazardous Materials Safety Administration may apply to the Office of Personnel Management for the authority to appoint qualified candidates to any position relating to pipeline safety, as determined by the Administrator, without regard to sections 3309 through 3319 of title 5, United States Code.

''(c) SAVINGS CLAUSE.—Nothing in this section shall preclude the Administrator of the Pipeline and Hazardous Materials Safety Administration from applying to the Office of Personnel Management for the authority described in subsection (b) prior to the completion of the report required under subsection (a).''

TRANSFER OF DUTIES AND POWERS OF RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

Pub. L. 108–426, §2(b), Nov. 30, 2004, 118 Stat. 2424, provided that: ''The authority of the Research and Special Programs Administration exercised under chapters 51, 57, 61, 601, and 603 of title 49, United States Code, is transferred to the Administrator of the Pipeline and Hazardous Materials Safety Administration.''

For transfer of authority of the Research and Special Programs Administration, other than authority exercised under chapters 51, 57, 61, 601, and 603 of this title, to the Administrator of the Research and Innovative Technology Administration, see section 4(b) of Pub. L. 108–426, set out as a note under former section 112 of this title.

Pub. L. 108–426, §7, Nov. 30, 2004, 118 Stat. 2428, provided that: ''The Secretary shall provide for the orderly transfer of duties and powers under this Act [see Short Title of 2004 Amendment note set out under section 101 of this title], including the amendments made by this Act, as soon as practicable but not later than 90 days after the date of enactment of this Act [Nov. 30, 2004].''

REPORTS

Pub. L. 108–426, §6, Nov. 30, 2004, 118 Stat. 2428, provided that:

''(a) REPORTS BY THE INSPECTOR GENERAL.—Not later than 30 days after the date of enactment of this Act [Nov. 30, 2004], the Inspector General of the Department of Transportation shall submit to the Secretary of Transportation and the Administrator of the Pipeline and Hazardous Materials Safety Administration a report containing the following:

''(1) A list of each statutory mandate regarding pipeline safety or hazardous materials safety that has not been implemented.

''(2) A list of each open safety recommendation made by the National Transportation Safety Board or the Inspector General regarding pipeline safety or hazardous materials safety.

''(b) REPORTS BY THE SECRETARY.—

''(1) STATUTORY MANDATES.—Not later than 90 days after the date of enactment of this Act, and every 180 days thereafter until each of the mandates referred to in subsection (a)(1) has been implemented, the Secretary shall transmit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on the specific actions taken to implement such mandates.

''(2) NTSB AND INSPECTOR GENERAL RECOMMENDATIONS.—Not later than January 1st of each year, the Secretary shall transmit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and

Transportation of the Senate a report containing each recommendation referred to in subsection (a)(2) and a copy of the Department of Transportation response to each such recommendation.''

## § 109. Maritime Administration

(a) ORGANIZATION AND MISSION.—The Maritime Administration is an administration in the Department of Transportation. The mission of the Maritime Administration is to foster, promote, and develop the merchant maritime industry of the United States.

(b) MARITIME ADMINISTRATOR.—The head of the Maritime Administration is the Maritime Administrator, who is appointed by the President by and with the advice and consent of the Senate. The Administrator shall report directly to the Secretary of Transportation and carry out the duties prescribed by the Secretary.

(c) DEPUTY MARITIME ADMINISTRATOR.—The Maritime Administration shall have a Deputy Maritime Administrator, who is appointed in the competitive service by the Secretary, after consultation with the Administrator. The Deputy Administrator shall carry out the duties prescribed by the Administrator. The Deputy Administrator shall be Acting Administrator during the absence or disability of the Administrator and, unless the Secretary designates another individual, during a vacancy in the office of Administrator.

(d) DUTIES AND POWERS VESTED IN SECRETARY.—All duties and powers of the Maritime Administration are vested in the Secretary.

(e) REGIONAL OFFICES.—The Maritime Administration shall have regional offices for the Atlantic, Gulf, Great Lakes, and Pacific port ranges, and may have other regional offices as necessary. The Secretary shall appoint a qualified individual as Director of each regional office. The Secretary shall carry out appropriate activities and programs of the Maritime Administration through the regional offices.

(f) INTERAGENCY AND INDUSTRY RELATIONS.—The Secretary shall establish and maintain liaison with other agencies, and with representative trade organizations throughout the United States, concerned with the transportation of commodities by water in the export and import foreign commerce of the United States, for the purpose of securing preference to vessels of the United States for the transportation of those commodities.

(g) DETAILING OFFICERS FROM ARMED FORCES.—To assist the Secretary in carrying out duties and powers relating to the Maritime Administration, not more than five officers of the armed forces may be detailed to the Secretary at any one time, in addition to details authorized by any other law. During the period of a detail, the Secretary shall pay the officer an amount that, when added to the officer's pay and allowances as an officer in the armed forces, makes the officer's total pay and allowances equal to the amount that would be paid to an individual performing work the Secretary considers to be of similar importance, difficulty, and responsibility as that performed by the officer during the detail.

(h) CONTRACTS, COOPERATIVE AGREEMENTS, AND AUDITS.—

(1) CONTRACTS AND COOPERATIVE AGREEMENTS.—In the same manner that a private corporation may make a contract within the scope of its authority under its charter, the Secretary may make contracts and cooperative agreements for the United States Government and disburse amounts to—

(A) carry out the Secretary's duties and powers under this section, subtitle V of title 46, and all other Maritime Administration programs; and

(B) protect, preserve, and improve collateral held by the Secretary to secure indebtedness.

(2) AUDITS.—The financial transactions of the Secretary under paragraph (1) shall be audited by the Comptroller General. The Comptroller General shall allow credit for an expenditure shown to be necessary because of the nature of the business activities authorized by this section or subtitle V of title 46. At least once a year, the Comptroller General shall report to Congress any departure by the Secretary from this section or subtitle V of title 46.

(i) GRANT ADMINISTRATIVE EXPENSES.—Except as otherwise provided by law, the administrative and related expenses for the administration of any grant programs by the Maritime Administrator may not exceed 3 percent.

(j) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, there are authorized to be appropriated such amounts as may be necessary to carry out the duties and powers of the Secretary relating to the Maritime Administration.

(2) LIMITATIONS.—Only those amounts specifically authorized by law may be appropriated for the use of the Maritime Administration for—

(A) acquisition, construction, or reconstruction of vessels;

(B) construction-differential subsidies incident to the construction, reconstruction, or reconditioning of vessels;

(C) costs of national defense features;

(D) payments of obligations incurred for operating-differential subsidies;

(E) expenses necessary for research and development activities, including reimbursement of the Vessel Operations Revolving Fund for losses resulting from expenses of experimental vessel operations;

(F) the Vessel Operations Revolving Fund;

(G) National Defense Reserve Fleet expenses;

(H) expenses necessary to carry out part B of subtitle V of title 46; and

(I) other operations and training expenses related to the development of waterborne transportation systems, the use of waterborne transportation systems, and general administration.

(Pub. L. 97–449, §1(b), Jan. 12, 1983, 96 Stat. 2417; Pub. L. 103–272, §5(m)(5), July 5, 1994, 108 Stat. 1375; Pub. L. 109–304, §12, Oct. 6, 2006, 120 Stat. 1698; Pub. L. 111–84, div. C, title XXXV, §3508, Oct. 28, 2009, 123 Stat. 2721; Pub. L. 111–383, div. A, title X, §1075(d)(26), Jan. 7, 2011, 124 Stat. 4374;

(b) DUTIES.—In carrying out this section, the Inspector General shall—

(1) keep the Chairman of the Board, the Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Transportation and Infrastructure of the House of Representatives fully and currently informed about problems relating to administration of the internal accounting and administrative control systems of the Board;

(2) issue findings and recommendations for actions to address the problems referred to in paragraph (1); and

(3) submit periodic reports to the Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Transportation and Infrastructure of the House of Representatives that describe any progress made in implementing actions to address the problems referred to in paragraph (1).

(c) ACCESS TO INFORMATION.—In carrying out this section, the Inspector General may exercise authorities granted to the Inspector General under subsections (a) and (b) of section 6 of the Inspector General Act of 1978 (5 U.S.C. App.).

(d) AUTHORIZATION OF APPROPRIATIONS.—

(1) FUNDING.—There are authorized to be appropriated to the Secretary of Transportation for use by the Inspector General of the Department of Transportation such sums as may be necessary to cover expenses associated with activities pursuant to the authority exercised under this section.

(2) REIMBURSABLE AGREEMENT.—In the absence of an appropriation under this subsection for an expense referred to in paragraph (1), the Inspector General and the Board shall have a reimbursement agreement to cover such expense.

(Added Pub. L. 114–110, §9, Dec. 18, 2015, 129 Stat. 2232.)

### Editorial Notes

REFERENCES IN TEXT

Section 6 of the Inspector General Act of 1978, referred to in subsec. (c), is section 6 of Pub. L. 95–452, which is set out in the Appendix to Title 5, Government Organization and Employees.

## SUBTITLE III—GENERAL AND INTERMODAL PROGRAMS

| Chapter | | Sec. |
|---|---|---|
| 51. | Transportation of Hazardous Material ................. | 5101 |
| 53. | Public Transportation ................ | 5301 |
| 55. | Intermodal Transportation ............... | 5501 |
| 57. | Sanitary Food Transportation ......... | 5701 |
| 59. | Intermodal Safe Container Transportation ................ | 5901 |
| 61. | One-Call Notification Programs ...... | 6101 |
| 63.[1] | Bureau of Transportation Statistics ................ | 6301 [2] |
| 63.[1] | Bureau of Transportation Statistics ................ | 6301 |
| 65. | Research planning ............................. | 6501 |
| 67. | Multimodal infrastructure investments ................ | 6701 [3] |

[1] So in original. Two items for chapter 63 have been enacted.
[2] Editorially supplied.

### Editorial Notes

AMENDMENTS

2021—Pub. L. 117–58, div. B, title I, §21202(c), Nov. 15, 2021, 135 Stat. 676, added item for chapter 67. Item was conformed to the style of this analysis and starting section number was supplied editorially.

2015—Pub. L. 114–94, div. A, title VI, §6019(c), Dec. 4, 2015, 129 Stat. 1581, added second item for chapter 63 and item for chapter 65.

2012—Pub. L. 112–141, div. E, title II, §52011(c)(2), July 6, 2012, 126 Stat. 895, added item for chapter 63.

2005—Pub. L. 109–59, title III, §3002(c), Aug. 10, 2005, 119 Stat. 1545, substituted "Public" for "Mass" in item for chapter 53.

1998—Pub. L. 105–178, title VII, §7302(b), June 9, 1998, 112 Stat. 482, added item for chapter 61.

## CHAPTER 51—TRANSPORTATION OF HAZARDOUS MATERIAL

| Sec. | |
|---|---|
| 5101. | Purpose. |
| 5102. | Definitions. |
| 5103. | General regulatory authority. |
| 5103a. | Limitation on issuance of hazmat licenses. |
| 5104. | Representation and tampering. |
| 5105. | Transporting certain highly radioactive material. |
| 5106. | Handling criteria. |
| 5107. | Hazmat employee training requirements and grants. |
| 5108. | Registration. |
| 5109. | Motor carrier safety permits. |
| 5110. | Shipping papers and disclosure. |
| [5111. | Repealed.] |
| 5112. | Highway routing of hazardous material. |
| 5113. | Unsatisfactory safety rating. |
| 5114. | Air transportation of ionizing radiation material. |
| 5115. | Training curriculum for the public sector. |
| 5116. | Planning and training grants, monitoring, and review. |
| 5117. | Special permits and exclusions. |
| 5118. | Hazardous material technical assessment, research and development, and analysis program. |
| 5119. | Uniform forms and procedures. |
| 5120. | International uniformity of standards and requirements. |
| 5121. | Administrative. |
| 5122. | Enforcement. |
| 5123. | Civil penalty. |
| 5124. | Criminal penalty. |
| 5125. | Preemption. |
| 5126. | Relationship to other laws. |
| 5127. | Judicial review. |
| 5128. | Authorization of appropriations. |

### Editorial Notes

AMENDMENTS

2012—Pub. L. 112–141, div. C, title III, §33007(b), July 6, 2012, 126 Stat. 836, added item 5118.

2005—Pub. L. 109–59, title VII, §§7111, 7115(a)(2). (h), 7123(c), Aug. 10, 2005, 119 Stat. 1899, 1901, 1908, struck out item 5111 "Rail tank cars", substituted "Special permits and exclusions" for "Exemptions and exclusions" in item 5117, struck out item 5118 "Inspectors", added items 5127 and 5128, and struck out former item 5127 "Authorization of appropriations".

2001—Pub. L. 107–56, title X, §1012(a)(2), Oct. 26, 2001, 115 Stat. 397, added item 5103a.

### §5101. Purpose

The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation

of hazardous material in intrastate, interstate, and foreign commerce.

(Pub. L. 103–272, § 1(d), July 5, 1994, 108 Stat. 759; Pub. L. 109–59, title VII, § 7101(b), Aug. 10, 2005, 119 Stat. 1891.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5101 ............ | 49 App.:1801. | Jan. 3, 1975, Pub. L. 93–633, § 102, 88 Stat. 2156. |

The words ''It is declared to be the policy of Congress'', ''the Nation'', and ''which are'' are omitted as surplus.

**Editorial Notes**

AMENDMENTS

2005—Pub. L. 109–59 substituted ''The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce'' for ''The purpose of this chapter is to provide adequate protection against the risks to life and property inherent in the transportation of hazardous material in commerce by improving the regulatory and enforcement authority of the Secretary of Transportation''.

**Statutory Notes and Related Subsidiaries**

SHORT TITLE OF 2015 AMENDMENT

Pub. L. 114–94, div. A, title III, § 3001, Dec. 4, 2015, 129 Stat. 1446, provided that: ''This title [amending sections 5302 to 5304, 5307, 5309 to 5312, 5314, 5315, 5323, 5325, 5327, 5329, 5336 to 5340, and 10501 of this title and sections 5313 and 5314 of Title 5, Government Organization and Employees, repealing sections 5313, 5319, and 5322 of this title, enacting provisions set out as notes under 5309, 5310, 5325, 5329, 5338 of this title, section 5313 of Title 5, and section 12143 of Title 42, The Public Health and Welfare, amending provisions set out as a note under sections 5303 of this title, and repealing provisions set out as a note under section 5309 of this title] may be cited as the 'Federal Public Transportation Act of 2015'.''

Pub. L. 114–94, div. A, title VII, § 7001, Dec. 4, 2015, 129 Stat. 1588, provided that: ''This title [amending sections 5103, 5107 to 5109, 5116, 5117, 5121, and 5128 of this title and enacting provisions set out as notes under sections 5103, 5116, 20103, 20141, 20155, and 31305 of this title] may be cited as the 'Hazardous Materials Transportation Safety Improvement Act of 2015'.''

SHORT TITLE OF 2012 AMENDMENT

Pub. L. 112–141, div. B, § 20001, July 6, 2012, 126 Stat. 622, provided that: ''This division [see Tables for classification] may be cited as the 'Federal Public Transportation Act of 2012'.''

Pub. L. 112–141, div. C, title III, § 33001, July 6, 2012, 126 Stat. 832, provided that: ''This title [see Tables for classification] may be cited as the 'Hazardous Materials Transportation Safety Improvement Act of 2012'.''

SHORT TITLE OF 2005 AMENDMENT

Pub. L. 109–59, title III, § 3001, Aug. 10, 2005, 119 Stat. 1544, provided that: ''This title [see Tables for classification] may be cited as the 'Federal Public Transportation Act of 2005'.''

Pub. L. 109–59, title VII, § 7001, Aug. 10, 2005, 119 Stat. 1891, provided that: ''This title [see Tables for classification] may be cited as the 'Hazardous Materials Transportation Safety and Security Reauthorization Act of 2005'.''

SHORT TITLE OF 1998 AMENDMENT

Pub. L. 105–178, title III, § 3001, June 9, 1998, 112 Stat. 338, provided that: ''This title [amending sections 5302

to 5305, 5307 to 5315, 5317 to 5320, 5323, 5325 to 5328, and 5333 to 5338 of this title and enacting provisions set out as notes under sections 301, 5301, 5307 to 5310, 5323, 5336, and 5338 of this title and sections 138 and 322 of Title 23, Highways] may be cited as the 'Federal Transit Act of 1998'.''

SHORT TITLE OF 1996 AMENDMENT

Pub. L. 104–291, title II, § 201, Oct. 11, 1996, 110 Stat. 3453, provided that: ''This title [enacting section 5908 of this title and amending sections 5901 to 5903 and 5905 to 5907 of this title] may be cited as the 'Intermodal Safe Container Transportation Amendments Act of 1996'.''

SHORT TITLE OF 1994 AMENDMENT

Pub. L. 103–311, title I, § 101, Aug. 26, 1994, 108 Stat. 1673, provided that: ''This title [amending sections 5102 to 5104, 5107, 5108, 5110, 5116, 5117, 5121, and 5125 to 5127 of this title and enacting provisions set out as notes under this section, sections 5103, 5112, and 5121 of this title, and section 307 of Title 23, Highways] may be cited as the 'Hazardous Materials Transportation Authorization Act of 1994'.''

TRANSFER OF FUNCTIONS

For transfer of duties, powers, and authority of Research and Special Programs Administration under this chapter to the Administrator of the Pipeline and Hazardous Materials Safety Administration, see section 2(b) of Pub. L. 108–426, set out as a note under section 108 of this title.

FINDINGS

Pub. L. 109–59, title VII, § 7101(a), Aug. 10, 2005, 119 Stat. 1891, provided that: ''Congress finds with respect to hazardous materials transportation that—

''(1) approximately 4,000,000,000 tons of regulated hazardous materials are transported each year and approximately 1,200,000 movements of hazardous materials occur each day, according to Department of Transportation estimates;

''(2) the movement of hazardous materials in commerce is necessary to maintain economic vitality and meet consumer demands and must be conducted in a safe, secure, and efficient manner;

''(3) accidents involving, or unauthorized access to, hazardous materials in transportation may result in a release of such materials and pose a serious threat to public health and safety;

''(4) because of the potential risks to life, property, and the environment posed by unintentional releases of hazardous materials, consistency in laws and regulations governing the transportation of hazardous materials is necessary and desirable; and

''(5) in order to provide reasonable, adequate, and cost-effective protection from the risks posed by the transportation of hazardous materials, a network of well-trained State and local emergency response personnel and hazmat employees is essential.''

BUY AMERICAN

Pub. L. 103–311, title I, § 123, Aug. 26, 1994, 108 Stat. 1682, provided that:

''(a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available under this title [see Short Title of 1994 Amendment note above] may be expended in violation of sections 2 through 4 of the Act of March 3, 1933 ([former] 41 U.S.C. 10a–10c; popularly known as the 'Buy American Act' [see 41 U.S.C. 8301 et seq.]), which are applicable to those funds.

''(b) SENSE OF CONGRESS; REQUIREMENT REGARDING NOTICE.—

''(1) In the case of any equipment or products that may be authorized to be purchased with financial assistance provided under this title, it is the sense of Congress that entities receiving such assistance should, in expending such assistance, purchase only American-made equipment and products.

''(2) In providing financial assistance under this title, the Secretary of Transportation shall provide

to each recipient of the assistance a notice describing the statement made in paragraph (1) by Congress.

"(c) PROHIBITION OF CONTRACTS.—If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a 'Made in America' inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, such person shall be ineligible to receive any contract or subcontract made with funds provided pursuant to this title, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

"(d) RECIPROCITY.—

"(1) Except as provided in paragraph (2), no contract or subcontract made with funds authorized under this title to a company organized under the laws of a foreign country unless the Secretary of Transportation finds that such country affords comparable opportunities to companies organized under laws of the United States.

"(2)(A) The Secretary of Transportation may waive the provisions of paragraph (1) if the products or services required are not reasonably available from companies organized under the laws of the United States. Any such waiver shall be reported to Congress.

"(B) Paragraph (1) shall not apply to the extent that to do so would violate the General Agreement on Tariffs and Trade or any other international agreement to which the United States is a party."

"SECRETARY" DEFINED

Pub. L. 112–141, div. C, title III, §33002, July 6, 2012, 126 Stat. 832, provided that: "In this title [see Tables for classification], the term 'Secretary' means the Secretary of Transportation."

## § 5102. Definitions

In this chapter—

(1) "commerce" means trade or transportation in the jurisdiction of the United States—

(A) between a place in a State and a place outside of the State;

(B) that affects trade or transportation between a place in a State and a place outside of the State; or

(C) on a United States-registered aircraft.

(2) "hazardous material" means a substance or material the Secretary designates under section 5103(a) of this title.

(3) "hazmat employee"—

(A) means an individual—

(i) who—

(I) is employed on a full time, part time, or temporary basis by a hazmat employer; or

(II) is self-employed (including an owner-operator of a motor vehicle, vessel, or aircraft) transporting hazardous material in commerce; and

(ii) who during the course of such full time, part time, or temporary employment, or such self employment, directly affects hazardous material transportation safety as the Secretary decides by regulation; and

(B) includes an individual, employed on a full time, part time, or temporary basis by a hazmat employer, or self employed, who during the course of employment—

(i) loads, unloads, or handles hazardous material;

(ii) designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce;

(iii) prepares hazardous material for transportation;

(iv) is responsible for the safety of transporting hazardous material; or

(v) operates a vehicle used to transport hazardous material.

(4) "hazmat employer"—

(A) means a person—

(i) who—

(I) employs or uses at least 1 hazmat employee on a full time, part time, or temporary basis; or

(II) is self-employed (including an owner-operator of a motor vehicle, vessel, or aircraft) transporting hazardous material in commerce; and

(ii) who—

(I) transports hazardous material in commerce;

(II) causes hazardous material to be transported in commerce; or

(III) designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce; and

(B) includes a department, agency, or instrumentality of the United States Government, or an authority of a State, political subdivision of a State, or Indian tribe, carrying out an activity described in clause (ii).

(5) "imminent hazard" means the existence of a condition relating to hazardous material that presents a substantial likelihood that death, serious illness, severe personal injury, or a substantial endangerment to health, property, or the environment may occur before the reasonably foreseeable completion date of a formal proceeding begun to lessen the risk of that death, illness, injury, or endangerment.

(6) "Indian tribe" has the same meaning given that term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).[1]

(7) "motor carrier"—

(A) means a motor carrier, motor private carrier, and freight forwarder as those terms are defined in section 13102; but

(B) does not include a freight forwarder, as so defined, if the freight forwarder is not performing a function relating to highway transportation.

(8) "National Response Team" means the National Response Team established under the National Contingency Plan established under section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9605).

---

[1] See References in Text note below.

Par. (4). Pub. L. 109–59, §7102(3), amended par. (4) generally. Prior to amendment, par. (4) consisted of subpars. (A) to (C), which included within definition of "hazmat employer" a person using at least one employee in connection with transporting or containers for transporting hazardous material, an owner-operator of a motor vehicle transporting hazardous material in commerce, and a department, agency, or instrumentality of the United States Government, or an authority of a State, political subdivision of a State, or Indian tribe, carrying out certain described activities.

Par. (5). Pub. L. 109–59, §7102(4), inserted "relating to hazardous material" after "of a condition".

Par. (7). Pub. L. 109–59, §7102(5), amended par. (7) generally. Prior to amendment, par. (7) read as follows: "'motor carrier' means a motor carrier, motor private carrier, and freight forwarder as those terms are defined in section 13102 of this title."

Par. (8). Pub. L. 109–59, §7102(6), substituted "National Response Team" for "national response team" in two places and "National Contingency Plan" for "national contingency plan".

Par. (9)(A). Pub. L. 109–59, §7102(7), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "includes a government, Indian tribe, or authority of a government or tribe offering hazardous material for transportation in commerce or transporting hazardous material to further a commercial enterprise; but".

Pars. (11) to (14). Pub. L. 109–59, §7102(8), added par. (11) and redesignated former pars. (11) to (13) as (12) to (14), respectively.

1995—Par. (7). Pub. L. 104–88 substituted "motor carrier, motor private" for "motor common carrier, motor contract carrier, motor private" and "section 13102" for "section 10102".

1994—Pars. (3)(C)(ii), (4)(A)(iii). Pub. L. 103–311 substituted "packagings" for "packages".

**Statutory Notes and Related Subsidiaries**

Effective Date of 2008 Amendment

Amendment by Pub. L. 110–244 effective as of the date of enactment of Pub. L. 109–59 (Aug. 10, 2005) and to be treated as included in Pub. L. 109–59 as of that date, and provisions of Pub. L. 109–59, as in effect on the day before June 6, 2008, that are amended by Pub. L. 110–244 to be treated as not enacted, see section 121(b) of Pub. L. 110–244, set out as a note under section 101 of Title 23, Highways.

## §5103. General regulatory authority

(a) DESIGNATING MATERIAL AS HAZARDOUS.— The Secretary shall designate material (including an explosive, radioactive material, infectious substance, flammable or combustible liquid, solid, or gas, toxic, oxidizing, or corrosive material, and compressed gas) or a group or class of material as hazardous when the Secretary determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property.

(b) REGULATIONS FOR SAFE TRANSPORTATION.— (1) The Secretary shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce. The regulations—

(A) apply to a person who—

(i) transports hazardous material in commerce;

(ii) causes hazardous material to be transported in commerce;

(iii) designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce;

(iv) prepares or accepts hazardous material for transportation in commerce;

(v) is responsible for the safety of transporting hazardous material in commerce;

(vi) certifies compliance with any requirement under this chapter; or

(vii) misrepresents whether such person is engaged in any activity under clause (i) through (vi); and

(B) shall govern safety aspects, including security, of the transportation of hazardous material the Secretary considers appropriate.

(2) A proceeding to prescribe the regulations must be conducted under section 553 of title 5, including an opportunity for informal oral presentation.

(c) FEDERALLY DECLARED DISASTERS AND EMERGENCIES.—

(1) IN GENERAL.—The Secretary may by order waive compliance with any part of an applicable standard prescribed under this chapter without prior notice and comment and on terms the Secretary considers appropriate if the Secretary determines that—

(A) it is in the public interest to grant the waiver;

(B) the waiver is not inconsistent with the safety of transporting hazardous materials; and

(C) the waiver is necessary to facilitate the safe movement of hazardous materials into, from, and within an area of a major disaster or emergency that has been declared under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

(2) PERIOD OF WAIVER.—A waiver under this subsection may be issued for a period of not more than 60 days and may be renewed upon application to the Secretary only after notice and an opportunity for a hearing on the waiver. The Secretary shall immediately revoke the waiver if continuation of the waiver would not be consistent with the goals and objectives of this chapter.

(3) STATEMENT OF REASONS.—The Secretary shall include in any order issued under this section the reasons for granting the waiver.

(d) CONSULTATION.—When prescribing a security regulation or issuing a security order that affects the safety of the transportation of hazardous material, the Secretary of Homeland Security shall consult with the Secretary of Transportation.

(e) BIENNIAL REPORT.—The Secretary of Transportation shall submit to the Committee on Transportation and Infrastructure of the House of Representatives and the Senate Committee on Commerce, Science, and Transportation a biennial report providing information on whether the Secretary has designated as hazardous materials for purposes of chapter 51 of such title all by-products of the methamphetamine-production process that are known by the Secretary to pose an unreasonable risk to health and safety

or property when transported in commerce in a particular amount and form.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 761; Pub. L. 103–311, title I, §117(a)(2), Aug. 26, 1994, 108 Stat. 1678; Pub. L. 103–429, §6(3), Oct. 31, 1994, 108 Stat. 4378; Pub. L. 107–296, title XVII, §1711(a), Nov. 25, 2002, 116 Stat. 2319; Pub. L. 109–59, title VII, §§7103, 7126, Aug. 10, 2005, 119 Stat. 1893, 1909; Pub. L. 109–177, title VII, §741, Mar. 9, 2006, 120 Stat. 272; Pub. L. 114–94, div. A, title VII, §7201, Dec. 4, 2015, 129 Stat. 1589.)

HISTORICAL AND REVISION NOTES
PUB. L. 103–272

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 5103(a) ........ | 49 App.:1803. | Jan. 3, 1975, Pub. L. 93–633, §104, 88 Stat. 2156. |
| 5103(b) ........ | 49 App.:1804(a)(1)–(3). | Jan. 3, 1975, Pub. L. 93–633, §105(a)(1)–(3), 88 Stat. 2157; restated Nov. 16, 1990, Pub. L. 101–615, §4, 104 Stat. 3247. |

In subsection (a), the words "such quantity and form of material" and "in his discretion" are omitted as surplus.

In subsection (b)(1), before clause (A), the words "in accordance with section 553 of title 5" are omitted because 5:553 applies unless otherwise stated. In clause (A)(i), the words "hazardous material in commerce", and in clause (A)(ii), the words "hazardous material . . . in commerce", are added for consistency in this chapter.

PUB. L. 103–429

This amends 49:5103(b)(2) to clarify the restatement of 49 App.:1804(a)(2) by section 1 of the Act of July 5, 1994 (Public Law 103–272, 108 Stat. 761).

**Editorial Notes**

REFERENCES IN TEXT

The Robert T. Stafford Disaster Relief and Emergency Assistance Act, referred to in subsec. (c)(1)(C), is Pub. L. 93–288, May 22, 1974, 88 Stat. 143, which is classified principally to chapter 68 (§5121 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 5121 of Title 42 and Tables.

AMENDMENTS

2015—Subsecs. (c) to (e). Pub. L. 114–94 added subsec. (c) and redesignated former subsecs. (c) and (d) as (d) and (e), respectively.

2006—Subsec. (d). Pub. L. 109–177 added subsec. (d).

2005—Subsec. (a). Pub. L. 109–59, §7126, substituted "Secretary shall designate" for "Secretary of Transportation shall designate".

Pub. L. 109–59, §7103(a), substituted "infectious substance, flammable or combustible liquid, solid, or gas, toxic, oxidizing, or corrosive material," for "etiologic agent, flammable or combustible liquid or solid, poison, oxidizing or corrosive material," and "determines" for "decides".

Subsec. (b)(1)(A). Pub. L. 109–59, §7103(b), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "apply to a person—

"(i) transporting hazardous material in commerce;

"(ii) causing hazardous material to be transported in commerce; or

"(iii) manufacturing, fabricating, marking, maintaining, reconditioning, repairing, or testing a packaging or a container that is represented, marked, certified, or sold by that person as qualified for use in transporting hazardous material in commerce; and".

Subsec. (b)(1)(C). Pub. L. 109–59, §7103(c)(1), struck out heading and text of subpar. (C). Text read as follows:

"When prescribing a security regulation or issuing a security order that affects the safety of the transportation of hazardous material, the Secretary of Homeland Security shall consult with the Secretary."

Subsec. (c). Pub. L. 109–59, §7103(c)(2), added subsec. (c).

2002—Subsec. (b)(1). Pub. L. 107–296, §1711(a)(1), substituted "transportation, including security," for "transportation" in introductory provisions.

Subsec. (b)(1)(B). Pub. L. 107–296, §1711(a)(2), substituted "aspects, including security," for "aspects".

Subsec. (b)(1)(C). Pub. L. 107–296, §1711(a)(3), added subpar. (C).

1994—Subsec. (b)(1)(A)(iii). Pub. L. 103–311 substituted "a packaging or a" for "a package or".

Subsec. (b)(2). Pub. L. 103–429 substituted "be conducted under section 553 of title 5, including" for "include" and "presentation" for "presentations".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–94 effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as a note under section 5313 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–296 effective 60 days after Nov. 25, 2002, see section 4 of Pub. L. 107–296, set out as an Effective Date note under section 101 of Title 6, Domestic Security.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–429 effective July 5, 1994, see section 9 of Pub. L. 103–429, set out as a note under section 321 of this title.

GAO STUDY ON ACCEPTANCE OF CLASSIFICATION EXAMINATIONS

Pub. L. 114–94, div. A, title VII, §7207, Dec. 4, 2015, 129 Stat. 1592, provided that:

"(a) IN GENERAL.—Not later than 180 days after the date of enactment of this Act [Dec. 4, 2015], the Comptroller General of the United States shall evaluate and transmit to the Secretary [of Transportation], the Committee on Transportation and Infrastructure of the House of Representatives, and the Committee on Commerce, Science, and Transportation of the Senate, a report on the standards, metrics, and protocols that the Secretary uses to regulate the performance of persons approved to recommend hazard classifications pursuant to section 173.56(b) of title 49, Code of Federal Regulations (commonly referred to as 'third-party labs').

"(b) EVALUATION.—The evaluation required under subsection (a) shall—

"(1) identify what standards and protocols are used to approve such persons, assess the adequacy of such standards and protocols to ensure that persons seeking approval are qualified and capable of performing classifications, and make recommendations to address any deficiencies identified;

"(2) assess the adequacy of the Secretary's oversight of persons approved to perform the classifications, including the qualification of individuals engaged in the oversight of approved persons, and make recommendations to enhance oversight sufficiently to ensure that classifications are issued as required;

"(3) identify what standards and protocols exist to rescind, suspend, or deny approval of persons who perform such classifications, assess the adequacy of such standards and protocols, and make recommendations to enhance such standards and protocols if necessary; and

"(4) include annual data for fiscal years 2005 through 2015 on the number of applications received for new classifications pursuant to section 173.56(b) of title 49, Code of Federal Regulations, of those applications how many classifications recommended by

persons approved by the Secretary were changed to another classification and the reasons for the change, and how many hazardous materials incidents have been attributed to a classification recommended by such approved persons in the United States.

"(c) ACTION PLAN.—Not later than 180 days after receiving the report required under subsection (a), the Secretary shall make available to the public a plan describing any actions the Secretary will take to establish standards, metrics, and protocols based on the findings and recommendations in the report to ensure that persons approved to perform classification examinations required under section 173.56(b) of title 49, Code of Federal Regulations, can sufficiently perform such examinations in a manner that meets the hazardous materials regulations.

"(d) REGULATIONS.—If the report required under subsection (a) recommends new regulations in order for the Secretary to have confidence in the accuracy of classification recommendations rendered by persons approved to perform classification examinations required under section 173.56(b) of title 49, Code of Federal Regulations, the Secretary shall consider such recommendations, and if determined appropriate, issue regulations to address the recommendations not later than 18 months after the date of the publication of the plan under subsection (c)."

RAILROAD CARRIER EMPLOYEE EXPOSURE TO RADIATION STUDY

Pub. L. 110–432, div. A, title IV, §411, Oct. 16, 2008, 122 Stat. 4888, provided that:

"(a) STUDY.—The Secretary of Transportation shall, in consultation with the Secretary of Energy, the Secretary of Labor, the Administrator of the Environmental Protection Agency, and the Chairman of the Nuclear Regulatory Commission, as appropriate, conduct a study of the potential hazards to which employees of railroad carriers and railroad contractors or subcontractors are exposed during the transportation of high-level radioactive waste and spent nuclear fuel (as defined in section 5101(a) [probably means section 5105(a)] of title 49, United States Code), supplementing the report submitted under section 5101(b) [probably means section 5105(b)] of that title, which may include—

"(1) an analysis of the potential application of 'as low as reasonably achievable' principles for exposure to radiation to such employees with an emphasis on the need for special protection from radiation exposure for such employees during the first trimester of pregnancy or who are undergoing or have recently undergone radiation therapy;

"(2) the feasibility of requiring real-time dosimetry monitoring for such employees;

"(3) the feasibility of requiring routine radiation exposure monitoring in fixed railroad locations, such as yards and repair facilities; and

"(4) a review of the effectiveness of the Department's packaging requirements for radioactive materials.

"(b) REPORT.—Not later than 18 months after the date of enactment of this Act [Oct. 16, 2008], the Secretary of Transportation shall transmit a report on the results of the study required by subsection (a) and any recommendations to further protect employees of a railroad carrier or of a contractor or subcontractor to a railroad carrier from unsafe exposure to radiation during the transportation of high-level radioactive waste and spent nuclear fuel to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Transportation and Infrastructure.

"(c) REGULATORY AUTHORITY.—The Secretary of Transportation may issue regulations that the Secretary determines appropriate, pursuant to the report required by subsection (b), to protect railroad employees from unsafe exposure to radiation during the transportation of radioactive materials."

[For definitions of "railroad carrier", "Department", "railroad", and "Secretary", as used in section 411 of

Pub. L. 110–432, set out above, see section 2(a) of Pub. L. 110–432, set out as a note under section 20102 of this title.]

SAFE PLACEMENT OF TRAIN CARS

Pub. L. 103–311, title I, §111, Aug. 26, 1994, 108 Stat. 1676, provided that the Secretary of Transportation would conduct a study of existing practices regarding the placement of cars, particularly hazardous-materials cars, on trains, consider whether such placement practices increase the risk of adverse effects on safety, and report the results of the study to Congress within 1 year after Aug. 26, 1994.

FIBER DRUM PACKAGING

Pub. L. 104–88, title IV, §406, Dec. 29, 1995, 109 Stat. 957, provided that:

"(a) IN GENERAL.—In the administration of chapter 51 of title 49, United States Code, the Secretary of Transportation shall issue a final rule within 60 days after the date of the enactment of this Act [Dec. 29, 1995] authorizing the continued use of fiber drum packaging with a removable head for the transportation of liquid hazardous materials with respect to those liquid hazardous materials transported by such drums pursuant to regulations in effect on September 30, 1991, if—

"(1) the packaging is in compliance with regulations of the Secretary under the Hazardous Materials Transportation Act [former 49 U.S.C. 1801 et seq.] as in effect on September 30, 1991; and

"(2) the packaging will not be used for the transportation of hazardous materials that include materials which are poisonous by inhalation or materials in Packing Groups I and II.

"(b) EXPIRATION.—The regulation referred to in subsection (a) shall expire on the later of September 30, 1997, or the date on which funds are authorized to be appropriated to carry out chapter 51 of title 49, United States Code (relating to transportation of hazardous materials), for fiscal years beginning after September 30, 1997.

"(c) STUDY.—

"(1) IN GENERAL.—Within 90 days after the date of the enactment of this Act [Dec. 29, 1995], the Secretary shall contract with the National Academy of Sciences to conduct a study—

"(A) to determine whether the requirements of section 5103(b) of title 49, United States Code (relating to regulations for safe transportation), as they pertain to fiber drum packaging with a removable head can be met for the transportation of liquid hazardous materials (with respect to those liquid hazardous materials transported by such drums pursuant to regulations in effect on September 30, 1991) with standards (including fiber drum industry standards set forth in a June 8, 1992, exemption application submitted to the Department of Transportation), other than the performance-oriented packaging standards adopted under docket number HM–181 contained in part 178 of title 49, Code of Federal Regulations; and

"(B) to determine whether a packaging standard (including such fiber drum industry standards), other than such performance-oriented packaging standards, will provide an equal or greater level of safety for the transportation of liquid hazardous materials than would be provided if such performance-oriented packaging standards were in effect.

"(2) COMPLETION.—The study shall be completed before March 1, 1997 and shall be transmitted to the Committee on Commerce, Science, and Transportation of the Senate and the Transportation and Infrastructure Committee of the House of Representatives.

"(d) SECRETARIAL ACTION.—By September 30, 1997, the Secretary shall issue final regulations to determine what standards should apply to fiber drum packaging with a removable head for transportation of liquid hazardous materials (with respect to those liquid haz-

ardous materials transported by such drums pursuant to regulations in effect on September 30, 1991) after September 30, 1997. In issuing such regulations, the Secretary shall give full and substantial consideration to the results of the study conducted in subsection (c).''

Pub. L. 103–311, title I, § 122, Aug. 26, 1994, 108 Stat. 1681, provided that:

''(a) INITIATION OF RULEMAKING PROCEEDING.—Not later than the 60th day following the date of enactment of this Act [Aug. 26, 1994], the Secretary of Transportation shall initiate a rulemaking proceeding to determine whether the requirements of section 5103(b) of title 49, United States Code (relating to regulations for safe transportation), as they pertain to open head fiber drum packaging can be met for the domestic transportation of liquid hazardous materials (with respect to those classifications of liquid hazardous materials transported by such drums pursuant to regulations in effect on September 30, 1991) with standards other than the performance-oriented packaging standards adopted under docket number HM–181 contained in part 178 of title 49, Code of Federal Regulations.

''(b) ISSUANCE OF STANDARDS.—If the Secretary of Transportation determines, as a result of the rulemaking proceeding initiated under subsection (a), that a packaging standard other than the performance-oriented packaging standards referred to in subsection (a) will provide an equal or greater level of safety for the domestic transportation of liquid hazardous materials than would be provided if such performance-oriented packaging standards were in effect, the Secretary shall issue regulations which implement such other standard and which take effect before October 1, 1996.

''(c) COMPLETION OF RULEMAKING PROCEEDING.—The rulemaking proceeding initiated under subsection (a) shall be completed before October 1, 1995.

''(d) LIMITATIONS.—

''(1) The provisions of subsections (a), (b), and (c) shall not apply to packaging for those hazardous materials regulated by the Department of Transportation as poisonous by inhalation under chapter 51 of title 49, United States Code.

''(2) Nothing in this section shall be construed to prohibit the Secretary of Transportation from issuing or enforcing regulations for the international transportation of hazardous materials.''

## § 5103a. Limitation on issuance of hazmat licenses

(a) LIMITATION.—

(1) ISSUANCE OF LICENSES.—A State may not issue to any individual a license to operate a motor vehicle transporting in commerce a hazardous material unless—

(A) ''the Secretary of Homeland Security'';[1] has first determined, upon receipt of a notification under subsection (d)(1)(B), that the individual does not pose a security risk warranting denial of the license; or

(B) the individual holds a valid transportation security card issued under section 70105 of title 46.

(2) RENEWALS INCLUDED.—For the purposes of this section, the term ''issue'', with respect to a license, includes renewal of the license.

(b) HAZARDOUS MATERIALS DESCRIBED.—The limitation in subsection (a) shall apply with respect to any material defined as hazardous material by the Secretary of Transportation for which the Secretary of Transportation requires placarding of a commercial motor vehicle transporting that material in commerce.

(c) RECOMMENDATIONS ON CHEMICAL AND BIOLOGICAL MATERIALS.—The Secretary of Health and Human Services shall recommend to the Secretary of Transportation any chemical or biological material or agent for regulation as a hazardous material under section 5103(a) if the Secretary of Health and Human Services determines that such material or agent poses a significant risk to the health of individuals.

(d) BACKGROUND RECORDS CHECK.—

(1) IN GENERAL.—Upon the request of a State regarding issuance of a license under subsection (a)(1)(A) to an individual, the Attorney General—

(A) shall carry out a background records check regarding the individual; and

(B) upon completing the background records check, shall notify the Secretary of Homeland Security of the completion and results of the background records check.

(2) SCOPE.—A background records check regarding an individual under this subsection shall consist of the following:

(A) A check of the relevant criminal history data bases.

(B) In the case of an alien, a check of the relevant data bases to determine the status of the alien under the immigration laws of the United States.

(C) As appropriate, a check of the relevant international data bases through Interpol-U.S. National Central Bureau or other appropriate means.

(e) REPORTING REQUIREMENT.—Each State shall submit to the Secretary of Homeland Security, at such time and in such manner as the Secretary of Homeland Security may prescribe, the name, address, and such other information as the Secretary of Homeland Security may require, concerning—

(1) each alien to whom the State issues a license described in subsection (a); and

(2) each other individual to whom such a license is issued, as the Secretary of Homeland Security may require.

(f) ALIEN DEFINED.—In this section, the term ''alien'' has the meaning given the term in section 101(a)(3) of the Immigration and Nationality Act.

(g) BACKGROUND CHECKS FOR DRIVERS HAULING HAZARDOUS MATERIALS.—

(1) IN GENERAL.—

(A) EMPLOYER NOTIFICATION.—Not later than 90 days after the date of enactment of this subsection, the Director of the Transportation Security Administration, after receiving comments from interested parties, shall develop and implement a process for notifying hazmat employers designated by an applicant of the results of the applicant's background record check, if—

(i) such notification is appropriate considering the potential security implications; and

(ii) the Director, in a final notification of threat assessment,[2] served on the applicant[2] determines that the applicant does

---

[1] So in original. The quotation marks and semicolon probably should not appear.

[2] So in original. Comma probably should appear after ''applicant''.

tence). "The district courts of the United States shall have jurisdiction, upon petition by the Attorney General" in 45:437(d)(2), and "The United States district court shall . . . upon petition by the Attorney General on behalf of the United States . . . have jurisdiction" in 45:439(a) for clarity and consistency. It is not necessary to restate that the district court has jurisdiction because of 28:1331 and 1345. See also the statement of Senator Prouty in 115 Cong. Rec. 40205 (1969) explaining that similar language in section 110 of S. 1933, 91st Cong., 1st Sess. (the derivative source for 45:439) would grant the Attorney General the power to seek injunctions. Clauses (1)–(3) are substituted for the source provisions to eliminate unnecessary words. In clause (1), the words "subject to the provisions of rules 65(a) and (b) of the Federal Rules of Civil Procedure" in 45:439(a) are omitted as surplus because the Federal Rules of Civil Procedure (28 App. U.S.C.) apply in the district court unless otherwise provided. In clause (2), the words "or an amount agreed on in compromise" are added for clarity.

In subsection (b)(1), the text of 45:439(c) (words before 1st comma) is omitted because it applies only to actions brought by a State authority. See discussion of the cross-reference in the note for section 20113(c) of the revised title. The last sentence is substituted for "in which the individual resides" in 45:438(c) because of the restatement.

In subsection (b)(2), the words "compliance order issued under section 20111(b) of this title" are substituted for "order, or directive" because the latter words are interpreted as referring to "orders directing compliance" in 45:437(a) (2d sentence), restated in section 20111(b).

### Editorial Notes

#### AMENDMENTS

2008—Subsec. (a)(1). Pub. L. 110–432, §309(1), inserted "this part, except for section 20109 of this title, or" after "enforce,".

Subsec. (a)(2). Pub. L. 110–432, §309(2), substituted "21301, 21302, or 21303" for "21301".

Subsec. (a)(3). Pub. L. 110–432, §309(3), (4), substituted "subpoena, request for admissions, request for production of documents or other tangible things, or request for testimony by deposition" for "subpena" and "part." for "chapter."

## § 20113. Enforcement by the States

(a) INJUNCTIVE RELIEF.—If the Secretary of Transportation does not begin a civil action under section 20112 of this title to enjoin the violation of a railroad safety regulation prescribed or order issued by the Secretary not later than 15 days after the date the Secretary receives notice of the violation and a request from a State authority participating in investigative and surveillance activities under section 20105 of this title that the action be brought, the authority may bring a civil action in a district court of the United States to enjoin the violation. This subsection does not apply if the Secretary makes an affirmative written finding that the violation did not occur or that the action is not necessary because of other enforcement action taken by the Secretary related to the violation.

(b) IMPOSITION AND COLLECTION OF CIVIL PENALTIES.—If the Secretary does not impose the applicable civil penalty for a violation of a railroad safety regulation prescribed or order issued by the Secretary not later than 60 days after the date of receiving notice from a State authority participating in investigative and surveillance activities under section 20105 of this title, the

authority may bring a civil action in a district court of the United States to impose and collect the penalty. This paragraph does not apply if the Secretary makes an affirmative written finding that the violation did not occur.

(c) VENUE.—A civil action under this section may be brought in the judicial district in which the violation occurred or the defendant has its principal executive office. However, a State authority may not bring an action under this section outside the State.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 869.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 20113(a) ...... | 45:436(b)(1) (related to authority to bring actions), (2). | Oct. 16, 1970, Pub. L. 91–458, §207(b), (c), 84 Stat. 974; Nov. 2, 1978, Pub. L. 95–574, §8, 92 Stat. 2461; restated Oct. 10, 1980, Pub. L. 96–423, §5, 94 Stat. 1812. |
|  | 45:439(a) (related to actions by States). | Oct. 16, 1970, Pub. L. 91–458, §210(a) (related to actions by States), 84 Stat. 975; Oct. 10, 1980, Pub. L. 96–423, §9(a), 94 Stat. 1814; Nov. 16, 1990, Pub. L. 101–615, §28(f), 104 Stat. 3277. |
| 20113(b) ...... | 45:436(a)(1) (related to authority to bring actions), (2). | Oct. 16, 1970, Pub. L. 91–458, §207(a), 84 Stat. 974; Nov. 2, 1978, Pub. L. 95–574, §8, 92 Stat. 2461; restated Oct. 10, 1980, Pub. L. 96–423, §5, 94 Stat. 1812; Nov. 16, 1990, Pub. L. 101–615, §28(e), 104 Stat. 3277. |
| 20113(c) ...... | 45:436(a)(1) (related to venue), (b)(1) (related to venue), (c). | |
|  | 45:439(c) (related to actions by States). | Oct. 16, 1970, Pub. L. 91–458, 84 Stat. 971, §210(c) (related to actions by States); added Oct. 10, 1980, Pub. L. 96–423, §9(b), 94 Stat. 1815. |

In subsection (a), the language about jurisdiction in 45:439(a) (related to actions by States) is omitted for the reasons explained in the revision note for section 20112(a) of the revised title.

In subsection (b), the word "impose" is substituted for "assess" for consistency. The words "the authority may bring a civil action in an appropriate district court of the United States" are substituted for "agency may apply to the United States district court" for consistency in the revised title and with other titles of the United States Code. The words "included in or made applicable to such rule, regulation, order, or standard" are omitted as surplus.

In subsection (c), the reference to "section 207(d)" in section 210(c) of the Federal Railroad Safety Act of 1970 (Public Law 91–458, 84 Stat. 971), as added by section 9(b) of the Federal Railroad Safety Authorization Act of 1980 (Public Law 96–423, 94 Stat. 1815), is assumed to have been intended as a reference to section 207(c). The Federal Railroad Safety Authorization Act of 1980 was derived from S. 2730, which in turn was derived from H.R. 7104. See 126 Cong. Rec. 26535 (1980). Section 207(d) in an earlier version of H.R. 7104 was redesignated as section 207(c) during the legislative process and no section 207(d) was enacted. See H.R. Rept. No. 96–1025, 96th Cong., 2d Sess., pp. 14, 15 (1980).

## § 20114. Judicial procedures

(a) CRIMINAL CONTEMPT.—In a trial for criminal contempt for violating an injunction or restraining order issued under this chapter, the violation of which is also a violation of this chapter, the defendant may demand a jury trial. The defendant shall be tried as provided in rule

42(b) of the Federal Rules of Criminal Procedure (18 App. U.S.C.).

(b) SUBPENAS FOR WITNESSES.—A subpena for a witness required to attend a district court of the United States in an action brought under this chapter may be served in any judicial district.

(c) REVIEW OF AGENCY ACTION.—Except as provided in section 20104(c) of this title, a proceeding to review a final action of the Secretary of Transportation under this part or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 870.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 20114(a) ...... | 45:439(b). | Oct. 16, 1970. Pub. L. 91–458, §§209(d), 210(1), 84 Stat. 975, 976. |
| 20114(b) ...... | 45:438(d). | |
| 20114(c) ...... | 45:431(f). | Oct. 16, 1970. Pub. L. 91–458, §202(f), 84 Stat. 972; restated Sept. 3, 1992. Pub. L. 102–365, §5(a)(1), 106 Stat. 975. |

In subsection (a), the words "the defendant may demand a jury trial" are substituted for "trial shall be by the court, or, upon demand of the accused, by a jury" to eliminate unnecessary words and for consistency in the revised title.

In subsection (b), the words "may be served in any judicial district" are substituted for "may run into any other district" for clarity.

In subsection (c), the words "a final action of the Secretary" are substituted for "Any final agency action taken by the Secretary" to eliminate unnecessary words. The words "this part or, as applicable to railroad safety, chapter 51 or 57 of this title" are substituted for "this subchapter or under any of the other Federal railroad safety laws, as defined in section 441(e) of this title" because of the restatement. The words "is subject to judicial review as provided in chapter 7 of title 5" are omitted as unnecessary because 5:ch. 7 applies unless otherwise stated. The words "by and in the manner prescribed" are omitted as surplus.

§ 20115. User fees

(a) SCHEDULE OF FEES.—The Secretary of Transportation shall prescribe by regulation a schedule of fees for railroad carriers subject to this chapter. The fees—
    (1) shall cover the costs of carrying out this chapter (except section 20108(a));
    (2) shall be imposed fairly on the railroad carriers, in reasonable relationship to an appropriate combination of criteria such as revenue ton-miles, track miles, passenger miles, or other relevant factors; and
    (3) may not be based on that part of industry revenues attributable to a railroad carrier or class of railroad carriers.

(b) COLLECTION PROCEDURES.—The Secretary shall prescribe procedures to collect the fees. The Secretary may use the services of a department, agency, or instrumentality of the United States Government or of a State or local authority to collect the fees, and may reimburse the department, agency, or instrumentality a reasonable amount for its services.

(c) COLLECTION, DEPOSIT, AND USE.—(1) The Secretary shall impose and collect fees under this section for each fiscal year before the end of the fiscal year.

(2) Fees collected under this section shall be deposited in the general fund of the Treasury as offsetting receipts. The fees may be used, to the extent provided in advance in an appropriation law, only to carry out this chapter.

(3) Fees prescribed under this section shall be imposed in an amount sufficient to pay for the costs of activities under this chapter. However, the total fees received for a fiscal year may not be more than 105 percent of the total amount of the appropriations for the fiscal year for activities to be financed by the fees.

(d) ANNUAL REPORT.—(1) Not later than 90 days after the end of each fiscal year in which fees are collected under this section, the Secretary shall report to Congress on—
    (A) the total amount of fees collected during that fiscal year;
    (B) the impact of the fees on the financial health of the railroad industry and its competitive position relative to each competing mode of transportation; and
    (C) the total cost of Government safety activities for each other competing mode of transportation, including any part of that total cost defrayed by Government user fees.

(2) Not later than 90 days after submitting a report for a fiscal year, the Secretary shall submit to Congress recommendations for corrective legislation if the report includes a finding that—
    (A) there has been an impact from the fees on the financial health of the railroad industry or its competitive position relative to each competing mode of transportation; or
    (B) there is a significant difference in the burden of Government user fees on the railroad industry and other competing modes of transportation.

(e) EXPIRATION.—This section expires on September 30, 1995.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 870.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 20115(a) ...... | 45:447(a)(1), (3). | Oct. 16, 1970. Pub. L. 91–458, 84 Stat. 971, §216; added Nov. 5, 1990, Pub. L. 101–508, §10501(a), 104 Stat. 1388–399. |
| 20115(b) ...... | 45:447(a)(2). | |
| 20115(c) ...... | 45:447(b)–(d). | |
| 20115(d) ...... | 45:447(e). | |
| 20115(e) ...... | 45:447(f). | |

In subsection (a), before clause (1), the words "after notice and comment" are omitted as unnecessary because of 5:553.

In subsection (c), the words "beginning on March 1, 1991" are omitted as obsolete.

§ 20116. Rulemaking process

No rule or order issued by the Secretary under this part shall be effective if it incorporates by reference a code, rule, standard, requirement, or practice issued by an association or other entity that is not an agency of the Federal Government, unless—
    (1) the date on which the code, rule, standard, requirement, or practice was adopted is specifically cited in the rule or order; or
    (2) the code, rule, standard, requirement, or practice has been subject to notice and com-

§ 172.804                                                    **49 CFR Ch. I (10–1–22 Edition)**

(c) The security plan, including the transportation security risk assessment developed in accordance with paragraph (a) of this section, must be in writing and must be retained for as long as it remains in effect. The security plan must be reviewed at least annually and revised and/or updated as necessary to reflect changing circumstances. The most recent version of the security plan, or portions thereof, must be available to the employees who are responsible for implementing it, consistent with personnel security clearance or background investigation restrictions and a demonstrated need to know. When the security plan is updated or revised, all employees responsible for implementing it must be notified and all copies of the plan must be maintained as of the date of the most recent revision.

(d) Each person required to develop and implement a security plan in accordance with this subpart must maintain a copy of the security plan (or an electronic file thereof) that is accessible at, or through, its principal place of business and must make the security plan available upon request, at a reasonable time and location, to an authorized official of the Department of Transportation or the Department of Homeland Security.

[68 FR 14521, Mar. 25, 2003, as amended at 75 FR 10989, Mar. 9, 2010]

### § 172.804  Relationship to other Federal requirements.

To avoid unnecessary duplication of security requirements, security plans that conform to regulations, standards, protocols, or guidelines issued by other Federal agencies, international organizations, or industry organizations may be used to satisfy the requirements in this subpart, provided such security plans address the requirements specified in this subpart.

### § 172.820  Additional planning requirements for transportation by rail.

(a) *General.* Each rail carrier transporting in commerce one or more of the following materials is subject to the additional safety and security planning requirements of this section:

(1) More than 2,268 kg (5,000 lbs.) in a single carload of a Division 1.1, 1.2 or 1.3 explosive;

(2) A quantity of a material poisonous by inhalation in a single bulk packaging;

(3) A highway route-controlled quantity of a Class 7 (radioactive) material, as defined in § 173.403 of this subchapter;

(4) A high-hazard flammable train (HHFT) as defined in § 171.8 of this subchapter; or

(5) A quantity of UN1972 (Methane, refrigerated liquid or Natural gas, refrigerated liquid) when transported in a rail tank car.

(b) Not later than 90 days after the end of each calendar year, a rail carrier must compile commodity data for the previous calendar year for the materials listed in paragraph (a) of this section. The following stipulations apply to data collected:

(1) Commodity data must be collected by route, a line segment or series of line segments as aggregated by the rail carrier. Within the rail carrier selected route, the commodity data must identify the geographic location of the route and the total number of shipments by UN identification number for the materials specified in paragraph (a) of this section.

(i) A rail carrier subject to additional planning requirements of this section based on paragraph (a)(5) of this section that has yet to transport UN 1972, must factor in planned shipments of UN 1972 to the commodity data for use in the paragraph (c) route analysis prior to initial transport of the material.

(ii) [Reserved]

(2) A carrier may compile commodity data, by UN number, for all Class 7 materials transported (instead of only highway route controlled quantities of Class 7 materials) and for all Division 6.1 materials transported (instead of only Division 6.1 poison inhalation hazard materials).

(c) *Rail transportation route analysis.* For each calendar year, a rail carrier must analyze the safety and security risks for the transportation route(s), identified in the commodity data collected as required by paragraph (b) of this section. The route analysis must

458

**ADD-14**

**Pipeline and Haz. Matls. Safety Admin., DOT**    **§ 172.820**

be in writing and include the factors contained in appendix D to this part, as applicable.

(1) The safety and security risks present must be analyzed for the route and railroad facilities along the route. For purposes of this section, railroad facilities are railroad property including, but not limited to, classification and switching yards, storage facilities, and non-private sidings. This term does not include an offeror's facility, private track, private siding, or consignee's facility.

(2) In performing the analysis required by this paragraph, the rail carrier must seek relevant information from state, local, and tribal officials, as appropriate, regarding security risks to high-consequence targets along or in proximity to the route(s) utilized. If a rail carrier is unable to acquire relevant information from state, local, or tribal officials, then it must document that in its analysis. For purposes of this section, a high-consequence target means a property, natural resource, location, area, or other target designated by the Secretary of Homeland Security that is a viable terrorist target of national significance, the attack of which by railroad could result in catastrophic loss of life, significant damage to national security or defense capabilities, or national economic harm.

(d) *Alternative route analysis.* (1) For each calendar year, a rail carrier must identify practicable alternative routes over which it has authority to operate, if an alternative exists, as an alternative route for each of the transportation routes analyzed in accordance with paragraph (c) of this section. The carrier must perform a safety and security risk assessment of the alternative routes for comparison to the route analysis prescribed in paragraph (c) of this section. The alternative route analysis must be in writing and include the criteria in appendix D of this part. When determining practicable alternative routes, the rail carrier must consider the use of interchange agreements with other rail carriers. The written alternative route analysis must also consider:

(i) Safety and security risks presented by use of the alternative route(s);

(ii) Comparison of the safety and security risks of the alternative(s) to the primary rail transportation route, including the risk of a catastrophic release from a shipment traveling along each route;

(iii) Any remediation or mitigation measures implemented on the primary or alternative route(s); and

(iv) Potential economic effects of using the alternative route(s), including but not limited to the economics of the commodity, route, and customer relationship.

(2) In performing the analysis required by this paragraph, the rail carrier should seek relevant information from state, local, and tribal officials, as appropriate, regarding security risks to high-consequence targets along or in proximity to the alternative routes. If a rail carrier determines that it is not appropriate to seek such relevant information, then it must explain its reasoning for that determination in its analysis.

(e) *Route Selection.* A carrier must use the analysis performed as required by paragraphs (c) and (d) of this section to select the route to be used in moving the materials covered by paragraph (a) of this section. The carrier must consider any remediation measures implemented on a route. Using this process, the carrier must at least annually review and select the practicable route posing the least overall safety and security risk. The rail carrier must retain in writing all route review and selection decision documentation and restrict the distribution, disclosure, and availability of information contained in the route analysis to covered persons with a need-to-know, as described in parts 15 and 1520 of this title. This documentation should include, but is not limited to, comparative analyses, charts, graphics or rail system maps.

(f) *Completion of route analysis.* (1) The rail transportation route analysis, alternative route analysis, and route selection process required under paragraphs (c), (d), and (e) of this section must be completed no later than the end of the calendar year following the year to which the analyses apply.

(2) The initial analysis and route selection determinations required under

459

**ADD-15**

§ 172.820                                                49 CFR Ch. I (10–1–22 Edition)

paragraphs (c), (d), and (e) of this section must include a comprehensive review of the entire system. Subsequent analyses and route selection determinations required under paragraphs (c), (d), and (e) of this section must include a comprehensive, system-wide review of all operational changes, infrastructure modifications, traffic adjustments, changes in the nature of high-consequence targets located along, or in proximity to, the route, and any other changes affecting the safety or security of the movements of the materials specified in paragraph (a) of this section that were implemented during the calendar year.

(3) A rail carrier need not perform a rail transportation route analysis, alternative route analysis, or route selection process for any hazardous material other than the materials specified in paragraph (a) of this section.

(g) *Rail carrier point of contact on routing issues.* Each rail carrier must identify a point of contact (including the name, title, phone number and e-mail address) on routing issues involving the movement of materials covered by this section in its security plan and provide this information to:

(1) State and/or regional Fusion Centers that have been established to coordinate with state, local and tribal officials on security issues and which are located within the area encompassed by the rail carrier's rail system; and

(2) State, local, and tribal officials in jurisdictions that may be affected by a rail carrier's routing decisions and who directly contact the railroad to discuss routing decisions.

(h) *Storage, delays in transit, and notification.* With respect to the materials specified in paragraph (a) of this section, each rail carrier must ensure the safety and security plan it develops and implements under this subpart includes all of the following:

(1) A procedure under which the rail carrier must consult with offerors and consignees in order to develop measures for minimizing, to the extent practicable, the duration of any storage of the material incidental to movement (see § 171.8 of this subchapter).

(2) Measures to prevent unauthorized access to the materials during storage or delays in transit.

(3) Measures to mitigate risk to population centers associated with in-transit storage.

(4) Measures to be taken in the event of an escalating threat level for materials stored in transit.

(5) Procedures for notifying the consignee in the event of a significant delay during transportation; such notification must be completed within 48 hours after the carrier has identified the delay and must include a revised delivery schedule. A significant delay is one that compromises the safety or security of the hazardous material or delays the shipment beyond its normal expected or planned shipping time. Notification should be made by a method acceptable to both the rail carrier and consignee.

(i) *Recordkeeping.* (1) Each rail carrier must maintain a copy of the information specified in paragraphs (b), (c), (d), (e), and (f) of this section (or an electronic image thereof) that is accessible at, or through, its principal place of business and must make the record available upon request, at a reasonable time and location, to an authorized official of the Department of Transportation or the Department of Homeland Security. Records must be retained for a minimum of two years.

(2) Each rail carrier must restrict the distribution, disclosure, and availability of information collected or developed in accordance with paragraphs (c), (d), (e), and (f) of this section to covered persons with a need-to-know, as described in parts 15 and 1520 of this title.

(j) *Compliance and enforcement.* If the carrier's route selection documentation and underlying analyses are found to be deficient, the carrier may be required to revise the analyses or make changes in route selection. If DOT finds that a chosen route is not the safest and most secure practicable route available, the FRA Associate Administrator for Safety, in consultation with TSA, may require the use of an alternative route. Prior to making such a determination, FRA and TSA will consult with the Surface Transportation Board (STB) regarding whether the

460

contemplated alternative route(s) would be economically practicable.

[73 FR 20771, Apr. 16, 2008, as amended at 73 FR 72193, Dec. 26, 2008; 76 FR 56314, Sept. 13, 2011; 80 FR 26746, May 8, 2015; 85 FR 45029, July 24, 2020]

### § 172.822 Limitation on actions by states, local governments, and Indian tribes.

A law, order, or other directive of a state, political subdivision of a state, or an Indian tribe that designates, limits, or prohibits the use of a rail line (other than a rail line owned by a state, political subdivision of a state, or an Indian tribe) for the transportation of hazardous materials, including, but not limited to, the materials specified in §172.820(a), is preempted. 49 U.S.C. 5125, 20106.

[73 FR 20772, Apr. 16, 2008]

APPENDIX A TO PART 172—OFFICE OF HAZARDOUS MATERIALS TRANSPORTATION COLOR TOLERANCE CHARTS AND TABLES

The following are Munsell notations and Commission Internationale de L'Eclairage (CIE) coordinates which describe the Office of Hazardous Materials Transportation Label and Placard Color Tolerance Charts in tables 1 and 2, and the CIE coordinates for the color tolerances specified in table 3. Central colors and tolerances described in table 2 approximate those described in table 1 while allowing for differences in production methods and materials used to manufacture labels and placards surfaced with printing inks. Primarily, the color charts based on table 1 are for label or placard colors applied as opaque coatings such as paint, enamel or plastic, whereas color charts based on table 2 are intended for use with labels and placards surfaced only with inks.

For labels printed directly on packaging surfaces, table 3 may be used, although compliance with either table 1 or table 2 is sufficient. However, if visual reference indicates that the colors of labels printed directly on package surfaces are outside the table 1 or 2 tolerances, a spectrophotometer or other instrumentation may be required to insure compliance with table 3.

TABLE 1—SPECIFICATIONS FOR COLOR TOLERANCE CHARTS FOR USE WITH LABELS AND PLACARDS SURFACED WITH PAINT, LACQUER, ENAMEL, PLASTIC, OTHER OPAQUE COATINGS, OR INK [1]

| Color | Munsell notations | CIE data for source C | | |
|---|---|---|---|---|
| | | Y | x | y |
| Red: | | | | |
| Central color | 7.5R 4.0/14 | 12.00 | .5959 | .3269 |
| Orange | 8.5R 4.0/14 | 12.00 | .6037 | .3389 |
| Purple and vivid | 6.0R 4.0/14 | 12.00 | .5869 | .3184 |
| Grayish | 7.5R 4.0/12 | 12.00 | .5603 | .3321 |
| Vivid | 7.5R 4.0/16 | 12.00 | .6260 | .3192 |
| Light | 7.5R 4.5/14 | 15.57 | .5775 | .3320 |
| Dark | 7. 5R 3.5/14 | 09.00 | .6226 | .3141 |
| Orange: | | | | |
| Central color | 5.OYR 6.0/15 | 30.05 | .5510 | .4214 |
| Yellow and Grayish | 6.25YR 6.0/15 | 30.05 | .5452 | .4329 |
| Red and vivid | 3.75YR 6.0/15 | 30.05 | .5552 | .4091 |
| Grayish | 5.OYR 6.0/13 | 30.05 | .5311 | .4154 |
| Vivid | 5.OYR 6.0/16 | 30.05 | .5597 | .4239 |
| Light | 5.OYR 6.5/15 | 36.20 | .5427 | .4206 |
| Dark | 5.OYR 5.5/15 | 24.58 | .5606 | .4218 |
| Yellow: | | | | |
| Central color | 5.OY 8.0/12 | 59.10 | .4562 | .4788 |
| Green | 6.5Y 8.0/12 | 59.10 | .4498 | .4865 |
| Orange and vivid | 3.5Y 8.0/12 | 59.10 | .4632 | .4669 |
| Grayish | 5.OY 8.0/10 | 59.10 | .4376 | .4601 |
| Vivid | 5.OY 8.0/14 | 59.10 | .4899 | .4920 |
| Light | 5.OY 8.5/12 | 68.40 | .4508 | .4754 |
| Dark | 5.OY 7.5/12 | 50.68 | .4620 | .4823 |
| Green: | | | | |
| Central color | 7.5G 4.0/9 | 12.00 | .2111 | .4121 |
| Bluish | 0.5BG 4.0/9 | 12.00 | .1974 | .3809 |
| Green-yellow | 5.0G 4.0/9 | 12.00 | .2237 | .4399 |
| Grayish A | 7.5G 4.0/7 | 12.00 | .2350 | .3922 |
| Grayish B [2] | 7.5G 4.0/6 | 12.00 | .2467 | .3822 |
| Vivid | 7.5G 4.0/11 | 12.00 | .1848 | .4319 |

461

Revision A: September, 99

# Maximizing Safety and Weight
## A White Paper on 263K+ Tank Cars

James H.  Rader
*Federal Railroad Administration*

Jean-Pierre Gagnon
*Transport Canada*

On September 9, 1970, in effort to reduce the risk associated with large-capacity tank cars transporting a hazardous material, the Federal government published a final rule that set the maximum gross rail load (GRL) and capacity for all tank cars constructed on or after November 15, 1971.[1]  The final rule prohibited the construction of any tank car after that date exceeding 263,000-pounds GRL or with a capacity greater than 34,500 gallons.  The preamble to the final rule focused on four essential safety areas that demanded the need for weight and capacity limitations:

- Probability of a tank puncture associated with the linear increase of kinetic energy and mass;
- The increased human health and environmental risk associated with the potential release of greater quantities of the material;
- Weight-related stress failures in track and equipment; and
- The design of the underframe.

During the next two decades, the growing demand for product and improvements in component material and track related structures compelled the railroad industry to develop new GRL standards. On November 21, 1994, the Association of American Railroads issued Circular Letter c- 8287, *Implementation of AAR Standard S-259 for Freight Cars with 286,000 lb., Gross Rail Loads*.  The circular became effective on January 1, 1995.  The S-259 standard outlined the requirements for car components and design load factors.  Under the standard, the design of the car body must be based on a GRL of 286,000-pounds .  Further, standard weight related design loads for 100-ton cars used for fatigue-design criteria must be multiplied by 1.09, with the exception of longitudinal fatigue-design loads.  The standard also established minimum equipment requirements for brakes, bearings, axles, wheels, draft systems, springs, and trucks.  While most tank cars built in the 1990s comply with the AAR S-259 standard, the majority of the tank cars do not have markings (stenciling) to indicate it.  Such tank cars are marked and certified to a GRL of 263,000-pounds.

Recent demands for an increase in GRL have prompted several tank car owners and shippers to ask for an exemption or permit from Federal law.  Larger tank cars benefit owners and shippers through fleet reduction and asset utilization and carriers through reduced handling.  As of today, the United States issued two GRL exemptions (both for 270,000-pounds GRL), and has one exemption pending for approval for 286,000-pounds GRL.  Canada has issued two permits for a  286,000-pounds GRL and one permit for a series of tank cars at a GRL of 270,000-pounds GRL. Transport Canada is also considering two permits for molten sulfur service.  As a note, in the United States tank cars marked to an AAR

---

[1] 35 FR 14216

Maximizing Safety and Weight
REV A: September, 99

specification are not subject to the GRL limitations in 49 CFR 179.13 and such tank cars may operate above 263,000-pounds GRL. For example, shippers of molten sulfur are operating tank cars built to the AAR S-259 standard and having a 286,000-pounds GRL.

The growing interest in increased GRL and the demands for safety have prompted the government to review the historical makings of the Federal rule and to place it in perspective with current technology, materials, and the operating environment. Based on this review and the need to ensure for the optimal mix of safety and weight, it is the opinion of the FRA and Transport Canada that applications for an exemption or permit consider the following safety-related items for both new construction and for existing equipment:

## 1.   Puncture resistance

For any given speed, tank cars exceeding 263,000-pounds GRL have greater kinetic energy than their 263,000-pounds GRL counterparts. This additional energy increases the puncture vulnerability of the tank structure upon impact with another object (broken rail, couplers, and other tank cars and car components). The preamble to the 1971 rule stated that inadequate consideration had been given in current design practice to the selection of material thickness to compensate for the greater kinetic energy levels encountered as tank car weight increases. As train operating speeds increase, this kinetic energy increases exponentially. Based on the above considerations, applicants for an exemption or permit must demonstrate, by a quantifiable engineering analysis, using an industry accepted procedure, that a tank car built above a 263,000-pounds GRL has increased head and shell resistance to puncture relative to a baseline tank car built to 263,000-pounds GRL.[2] Applicants must achieve this by improving the puncture resistance of the baseline tank car such as increasing the head and shell thickness, by using different materials of construction, or by modifying design features.

## 2.   Controlling longitudinal loading

Aside from accidents and incidents that occur from time to time and which damage railroad equipment, there are other types of events that result in high dynamic or quasi-static loads applied through the coupler at the time of coupling, during switching, and during train operation.

Numerous examples of these severe impact events or high-train load events have been identified in correspondence to the AAR or have appeared in Tank Car Committee dockets during the recent years. Most of these events could be categorized as extreme in that sill separation, tank failure, or severe distortion of the tank occurred making the event nearly impossible to miss or hide.

There is also concern about a similar category of such events of slightly lower magnitude which result in stresses to the structure that exceed the design limits, but are not severe enough to produce obvious defects to the structure. The industry needs to develop means to identify these types of events.

In an effort to regulate and control some of the best known factors that contribute to these high-load events, Transport Canada is introducing new requirements as part of its proposed clear language

---

[2] The baseline car is one designed to the minimum tank head and shell thickness authorized for the commodity based on the use of ASTM A516 Grade 70 steel.

2

Maximizing Safety and Weight
REV A: September, 99

regulations that would render illegal relative coupling speeds in excess of 7.5 mph during switching.  If a rail car couples into a tank car or a tank car couples into another railcar at speeds greater than 7.5 mph, a structural integrity inspection of the tank would be required.  A structural integrity inspection would also be called for at lower impact speeds when the ambient temperature is at or below -25 degrees Celsius (-13 degrees Fahrenheit).  Transport Canada chose this speed after extensive research performed in Ottawa involving the determination of peak coupler loads generated from impacts of tank cars of varying mass, speed, and number.

Although speed is not the ultimate criteria in determining the severity of a dynamic event, it is the easiest to measure.  Ideally the load generated by the impact, or in-train dynamics, should be the parameter that "triggers" an alert.

Rather than using speed as a measure for determining the severity of a dynamic event, FRA is considering research to help develop an "overload detection device" as an integral part of a draft gear.  The device would detect dynamic loads near or exceeding the design limits for a tank car.  Much like a "telltale" indicator, an overload detection device would provide objective evidence that a condition exists that requires an investigation into the structural integrity of the tank car.  In addition to FRA's research, the AAR Operating Environment Task Force, operating under the auspices of the Tank Car Committee is exploring the feasibility of instrumenting and continuously monitoring tank cars for the same purpose using accelerometers and/or strain gauges.

Due to the increased number of 286,000-pounds GRL rail cars in service and longer trains, the magnitude of in-train and yard impact loads is likely to increase.  With increasing loads, there are two issues of concern: (1) high-magnitude loads, discussed above, that may result in sudden crack nucleation, rapid crack propagation, or even failure of structurally significant items, such as a high-speed yard impact that results in sill separation; and (2) low-magnitude loads that are associated with crack growth by fatigue.  To address these two issues, applicants must select an optimal cushioning system effective in minimizing the detrimental effects of both types of loads.


3.   Structural-worthiness

Tank car design involves engineering calculations and tests aimed at demonstrating that the tank car can withstand certain specified static, dynamic, and fatigue producing environmental loads without any adverse effect on the structure.  Aside from basic pressure loads (resulting from the pressure of the contents) or weight related loads (such as jacking), there are other specified loads that are independent of the gross weight that must be used with appropriate safety factor to design the tank cars.  These loads, essentially applied through the couplers, were mandated more than a decade ago before the advent of the 286,000-pounds GRL car.  The question then arises as to whether they should be factored up to take into account the increased gross weight.

For our basic reasoning, we start with a given train length and a certain number of rail cars and a certain routing and speed for the train.  Without varying any of the above, we now compare the coupler loads (draft, buff, vertical up and down) generated when running this train with rail cars weighing 263,000-pounds GRL against running this train with rail cars weighing 286,000-pounds GRL.  It would appear reasonable to expect the coupler loads to increase with increasing weight.

3

Maximizing Safety and Weight
REV A: September, 99

The question would then be to determine by what factor these coupler loads increase. Without a study to this effect it was deemed conservative to require that the REPOS loads used for fatigue calculations be factored up in a linear way by a factor corresponding to the gross weight increase, that is 286/263 or 1.09.

Going a step further and for the reasons mentioned above any request for an increase in GRL requires that the applicant addresses the rationale followed for the static coupler horizontal and vertical design loads they used. The applicant should also address the design impact load selected (e.g. 1,250,000 lbs., or other) taking into consideration the type of draft gear on the car.

To verify structural-worthiness, the applicant must provide test evidence demonstrating that the tank car design has been successfully subjected to the representative structural, static, and impact testing prescribed in M-1001, Chapter XI

## 4. Track-worthiness

Tank cars, by design, have relatively high torsional rigidity compared to other types of railcars. This high rigidity combined with a higher GRL warrants the use of so-called "advanced" truck designed to carry the increased load while maintaining improved track-worthiness characteristics. The interaction between the rigid tank car body, higher GRL, and trucks could cause truck warping, undesired large amplitude oscillations such as hunting, and accelerated wear within truck components. The result is a higher potential for derailments. To verify vehicle performance, applicants must provide analytical, and as necessary test evidence, demonstrating that the vehicle characteristics of the tank car body and the suspension are in accordance with AAR M-1001, Chapter XI, Sections 11.7, 11.8, and Appendix A.

## 5. Service equipment

## 5.1 Valves and fittings

A review of the FRA/AAR accident statistics clearly shows that service equipment without protection has a greater likelihood of damage in an accident than those that have protection. As an illustration, the data show that for every 100 Class 111A tank cars without top-fitting protection involved in an accident, 12 release a product through a top fitting. This compares unfavorably to Class 105A tank cars having top-fitting protection where only 2 for every 100 involved in an accident release product. Another way to quantify the benefits of top-fitting protection is through a source distribution of accident-caused releases. A source distribution of accident-caused releases shows that damaged top fittings account for more than 50 percent of the total number of releases, although the amount of lading loss is about 1/3 of that from other sources.

It is without considerable investment then, that the National Transportation Safety Board recommended improvements in fitting design to ensure that closure fittings maintain their integrity in accidents typically survivable by the rail tank.[3] In addition to the Safety Board, the FRA and TC also have voiced their concern with respect to the vulnerability to damage of service equipment in accidents. While not

---

[3] "*Head-on Collision Between Iowa Interstate Railroad Extra 470 West and Extra 406 East with Release of Hazardous Materials near Altoona, Iowa on July 30, 1988*" (NTSB/RAR-89-04).

4

Maximizing Safety and Weight
REV A: September, 99

totally as a result of the government's concern with respect to the frequency of top-fitting damage in accidents and the quantity of product lost, the industry has adopted standards for the protection of top discontinuities (See AAR's Tank Car Manual Section E10.00). As a matter of clarification, while the industry publishes a standard for top-fitting protection, there is no mandate to apply it to any tank car or commodity combination. To reduce the consequences of an accident, applicants for an exemption or permit must demonstrate that all top and bottom discontinuities have adequate protection.

## 5.2 Pressure relief devices

In addition to the vulnerability of top-fittings to damage in an accident and the subsequent release of product, pressure relief devices are also vulnerable to pressure surges and account for a large number of product releases. Over the last decade, Federal and industry research dollars have targeted improvements in the design of and improvements to non-reclosing pressure relief devices (safety vents). Improvements include dampening hydraulic pressure surges to the rupture disc by means of baffles and an increase in the burst pressure of the disc. Despite these improvements, the rupture disc simply remains a fuse that once broken, requires replacement. As an example, during the 1991 through 1996 period, the RSPA/AAR statistics for non-accident releases show 1,713 disc failures.[4]   Recent changes in Federal law that requires a higher-rated burst pressure for the rupture disc and the industry's efforts to require surge baffles and to report incidents through its Non-Accident Release Program have caused a downward trend in the number of such releases. However, any such reduction may not outweigh the benefits derived from the use of a reclosing pressure relief device (safety valve) having a start-to-discharge pressure setting sufficient to prevent it from functioning during a pressure surge from yard impacts and in-train forces.

The potential for railroad employee injury is high if a rupture disc in a non-reclosing pressure relief device fails near the employee. To compound this issue, there is no telltale indicator, other than product splashing out of the tank car, to reveal that a disc has failed. It is probable that a failed disc will not be discovered in transit until an employee witnesses a release of a product, is a victim of a release of product, or sees product on the tank car.

For these reasons, applicants must use reclosing pressure relief devices for any tank car operating above 263,000 pound GRL, unless the applicant can demonstrate that the use of such a device will decrease the level of safety below that afforded by a non-reclosing pressure relief device.

## 6.  Service reliability and maintenance management

Maintenance management of an asset requires car owners to develop a quantitative approach to maintaining the minimum level of performance of each component on a tank car. Knowledge of the environment and the behavior of the structure within the environment, e.g., fatigue, corrosion, wear, is essential to identify appropriate areas of inspection and the inspection method. A basic understanding of the failure mode of a component and the elements that contribute to the failure mode of the component are essential to the preparation of an adequate life-cycle maintenance program. The plan should be seen as a living document intended to be periodically improved and amended based on continuous

---

[4] During the same period, there were 461 occasions where a reclosing pressure relief device functioned.

5

Maximizing Safety and Weight
REV A: September, 99

monitoring and assessment of the results of in-service inspections and other non-routine data and a comparison against expected or predicted performance levels.

Recently, the AAR issued Casualty Prevention Circular CPC-1098, "*Life Cycle Inspection Program*," for public comment that provides guidance on the development of a maintenance program for managing a fleet of tank cars.[5]  The circular requires the development of a manual that identifies the required inspection items, inspection methods, acceptance criteria, and inspection frequencies.  In addition, the circular letter requires written procedures (work instructions) that ensure that the work on the tank car conforms to Federal, industry, and the tank car owner's requirements.

The applicant for an exemption or permit must provide documented evidence that the builder and tank car owner have initiated development of such a manual and a program to analyze inspection results. Before the first renewal of the exemption or permit, the applicant must have completed and filed the manual with the Federal Railroad Administration and Transport Canada.

For more information on reliability, see the following materials:

Handbook of Reliability Engineering and Management, W. G. Ireson, McGraw Hill, 1996;

Reliability-Centered Maintenance, F. S. Nowlan and H. F. Heap, Final Report for Contract MDA 903-75-C-0349, Office of Assistant Secretary of Defense, Washington, D.C., 1978;

Reliability-Centered Maintenance, A. M. Smith, McGraw Hill, 1992;

Reliability-Centered Maintenance, J. Moubray, Industrial Press, 1997;

Reliability in Engineering Design, K.C. Kapur and L. R. Lamberson, John Wiley & Sons, 1977.

Risk-Based Management: A Reliability-Centered Approach, R. B. Jones, Gulf Publishing Company, 1995; and

SAE Standard JA 1011, Reliability-Centered Maintenance

The industry and the government have expended considerable research on DTA to support maintenance management efforts.  Although a DTA is not required to receive an exemption or permit, the applicant should plan to initiate an analysis of the tank car structure in accordance with the guidelines provided by Southwest Research Institute to support the portion of a life-cycle inspection and maintenance program related to the detection of cracks.

## 7.  Maximizing safety and weight

Current industry practice is to design railroad equipment at pre-established GRL criteria.  For most rail equipment, the pre-established threshold provides economies and standardization.  On the other hand, tank cars transport products with varying degrees of hazards, with varying density, and various physical states.  For these reasons, applicants must evaluate the increased GRL of a tank car against the risk posed by the potential quantity and form of the product released.  When evaluating an application for an exemption or permit, the government will compare the level of safety introduced by the proposed increase in GRL against the level of safety provided by the current regulation.

---

[5] See AAR CPC-1098, September 7, 1999.

6

Maximizing Safety and Weight
REV A: September, 99

Any request for an increase in GRL requires the applicant to address and demonstrate that there is at least an equal of safety of transporting more product in a given tank car.  Applicants must show risk minimization by addressing all the elements outlined in this paper.

7