NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 20-1317 (consolidated with Nos. 20-1318, 20-1431, & 21-1009)

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

SIERRA CLUB, et al.,

*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,

*Respondents.*

———————————

On Petition for Review of Final Action of the
Pipeline and Hazardous Materials Safety Administration

———————————

**INITIAL OPENING BRIEF OF STATE PETITIONERS**

———————————

LETITIA JAMES
Attorney General of New York

MICHAEL J. MYERS
Senior Counsel
MAX SHTERNGEL
Assistant Attorney General
BRIAN LUSIGNAN
Assistant Solicitor General
The Capitol
Albany, New York 12224
(518) 776-2382
michael.myers@ag.ny.gov

Attorneys for the State of New York

ANTHONY G. BROWN
Attorney General of Maryland

JOSHUA M. SEGAL
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6446
jsegal@oag.state.md.us

Attorneys for the State of Maryland

October 13, 2023

*(Counsel for additional petitioners listed on signature page)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties

Petitioners

The following parties appear in these cases as petitioners:

Petitioners in Case No. 20-1317, filed August 18, 2020, are the Sierra Club, Center for Biological Diversity, Clean Air Council, Delaware Riverkeeper Network, Environmental Confederation of Southwest Florida, and Mountain Watershed Association. Petitioners in case number 20-1317 have no parent companies and have never issued stock.

Petitioners in Case No. 20-1318, filed August 18, 2020, are the State of Maryland, State of New York, State of California, State of Delaware, District of Columbia, State of Illinois, Commonwealth of Massachusetts, People of the State of Michigan, State of Minnesota, State of New Jersey, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, and State of Washington.

Petitioner in Case Nos. 20-1431 and 21-1009 is the Puyallup Tribe of Indians, a sovereign Indian tribe whose government is recognized by the United States.

<u>Respondents</u>

Respondents are the Pipeline and Hazardous Materials Safety Administration; Tristan Brown, in his official capacity as Administrator of the Pipeline and Hazardous Safety Administration; the United States Department of Transportation; Pete Buttigieg, in his official capacity as Secretary of Transportation; and the United States of America.

## B. Ruling Under Review

Petitioners seek review of a final rule issued by the Pipeline and Hazardous Materials Safety Administration entitled "Hazardous Materials: Liquefied Natural Gas by Rail," published at 85 Fed. Reg. 44,994 (July 24, 2020).

### a. Related Cases

The rule at issue has not been previously reviewed in this or any other court. Petitioners are aware of three additional petitions challenging the same final rule (noted above). *See Sierra Club v. U.S. Department of Transportation*, D.C. Cir. No. 20-1317; *Puyallup Tribe of Indians v. U.S. Department of Transportation*, D.C. Cir. Nos. 20-1431 and 21-1009; and *Damascus v. U.S. Department of Transportation*, D.C. Cir. No. 20-1387. All of the above cases were consolidated with this one. Case No. 20-1387 has been dismissed.

/s/ Joshua M. Segal
Joshua M. Segal

ii

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

STATUTES AND REGULATIONS ...........................................................2

ISSUES PRESENTED FOR REVIEW .......................................................2

STATEMENT OF THE CASE ...................................................................3

    A.    Statutory Background ..............................................................3

    B.    Factual Background .................................................................5

SUMMARY OF ARGUMENT ..................................................................9

STANDING .............................................................................................11

    A.    Proprietary Injury .................................................................11

    B.    Injury to Quasi-Sovereign Interests.....................................11

    C.    Procedural Injury .................................................................12

ARGUMENT ..........................................................................................13

I.    THIS COURT REVIEWS PHMSA'S ACTION FOR WHETHER IT IS
ARBITRARY AND CAPRICIOUS OR CONTRARY TO LAW. ...................13

II.    PHMSA VIOLATED NEPA'S PUBLIC PARTICIPATION REQUIREMENTS BY
ADOPTING A FINAL RULE THAT SIGNIFICANTLY DEPARTED FROM ITS
PROPOSAL. .........................................................................................14

III.    AN EIS WAS REQUIRED TO FULLY ASSESS THE LNG RULE'S
ENVIRONMENTAL IMPACTS. ...............................................................16

IV.    PHMSA FAILED TO TAKE A "HARD LOOK" AT THE LNG RULE'S
IMPACTS ON PUBLIC SAFETY, THE ENVIRONMENT, AND ENVIRONMENTAL
JUSTICE COMMUNITIES, RENDERING ITS FINDING OF NO SIGNIFICANT
IMPACT ARBITRARY AND CAPRICIOUS. ............................................20

(Page 4 of Total)

A.   PHMSA's Analysis of the LNG Rule's Impacts on Public Safety Was Arbitrary and Capricious.............................................................21

1.   There is no "established track record of safety" for shipping large quantities of LNG in 120W tank cars. ..............22

2.   PHMSA ignored the unique hazards of shipping bulk quantities of LNG in dozens of rail cars within a single train. .......................................................................................24

B.   PHMSA Failed to Assess the LNG Rule's Impact on Upstream and Downstream Greenhouse Gas Emissions.....................................26

C.   PHMSA Failed to Assess the LNG Rule's Impact on Environmental Justice Communities....................................................28

CONCLUSION.......................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................35

CERTIFICATE OF SERVICE

DECLARATION PROVIDING ADDITIONAL SUPPORT FOR PETITIONERS' STANDING

ADDENDUM

iv

## TABLE OF AUTHORITIES

Page

### Cases

*Air Alliance Houston v. Environmental Prot. Agency*, 906 F.3d 1049
(D.C. Cir. 2018) ..................................................................11

*Baltimore Gas & Electric v. NRDC*, 462 U.S. 87 (1983).........................................14

*Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961
(9th Cir. 2003)..................................................................15

*Eagle County, Colo. v. Surface Transp. Bd.*, No. 22-1019, 2023 WL 5313815
(D.C. Cir. Aug. 18, 2023) ...................................................26

*EarthReports, Inc. v. FERC*, 828 F.3d 949 (D.C. Cir. 2016) ...............................26

*Environmental Defense Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .........................................................4, 17

*Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) ........27

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) ...........................4, 20

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360  (1989) ...............................14

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...........................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile
Ins. Co.*, 463 U.S. 29 (1983) ...........................................................13

*\*National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075
(D.C. Cir. 2019) ....................................................... 4, 10, 18, 20

*New York v. Nuclear Regulatory Commission*, 681 F.3d 471 (D.C. Cir. 2012)......17

*Oregon Natural Desert Ass'n. v. Rose*, 921 F.3d 1185 (9th Cir. 2019) .................15

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).....................14

*\*Sierra Club v. Federal Energy Regulatory Comm'n*, 867 F.3d 1357
(D.C. Cir. 2017) ......................................................... 13, 26, 28, 29

v

*Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616 (D.C. Cir. 2021) ...................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C. 2017) ...................................................28

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021)............................................ 4, 17, 18, 20, 28, 29

*State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982) ...............................27

*Vecinos para el Beinestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) ...................................................................26

*WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41 (D.D.C. 2019) .........................17

**Statutes**

5 U.S.C. § 706(2)(A).....................................................................13

28 U.S.C. §§ 2341-2351 ...............................................................2

42 U.S.C. § 4332(C) .....................................................................3

49 U.S.C. § 108 ...........................................................................5

49 U.S.C. § 5127(a) ......................................................................2

49 U.S.C. § 20114(c) ....................................................................2

**Regulations**

40 C.F.R. § 1500.1(b) (2019).........................................................14

40 C.F.R. § 1502.9(c)(1)(i) (2019) .................................................15

40 C.F.R. § 1502.16(b) (2019).......................................................26

40 C.F.R. § 1508.9 (2019) .............................................................3

*40 C.F.R. § 1508.27 (2019).......................................................4, 16

40 C.F.R. § 1508.27(b)(2) (2019)................................................4, 16

40 C.F.R. § 1508.27(b)(4) (2019)................................................4, 18

vi

40 C.F.R. § 1508.27(b)(5) (2019) ........................................................4, 17

49 C.F.R. § 1.97(b)(3) ...............................................................................5

## Federal Register

Federal Actions to Address Environmental Justice in Minority Populations
and Low-Income Populations, 59 Fed. Reg. 7,629 (Feb. 16, 1994)..................28

Hazardous Materials: Liquefied Natural Gas by Rail,
84 Fed. Reg. 56,964 (Oct. 24, 2019) ......................................5-7, 10, 15, 18- 20

Hazardous Materials: Liquefied Natural Gas by Rail,
85 Fed. Reg. 44,994 (July 24, 2020)....................1- 4, 7-13, 15-18, 21-24, 26-31

Hazardous Materials: Suspension of HMR Amendments Authorizing
Transportation of Liquefied Natural Gas by Rail,
86 Fed. Reg. (Nov. 8, 2021) ................................................................8

Hazardous Materials: Suspension of HMR Amendments Authorizing
Transportation of Liquefied Natural Gas by Rail,
88 Fed. Reg. (Sept. 1, 2023) ................................................................9

## Miscellaneous

Council on Environmental Quality, *Environmental Justice Guidance Under the
National Environmental Policy Act* (Dec. 10, 1997)..........................................29

*Authorities upon which State Petitioners chiefly rely are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| 120W tank car | DOT113C120W tank car |
| 140W tank car | DOT113C140W tank car |
| Earthjustice Comments | Comments of Earthjustice, PHMSA-2018-0025-0440 |
| EIS | Environmental impact statement |
| J.A. | Joint Appendix |
| LNG | Liquefied natural gas |
| LNG Rule | *Hazardous Materials: Liquefied Natural Gas by Rail*, 85 Fed. Reg. 44,994 (July 24, 2020) |
| PHMSA | The U.S. Pipeline and Hazardous Materials Safety Administration |
| State Comments | Comments of the Attorneys General of Maryland, New York, California, Delaware, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia, PHMSA-2018-0025-0283 |
| Safety Board Comments | Comments of the National Transportation Safety Board, PHMSA-2018-0025-0078 |
| The Proposal | *Hazardous Materials: Liquefied Natural Gas by Rail*, 84 Fed. Reg. 56,964 (proposed Oct. 24, 2019) |

| | |
|---|---|
| Tribe Comments | Comments of the Puyallup Tribe of Indians, PHMSA-2018-0025-0159 |
| W9 tank car | DOT113C120W9 tank car |

ix

## PRELIMINARY STATEMENT

In 2020, the U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued a final rule that authorized the shipment of refrigerated methane, also known as liquefied natural gas (LNG), a hazardous cargo, in untested rail tank cars across our nation's extensive railroad network. *See* Hazardous Materials: Liquefied Natural Gas by Rail, 85 Fed. Reg. 44,994 (July 24, 2020) (the "LNG Rule"). This was a transformative change from previous regulations, which generally prohibited the shipment of LNG in rail tank cars. A coalition of 14 states and the District of Columbia ("the States") sought review of the LNG Rule in this Court.

Under the National Environmental Policy Act (NEPA), PHMSA was required to assess the environmental impacts of the LNG Rule before finalizing it. But rather than prepare an environmental impact statement, which NEPA requires for any federal action with the potential to cause significant environmental impacts, PHMSA prepared an environmental assessment and finding of no significant impact. That decision contravened NEPA and its implementing regulations. Moreover, the environmental assessment that PHMSA did complete was both procedurally and substantively flawed. This court should vacate the LNG Rule as unlawful.

## JURISDICTIONAL STATEMENT

The LNG Rule was signed on June 19, 2020 and published on July 24, 2020. State Petitioners filed their petition for review in this Court on August 18, 2020. This Court has jurisdiction to review the LNG Rule pursuant to 49 U.S.C. §§ 5127(a) and 20114(c) and the Administrative Orders Review Act, 28 U.S.C. §§ 2341-2351, because the petition for review was filed within sixty days after the LNG Rule became final.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the addendum at the end of this brief.

## ISSUES PRESENTED FOR REVIEW

1.    Did PHMSA violate NEPA's public participation requirements by introducing an unforeseeable selected alternative in its final environmental assessment without providing opportunity for public comment on that alternative?

2.    Was PHMSA's failure to prepare an environmental impact statement arbitrary, capricious, and contrary to law, where the LNG Rule presented acute risks to public safety, involved unique unknown hazards, and generated substantial controversy?

3.    Did PHMSA fail to take a hard look at the environmental impacts of allowing LNG to be shipped in rail tank cars, where its final environment assessment

ignored important safety aspects of the LNG Rule, did not consider the Rule's impact on greenhouse gas emissions, and failed to assess the Rule's impact on environmental justice communities?

## STATEMENT OF THE CASE

The States adopt the Statement of the Case set forth in Environmental Petitioners' brief but add the following to emphasize several areas relevant to our argument.

### A.    Statutory Background

Under NEPA, a federal agency must prepare an environmental impact statement ("EIS")—i.e., a "detailed statement" of the action's reasonably foreseeable environmental effects—before undertaking any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Before preparing an EIS, an agency may first prepare an environmental assessment, "a concise public document" that provides the agency's "analysis for determining whether to prepare an [EIS] or a finding of no significant impact" and that should "facilitate preparation of an [EIS] when one is necessary." 40 C.F.R. § 1508.9 (2019).[1]

---

[1] NEPA's implementing regulations have since been amended. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (Jul. 16, 2020) (final rule effective Sept. 14, 2020).

3

However, "if *any* significant environmental impacts might result from the proposed agency action," then the agency must prepare an EIS "*before* agency action is taken." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002)) (emphasis in original).  An environmental assessment "is intended to help an agency decide if an EIS is warranted" in the first place; it "is not meant to replace or substitute for an EIS." *Environmental Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (citation omitted).

The NEPA implementing regulations that were in effect when PHMSA developed the LNG Rule provide that an agency must consider the "context" and "intensity" of the impacts in determining their significance.  40 C.F.R. § 1508.27 (2019).  The regulations specify ten factors that "should be considered" in assessing the "intensity" of an environmental impact; implicating any of the factors may be enough to require an EIS.  *Id.*; *see also National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019).   Among these are "[t]he degree to which the proposed action affects public health or safety"; "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; and "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(2), (4), (5) (2019).

4

### B.     Factual Background

PHMSA is the entity within the Department of Transportation tasked with issuing regulations for the safe transportation of hazardous materials in interstate commerce.  49 U.S.C. § 108; 49 C.F.R. § 1.97(b)(3).

In October 2019, PHMSA published a notice of proposed rulemaking to authorize the shipment of LNG in rail tank cars.  Hazardous Materials: Liquefied Natural Gas by Rail, 84 Fed. Reg. 56,964 (proposed Oct. 24, 2019) ("the Proposal"). The Proposal responded to a 2017 petition from the American Association of Railroads ("the Association"), as well as Executive Order 13868: Promoting Energy Infrastructure and Economic Growth (issued by then-President Trump in April 2019), which directed the Department of Transportation to undertake such a rulemaking within 100 days and to finalize the resulting regulations within thirteen months.  *Id.* at 56,965 & n.1.

 PHMSA proposed authorizing the shipment of LNG in 120W tank cars, which are double-walled tank cars with a 30,000-gallon capacity, designed to transport other refrigerated gases.  *Id*. at 56,966-67 & n.8.  PHMSA claimed that 120W tank cars had a history of safely transporting a different hazardous cargo, cryogenic ethylene, even though only a limited number of such cars had been built or used.  *Id*. at 56,967.  PHMSA did not propose to require any operational controls—i.e., regulatory limits on train operations that are intended to improve

5

safety—relying instead on voluntary compliance with non-binding industry standards. *Id*. at 56,968-69.

The Proposal included a draft environmental assessment and proposed finding of no significant impact. *Id*. at 56,970-75. The draft assessment considered three alternatives. It determined that the first, a "no action" alternative that would have continued to bar LNG from shipment in tank cars, "fail[ed] to comply with" Executive Order 13868 and "would not address" the Association's petition or other stakeholder comments.[2] *Id*. at 56,971. The second alternative would have granted the Association's petition in full by allowing LNG shipments in both 120W and 140W tank cars. *Id*. The draft assessment found that "a complete engineering review" and "more research and supporting data [were] needed" to support using 140W tank cars to transport LNG, and therefore did not further examine that alternative's impacts. *Id*. Third, PHMSA's "proposed action" alternative would have authorized transporting LNG in only 120W tank cars without any further operational controls. *Id*. The Proposal drew significant public concern, including from the State, Environmental, and Tribal Petitioners, the National Transportation Safety Board, and various groups of emergency responders.

---

[2] The referenced stakeholder comments comprised a single comment letter supporting the transport of LNG by rail in response to a general notification of regulatory review of PHMSA's programs. *See* 84 Fed. Reg. at 56,965 n.8.

6

The final LNG Rule sharply departed from the Proposal. Rather than authorize the shipment of LNG in the existing fleet of 120W tank cars, the Rule created an entirely new tank car specification—the W9 tank car—with an increased maximum filling density. 85 Fed. Reg. at 44,994, 44,996. PHMSA specified that the outer shell of the W9 tank car would be one-eighth of an inch thicker than the 120W tank car and made of higher-grade steel. *Id*. at 45,004-05. Importantly, 120W tank cars cannot be retrofitted to meet these requirements, so tank cars will have to be built from scratch to comply with the LNG Rule. *Id.* at 44,996, 45,003. The LNG Rule also prescribed certain operational controls for braking, monitoring, and route analysis based on the number of LNG cars in a train. *See id.* at 44,995.

PHMSA prepared a final environmental assessment to accompany the LNG Rule. That assessment again ruled out the 140W alternative without further analysis. (Final Environmental Assessment 4-6, J.A. XXXX-XXXX.) PHMSA's preferred alternative now included the changes to tank car design and operational controls that would be codified through the LNG Rule. (Final Environmental Assessment 6-9, J.A. XXXX-XXXX.) The final assessment acknowledged the dangers of an LNG derailment but dismissed them as "low probability," given the additional features required by the LNG Rule. (Final Environmental Assessment 22, J.A. XXXX.) It also acknowledged that the LNG Rule would influence the upstream production and downstream use of natural gas but declined to assess those impacts due to "multiple

7

economic and practical unknowns," focusing instead on a comparison of the emission profiles of truck and rail transportation of LNG. (Final Environmental Assessment 35, J.A. XXXX.) PHMSA concluded that the LNG Rule would not have significant environmental impacts and that a full environmental impact statement was therefore unnecessary. (Final Environmental Assessment 62, J.A. XXXX.)

### C.    This Proceeding

The States petitioned for review of the LNG Rule in this Court on August 18, 2020. At PHMSA's request, this Court placed the case in abeyance on March 16, 2021. (Doc. # 1890143.) In November 2021, PHMSA issued a notice of proposed rulemaking to temporarily suspend the LNG Rule. Hazardous Materials: Suspension of HMR Amendments Authorizing Transportation of Liquefied Natural Gas by Rail, 86 Fed. Reg. 61,731 (proposed Nov. 8, 2021).

In May 2023, with PHMSA having yet to finalize the proposed temporary suspension of the LNG Rule, petitioners moved to lift the abeyance. (Doc. # 1999694.) Over PHMSA's objection, this Court lifted the abeyance in July 2023. (Doc. # 2008381.)

In September 2023, PHMSA published a final rule temporarily suspending the LNG Rule until the earlier of June 30, 2025 or the completion of a "rulemaking evaluating potential modifications to requirements governing rail tank car

8

transportation of LNG." Hazardous Materials: Suspension of HMR Amendments Authorizing Transportation of Liquefied Natural Gas by Rail, 88 Fed. Reg. 60,356 (Sept. 1, 2023). The suspension rule recognized that the LNG Rule "could lead to indirect environmental impacts of increased methane emissions released during production, loading and unloading, or at other times during its life cycle." *Id.* at 60,372. It also observed that, due to subsequently completed studies, "[u]ncertainty regarding whether the [LNG Rule] ensures adequate protection of public safety has only increased" *id.* at 60,363, and that suspending the LNG Rule would allow PHMSA to "further consider whether the transportation of LNG could pose disproportionately high or adverse effects on minority and low income communities," *id.* at 60,371.

To date, PHMSA has not proposed any modifications to the LNG Rule itself, much less provided any assurance that such modifications will address the LNG Rule's serious deficiencies. Therefore, as this Court implicitly recognized when it lifted the abeyance, this case is ripe for judicial review.

## SUMMARY OF ARGUMENT

PHMSA violated NEPA's public participation requirements when it modified the proposed LNG Rule to require a novel and untested tank car design whose details were previously unknown to the public. Had the States been able to comment on the use of the new W9 design, they would have raised concerns about whether it carried

9

additional risks, different from the 120W tank cars specified in the Proposal, and the potential to include additional safety features given that all W9 tank cars would have to be built from scratch.

Additionally, PHMSA's decision to prepare an environmental assessment rather than an EIS for the LNG Rule rested on an arbitrary conclusion that the rule did not implicate any of the ten "intensity" factors specified by NEPA's implementing regulations. 40 C.F.R. § 1508.27(b) (2019). But the LNG Rule clearly "affects public health or safety," *id*. § 1508.27(b)(2) (2019), it "involves unique or unknown risks," *id*. § 1508.27(b)(5) (2019), and its effects were "likely to be highly controversial," *id*. § 1508.27(b)(4) (2019). As this Court has noted, "implicating any one of the factors may be sufficient to require development of an EIS." *National Parks Conservation Ass'n,* 916 F.3d at 1082 (citation omitted).

Even if an environmental assessment was appropriate under these circumstances, PHMSA's analysis was arbitrary and capricious, as it failed to take a "hard look" at the LNG Rule's effects on public safety, indirect greenhouse gas emissions, and environmental justice communities. Indeed, PHMSA rushed to finalize the rule on a record lacking safety studies regarding how either LNG or the W9 tank car would act during derailment; arbitrarily dismissed the rule's indirect impacts on greenhouse gas emissions as too complicated; and offered no attempt to

10

assess the composition of the communities along the routes that will carry LNG trains.

## STANDING

State Petitioners have standing to bring this challenge, as the LNG Rule directly threatens their communities and the environment.

### A.    Proprietary Injury

The threat of LNG being shipped by rail in unproven and untested tank cars constitutes an injury-in-fact sufficient to establish standing.  State Petitioners are financially injured by the LNG Rule because they must train personnel to respond to the potentially catastrophic consequences should an LNG train derail in one of our jurisdictions, and to assemble plans and equipment necessary to respond to such incidents.  (Declaration of New York State Fire Administrator James B. Cable dated October 12, 2023 ("Cable Declaration"), ¶¶ 22-32; State Comments 14-15, J.A. XXXX-XXXX.)  Those injuries are directly traceable to the LNG Rule, and a favorable court decision vacating or remanding the Rule will redress those injuries. *See Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059-1060 (D.C. Cir. 2018).

### B.    Injury to Quasi-Sovereign Interests

In addition, State Petitioners face injuries to their quasi-sovereign interests in protecting their natural resources and the health and safety of their residents.  By authorizing the transportation of LNG through the States, without any further review

11

or approval by PHMSA, the LNG Rule removed a regulatory safeguard essential to protecting our residents, resources, and property from this dangerous activity.  (*See* Cable Declaration ¶ 20-21; State Comments 1, J.A. XXXX.)   The LNG Rule increases the risk of a catastrophic accident that could harm public health and the environment.  (*See* Cable Declaration ¶¶ 9-15; State Comments at 6-15, J.A. XXXX-XXXX.)   In addition, the Rule is likely to result in a substantial increase in greenhouse gas emissions from the combustion of LNG, further exacerbating climate change harms that our States are experiencing.  (*See* State Comments 16-17, J.A. XXXX-XXXX.)  Vacating the LNG Rule, or remanding the Rule for the agency to prepare an EIS, would redress those harms.  *See Massachusetts v. EPA*, 549 U.S. 497, 519-20 (2007).

### C.     Procedural Injury

Finally, by failing to provide an opportunity to comment on the significant changes to the LNG Rule, PHMSA deprived State Petitioners of their procedural rights under NEPA.  "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts*, 549 U.S. at 518.  Thus, State Petitioners have established Article III standing.

## ARGUMENT[3]

## I.    THIS COURT REVIEWS PHMSA'S ACTION FOR WHETHER IT IS ARBITRARY AND CAPRICIOUS OR CONTRARY TO LAW.

Challenges to an agency's compliance with NEPA are subject to the standard of review provided by the Administrative Procedure Act (APA). *Sierra Club v. Federal Energy Regulatory Comm'n*, 867 F.3d 1357, 1367 (D.C. Cir. 2017). Under the APA, a "reviewing court shall . . . hold unlawful and set aside" an agency action found contrary to law or arbitrary and capricious. 5 U.S.C. § 706(2)(A). A rule is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations and citation omitted).

In the NEPA context, this standard means that an agency must take a "hard look" at the environmental consequences of its actions. *Sierra Club*, 867 F.3d at 1367. Thus, a court should hold an agency's NEPA analysis "deficient, and the agency action it undergirds [] arbitrary and capricious, if the [analysis] does not contain sufficient discussion of the relevant issues and opposing viewpoints or if it

---

[3] In addition to the arguments below, State Petitioners incorporate by reference Environmental Petitioners' arguments that the LNG Rule was promulgated in violation of the Hazardous Materials Transportation Act's safety requirements and the Administrative Procedure Act's procedural requirements.

13

does not demonstrate reasoned decisionmaking." *Id.* (quotation marks and citation omitted).

## II.    PHMSA   VIOLATED   NEPA'S   PUBLIC   PARTICIPATION REQUIREMENTS BY ADOPTING A FINAL RULE THAT SIGNIFICANTLY DEPARTED FROM ITS PROPOSAL.

Public participation is critical to NEPA's proper operation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Baltimore Gas & Electric v. NRDC*, 462 U.S. 87, 97 (1983) (explaining that NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process"). Because "public scrutiny [is] essential to implementing NEPA," the statute's implementing regulations instruct that "high quality" environmental information must be made available to the public before decisions are made. 40 C.F.R. § 1500.1(b) (2019). An agency conducting an environmental assessment also "shall involve . . . the public, to the extent practicable," *id.* § 1501.4(b) (2019), a duty that includes "[m]ak[ing] diligent efforts to involve the public," *id.* § 1506.6(a) (2019), and "[s]olicit[ing] appropriate information from the public," *id.* § 1506.6(d) (2019). *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA ensures that [an] agency will not act on incomplete information.").

Where a final rule takes an unforeseeable turn from the proposal, NEPA requires an agency to provide additional opportunities for public participation. *Cf.*

40 C.F.R. § 1502.9(c)(1)(i) (2019) (providing that an agency "shall" supplement a draft or final EIS if it "makes substantial changes in the proposed action that are relevant to environmental concerns"). Failure to do so violates NEPA. *See Oregon Natural Desert Ass'n. v. Rose*, 921 F.3d 1185, 1192 (9th Cir. 2019); *Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 970 (9th Cir. 2003).

PHMSA's selection of an entirely new tank car design in the LNG Rule presented just such a substantial change. The Proposal never mentioned the W9 tank car. Indeed, PHMSA provided no notice that it would consider requiring an entirely new tank car that would have to be built from scratch, rather than the existing models discussed in the Proposal. Thus, this is not a case where the ultimately selected alternative was an option of which the public should have been aware. *Cf. Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616, 629-30 (D.C. Cir. 2021) (holding supplemental EIS was not required where the selected alternative was a proposed alternative in the draft EIS). Indeed, PHMSA "eliminated from full consideration" an alternative allowing LNG shipments in 140W tank cars precisely because it lacked sufficient information about those tank cars—reasoning that would apply with even more force to an entirely new design. (Final Environmental Assessment 6, J.A. XXXX.) Consequently, it was impossible to predict that PHMSA would choose a final tank car design that had never been tested or fabricated, and that lacked any safety history.

15

PHMSA was therefore obligated to provide additional opportunities for public comment on the environmental assessment.  Had it done so, State Petitioners would have raised additional concerns about the W9 tank car's increased weight and advocated for a bottom-up review of the car's safety features.

## III.   AN EIS WAS REQUIRED TO FULLY ASSESS THE LNG RULE'S ENVIRONMENTAL IMPACTS.

Whether the effects of an agency action are "significant" and therefore trigger the requirement to prepare an EIS turns on the "intensity" of a project's impacts within the appropriate "context."  40 C.F.R. § 1508.27 (2019).  Here, PHMSA concluded that the LNG Rule triggered none of the intensity factors specified by NEPA's implementing regulations.  (Final Environmental Assessment 57-60, J.A. XXXX-XXXX.)  That conclusion was arbitrary because the LNG Rule squarely implicated three of the factors.

First, the extreme danger inherent in transporting LNG by rail warranted an EIS.  NEPA's regulations instruct that "the degree to which the proposed action affects public health or safety" can indicate that an EIS is necessary.  40 C.F.R. § 1508.27(b)(2) (2019).  In the final environmental assessment, PHMSA admitted that "derailment followed by [tank] failure poses a risk to public safety," but largely dismissed those risks based on "the existing safety history of the DOT-113 tank car." (Final Environmental Assessment 58, J.A. XXXX.)  But the relative infrequency of past derailments does not absolve PHMSA's obligation to prepare an EIS.  *Standing*

16

*Rock Sioux Tribe*, 985 F.3d at 1049-50 ("Under NEPA, an agency must look at both the probabilities of potentially harmful events and the consequences if those events come to pass." (citation omitted)).  The extreme danger posed by the release of even a single carload of LNG is too great to dismiss.[4]  *See id.* ("[T]he government is not in the business of approving . . . facilities that have any material prospect of catastrophic failure.").

Second, the unique and unknown nature of the hazards presented by the LNG Rule independently warranted an EIS.  An EIS is required if the effects of an action are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5) (2019); *see Environmental Defense Ctr.*, 36 F.4th at 880-82 (noting need for EIS when proposed action contains "significant data gaps"); *see also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 83-84 (D.D.C. 2019) (collecting cases).  That was true here.  The LNG Rule approved the shipment of unprecedented quantities of LNG, in untested railcars, with significant uncertainties about how LNG would behave during derailment.  (*See* State Comments 12, J.A. XXXX

---

[4] (*See* State Comments 15, J.A. XXXX (release of single car of LNG would create vapor cloud capable of covering 2.5 million cubic feet); Earthjustice Comments 14, J.A. XXXX (discussing the risk of LNG vapor cloud entering confined space such as sewer or subway tunnel); Tribe Comments 11, J.A. XXXX (same).)

17

(describing missing safety studies).)  In the face of such uncertainty, an EIS was required.  *See Environmental Defense Ctr.*, 36 F.4th at 882.

Third, the substantial controversy generated by the Proposal indicated that an EIS was necessary.  NEPA's implementing regulations instruct that "the degree to which the effects . . . are likely to be highly controversial" indicates whether an EIS must be prepared.  40 C.F.R. § 1508.27(b)(4) (2019).  This Court has clarified that "highly controversial" turns on whether a "substantial dispute exists as to the size, nature, or effect of the major federal action."  *Standing Rock Sioux Tribe*, 985 F.3d at 1042 (internal quotation marks and citation omitted).

In deciding whether an agency action is highly controversial, courts have looked to whether commenters articulated "flaws in the methods or data relied upon by the agency in reaching its conclusions," particularly when those commenters are government entities.  *National Parks Conservation Ass'n*, 916 F.3d at 1083.  Thus, in *National Parks Conservation Association*, this Court found it relevant that the Advisory Council on Historic Preservation, the National Park Service, and the Virginia Department of Historic Resources objected to the methods used for evaluating the impacts of a proposed power line.  *See* 916 F.3d at 1084-85.  And in *Standing Rock Sioux Tribe*, this Court found the construction of a pipeline under a culturally significant waterbody highly controversial based on objections raised by Tribal agencies.  *See* 985 F.3d at 1044.

18

The comments here fit that pattern.  Comments from state governments, emergency responders (International Association of Fire Fighters Comments 4, J.A. XXXX; National Association of State Fire Marshals Comments 1, J.A. XXXX), the Puyallup Tribe (Tribe Comments 9-11, J.A. XXXX-XXXX), and the National Transportation Safety Board (Safety Board Comments 3, J.A. XXXX) all stressed the absence of *any* studies showing that LNG can be safely moved in rail cars.  The States, for example, expressed concern that the Proposal's safety assessment was "based on untested assumptions" and that it "downplay[ed] or overlook[ed] major risks."  (State Comments 7-8, J.A. XXXX-XXXX.)

The National Transportation Safety Board, the independent federal authority that investigates transportation accidents and issues safety recommendations, voiced similar concerns.  The Board stressed that the docket lacked "any data . . . that provide a crashworthiness assessment for the [120W] tank car design."  (Safety Board Comments 3, J.A. XXXX.)  The Board also rejected PHMSA's approach of "relying on data for the accident history of similar hazardous materials transported in the small fleet of [120W] tank cars (as stated in the [Proposal]) or making engineering assumptions based on the performance of pressure tank cars with completely different features and operating parameters."  (Safety Board Comments 3, J.A. XXXX.) That information, the Board continued, "does not provide a statistically significant or valid safety assessment and calls into question how

19

[PHMSA] determined the [120W] tank car is an acceptable package to transport LNG." (Safety Board Comments 3, J.A. XXXX.)

The final environmental assessment failed to resolve these controversies. Rather than grapple with commenters' concerns, PHMSA made a series of modifications to the Proposal and claimed that those changes, along with historical derailment data and a comparison of rail and truck safety, adequately addressed them. (Final Environmental Assessment 39, J.A. XXXX.) But repeating the same assertions to which commenters objected did not resolve the conflict. *See National Parks Conservation Ass'n*, 916 F.3d at 1085-86. Rather, PHMSA should have acknowledged the criticisms around its analysis and proceeded to develop an EIS that resolved these controversies. *See Standing Rock Sioux Tribe*, 985 F.3d at 1043 ("Indeed, an EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain.").

## IV.  PHMSA FAILED TO TAKE A "HARD LOOK" AT THE LNG RULE'S IMPACTS ON PUBLIC SAFETY, THE ENVIRONMENT, AND ENVIRONMENTAL JUSTICE COMMUNITIES, RENDERING ITS FINDING OF NO SIGNIFICANT IMPACT ARBITRARY AND CAPRICIOUS.

Even if an environmental assessment was appropriate under these circumstances, PHMSA's analysis failed to take a "hard look" at the LNG Rule's effects on public safety, indirect greenhouse-gas emissions, and overburdened communities. *See Grand Canyon Trust*, 290 F.3d at 340-341 (stating that finding of

20

no significant impact can be upheld only if an agency has, among other things, "taken a hard look at the problem in preparing the [environmental assessment]"). PHMSA's finding of no significant impact was therefore arbitrary and capricious and should be vacated.

### A.    PHMSA's Analysis of the LNG Rule's Impacts on Public Safety Was Arbitrary and Capricious.

PHMSA's analysis of the LNG Rule's public safety impacts was flawed in multiple ways.  Most fundamentally, PHMSA concluded that the W9 tank car sufficiently reduced the risk of catastrophic accidents without any safety studies to support such claims.  Commenters articulated the need for such testing *before* PHMSA authorized the shipment of LNG in rail tank cars.  (*See, e.g.*, State Comments 12, J.A. XXXX; Safety Board Comments 3, J.A. XXXX; Earthjustice Comments 19, J.A. XXXX; Tribe Comments 2, J.A. XXXX.)  PHMSA disagreed, relying instead on historical data concerning the performance of 120W tank cars transporting a different substance (ethylene) in manifest trains,[5] and the performance of an altogether different type of tank car used to transport ethanol and crude oil. (Final Environmental Assessment 42-45, J.A. XXXX-XXXX.)  As explained below,

---

[5] "A manifest train is made up of mixed rail cars.  A unit train is a train in which all cars carry the same commodity and are shipped from the same origin to the same destination."  (Final Environmental Assessment 24 n.10, J.A. XXXX.)

21

however, the use of historical derailment data in place of actual testing of the W9 tank car did not constitute the "hard look" required by NEPA.

### 1. There is no "established track record of safety" for shipping large quantities of LNG in 120W tank cars.

The regulatory docket brims with PHMSA's statements to the effect that the 120W tank car has "an established track record of safety." 85 Fed. Reg. at 44,994; *see, e.g., id*. at 45,012 ("The safety history of [120W] tank cars is sufficient to draw a conclusion that these tank cars are appropriate for the bulk transportation of LNG."). Indeed, the final environmental assessment asserted that "the safety history of the [120W] tank car" meant that "the risk of a tank car failure and ignition is low." (Final Environmental Assessment 25, J.A. XXXX.)  In fact, not only is derailment data on 120W tank cars scarce—likely because that model has only seen limited commercial use—but the information that PHMSA did provide does not support its conclusion.

PHMSA highlighted two sets of non-W9 derailments in support of the safety of the W9 tank car.  The first included derailments in Kansas and Louisiana.  85 Fed. Reg. at 45,005.   The Kansas derailment involved three cars filled with liquid ethylene.  (Final Environmental Assessment 14-15, J.A. XXXX-XXXX.)  Upon derailing, two of the three cars breached (i.e., spilled their contents) and caught fire. (Final Environmental Assessment 14-15, J.A. XXXX-XXXX.) The third vented gaseous ethylene, which also caught fire.  (Final Environmental Assessment 14-15,

22

J.A. XXXX-XXXX.)  All three cars' contents were lost, and authorities ordered a one-mile evacuation.  (Final Environmental Assessment 14-15, J.A. XXXX-XXXX.) The Louisiana incident involved the derailment of two cars carrying non-flammable liquid argon; both cars breached.  (Final Environmental Assessment 15, J.A. XXXX.)  Thus, in this first set of derailments on which PHMSA relied, four out of five tank cars (i.e., 80%) breached and lost their cargo.

The second set of derailments involved trains carrying ethanol or crude oil in DOT111 and DOT117 tank cars.[6]  PHMSA introduced these examples to show that the W9 car's thicker outer shell would minimize the risk of tank puncture, but the data again does not support that conclusion.  85 Fed. Reg. at 45,006.  In the two accidents involving DOT111 cars, a total of 49 of 52 derailed cars breached.  *Id*.  In the accident involving the thicker-shelled DOT117 cars, 8 of 32 cars breached.  *Id*. While the DOT117 thus fared better by comparison, a significant number of those cars still breached.  PHMSA's experience with thicker-shelled tank cars therefore does not support the conclusion that the W9 car's thicker outer shell will eliminate the risk of derailment-induced punctures. Moreover, breaching even a smaller proportion of LNG cars would significantly threaten public safety due to the unique

---

[6] The DOT111 has a single 7/16-inch-thick shell, while the DOT117 has a single 9/16-inch-thick shell.

hazards of an LNG release, as discussed below.  (*See, e.g.*, State Comments 15, J.A. XXXX.)

> **2.    PHMSA ignored the unique hazards of shipping bulk quantities of LNG in dozens of rail cars within a single train.**

The final environmental assessment repeatedly ignored the unique risks of transporting LNG in blocks of tank cars within a single train.  First, it arbitrarily dismissed the possibility that the extremely low temperatures of escaped LNG could cause neighboring tank cars to fail.  (Final Environmental Assessment 7-8, J.A. XXXX-XXXX.)   The final assessment acknowledged that the stronger steel specified for the outer tank of a W9 tank car "does not maintain the same strength and ductility" when exposed to extremely low temperatures.  (Final Environmental Assessment 7-8, J.A. XXXX-XXXX.)  Still, it concluded that this was not a safety concern because non-cold-resistant steel has been used in existing tank cars to transport ethylene without incident.  (Final Environmental Assessment 7-8, J.A. XXXX-XXXX.)  That conclusion, however, inexplicably focused on the threat of failure from the intrusion of LNG into "the void space between the inner and outer tanks" of a single car and ignored the risk that escaped LNG could compromise neighboring cars. (Final Environmental Assessment 7-8, J.A. XXXX-XXXX.)

That conclusion was even more confounding given PHMSA's acknowledgement that "large spills of the liquid onto metal structures that are not

designed to withstand cryogenic [i.e., extremely low] temperatures can cause embrittlement and fracturing." (Final Environmental Assessment 13, J.A. XXXX.) PHMSA did not explain why the outer shell of an adjacent tank car—which is also made of metal not designed to withstand extremely low temperatures—would not be at risk of embrittlement and fracturing from escaped LNG. (Final Environmental Assessment 13, J.A. XXXX.)

Additionally, the risk is much greater under the LNG Rule than has historically been the case for ethylene because of projected differences in how those commodities are transported. While ethylene is shipped in one to three cars per manifest train, PHMSA expects that dozens of rail cars of LNG will be shipped together in either manifest or unit train configurations. (*See* State Comments 8, J.A. XXXX.)

Second, PHMSA's reasoning for ignoring the risk of a vapor explosion, which can result when a liquid held in a confined space expands into a gas, does not pass muster. PHMSA considered the risk of a vapor explosion during derailment to be highly unlikely under four scenarios involving varying levels of damage to the shells of the tank car. (Final Environmental Assessment 21, J.A. XXXX.) But PHMSA failed to assess how a tank car with intact shells, but damaged or malfunctioning pressure relief valves, would fare during derailment. Those are the conditions where

25

a vapor explosion would be most likely, since the LNG cargo would rapidly expand

without any way of escaping the inner tank.  (State Comments at 3, J.A. XXXX.)

### B.     PHMSA Failed to Assess the LNG Rule's Impact on Upstream and Downstream Greenhouse Gas Emissions.

A reviewing agency must assess both the direct and indirect effects of its

actions.  40 C.F.R. § 1502.16(b) (2019).  Indirect effects are those that "are caused

by the action and are later in time or farther removed in distance, but still reasonably

foreseeable results of the action."  *Id.* § 1508.8(b) (2019).  In the NEPA context, a

matter is reasonably foreseeable if it is "sufficiently likely to occur that a person of

ordinary prudence would take it into account in reaching a decision."  *EarthReports,*

*Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citations omitted).  Thus, this

Court has repeatedly held that the upstream development and downstream use of

natural gas can be indirect effects of agency action.  *See, e.g.*, *Sierra Club*, 867 F.3d

at 1374; *Vecinos para el Beinestar de la Comunidad Costera v. FERC*, 6 F.4th 1321,

1329 (D.C. Cir. 2021); *Eagle County, Colo. v. Surface Transp. Bd.*, No. 22-1019,

2023 WL 5313815, *12-15 (D.C. Cir. Aug. 18, 2023).

Here, PHMSA issued the LNG Rule to spur "development of our Nation's

vast energy resources."  85 Fed. Reg. at 44,998.  The final environmental assessment,

though, did not attempt to quantify the LNG Rule's effects on upstream or

downstream emissions because, according to PHMSA, a series of "unknowns

frustrate meaningful predictions."   (Final Environmental Assessment 35, J.A.

26

XXXX.)  That lack of analysis falls short of the required "hard look" and is yet another reason why the finding of no significant impact is arbitrary and capricious.

Indeed, in circumstances like these, where a nationally applicable rule could have a transformative effect on an aspect of the human environment, it is particularly important that the agency consider its actions' indirect effects.  *See Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) (finding environmental assessment insufficient where agency failed to consider risk of dispersion of genetically modified organisms).  Here, though, PHMSA ignored the LNG Rule's impact on upstream gas development and downstream fuel use because it found that "multiple economic and practical unknowns frustrate meaningful predictions." (Final Environmental Assessment 35, J.A. XXXX.)  Surely an agency cannot throw its hands up and refuse to assess an important and foreseeable impact because it lacks certainty, especially when those same impacts provide the justification for the action in the first place.

It is particularly important that such effects are considered now, because shipping LNG pursuant to the LNG Rule requires no further approval by PHMSA.  As the Ninth Circuit has stated, "the critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur." *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).  Here,

27

there is no later step at which PHMSA could assess the LNG Rule's foreseeable impacts on greenhouse-gas emissions.[7]

### C.    PHMSA Failed to Assess the LNG Rule's Impact on Environmental Justice Communities.

Executive Order 12898 requires federal agencies to consider the effects of their actions on environmental justice communities. Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7,629 (Feb. 16, 1994). To comply with this directive, agencies "should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on [those populations]." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 136 (D.D.C. 2017) (quoting Council on Environmental Quality, *Environmental Justice Guidance Under the National Environmental Policy Act* (Dec. 10, 1997)). This Court reviews an agency's environmental justice analysis to determine whether the agency took a "hard look" at the appropriate issues. *Sierra Club*, 867 F.3d at 1368.

---

[7] PHMSA subsequently acknowledged the LNG Rule's potential impact on upstream and downstream greenhouse gas emissions. *See* discussion above at page 9.

28

*Sierra Club* illustrates what constitutes a "hard look." There, this Court found an agency's analysis of a pipeline's impact on environmental justice communities sufficient because the agency assessed the proposed pipeline's proximity to environmental justice communities and compared such impacts across alternatives. *Id*. at 1369. At the same time, this Court acknowledged that "perhaps [petitioners] would have a stronger claim if the agency had refused entirely to discuss the demographics of the populations that will feel the pipelines' effects, and had justified this refusal by pointing to the limited intensity, extent, and duration of those effects." *Id*.

PHMSA refused to engage in precisely that discussion here. The final environmental assessment conceded that it is "possible" that the "rulemaking will facilitate the transportation of LNG through environmental justice communities." (Final Environmental Assessment 42, J.A. XXXX.) Yet the assessment included no analysis of the composition of communities along rail lines likely to support LNG traffic. Instead, PHMSA opined that the rule may reduce LNG transportation by highway and thereby decrease burdens on environmental justice communities bordering highways. (Final Environmental Assessment 42, J.A. XXXX.) Such analysis falls far short of the "hard look" required and is yet another reason why the court should vacate the LNG Rule. *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d

at 136 (holding Army Corps' NEPA analysis arbitrary and capricious when it ignored impacts on nearby tribe).[8]

## CONCLUSION

The petition for review should be granted and the Court should vacate the LNG Rule.

Dated: October 13, 2023

Respectfully submitted,

LETITIA JAMES
Attorney General of New York

/s/ Michael J. Myers
Michael J. Myers
Senior Counsel
Max Shterngel*
Assistant Attorney General
Brian Lusignan
Assistant Solicitor General
The Capitol
Albany, NY 12224
michael.myers@ag.ny.gov
(518) 776-2382

Attorneys for the State of New York

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Joshua M. Segal[9]
Joshua M. Segal
Assistant Attorney General
Steven J. Goldstein*
Special Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jsegal@oag.state.md.us
(410) 576-6446

Attorneys for the State of Maryland

---

[8] PHMSA subsequently acknowledged the need to further evaluate the LNG Rule's impact on environmental justice communities. *See* discussion above at page 9.

[9] Counsel for the State of Maryland represents that the other parties listed in these signature blocks consent to this filing.

FOR THE STATE OF
CALIFORNIA

ROB BONTA
Attorney General of California


/s/ Kavita Lesser
Edward H. Ochoa*
Senior Assistant Attorney General
Jeremy Brown*
Supervising Deputy Attorney General
Kavita Lesser
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6605
kavita.lesser@doj.ca.gov
ed.ochoa@doj.ca.gov
jeremy.brown@doj.ca.gov

Attorneys for the State of California

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware


/s/ Christian Douglas Wright
Christian Douglas Wright
Director of Impact Litigation
Ralph K. Durstein III*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
christian.wright@delaware.gov
ralph.durstein@delaware.gov

Attorneys for the State of Delaware

31

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

/s/Elizabeth Dubats
Elizabeth Dubats
Jason E. James
Assistant Attorneys General
69 W. Washington St., Suite 1800
Chicago, IL 60602
(773) 590-6794
elizabeth.dubats@ilag.gov
jason.james@ilag.gov

Attorneys for the State of Illinois

FOR THE COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General

/s/ Seth Schofield
Seth Schofield
Senior Appellate Counsel
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
seth.schofield@mass.gov

Attorneys for the Commonwealth of
Massachusetts

FOR THE PEOPLE OF THE STATE
OF MICHIGAN

DANA NESSEL
Attorney General

/s/ Elizabeth Morrisseau
Elizabeth Morrisseau
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

Attorneys for the People of the State of
Michigan

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

/s/ Peter N. Surdo
Peter N. Surdo
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street
Town Square Tower, Suite 1400
Saint Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

Attorneys for the State of Minnesota

32

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General

/s/ Lisa Morelli
Lisa Morelli
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, NJ 08625
(609) 376-2740
lisa.morelli@law.njoag.gov

Attorneys for the State of New Jersey

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

/s/ Paul A. Garrahan
Paul A. Garrahan
Attorney-in-Charge
Steve Novick
Special Assistant Attorney General
Natural Resources Section
General Counsel Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4540
paul.garrahan@doj.state.or.us
steve.novick@doj.state.or.us

Attorneys for the State of Oregon

FOR THE COMMONWEALTH
OF PENNSYLVANIA

MICHELLE A. HENRY
Attorney General

/s/ Ann R. Johnston
Ann R. Johnston
Assistant Chief Deputy Attorney General
Civil Environmental Enforcement Unit
Office of the Attorney General
Strawberry Square
14th Floor
Harrisburg, PA 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

Attorneys for the Commonwealth of
Pennsylvania

FOR THE STATE OF
RHODE ISLAND

PETER F. NERONHA
Attorney General

/s/ Nicholas M. Vaz
Nicholas M. Vaz
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

Attorneys for the State of Rhode Island

33

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General

/s/ Laura B. Murphy
Laura B. Murphy
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3186
Laura.murphy@vermont.gov

Attorneys for the State of Vermont

FOR THE STATE OF
WASHINGTON

ROBERT W. FERGUSON
Attorney General

/s/ Julian H. Beattie
Julian H. Beattie
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
(360) 586-6749
julian.beattie@atg.wa.gov

Attorneys for the State of Washington

FOR THE DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
Attorney General

/s/ Caroline S. Van Zile
Caroline S. Van Zile
Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street N.W., Suite 8100
Washington, D.C. 20001
(202) 724-6609
Caroline.vanzile@dc.gov

Attorneys for the District of Columbia

*Not admitted to the bar of this Court

34

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of the briefing order established in this case, and Federal Rule of Appellate Procedure 32(a)(7)(B), because this brief contains 6,540 words, Environmental Petitioners brief includes 8,990 words, and the Petitioner Tribe's brief includes 10,319 words excluding the parts of the briefs exempted by Rule 32(f).  Thus, petitioners' briefs comprise a total of 25,849 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Joshua M. Segal
Joshua M. Segal

35

## CERTIFICATE OF SERVICE

I certify that, on this 13th day of October, 2023, this Initial Opening Brief of State Petitioners was filed electronically via the Court's CM/ECF system, which will effect service on all counsel of record who are registered CM/ECF users.


<u>/s/ Joshua M. Segal</u>
Joshua M. Segal