No. 20-1317 (consolidated with Nos. 20-1318, 20-1431, & 21-1009)

———————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

SIERRA CLUB, et al.,

*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,

*Respondents.*

———————————

## STATE PETITIONERS' ADDENDUM

# ADDENDUM – TABLE OF CONTENTS

Pages

## Statutes

5 U.S.C. § 706 .................................................................Add. 1

28 U.S.C. §§ 2341-51................................................. Add. 2-7

42 U.S.C. § 4332 ...........................................................Add. 9

49 U.S.C. § 108 ....................................................... Add. 10-12

49 U.S.C. § 5127 ..................................................... Add. 13-14

49 U.S.C. § 20114 ........................................................Add. 15

## Regulations

40 C.F.R. § 1500 (2019) ......................................... Add. 16-20

40 C.F.R. § 1502 (2019) ......................................... Add. 21-28

40 C.F.R. § 1508 (2019) ......................................... Add. 29-33

## Federal Register

Executive Order 12898, Federal Actions to Address
   Environmental Justice in Minority Populations and Low-
   Income Populations, 59 Fed. Reg. 7,629 (Feb. 16, 1994) ................... Add. 34-38

Hazardous Materials: Liquefied Natural Gas by Rail, 84 Fed.
   Reg. 56,964 (Oct. 24, 2019) (Notice of Proposed
   Rulemaking)......................................................... Add. 41-52

Hazardous Materials: Liquefied Natural Gas by Rail, 85 Fed.
   Reg. 44,994 (July 24, 2020) (Final Rule) ........................... Add. 53-89

Hazardous Materials: Suspension of HMR Amendments
   Authorizing Transportation of Liquefied Natural Gas by
   Rail, 86 Fed. Reg. 61,731 (Nov. 8, 2021) (Notice of
   Proposed Rulemaking)...................................................... Add. 90-104

Pages

Hazardous Materials: Suspension of HMR Amendments
    Authorizing Transportation of Liquefied Natural Gas by
    Rail,  88 Fed. Reg. 60,356 (Sept. 1, 2023) (Final Rule).................. Add. 105-124

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit

objection of such party or intervenor, who may prosecute, defend, or continue said action or proceeding unaffected by the action or non-action of the Attorney General therein.

(June 25, 1948, ch. 646, 62 Stat. 970; May 24, 1949, ch. 139, § 116, 63 Stat. 105; Pub. L. 93–584, § 6, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 95–473, § 2(a)(3)(C), Oct. 17, 1978, 92 Stat. 1465; Pub. L. 104–88, title III, § 305(c)(1)(C), (D), Dec. 29, 1995, 109 Stat. 945.)

HISTORICAL AND REVISION NOTES

1948 ACT

Based on title 28, U.S.C., 1940 ed., § 45a (Mar. 3, 1911, ch. 231, §§ 212, 213, 36 Stat. 1150, 1151; Oct. 22, 1913, ch. 32, 38 Stat. 220).

The provision in the second sentence of section 45a of title 28, U.S.C., 1940 ed., authorizing the Attorney General to employ and compensate special attorneys was omitted as covered by sections 503 and 508 [now 543 and 548] of this title. The provision in the same sentence authorizing the court to make rules for the conduct and procedure of actions under this section were omitted as covered by the Federal Rules of Civil Procedure and section 2071 of this title relating to authority of district courts to promulgate local rules of procedure.

The last paragraph of section 45a of title 28, U.S.C., 1940 ed., was omitted as merely repetitive of the language immediately following the first proviso.

Word "action" was substituted for "suit" in conformity with Rule 2 of the Federal Rules of Civil Procedure.

Changes were made in phraseology.

1949 ACT

This section corrects, in section 2323 of title 28, U.S.C., the reference to certain sections in title 49, U.S.C. The provisions which were formerly set out as section 49 of such title 49 are now set out as section 23 of such title.

**Editorial Notes**

AMENDMENTS

1995—Pub. L. 104–88 substituted "Surface Transportation Board" for "Interstate Commerce Commission" and substituted "the Board" for "the Commission" in two places.

1978—Pub. L. 95–473 substituted "enforcement actions and actions to collect civil penalties under subtitle IV of title 49" for "actions under section 20 of the Act of February 4, 1887, as amended (24 Stat. 386; 49 U.S.C. 20), section 23 of the Act of May 16, 1942, as amended (56 Stat. 301; 49 U.S.C. 23), and section 3 of the Act of February 19, 1903, as amended (32 Stat. 848; 49 U.S.C. 43)" in first par.

1975—Pub. L. 93–584 struck out reference to the district courts and the Supreme Court of the United States upon appeal from the district courts as the courts in which the Attorney General can represent the United States in first par.

1949—Act May 24, 1949, substituted "20, 23, and 43" for "20, 43, and 49" in first par.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 1301 of Title 49, Transportation.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–584 not applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission

which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

**[§§ 2324, 2325. Repealed. Pub. L. 93–584, § 7, Jan. 2, 1975, 88 Stat. 1918]**

Section 2324, act June 25, 1948, ch. 646, 62 Stat. 970, related to power of court to restrain or suspend operation of orders of Interstate Commerce Commission pending final hearing and determination of action.

Section 2325, act June 25, 1948, ch. 646, 62 Stat. 970, related to requirement of a three judge district court to hear and determine interlocutory or permanent injunctions restraining enforcement, operation or execution of orders of Interstate Commerce Commission.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF REPEAL

Repeal applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission which are pending when this repeal becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as an Effective Date of 1975 Amendment note under section 2321 of this title.

**CHAPTER 158—ORDERS OF FEDERAL AGENCIES; REVIEW**

Sec.
2341.    Definitions.
2342.    Jurisdiction of court of appeals.
2343.    Venue.
2344.    Review of orders; time; notice; contents of petition; service.
2345.    Prehearing conference.
2346.    Certification of record on review.
2347.    Petitions to review; proceedings.
2348.    Representation in proceeding; intervention.
2349.    Jurisdiction of the proceeding.
2350.    Review in Supreme Court on certiorari or certification.
2351.    Enforcement of orders by district courts.
[2352, 2353. Repealed.]

**Editorial Notes**

AMENDMENTS

1982—Pub. L. 97–164, title I, § 138, Apr. 2, 1982, 96 Stat. 42, struck out item 2353 "Decision of the Plant Variety Protection Office".

1966—Pub. L. 89–773, § 4, Nov. 6, 1966, 80 Stat. 1323, struck out item 2352 "Rules".

**§ 2341. Definitions**

As used in this chapter—

(1) "clerk" means the clerk of the court in which the petition for the review of an order, reviewable under this chapter, is filed;

(2) "petitioner" means the party or parties by whom a petition to review an order, reviewable under this chapter, is filed; and

(3) "agency" means—

(A) the Commission, when the order sought to be reviewed was entered by the Federal Communications Commission, the Federal Maritime Commission, or the Atomic Energy Commission, as the case may be;

(B) the Secretary, when the order was entered by the Secretary of Agriculture or the Secretary of Transportation;

(C) the Administration, when the order was entered by the Maritime Administration;

(D) the Secretary, when the order is under section 812 of the Fair Housing Act; and

(E) the Board, when the order was entered by the Surface Transportation Board.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622; amended Pub. L. 93–584, §3, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 100–430, §11(b), Sept. 13, 1988, 102 Stat. 1635; Pub. L. 102–365, §5(c)(1), Sept. 3, 1992, 106 Stat. 975; Pub. L. 104–88, title III, §305(d)(1)–(4), Dec. 29, 1995, 109 Stat. 945.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1031. | Dec. 29, 1950, ch. 1189, §1, 64 Stat. 1129.<br>Aug. 30, 1954, ch. 1073, §2(a), 68 Stat. 961. |

Subsection (a) of former section 1031 of title 5 is omitted as unnecessary because the term "court of appeals" as used in title 28 means a United States Court of Appeals and no additional definition is necessary.

In paragraph (3), reference to the United States Maritime Commission is omitted because that Commission was abolished by 1950 Reorg. Plan No. 21, §306, eff. May 24, 1950, 64 Stat. 1277. Reference to "Federal Maritime Commission" is substituted for "Federal Maritime Board" on authority of 1961 Reorg. Plan No. 7, eff. Aug. 12, 1961, 75 Stat. 840.

**Editorial Notes**

REFERENCES IN TEXT

Section 812 of the Fair Housing Act, referred to in par. (3)(D), is classified to section 3612 of Title 42, The Public Health and Welfare.

AMENDMENTS

1995—Par. (3)(A). Pub. L. 104–88, §305(d)(1), struck out "the Interstate Commerce Commission," after "Maritime Commission,".

Par. (3)(E). Pub. L. 104–88, §305(d)(2)–(4), added subpar. (E).

1992—Par. (3)(B). Pub. L. 102–365 inserted "or the Secretary of Transportation" after "Secretary of Agriculture".

1988—Par. (3)(D). Pub. L. 100–430 added subpar. (D).

1975—Par. (3). Pub. L. 93–584 inserted reference to the Interstate Commerce Commission.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 1301 of Title 49, Transportation.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–430 effective on the 180th day beginning after Sept. 13, 1988, see section 13(a) of Pub. L. 100–430, set out as a note under section 3601 of Title 42, The Public Health and Welfare.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–584 not applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

TRANSFER OF FUNCTIONS

Atomic Energy Commission abolished and functions transferred by sections 5814 and 5841 of Title 42, The Public Health and Welfare. See also, Transfer of Functions notes set out under those sections.

§ 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of—

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305,[1] 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622; amended Pub. L. 93–584, §4, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 95–454, title II, §206, Oct. 13, 1978, 92 Stat. 1144; Pub. L. 96–454, §8(b)(2), Oct. 15, 1980, 94 Stat. 2021; Pub. L. 97–164, title I, §137, Apr. 2, 1982, 96 Stat. 41; Pub. L. 98–554, title II, §227(a)(4), Oct. 30, 1984, 98 Stat. 2852; Pub. L. 99–336, §5(a), June 19, 1986, 100 Stat. 638; Pub. L. 100–430, §11(a), Sept. 13, 1988, 102 Stat. 1635; Pub. L. 102–365, §5(c)(2), Sept. 3, 1992, 106 Stat. 975; Pub. L. 103–272, §5(h), July 5, 1994, 108 Stat. 1375; Pub. L. 104–88, title III, §305(d)(5)–(8), Dec. 29, 1995, 109 Stat. 945; Pub. L. 104–287, §6(f)(2), Oct. 11, 1996, 110 Stat. 3399; Pub. L. 109–59, title IV, §4125(a), Aug. 10, 2005, 119 Stat. 1738; Pub. L. 109–304, §17(f)(3), Oct. 6, 2006, 120 Stat. 1708.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1032. | Dec. 29, 1950, ch. 1189, §2, 64 Stat. 1129.<br>Aug. 30, 1954, ch. 1073, §2(b), 68 Stat. 961. |

[1] See References in Text note below.

The words "have exclusive jurisdiction" are substituted for "shall have exclusive jurisdiction".

In paragraph (1), the word "by" is substituted for "in accordance with".

In paragraph (3), the word "now" is omitted as unnecessary. The word "under" is substituted for "pursuant to the provisions of". Reference to "Federal Maritime Commission" is substituted for "Federal Maritime Board" on authority of 1961 Reorg. Plan No. 7, eff. Aug. 12, 1961, 75 Stat. 840. Reference to the United States Maritime Commission is omitted because that Commission was abolished by 1950 Reorg. Plan No. 21, §306, eff. May 24, 1951, 64 Stat. 1277, and any existing rights are preserved by technical sections 7 and 8.

#### Editorial Notes

##### References in Text

Section 305 of title 46, referred to in par. (3)(B), was redesignated section 46105 of Title 46, Shipping, by Pub. L. 116–283, div. G, title LVXXXVI, §8605(a)(3), Jan. 1, 2021, 134 Stat. 4765.

Section 812 of the Fair Housing Act, referred to in par. (6), is classified to section 3612 of Title 42, The Public Health and Welfare.

##### Amendments

2006—Par. (3)(A). Pub. L. 109–304, §17(f)(3)(A), substituted "section 50501, 50502, 56101–56104, or 57109 of title 46" for "section 2, 9, 37, or 41 of the Shipping Act, 1916 (46 U.S.C. App. 802, 803, 808, 835, 839, and 841a)".

Par. (3)(B). Pub. L. 109–304, §17(f)(3)(B), added subpar. (B) and struck out former subpar. (B) which read as follows:

"(B) the Federal Maritime Commission issued pursuant to—

"(i) section 19 of the Merchant Marine Act, 1920 (46 U.S.C. App. 876);

"(ii) section 14 or 17 of the Shipping Act of 1984 (46 U.S.C. App. 1713 or 1716); or

"(iii) section 2(d) or 3(d) of the Act of November 6, 1966 (46 U.S.C. App. 817d(d) or 817e(d);".

2005—Par. (3)(A). Pub. L. 109–59 inserted ", subchapter III of chapter 311, chapter 313, or chapter 315" before "of title 49".

1996—Par. (3)(A). Pub. L. 104–287 amended Pub. L. 104–88, §305(d)(6). See 1995 Amendment note below.

1995—Par. (3)(A). Pub. L. 104–88, §305(d)(6), as amended by Pub. L. 104–287, inserted "or pursuant to part B or C of subtitle IV of title 49" before the semicolon.

Pub. L. 104–88, §305(d)(5), substituted "or 41" for "41, or 43".

Par. (3)(B). Pub. L. 104–88, §305(d)(7), redesignated cls. (ii), (iv), and (v) as (i), (ii), and (iii), respectively, and struck out former cls. (i) and (iii) which read as follows:

"(i) section 23, 25, or 43 of the Shipping Act, 1916 (46 U.S.C. App. 822, 824, or 841a);

"(iii) section 2, 3, 4, or 5 of the Intercoastal Shipping Act, 1933 (46 U.S.C. App. 844, 845, 845a, or 845b);".

Par. (5). Pub. L. 104–88, §305(d)(8), added par. (5) and struck out former par. (5) which read as follows: "all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title and all final orders of such Commission made reviewable under section 11901(j)(2) of title 49, United States Code;".

1994—Par. (7). Pub. L. 103–272 substituted "section 20114(c) of title 49" for "section 202(f) of the Federal Railroad Safety Act of 1970".

1992—Par. (7). Pub. L. 102–365, which directed the addition of par. (7) at end, was executed by adding par. (7) after par. (6) and before concluding provisions, to reflect the probable intent of Congress.

1988—Par. (6). Pub. L. 100–430 added par. (6).

1986—Par. (3). Pub. L. 99–336 amended par. (3) generally. Prior to amendment, par. (3) read as follows: "such final orders of the Federal Maritime Commission or the Maritime Administration entered under chapters 23 and 23A of title 46 as are subject to judicial review under section 830 of title 46;".

1984—Par. (5). Pub. L. 98–554 substituted "11901(j)(2)" for "11901(i)(2)".

1982—Pub. L. 97–164 inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "court of appeals" in provisions preceding par. (1), and struck out par. (6) which had given the court of appeals jurisdiction in cases involving all final orders of the Merit Systems Protection Board except as provided for in section 7703(b) of title 5. See section 1295(a)(9) of this title.

1980—Par. (5). Pub. L. 96–454 inserted "and all final orders of such Commission made reviewable under section 11901(i)(2) of title 49, United States Code" after "section 2321 of this title".

1978—Par. (6). Pub. L. 95–454 added par. (6).

1975—Par. (5). Pub. L. 93–584 added par. (5).

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1996 Amendment

Pub. L. 104–287, §6(f), Oct. 11, 1996, 110 Stat. 3399, provided that the amendment made by that section is effective Dec. 29, 1995.

##### Effective Date of 1995 Amendment

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 1301 of Title 49, Transportation.

##### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–430 effective on 180th day beginning after Sept. 13, 1988, see section 13(a) of Pub. L. 100–430, set out as a note under section 3601 of Title 42, The Public Health and Welfare.

##### Effective Date of 1986 Amendment

Pub. L. 99–336, §5(b), June 19, 1986, 100 Stat. 638, provided that: "The amendment made by this section [amending this section] shall apply with respect to any rule, regulation, or final order described in such amendment which is issued on or after the date of the enactment of this Act [June 19, 1986]."

##### Effective Date of 1982 Amendment

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

##### Effective Date of 1978 Amendment

Amendment by Pub. L. 95–454 effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as a note under section 1101 of Title 5, Government Organization and Employees.

##### Effective Date of 1975 Amendment

Amendment by Pub. L. 93–584 not applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

##### Transfer of Functions

Atomic Energy Commission abolished and functions transferred by sections 5814 and 5841 of Title 42, The Public Health and Welfare. See, also, Transfer of Functions notes set out under those sections.

### § 2343. Venue

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1033. | Dec. 29, 1950, ch. 1189, §3, 64 Stat. 1130. |

The section is reorganized for clarity and conciseness. The word "is" is substituted for "shall be". The word "petitioner" is substituted for "party or any of the parties filing the petition for review" in view of the definition of "petitioner" in section 2341 of this title.

### § 2344. Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1034. | Dec. 29, 1950, ch. 1189, §4, 64 Stat. 1130. |

The section is reorganized, with minor changes in phraseology. The words "as prescribed by section 1033 of this title" are omitted as surplusage. The words "of the United States" following "Attorney General" are omitted as unnecessary.

### § 2345. Prehearing conference

The court of appeals may hold a prehearing conference or direct a judge of the court to hold a prehearing conference.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1035. | Dec. 29, 1950, ch. 1189, §5, 64 Stat. 1130. |

### § 2346. Certification of record on review

Unless the proceeding has been terminated on a motion to dismiss the petition, the agency shall file in the office of the clerk the record on review as provided by section 2112 of this title.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 623.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1036. | Dec. 29, 1950, ch. 1189, §6, 64 Stat. 1130. Aug. 28, 1958, Pub. L. 85–791, §31(a), 72 Stat. 951. |

The words "of the court of appeals in which the proceeding is pending" are omitted as unnecessary in view of the definition of "clerk" in section 2341 of this title, and by reason of the exclusive jurisdiction of the court of appeals set forth in section 2342 of this title.

### § 2347. Petitions to review; proceedings

(a) Unless determined on a motion to dismiss, petitions to review orders reviewable under this chapter are heard in the court of appeals on the record of the pleadings, evidence adduced, and proceedings before the agency, when the agency has held a hearing whether or not required to do so by law.

(b) When the agency has not held a hearing before taking the action of which review is sought by the petition, the court of appeals shall determine whether a hearing is required by law. After that determination, the court shall—

(1) remand the proceedings to the agency to hold a hearing, when a hearing is required by law;

(2) pass on the issues presented, when a hearing is not required by law and it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or

(3) transfer the proceedings to a district court for the district in which the petitioner resides or has its principal office for a hearing and determination as if the proceedings were originally initiated in the district court, when a hearing is not required by law and a genuine issue of material fact is presented. The procedure in these cases in the district court is governed by the Federal Rules of Civil Procedure.

(c) If a party to a proceeding to review applies to the court of appeals in which the proceeding is pending for leave to adduce additional evidence and shows to the satisfaction of the court that—

(1) the additional evidence is material; and

(2) there were reasonable grounds for failure to adduce the evidence before the agency;

the court may order the additional evidence and any counterevidence the opposite party desires to offer to be taken by the agency. The agency may modify its findings of fact, or make new findings, by reason of the additional evidence so taken, and may modify or set aside its order, and shall file in the court the additional evidence, the modified findings or new findings, and the modified order or the order setting aside the original order.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 623.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1037. | Dec. 29, 1950, ch. 1189, §7, 64 Stat. 1130. Aug. 28, 1958, Pub. L. 85–791, §31(b), 72 Stat. 951. |

The headnotes of the subsections are omitted as unnecessary and to conform to the style of title 28.

In subsection (a), the words "the petition" following "on a motion to dismiss" are omitted as unnecessary. The word "are" is substituted for "shall be". The words "in fact" following "when the agency has" are omitted as unnecessary.

In subsection (b)(3), the words "United States" preceding "district court" are omitted as unnecessary because the term "district court" as used in title 28 means a United States district court. See section 451 of title 28, United States Code. The words "or any petitioner" are omitted as unnecessary in view of the definition of "petitioner" in section 2341 of this title. In the last sentence, the word "is" is substituted for "shall be".

In subsection (c), the words "applies" and "shows" are substituted for "shall apply" and "shall show", respectively.

**Editorial Notes**

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (b)(3), are set out in the Appendix to this title.

### § 2348. Representation in proceeding; intervention

The Attorney General is responsible for and has control of the interests of the Government in all court proceedings under this chapter. The agency, and any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and as of right, and be represented by counsel in any proceeding to review the order. Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order. The Attorney General may not dispose of or discontinue the proceeding to review over the objection of any party or intervenor, but any intervenor may prosecute, defend, or continue the proceeding unaffected by the action or inaction of the Attorney General.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 623.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1038. | Dec. 29, 1950, ch. 1189, §8, 64 Stat. 1131. |

In the first sentence, the words "is responsible for and has control" are substituted for "shall be responsible for and have charge and control".

In the last sentence, the word "may" is substituted for "shall". The word "aforesaid" following "any party or intervenor" is omitted as unnecessary. The words "any intervenor" and "inaction" are substituted for "said intervenor or intervenors" and "nonaction", respectively.

### § 2349. Jurisdiction of the proceeding

(a) The court of appeals has jurisdiction of the proceeding on the filing and service of a petition to review. The court of appeals in which the record on review is filed, on the filing, has jurisdiction to vacate stay orders or interlocutory injunctions previously granted by any court, and has exclusive jurisdiction to make and enter, on the petition, evidence, and proceedings set forth in the record on review, a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency.

(b) The filing of the petition to review does not of itself stay or suspend the operation of the order of the agency, but the court of appeals in its discretion may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition. When the petitioner makes application for an interlocutory injunction restraining or suspending the enforcement, operation, or execution of, or setting aside, in whole or in part, any order reviewable under this chapter, at least 5 days' notice of the hearing thereon shall be given to the agency and to the Attorney General. In a case in which irreparable damage would otherwise result to the petitioner, the court of appeals may, on hearing, after reasonable notice to the agency and to the Attorney General, order a temporary stay or suspension, in whole or in part, of the operation of the order of the agency for not more than 60 days from the date of the order pending the hearing on the application for the interlocutory injunction, in which case the order of the court of appeals shall contain a specific finding, based on evidence submitted to the court of appeals, and identified by reference thereto, that irreparable damage would result to the petitioner and specifying the nature of the damage. The court of appeals, at the time of hearing the application for an interlocutory injunction, on a like finding, may continue the temporary stay or suspension, in whole or in part, until decision on the application.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 624; amended Pub. L. 98–620, title IV, §402(29)(F), Nov. 8, 1984, 98 Stat. 3359.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1039. | Dec. 29, 1950, ch. 1189, §9, 64 Stat. 1131. Sept. 13, 1961, Pub. L. 87–225, §1, 75 Stat. 497. |

The headnotes of the subsections are omitted as unnecessary and to conform to the style of title 28.

In subsection (a), the words "has jurisdiction" and "has exclusive jurisdiction" are substituted for "shall have jurisdiction" and "shall have exclusive jurisdiction", respectively. The words "previously granted" are substituted for "theretofore granted" as the preferred expression.

In subsection (b), the words "does not" are substituted for "shall not". The words "of the United States" following "Attorney General" are omitted as unnecessary. The words "In a case in which" are substituted for "In cases where". The word "result" is substituted for "ensue". In the fourth sentence, the words "provided for above" following the last word "applica-

tion'' are omitted as unnecessary. In the last sentence, the word ''applies'' is substituted for ''shall apply''.

EDITORIAL NOTES

AMENDMENTS

1984—Subsec. (b). Pub. L. 98–620 struck out provisions that the hearing on an application for an interlocutory injunction be given preference and expedited and heard at the earliest practicable date after the expiration of the notice of hearing on the application, and that on the final hearing of any proceeding to review any order under this chapter, the same requirements as to precedence and expedition was to apply.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620 set out as an Effective Date note under section 1657 of this title.

## § 2350. Review in Supreme Court on certiorari or certification

(a) An order granting or denying an interlocutory injunction under section 2349(b) of this title and a final judgment of the court of appeals in a proceeding to review under this chapter are subject to review by the Supreme Court on a writ of certiorari as provided by section 1254(1) of this title. Application for the writ shall be made within 45 days after entry of the order and within 90 days after entry of the judgment, as the case may be. The United States, the agency, or an aggrieved party may file a petition for a writ of certiorari.

(b) The provisions of section 1254(2) of this title, regarding certification, and of section 2101(f) of this title, regarding stays, also apply to proceedings under this chapter.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 624; amended Pub. L. 100–352, § 5(e), June 27, 1988, 102 Stat. 663.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1040. | Dec. 29, 1950, ch. 1189, § 10, 64 Stat. 1132. |

The words ''of the United States'' following ''Supreme Court'' are omitted as unnecessary because the term ''Supreme Court'' as used in title 28 means the Supreme Court of the United States.

The words ''section 2101(f) of this title'' are substituted for ''section 2101(e) of Title 28'' on authority of the Act of May 24, 1949, ch. 139, § 106(b), 63 Stat. 104, which redesignated subsection (e) of section 2101 as subsection (f).

EDITORIAL NOTES

AMENDMENTS

1988—Subsec. (b). Pub. L. 100–352 substituted ''1254(2)'' for ''1254(3)''.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–352 effective ninety days after June 27, 1988, except that such amendment not to apply to cases pending in Supreme Court on such effective date or affect right to review or manner of review-

ing judgment or decree of court which was entered before such effective date, see section 7 of Pub. L. 100–352, set out as a note under section 1254 of this title.

## § 2351. Enforcement of orders by district courts

The several district courts have jurisdiction specifically to enforce, and to enjoin and restrain any person from violating any order issued under section 193 of title 7.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 624.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................... | 5 U.S.C. 1042. | Dec. 29, 1950, ch. 1189, § 12, 64 Stat. 1132. |

The words ''United States'' preceding ''district court'' are omitted as unnecessary because the term ''district court'' as used in title 28 means a United States district court. See section 451 of title 28, United States Code. The words ''have jurisdiction'' are substituted for ''are vested with jurisdiction''. The words ''heretofore or hereafter'' following ''order'' are omitted as unnecessary and any existing rights and liabilities are preserved by technical sections 7 and 8.

## [§ 2352. Repealed. Pub. L. 89–773, § 4, Nov. 6, 1966, 80 Stat. 1323]

Section, Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 624, directed the several courts of appeals to adopt and promulgate rules, subject to the approval of the Judicial Conference of the United States, governing the practice and procedure, including prehearing conference procedure, in proceedings to review orders under this chapter. See section 2072 of this title.

STATUTORY NOTES AND RELATED SUBSIDIARIES

SAVINGS PROVISION

Pub. L. 89–773, § 4, Nov. 6, 1966, 80 Stat. 1323, provided in part that the repeal of this section shall not operate to invalidate or repeal rules adopted under the authority of this section prior to the enactment of Pub. L. 89–773, which rules shall remain in effect until superseded by rules prescribed under authority of section 2072 of this title as amended by Pub. L. 89–773.

## [§ 2353. Repealed. Pub. L. 97–164, title I, § 138, Apr. 2, 1982, 96 Stat. 42]

Section, added Pub. L. 91–577, title III, § 143(c), Dec. 24, 1970, 84 Stat. 1559, gave the court of appeals nonexclusive jurisdiction to hear appeals under section 71 of the Plant Variety Protection Act (7 U.S.C. 2461). See section 1295(a)(8) of this title.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as an Effective Date of 1982 Amendment note under section 171 of this title.

## CHAPTER 159—INTERPLEADER

Sec.
2361.    Process and procedure.

## § 2361. Process and procedure

In any civil action of interpleader or in the nature of interpleader under section 1335 of this title, a district court may issue its process for all claimants and enter its order restraining

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

"(1) the Department of the Army has issued a permit for the activity; and

"(2) the Army Corps of Engineers has found that the activity has no significant impact."

---

[1] So in original. The period probably should be a semicolon.

### EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

### § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

#### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

### § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

### § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

### § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

### § 4341. Omitted

#### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

### § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attain-

tion, to determine the best practices for meeting the diverse needs throughout the National Airspace System;

(g) establish strong incentives to managers for achieving results; and

(h) formulate and recommend to the Administrator any management, fiscal, or legislative changes necessary for the organization to achieve its performance goals.

SEC. 3. *Aviation Management Advisory Committee.* The Air Traffic Control Subcommittee of the Aviation Management Advisory Committee shall provide, consistent with its responsibilities under Air-21, general oversight to ATO regarding the administration, management, conduct, direction, and supervision of the air traffic control system.

SEC. 4. *Evaluation and Report.* Not later than 5 years after the date of this order, the Aviation Management Advisory Committee shall provide to the Secretary and the Administrator a report on the operation and effectiveness of the ATO, together with any recommendations for management, fiscal, or legislative changes to enable the organization to achieve its goals.

SEC. 5. *Definitions.* The term "air traffic control system" has the same meaning as the term defined by section 40102(a)(42) [now 40102(a)(47)] of title 49, United States Code.

SEC. 6. *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it, create any right to administrative or judicial review, or any right, whether substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

DEFINITIONS FOR TITLE II OF PUB. L. 104–264

Pub. L. 104–264, title II, § 202, Oct. 9, 1996, 110 Stat. 3227, provided that: "In this title [see Effective Date of 1996 Amendment note set out above], the following definitions apply:

"(1) ADMINISTRATION.—The term 'Administration' means the Federal Aviation Administration.

"(2) ADMINISTRATOR.—The term 'Administrator' means the Administrator of the Federal Aviation Administration.

"(3) SECRETARY.—The term 'Secretary' means the Secretary of Transportation."

## § 107. Federal Transit Administration

(a) The Federal Transit Administration is an administration in the Department of Transportation.

(b) The head of the Administration is the Administrator who is appointed by the President, by and with the advice and consent of the Senate. The Administrator reports directly to the Secretary of Transportation.

(c) The Administrator shall carry out duties and powers prescribed by the Secretary.

(Pub. L. 97–449, §1(b), Jan. 12, 1983, 96 Stat. 2417; Pub. L. 102–240, title III, §3004(c)(1), (2), Dec. 18, 1991, 105 Stat. 2088.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 107 .............. | 49:1608 (note). | Reorg. Plan No. 2 of 1968, eff. July 1, 1968, §3, 82 Stat. 1369. |

In subsection (b), the words "and shall be compensated at the rate now or hereafter provided for Level III of the Executive Schedule Pay Rates (5 U.S.C. 5314)" are omitted as surplus because of 5:5314.

AMENDMENTS

1991—Pub. L. 102–240 substituted "Federal Transit Administration" for "Urban Mass Transportation Administration" in section catchline and subsec. (a).

CHANGE OF NAME

Pub. L. 102–240, title III, §3004(a), (b), Dec. 18, 1991, 105 Stat. 2088, provided that:

"(a) REDESIGNATION OF UMTA.—The Urban Mass Transportation Administration of the Department of Transportation shall be known and designated as the 'Federal Transit Administration'.

"(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the Urban Mass Transportation Administration shall be deemed to be a reference to the 'Federal Transit Administration'."

## § 108. Pipeline and Hazardous Materials Safety Administration

(a) IN GENERAL.—The Pipeline and Hazardous Materials Safety Administration shall be an administration in the Department of Transportation.

(b) SAFETY AS HIGHEST PRIORITY.—In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in pipeline transportation and hazardous materials transportation.

(c) ADMINISTRATOR.—The head of the Administration shall be the Administrator who shall be appointed by the President, by and with the advice and consent of the Senate, and shall be an individual with professional experience in pipeline safety, hazardous materials safety, or other transportation safety. The Administrator shall report directly to the Secretary of Transportation.

(d) DEPUTY ADMINISTRATOR.—The Administration shall have a Deputy Administrator who shall be appointed by the Secretary. The Deputy Administrator shall carry out duties and powers prescribed by the Administrator.

(e) CHIEF SAFETY OFFICER.—The Administration shall have an Assistant Administrator for Pipeline and Hazardous Materials Safety appointed in the competitive service by the Secretary. The Assistant Administrator shall be the Chief Safety Officer of the Administration. The Assistant Administrator shall carry out the duties and powers prescribed by the Administrator.

(f) DUTIES AND POWERS OF THE ADMINISTRATOR.—The Administrator shall carry out—

(1) duties and powers related to pipeline and hazardous materials transportation and safety vested in the Secretary by chapters 51, 57, 61, 601, and 603; and

(2) other duties and powers prescribed by the Secretary.

(g) LIMITATION.—A duty or power specified in subsection (f)(1) may be transferred to another part of the Department of Transportation or another government entity only if specifically provided by law.

(Pub. L. 97–449, §1(b), Jan. 12, 1983, 96 Stat. 2417; Pub. L. 103–272, §4(j)(4), July 5, 1994, 108 Stat. 1365; Pub. L. 108–426, §2(a), Nov. 30, 2004, 118 Stat. 2423.)

HISTORICAL AND REVISION NOTES
PUB. L. 97–449

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 108(a) ........ | 49:1655(b)(1), (2). | Oct. 15, 1966, Pub. L. 89–670, §§3(e)(3) (related to USCG), 6(b)(1), (2), 80 Stat. 932, 938. |
| 108(b) ........ | 49:1652(e)(3) (related to USCG). | |

Subsection (a) reflects the transfer of the Coast Guard to the Department of Transportation as provided by the source provisions and 14:1. The words "Except when operating as a service of the Navy" are substituted for 49:1655(b)(2) because of 14:3. The words "The Secretary of Transportation exercises . . . vested in the Secretary of the Treasury . . . immediately before April 1, 1967" are substituted for "and there are hereby transferred to and vested in the Secretary . . . of the Secretary of the Treasury" to reflect the transfer of duties and powers to the Secretary of Transportation on April 1, 1967, the effective date of the Department of Transportation Act (Pub. L. 89–670, 80 Stat. 931).

In subsection (b), the first sentence is included to provide the name of the officer in charge of the Coast Guard, as reflected in 14:44. In the 2d sentence, the words "carrying out the duties and powers specified by law" are substituted for "such functions, powers, and duties as are specified in this chapter to be carried out", and the words "carry out duties and powers prescribed" are substituted for "carry out such additional functions, powers, and duties as", for consistency.

PUB. L. 103–272

Section 4(j)(4) amends 49:108(a) to reflect the intent of 49 App.:1655(b)(2), on which 49:108(a) was based.

AMENDMENTS

2004—Pub. L. 108–426 amended section catchline and text generally, substituting provisions relating to Pipeline and Hazardous Materials Safety Administration for provisions relating to Coast Guard.

1994—Subsec. (a). Pub. L. 103–272 designated existing provisions as par. (1), substituted "The Coast Guard" for "Except when operating as a service in the Navy, the Coast Guard", and added par. (2).

SAVINGS PROVISIONS

Pub. L. 108–426, §5, Nov. 30, 2004, 118 Stat. 2426, as amended by Pub. L. 110–244, title III, §302(h), June 6, 2008, 122 Stat. 1618, provided that:

"(a) TRANSFER OF ASSETS AND PERSONNEL.—Personnel, property, and records employed, used, held, available, or to be made available in connection with functions transferred within the Department of Transportation by this Act [see Short Title of 2004 Amendment note set out under section 101 of this title] shall be transferred for use in connection with the functions transferred, and unexpended balances of appropriations, allocations, and other funds (including funds of any predecessor entity) shall also be transferred accordingly.

"(b) LEGAL DOCUMENTS.—All orders (including delegations by the Secretary of Transportation), determinations, rules, regulations, permits, grants, loans, contracts, settlements, agreements, certificates, licenses, and privileges—

"(1) that have been issued, made, granted, or allowed to become effective by any officer or employee, or any other Government official, or by a court of competent jurisdiction, in the performance of any function that is transferred by this Act; and

"(2) that are in effect on the effective date of such transfer (or become effective after such date pursuant to their terms as in effect on such effective date),

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the Department, any other

authorized official, a court of competent jurisdiction, or operation of law.

"(c) PROCEEDINGS.—The provisions of this Act shall not affect any proceedings, including administrative enforcement actions, pending before this Act takes effect, insofar as those functions are transferred by this Act; but such proceedings, to the extent that they relate to functions so transferred, shall proceed in accordance with applicable law and regulations. Nothing in this subsection shall be deemed to prohibit the conclusion or modification of any proceeding described in this subsection under the same terms and conditions and to the same extent that such proceeding could have been concluded or modified if this Act had not been enacted. The Secretary of Transportation is authorized to provide for the orderly transfer of pending proceedings.

"(d) SUITS.—

"(1) IN GENERAL.—This Act shall not affect suits commenced before the date of enactment of this Act [Nov. 30, 2004], except as provided in paragraphs (2) and (3). In all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted.

"(2) SUITS BY OR AGAINST DEPARTMENT.—Any suit by or against the Department begun before the date of enactment of this Act, shall proceed in accordance with applicable law and regulations, insofar as it involves a function retained and transferred under this Act.

"(3) PROCEDURES FOR REMANDED CASES.—If the court in a suit described in paragraph (1) remands a case, subsequent proceedings related to such case shall proceed under procedures that are in accordance with applicable law and regulations as in effect at the time of such subsequent proceedings.

"(e) CONTINUANCE OF ACTIONS AGAINST OFFICERS.—No suit, action, or other proceeding commenced by or against any officer in his or her official capacity shall abate by reason of the enactment of this Act.

"(f) EXERCISE OF AUTHORITIES.—An officer or employee of the Department, for purposes of performing a function transferred by this Act, may exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date of the transfer of the function by this Act.

"(g) REFERENCES.—A reference relating to an agency, officer, or employee affected by this Act in any Federal law, Executive order, rule, regulation, or delegation of authority, or in any document pertaining to an officer or employee, is deemed to refer, as appropriate, to the agency, officer, or employee who succeeds to the functions transferred by this Act.

"(h) DEFINITION.—In this section, the term 'this Act' includes the amendments made by this Act."

WORKFORCE MANAGEMENT

Pub. L. 114–183, §9, June 22, 2016, 130 Stat. 520, provided that:

"(a) REVIEW.—Not later than 1 year after the date of the enactment of this Act [June 22, 2016], the Inspector General of the Department of Transportation shall submit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate, a review of Pipeline and Hazardous Materials Safety Administration staff resource management, including—

"(1) geographic allocation plans, hiring and time-to-hire challenges, and expected retirement rates and recruitment and retention strategies;

"(2) an identification and description of any previous periods of macroeconomic and pipeline industry conditions under which the Pipeline and Hazardous Materials Safety Administration has encountered difficulty in filling vacancies, and the degree to which special hiring authorities, including direct hiring authority authorized by the Office of Personnel Management, could have ameliorated such difficulty; and

''(3) recommendations to address hiring challenges, training needs, and any other identified staff resource challenges.

''(b) DIRECT HIRING.—Upon identification of a period described in subsection (a)(2), the Administrator of the Pipeline and Hazardous Materials Safety Administration may apply to the Office of Personnel Management for the authority to appoint qualified candidates to any position relating to pipeline safety, as determined by the Administrator, without regard to sections 3309 through 3319 of title 5, United States Code.

''(c) SAVINGS CLAUSE.—Nothing in this section shall preclude the Administrator of the Pipeline and Hazardous Materials Safety Administration from applying to the Office of Personnel Management for the authority described in subsection (b) prior to the completion of the report required under subsection (a).''

TRANSFER OF DUTIES AND POWERS OF RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

Pub. L. 108–426, §2(b), Nov. 30, 2004, 118 Stat. 2424, provided that: ''The authority of the Research and Special Programs Administration exercised under chapters 51, 57, 61, 601, and 603 of title 49, United States Code, is transferred to the Administrator of the Pipeline and Hazardous Materials Safety Administration.''

For transfer of authority of the Research and Special Programs Administration, other than authority exercised under chapters 51, 57, 61, 601, and 603 of this title, to the Administrator of the Research and Innovative Technology Administration, see section 4(b) of Pub. L. 108–426, set out as a note under former section 112 of this title.

Pub. L. 108–426, §7, Nov. 30, 2004, 118 Stat. 2428, provided that: ''The Secretary shall provide for the orderly transfer of duties and powers under this Act [see Short Title of 2004 Amendment note set out under section 101 of this title], including the amendments made by this Act, as soon as practicable but not later than 90 days after the date of enactment of this Act [Nov. 30, 2004].''

REPORTS

Pub. L. 108–426, §6, Nov. 30, 2004, 118 Stat. 2428, provided that:

''(a) REPORTS BY THE INSPECTOR GENERAL.—Not later than 30 days after the date of enactment of this Act [Nov. 30, 2004], the Inspector General of the Department of Transportation shall submit to the Secretary of Transportation and the Administrator of the Pipeline and Hazardous Materials Safety Administration a report containing the following:

''(1) A list of each statutory mandate regarding pipeline safety or hazardous materials safety that has not been implemented.

''(2) A list of each open safety recommendation made by the National Transportation Safety Board or the Inspector General regarding pipeline safety or hazardous materials safety.

''(b) REPORTS BY THE SECRETARY.—

''(1) STATUTORY MANDATES.—Not later than 90 days after the date of enactment of this Act, and every 180 days thereafter until each of the mandates referred to in subsection (a)(1) has been implemented, the Secretary shall transmit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on the specific actions taken to implement such mandates.

''(2) NTSB AND INSPECTOR GENERAL RECOMMENDATIONS.—Not later than January 1st of each year, the Secretary shall transmit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report containing each recommendation referred to in subsection (a)(2) and a copy of the Department of Transportation response to each such recommendation.''

## § 109. Maritime Administration

(a) ORGANIZATION AND MISSION.—The Maritime Administration is an administration in the Department of Transportation. The mission of the Maritime Administration is to foster, promote, and develop the merchant maritime industry of the United States.

(b) MARITIME ADMINISTRATOR.—The head of the Maritime Administration is the Maritime Administrator, who is appointed by the President by and with the advice and consent of the Senate. The Administrator shall report directly to the Secretary of Transportation and carry out the duties prescribed by the Secretary.

(c) DEPUTY MARITIME ADMINISTRATOR.—The Maritime Administration shall have a Deputy Maritime Administrator, who is appointed in the competitive service by the Secretary, after consultation with the Administrator. The Deputy Administrator shall carry out the duties prescribed by the Administrator. The Deputy Administrator shall be Acting Administrator during the absence or disability of the Administrator and, unless the Secretary designates another individual, during a vacancy in the office of Administrator.

(d) DUTIES AND POWERS VESTED IN SECRETARY.—All duties and powers of the Maritime Administration are vested in the Secretary.

(e) REGIONAL OFFICES.—The Maritime Administration shall have regional offices for the Atlantic, Gulf, Great Lakes, and Pacific port ranges, and may have other regional offices as necessary. The Secretary shall appoint a qualified individual as Director of each regional office. The Secretary shall carry out appropriate activities and programs of the Maritime Administration through the regional offices.

(f) INTERAGENCY AND INDUSTRY RELATIONS.—The Secretary shall establish and maintain liaison with other agencies, and with representative trade organizations throughout the United States, concerned with the transportation of commodities by water in the export and import foreign commerce of the United States, for the purpose of securing preference to vessels of the United States for the transportation of those commodities.

(g) DETAILING OFFICERS FROM ARMED FORCES.—To assist the Secretary in carrying out duties and powers relating to the Maritime Administration, not more than five officers of the armed forces may be detailed to the Secretary at any one time, in addition to details authorized by any other law. During the period of a detail, the Secretary shall pay the officer an amount that, when added to the officer's pay and allowances as an officer in the armed forces, makes the officer's total pay and allowances equal to the amount that would be paid to an individual performing work the Secretary considers to be of similar importance, difficulty, and responsibility as that performed by the officer during the detail.

(h) CONTRACTS, COOPERATIVE AGREEMENTS, AND AUDITS.—

(1) CONTRACTS AND COOPERATIVE AGREEMENTS.—In the same manner that a private corporation may make a contract within the scope of its authority under its charter, the

Secretary prescribes after November 16, 1990. However, the''.

Subsec. (d)(1). Pub. L. 109–59, §7122(b), inserted ''or section 5119(e)'' before period at end of first sentence.

Subsec. (e). Pub. L. 109–59, §7122(c), inserted ''or section 5119(b)'' before period at end of first sentence.

Subsec. (f). Pub. L. 109–59, §7123(a), redesignated subsec. (g) as (f), realigned margins, and struck out heading and text of former subsec. (f). Text read as follows: ''A party to a proceeding under subsection (d) or (e) of this section may bring a civil action in an appropriate district court of the United States for judicial review of the decision of the Secretary not later than 60 days after the decision becomes final.''

Subsec. (g). Pub. L. 109–59, §7123(a)(2), redesignated subsec. (h) as (g). Former subsec. (g) redesignated (f).

Subsecs. (h), (i). Pub. L. 109–59, §7123(a)(2), redesignated subsecs. (h) and (i) as (g) and (h), respectively.

Pub. L. 109–59, §7122(d), added subsecs. (h) and (i).

2002—Subsecs. (a), (b)(1). Pub. L. 107–296 substituted ''chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security'' for ''chapter or a regulation prescribed under this chapter'' wherever appearing.

1994—Subsec. (a), (b)(1). Pub. L. 103–429 inserted ''and unless authorized by another law of the United States'' after ''section'' in introductory provisions.

Subsec. (b)(1)(E). Pub. L. 103–311, §117(a)(2), substituted ''a packaging or a'' for ''a package or''.

Subsec. (d). Pub. L. 103–311, §120(b), inserted after second sentence ''The Secretary shall issue a decision on an application for a determination within 180 days after the date of the publication of the notice of having received such application, or the Secretary shall publish a statement in the Federal Register of the reason why the Secretary's decision on the application is delayed, along with an estimate of the additional time necessary before the decision is made.''

Subsec. (g). Pub. L. 103–311, §107, designated existing provisions as par. (1) and added par. (2).

EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effective and Termination Dates of 2012 Amendment note under section 101 of Title 23, Highways.

EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–296 effective 60 days after Nov. 25, 2002, see section 4 of Pub. L. 107–296, set out as an Effective Date note under section 101 of Title 6, Domestic Security.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–429 effective July 5, 1994, see section 9 of Pub. L. 103–429, set out as a note under section 321 of this title.

## § 5126. Relationship to other laws

(a) CONTRACTS.—A person under contract with a department, agency, or instrumentality of the United States Government that transports hazardous material, or causes hazardous material to be transported, or designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented as qualified for use in transporting hazardous material shall comply with this chapter, regulations prescribed and orders issued under this chapter, and all other requirements of the Government, State and local governments, and Indian tribes (except a requirement preempted by a law of the United States) in the same way and to the same extent that any person engaging in that transportation, designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing that is in or affects commerce must comply with the provision, regulation, order, or requirement.

(b) NONAPPLICATION.—This chapter does not apply to—

(1) a pipeline subject to regulation under chapter 601 of this title; or

(2) any matter that is subject to the postal laws and regulations of the United States under this chapter or title 18 or 39.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 783; Pub. L. 103–311, title I, §117(a)(2), Aug. 26, 1994, 108 Stat. 1678; Pub. L. 109–59, title VII, §7124, Aug. 10, 2005, 119 Stat. 1908; Pub. L. 110–244, title III, §302(d), June 6, 2008, 122 Stat. 1618.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5126(a) ........ | 49 App.:1818. | Jan. 3, 1975, Pub. L. 93–633, 88 Stat. 2156, §120; added Nov. 16, 1990, Pub. L. 101–615, §20, 104 Stat. 3270. |
| 5126(b) ........ | 49 App.:1811(f). | Jan. 3, 1975, Pub. L. 93–633, §112(f), 88 Stat. 2161; Nov. 30, 1979, Pub. L. 96–129, §216(a), 93 Stat. 1015; restated Nov. 16, 1990, Pub. L. 101–615, §13, 104 Stat. 3260. |

In subsection (a), the word ''manufactures'' is substituted for ''manufacturers'' to correct an error in the source provisions. The words ''of the executive, legislative, or judicial branch'', ''be subject to and'', ''substantive and procedural'', and ''this chapter or any other'' are omitted as surplus.

AMENDMENTS

2008—Subsec. (a). Pub. L. 110–244 amended Pub. L. 109–59. See 2005 Amendment note below.

2005—Subsec. (a). Pub. L. 109–59, §7124(4), substituted ''designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing'' for ''manufacturing, fabricating, marking, maintenance, reconditioning, repairing, or testing''.

Pub. L. 109–59, §7124(3), as amended by Pub. L. 110–244, substituted ''shall comply with this chapter'' for ''must comply with this chapter''.

Pub. L. 109–59, §7124(1), (2), substituted ''transports hazardous material, or causes hazardous material to be transported,'' for ''transports or causes to be transported hazardous material,'' and ''designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented'' for ''manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a packaging or a container that the person represents, marks, certifies, or sells''.

1994—Subsec. (a). Pub. L. 103–311 substituted ''a packaging or a'' for ''a package or''.

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–244 effective as of the date of enactment of Pub. L. 109–59 (Aug. 10, 2005) and to be treated as included in Pub. L. 109–59 as of that date, and provisions of Pub. L. 109–59, as in effect on the day before June 6, 2008, that are amended by Pub. L. 110–244 to be treated as not enacted, see section 121(b) of Pub. L. 110–244, set out as a note under section 101 of Title 23, Highways.

## § 5127. Judicial review

(a) FILING AND VENUE.—Except as provided in section 20114(c), a person adversely affected or aggrieved by a final action of the Secretary

under this chapter may petition for review of the final action in the United States Court of Appeals for the District of Columbia or in the court of appeals for the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not more than 60 days after the Secretary's action becomes final.

(b) JUDICIAL PROCEDURES.—When a petition is filed under subsection (a), the clerk of the court immediately shall send a copy of the petition to the Secretary. The Secretary shall file with the court a record of any proceeding in which the final action was issued, as provided in section 2112 of title 28.

(c) AUTHORITY OF COURT.—The court has exclusive jurisdiction, as provided in subchapter II of chapter 5 of title 5, to affirm or set aside any part of the Secretary's final action and may order the Secretary to conduct further proceedings.

(d) REQUIREMENT FOR PRIOR OBJECTION.—In reviewing a final action under this section, the court may consider an objection to a final action of the Secretary only if the objection was made in the course of a proceeding or review conducted by the Secretary or if there was a reasonable ground for not making the objection in the proceeding.

(Added Pub. L. 109–59, title VII, § 7123(b), Aug. 10, 2005, 119 Stat. 1907.)

PRIOR PROVISIONS

A prior section 5127 was renumbered section 5128 of this title.

### § 5128. Authorization of appropriations

(a) IN GENERAL.—There are authorized to be appropriated to the Secretary to carry out this chapter (except sections 5107(e), 5108(g)(2), 5113, 5115, 5116, and 5119)—

(1) $53,000,000 for fiscal year 2016;
(2) $55,000,000 for fiscal year 2017;
(3) $57,000,000 for fiscal year 2018;
(4) $58,000,000 for fiscal year 2019; and
(5) $60,000,000 for fiscal year 2020.

(b) HAZARDOUS MATERIALS EMERGENCY PREPAREDNESS FUND.—From the Hazardous Materials Emergency Preparedness Fund established under section 5116(h), the Secretary may expend, for each of fiscal years 2016 through 2020—

(1) $21,988,000 to carry out section 5116(a);
(2) $150,000 to carry out section 5116(e);
(3) $625,000 to publish and distribute the Emergency Response Guidebook under section 5116(h)(3); and
(4) $1,000,000 to carry out section 5116(i).

(c) HAZARDOUS MATERIALS TRAINING GRANTS.—From the Hazardous Materials Emergency Preparedness Fund established pursuant to section 5116(h), the Secretary may expend $4,000,000 for each of fiscal years 2016 through 2020 to carry out section 5107(e).

(d) COMMUNITY SAFETY GRANTS.—Of the amounts made available under subsection (a) to carry out this chapter, the Secretary shall withhold $4,000,000 for each of fiscal years 2016 through 2020 to carry out section 5107(i).

(e) CREDITS TO APPROPRIATIONS.—

(1) EXPENSES.—In addition to amounts otherwise made available to carry out this chapter, the Secretary may credit amounts received from a State, Indian tribe, or other public authority or private entity for expenses the Secretary incurs in providing training to the State, Indian tribe, authority, or entity.

(2) AVAILABILITY OF AMOUNTS.—Amounts made available under this section shall remain available until expended.

(Pub. L. 103–272, § 1(d), July 5, 1994, 108 Stat. 783, § 5127; Pub. L. 103–311, title I, §§ 103, 119(b), (c)(4), Aug. 26, 1994, 108 Stat. 1673, 1680; renumbered § 5128 and amended Pub. L. 109–59, title VII, §§ 7123(b), 7125, Aug. 10, 2005, 119 Stat. 1907, 1908; Pub. L. 110–244, title III, § 302(f), June 6, 2008, 122 Stat. 1618; Pub. L. 112–141, div. C, title III, § 33017, July 6, 2012, 126 Stat. 841; Pub. L. 113–159, title I, § 1301, Aug. 8, 2014, 128 Stat. 1847; Pub. L. 114–21, title I, § 1301, May 29, 2015, 129 Stat. 225; Pub. L. 114–41, title I, § 1301, July 31, 2015, 129 Stat. 453; Pub. L. 114–73, title I, § 1301, Oct. 29, 2015, 129 Stat. 575; Pub. L. 114–87, title I, § 1301, Nov. 20, 2015, 129 Stat. 684; Pub. L. 114–94, div. A, title VII, § 7101, Dec. 4, 2015, 129 Stat. 1588.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5127(a) ........ | 49 App.:1812(a). | Jan. 3, 1975, Pub. L. 93–633, § 115, 88 Stat. 2164; July 19, 1975, Pub. L. 94–56, § 4, 89 Stat. 264; Oct. 11, 1976, Pub. L. 94–474, § 3, 90 Stat. 2068; Sept. 30, 1978, Pub. L. 95–403, 92 Stat. 863; Oct. 30, 1984, Pub. L. 98–559, § 2, 98 Stat. 2907; restated Nov. 16, 1990, Pub. L. 101–615, § 14, 104 Stat. 3260; Oct. 24, 1992, Pub. L. 102–508, § 504, 106 Stat. 3311. |
| 5127(b) ........ | 49 App.:1816(d). | Jan. 3, 1975, Pub. L. 93–633, 88 Stat. 2156, § 118(d); added Nov. 16, 1990, Pub. L. 101–615, § 18, 104 Stat. 3269; Oct. 24, 1992, Pub. L. 102–508, § 506, 106 Stat. 3312. |
| 5127(c) ........ | 49 App.:1815(i)(3). | Jan. 3, 1975, Pub. L. 93–633, 88 Stat. 2156, § 117A(i); added Nov. 16, 1990, Pub. L. 101–615, § 17, 104 Stat. 3268. |
| 5127(d) ........ | 49 App.:1815(i)(1), (2), (4). | |
| 5127(e) ........ | 49 App.:1819(h) (1st sentence). | Jan. 3, 1975, Pub. L. 93–633, 88 Stat. 2156, § 121(h); added Nov. 16, 1990, Pub. L. 101–615, § 22, 104 Stat. 3272. |
| 5127(f) ........ | 49 App.:1812(b). | |
| 5127(g) ........ | 49 App.:1815(i)(5). 49 App.:1819(h) (last sentence). | |

In the section, references to fiscal years 1991 and 1992 are omitted as obsolete.

In subsections (b), (c)(1), and (d), the words "amounts in" are omitted as surplus.

In subsection (c), the text of 49 App.:1815(i)(3)(A) is omitted as obsolete.

In subsection (c)(2), the words "relating to dissemination of the curriculum" are omitted as surplus.

AMENDMENTS

2015—Pub. L. 114–94 amended section generally. Prior to amendment, section related to authorization of appropriations for fiscal years 2013 to 2015.

Subsec. (a)(3). Pub. L. 114–41, § 1301(a)(2), added par. (3) and struck out former par. (3) which read as follows: "$35,615,474 for the period beginning on October 1, 2014, and ending on July 31, 2015."

Pub. L. 114–21, § 1301(a), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "$28,468,948 for the period beginning on October 1, 2014, and ending on May 31, 2015."

principal executive office. However, a State authority may not bring an action under this section outside the State.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 869.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 20113(a) ...... | 45:436(b)(1) (related to authority to bring actions), (2). | Oct. 16, 1970, Pub. L. 91–458, §207(b), (c), 84 Stat. 974; Nov. 2, 1978, Pub. L. 95–574, §8, 92 Stat. 2461; restated Oct. 10, 1980, Pub. L. 96–423, §5, 94 Stat. 1812. |
| | 45:439(a) (related to actions by States). | Oct. 16, 1970, Pub. L. 91–458, §210(a) (related to actions by States), 84 Stat. 975; Oct. 10, 1980, Pub. L. 96–423, §9(a), 94 Stat. 1814; Nov. 16, 1990, Pub. L. 101–615, §28(f), 104 Stat. 3277. |
| 20113(b) ...... | 45:436(a)(1) (related to authority to bring actions), (2). | Oct. 16, 1970, Pub. L. 91–458, §207(a), 84 Stat. 974; Nov. 2, 1978, Pub. L. 95–574, §8, 92 Stat. 2461; restated Oct. 10, 1980, Pub. L. 96–423, §5, 94 Stat. 1812; Nov. 16, 1990, Pub. L. 101–615, §28(e), 104 Stat. 3277. |
| 20113(c) ...... | 45:436(a)(1) (related to venue), (b)(1) (related to venue), (c). | |
| | 45:439(c) (related to actions by States). | Oct. 16, 1970, Pub. L. 91–458, 84 Stat. 971, §210(c) (related to actions by States); added Oct. 10, 1980, Pub. L. 96–423, §9(b), 94 Stat. 1815. |

In subsection (a), the language about jurisdiction in 45:439(a) (related to actions by States) is omitted for the reasons explained in the revision note for section 20112(a) of the revised title.

In subsection (b), the word "impose" is substituted for "assess" for consistency. The words "the authority may bring a civil action in an appropriate district court of the United States" are substituted for "action may apply to the United States district court" for consistency in the revised title and with other titles of the United States Code. The words "included in or made applicable to such rule, regulation, order, or standard" are omitted as surplus.

In subsection (c), the reference to "section 207(d)" in section 210(c) of the Federal Railroad Safety Act of 1970 (Public Law 91–458, 84 Stat. 971), as added by section 9(b) of the Federal Railroad Safety Authorization Act of 1980 (Public Law 96–423, 94 Stat. 1815), is assumed to have been intended as a reference to section 207(c). The Federal Railroad Safety Authorization Act of 1980 was derived from S. 2730, which in turn was derived from H.R. 7104. See 126 Cong. Rec. 26535 (1980). Section 207(d) in an earlier version of H.R. 7104 was redesignated as section 207(c) during the legislative process and no section 207(d) was enacted. See H.R. Rept. No. 96–1025, 96th Cong., 2d Sess., pp. 14, 15 (1980).

## § 20114. Judicial procedures

(a) CRIMINAL CONTEMPT.—In a trial for criminal contempt for violating an injunction or restraining order issued under this chapter, the violation of which is also a violation of this chapter, the defendant may demand a jury trial. The defendant shall be tried as provided in rule 42(b) of the Federal Rules of Criminal Procedure (18 App. U.S.C.).

(b) SUBPENAS FOR WITNESSES.—A subpena for a witness required to attend a district court of the United States in an action brought under this chapter may be served in any judicial district.

(c) REVIEW OF AGENCY ACTION.—Except as provided in section 20104(c) of this title, a pro-

ceeding to review a final action of the Secretary of Transportation under this part or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 870.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 20114(a) ...... | 45:439(b). | Oct. 16, 1970, Pub. L. 91–458, §§209(d), 210(b), 84 Stat. 975, 976. |
| 20114(b) ...... | 45:438(d). | |
| 20114(c) ...... | 45:431(f). | Oct. 16, 1970, Pub. L. 91–458, §207(f), 84 Stat. 972; restated Sept. 3, 1992, Pub. L. 102–365, §5(a)(1), 106 Stat. 975. |

In subsection (a), the words "the defendant may demand a jury trial" are substituted for "trial shall be by the court, or, upon demand of the accused, by a jury" to eliminate unnecessary words and for consistency in the revised title.

In subsection (b), the words "may be served in any judicial district" are substituted for "may run into any other district" for clarity.

In subsection (c), the words "a final action of the Secretary" are substituted for "Any final agency action taken by the Secretary" to eliminate unnecessary words. The words "this part or, as applicable to railroad safety, chapter 51 or 57 of this title" are substituted for "this subchapter or under any of the other Federal railroad safety laws, as defined in section 441(e) of this title" because of the restatement. The words "is subject to judicial review as provided in chapter 7 of title 5" are omitted as unnecessary because 5:ch. 7 applies unless otherwise stated. The words "by and in the manner prescribed" are omitted as surplus.

## § 20115. User fees

(a) SCHEDULE OF FEES.—The Secretary of Transportation shall prescribe by regulation a schedule of fees for railroad carriers subject to this chapter. The fees—

(1) shall cover the costs of carrying out this chapter (except section 20108(a));

(2) shall be imposed fairly on the railroad carriers, in reasonable relationship to an appropriate combination of criteria such as revenue ton-miles, track miles, passenger miles, or other relevant factors; and

(3) may not be based on that part of industry revenues attributable to a railroad carrier or class of railroad carriers.

(b) COLLECTION PROCEDURES.—The Secretary shall prescribe procedures to collect the fees. The Secretary may use the services of a department, agency, or instrumentality of the United States Government or of a State or local authority to collect the fees, and may reimburse the department, agency, or instrumentality a reasonable amount for its services.

(c) COLLECTION, DEPOSIT, AND USE.—(1) The Secretary shall impose and collect fees under this section for each fiscal year before the end of the fiscal year.

(2) Fees collected under this section shall be deposited in the general fund of the Treasury as offsetting receipts. The fees may be used, to the extent provided in advance in an appropriation law, only to carry out this chapter.

(3) Fees prescribed under this section shall be imposed in an amount sufficient to pay for the



# CODE OF FEDERAL REGULATIONS

# Title 40
## Protection of Environment

Part 1060 to End

Revised as of July 1, 2019

Containing a codification of documents
of general applicability and future effect

As of July 1, 2019

Published by the Office of the Federal Register
National Archives and Records Administration
as a Special Edition of the Federal Register

## U.S. GOVERNMENT OFFICIAL EDITION NOTICE

### Legal Status and Use of Seals and Logos



The seal of the National Archives and Records Administration (NARA) authenticates the Code of Federal Regulations (CFR) as the official codification of Federal regulations established under the Federal Register Act. Under the provisions of 44 U.S.C. 1507, the contents of the CFR, a special edition of the Federal Register, shall be judicially noticed. The CFR is prima facie evidence of the original documents published in the Federal Register (44 U.S.C. 1510).

It is prohibited to use NARA's official seal and the stylized Code of Federal Regulations logo on any republication of this material without the express, written permission of the Archivist of the United States or the Archivist's designee. Any person using NARA's official seals and logos in a manner inconsistent with the provisions of 36 CFR part 1200 is subject to the penalties specified in 18 U.S.C. 506, 701, and 1017.

### Use of ISBN Prefix

This is the Official U.S. Government edition of this publication and is herein identified to certify its authenticity. Use of the 0–16 ISBN prefix is for U.S. Government Publishing Office Official Editions only. The Superintendent of Documents of the U.S. Government Publishing Office requests that any reprinted edition clearly be labeled as a copy of the authentic work with a new ISBN.



U.S. GOVERNMENT PUBLISHING OFFICE

U.S. Superintendent of Documents • Washington, DC 20402–0001

http://bookstore.gpo.gov

Phone: toll-free (866) 512-1800; DC area (202) 512-1800

## PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

### § 1500.1  Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains ''action-forcing'' provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of en-

vironmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

### § 1500.2  Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

### § 1500.3  Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act)

467

Add. 18

except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

### § 1500.4  Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o) Combining environmental documents with other documents (§ 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

[43 FR 55990, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1500.5  Reducing delay.

Agencies shall reduce delay by:

**Council on Environmental Quality**

(a) Integrating the NEPA process into early planning (§ 1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§ 1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (§ 1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (§§ 1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (§ 1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (§ 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(i) Combining environmental documents with other documents (§ 1506.4).

(j) Using accelerated procedures for proposals for legislation (§ 1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§ 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

**§ 1500.6  Agency authority.**

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

**§ 1501.1  Purpose.**

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

469

**Council on Environmental Quality**

action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

### § 1501.8  Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided*, That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1   Purpose.
1502.2   Implementation.
1502.3   Statutory requirements for statements.
1502.4   Major Federal actions requiring the preparation of environmental impact statements.
1502.5   Timing.
1502.6   Interdisciplinary preparation.
1502.7   Page limits.
1502.8   Writing.
1502.9   Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover sheet.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  List of preparers.
1502.18  Appendix.
1502.19  Circulation of the environmental impact statement.
1502.20  Tiering.
1502.21  Incorporation by reference.
1502.22  Incomplete or unavailable information.
1502.23  Cost-benefit analysis.
1502.24  Methodology and scientific accuracy.
1502.25  Environmental review and consultation requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

### § 1502.1  Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the

473

Add. 21

§ 1502.2                                             40 CFR Ch. V (7–1–19 Edition)

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

**§ 1502.2 Implementation.**

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alter-

natives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

**§ 1502.3 Statutory requirements for statements.**

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

**§ 1502.4 Major Federal actions requiring the preparation of environmental impact statements.**

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such

474

**Council on Environmental Quality** §1502.9

as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§1501.7), tiering (§1502.20), and other methods listed in §§1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

**§1502.5  Timing.**

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the

public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

**§1502.6  Interdisciplinary preparation.**

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.7).

**§1502.7  Page limits.**

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of §1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

**§1502.8  Writing.**

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

**§1502.9  Draft, final, and supplemental statements.**

Except for proposals for legislation as provided in §1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

475

Add. 23

in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

### § 1502.10  Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§1502.11 through 1502.18, in any appropriate format.

### § 1502.11  Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under §1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

### § 1502.12  Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice

**Council on Environmental Quality**  § 1502.16

among alternatives). The summary will normally not exceed 15 pages.

### § 1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

### § 1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### § 1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data

and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16  Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections $102(2)(C)(i)$, (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section $102(2)(C)(iii)$ as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

477

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

478

**Council on Environmental Quality**                                    **§ 1502.24**

may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

### § 1502.22  Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

### § 1502.23  Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24  Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

479

§ 1502.25                                                    40 CFR Ch. V (7–1–19 Edition)

**§ 1502.25 Environmental review and consultation requirements.**

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING

Sec.
1503.1   Inviting comments.
1503.2   Duty to comment.
1503.3   Specificity of comments.
1503.4   Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

**§ 1503.1   Inviting comments.**

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

**§ 1503.2   Duty to comment.**

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

**§ 1503.3   Specificity of comments.**

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

480

**Council on Environmental Quality**

§ 1508.5

which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in §1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by §1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1   Terminology.
1508.2   Act.
1508.3   Affecting.
1508.4   Categorical exclusion.
1508.5   Cooperating agency.
1508.6   Council.
1508.7   Cumulative impact.
1508.8   Effects.
1508.9   Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact statement.
1508.12  Federal agency.
1508.13  Finding of no significant impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

### §1508.1   Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

### §1508.2   Act.

*Act* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

### §1508.3   Affecting.

*Affecting* means will or may have an effect on.

### §1508.4   Categorical exclusion.

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### §1508.5   Cooperating agency.

*Cooperating agency* means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

**§ 1508.6  Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7  Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8  Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9  Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10  Environmental document.**

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

**§ 1508.11  Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12  Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13  Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

492

**Council on Environmental Quality**

**§ 1508.19**

repeat any of the discussion in the assessment but may incorporate it by reference.

**§ 1508.14   Human environment.**

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

**§ 1508.15   Jurisdiction by law.**

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

**§ 1508.16   Lead agency.**

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

**§ 1508.17   Legislation.**

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

**§ 1508.18   Major Federal action.**

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

**§ 1508.19   Matter.**

*Matter* includes for purposes of part 1504:

493

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### § 1508.20  Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### § 1508.21  NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### § 1508.22  Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### § 1508.23  Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### § 1508.24  Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### § 1508.25  Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

494

**Council on Environmental Quality**  **§ 1508.28**

consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26  Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27  Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28  Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

495

Federal Register

Vol. 59, No. 32

Wednesday, February 16, 1994

# Presidential Documents

Title 3—

**The President**

Executive Order 12898 of February 11, 1994

## Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1–1.** *Implementation.*

**1–101.** *Agency Responsibilities.* To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Mariana Islands.

**1–102.** *Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (i) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (l) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate. The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b) The Working Group shall: (1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1–103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3–3 of this order;

(4) assist in coordinating data collection, required by this order;

(5) examine existing data and studies on environmental justice;

(6) hold public meetings as required in section 5–502(d) of this order; and

(7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

**1–103.** *Development of Agency Strategies.* (a) Except as provided in section 6–605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)–(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum: (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations. In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform the Working Group of the process.

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

**1–104.** *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1–103(e) of this order.

**Sec. 2–2.** *Federal Agency Responsibilities for Federal Programs.* Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

Sec. 3–3. *Research, Data Collection, and Analysis.*

**3–301.** *Human Health and Environmental Research and Analysis.* (a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

(b) Environmental human health analyses, whenever practicable and appropriate, shall identify multiple and cumulative exposures.

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

**3–302.** *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. section 552a): (a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1–103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public, unless prohibited by law; and

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001–11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

Sec. 4–4. *Subsistence Consumption of Fish and Wildlife.*

**4–401.** *Consumption Patterns.* In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**4–402.** *Guidance.* Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or

wildlife. Agencies shall consider such guidance in developing their policies and rules.

**Sec. 5–5.** *Public Participation and Access to Information.* (a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

**Sec. 6–6.** *General Provisions.*

**6–601.** *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

**6–602.** *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

**6–603.** *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

**6–604.** *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

**6–605.** *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

**6–606.** *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**6–607.** *Costs.* Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

**6–608.** *General.* Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

**6–609.** *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance

**Federal Register** / Vol. 59, No. 32 / Wednesday, February 16, 1994 / Presidential Documents

of the United States, its agencies, its officers, or any other person with this order.

THE WHITE HOUSE,
*February 11, 1994.*

[FR Citation 59 FR 7629]

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and

• Does not provide the EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

**List of Subjects in 40 CFR Part 52**

Administrative practice and procedure, Environmental protection, Air pollution control, Carbon monoxide, Incorporation by reference, Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide, Volatile organic compounds.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: October 8, 2019.

**Deborah Jordan,**

*Acting Regional Administrator, Region IX.*

[FR Doc. 2019–22910 Filed 10–23–19; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Pipeline and Hazardous Materials Safety Administration**

**49 CFR Parts 172 and 173**

**[Docket No. PHMSA–2018–0025 (HM–264)]**

**RIN 2137–AF40**

**Hazardous Materials: Liquefied Natural Gas by Rail**

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation (DOT).

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** PHMSA, in coordination with the Federal Railroad Administration

(FRA), is proposing changes to the Hazardous Materials Regulations to allow for the bulk transport of Methane, refrigerated liquid, commonly known as liquefied natural gas (LNG), in rail tank cars. This rulemaking proposes to authorize the transportation of Methane, refrigerated liquid by rail in the DOT–113C120W specification rail tank car.

**DATES:** Comments must be received by December 23, 2019. To the extent possible, PHMSA will consider late-filed comments.

**ADDRESSES:** You may submit comments identified by the Docket Number PHMSA–2018–0025 (HM–264) via any of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Fax:* 1–202–493–2251.

• *Mail:* Docket Management System; U.S. Department of Transportation, West Building, Ground Floor, Room W12–140, Routing Symbol M–30, 1200 New Jersey Avenue SE, Washington, DC 20590.

• *Hand Delivery:* To the Docket Management System; Room W12–140 on the ground floor of the West Building, 1200 New Jersey Avenue SE, Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

*Instructions:* All submissions must include the agency name and Docket Number (PHMSA–2018–0025) or RIN (2137–AF40) for this rulemaking at the beginning of the comment. To avoid duplication, please use only one of these four methods. All comments received will be posted without change to the Federal Docket Management System (FDMS) and will include any personal information you provide. If sent by mail, comments must be submitted in duplicate. Persons wishing to receive confirmation of receipt of their comments must include a self-addressed stamped postcard.

*Docket:* For access to the dockets to read background documents or comments received, go to *http:// www.regulations.gov* or DOT's Docket Operations Office (see **ADDRESSES**).

*Confidential Business Information:* Confidential Business Information (CBI) is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (FOIA) (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to this notice contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to this

notice, it is important that you clearly designate the submitted comments as CBI. Pursuant to 49 CFR 105.30, you may ask PHMSA to give confidential treatment to information you give to the agency by taking the following steps: (1) Mark each page of the original document submission containing CBI as ''Confidential''; (2) send PHMSA, along with the original document, a second copy of the original document with the CBI deleted; and (3) explain why the information you are submitting is CBI. Unless you are notified otherwise, PHMSA will treat such marked submissions as confidential under the FOIA, and they will not be placed in the public docket of this notice. Submissions containing CBI should be sent to Michael Ciccarone, Office of Hazardous Materials Safety, Standards and Rulemaking Division, Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation, 1200 New Jersey Ave. SE, Washington, DC 20590–0001. Any commentary that PHMSA receives which is not specifically designated as CBI will be placed in the public docket for this rulemaking.

*Privacy Act:* In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without change, including any personal information the commenter provides, to *http:// www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *http://www.dot.gov/privacy.*

**FOR FURTHER INFORMATION CONTACT:** Michael Ciccarone, Standards and Rulemaking Division, (202) 366–8553, Pipeline and Hazardous Materials Safety Administration, or Mark Maday, Federal Railroad Administration, (202) 366–2535, U.S. Department of Transportation, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Overview
II. Background
 A. Properties and Use of LNG
 B. Current Requirements for LNG
 C. Petition for Rulemaking (P–1697)
 D. Regulatory Review
 E. International Regulation
III. Proposed Changes
 A. Tank Car Specification
 B. Operational Controls
IV. Section-by-Section Review
V. Regulatory Analyses and Notices
 A. Statutory/Legal Authority for This Rulemaking
 B. Executive Order 12866 and DOT Regulatory Policies and Procedures

C. Executive Order 13771
D. Executive Order 13132
E. Executive Order 13175
F. Regulatory Flexibility Act, Executive Order 13272, and DOT Policies and Procedures
G. Paperwork Reduction Act
H. Regulation Identifier Number (RIN)
I. Unfunded Mandates Reform Act
J. Environmental Assessment
K. Privacy Act
L. Executive Order 13609 and International Trade Analysis
M. National Technology Transfer and Advancement Act
N. Executive Order 13211
List of Subjects

## I. Overview

PHMSA, in coordination with FRA, is issuing this NPRM to solicit public comment on potential changes to the Hazardous Materials Regulations (HMR; 49 CFR parts 171–180) that permit the bulk transport of Methane, refrigerated liquid, commonly known as liquefied natural gas (LNG), in rail tank cars. Specifically, this NPRM proposes to authorize the transportation of Methane, refrigerated liquid by rail in certain DOT specification 113 (DOT–113) rail tank cars.[1]

LNG has been transported safely by highway and vessel for over 50 years within the United States and is now a critical energy resource for the 21st century; however, the HMR do not authorize the bulk transport of LNG in rail tank cars. Historically, this limitation has not created a major impediment in the transportation of natural gas (either in gas or liquid form), but the expansion in United States energy production has led to significant challenges in the transportation system.

Between 2010 and 2018, the number of LNG facilities in the U.S. increased by 28.7 percent, and total storage and vaporization capacities increased by 21 and 23 percent, respectively.[2] Over the same period, total liquefaction capacity increased by 939 percent due to new LNG export terminals.[3] This data suggests that there may be a demand for greater flexibility in the modes of transportation available to transport LNG, which is supported by PHMSA's receipt of a petition for rulemaking (P–1697) from the Association of American Railroads (AAR) proposing amendments to the HMR to allow for the transportation of Methane, refrigerated liquid by rail in DOT–113 rail tank cars. As noted in the petition, some shippers have expressed that there is an interest in the transportation of LNG by rail (domestically and for international export), which would help address these challenges. Additionally, there is an existing request for a special permit that seeks to authorize shipments of LNG in DOT specification 113C120W tank cars subject to certain operational conditions that would be used to transport LNG to ports or the applicant's domestic customers.[4]

Federal hazardous materials law authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." 49 U.S.C. 5103(b)(1). The Secretary has delegated this authority to PHMSA in 49 CFR 1.97(b). The HMR are designed to achieve three primary goals: (1) Help ensure that hazardous materials are packaged and handled safely and securely during transportation; (2) provide effective communication to transportation workers and emergency responders of the hazards of the materials being transported; and (3) minimize the consequences of an accident or incident should one occur. The hazardous material regulatory system is a risk management system that is prevention-oriented and focused on identifying safety or security hazards and reducing the probability and consequences of a hazardous material release.

The Administrative Procedure Act (APA), 5 U.S.C. 551, *et seq.* requires Federal agencies to give interested persons the right to petition an agency to issue, amend, or repeal a rule. 5 U.S.C. 553(e). In accordance with PHMSA's rulemaking procedure regulations in 49 CFR part 106, interested persons may ask PHMSA to add, amend, or repeal a regulation by filing a petition for rulemaking along with information and arguments supporting the requested action (49 CFR 106.95). PHMSA has assessed P–1697[5] in accordance with 49 CFR 106.105 and determined that the request merits consideration in a rulemaking. In addition, a comment received to a notification[6] of regulatory review issued by DOT's Office of the Secretary of Transportation (OST) in October 2017 further expressed industry support of deregulatory efforts to address the safe transportation of LNG by rail.

PHMSA and FRA share responsibility for regulating the transportation of hazardous materials by rail and take a system-wide, comprehensive approach that focuses on prevention, mitigation, and response to manage and reduce the risk posed to people and the environment. In this rulemaking, PHMSA is seeking public comment on proposed changes to address the safe transportation of LNG by rail.

## II. Background

### A. Properties and Use of LNG

The proper classification of any hazardous material is required prior to it being offered into transportation. In accordance with § 173.115(g), a "cryogenic liquid" means a refrigerated liquefied gas having a boiling point colder than $-90\,°C$ ($-130\,°F$) at an absolute pressure of 101.3 kPa (14.7 psia). Natural gas (methane) has a boiling point of $-162\,°C$ ($-260\,°F$), which means it must be refrigerated to be liquid—hence, liquefied natural gas. Therefore, LNG meets the definition of Division 2.1, cryogenic liquid and is described by the entry "UN1972, Methane, refrigerated liquid (*cryogenic liquid*), 2.1" in the Hazardous Materials Table (HMT; § 172.101).

LNG is natural gas that has been liquefied through condensation at ambient pressure—a process referred to as liquefaction. The resulting LNG takes up about 1/600th of the volume of natural gas in its vapor state. Thus, LNG can be readily and economically stored and transported in specially designed storage tanks, highway cargo tanks, or International Organization for Standardization (ISO) containers. LNG is odorless, colorless, non-corrosive, and non-toxic. It will float on water, causing the water to look like its boiling as the liquid transitions back to vapor. To be consumed, LNG must be vaporized by warming to return it to its gaseous form; this warming and vaporization process is called regasification. The vaporized natural gas is then injected back into a pipeline system, or used to fuel natural gas operated equipment.

There is an international market for LNG, whereas natural gas tends to be a

---

[1] This NPRM is consistent with Section 4(b) of the President's April 10, 2019, "Executive Order on Promoting Energy Infrastructure and Economic Growth," which directs the Secretary of Transportation to publish an NPRM that would propose to treat LNG the same as other cryogenic liquids and permit LNG to be transported in approved rail tank cars. The Executive Order also directs that the NPRM be published within 100 days of date of the order, and that a final rule must be published within thirteen months of the date of the order. *See https://www.whitehouse.gov/presidential-actions/executive-order-promoting-energy-infrastructure-economic-growth/.*

[2] Based on PHMSA annual report data from 2010–2018.

[3] *Id.*

[4] Docket No. PHMSA 2019–0100 at *https://www.regulations.gov/docket?D=PHMSA-2019-0100.*

[5] Docket No. PHMSA–2017–0020.

[6] See Interested Parties for Hazardous Materials Transportation comment in response to DOT's Notification of Regulatory Review, 82 FR 45750 (Oct. 2, 2017), which can be found at Docket No. DOT–OST–2017–0069, *https://www.regulations.gov/docket?D=DOT-OST-2017-0069.*

domestic commodity. International trends in the LNG industry directly impact domestic LNG and natural gas trends. LNG supplies regions, both domestic and international, that lack a natural gas source or the infrastructure to receive natural gas via pipeline. LNG production and consumption trends are related to international fuel prices, mainly crude oil, diesel, and coal. The LNG market in the United States grew considerably between 2010 and 2018.[7] In that timeframe, the number of LNG facilities in the United States increased by 28.7 percent, and the total storage and vaporization capacities increased by 21 and 23 percent, respectively. Over the same period, total liquefaction capacity increased by 939 percent due to new LNG export terminals.

### B. Current Requirements for LNG

The current HMR do not authorize the bulk transport of LNG in rail tank cars.[8] LNG may only be transported via rail in accordance with the conditions of a PHMSA special permit or in a portable tank pursuant to the conditions of an FRA approval.

The HMR include design, manufacturing, and maintenance standards for packaging (see parts 178–180). Additionally, the regulations specify which packaging types may be used for specific materials and provide requirements for filling and loading of packages (see part 173). Column (8C) of the HMT provides bulk packaging authorizations for LNG in accordance with § 173.318, Cryogenic liquids in cargo tanks, only, and does not include authorization of LNG for rail tank cars. Additionally, Column (7) contains portable tank instruction T75 (see § 172.102(c)(7)), which allows for the transportation of refrigerated liquefied gases in certain United Nations (UN) portable tanks, which can then be moved by rail in accordance with § 174.63. Currently, to transport LNG by rail in a method not authorized, a person must apply for a special permit from the Associate Administrator for Hazardous Materials Safety, PHMSA (see 49 CFR 107.105).

### C. Petition for Rulemaking (P–1697)

The Association of American Railroads' Petition for Rulemaking

On January 17, 2017, AAR submitted a petition for rulemaking to PHMSA titled, "Petition for Rulemaking to

Allow Methane, Refrigerated Liquid to be Transported in Rail Tank Cars" [PHMSA–2017–0020 (P–1697)] requesting revisions to § 173.319 of the HMR that would permit the transportation of LNG by rail in DOT–113 tank cars.

In its petition, AAR proposed that PHMSA amend the entry for "UN1972, Methane, refrigerated liquid" in the HMT (see § 172.101) to add a reference to § 173.319 in Column (8C), thereby authorizing transport of UN 1972 in rail tank cars. Additionally, AAR proposed that PHMSA amend § 173.319 to include specific requirements for DOT–113 cars used for the transportation of LNG. AAR suggested that the authorized tank car specifications be DOT–113C120W and DOT–113C140W,[9] noting that 120W cars should provide 40 days in transportation and 140W cars should provide 45 days before the tank car might begin to vent the commodity from the pressure relief device.[10] AAR further proposed amending § 173.319(d)(2) to include maximum filling densities comparable to those specified for cargo tanks containing LNG in § 173.318(f)(3).

AAR noted that the current HMR allow for transport of LNG by highway and expressed the opinion that rail transport of LNG is a safer mode of transportation by comparison. AAR stated that LNG is similar in all relevant properties to other flammable cryogenic liquids, such as ethylene, that are currently authorized for transportation by rail tank car. AAR further stated that they believe the DOT–113 tank car was not previously authorized because of a lack of demand in the market. However, AAR noted that there is commercial interest in transporting LNG by rail tank car domestically, and internationally from the United States to Mexico, and that some railroads are actively exploring LNG as a locomotive fuel, thereby requiring supply of LNG along their networks.

AAR's petition—P–1697—requests a regulatory change that has the potential to reduce regulatory burdens and enhance domestic energy production without having a negative impact on safety; therefore, PHMSA accepted it as having merit for consideration in a rulemaking. PHMSA requests public comment on all relevant aspects of this NPRM, including its potential to reduce

regulatory burdens, enhance domestic energy production, and impact safety.

The Center for Biological Diversity's Response to P–1697

On May 15, 2017, the Center for Biological Diversity (the Center) submitted a response to P–1697, recommending that PHMSA deny AAR's petition for rulemaking because of potential environmental impacts of LNG. The Center commented that PHMSA should not proceed in evaluating the petition request until the Agency has conducted a National Environmental Policy Act (NEPA) evaluation, prepared an Environmental Impact Statement (EIS) or Environmental Assessment (EA), and provided opportunity for public review and comment in accordance with the Hazardous Materials Transportation Act (HMTA), as applicable.

PHMSA is issuing this NPRM in accordance with the APA and all related Executive Orders and laws, including NEPA. This NPRM provides opportunity for public notice and comment. See section "V. J. Environmental Assessment" of this rulemaking for further discussion of the EA.

### D. Regulatory Review

On October 2, 2017, DOT published a notice[11] in the **Federal Register** expressing Department-wide plans to review existing regulations and other agency actions to evaluate their continued necessity, determine whether they are crafted effectively to solve current problems, and evaluate whether they potentially burden the development or use of domestically produced energy resources. As part of this review process, the Department invited the public to provide input on existing rules and other agency actions that have potential for repeal, replacement, suspension, or modification.

The Interested Parties for Hazardous Materials Transportation (Interested Parties) submitted a comment[12] requesting the authorization of LNG for rail tank car transport. Specifically, the Interested Parties noted in its comment that LNG shares similar properties to other flammable cryogenic materials currently authorized by rail tank car and has already been moved in the United

---

[7] U.S. DOE, EIA: *https://www.eia.gov/todayinenergy/detail.php?id=34032*.

[8] The HMR defines "bulk packaging" as having a capacity of greater than 119 gallons per 49 CFR 171.8. By way of comparison, a single DOT–113C120W tank car has a capacity of approximately 30,000 gallons.

[9] The HMR do not authorize the DOT–113C140W specification tank car for hazardous materials transportation. See section "III. A. Tank Car Specification" of this rulemaking for further discussion.

[10] PHMSA understands this to mean one-way transit time.

[11] *Notification of Regulatory Review,* Docket No. DOT–OST–2017–0069, 82 FR 45750 (October 2, 2017).

[12] Comment from Interested Parties for Hazardous Materials Transportation, Document No. DOT–OST–2017–00692591, *https://www.regulations.gov/searchResults?rpp=25&po=0&s=dot-ost-2017-0069-2591&fp=true&ns=true.*

States under a special permit. Additionally, they noted that Transport Canada (TC) authorizes LNG for transportation by rail in DOT–113 equivalent rail cars and that there is an increased commercial demand for rail transport within the United States and between the United States and Mexico.

PHMSA has reviewed the Interested Parties' comment and is proposing to authorize the transport of LNG by rail because it may support Department-wide safety investments and promote cost saving actions. The PHMSA proposal would amend the HMR to authorize transportation of LNG by rail in a DOT–113 specification rail car. PHMSA requests public comment on the potential regulatory impact of this proposal.

*E. International Regulation*

The Transport of Dangerous Goods Directorate within TC develops safety standards and regulations, provides oversight, and gives expert advice on dangerous goods incidents to promote public safety in the transportation of dangerous goods by all modes of transport in Canada. TC recently published a new standard on the bulk transport of LNG. TC authorizes LNG for transportation by rail in DOT–113 equivalent rail tank cars (TC–113C120W). PHMSA is not currently aware of LNG being transported via TC–113C120W; however, should that change, PHMSA expects incident and commodity flow data within Canada to be shared with PHMSA and FRA.

In Mexico, the Railway Transport Regulatory Agency's (Agencia Reguladora del Transporte Ferroviario), under the Ministry of Communications and Transportation (Secretaría de Comunicaciones y Transportes or SCT), mission is to promote, regulate, and monitor the railroad industry, and is responsible for regulating all types of cargo movement on trains. Currently, SCT does not provide explicit authorization for the bulk transportation of LNG in rail tank cars.

## III. Proposed Changes

LNG's role as an energy resource continues to expand with ongoing innovation and economic development. Historically, the United States transported LNG by highway and exported LNG via ports only. As a result, there was no need for a regulation that authorized transportation via rail tank car. With a growing supply and demand,[13] rail

transportation is being considered as a viable alternative to the transportation of LNG by highway. PHMSA has identified this as an area where there are opportunities to allow industry innovation and to support infrastructure development while maintaining a high level of safety. The hazards of transporting LNG are no different than that of flammable cryogenic liquids already authorized for bulk rail transport in accordance with the HMR.[14] The HMR provides the framework for the safe transportation of hazardous materials in commerce, and regardless of the future capacity for LNG rail transport, the material itself will be transported in the safe specification tank cars outlined below. Nonetheless, in this NPRM, PHMSA and FRA must consider requirements for both the packaging (*i.e.,* the rail tank car) and operational controls for a train consisting of tank cars loaded with LNG.

*A. Tank Car Specification*

The DOT–113 specification cryogenic liquid tank car is built to comply with specifications contained in 49 CFR part 179, subpart F and TC regulation TC14877E, Section 8.6, as well as certain requirements of the rail industry as identified in the AAR Manual of Standards and Recommended Practices, Specifications for Tank Cars (M–1002). These rail tank cars are vacuum-insulated and consist of an inner alloy (stainless) steel tank enclosed with an outer carbon steel jacket shell specifically designed for the transportation of refrigerated liquefied gases, such as liquid hydrogen, oxygen, ethylene, nitrogen, and argon. Additionally, the design and use of the DOT–113 specification tank car includes added safety features—such as protection systems for piping between the inner and outer tanks, multiple pressure relief devices (pressure relief valves and vents), thermal integrity tests, and in-transit reporting requirements—that contribute to an excellent safety record throughout its 50 years of service.

In this NPRM, PHMSA is proposing to authorize DOT–113C120W tank cars for use in the transportation of LNG by rail. The HMR currently authorize the DOT–113C120W specification tank car for another flammable cryogenic liquid which shares similar chemical and operating characteristics with LNG (*i.e.,* ethylene). The DOT–113C120W design

specification is similarly suitable for the transport of Methane, refrigerated liquid (LNG). We anticipate that DOT–113 specification tank cars will need to be manufactured to satisfy the demand for transporting LNG as the current fleet of these tank cars is used for the transportation of ethylene and other cryogenic liquids.

DOT–113 specification rail tank cars are constructed in accordance with the requirements of 49 CFR, part 179, subpart F, "Specification for Cryogenic Liquid Tank Car Tanks and Seamless Steel Tanks." These cars are built to a double pressure vessel design with the commodity tank (inner vessel) constructed of ASTM A 240/A 240M, Type 304 or 304L stainless steel, and the outer jacket shell (outer vessel) typically is constructed of carbon steel. This design provides an increased crashworthiness when compared to a single vessel design rail tank car. The rail tank car is manufactured with an insulated annular space holding a vacuum between the two pressure vessels. This vacuum area and the insulation significantly reduce the rate of heat leak from the atmosphere to the liquid inside the tank car thus minimizing the heating of the cryogenic (*i.e.,* refrigerated) material in the tank car while being transported. For these reasons, PHMSA has determined the DOT–113C120W specification tank car is an acceptable packaging to transport Methane, refrigerated liquid (LNG) by rail. This determination is based upon the design of the DOT cryogenic tank car specification, which includes added safety features designed to address the hazards presented by cryogenic liquids, and has a demonstrated safety record.

In addition to requesting a rule change to allow DOT–113C120W tank cars to transport LNG, AAR requested that PHMSA add a new tank car specification, the DOT–113C140W, for transportation of bulk quantities of LNG. AAR stated that the advantage to the DOT–113C140W tank car is that it is similar in design and construction to the DOT–113C120W specification, but would allow for an additional transportation timeframe of 5 days for cryogenic materials. This claim assumes that the new specification would use a thicker inner tank material that would allow for a higher inner tank test pressure (140 psig) and higher pressure relief device settings. These design changes could have the potential to increase the time in transportation by 5 days.

Currently, the HMR does not authorize the DOT–113C140W specification for cryogenic hazardous materials transportation and thus, this

---

[13] U.S. Energy Information Administration, "Growth in domestic natural gas production leads to development of LNG export terminals," March 4,

2016, accessed at *https://www.eia.gov/todayinenergy/detail.php?id=25232.*

[14] For description of potential safety hazards of LNG, see LNG Safety Assessment Evaluation Methods, *https://prod.sandia.gov/techlib-noauth/access-control.cgi/2015/153859r.pdf.*

type of regulatory change would require considerably more time and resources to incorporate a new specification proposal into this rulemaking. PHMSA believes the addition of this tank car specification warrants an extensive engineering review and evaluation, including consideration of the risk of release in a derailment and ignition when transported at these higher pressures. PHMSA does not want to delay deregulatory action authorizing the DOT–113C120W tank car for the transport of LNG pending evaluation of the DOT–113C140W tank car. Accordingly, PHMSA is not proposing to authorize the DOT–113C140W specification at this time.

Moreover, the petitioner did not include design specifications for the DOT–113C140W tank car. PHMSA may consider it for future rulemaking after

design specifications, engineering details, and data demonstrating an equivalent level of safety are submitted to PHMSA in support of this regulatory change.

PHMSA is proposing to amend the Pressure Control Valve Setting or Relief Valve Setting Table in § 173.319(d)(2) by adding a column for methane as follows:

### PRESSURE CONTROL VALVE SETTING OR RELIEF VALVE SETTING

| Maximum start-to-discharge pressure (psig) | Maximum permitted filling density (percent by weight) | | | | |
|---|---|---|---|---|---|
| | Ethylene | Ethylene | Ethylene | Hydrogen | Methane |
| 17 ............................................... | ............................. | ............................. | ............................. | 6.60. | |
| 45 ............................................... | 52.8. | | | | |
| 75 ............................................... | ............................. | 51.1 ................ | 51.1 ................ | ............................. | 32.5. |
| Maximum pressure when offered for transportation. | 10 psig ................ | 20 psig ................ | 20 psig ................ | ............................. | 15 psig. |
| Design service temperature ................ | Minus 260 °F ....... | Minus 260 °F ....... | Minus 155 °F ...... | Minus 423 °F ....... | Minus 260 °F. |
| Specification (see §180.507(b)(3) of this subchapter). | 113D60W, 113C60W. | 113C120W ............ | 113D120W ........... | 113A175W, 113A60W. | 113C120W. |

The proposed changes to the table would authorize methane in DOT–113C120W specification tank cars with a start-to-discharge pressure valve setting of 75 psig; a design service temperature of −260 °F; a maximum pressure when offered for transportation of 15 psig; and a filling density of 32.5 percent by weight. The maximum offering pressure of 15 psig is consistent with the 20-day transportation requirement for cryogenic materials and the estimated 3 psig per day pressure increase during transportation. The filling density is similar to the filling density requirements for cryogenic materials transported in a cargo tank motor vehicle. These requirements will provide a 15 percent vapor volume outage (at the start-to-discharge-pressure of the pressure relief valve) for the rail tank car during transportation.

*B. Operational Controls*

AAR's Circular OT–55 is a detailed protocol establishing recommended railroad operating practices for the transportation of hazardous materials that was developed by the rail industry through the AAR.[15] The recommended practices were originally implemented by all Class I rail carriers operating in the United States, with short-line railroads following on as signatories. As a result, Circular OT–55 is comprehensive in its reach, applying to all train movements that fit within the

terms of the circular. The circular outlines operational controls for trains meeting the industry definition of a "Key Train," including speed restrictions, track requirements, storage requirements, and the designation of "Key Routes." [16] Circular OT–55 defines a "Key Train" as any train with:

• One tank car load of Poison or Toxic Inhalation Hazard (PIH or TIH) (Hazard Zone A, B, C, or D), anhydrous ammonia (UN1005), or ammonia solutions (UN3318), or;

• 20 car loads or intermodal portable tank loads of any combination of hazardous material, or;

• One or more car loads of Spent Nuclear Fuel (SNF), High Level Radioactive Waste (HLRW).

While PHMSA is not proposing to incorporate by reference Circular OT–55 or to adopt the requirements for "Key Trains" in the HMR in this rulemaking, the railroad industry's voluntary adoption of the circular is an important consideration for PHMSA in assessing what operational controls are necessary. In accordance with the "Key Train" definition and the changes being considered in this NPRM, Circular OT–55's operational controls would apply to the bulk transport of LNG by rail in a

train consist that is composed of 20 car loads or intermodal portable tank loads in which LNG is present along with any combination of other hazardous materials. Therefore, bulk transport of LNG would be subject to the industry standard even if only one rail tank car of the 20-car consist contained LNG, regardless of the classes of hazardous materials contained in the remaining 19 rail cars. Due to the operational controls introduced for "Key Trains," Circular OT–55, provides an additional level of safety regardless of what combination of hazardous materials the train consist is transporting. As such, PHMSA and FRA believe this industry standard helps ensure the safe transportation of all hazardous materials, including LNG.

PHMSA and FRA considered other options for operational controls such as mirroring the operational controls adopted for high-hazard flammable trains (HHFT)[17] or adopting the "Key Train" requirements into the HMR. Additional operational controls, while not limited to the following, might include limitations on train length, controls for train composition, speed restrictions, braking requirements, and routing requirements.

*Train Length and Train Composition.* PHMSA and FRA have not restricted train length in the past; however, PHMSA solicits comment on whether

---

[15] Circular OT–55, "Recommended Railroad Operating Practices for Transportation of Hazardous Materials," *https://www.railinc.com/rportal/documents/18/260773/OT-55.pdf.*

[16] Circular OT–55 defines a "Key Route" as "any track with a combination of 10,000 car loads or intermodal portable tank loads of hazardous materials, or a combination of 4,000 car loadings of PIH or TIH (Hazard zone A, B, C, or D), anhydrous ammonia, flammable gas, Class 1.1 or 1.2 explosives, environmentally sensitive chemicals, Spent Nuclear Fuel (SNF), and High Level Radioactive Waste (HLRW) over a period of one year."

[17] As defined in § 171.8, a high-hazard flammable train means a single train transporting 20 or more loaded tank cars of a Class 3 flammable liquid in a continuous block or a single train carrying 35 or more loaded tank cars of a Class 3 flammable liquid throughout the train consist.

there is a reasoned basis for limiting the length of a train transporting LNG tank cars, and what that limitation would look like. Moreover, PHMSA solicits comment on whether there is a reasoned basis for limiting the amount of LNG tank cars that can be in one consist, or where the LNG tank cars may be placed within the train. For example, the National Transportation Safety Board issued a Safety Recommendation (R–17–001) [18] to PHMSA to: (1) Evaluate the risks posed to train crews by hazardous materials transported by rail; (2) determine the adequate separation distance between hazardous materials cars and locomotives and occupied equipment that ensures the protection of train crews during normal operations and accident conditions; (3) and collaborate with FRA to revise 49 CFR 174.85 to reflect those findings. To date, PHMSA has initiated a literature review to help identify gaps and changes in factors from previous and current studies and ultimately determine the adequate separation distance of train crews from hazardous materials in a train.

*Speed Restrictions and Braking Requirements.* The HHFT regulations include a speed restriction of 50 miles per hour (mph) for all HHFTs with an additional speed restriction of 40 mph for those HHFTs traveling within a high-threat urban area (§ 174.310(a)(2)). The HHFT regulations also include advanced braking requirements for HHFTs, requiring all HHFTs operating in excess of 30 mph to be equipped and operated with distributed power system or a two-way end-of-train device (§ 174.310(a)(3)), which helps to propagate a quicker application of the air brake system throughout the entire train, particularly in emergency braking situations.

*Routing Requirements.* Section 172.820 prescribes additional planning requirements for transportation by rail, including route analysis, requiring railroads to address safety and security risks for the transportation along routes where commodity data is collected. This requirement applies to a rail carrier transporting one or more of: (1) More than 2,268 kg (5,000 lbs.) in a single carload of a Division 1.1, 1.2 or 1.3 explosive; (2) A quantity of a material poisonous by inhalation in a single bulk packaging; (3) A highway route-controlled quantity of a Class 7 (radioactive) material, as defined in § 173.403; or (4) A high-hazard

flammable train (HHFT) as defined in § 171.8.

PHMSA recognizes that there may be other operational controls or combinations of controls to consider and encourages comments on such controls. However, for this rulemaking, PHMSA and FRA decided not to propose additional operational controls because there is not sufficient data about the potential movements of LNG by tank car. While PHMSA expects LNG will initially move in smaller quantities (*i.e.,* a few tank cars) as part of manifest trains, it is uncertain whether LNG will continue to be transported in those quantities or if LNG by rail will shift to be transported using a unit train model of service, and if so, how quickly that shift will occur.

Finally, PHMSA notes that there is an existing special permit application to transport LNG by tank car. PHMSA is seeking comment on the draft special permit and environmental assessment, *see* 84 FR 26507 and Docket No. PHMSA–2019–0100, and will consider information provided to the special permit docket that is pertinent to the issue of operational controls in this rulemaking or potential future rulemakings. In conclusion, we invite comment on PHMSA's and FRA's reliance on existing regulations and the operational controls in Circular OT–55 (not incorporated into the HMR) and whether additional operational controls may be warranted based on an assessment of risk. We also encourage commenters to provide data on the safety or economic impacts associated with any proposed operational controls, including analysis of the safety justification or cost impact of implementing operational controls.

## IV. Section-by-Section Review

The following is a section-by-section review of the amendments considered in this NPRM.

### Section 172.101

Section 172.101 provides the HMT and instructions for its use. PHMSA proposes amending the entry for ''UN1972, Methane, refrigerated liquid'' in the HMT to add reference to the cryogenic liquids in (rail) tank cars packaging section—§ 173.319 in Column (8C).

### Section 173.319

Section 173.319 prescribes requirements for cryogenic liquids transported in rail tank cars. Paragraph (d) provides which cryogenic liquids may be transported in a DOT–113 tank car when directed to this section by Column (8C) of the § 172.101 HMT.

PHMSA proposes to amend paragraph (d)(2) to authorize the transport of Methane, refrigerated liquid (LNG). Additionally, PHMSA is proposing to amend the Pressure Control Valve Setting or Relief Valve Setting Table in § 173.319(d)(2) to specify settings for methane in DOT–113C120W tank cars, specifically, a start-to-discharge pressure valve setting of 75 psig; a design service temperature of −260 °F; a maximum pressure when offered for transportation of 15 psig; and a filling density of 32.5 percent by weight.

## V. Regulatory Analyses and Notices

### A. Statutory/Legal Authority for This Rulemaking

This rulemaking is published under the authority of Federal Hazardous Materials Transportation Law (Federal hazmat law; 49 U.S.C. 5101 *et seq.*), and the Federal Railroad Safety Laws (49 U.S.C. ch. 201–213). Section 5103(b) of the Federal Hazmat Law authorizes the Secretary of Transportation to ''prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce.'' Section 20103 of the Federal Railroad Safety Laws, authorizes the Secretary to prescribe regulations and issue orders for every area of railroad safety. The Secretary's authority is delegated to PHMSA at 49 CFR 1.97. This rulemaking proposes to authorize the transportation of LNG by rail in DOT–113C120W tank cars.

### B. Executive Order 12866 and DOT Regulatory Policies and Procedures

This rulemaking is considered a significant regulatory action under section 3(f) of Executive Order 12866 (''Regulatory Planning and Review'') and was reviewed by the Office of Management and Budget (OMB). This rulemaking is also considered a significant rulemaking under the DOT Regulatory Policies and Procedures of February 26, 1979 [44 FR 11034].

Executive Order 12866 (''Regulatory Planning and Review'') [19] requires agencies to regulate in the ''most cost-effective manner,'' to make a ''reasoned determination that the benefits of the intended regulation justify its costs,'' and to develop regulations that ''impose the least burden on society.''

Additionally, Executive Order 12866 requires agencies to provide a meaningful opportunity for public participation, which also reinforces requirements for notice and comment

---

[18] *https://www.ntsb.gov/safety/safety-recs/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=R-17-001.*

[19] See 58 FR 51735, October 4, 1993 for Executive Order 12866.

under the APA.[20] Therefore, in this NPRM, PHMSA seeks public comment on revisions to the HMR authorizing the transportation of LNG by rail tank car. PHMSA also seeks comment on the preliminary cost and cost savings analyses, as well as any information that could assist in quantifying the benefits of this rule. Overall, this rulemaking maintains the continued safe transportation of hazardous materials while producing a net cost savings. For additional discussion about the economic impacts, see the preliminary Regulatory Impact Analysis posted in the docket.[21]

### C. Executive Order 13771

This proposed rule is expected to be an Executive Order 13771 deregulatory action. Details on the estimated cost savings of this proposed rule can be found in the rule's economic analysis.[22]

### D. Executive Order 13132

This rulemaking was analyzed in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism"). This rulemaking may preempt State, local, and Tribal requirements but does not propose any regulation that has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

The Federal hazmat law, 49 U.S.C. 5101–5128, contains an express preemption provision [49 U.S.C. 5125(b)] that preempts State, local, and Indian tribal requirements on the following subjects:

(1) The designation, description, and classification of hazardous materials;

(2) The packing, repacking, handling, labeling, marking, and placarding of hazardous materials;

(3) The preparation, execution, and use of shipping documents related to hazardous materials and requirements related to the number, contents, and placement of those documents;

(4) The written notification, recording, and reporting of the unintentional release in transportation of hazardous material; and

(5) The design, manufacture, fabrication, marking, maintenance, recondition, repair, or testing of a packaging or container represented, marked, certified, or sold as qualified

for use in transporting hazardous material.

This proposed rule addresses covered subject item (2) above and preempts State, local, and Indian tribe requirements not meeting the "substantively the same" standard.

Federal preemption also may exist pursuant to section 20106 of the former Federal Railroad Safety Act of 1970 (FRSA), repealed, revised, reenacted, and recodified at 49 U.S.C. 20106. Section 20106 of the former FRSA provides that States may not adopt or continue in effect any law, regulation, or order related to railroad safety or security that covers the subject matter of a regulation prescribed or order issued by the Secretary of Transportation (with respect to railroad safety matters) or the Secretary of Homeland Security (with respect to railroad security matters), except when the State law, regulation, or order qualifies under the section's "essentially local safety or security hazard."

PHMSA invites State and local governments with an interest in this rulemaking to comment on any effect that revisions to the HMR relative to LNG transportation may cause.

### E. Executive Order 13175

This rulemaking was analyzed in accordance with the principles and criteria contained in Executive Order 13175 ("Consultation and Coordination with Indian Tribal Governments"). PHMSA does not anticipate that this rulemaking will have substantial direct tribal implications. Therefore, the funding and consultation requirements of Executive Order 13175 are not expected to apply. However, PHMSA invites Indian tribal governments to comment on any effect that revisions to the HMR relative to LNG transportation may cause.

### F. Regulatory Flexibility Act, Executive Order 13272, and DOT Policies and Procedures

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires agencies to consider whether a rulemaking would have a "significant economic impact on a substantial number of small entities" to include small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations under 50,000. This proposed rulemaking has been developed in accordance with Executive Order 13272 ("Proper Consideration of Small Entities in Agency Rulemaking") and DOT's procedures and policies to promote compliance with the

Regulatory Flexibility Act to ensure that potential impacts of draft rules on small entities are properly considered. The proposed changes are generally intended to provide relief by easing requirements with no anticipated reduction in safety.

*Consideration of alternative proposals for small businesses.* The Regulatory Flexibility Act directs agencies to establish exceptions and differing compliance standards for small businesses, where it is possible to do so and still meet the objectives of applicable regulatory statutes.

The impact of this proposed rulemaking on small businesses is not expected to be significant. The proposed changes are generally intended to provide regulatory flexibility and cost savings to industry members. However, PHMSA seeks comment on the potential impacts on small entities.

### G. Paperwork Reduction Act

Section 1320.8(d), Title 5, Code of Federal Regulations requires that PHMSA provide interested members of the public and affected agencies an opportunity to comment on information collection and recordkeeping requests. This NPRM does not impose new information collection and recordkeeping burdens.

### H. Regulation Identifier Number (RIN)

A regulation identifier number (RIN) is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. The RIN contained in the heading of this document can be used to cross-reference this action with the Unified Agenda.

### I. Unfunded Mandates Reform Act

This rulemaking does not impose unfunded mandates under the Unfunded Mandates Reform Act of 1995. It does not result in costs of $100 million or more, adjusted for inflation, to either State, local, or Tribal governments, in the aggregate, or to the private sector and is the least burdensome alternative that achieves the objective of the rulemaking. PHMSA will evaluate any regulatory action that might be proposed in subsequent stages of the proceeding to assess the effects on State, local, and Tribal governments and the private sector.

### J. Environmental Assessment

The National Environmental Policy Act of 1969 (NEPA) requires Federal agencies to consider the consequences of major Federal actions and prepare a

---

[20] See 5 U.S.C. 553.

[21] See Docket No. PHMSA–2018–0025 at *www.regulations.gov.*

[22] Ibid.

detailed statement on actions significantly affecting the quality of the human environment. The Council on Environmental Quality (CEQ) implementing regulations (40 CFR part 1500) require Federal agencies to conduct an environmental review considering (1) the need for the action, (2) alternatives to the action, (3) probable environmental impacts of the action and alternatives, and (4) the agencies and persons consulted during the consideration process (*see* 40 CFR 1508.9(b)).

### 1. Need for the Action

The purpose of this NPRM is to propose amendments that authorize the transportation of Methane, refrigerated liquid, commonly known as liquefied natural gas (LNG), by rail in a DOT–113C120W tank car. This proposed rulemaking would facilitate the transportation of LNG by rail in a packaging other than a portable tank. This action would facilitate the transportation of natural gas to markets where pipeline transportation is limited or unavailable.

### 2. Alternatives Considered

Transportation of hazardous materials in commerce is subject to requirements in the HMR, issued under authority of Federal hazmat law, codified at 49 U.S.C. 5101 *et seq.* To facilitate the safe and efficient transportation of hazardous materials in international commerce, the HMR provide that both domestic and international shipment of hazardous materials may be offered for transportation and transported under provisions of the international regulations.

In proposing this rulemaking, PHMSA is considering the following alternatives:

Alternative 1: No Action Alternative

The No Action Alternative would not adopt the regulatory changes proposed in this NPRM. If PHMSA were to select this alternative, it would not proceed with any rulemaking on this subject and the current regulatory standards would remain in effect. If the current regulatory standards remain in effect, LNG would not be authorized for transportation by tank car. The No Action Alternative would not address AAR's petition for rulemaking or stakeholder comments to the October 2, 2017, notification of regulatory review. LNG transportation by highway and by rail—via a PHMSA special permit[23] or

an FRA approval[24]—would continue and perhaps increase over time. However, these alternatives typically have limited applicability because they only apply to the parties to the PHMSA special permit or FRA approval. The No Action Alternative would also fail to comply with the April 10, 2019 Executive Order, ''Executive Order on Promoting Energy Infrastructure and Economic Growth.'' That E.O. orders the Secretary of Transportation to propose regulatory changes ''no later than 100 days after the date of this order, that would treat LNG the same as other cryogenic liquids and permit LNG to be transported in approved rail tank cars. The Secretary shall finalize such rulemaking no later than 13 months after the date of this order.''

Alternative 2: Authorize LNG in DOT–113C120W and DOT–113C140W Tank Cars

This alternative would adopt the AAR petition in its entirety, including the authorization of the DOT–113C140W specification tank car into the HMR for the transportation of LNG. As discussed earlier, in the section ''III. A. *Tank Car Specification*'' section, the intended advantage to the DOT–113C140W tank car is that it would have a similar design and construction to the DOT–113C120W specification, but would potentially allow for five days of additional transportation time because the tank car would use a thicker inner tank material that would allow for a higher inner tank test pressure (140 psig) and higher pressure relief device settings. PHMSA and FRA believe that a complete engineering review of this specification is warranted, and that more research and supporting data are needed to demonstrate that this additional transportation timeframe benefits safety or justifies the addition of a new tank car specification to the HMR. While PHMSA is not opposed to considering this request for future action, it does not want to delay action on the DOT–113C120W tank car. Accordingly, this alternative was eliminated from full consideration in this rulemaking and draft EA.

Alternative 3: Proposed Alternative

The Proposed Alternative is the current proposal as it appears in this NPRM, applying to transportation of hazardous materials by rail. The Proposed Alternative would authorize the transportation of LNG by rail in a DOT–113C120W specification tank car. See sections ''III. Changes Being Considered'' and ''IV. Section-by-Section Review'' of this rulemaking for further discussion on the proposed amendments encompassed in this alternative.

### 3. Environmental Impacts

Alternative 1: No Action Alternative

If PHMSA were to select the No Action Alternative, current regulations would remain in place and no new enabling provisions would be added. This alternative would not amend the HMR to allow shippers to transport bulk quantities of LNG by rail tank car. As such, the current regulatory requirements would require that LNG continue to be transported by highway, or for rail transportation, be limited to certain PHMSA special permit holders or LNG in portable tanks pursuant to the conditions of an FRA approval. This alternative would prevent the use of a tank car that was designed to address the hazards presented by cryogenic liquids, and has a demonstrated safety record. Authorizing the transport of LNG by tank car via rulemaking has the potential to allow shippers to move a greater quantity of LNG more efficiently, as highway transportation requires the use of more vehicles to move the same amount of material as rail transportation, thereby increasing air pollutants, including greenhouse gases. In 2017, U.S. railroads moved a ton of freight an average of 479 miles per gallon of fuel. On average, railroads are four times more fuel efficient than trucks. Because greenhouse gas emissions are directly related to fuel consumption, moving freight by rail instead of truck reduces greenhouse gas emissions by an average of 75 percent. In addition, emissions of particulate matter and nitrogen oxides are significantly lower for railroads than for trucks.[25]

Furthermore, highway transportation may present a greater risk of accident and release of LNG for each movement, which creates a danger for both humans and the environment. From 2005 to 2017, there were eight incidents involving Methane, refrigerated liquid

---

[23] On September 14, 2017, PHMSA announced it had received an application for a special permit to transport LNG by rail in DOT–113 tank cars from

Energy Transport Solutions, LLC. The PHMSA-assigned application number is 20534–N. *See* 82 FR 43285. PHMSA is currently reviewing the application. Additionally, PHMSA issued a notice announcing the availability for public review and comment of the draft environmental assessment for this special permit request to transport LNG by rail tank car. *See* 84 FR 26507 and Docket No. PHMSA–2019–0100.

[24] FRA has granted approvals to Alaska Railroad and Florida East Coast Railroad allowing for the transportation of LNG by rail in ISO containers provided that the operators comply with certain operational controls.

[25] AAR ''Overview of America's Freight Railroads'' (October, 2018) *https://www.aar.org/wp-content/uploads/2018/05/AAR-Overview-Americas-Freight-Railroads.pdf.*

transported by cargo tank motor vehicle (CTMV).[26] No injuries or fatalities were reported to PHMSA. Two of the crashes were single vehicle rollovers. Furthermore, the total quantity spilled in these eight incidents was 11,296 gallons. For three of the eight incidents reported, a total of 165 people were evacuated. One of the three incidents (not a crash) involved 102 evacuations and 1,000 gallons spilled. One other incident of the three, a rollover incident, involved 50 evacuations and zero gallons spilled. The last of the three incidents involved 13 evacuations and 4,625 gallons spilled. In any of these incidents injuries or fatalities could have occurred, especially if an ignition source had been present; the gallons spilled and the number of evacuations demonstrate that the incidents presented significant risk to human life and environmental resources in the vicinity of each incident. While PHMSA understands there are limited rail shipments of Methane, refrigerated liquid, compared to highway transportation, PHMSA and FRA have no record of any reported incidents involving Methane, refrigerated liquid in portable tanks transported by rail since 2005.

Alternative 3: Proposed Alternative

PHMSA proposes to amend the HMR to allow the transportation of LNG in DOT–113C120W rail cars. PHMSA understands that authorizing the rail transportation of LNG would reduce greenhouse gas emissions by requiring fewer trips to transport the same amount of material currently being transported by highway. Furthermore, fewer trips are anticipated to result in fewer accidents and spills of LNG during transportation.

PHMSA has collected data on the safety history of the DOT–113 tank car from its own incident database and from AAR, which compiles data provided by FRA. PHMSA has analyzed data regarding DOT–113 damage history. From 1980 to 2017 (a 37-year period), there were 14 instances of damage to DOT–113 tank cars during transportation. Of the 14 instances, there were three instances where a DOT–113 tank car lost lading from breach of both the outer and inner tanks. This is the most serious type of damage. Additionally, there were three instances in which a DOT–113 tank car lost lading from damage or other failure to the valves/fittings. The vast majority of incidents causing damage to the DOT–

113 tank cars did not result in a loss of hazardous materials.

The first derailment that resulted in breach of an inner tank of a DOT–113 tank car took place in May 2011 in Moran, Kansas. Three DOT–113C120 specification tank cars containing refrigerated liquid ethylene sustained damage. Two of the cars were breached in the derailment and initially caught fire. One of the fires consumed the entire contents of the DOT–113 tank car. The two remaining cars, that is, the one that had been breached in the derailment and the other that had been damaged but not breached, were mechanically breached to expedite the burning and consumption of the contents to expedite removal from the site of the derailment. The total quantity of refrigerated ethylene lost was approximately 45,000 gallons and the total damage estimate was calculated at approximately $231,000 in 2017. The other derailment that caused tank failure of a DOT–113 tank car occurred in October 2014 in Mer Rouge, Louisiana. The rail tank cars were filled with refrigerated liquid argon. One car was a DOT–113A90W specification tank car authorized by Special Permit and the other was an AAR204W tank car. The total quantity of refrigerated liquid argon spilled was 47,233 gallons and the total damage estimate is calculated at approximately $228,000 (in 2017 dollars). No injuries or fatalities were reported as a result of the release of hazardous materials from either incident. Depending on demand, the numbers of DOT–113 tank cars in operation under the proposed regulatory change could increase well beyond the numbers of DOT–113 tank cars currently in operation.

Though rare, derailments involving DOT–113 tank cars can result in large quantities of hazardous materials released, which can result from venting or breach of the inner tank shell. These releases can be considerably larger than releases from a CTMV that travels by highway. Nonetheless, considering that the DOT–113 tank car has a 50-year service history and with the understanding it is possible there are unreported incidents from years past, the safety history is noteworthy. It is difficult to estimate the failure rate of the DOT–113 tank car in derailments because railroads are not required to report incidents to PHMSA or FRA unless they meet a baseline threshold. 49 CFR 171.16 and 225.19. Incident data suggests that incidents involving rail tank cars can lead to higher consequence incidents; however, PHMSA believes that rail transportation is advantageous considering the

quantity transported compared to miles traveled.

LNG Characteristics and Hazards

With regard to how LNG could respond under accident conditions, when a large amount of LNG is spilled and its vapors come into contact with an ignition source, the vapors will ignite if the vapor concentration in a vapor-air mixture is between 5 and 15 percent and cause the spill to develop into a pool fire (if ignited immediately) or flash vapor fire if the vapor cloud is ignited at some distance from the spill location. Both types of fires present a radiant heat hazard. If there is no ignition source in the immediate vicinity of the release, the spilled LNG will vaporize rapidly forming a cold gas cloud that is heavier than air, which then mixes with ambient air, spreads and is carried downwind. The dispersion of the cloud due to the wind results in its temperature increase of the vapor due to mixing with air that gets entrained into the cloud; but the cloud temperature always remains lower than that of ambient air, because of exchange of heat between the air that is mixing and the virgin cold vapor. Also, the density of the cloud decreases due to continuous mixing with air; however, the cloud density is never lower than that of the ambient air. The result is that the cloud is always heavier than air and disperses hugging the ground (with highest vapor concentrations at ground level). The only way the vapor cloud can become either neutrally buoyant or buoyant is if external heat (such as from solar heating or heating from the ground) is added to the cloud. These heat transfer mechanisms provide insufficient heat to the cloud in normal dispersion before the vapor cloud dilutes to concentration below lower flammability limit, LFL, of 5 percent by volume.

The dispersing cloud is visible as a white cloud due to the condensation of water vapor from the atmosphere and because in the initial stages the dispersing cloud is cold (starting from −260 degrees Fahrenheit). However, as the overall cloud temperature increases due to mixing with ambient air, and as the cloud temperature increases to above the "wet bulb" temperature corresponding to the relative humidity of the atmospheric air, the condensed water re-evaporates and the cloud becomes non-visible. The flammable region of the vapor cloud is enclosed within the visible vapor cloud if the ambient relative humidity is greater than or equal to 55 percent. For regions with relative humidity less than this value, the flammable cloud is outside

---

[26] See pages 11 and 12 of the Preliminary Regulatory Impact Analysis for further discussion of incidents involving cryogenic liquids.

Add. 47

the visible cloud. An ignition source can only ignite the vapor cloud when it is available and the vapor concentration is in the 5 to 15 percent average vapor concentration in air. Once ignited, the vapors will burn back, generally upwind, to the LNG source. The distance over which an LNG vapor cloud remains flammable is difficult to predict; local weather conditions (wind speed, atmospheric stability or turbulence), terrain, surface cover (*i.e.,* vegetation, trees, and buildings) will influence how a vapor cloud disperses, and how rapidly it dilutes.

If an LNG vapor cloud is ignited before the cloud has been dispersed or diluted to below its lower flammability limit, a flash fire will occur. Unlike other flammable liquids and gases, a LNG vapor cloud will not ignite entirely at once. If ignited, the flash fire that forms has a temperature of about 1,330 °C (2,426 °F). The resulting ignition leads to a relatively slow (subsonic) burning vapor fire which travels back to the release point producing either a pool fire or a jet fire. The radiant heat effects from such a flash fire does not extend to distances significantly larger than the width of the flammable cloud. The slow burning vapor fire will not generate damaging overpressures (*i.e.,* explosions), if unconfined. To produce an overpressure event, the LNG vapors need to be within the flammability range and ignited, and either be confined within a structure or the travelling flame in the open encounters structural obstructions (*e.g.,* houses, trees, bushes, pipe racks, etc.) that can increase the flame turbulence significantly when the flash fire reaches the source of vapor (boiling LNG), if there is still a liquid pool of LNG evaporating at that time, a pool fire will result.

Methane in vapor state can be an asphyxiant when it displaces oxygen in a confined space. When LNG is spilled on the ground, into a confined area, such as bound by a dike, the LNG will initially boil-off rapidly forming a vapor cloud, but the boil-off will slow down as the ground cools due to heat being extracted from it to provide for the evaporation of LNG. If LNG is spilled on water, LNG will float on top of the water, spread in an unconfined manner, and vaporize very rapidly. This rapid vaporization will occur even at water temperatures near freezing since freezing water is significantly warmer than the spilled LNG.

LNG is stored and transported at −260 °F (−160 °C). Due to this extremely low temperature, contact with a cryogenic liquid can cause severe injury to human skin and eyes. It will also make ordinary metals, including carbon steel, subject to embrittlement and fracture when exposed to these temperatures. Transportation of cryogenic materials require specialized double walled (tank within a tank) containers for transportation.

DOT–113 Tank Car Characteristics

The DOT–113 specification tank car is a specially designed rail tank car for the transport of cryogenic liquids. This tank car design has been in use for over 50 years. As noted above, there are only six documented derailments involving the transportation of the DOT–113 specification tank car that resulted in loss of tank contents.

DOT–113 specification rail tank cars are built to a double pressure-vessel design with the commodity tank (inner vessel) constructed to withstand a burst pressure of 300 psig and fabricated of ASTM A 240/A 240M, Type 304 or 304L stainless steel; the outer jacket shell (outer vessel) is typically constructed of carbon steel and is designed to withstand an external pressure (critical collapsing pressure) of 37.5 psig. See §§ 179.400–8(d) and 179.401–1, respectively. The inner vessel is designed with a minimum thickness of 3/16 inch and the outer shell thickness is greater than 7/16 inch. The rail tank car is manufactured with an insulated annular space holding a vacuum between the two pressure vessels. This vacuum area and the insulation on the outer wall of the inner tank significantly reduce the rate of heat transfer from the atmosphere to the liquid inside the tank car, thus minimizing the heating of the cryogenic (*i.e.,* refrigerated) liquid in the tank car while being transported. Other key safety features of the DOT–113 specification tank car include, but are not limited to, the following:

• Several inches of aluminized Mylar super-insulation surrounding the inner tank.

• A vacuum environment/annular space between the inner and outer tanks for enhanced product pressure and temperature control.

• Specifically, designed loading and unloading equipment (piping, valves, gages, etc.) for use in cryogenic service.

• Safety equipment (pressure relief valves, safety vents, safety shut off valves, and remote monitoring systems) to prevent or limit overpressure issues or non-accident releases.

• Mandated in-transit tracking (time sensitive shipment) and car handling instructions.

Regulations controlling the movement of LNG in the DOT–113C120W packaging would be the same as those that apply to the transportation of other cryogenic liquids, including ethylene. Regulatory requirements governing these operational practices appear in 49 CFR part 174 and 49 CFR 173.319, which is administered by the FRA. In addition, the AAR has issued Circular OT–55, which sets forth Recommended Railroad Operating Practices for Transportation of Hazardous Materials for key trains. Rail carriers require compliance with the standard through AAR Interchange Rules. AAR Circular OT–55 (currently designated as version Q) calls for operational controls for trains carrying certain quantities of hazardous materials, such as LNG unit trains, which are sufficient to address the risks associated with moving LNG in DOT–113 tank cars. The operational controls recommended in OT–55 for the transport of hazardous materials regulate, among other things:

• "Key Trains" are 20 carloads or intermodal portable tank loads of any combination of hazardous materials.

• "Key Trains," including LNG-carrying unit trains, are subject to a maximum speed restriction of 50 mph;

• "Key Routes," which are lengths of track on which either (i) 10,000 car loads or more of hazardous materials or (ii) 4,000 car loadings of flammable gas (such as LNG, which is refrigerated (cryogenic) liquid methane, a Division 2.1 flammable gas) will travel over a one-year period and are subject to additional inspection and equipment requirements;

• Separation distance requirements relating to the spacing of loading and operations, loaded tank cars, and other storage tanks at rail facilities; and

• Community awareness and preparations for emergency planning/incident response actions.

DOT–113 Specification Tank Car Survivability

Due to its unique design requirements, the DOT–113 specification tank car is inherently more robust than other tank cars transporting other flammable liquids or liquefied gases. In the event of a DOT–113 specification tank car derailment causing only breach of the outer shell, the breach would cause the loss of the insulating vacuum between the inner and outer tank, allowing the inner tank and material to warm and build pressure. The resulting pressure build would lead to the activation of the pressure relief systems on the car and the controlled venting of LNG vapor. While this scenario is concerning, the controlled venting of LNG vapor involves less risk than the uncontrolled release of an entire LNG lading. Additionally, it is highly unlikely that

damage to the tank car involved in a derailment would result in explosion due to a boiling liquid expanding vapor explosion (BLEVE). This event is highly unlikely due to the loading pressure requirements [27] for cryogenic materials, and due to the mandated requirements for redundant pressure relief systems (valves and safety vents) that are built into each car. This rulemaking proposes a 15 psig maximum loading pressure when LNG is offered for transportation in the DOT–113C120W tank car. This loading pressure, along with other safety requirements and operational controls reduce the potential of a BLEVE.

LNG Release Scenarios

Based on the review incident reporting and the 50 year history of transporting cryogenic liquids in DOT–113 specification tank cars, there are three (3) possible release scenarios that could occur during the transport of LNG by rail tank car. Ranked in order of probability, they are:

1. Non-accident release (NAR) from service equipment. Probability—Low; Consequence—Low

2. Outer tank damage resulting vapor release from Pressure Relief Device (PRD). Probability—Low; Consequence—Low to High (in the event that ignition of vented vapors led to failure/explosion of the tank car)

3. Inner tank damage resulting in large release. Probability—Low; Consequence—High

Although Scenario 3 has a low probability, a breached inner tank during a transportation accident could have a high consequence because of the higher probability of a fire due to the formation of a flammable gas vapor/air mixture in the immediate vicinity of the spilled LNG. This probability is based on the likelihood of ignition sources (sparks, hot surfaces, etc.) being generated by other equipment, rail cars, or vehicles involved in a transportation accident that could ignite a flammable vapor cloud.

Hazard Distances

As with any incident involving a hazardous material in transportation, the actual hazard distance created by a material that is spilled or burning will be influenced by many factors. These factors include, but are not limited to the following:

• Spill Size
• Weather (Wind, Temperature, Humidity, Precipitation)
• Terrain Contours (Hills, Valleys)
• Surface Cover (Vegetation, Structures)
• Soil (Dirt, Clay, Sand)

As stated previously, hazard distance of a vapor cloud dispersion of LNG is difficult to predict. Local weather conditions, terrain, surface cover (*i.e.,* vegetation, trees, and buildings) will influence how a vapor cloud disperses, and how rapidly it diffuses.

Similarly, the actual hazard distance that radiant heat from a pool fire of LNG would impact is dependent on the same factors that influence a vapor cloud. Additionally, the impact of radiant heat from a fire on occupied structures will be influenced by local building codes that govern building setback requirements from railroad right-of-way. Depending on the jurisdiction, setbacks for occupied structures could be within fifty (50) feet of either side of a railroad track.

Regardless of the scenario, the recommended protective action distances [28] identified in the PHMSA Emergency Response Guidebook (ERG) for LNG would be appropriate for the initial protection of the public during an incident involving LNG. However, these protective distances may encompass occupied structures along rail lines, depending on the location of a failure and the proximity of occupied structures to a breached tank car.

Cascading Failure of Multiple DOT–113 Tank Cars

As stated previously, DOT–113 specification tank cars are inherently more robust when compared to other specification tank cars, due to their unique design, materials of construction, and their specific purpose to transport cryogenic liquids. The special design of the DOT–113 tank car reduces the probability of cascading failures of other undamaged DOT–113 specification tank cars being transported in a block or unit train configuration.

In the scenario where multiple DOT–113 specification tank cars are transported in a block or unit train configuration, fire/radiant heat exposure or cryogenic temperature exposure could potentially lead to the release of material or failure of otherwise undamaged tank cars.

Fire/Radiant Heat Exposure

In a scenario involving fire/radiant heat exposure, an undamaged DOT–113 specification tank car exposed to a radiant heat source could eventually build pressure that would trigger the activation of the tank car's PRD.

As stated previously, this scenario would result in the controlled venting of LNG vapor to the environment. Ignition of these vapors could occur if an ignition source is present, but would be contained to the proximity of the release point of the vapors from the tank car. Additionally, as stated previously, it is highly unlikely that an undamaged DOT–113 tank car involved in a derailment would result in explosion due to a BLEVE. This event is highly unlikely due to the design of the tank car, the loading pressure requirements for cryogenic materials, the mandated requirements for redundant pressure relief systems (valves and safety vents) and insulation systems that are built into each car. It is not possible to state with certainty whether a BLEVE [29] is possible in the case of a LNG tank car derailment, and what conditions need to be present for such an event to occur. However, a recent full-scale test with a double walled portable cryogenic tank filled with liquid nitrogen (and PRDs operated as designed) and exposed to a greater than 200-minute engulfing propane pool fire was neither destroyed nor did a BLEVE occur. The number of cars that could be impacted by this type of exposure would be dependent on multiple factors. Some of these include, but are not limited to: The number or LNG cars in the consist, the locations of those tank cars, type of fire, exposure distance, and defensive actions of responders. Exposure to radiant heat from an LNG pool fire or being caught within the flash vapor fire could result in fatalities, serious injuries, and property damage. These risks also exist in the transportation of LNG via highway, existing rail transportation, and pipeline. However, given the safety history of the DOT–113C120W tank cars, it is expected that the risk of tank car failure and ignition is low.

---

[27] 49 CFR 173.319.

[28] For a large spill, consider initial downwind evacuation for at least 800 meters. If a tank car is involved in a fire, isolate for 1600 meters in all directions; also, consider evacuation for 1600 meters in all directions.

[29] A BLEVE is not caused by a combustion explosion of a flammable material. As the name implies, it is the explosion caused by rapidly evolving vapor in relatively small space which leads to significant increase in pressure which may violently damage/destroy a container. When a container with a liquid in it is exposed to a fire and no pressure relief (or partial intermittent relief) occurs the liquid within it can be heated to superheat temperature conditions. If this is followed by a small breach of the container (due to, say, wall metal failure), the rapid depressurization that results leads to an extremely rapid boiling of the liquid, and release of a significant mass of vapor, in microseconds to milliseconds, into the container. This results in very high pressures inside the container leading to its burst, causing an "explosion" (an explosion is the release of energy in an extremely short duration of time). Whether such phenomena occur in a double walled tank car exposed to an external fire is uncertain.

## Cryogenic Temperature Exposure

In a scenario involving cryogenic temperature exposure, the risk to an undamaged DOT–113 specification tank car is the embrittlement of the car's steel due to exposure to the extremely cold temperatures of the material. This type of exposure could lead to the failure of the tank car's outer carbon steel tank, but not the inner stainless steel tank. As stated previously, if a DOT–113 specification tank car has its outer tank compromised, the car would lose its insulating vacuum and would eventually start to build pressure within the product tank. This pressure build would eventually lead to the activation of the tank car's PRDs and the controlled venting of LNG vapors.

## Air Pollution and Greenhouse Gases

The rulemaking could result in the manufacture of additional DOT–113C120W tank cars. Depending on demand, this manufacture process could result in minor increases in the emission of air pollution and increased emission of greenhouse gases (GHGs), due to the steel and insulating materials that the tank car is comprised of. Also, the transportation of rail tank cars filled with LNG would result in air pollution and GHG emissions associated with increased use of diesel-powered trains. However, transportation of LNG via rail instead of via highway would reduce the emission of air pollution and the emission of GHGs. In general, highway transportation requires proportionally more fuel and results in proportionally more emissions than rail transportation. According to AAR, moving freight by rail instead of truck lowers GHG emissions by 75%. Railroads move approximately one-third of U.S. exports and intercity freight volume in the United States. Despite the large volume of freight moved, U.S. Environmental Protection Agency data show freight railroads account for only 0.5% of total U.S. greenhouse gas emissions and just 2% of emissions from transportation-related sources.[30] Furthermore, removing barriers for the transportation of LNG could promote the use of LNG over more polluting energy sources.

The failure of one or more DOT–113C120W tank cars filled with LNG would release a large amount of either burned methane or unburned methane hydrocarbons into the atmosphere. Unburned methane hydrocarbons are a potent GHG and a pollutant. However, as described above, the likelihood of such a failure is very low, given the safety record of DOT–113C120W tank cars. Nonetheless, unburned methane enters the atmosphere in the production and transportation of methane on a more frequent basis.

While the authorization of the DOT–113 specification tank car for LNG service will facilitate the transportation of LNG, natural gas and LNG is currently transported via pipeline, vessel, highway, and rail. Increased transport of LNG by rail may result in fewer GHG emissions when compared to transport by highway or construction of new pipeline infrastructure. Also, facilitating LNG transport by rail may discourage the polluting and wasteful practice of natural gas flaring during the production of oil by allowing the natural gas to reach a viable market. This rulemaking may further decrease GHG emissions by facilitating the utilization of natural gas over more polluting sources of energy. Nonetheless, any action that facilitates the use of a fossil fuel arguably could contribute to the emission of GHGs, which are the principle cause of global climate change. As a regulator of hazardous materials packaging safety, PHMSA lacks the expertise to perform a quantitative prediction of how this rulemaking could affect GHG emissions. The selection of either the no action alternative or the proposed action alternative could both increase and decrease GHGs directly and indirectly depending on various economic variables.

## 4. Agencies Consulted

PHMSA has coordinated with the Federal Motor Carrier Safety Administration and FRA in the development of this proposed rulemaking. PHMSA will consider the views expressed in comments to the NPRM submitted by members of the public, State and local governments, and industry.

## 5. Conclusion and Proposed FONSI

PHMSA believes that the amendments proposed in this NPRM will ultimately reduce the environmental impact of the transportation of LNG. PHMSA proposes to make a finding that the proposed amendments would not result in a significant environmental impact. PHMSA welcomes any views, data, or information related to safety or environmental impacts that may result if the proposed requirements are adopted, as well as additional information on possible alternatives and their environmental impacts. PHMSA proposes to find that the proposed regulations allowing the transport of LNG via DOT–113C120W tank car will not result in a significant environmental impact.

## K. Privacy Act

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *http://www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *http://www.dot.gov/privacy.*

## L. Executive Order 13609 and International Trade Analysis

Under Executive Order 13609 (''Promoting International Regulatory Cooperation''), agencies must consider whether the impacts associated with significant variations between domestic and international regulatory approaches are unnecessary or may impair the ability of American business to export and compete internationally. *See* 77 FR 26413 (May 4, 2012). In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

Similarly, the Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. For purposes of these requirements, Federal agencies may participate in the establishment of international standards, so long as the standards have a legitimate domestic objective, such as providing for safety, and do not operate to exclude imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards.

PHMSA participates in the establishment of international standards in order to protect the safety of the American public, and we have assessed the effects of the proposed rule to ensure that it does not cause unnecessary obstacles to foreign trade. Accordingly, this rulemaking is consistent with Executive Order 13609 and PHMSA's obligations under the Trade Agreement Act, as amended. This

---

[30] *https://www.aar.org/issue/freight-rail-and-the-environment/.*

rulemaking does not negatively impact international trade.

### M. National Technology Transfer and Advancement Act

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs Federal agencies to use voluntary consensus standards in their regulatory activities unless doing so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.*, specification of materials, test methods, or performance requirements) that are developed or adopted by voluntary consensus standards bodies. This rulemaking does not incorporate by reference any voluntary consensus standards; however, the development of this proposed rule is based on the applicability of the operational controls in AAR Circular OT–55 to the bulk transport of LNG by rail in a train consist that is composed of 20 car loads or intermodal portable tank loads in which LNG is present along with any combination of other hazardous materials.

### N. Executive Order 13211

Executive Order 13211 (''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'') [66 FR 28355; May 22, 2001] requires Federal agencies

to prepare a Statement of Energy Effects for any ''significant energy action.'' Under the executive order, a ''significant energy action'' is defined as any action by an agency (normally published in the **Federal Register**) that promulgates, or is expected to lead to the promulgation of, a final rule or regulation (including a notice of inquiry, ANPRM, and NPRM) that (1)(i) is a significant regulatory action under Executive Order 12866 or any successor order and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) is designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action.

This NPRM is a significant action under Executive Order 12866, but it is not expected to have an annual effect on the economy of at least $100 million. Further, this action is not likely to have a significant adverse effect on the supply, distribution or use of energy in the U.S. For additional discussion of the anticipated economic impact of this rulemaking, please review the preliminary RIA. PHMSA welcomes any data or information related to energy impacts that may result from this NPRM, as well as possible alternatives and their energy impacts. Please describe the impacts and the basis for the comment.

### List of Subjects

*49 CFR Part 172*

Hazardous materials table, Hazardous materials transportation, Labeling, Markings, Packaging and containers.

*49 CFR Part 173*

Hazardous materials transportation, Incorporation by reference, Packaging and containers, Cryogenic liquids, Reporting and recordkeeping requirements.

In consideration of the foregoing, PHMSA proposes to amend 49 CFR chapter I as follows:

### PART 172—HAZARDOUS MATERIALS TABLE, SPECIAL PROVISIONS, HAZARDOUS MATERIALS COMMUNICATIONS, EMERGENCY RESPONSE INFORMATION, TRAINING REQUIREMENTS, AND SECURITY PLANS

■ 1. The authority citation for part 172 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 2. In § 172.101, in table § 172.101 HAZARDOUS MATERIALS TABLE, revise the entry for ''UN1972, Methane, refrigerated liquid'' to read as follows:

**§ 172.101  Purpose and use of the hazardous materials table.**

\*      \*      \*      \*      \*

### § 172.101—HAZARDOUS MATERIALS TABLE

| Symbols | Hazardous materials descriptions and proper shipping names | Hazard class or division | Identification Nos. | PG | Label codes | Special provisions (§ 172.102) | Packaging (§ 173.* * *) | | | Quantity limitations (see §§ 173.27 and 175.75) | | Vessel stowage | |
| | | | | | | | Exceptions | Non-bulk | Bulk | Passenger aircraft/rail | Cargo aircraft only | Location | Other |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8A) | (8B) | (8C) | (9A) | (9B) | (10A) | (10B) |
| | Methane, refrigerated liquid *(cryogenic liquid)* or Natural gas, refrigerated liquid *(cryogenic liquid), with high methane content).* | 2.1 | UN1972 ...... | .................. | 2.1 | .................. | T75, TP5 | None ...... | None ...... | 318, 319 .. | Forbidden | Forbidden | D .............. | 40 |

### PART 173—SHIPPERS—GENERAL REQUIREMENTS FOR SHIPMENTS AND PACKAGINGS

■ 3. The authority citation for part 173 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 4. In § 173.319, revise paragraph (d)(2) to read as follows:

**§ 173.319  Cryogenic liquids in tank cars.**

\*      \*      \*      \*      \*

(d) \*  \*  \*

(2) *Ethylene, hydrogen (minimum 95 percent parahydrogen), and methane, cryogenic liquids* must be loaded and shipped in accordance with the following table:

### PRESSURE CONTROL VALVE SETTING OR RELIEF VALVE SETTING

| Maximum start-to-discharge pressure (psig) | Maximum permitted filling density (percent by weight) | | | | |
|---|---|---|---|---|---|
| | Ethylene | Ethylene | Ethylene | Hydrogen | Methane |
| 17 ................................................................ | ............................... | ............................... | ............................... | 6.60. | |
| 45 ................................................................ | 52.8. | | | | |
| 75 ................................................................ | | 51.1 ................... | 51.1 ................... | | 32.5. |
| Maximum pressure when offered for transportation. | 10 psig ................. | 20 psig ................. | 20 psig ................. | ............................... | 15 psig. |
| Design service temperature .................. | Minus 260 °F ........ | Minus 260 °F ........ | Minus 155 °F ........ | Minus 423 °F ........ | Minus 260 °F. |
| Specification (see §180.507(b)(3) of this subchapter). | 113D60W, 113C60W. | 113C120W ............ | 113D120W ............ | 113A175W, 113A60W. | 113C120W. |

\*    \*    \*    \*    \*

Issued in Washington, DC, on October 16, 2019, under authority delegated in 49 CFR 1.97.

**Drue Pearce,**

*Deputy Administrator, Pipeline and Hazardous Materials Safety Administration.*

[FR Doc. 2019–22949 Filed 10–23–19; 8:45 am]

**BILLING CODE 4910–60–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

**[Docket No. FWS–R4–ES–2018–0082; FXES11130900000–178–FF0932000]**

**RIN 1018–BC11**

### Endangered and Threatened Wildlife and Plants; Removal of the Interior Least Tern From the Federal List of Endangered and Threatened Wildlife

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), propose to remove the inland population of the least tern (Interior least tern) (*Sterna* (now *Sternula*) *antillarum*), from the Federal List of Endangered and Threatened Wildlife. The Interior least tern is a bird that nests adjacent to major rivers of the Great Plains and Lower Mississippi Valley. This proposed action is based on a thorough review of the best available scientific and commercial data, which indicate that the Interior least tern has recovered and no longer meets the definition of an endangered or a threatened species under the Endangered Species Act of 1973, as amended (Act). Our review shows that threats identified for the species at the time of listing, *i.e.,* habitat loss, curtailment of range, predation, and inadequacy of regulatory mechanisms, have been eliminated or reduced, and the Interior least tern has increased in abundance and range. We also announce the availability of a draft post-delisting monitoring (PDM) plan for the Interior least tern. We seek information, data, and comments from the public regarding this proposed rule and the associated draft PDM plan.

**DATES:** We will accept comments received or postmarked on or before December 23, 2019. Comments submitted electronically using the Federal eRulemaking Portal (see **ADDRESSES,** below) must be received by 11:59 p.m. Eastern Time on the closing date. We must receive requests for public hearings, in writing, at the address shown in **FOR FURTHER INFORMATION CONTACT** by December 9, 2019.

**ADDRESSES:** *Written comments:* You may submit comments on this proposed rule and the associated draft PDM plan by one of the following methods:

(1) *Electronically:* Go to the Federal eRulemaking Portal: *http://www.regulations.gov.* In the Search box, enter FWS–R4–ES–2018–0082, which is the docket number for this rulemaking. Then, click on the Search button. On the resulting page, in the Search panel on the left side of the screen, under the Document Type heading, click on the Proposed Rule box to locate this document. You may submit a comment by clicking on "Comment Now!"

(2) *By hard copy:* Submit by U.S. mail or hand-delivery to: Public Comments Processing, Attn: FWS–R4–ES–2018–0082, U.S. Fish and Wildlife Service, MS: BPHC, 5275 Leesburg Pike, Falls Church, VA 22041–3803.

We request that you send comments only by the methods described above. We will post all comments on *http://www.regulations.gov.* This generally means that we will post any personal information you provide us (see *Public Comments,* below, for more information).

*Document availability:* The proposed rule, draft PDM plan, and supporting documents are available at *http://www.regulations.gov* under Docket No. FWS-R4–ES–2018–0082.

**FOR FURTHER INFORMATION CONTACT:** Stephen Ricks, Field Supervisor, U.S. Fish and Wildlife Service, Mississippi Ecological Services Field Office, 6578 Dogwood View Parkway, Jackson, MS 39213; telephone (601) 321–1122. Individuals who use a telecommunications device for the deaf (TDD), may call the Federal Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

*Why we need to publish a rule.* Under the Act, we are required to conduct a review of all listed species at least once every 5 years (5-year review) to review their status and determine whether they should be classified differently or removed from listed status. In the Act, the term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." Therefore, we use the term "species" to refer to the Interior population of the least tern in this proposed rule. In our 2013 5-year review for the Interior least tern, we recommended removing the Interior least tern from the List of Endangered and Threatened Wildlife (*i.e.,* "delisting" the species). However, to change the status of a listed species under the Act, we must complete the formal rulemaking process. Therefore, we are publishing this proposed rule in the **Federal Register** and seeking public comments on it. Within 1 year of the publication of this proposed rule, we will make a final determination on the proposal.

*What this document does.* This document proposes to delist the Interior least tern (*Sterna* (now *Sternula*) *antillarum*).

*The basis for our action.* Under the Act, we may delist a species if the best scientific and commercial data indicate

# DEPARTMENT OF TRANSPORTATION

## Pipeline and Hazardous Materials Safety Administration

### 49 CFR Parts 172, 173, 174, 179, and 180

**[Docket No. PHMSA–2018–0025 (HM–264)]**

**RIN 2137–AF40**

### Hazardous Materials: Liquefied Natural Gas by Rail

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** PHMSA, in coordination with the Federal Railroad Administration (FRA), is amending the Hazardous Materials Regulations (HMR) to allow for the bulk transport of "Methane, refrigerated liquid," commonly known as liquefied natural gas (LNG), in rail tank cars. This rulemaking authorizes the transportation of LNG by rail in DOT–113C120W specification rail tank cars with enhanced outer tank requirements, subject to all applicable requirements and certain additional operational controls. The enhancements to the outer tank are indicated by the new specification suffix "9" (DOT–113C120W9).

**DATES:**

*Effective date:* This rule is effective August 24, 2020.

*Voluntary compliance date:* Voluntary compliance is authorized July 24, 2020.

**FOR FURTHER INFORMATION CONTACT:** Michael Ciccarone, Standards and Rulemaking Division, (202) 366–8553, Pipeline and Hazardous Materials Safety Administration, or Mark Maday, Federal Railroad Administration, (202) 366–2535, U.S. Department of Transportation, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

**SUPPLEMENTARY INFORMATION:**

### Abbreviations and Terms

AAR    Association of American Railroads
APA    Administrative Procedure Act
ASNT    American Society of Non-destructive Testing
ASTM    American Society of Testing and Materials
AWS    American Welding Society
BLET    Brotherhood of Locomotive Engineers and Trainmen
BLEVE    Boiling Liquid Expanding Vapor Explosion
BNSF    Burlington Northern Santa Fe
CEQ    Council on Environmental Quality
CFR    Code of Federal Regulations

CPUC    California Public Utilities Commission
CTMV    Cargo Tank Motor Vehicle
DOT    Department of Transportation
DOT–SP    Department of Transportation Special Permit
DP    Distributed Power
EA    Environmental Assessment
ECP    Electronically Controlled Pneumatic
EIS    Environmental Impact Statement
E.O.    Executive Order
EOT    End of Train
ERG    Emergency Response Guidebook
ETS    Energy Transport Solutions, LLC
FEMA    Federal Emergency Management Agency
FRA    Federal Railroad Administration
FRSA    Federal Railroad Safety Act
GHG    Greenhouse Gas
GRL    Gross Rail Load
HHFT    High-Hazard Flammable Train
HLRW    High Level Radioactive Waste
HMEP    Hazardous Materials Emergency Preparedness
HMT    Hazardous Materials Table
HMTA    Hazardous Materials Transportation Act
HMR    Hazardous Materials Regulations
IAFC    International Association of Fire Chiefs
IAFF    International Association of Fire Fighters
IBR    Incorporation by Reference
IFR    Interim Final Rule
LNG    Liquefied Natural Gas
LPG    Liquefied Petroleum Gas
MLI    Multi-Layer Insulation
NASFM    National Association of State Fire Marshals
NEPA    National Environmental Policy Act
NFPA    National Fire Protection Association
NGO    Non-Governmental Organization
NJDEP    New Jersey Department of Environmental Protection
NPRM    Notice of Proposed Rulemaking
NTSB    National Transportation Safety Board
NYDEC    New York State Department of Environmental Conservation
NYDHSES    New York State Division of Homeland Security and Emergency Services
NYDOT    New York State Department of Transportation
OIRA    Office of Information and Regulatory Affairs
OMB    Office of Management and Budget
PHMSA    Pipeline and Hazardous Materials Safety Administration
PRD    Pressure Relief Device
PRV    Pressure Relief Valve
PSR    Physicians for Social Responsibility
RSI    Railway Supply Institute
RFA    Regulatory Flexibility Act
RIA    Regulatory Impact Analysis
RIN    Regulatory Identifier Number
RSI–CTC    Railway Supply Institute Committee on Tank Cars
SNF    Spent Nuclear Fuel
SI    Super Insulation
TTD    Transportation Trades Department, AFL–CIO
The Center    The Center for Biological Diversity
TC    Transport Canada
TDG    Transportation of Dangerous Goods
UMRA    Unfunded Mandates Reform Act

UN    United Nations
U.S.C.    United States Code
VCE    Vapor Cloud Explosion

## Table of Contents

I. Overview
II. NPRM and Background
　A. Petition for Rulemaking (P–1697)
　B. Regulatory Review
　C. DOT Special Permit 20534
III. Amendments to the HMR Adopted in This Final Rule
　A. Existing HMR Requirements for Rail Transport of Flammable Cryogenic Material
　B. The DOT–113C120W Specification Tank Car
　C. Additional Operational Controls for LNG Transportation
IV. Summary and Discussion of Comments to the Rulemaking Docket
　A. Tank Car Design
　B. Operational Controls
　C. Environmental Impacts
　D. Economic Analysis
　E. Emergency Response
　F. Comments of General Opposition
　G. Comments From the Puyallup Tribe
　H. Comments Beyond the Scope of This Rulemaking
V. Section-by-Section Review
VI. Regulatory Analyses and Notices
　A. Statutory/Legal Authority for This Rulemaking
　B. Executive Order 12866 and DOT Regulatory Policies and Procedures
　C. Executive Order 13771
　D. Executive Order 13132
　E. Executive Order 13175
　F. Regulatory Flexibility Act, Executive Order 13272, and DOT Policies and Procedures
　G. Paperwork Reduction Act
　H. Regulation Identifier Number (RIN)
　I. Unfunded Mandates Reform Act
　J. Environmental Assessment
　K. Privacy Act
　L. Executive Order 13609 and International Trade Analysis
　M. Executive Order 13211
List of Subjects

## I. Overview

In this final rule, PHMSA is authorizing the transportation of LNG by rail tank car, pursuant to Federal Hazardous Materials Transportation law (Federal hazmat law; 49 U.S.C. 5101 *et seq.*), because we have determined that bulk rail transport is a safe alternative for this energy product. The final rule authorizes the transportation of LNG by rail in DOT–113 tank cars, which have an established track record of safety in transporting other cryogenic flammable materials. The DOT–113 tank car authorized for LNG service will be enhanced with an outer tank that is thicker and made of steel with a greater puncture resistance to provide an added measure of safety and crashworthiness. Additionally, there will be operational controls in the form of enhanced braking requirements, remote

monitoring, and route analysis, which are intended to exceed current safety requirements for other flammable cryogenic materials.

PHMSA's mission is to protect people and the environment by advancing the safe transportation of energy products and other hazardous materials that are essential to our daily lives. To do this, the agency establishes national policy, sets and enforces standards, conducts research to prevent incidents, and prepares the public and first responders to reduce consequences if an incident does occur. PHMSA and FRA share responsibility for regulating the transportation of hazardous materials by rail and take a system-wide, comprehensive approach that focuses on prevention, mitigation, and response to manage and reduce the risk posed to people and the environment. In line with PHMSA's mission and shared responsibility with FRA for oversight of the rail transport of hazardous materials, PHMSA is issuing this final rule to authorize the transportation of LNG by rail in DOT–113C120W specification rail tank cars with enhanced outer tank material and thickness (those enhancements to be indicated by the specification suffix ''9''), subject to operational controls for braking, monitoring, and route analysis.

This authorization conforms to the intent and purpose of the HMR (49 CFR parts 171–180), which are designed to ensure the safe transportation of all hazardous materials packagings (including tank cars). Collectively, the HMR combine packaging design and maintenance, operational controls, package handling, employee training, hazard communication, emergency response information, and security plan requirements to safeguard transportation. These measures help ensure that hazardous contents safely remain within a package during the course of transportation while also providing for public awareness and appropriate response mechanisms. Supplemental to the HMR, PHMSA oversees a Hazardous Materials Emergency Preparedness (HMEP) grant program that provides funding to the emergency response community for training and planning purposes, furthering appropriate response efforts.

The United States leverages domestic technology improvements to transform American life through increased natural gas production and energy independence. As a result, the United States is today the world's largest natural gas producer through economical production from shale and other unconventional formations.[1] Transportation of natural gas, however, can be constrained by the capacity of existing transportation infrastructure, which negatively affects regions with insufficient access to pipelines or ports. This constraint on capacity, coupled with increased natural gas production in the United States, has resulted in the consideration of using rail transport to help efficiently deliver natural gas to domestic U.S. and international markets.

Authorizing the use of proven DOT–113C120W-specification tank cars to transport LNG will allow the rail industry to play a role in the safe, efficient transport of this important energy product for the 21st century. LNG—referred to as ''Methane, refrigerated liquid'' [2] within the HMR—has been transported safely by trucks on highways and by marine vessels for over 40 years in the United States, and over 50 years internationally. However, the HMR did not authorize the bulk transport of LNG in rail tank cars prior to this rulemaking action, instead permitting rail transport of LNG only on an *ad hoc* basis as authorized by the conditions of a PHMSA special permit (49 CFR 107.105) or in a portable tank secured to a rail car pursuant to the conditions of an FRA approval. The recent expansion in U.S. natural gas production has increased interest in a programmatic approach to using appropriately the nation's rail infrastructure to facilitate efficient transportation of LNG. In response to that interest, PHMSA, in coordination with the FRA, issues this final rule to amend the HMR to permit the bulk transport of LNG in DOT–113C120W specification rail tank cars with enhanced outer tank requirements (those enhancements to be indicated by the specification suffix ''9''), subject to operational controls for braking, monitoring, and routing.

In addition, this final rule satisfies the directive in Executive Order (E.O.) 13868 [84 FR 15495, April 19, 2019] to propose, consistent with applicable law, regulations that ''treat LNG the same as other cryogenic liquids and permit LNG to be transported in approved rail tank cars.'' [3] E.O. 13868 recognizes the leading role that the United States plays in producing natural gas, the importance of improving the United States' capacity to supply natural gas, including LNG, to domestic and international markets, and the need to continue to transport this energy product in a safe and efficient manner. In issuing this final rule, PHMSA furthers the purposes and policies set forth in E.O. 13868 by enabling an additional safe, reliable, and efficient transportation alternative for bringing domestically produced natural gas to existing, and potentially new, markets.

The present action is based on a longstanding understanding of the properties of LNG and an evidence-based approach to the safety of the DOT–113 tank cars designed and used to transport flammable cryogenic materials. At the same time, in promulgating this final rule, and as it does with other hazardous materials, PHMSA recognizes that there is ongoing and potential future research related to the transportation of LNG by all modes. The Agency will continue to use this research to inform potential future regulatory activity, as appropriate.

In the following table, PHMSA provides an overview of: (1) The requirements for LNG transportation in tank cars pursuant to DOT Special Permit 20534 (DOT–SP 20534),[4] issued to Energy Transport Solutions, LLC (ETS) during the Notice of Proposed Rulemaking (NPRM) [5] comment period to authorize ETS's rail transportation of LNG along specific routes; (2) the requirements proposed in the October 24, 2019 NPRM; and (3) the requirements adopted in this final rule. Requirements related to the thermal performance of the DOT–113C120W tank car are unchanged from the NPRM (75 psig maximum start to discharge pressure; maximum pressure when offered; and design service temperature). But this final rule, after consideration of comments received in the docket and to provide additional operational controls and crashworthiness for LNG tank cars, adopts supplemental requirements to those initially proposed in the NPRM: Remote monitoring of pressure and location for LNG tank cars in

---

[1] CRS, ''An Overview of Unconventional Oil and Natural Gas: Resources and Federal Actions,'' 7–5700, Summary, (2015).

[2] Use of this description in quotes and with methane capitalized reflects the proper shipping name as listed in the § 172.101 Hazardous Materials Table.

[3] PHMSA notes that it first announced in the ''Spring 2018 Unified Agenda of Federal Regulatory and Deregulatory Actions'' [83 FR 27085] that it had initiated a ''pre-rule'' action on LNG by Rail, and subsequently announced that it would proceed with an NPRM in the ''Fall 2018 Regulatory Plan and the Unified Agenda of Federal Regulatory and Deregulatory Actions'' [83 FR 57803]. While these actions notified the public of PHMSA's intention to develop propose a regulatory framework for the safe rail transportation of LNG, PHMSA had not published a proposed rulemaking by the time the President issued E.O. 13868 on April 10, 2018.

[4] *https://www.regulations.gov/document? D=PHMSA-2019-0100-3006.*

[5] *Hazardous Materials: Liquefied Natural Gas by Rail NPRM* [84 FR 56964].

transportation; two-way end-of-train (EOT) or distributed power (DP) system for trains transporting 20 or more loaded tank cars of LNG in a continuous block, or 35 or more loaded tank cars of LNG throughout the train; and a requirement that railroads comply with § 172.820 route planning requirements. In addition, to account properly for the properties of LNG, this final rule raises the maximal filling density limit to 37.3% from the proposed 32.5%. Finally, in this final rule PHMSA is also adopting enhanced outer tank requirements compared with the requirements that apply to other DOT– 113C120W-specification tank cars, including a thicker 9/16th inch outer tank made from high quality TC–128B normalized steel. Compliance with these enhanced outer tank requirements will be indicated by the new specification suffix ''9'' (DOT– 113C120W9).

### TABLE 1—SUMMARY OF DOT–SP 20534, NPRM PROPOSALS, AND FINAL RULE COMPONENTS

| LNG requirements | | | |
| --- | --- | --- | --- |
| Topics | DOT special permit 20534 | NPRM | Final rule |
| Approval of LNG | Permitted between Wyalusing, PA and Gibbstown, NJ, with no intermediate stops. | Permitted Nationwide | Permitted Nationwide. |
| Remote Monitoring | Required as a condition of the DOT–SP. | Not Required | Required as a Special Provision for LNG. |
| Maximum Start to Discharge Pressure. | Not Specified | 75 psig | 75 psig. |
| Maximum Pressure when Offered for Transportation. | 15 psig | 15 psig | 15 psig. |
| Design Service Temperature | Not Specified | Minus 260 °F | Minus 260 °F. |
| Maximum Permitted Filling Density (percent by weight). | 32.5% | 32.5% | 37.3%. |
| When is a two-way end-of-train (EOT) or a distributed power (DP) system required. | Required when a train is transporting 20 or more tank cars authorized under this special permit. | Not Proposed | Required when a train is transporting 20 or more loaded tank cars of LNG in a continuous block or 35 or more loaded tank cars of LNG throughout the train. |
| Route Controls | Authorized only on one route | Not Proposed | Must comply with 172.820. |
| Minimum Wall Thickness of the Outer Tank Shell and the Outer Tank Heads. | Shell: 7/16″ ........ Tank Head: 1/2″ | Shell: 7/16″ ........ Tank Head: 1/2″ | Shell and Tank Head: Enhanced 9/16″. |
| Required Outer Tank Steel Type(s) | As specified in AAR Specifications for Tank Cars, Appendix M. | As specified in AAR Specifications for Tank Cars, Appendix M. | AAR TC 128, Grade B normalized steel plate. |

## II. NPRM and Background

PHMSA on October 24, 2019, in consultation with the FRA, published the NPRM proposing to authorize the transport of LNG by rail. PHMSA issued the NPRM in response to a petition for rulemaking (P–1697)[6] from the Association of American Railroads (AAR) and a review of existing regulations.

The NPRM proposed a framework for transporting LNG by rail safely by designating an authorized packaging, and by determining how the packaging would be filled safely. PHMSA chose the DOT–113C120W specification tank car packaging designed for flammable cryogenic material. This packaging has been transporting similar flammable cryogenic materials for decades with no fatalities or serious injuries. As for the filling/loading controls, PHMSA proposed a maximum start-to-discharge pressure of 75 psig, a maximum permitted filling density of 32.5 percent by weight, a maximum pressure when offered for transportation of 15 psig, and

a design service temperature of minus 260 degrees Fahrenheit. The maximum offering pressure of 15 psig proposed in the NPRM is consistent with the 20-day transportation requirement for cryogenic materials and the allowable average daily pressure rise of 3 psig per day during transportation.

In the NPRM, PHMSA also proposed operational controls consistent with the existing requirements of the HMR, and invited comment on whether existing regulations and the operational controls in AAR's Circular OT–55 entitled ''*Recommended Railroad Operating Practices For Transportation of Hazardous Materials*''[7] are sufficient. The NPRM also sought comment on the potential need for additional operating controls. Beyond the operational controls already included for other flammable cryogenic materials

transported by rail, PHMSA specifically referenced train length and composition, speed restrictions, braking requirements, and routing requirements as potential areas of interest to provide for enhanced operational control requirements. PHMSA also encouraged commenters to provide data on the safety or economic impacts associated with any additional operational controls, including analysis of the safety justification or cost impact of their implementation.

PHMSA also received a request from the Offices of the Attorneys General of New York and Maryland to extend the 60-day comment period for the NPRM an additional 30 days. PHMSA issued a notice[8] on December 23, 2019, extending the comment period until January 13, 2020.

---

[6] PHMSA–2017–0020–0002.

[7] The freight rail industry developed the first edition of OT–55, which details railroad operating practices for hazardous materials, in the late 1980s, as part of an inter-industry hazardous materials rail safety task force that also included the Chemical Manufacturers Association (now the American Chemistry Council) and the Railway Progress Institute (now the Railway Supply Institute).

[8] *Hazardous Materials: Liquefied Natural Gas by Rail; Extension of Comment Period* [84 FR 70491], *https://www.federalregister.gov/documents/2019/ 12/23/2019-27656/hazardous-materials-liquefied- natural-gas-by-rail-extension-of-comment-period.*

## A. Petition for Rulemaking (P–1697)

### 1. AAR's Petition for Rulemaking and the NPRM

On January 17, 2017, AAR submitted a petition for rulemaking to PHMSA, entitled ''Petition for Rulemaking to Allow Methane, Refrigerated Liquid to be Transported in Rail Tank Cars'' (P–1697), requesting revisions to the Hazardous Materials Table (HMT; § 172.101) and § 173.319 of the HMR that would permit the transportation of LNG by rail in DOT–113 tank cars. The Administrative Procedure Act (APA), 5 U.S.C. 551, *et seq.* requires Federal agencies to give interested persons the right to petition an agency to issue, amend, or repeal a rule. 5 U.S.C. 553(e). PHMSA's rulemaking procedures at § 106.95 allow interested persons to ask PHMSA to add, amend, or repeal a regulation by filing a petition for rulemaking along with information and arguments supporting the requested action. In May 2018, PHMSA accepted P–1697 in accordance with § 106.105 by notifying AAR that the request merited consideration in a future rulemaking.[9]

In its petition, AAR proposed that PHMSA amend the entry for ''United Nations (UN) 1972, Methane, refrigerated liquid'' in the HMT to add a reference to § 173.319 in Column (8C) authorizing transport in rail tank cars. Additionally, AAR proposed that PHMSA amend § 173.319 to include specific requirements for DOT–113 tank cars used for the transportation of LNG, and suggest that the authorized tank car specifications be DOT–113C120W and DOT–113C140W.[10] AAR further proposed amending § 173.319(d)(2) to include maximum filling densities comparable to those specified for cargo tanks containing LNG in § 173.318(f)(3). AAR argued that ''LNG should be authorized for rail transportation because it is a safe method of transportation, LNG shippers have indicated a desire to use rail to transport it, and because railroads potentially will need to transport LNG for their own use as a locomotive fuel.'' With respect to shipper demand, AAR contended the following:

The only way to transport LNG is by obtaining special approval from PHMSA for rail transport, or by transporting it via highway; and that notwithstanding the requirement for a special approval, customers have expressed interest in shipping LNG by rail from Pennsylvania to New England, and between the U.S. and Mexico. Authorizing transportation of LNG by rail likely would stimulate more interest. In addition, several railroads are actively exploring LNG as a locomotive fuel. If railroads are to use LNG-powered locomotives, they would need to supply LNG along their networks. Transporting LNG in tank cars would be an optimal, if not essential, way to transport LNG to those locations.

Furthermore, with respect to rail as a safe method of transportation, AAR noted:

Rail is undeniably safer than over-the-road transportation of LNG, and transport via that mode should be facilitated. The reason the hazardous materials regulations do not currently authorize the transportation of LNG by rail is simply that there was a lack of demand for rail transport of LNG when PHMSA authorized DOT–113 tank cars for the transportation of cryogenic liquids and listed the cryogenic liquids that could be transported in those cars. There was no determination that rail was an unsuitable mode of transporting LNG.

In the NPRM, PHMSA noted that AAR's requested action fits generally into the existing structure of the HMR, which combines packaging design and maintenance, operational controls, package handling, employee training, hazard communication, emergency response information, and security plan requirements to ensure safe transportation of hazardous materials. In the NPRM, PHMSA also requested public comment on the proposals present in AAR's petition, including their potential to reduce regulatory burdens, enhance domestic energy production, and impact safety.

### 2. The Center for Biological Diversity's Response to P–1697

On May 15, 2017, the Center for Biological Diversity (the Center) submitted a comment to P–1697, recommending that PHMSA deny AAR's petition for rulemaking because of potential environmental impacts of transporting LNG. The Center commented that PHMSA should not proceed in evaluating the petition request until the Agency has conducted a National Environmental Policy Act (NEPA) evaluation, prepared an Environmental Impact Statement (EIS) or Environmental Assessment (EA), and provided opportunity for public review and comment in accordance with Federal hazmat law, as applicable. PHMSA regulations do not require PHMSA to conduct a NEPA evaluation at the time it responds to a petition, and PHMSA has not taken such actions historically as part of its decision whether to accept or deny a petition for rulemaking. As result, PHMSA did not prepare an EA or EIS prior to responding to P–1697. This decision was made with the knowledge that PHMSA would be required to conduct a NEPA analysis as part of a potential rulemaking.

When PHMSA published the NPRM, it prepared a draft EA, *see Section V. J.* ''*Environmental Assessment*'' of the NPRM. A final EA for the rulemaking is included in the rulemaking docket as part of the analysis for the final rule.

## B. Regulatory Review

On October 2, 2017, DOT published a notice [11] in the **Federal Register** expressing Department-wide plans to review existing regulations and other agency actions to evaluate their continued necessity, determine whether they are crafted effectively to solve current problems, and evaluate whether they potentially burden the development or use of domestically produced energy resources. As part of this review process, DOT invited the public to provide input on existing rules and other agency actions that have potential for repeal, replacement, suspension, or modification.

The Interested Parties for Hazardous Materials Transportation (Interested Parties) submitted a comment [12] supporting the authorization of LNG for rail tank car transport. Specifically, the Interested Parties noted in its comment that LNG shares similar properties to other flammable cryogenic materials currently authorized by rail tank car and

---

[9] PHMSA–2017–0020–0005.

[10] The HMR do not authorize the DOT–113C140W specification tank car for hazardous materials transportation. *See* section ''III. A. *Tank Car Specification*'' of the NPRM for further discussion.

[11] *Notification of Regulatory Review,* Docket No. DOT–OST–2017–0069 [82 FR 45750].

[12] Comment from Interested Parties for Hazardous Materials Transportation, Document No. DOT–OST–2017–0069–2591, at: *https://www.regulations.gov/document?D=DOT-OST-2017-0069-2591.* The Interested Parties is a volunteer-run coalition of organizations that share an interest in legislative and regulatory issues related to the safe and secure domestic and international transportation of hazardous materials. Interested Parties members include associations representing hazardous materials shippers, carriers, packaging manufacturers and other related groups, including the Agricultural Retailers Association; American Chemistry Council; American Fuel & Petrochemical Manufacturers; American Trucking Associations; American Pyrotechnics Association; Association of HazMat Shippers; The Chlorine Institute; Compressed Gas Association; Council on the Safe Transportation of Hazardous Articles; Dangerous Goods Advisory Council; The Fertilizer Institute; Gases and Welding Distributors Association; Institute of Makers of Explosives; International Liquid Terminals Association; International Vessel Operators Dangerous Goods Association; Medical Device Battery Transport Council; National Association of Chemical Distributors; National Private Truck Council; National Tank Truck Carriers; Plastics Industry Association; Petroleum Marketers Association of America; Radiopharmaceutical Shippers & Carriers Conference; Railway Supply Institute, Inc.; Reusable Industrial Packaging Association; Sporting Arms Ammunition Manufacturers Institute; The Sulphur Institute; and the Utility Solid Waste Activities Group.

has already been moved in the United States under a special permit. Additionally, they noted that Transport Canada authorizes LNG for transportation by rail in DOT–113-equivalent rail cars and that there is increased commercial demand for rail transport of LNG within the United States and between the United States and Mexico.

After consideration of the issues, PHMSA is acting on the comment from the Interested Parties by amending the HMR to allow for bulk transport of LNG by rail in a DOT–113 specification tank car. Additionally, this action supports the objectives of the Notification of Regulatory Review because it is expected to "promote [the] clean and safe development of our Nation's vast energy resources, while avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation."

*C. DOT Special Permit 20534*

On August 21, 2017, PHMSA received an application for a special permit from ETS to authorize the transportation in commerce of "Methane, refrigerated liquid" in DOT–113C120W tank cars.

Upon completion of its preliminary evaluation of the application, PHMSA published for public comment a Notice of Draft Environmental Assessment for a Special Permit Request for Liquefied Natural Gas by Rail in the **Federal Register** on June 6, 2019.[13] The notice requested comment on potential safety, environmental, and any additional impacts that should be considered as part of the special permit evaluation process. The docket for the draft Environmental Assessment enclosed a draft special permit. The notice was initially published with a 30-day comment period and was extended an additional 30 days after comments from numerous stakeholders, including non-governmental organizations (NGOs) and private individuals. The extended comment period closed on August 7, 2019 and PHMSA received 2,994 comments.

On December 5, 2019, PHMSA granted DOT–SP 20534 to ETS authorizing the transportation of LNG in DOT–113C120W tank cars between Wyalusing, Pennsylvania, and Gibbstown, New Jersey, with no intermediate stops, and subject to certain operational controls. Some of the operational controls required by the

special permit had not been proposed in the draft special permit; PHMSA introduced those additional operational controls in response to comments received and additional documentation provided by the applicant, as well as to further reduce risk by supplementing the robust safety regime established by the HMR. Those information requests also were intended to increase PHMSA and FRA's knowledge of ETS's operations to inform later decisions on DOT–SP 20534 and the HMR. Specifically, PHMSA added the following requirements to the special permit:

(1) Each tank car must be operated in accordance with § 173.319 except for the identified maximum permitting filling density, maximum operating pressure, and remote sensing equipment as specified in the special permit;

(2) Shipments are authorized between Wyalusing, Pennsylvania, and Gibbstown, New Jersey, with no intermediate stops.

(3) Within 90 days after issuance, the grantee shall prepare and submit a plan providing per shipment quantities, timelines, and other actions to be taken for moving from single car shipments to multi-car shipments, and subsequently to unit trains (20 or more tank cars).

(4) Trains transporting 20 or more tank cars authorized under this special permit must be equipped and operated with a two-way end of train device as defined in 49 CFR 232.5 or distributed power as defined in 49 CFR 229.5.

(5) Prior to the initial shipment of a tank car under this special permit, the grantee must provide training to emergency response agencies that could be affected between the authorized origin and destination. The training shall conform to NFPA–472, a voluntary consensus standard developed by the National Fire Protection Association (NFPA) establishing minimum competencies for responding to hazardous materials emergencies, including known hazards in emergencies involving the release of LNG, and emergency response methods to address an incident involving a train transporting LNG.

(6) While in transportation, the grantee must remotely monitor each tank car for pressure, location, and leaks.

Following issuance of DOT–SP 20534, PHMSA published a notice[14] in the **Federal Register** that PHMSA had added DOT–SP 20534 and documents supporting the special permit

decision—the Special Permit Evaluation Form and Final Environmental Assessment—to the docket for the HM–264 NPRM (Docket No. PHMSA–2018–0025) for consideration by the public because of the overlapping subject matter. PHMSA invited comments on DOT–SP 20534 operational controls to be submitted to the HM–264 rulemaking docket by December 23, 2019.[15] PHMSA noted it would consider any additional comments on the operational controls included in DOT–SP 20534, which was posted to the HM–264 rulemaking docket to aid in determining appropriate operational controls for this final rule. PHMSA encouraged commenters to provide data on the safety or economic impacts associated with operational controls in the special permit, including analysis of the safety benefits and the potential cost-benefit impact of implementing those or other operational controls.

**III. Amendments to the HMR Adopted in This Final Rule**

In this final rule, PHMSA is authorizing LNG, a well characterized and understood material, for transportation in a specific rail car packaging that has a long, safe record carrying similar cryogenic materials, including flammable materials. Additionally, to provide an additional level of safety and in response to comments, PHMSA is adopting certain supplemental packaging integrity enhancements and operational controls.

*A. Existing HMR Requirements for Rail Transport of Flammable Cryogenic Material*

Federal hazmat law, 49 U.S.C. 5103, requires PHMSA[16] to designate material or a group or class of material as hazardous when it determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property, and to prescribe regulations for the safe transportation of hazardous material in commerce. Transportation includes the movement of that hazardous material and any loading, unloading, or storage incidental to the movement.[17] These statutory provisions are implemented within PHMSA regulations at 49 CFR parts 171 to 180 (*i.e.,* the HMR).

The HMR prescribe a comprehensive suite of requirements for hazardous material classification, hazard communication, emergency response

---

[13] *Hazardous Materials Safety: Notice of Availability of the Draft Environmental Assessment for a Special Permit Request for Liquefied Natural Gas by Rail* [84 FR 26507].

[14] *Hazardous Materials: Notice of Issuance of Special Permit Regarding Liquefied Natural Gas* [84 FR 67768].

[15] On December 23, 2019, PHMSA extended the comment period to January 13, 2020 [84 FR 70491].

[16] The authority was delegated by the Secretary of Transportation in 49 CFR 1.97.

[17] 49 U.S.C. 5102(13).

information, training, packaging, and material handling. These requirements are designed to prevent the release of hazardous materials in transportation, and in the event of a release, to provide emergency responders and the public with necessary information to protect themselves and mitigate the consequences of the release to the greatest extent possible. The HMR are a proven hazardous material regulatory system well suited to manage the risks of LNG transportation in rail tank cars. The robust requirements already in place in the HMR for packaging, rail car handling, hazard communication and training address many of the safety concerns related to the transportation of LNG by rail. Moreover, PHMSA works closely with other Federal and State partners to enforce the requirements of the HMR.

1. Packaging

Selecting proper packaging for a hazardous material is a critical step in the HMR safety system. Hazardous materials packaging must be chemically and physically compatible with the material contained in the package, also known as the lading. The packaging must be able to withstand all conditions normally encountered during transportation, which include humidity and pressure changes, shocks, and vibrations. The HMR authorize many types of packagings for hazardous materials, ranging in size from 1 milliliter glass sample tubes, to 30,000-gallon railroad tank cars. Different modes of transportation (highway, air, rail, and vessel) and varying volumes of hazardous materials present different challenges, and require a variety of packaging designs to account for different conditions encountered in transportation. Tank cars used for rail transportation must be designed to withstand exposure to weather, in-train forces and switching, vibrations, dynamic forces, and exposure to the lading they transport.

Cryogenic materials pose unique challenges for selecting appropriate transportation packaging. The lading's extreme cold properties render most types of packaging material too brittle to maintain containment during transportation. Therefore, all cryogenic packagings in the HMR are required to be constructed from specific steel alloys with physical properties that enable them to retain their strength and ductility at the lading's extreme low temperatures.

Another challenge that must be considered is ensuring that the lading remains at these cold temperatures during transportation. Temperature

maintenance of the lading prevents expansion and overpressure conditions, or possible activation of the transportation vessel's pressure relief device. To help ensure that neither scenario occurs during transportation, all bulk packagings authorized in the HMR for transportation of flammable cryogenic materials (*e.g.,* DOT–113 tank cars, MC–338 cargo tanks, and UN T75 portable tanks) are built as a "tank-within-a-tank" design. The inner tank contains the cryogenic material. The space between the inner and outer tanks is evacuated to a high degree of vacuum (absolute pressure less than 75 microns of mercury or 0.0001 atmospheres). The outer surface of the inner tank is wrapped with a high-grade insulation consisting of multiple layers of a thin reflecting material such as an aluminum foil sandwiched between a thin non-conducting paper type material. Alternately, the physical insulation may also be made of fine grained perlite particles filling the void space between the inner and outer tanks. The combined effect of vacuum in the annular space between the inner and outer tanks together with the physical insulation substantially reduces the heat transfer from the atmosphere to the lading, thus effectively maintaining the lading temperature within safe limits during transportation. Furthermore, the outer tank shields the inner tank from physical damage, exposure to the elements, and in-train forces, while providing structural support to the packaging.

Tank car design is a mature field, and the requirements for designing and building a tank car able to withstand the conditions encountered during transportation are codified in part 179 of the HMR. An industry publication, AAR Manual of Standards and Recommended Practices, Section C—III, Specifications for Tank Cars, Specification M–1002 (AAR Specifications for Tank Cars), is incorporated by reference into the HMR. HMR tank specifications and standards are aligned with authoritative design and construction standards found in the ASME Boiler & Pressure Vessel Code (BPVC), Section VIII, Division 1 *Rules for Construction of Pressure Vessels,* and welding requirements found in ASME BPVC Section IX, *Welding and Brazing Qualifications.* The inner and outer tanks are designed to ASME BPVC Section VIII Division 1 using the design margins and loading conditions for pressure vessels. The ASME BPVC Section VIII Division 1 design margin and loading conditions determine the design thickness of both the inner and outer tanks. However, the HMR

prescribe minimum thicknesses requirements for both tanks. American Welding Society (AWS) standards are used during manufacturing to ensure that the welding performed has quality control systems and is performed by qualified personnel. The DOT–113 tank car requirements in the HMR incorporate elements of rigorous engineering standards, including the ASME BPVC as well as the AAR Specifications for Tank Cars, M–1002. M–1002 in turn draws on well-established industry standards of the AWS, ASTM, American Society of Non-destructive Testing (ASNT) as well as ASME, for design, materials, fabrication, testing and inspection requirements. The ASME BPVC, Section VIII, Division 1, has become the international benchmark standard for pressure vessel design for a multitude of industries, including transportation. These standards impose criteria for forming, fabricating, inspecting, and testing pressure vessels and their components and for qualifying welders, welding operators, and welding procedures to ensure the soundness of pressure vessels. Starting from these rigorous design principles, the specification requirements in part 179 of the HMR add design requirements to address conditions encountered in transportation and not necessarily applicable to stationary storage. For example, the HMR require the use of specific steels that balance toughness, strength, and weldability with being able to withstand extremely low temperatures.

Like other bulk packagings, cryogenic packagings authorized in the HMR, including DOT–113 tank cars, have requirements for safety relief devices, also referred to as pressure relief devices (PRDs). PRDs are designed to vent the contents of the tank in a controlled manner to prevent the inner tank from suffering a catastrophic failure or explosion due to pressure-increasing events, such as exposure to fire. DOT–113 tank cars have two different PRDs: (1) A pair of reclosing pressure relief valves (PRVs), which operate on a temporary basis to relieve inner tank pressure and bring it back to safe levels; and (2) a pair of non-reclosing safety vents (rupture disk) that open at a pressure higher than the start to discharge pressure of the PRVs and remain open once the disk ruptures. The latter devices are a failsafe in the event the primary PRVs fail to perform as intended.

The HMR explicitly authorize LNG for transportation in UN T75 insulated portable tanks that are loaded onto railroad flat cars and MC–338 cargo

tanks, which are both tank-within-a-tank designs. Both bulk packagings have an established safety record for LNG and other flammable cryogenic materials over many years of transportation, demonstrating the high level of safety provided by the tank-within-a-tank design. On May 4, 1963, the Interstate Commerce Commission Safety and Service Board published final rule Order 57 [28 FR 4495], which authorized the transportation of liquefied hydrogen in a DOT–113 tank car. The DOT–113 specification itself was adopted into the HMR on December 1, 1962 in final rule Order 56 [27 FR 11849]. Prior to adoption, the DOT–113 design had been authorized to transport liquefied hydrogen by special permits, documents issued by PHMSA and its predecessor agencies that permit a variance from the requirements of the HMR provided an equivalent level of safety is maintained. PHMSA and its predecessor agencies have used special permits to evaluate new transportation technologies and practices prior to authorizing them for broader use. Liquefied ethylene, a flammable cryogenic material with physical properties (including flammability range and cryogenic state) similar to LNG, has been authorized for transportation in DOT–113C120W tank cars since the publication of final rule HM–115, *Cryogenic Liquids* [48 FR 27674, June 16, 1983]. The DOT–113C120W tank car was authorized by special permit prior to adoption in the HMR.

It is essential to ensure that cryogenic lading remains below a maximum temperature during transportation. The HMR address this currently by requiring tank car owners to ensure the thermal integrity of DOT–113 packages through measurement of thermal performance throughout the life of the tank. Specifically, the HMR prohibit the transportation of a DOT–113 if the average daily pressure rise in the tank exceeded 3 psig during the prior shipment. The insulation located in the annular space between the outer and inner tanks can lose its effectiveness over time due to conditions encountered during transportation, through settling of the insulation or through the development of micro vacuum leaks. New multi-layer insulation systems do not suffer settling problems, but are still susceptible to the degradation of vacuum and therefore must be monitored in the same way as older insulation systems. As the effectiveness of the insulation system lessens, more thermal energy can be transmitted to the inner tank and the lading. The rate of thermal energy transfer can be

determined by measuring the pressure the lading exerts on the inner tank at the time the material is offered, and after the material arrives at its destination. If the average daily pressure rise during transportation exceeds 3 psig, the thermal integrity of the tank must be tested. This testing involves measuring either pressure rise or calculated heat transfer over a 24-hour period. When the pressure rise test is performed, the absolute pressure in the annular space of the loaded tank car may not exceed 75 microns of mercury at the beginning of the test and may not increase more than 25 microns during the 24-hour period. If the tank fails the thermal integrity test, it must be removed from hazardous material transportation service until it has been repaired and passes the required thermal integrity tests. This system of thermal integrity management has proven to be an effective way of preventing unsafe pressure increases during transportation for the existing DOT–113 fleet, and PHMSA expects that it will continue to be effective for DOT–113s used in LNG service.

The flammability and low-temperature hazards presented by LNG in transportation are well understood. The DOT–113C120W tank car has a well-established safety record transporting similar cryogenic flammable materials. The construction specifications for the steel used for fabricating the inner tank of the DOT–113C120W tank car requires it to withstand a (design) service temperature of −260 °F, which is also the temperature of LNG at atmospheric pressure (*i.e.,* LNG is not cooled below this temperature). The austenitic steel required for the inner tank retains all necessary strength and ductility at −260 °F, and is suitable for use to −423 °F the shipping temperature of liquefied hydrogen, a far lower temperature than it would be exposed to in LNG service.

### 2. Hazard Communication

Once the lading has been properly packaged, the HMR prescribe an extensive system of multi-layered hazard communication tools designed to provide information on the type and location of hazardous materials present to transportation employees, emergency responders, and the public. The discussion below will focus on hazard communication requirements specific to rail transportation, but similar requirements exist for highway, vessel, and air transport, with variations to account for specific challenges applicable to each mode of transportation.

The HMR require that a tank car containing a hazardous material conspicuously display placards on each side and each end of the car. The diamond-shaped placards are designed to be instantly recognizable to any trained emergency responder or transportation employee. Placards allow for quick identification of the DOT hazard class or division of the material being transported by their color, symbol, and the numeral entered in the bottom corner of the placard. Specifically, for DOT–113 tank cars transporting flammable gases such as LNG, the placard must also be placed on a white square background to increase the contrast and visibility of the placard in accordance with § 172.510(a)(3), and as a visual signal of the special handling procedures for DOT–113 tank cars transporting flammable gases. Tank cars must additionally be marked on each side and each end with the UN ID number of the hazardous material being carried. This marking is typically displayed on a white rectangle in the center of the placard. Moreover, tank cars loaded with flammable gases, like LNG, are required to be marked on two sides with the key words of the proper shipping name, or the common name of the material being transported. Therefore, a tank car transporting LNG will be marked with the words ''Methane, refrigerated liquid'' or ''Natural gas, refrigerated liquid'' on two sides of the tank car.

The train crew is required to maintain a document which identifies the position in the train of each rail car containing a hazardous material. The crew is also required to maintain emergency response information for each hazardous material carried in the train. This emergency response information must include specific information related to the material being transported, including:
○ Immediate hazards to health;
○ Risks of fire or explosion;
○ Immediate precautions to be taken in the event of an accident or incident;
○ Immediate methods for handling fires;
○ Initial methods for handling spills or leaks in the absence of fire; and
○ Preliminary first aid measures.
As one method of compliance with these requirements, train crews often carry the DOT Emergency Response Guidebook (ERG),[18] a joint publication of PHMSA, Transport Canada, the Secretariat of Communication and Transport of Mexico, and interested parties from government and industry,

---

[18] *https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/ERG2016.pdf.*

to supplement emergency response information provided by the person shipping the hazardous material. The ERG is intended for use by emergency services personnel to provide guidance for initial response to hazardous materials transportation incidents. The ERG cross-references specific materials with incident response information, including firefighting instructions and evacuation distances. The ERG is made widely available, as PHMSA provides millions of free copies of the ERG to emergency responders in every State, and several commercial publishers have copies available for purchase. Smartphone applications of the ERG are also available. The ERG includes instruction to handle incidents involving flammable cryogenic materials such as LNG.

Finally, the document carried by the train crew is required to display clearly the emergency response telephone number for each hazardous material transported in the train. The phone number must be easily recognizable to the train crew, or any other person using the train document in an emergency. The telephone number must be of a person who either: (1) Is knowledgeable of the hazardous material being shipped, and has comprehensive emergency response and incident mitigation information for that material; or (2) has immediate access to a person who possesses such knowledge and information. The emergency response telephone number must be monitored at all times the material is in transportation. A telephone number that requires a call back (such as an answering service, answering machine, or beeper device) does not meet this requirement. The emergency response telephone number may be monitored by the person offering the hazardous material, or an agency or organization capable of, and accepting responsibility for, providing the comprehensive emergency response and incident mitigation information.

The railroad industry has also developed its own electronic hazard communication aids, beyond the requirements of the HMR. Specifically, the AAR, in conjunction with its members and Railinc (an AAR technology subsidiary), has developed and deployed an application called AskRail.[19] The AskRail app links to the freight railroad industry's train and railcar information database maintained by Railinc. AskRail provides an emergency responder who has registered to use the service with

detailed information about the type and location of all cars carrying hazardous materials in a train including emergency response guidance.

This existing system of hazard communication under the HMR, supplemented by industry efforts such as AskRail, accurately communicates the hazards presented by hazardous materials to emergency responders, transportation employees, and the public and contributes to proper emergency response when accidents occur in transportation.

## 3. Training

The HMR requirements for safe transportation of hazardous materials also encompass training for all hazmat employees involved in the transportation of hazardous material. *See* part 172 subpart H. Training is the cornerstone of compliance with the HMR, because only properly trained employees can ensure the applicable HMR requirements are followed appropriately. All hazmat employees must be trained and tested by their employer to perform their HMR-related functions correctly and safely. This includes employees who prepare a hazardous material package for transportation, transport hazardous materials (*e.g.,* the train crew), or unload hazardous material. *See* § 171.8. In accordance with § 172.704, training must cover:

○ General awareness of HMR requirements;
○ Function-specific training applicable to the particular functions performed by the employee (*e.g.,* proper loading procedures for flammable cryogenic material);
○ Safety;
○ Security awareness; and
○ In-depth security training, when applicable.

Training must be documented in accordance with § 172.704(d), and repeated at least every 3 years.

## 4. Security Plans

The HMR also address security requirements for certain high-risk hazardous materials. Offerors and carriers of materials listed in § 172.800 must develop and adhere to a transportation security plan for hazardous materials. Security plans are required of any offeror or carrier of flammable gas in a quantity over 792 gallons, which is far below the volume of a single tank car of LNG or similar flammable cryogenic material. Security plans must include an assessment of transportation security risks for shipments of the hazardous materials, including site-specific or location-

specific risks associated with facilities at which the hazardous materials listed in § 172.800 are prepared for transportation, stored, or unloaded incidental to movement, and appropriate measures to address the assessed risks. Specifically, security plans must address three elements:

○ *Personnel security.* Measures to confirm information provided by job applicants hired for positions that involve access to and handling of the hazardous materials covered by the security plan.
○ *Unauthorized access.* Measures to address the assessed risk that unauthorized persons may gain access to the hazardous materials covered by the security plan or transport conveyances being prepared for transportation of the hazardous materials covered by the security plan.
○ *En route security.* Measures to address the assessed security risks of shipments of hazardous materials covered by the security plan en route from origin to destination, including shipments stored incidental to movement.

Properly implemented security plans decrease the risk that a shipment of hazardous material, including LNG, can be used in an attack against persons or critical infrastructure within the United States.

## 5. Preparing a Packaging for Transportation

Hazardous materials packages must be prepared and filled in such a way to ensure that there can be no detectable release of hazardous materials to the environment during conditions normally incident to transportation. Specifically, for LNG, there are several existing requirements in the HMR that address the proper filling of a DOT–113 tank car to ensure safe transportation of the commodity. These package preparation requirements include:

• As provided in § 173.31, when the car is offered into transportation, the offeror must inspect the tank car and all closures prior to movement (*i.e.,* the pre-trip inspection); and
• Filling density restrictions and loading pressure restrictions in § 173.319 for cryogenic material.

The filling and loading restrictions in § 173.319 are based on the physical properties of each flammable cryogenic material and are designed to ensure that during transportation, the inner tank will not experience a pressure rise that triggers the PRVs to activate.

## 6. Route Planning

The HMR address requirements for rail route planning in § 172.820. Trains

---

[19] *https://public.railinc.com/products-services/askrail.*

meeting the following criteria are required to assess the safety and security risks along transportation routes (§ 172.820(c)) and perform an alternative route analysis (§ 172.820(d)):

(1) More than 2,268 kg (5,000 lbs.) in a single carload of a Division 1.1, 1.2 or 1.3 explosive;

(2) A quantity of a material poisonous by inhalation in a single bulk packaging;

(3) A highway route-controlled quantity of a Class 7 (radioactive) material, as defined in § 173.403 of this subchapter; or

(4) A high-hazard flammable train (HHFT) as defined in § 171.8 of this subchapter.

Historically, there has been considerable public and Congressional interest in the safe and secure rail routing of security-sensitive hazardous materials (such as chlorine and anhydrous ammonia). The Implementing Recommendations of the 9/11 Commission Act of 2007[20] directed the Secretary, in consultation with the Secretary of Homeland Security, to publish a rule governing the rail routing of security-sensitive hazardous materials. On December 21, 2006, PHMSA, in coordination with FRA and the Transportation Security Administration (TSA) of the U.S. Department of Homeland Security (DHS), published an NPRM under Docket HM–232E (71 FR 76834), which proposed to revise the current requirements in the HMR applicable to the safe and secure transportation of hazardous materials by rail. Specifically, the HM–232E NPRM proposed to require rail carriers to compile annual data on specified shipments of hazardous materials, use the data to analyze safety and security risks along rail routes where those materials are transported, assess alternative routing options, and make routing decisions based on those assessments.

In the HM–232E NPRM, PHMSA solicited comments on whether the proposed requirements should also apply to flammable gases, flammable liquids, or other materials that could be weaponized, as well as hazardous materials that could cause serious environmental damage if released into rivers or lakes. Commenters who addressed this issue indicated that rail shipments of Division 1.1, 1.2, and 1.3 explosives; PIH materials; and highway-route controlled quantities of radioactive materials pose significant rail safety and security risks warranting the enhanced security measures

proposed. Commenters generally did not support enhanced security measures for a broader list of materials than were proposed in the NPRM.

PHMSA adopted the NPRM's proposed security measures in an April 16, 2008 Interim Final Rule (IFR) (73 FR 20752) which was subsequently amended by a November 26, 2008 final rule (73 FR 72182). The 2008 IFR and final rule imposed a series of rail routing requirements in § 172.820. Carriers must compile annual data on certain shipments of explosive, PIH, and radioactive materials; use the data to analyze safety and security risks along rail routes where those materials are transported; assess alternative routing options; and make routing decisions based on those assessments. In accordance with § 172.820(e), the carrier must select the route posing the least overall safety and security risk. The carrier must retain in writing all route review and selection decision documentation. Additionally, the rail carrier must identify a point of contact on routing issues involving the movement of covered materials and provide that contact information to the appropriate State, local, and tribal personnel.

PHMSA proposed in the August 1, 2014 NPRM, in § 174.310(a)(1), to modify the rail routing requirements specified in § 172.820 to apply to any HHFT. The routing requirements discussed in the NPRM reflect the practices recommended by the NTSB in recommendation R–14–4,[21] and are in widespread use across the rail industry for security-sensitive hazardous materials. An overwhelming majority of commenters expressed support for additional routing requirements for HHFTs and thus, PHMSA finalized the proposed requirements.[22]

In this final rule, PHMSA makes any railroad that transports a quantity of LNG in a tank car subject to the route planning requirements in § 172.820.

### 7. Operational Controls

In addition to requirements for packaging, hazard communication, training, and security plans that must be met before the hazardous material is offered for transportation, the HMR contain operational controls requirements for the safe transportation of hazardous materials in tank cars. These requirements include specific provisions for handling flammable cryogenic materials similar to LNG,

including loading and unloading requirements for tank cars in §§ 173.31 and 174.67, which help prevent movement of tank cars during loading/unloading operations, help prevent other rail equipment from approaching tank cars during loading/unloading through use of derails, bumpers, or lining switches to prevent entry, and include specific instructions that tank car unloading personnel are required to follow, such as attendance of the unloading operation and care of tools used for unloading.

Other operational controls include an unloading requirement in § 174.204 that requires that tank cars containing a flammable cryogenic material must be unloaded directly from the car to permanent storage tanks of sufficient capacity to receive the entire contents of the car. Finally, switching restrictions in § 174.83(b) prohibit a DOT–113 specification tank car displaying a Division 2.1 (flammable gas) placard, including a DOT–113 specification tank car containing a residue of a Division 2.1 material (e.g., LNG), from being cut off while in motion, coupled into with more force than is necessary to complete the coupling, or struck by any car moving under its own momentum. These special handling requirements protect DOT–113 tank cars from experiencing unnecessary impact forces during switching. Compliance with these switching restrictions is highlighted by the special white background for the flammable gas placard required by § 172.510 for DOT–113, and a marking requirement for the tank car which indicates that the cars may not be humped or cut off while in motion (see § 179.400–25).

Additionally, three operational controls currently address the expedited movement of a tank car transporting hazardous materials, delivery of tank cars containing gases and cryogenic material, and notification of delays in transit. First, § 174.14 requires that a carrier must forward each shipment of hazardous materials promptly and within 48 hours (Saturdays, Sundays, and holidays excluded), after acceptance at the originating point or receipt at any yard, transfer station, or interchange point, except that where biweekly or weekly service only is performed, a shipment of hazardous materials must be forwarded on the first available train. Furthermore, § 174.14(b) states that a tank car loaded with any Division 2.1 material (which would include LNG), may not be received and held at any point, subject to forwarding orders, to defeat the purpose of this requirement for the expedited movement of a hazardous material, or to

---

[20] https://www.congress.gov/110/plaws/publ53/PLAW-110publ53.pdf.

[21] https://www.ntsb.gov/publications/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=R-14-004.

[22] 80 FR 26644.

defeat the requirements of § 174.204 for tank car delivery of gases such as cryogenic liquids. Section 174.204 prohibits tank cars containing Class 2 materials from being unloaded unless the shipment is consigned for delivery to an unloading facility on private tracks, and prohibits the storage of Division 2.1 (flammable) cryogenic material. If a tank car containing Class 2 material cannot be delivered to a private track for unloading, the regulation does allow the car to be unloaded on a rail carriers tracks provided the lading is piped directly from the tank car to permanent storage tanks. Finally, in accordance with § 173.319, the shipper must notify FRA whenever a tank car containing any flammable cryogenic material is not received by the consignee within 20 days from the date of shipment.

8. Risk Based Framework

The HMR address the risks inherent in the transportation of hazardous materials through comprehensive packaging, hazard communication, training, security planning, and material- and mode-specific operational controls.

The HMR regulate 435 million shipments of hazardous materials every year and by all modes of transportation, with an average of 20 hazardous material incidents resulting in death and serious injury each year, most of which occur in the highway mode. The existing HMR requirements are robust and will adequately address the risks posed by transportation of LNG in DOT–113C120W tank cars. However, in this final rule, PHMSA is adopting certain additional safety measures designed to further reduce those risks. These safety measures are discussed in detail in the following section.

*B. The DOT–113C120W Specification Tank Car*

PHMSA considers the existing DOT–113C120W tank car a suitable packaging for transportation of LNG by rail. The inner tank is capable of withstanding the cryogenic temperatures and chemical properties of LNG, and the thermal protection system is capable of maintaining LNG at a safe pressure and temperature throughout transportation. However, in this final rule, to improve crashworthiness and in response to comments received, PHMSA requires that DOT–113C120W tank cars used for LNG transportation must be constructed with a thicker outer tank, and that the outer tank be constructed of a higher quality steel currently required for construction of DOT–117A and PIH/TIH tank car tanks. PHMSA has determined

that the thicker outer tank in DOT–117A and PIH/TIH tank cars improved crashworthiness. The DOT–117A crashworthiness improvement results are discussed below. Additionally, PHMSA is adopting the proposals for maximum offering pressure as proposed in the NPRM, but is amending the maximum filling density to 37.3%.

1. Suitability of the DOT–113C120W Tank Car for LNG

The DOT–113C120W tank car has a long history of safe transportation of flammable cryogenic material similar to LNG. The safe history of DOT–113C120W tank cars used for the transportation of other cryogenic materials such as ethylene since 1983 (and earlier under special permits) is a key factor in determining that this tank car design is appropriate for the transportation of LNG. Please see our discussion of the history of the DOT–113 specification in "*Section III.A. Existing HMR Requirements for Rail Transport of Flammable Cryogenic Gas*" for further details.

DOT–113C120W rail tank cars are vacuum-insulated tank-within-a-tank designs (similar to a thermos bottle) consisting of an inner alloy stainless steel tank enclosed within a carbon steel outer tank specifically designed for the transportation of cryogenic material, such as liquid hydrogen, oxygen, ethylene, nitrogen, and argon. Additionally, the design and use of the DOT–113 specification tank car includes added safety features—such as protection systems for piping between the inner and outer tanks, multiple PRDs (pressure relief valves and vents), and insulation—that contribute to an excellent safety record throughout its 50 years of service. The HMR currently authorize the DOT–113C120W specification tank car, the same specification being authorized for LNG in this rule, for another flammable cryogenic material, ethylene, which has chemical properties similar to those of LNG.

The DOT–113 tank car requirements in the HMR incorporate elements of rigorous engineering standards, including the ASME BPVC as well as the AAR Specifications for Tank Cars, M–1002. M–1002 in turn draws on well-established industry standards of the American Society for Testing and Materials (ASTM), American Society of Non-destructive Testing (ASNT), as well as ASME, for design, materials, fabrication, testing and inspection requirements. The ASME BPVC, Section VIII, Division 1, is the international benchmark standard for pressure vessel design for a multitude of industries,

including transportation. Starting from these rigorous design principles, the specification requirements in part 179 of the HMR add design requirements to address conditions encountered in transportation and not necessarily applicable to stationary storage. For example, the HMR require the use of specific steels that balance toughness, strength, and weldability with being able to withstand extremely low temperatures.

When cryogenic ethylene is transported in DOT–113C120W specification tank cars, it is offered at cryogenic service temperature (defined in § 173.115(g) as colder than −90 °C), as LNG would be in this final rule. The delimiter letter "C"—as used in "DOT–113C120W"—indicates the car is designed for a loading and shipping temperature as low as −260 °F (−162 °C) (*see* the specification requirements in § 179.401–1 for DOT–113C120W tank cars). Negative 260 °F corresponds to the temperature at which LNG converts from a gas to a liquid. The HMR do not permit the filling of a tank car below its service temperature (*see* § 173.319(a)(4)(ii)). However, should the inner tank experience colder temperatures, the 300-grade austenitic stainless steels, 304/304L, permitted for the inner tank, are authorized to withstand the much lower service temperature of cryogenic hydrogen, 423 °F.

Similarly, the standard heat transfer rate assigned to the DOT–113C120W tank car in § 179.401–1, a maximum of 0.4121 Btu per day per pound of water capacity, is consistent with the requirements for the other bulk packages authorized for LNG in the HMR (MC 338 cargo tanks and UN T75 portable tanks), and packages authorized by DOT Special Permits. The specific design properties of the DOT–113C120W, including service temperature and thermal performance, make it an appropriate packaging for safe transportation of LNG, in the same way that the packaging is currently used to transport cryogenic ethylene.

2. Materials of Construction for DOT–113 Tank Cars

In the United States, storage vessels for LNG are designed and constructed in accordance with ASME BPVC Section VIII *Rules for Construction of Pressure Vessels,* Division 1. To maintain the low temperature, LNG storage tanks are usually made with an inner and outer tank with insulating material between and a vacuum applied to the annular space.

a. Inner Tank

ASTM A240/240M 300-grade austenitic stainless steels, 304/304L, are the only steels authorized in the HMR for constructing the inner tank of a DOT–113 tank car. The major elements in these steels are: Carbon—0.08% (0.03%); manganese—2.00% (both); chromium—18.0–20.00% (both); nickel—8.00–11.00% (8.00–12.00%); and the remainder iron. The role of chromium and nickel in the 304/304L grade steels is to: (1) Retain the Face Centered Cubic (FCC) atomic structure which gives 304/304L its strength, ductility and toughness down to cryogenic temperatures and (2) provide a corrosion resistant passive layer. The tensile strength of 304/304L steel is 70,000–75,000 psi with Charpy V-notch toughness (resistance to brittle failure) values in the range of 80–130 ft. lbs. at −320 °F (minimum Charpy V-notch failure value is 60 ft. lbs.), below the temperature range encountered during LNG transportation. The service environment of a railroad tank car is dynamic and severe and can result in the accumulation of impact and fatigue damage. Austenitic stainless steels, which are readily weldable using qualified welders and welding procedures, are therefore well-suited for use in the construction and repair of tank cars.

For storage tanks, ASME design criteria allow for the use of 300-grade stainless steels or ASTM A553 *Standard Specification for Pressure Vessel Plates, Alloy Steel, Quenched and Tempered 7, 8, and 9% Nickel.* Both the 304/304L and A553 steels have similar nickel content limits, but utilize the nickel to achieve strength and toughness in different ways. The A553 steel is a heat treatable, "quench and tempered" type of steel with the nickel helping to form martensite, a strong but brittle metallurgical product. The quench and tempering treatment makes welding A553 difficult, requiring expertise in welding procedure development and operator skill which adds risk to its use for tank cars. By contrast, the nickel content in 304/304L stainless steels facilitates the formation of austenite, a strong, tough and ductile form of steel, which maintains its physical properties at cryogenic temperatures. This, coupled with its excellent weldability, make it the clear choice for cryogenic tank cars.

The inner tank has a minimum thickness requirement of 3/16th inch (after forming) unless increased through a calculated formula in 179.400–8, which increases thickness based on inner diameter of the tank. The calculations used to determine the thickness of the inner tank are aligned with the ASME BPVC Section VIII Division 1 and align with all other tanks used for cryogenic materials. Typically, DOT–113 inner tanks exceed the minimum value of 3/16th inch thickness to conform to ASME calculations and to avoid localized thinning arising from manufacturing processes and the variation in the thickness of steel sourced from steel mills. Therefore, in this final rule, PHMSA maintains the current requirements for inner tanks.

b. Outer Tank

For DOT–113 tank cars, plate materials listed in M–1002 Appendix M must be used for the outer tank. Industry practice has been to fabricate the external tank from ASTM A516–70 steel. A516–70 steel has provided reliable performance in the service history of DOT–113 tank cars. However, PHMSA in this final rule is authorizing rail transport of LNG in DOT–113C120W-specification tank cars with enhanced outer tank thickness and materials (with a specification suffix "9" added to denote those enhancements). Specifically, this final rule requires DOT–113C120W9-specification tank cars carrying LNG to have a minimum outer tank thickness of 9/16" (compared to 7/16" for other DOT–113C120W-specification tank cars). Further, those thicker outer tanks must be made of TC–128 Grade B (TC–128B) normalized steel. TC–128B normalized steel is currently used for TIH and flammable liquid tank car designs and its manufacturing process produces a more puncture resistant steel as compared to A516–70 steel. AAR TC–128 Grade B normalized steel is a high-strength, fine-grained carbon-manganese-silicon steel intended for fusion-welded tank car tanks in service at moderate and lower temperatures. By normalizing (heating the steel to 1600 °F and air cooling) TC–128 steel and controlling its chemistry, the outer tank of an LNG tank car made from TC–128 Grade B steel has a reduced probability of tank failure due to cracking and an increased resistance to puncture compared to ASTM A516–70 steel.

The TC–128 Grade B normalized carbon steel used to construct the outer tank for DOT–113C120W9 tank cars does not maintain the same strength and ductility at the cryogenic temperatures of the lading. However, this is not a safety concern for DOT–113 tank cars. Existing DOT–113C120W tank cars used in cryogenic ethylene service have outer tanks constructed of ASTM A516–70 carbon steel. ASTM A516–70 is also not resistant to cryogenic temperatures, and has been used safely in the outer tank of DOT–113C120W tank cars for decades. Similarly, the steel used to construct the outer tanks of other "tank-within-a-tank" cryogenic packagings, including MC–338 cargo tanks, UN T75 portable tanks, and ocean-going LNG tanker ships, is not resistant to cryogenic temperature.

LNG in these packagings is contained during transportation in an inner stainless-steel tank or tank lined with cryogenic compatible liners, which maintains strength and ductility at cryogenic temperatures, while the outer tank provides accident protection and structural support to the packaging. The only way LNG can be released from the inner tank of a rail tank car to the void space between the inner and outer tanks is if the inner tank is compromised. In a rail accident, a puncture of the inner tank can occur only after the outer tank is breached. In such a scenario, any LNG released from the breach of the inner tank will also be released into the environment and not be contained in the space between the two tanks even if the outer tank is made of stainless steel that maintains strength and ductility at cryogenic temperatures. Therefore, there is no safety advantage in making the outer tank of stainless steel. On other hand, making the outer tank of stainless steel able to withstand cryogenic temperatures in addition to withstanding the in-train forces during transportation, providing puncture resistance, and ensuring structural support for the tank car would be prohibitively expensive (especially if the thickness is the same as or thicker than the adopted 9/16th inch TC–128 Grade B normalized carbon steel design).

As explained further below, PHMSA expects that each of the enhancements provided for in the final rule will improve tank car crashworthiness.

c. Determination of Inner and Outer Tank Requirements

PHMSA is maintaining the requirements for the inner tank. ASTM A 240/A 240M, Type 304 or 304L steel has the correct balance of strength, durability, and weldability for use in transportation applications for cryogenic materials, as demonstrated over many years of use. However, due to the possibility of LNG being transported in blocks of tank cars within each train that are larger than the blocks of tank cars that are typically used for rail transportation of other flammable cryogenic liquids, and in response to comments, PHMSA is authorizing in this final rule rail transportation of LNG

in DOT–113C120W-specification tank cars with enhanced outer tank thickness and materials (those enhancements to be indicated by the specification suffix "9") to obtain improved crashworthiness.

The inner tank design of DOT–113C120W9 tank cars will be identical to other DOT–113C120W-specification tank cars, and will have the same safety features to vent the contents in the event of an unsafe pressure increase. In essence, the lading retention capabilities of the DOT–113C120W9 and other DOT–113C120W-specification tank cars are identical, with specific enhancements to the outer tank of the tank car design being employed to increase crashworthiness.

The outer tank enhancements for the DOT–113C120W9 incorporate the best available technology for the outer tank of a tank car with little additional manufacturing costs. Increasing wall thickness and the use of normalized steel (which increases the ductility of the steel) of the outer tank wall together provide enhanced crashworthiness for the tank car. Previously, there was limited economic rationale to amend the outer tank characteristics for the DOT–113C120W tank car to incorporate those elements because of the small size of the fleet and the small number of tank cars within each train. The existing level of safety provided by the DOT–113C120W tank car and existing operational controls is sufficient for the current use scenarios, as shown by the safety history of that tank car with over 100,000 shipments.

Currently, because of market demand and usage patterns for ethylene, DOT–113 tank cars are transported as part of mixed commodity freight trains at one to three cars per train. However, as the number of tank cars within a train increases—in blocks of cars larger than three or in unit trains—there is a higher probability that a car containing a flammable cryogenic material such as LNG will be involved should a derailment or other accident occur.

PHMSA cannot predict the number of DOT–113C120W9 tank cars per train the LNG market will support, but we know that from ETS's application for DOT–SP 20534, that it has plans to operate unit trains of at least 80 cars per train at some point in the future. With the possibility of larger numbers of cars in LNG transportation, PHMSA and FRA

have determined that applying improved outer tank requirements is feasible from a manufacturing and economic perspective. Given the feasibility of securing a more robust tank car design within prevailing manufacturing processes across North America, PHMSA determined that the authorization for transporting LNG by rail can achieve an additional safety margin by employing the more robust car design described herein.

If a tank car containing LNG is breached during a derailment, the LNG will behave largely the same way as crude oil or ethanol. The LNG lading will be released as a very cold liquid, creating an LNG pool that could catch on fire. Employing a thicker outer shell will reduce the puncture probability of the inner tank, and thus mitigate the consequences of the derailment. Moreover, a tank car is estimated to have a service life of approximately 50 years. DOT–113 tank cars compliant with the enhanced outer shell requirements are projected to cost 3% more to manufacture. When divided by the large number of carloads that would be carried during a DOT–113's 50-year service life, the 9/16th inch TC–128B normalized steel outer tank is highly cost-effective in that it will mitigate the consequences of derailment involving LNG by reducing the number of tanks punctured in the unlikely event of an accident. See our discussion of modeling crashworthiness in *Section III. B. 6.* "*Finite Element Modeling and Validation*" for additional information.

### 3. Safety History

DOT–113 tank cars have a demonstrated safety record of over 50 years. More than 100,000 rail shipments of cryogenic material in DOT–113 tank cars have taken place with no reported fatalities or serious injuries occurring due to a train-accident caused release of product. Only twice—during the 2011 incident in Moran, KS and the 2014 incident in Mer Rouge, LA—did the inner tank of a DOT–113 tank car release product due to damage sustained during an accident. LNG transportation by rail in currently authorized packaging also has a demonstrated, albeit brief, safety history. Since LNG was authorized to be shipped by rail in T–75 UN containers, PHMSA and FRA have no record of any rail incidents involving these packagings.

### 4. Crashworthiness Assessment/Field Tests

PHMSA and FRA are confident, based on rigorous modeling, testing, and experience (described in detail in below), that the DOT specification tank cars, enhanced with a 9/16th inch outer tank made of TC–128 Grade B normalized steel, will provide sufficient crashworthiness in accident scenarios compared to tank cars manufactured from 7/16th inch A516–70 steel outer tanks. As part of the analysis conducted for the *Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains,* (HM–251; 80 FR 26643, May 8, 2015) along with the final rule RIA, PHMSA determined that there was a reduction in the number of tank cars punctured when increasing the outer tank thickness from 7/16th inch to 9/16th inch of TC–128 Grade B normalized steel with a train traveling at 40 mph.

This final rule will require the same increase in thickness of the same type of steel as was required in the HM–251 final rule for DOT–117 tank cars. PHMSA, therefore, expects a similar increase in safety benefits from the use of enhanced outer tank thickness and improved materials.

### 5. Comparison of Derailments

In the following table, FRA compared three derailment accidents that occurred in relatively similar conditions. All accidents involved trains travelling at similar speeds, in similar weather conditions, and with a similar number of cars derailed. The tank cars that derailed in Guernsey, Saskatchewan, had a tank thickness of 9/16th inch and had 62 percent fewer shell punctures than the tank cars that derailed in Casselton, North Dakota, and 69 percent fewer tank punctures than the tank cars that derailed in Arcadia, Ohio. The tank cars involved in the Casselton and Arcadia derailments had a tank thickness of 7/16th inch. These scenarios validate the extensive modeling and simulations done and provide evidence of the substantial safety benefit of requiring an outer tank thickness of 9/16th inch in the construction of the DOT–113C120W tank car that is being authorized for the transportation of LNG by rail in this rule.

Add. 64

TABLE 3—COMPARISON OF DERAILMENTS

| | Derailment location | | |
|---|---|---|---|
| | Guernsey, SK | Casselton, ND | Arcadia, OH |
| Derailment date | 2/6/2020 | 12/30/2013 | 2/6/2011. |
| Temp at Time of Derailment | −18 °C (0 °F) | −18 °C (−1 °F) | −4 °C (25 °F). |
| Train speed (MPH) | 42 | 48 | 42. |
| Type of cars (Specification) | DOT 117J (286K) | DOT 111 Legacy (263K) | DOT 111 Legacy (263K). |
| Shell Thickness | 9/16th inch | 7/16th inch | 7/16th inch. |
| Total cars derailed | 32 | 20 | 32. |
| Total cars breached | 8 | 19 | 30. |
| *Head Punctures* | *0* | *3* | *10.* |
| *Shell Punctures* | *5* | *13* | *16.* |
| *Fittings Compromised* | *3* | *10* | *13.* |
| Product(s) released | UN 1267 Crude Oil | UN 1267 Crude Oil | UN 1987 Ethanol. |
| Fire Occurred | Yes | Yes | Yes. |
| Thermal Ruptures | No | Yes | Yes. |
| Approximate size of derailment area. | 900′L × 250′W (est) | 600′L × 600′W | 1200′L × 450′W. |
| General topography of derailment area. | Flat field, raised RR bed | Flat/straight tangent track | Flat field, raised RR bed. |

6. Finite Element Modeling and Validation

FRA's Research program, in coordination with PHMSA, funded the development and continued refinement of Finite Element (FE) Models for a variety of tank car specifications as well as computer simulation of impacts and derailments. FE modeling is a widely-used method for evaluating the effects of stresses on components or structures and is used in the fields of structural analysis, heat transfer, and fluid flow. Within the FRA research program, component and full scale tests results are used to validate the computer simulations and their assumptions and boundary conditions. Full scale test results are compared to simulation results, including the overall force-time or force-indentation histories, the puncture/non-puncture outcomes, the rigid body motions of the tank car, the internal pressures within the lading, and the energy absorbed by the tank during the impact.

The Volpe National Transportation Systems Center (Volpe Center) supports the FRA in this research effort, and has performed pre- and post-test FE analyses corresponding to several component and full-scale shell impact tests. Validated models and computer simulations are a necessary alternative to full-scale impact testing which is time consuming, expensive, and challenging to perform.

A primary purpose for a pre-test simulation is to estimate the threshold puncture speed of the test tank car. The puncture speed of the tank car is the speed at which, under the test conditions, the initial kinetic energy of the ram car is equal to the energy necessary to puncture the inner and

outer tank. The threshold puncture speed is the maximum speed at which the tank car can be impacted under the prescribed conditions without resulting in a tear to the inner and outer tanks that would allow its lading to escape.

Results of recent tests and simulations demonstrate the potential improvement in crashworthiness from the outer tank enhancements set forth in this final rule. In November 2019 FRA conducted a full-scale impact test of a DOT–113C120W tank car at TTC in Pueblo, CO.[23] According to the test report, the initial kinetic energy imparted to the inner and outer tanks was about 2.8 Million ft.-lbs. Further, it is estimated that the residual energy (after puncture of the inner and outer tanks) was about 25% of the initial energy. Accordingly, the puncture energy of the DOT–113 tank is about 75% of 2.8 Million ft.-lbs., or 2.1 Million ft.-lbs. A separate full-scale impact test was performed on a DOT–117J100W specification tank car equipped with a jacket and thermal protection material. A review of the test report suggests that the tank (made of TC–128B normalized steel) absorbed an energy of about 1.9 Million ft.-lbs., without puncture. The report also notes that under those conditions, the tank was near puncture. PHMSA estimates the puncture capacity of the DOT–117 car to be about 2 Million ft.-lbs. Comparing the puncture capacities of the two tank specifications (DOT–113 @ 2.1 Million ft.-lbs., and the DOT–117 @ 2 Million ft.-lbs.), their performances are very similar, and that the DOT–113 might even have a slightly higher puncture resistance. The two tank cars have about the same cumulative

thickness. Therefore, based on the puncture tests and modeling, PHMSA and FRA anticipate that increasing the outer tank thickness of the DOT–113 from 7/16 to 9/16 (a 28.5% increase), and requiring the use of the more puncture-resistant TC–128B normalized steel, will add about 20–30% to the puncture resistance (*i.e.,* reduction in number of punctures) of the DOT–113C120W9.

The above comparison of testing and simulation results was used to determine the suitability of the DOT–113 tank car for LNG service, as well as to determine the increased safety gained by using a 9/16th inch thick outer tank shell of TC–128 Grade B, normalized steel. Further, a similar model was created in the *Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains* [HM–251, 80 FR 26643] rulemaking to help evaluate how effectively the increased thickness improved on the DOT–111 tank car (predecessor to the DOT–117). The results of that modeling were factored into design of the current DOT–117 specification tank car which improved on the DOT–111 tank car design.

7. Loading and Preparation for Offering

In this final rule, PHMSA is adopting a 37.3 percent maximum filling density for LNG, which will allow for approximately 2 percent outage below the inlet of the pressure control valve to prevent the venting of liquid material at start-to-discharge pressure, thus ensuring the safe transportation of LNG. In the NPRM, PHMSA proposed a 32.5 percent filling density. However, PHMSA has determined a 37.3 percent maximum filling density is appropriate

---

[23] Full-Scale Shell Impact Test of a DOT–113 Tank Car, RR 20–03, February 2020.

Add. 65

because it is consistent with outages determined to be safe for LNG in other packagings such as MC–338 cargo tanks and UN T75 portable tanks. This maximum filling density is also more conservative than maximum filling densities set in the HMR for other flammable cryogenic materials, which allows for 0.5 percent outage at the start-to-discharge pressure. *See* § 173.319(b)(1). Additionally, a 37.3 percent maximum filling density harmonizes with Canada's Transportation of Dangerous Goods (TDG) regulations which have been in place since 2015.

PHMSA expects that any tank car containing a cryogenic material will be delivered to its destination within 20 days of offering, and requires notification of any car that has not reached its destination within this timeframe. *See* § 173.319(a)(3). Therefore, PHMSA is adopting a 15 psig maximum offering pressure, as proposed, which is appropriate for the transportation of LNG and is consistent with the level of safety provided to other flammable cryogenic materials. The HMR do not prohibit shippers from offering a tank car of LNG at a lower pressure.

## 8. Review Approval Provision to Exceed Weight

On May 14, 2010, PHMSA published a final rule amending the HMR to incorporate provisions contained in several widely used or longstanding special permits that have an established safety record. The final rule, *Hazardous Materials: Incorporation of Special Permits into Regulations* (75 FR 27205, May 14, 2010), in part, amended the HMR to allow certain rail tank cars transporting hazardous materials to exceed the gross weight on rail limitation of 263,000 pounds upon approval of the FRA. On January 25, 2011, the FRA published a notice (76 FR 4250) of FRA's approval pursuant to the Final Rule of the operation of certain tank cars in hazardous materials service that exceed 263,000 pounds and weigh up to 286,000 pounds gross rail load (GRL). In 2002, AAR adopted a revised industry standard related to railroad freight cars weighing over 263,000 pounds GRL and weighing up to 286,000 pounds. This revised industry standard, AAR Standard S–286 (adopted 2002, revised 2003, 2005, 2006), Free/Unrestricted Interchange for 286,000 pound GRL Cars (S–286), is applicable to rail freight cars manufactured, rebuilt or modified on or after January 1, 2003, and is the existing industry standard for designing, building, and operating rail cars at gross weights over 263,000

pounds and up to 286,000 pounds. S–286 sets forth industry-tested practices for designing, building, and operating rail cars at gross weights over 263,000 pounds and up to 286,000 pounds. S–286 provides for the free interchange among carriers of cars built to meet its requirements.

In this rulemaking, DOT–113 tank cars in LNG service will be required to have an outer tank that is 9/16th inch thick (after forming) and made from TC–128 Grade B, normalized steel plate. Depending on the specific design characteristics of a tank car manufactures approved car design, PHMSA and FRA determined that simply the use of 9/16th inch TC–128, Grade B normalized steel for the outer tank would not increase the GRL above 263,000 pounds; however, PHMSA and FRA understand that operators may select certain specification designs that may place the rail car at a GRL over 263,000 pounds.

In an effort to maintain consistency with FRA's current approval (*see* 76 FR 4250, January 25, 2011) of newly manufactured railroad tank cars with a GRL exceeding 263,000 pounds, this final rule will amend the HMR to state that tank cars manufactured for LNG service after (the effective date of this final rule) may be loaded to a maximum GRL of 286,000 provided the tank car meets the following criteria:

1. Tank car is constructed in accordance with S–286.

2. The outer shell and heads are constructed with TC–128 Grade B, normalized steel.

This aligns with the action PHMSA and FRA took when creating the DOT–117 specification and does not place a new burden on tank car manufacturers. A tank car manufacturer may therefore consider their design "approved" provided it meets the two conditions above, with no application to FRA or PHMSA required.

## C. Additional Operational Controls for LNG Transportation

In the NPRM, PHMSA proposed to rely on the operational controls already required in the HMR for the transportation by rail of other flammable cryogenic materials, and invited comment on whether additional operational controls may be warranted. PHMSA encouraged commenters to provide data on the safety or economic impacts associated with any proposed operational controls, including analysis of the safety justification or cost impact of implementing operational controls.

In this final rule, PHMSA is amending the HMR to adopt operational controls beyond the current extensive

requirements of the HMR. These additional operational controls consist of requirements for:

• A two-way end-of-train (EOT) device or distributed power (DP) for trains with 20 continuous tank cars of LNG, or 35 tank cars of LNG throughout the entire train;

• Location and inner tank pressure monitoring for each tank car containing LNG; and

• Compliance with § 172.820 route planning requirements (*i.e.,* rail routing).

PHMSA and FRA believe that the current requirements of the HMR ensure a robust level of safety for the transport of LNG by rail that is further reinforced by widely-adopted voluntary industry standards in AAR Circular OT–55. Additionally, the new operational controls in this final rule will add a still greater margin of safety to address the risks posed by LNG transportation in DOT–113C120W tank cars.

## 1. AAR Circular OT–55

AAR Circular OT–55 (OT–55) outlines operational controls for trains meeting the industry definition of a "Key Train," including speed restrictions, track requirements, storage requirements, and the designation of "Key Routes," which are subject to additional inspection and equipment requirements. OT–55 defines a "Key Train" as any train with:

• One tank car load of Poison or Toxic Inhalation Hazard (PIH or TIH) (Hazard Zone A, B, C, or D), anhydrous ammonia (UN1005), or ammonia solutions (UN3318);

• 20 car loads or intermodal portable tank loads of any combination of hazardous material; or;

• One or more car loads of Spent Nuclear Fuel (SNF), High Level Radioactive Waste (HLRW).

Key Trains have a maximum speed of 50 mph. If a defect to a rail car (*e.g.,* hanging equipment) is reported by a wayside detector but not confirmed by visual inspection, the maximum speed is reduced to 30 mph. Circular OT–55 defines a "Key Route" as "any track with a combination of 10,000 car loads or intermodal portable tank loads of hazardous materials, or a combination of 4,000 car loadings of PIH or TIH (Hazard zone A, B, C, or D), anhydrous ammonia, flammable gas, Class 1.1 or 1.2 explosives, environmentally sensitive chemicals, Spent Nuclear Fuel (SNF), and High Level Radioactive Waste (HLRW) over a period of one year." OT–55 states that "main tracks on 'Key Routes' must be inspected by rail defect detection and track geometry inspection cars or any equivalent level of inspection no less than two times

each year; sidings are similarly inspected no less than one time each year; and main track and sidings will have periodic track inspections that will identify cracks or breaks in joint bars.'' Finally, OT–55 states that ''wayside defective bearing detectors shall be placed at a maximum of 40 miles apart on ''Key Routes,'' or equivalent level of protection may be installed based on improvements in technology.'' These recommended practices were originally implemented by all major Class I rail carriers operating in the United States, with smaller short-line railroads following on as signatories.

While PHMSA did not propose to incorporate by reference OT–55 or to adopt the requirements for ''Key Trains'' in the HMR, the railroad industry's widespread, voluntary adoption of the circular is an important consideration for PHMSA in assessing the need for prescribing additional operational controls by regulation. AAR first published Circular No. OT–55 in January 1990 to document recommended railroad operating practices for the transportation of hazardous materials. The first issue of the circular included recommended mainline and yard operating practices, designation of key routes, proposed separations from hazmat storage areas, training of transportation employees, and implementation of TRANSCAER®. TRANSCAER® is a national community outreach program that works to improve community awareness, emergency planning and incident response for the transportation of hazardous materials, criteria for shipper notification, and procedures for handling time sensitive materials. Over the past 30 years, OT–55 has been routinely revised as needed to incorporate technological developments and other changes in industry practice concerning the safe transportation of hazardous materials. For instance, OT–55 has adopted revisions to AAR's interchange standards, and technology advancements such as the use of electronic emergency response information to provide timely and reliable information to emergency responders.

To further promote compliance with the recommended practices outlined in OT–55, and compliance with Federal transportation laws, the rail industry developed and published the *United States Hazardous Materials Instructions for Rail*, commonly referred to as ''HM–1.'' The purpose of the HM–1 is to provide the rail industry with uniform hazardous materials operating rules that railroads can implement and consistently apply to support

compliance with Federal regulations, and to enhance significantly employee safety and the safety of the communities through which the railroads operate. The HM–1 may be implemented as published, or it may be modified by an individual railroad to be consistent with its unique operating rules and practices.

Through its enforcement activities, FRA verifies that each railroad has established operating rules governing the safe transportation of hazardous materials, and utilizes those instructions to enforce that railroad's compliance with the Federal operating and hazardous materials transportation regulations.

In accordance with the ''Key Train'' definition and the changes being adopted, OT–55's operational controls would apply to the bulk transport of LNG by rail in a train that is composed of 20 car loads or intermodal portable tank loads in which LNG is present along with any combination of other hazardous materials. Due to the operational controls required for ''Key Trains,'' Circular OT–55 provides an additional level of safety regardless of what combination of hazardous materials the train is transporting. PHMSA and FRA believe this industry standard reduces the risk of derailments and collisions and therefore decreases the risk involved in the transportation of all hazardous materials, including LNG.

PHMSA and FRA note that the hazardous materials operating instructions from Circular OT–55–Q, the most recent edition, have been incorporated into railroads' (carriers') operating rules. Furthermore, FRA regularly performs reviews of railroads and their operating rules and are not aware of any instances in which a railroad is failing to adhere to Circular OT–55 when operating ''Key Trains.''

2. Additional Operational Controls in the Final Rule

In this final rule, PHMSA is adopting several additional operational controls:

(1) Trains with a block of 20 loaded tank cars of LNG, or 35 loaded tank cars of LNG throughout the entire train, are required to be equipped with an EOT device or DP.[24]

(2) Each loaded tank car containing LNG must be monitored for location and tank pressure by the offeror and notify the carrier if the tank pressure rises by more than 3 psig in any 24-hour period.

(3) Each carrier operating trains carrying a loaded tank car of LNG must perform additional planning requirements in accordance with

§ 172.820 (*i.e.*, rail routing). While the general operational controls in the HMR, as supplemented by the widespread, voluntary practices governing Key Trains in Circular OT–55, provide robust protections against derailment and other accidents (and by extension, a loss of package integrity resulting from the same) involving train configurations with only a handful of tank cars, PHMSA believes that the additional operational controls established by this final rule will ensure safe transportation of LNG regardless of train configuration. As explained earlier, trains currently transport to three DOT–113 tank cars of flammable cryogenic materials (such as ethylene) in mixed commodity freight trains. However, if the market for rail transportation of LNG evolves to include movement of LNG in larger quantities (in blocks of cars or unit configurations) within each train, there is a higher probability that, should a derailment occur, one or more cars containing LNG would be involved and would be breached.

The additional operational controls will decrease the likelihood and severity of derailments (DP/EOT device); decrease the likelihood that an LNG tank car is lost in transport (location monitoring); increase the likelihood that the railroad is notified immediately in the unlikely event that a tank car experiences unsafe conditions during transportation (pressure monitoring); and reduce the severity of the consequences in a derailment scenario by requiring that railroads transport LNG on the safest route available to them (rail routing and risk assessment). Over a DOT–113 tank car's expected 50-year service life, the use of DP/EOT devices for block carriage and unit trains, remote monitoring, and risk-based routing of trains transporting LNG will help ensure the transportation safety of LNG on the rail transportation network.

Enhanced braking requirements can result in accident avoidance and can lessen the consequences of an accident by more quickly slowing the train and decreasing the energy of impacts by reducing the number of tank cars affected by a potential derailment. PHMSA decided on the HHFT threshold (*i.e.*, a continuous block of 20 loaded LNG tank cars or 35 loaded LNG tank cars throughout the train) based on the effectiveness of this existing requirement for flammable liquids in rail transportation. PHMSA reviewed the possibility of requiring electronically controlled pneumatic (ECP) braking on cars meeting the above threshold, but determined that ECP

---

[24] *See* Section IV. B. *Operational Controls, 1. Braking and Routing* for further discussion.

brakes are not a practical alternative given that ECP brakes are not cost justified when applied to unit train configurations in the HHFT environment. *See* HM–251F; 83 FR 48393 (Sept. 25, 2019).[25]

Given the availability of existing braking technologies, PHMSA is requiring advanced braking in the form of a two-way EOT device or, alternatively, a linked and operational DP system located at the rear of the train. A two-way EOT device or DP system is more effective than conventional brakes because a locomotive engineer can initiate an emergency brake application from the front and rear of the train, which can reduce stopping distances and lessen in-train forces that can cause or contribute to the severity of certain derailments. These advanced braking requirements are consistent with the current requirements for HHFTs, which apply to Class 3 flammable liquids that are transported in a single block of twenty cars or 35 cars dispersed throughout a single train.[26]

The requirement to remotely monitor a tank car containing LNG will allow shippers and carriers to better identify adverse conditions and prevent a non-accidental release of LNG while in transportation. Moreover, the requirements in this final rule allow for flexibility for shippers and carriers in determining how to best monitor the location of the tank cars and pressure within the inner tank. PHMSA and FRA expect that the industry will develop standard practices and implement technologies to meet the HMR performance standard for monitoring.

PHMSA is also adopting routing requirements in § 172.820 to further reduce the risk of a train accident. This amendment requires railroads to evaluate safety and security risk factors when assessing the potential routes to be used to transport LNG. The 27 safety and security risk factors set forth in Appendix D of Part 172 against which carriers evaluate their routes provide a robust framework for identifying and

managing route-based risks associated with LNG transportation by rail. FRA regularly conducts evaluations of a railroad's route risk assessment requirements to ensure adherence to the requirement.

Requirements of the route analysis measures for a rail carrier include:
• Compilation of commodity transportation data;
• Analysis of safety and security risks for transportation route(s);
• Identification and analysis of potential alternate route(s); and
• Based on the above data, selection of the practicable route posing the least overall safety and security risk.

By expanding the existing route analysis and consultation requirements of § 172.820 to include LNG by tank car, PHMSA is incorporating additional safety elements that are available within the overall hazardous materials regulatory scheme. It is worth noting that routing requirements were not mandated in the special permit issued to ETS because the permit is issued to a shipper rather than a rail carrier who is ultimately responsible for the route risk analysis. In this final rule, there is no limitation on specific origins and destinations, thereby necessitating routing and risk analysis under § 172.820. Some of the operational controls included in special permit DOT–SP 20534 were not adopted or were revised in the final rule. The requirement to submit a plan providing per shipment quantities, timelines, etc., was included in DOT–SP 20534 in order to gather more information about the movement of the material. This requirement is not feasible for a broadly applicable regulatory authorization. In this final rule, PHMSA applied the HHFT criteria in reaching its determination to require the same braking requirements for LNG transportation. After review of the comments and the safety history of flammable liquid HHFTs, PHMSA concludes that this is best option to ensure safe movement of LNG. In the final rule, the remote monitoring requirements are different than what was included in the DOT–SP 20534 because PHMSA does not believe that direct monitoring for leaks is necessary. Monitoring for tank pressure and tank car location parameters will sufficiently inform the offeror of the tank car's location and condition and allow notification to the carrier should an undesirable condition occur. For example, registering and notification of an unexpected decrease in pressure could likely indicate a methane release and could be communicated

immediately to the rail carrier and the closest emergency responders.

With respect to train length and weight limitations, PHMSA determined that there should not be a maximum for either in this rulemaking. PHMSA notes that the HMR do not limit the number of shipments a shipper can offer into transportation, nor do the HMR restrict the number or type of hazardous materials rail cars that a carrier can transport in a train. An individual railroad's appropriate train operating lengths are based on multiple factors, including, but not limited to, track profile, train make-up, train dynamics, and crew training. Due to these and other unique factors that influence a specific railroad's operation, PHMSA and FRA conclude that determination of appropriate train lengths is best left to the individual railroads.

Regarding separation distance, which is the number of non-placarded rail cars between a locomotive or occupied caboose and railcars containing hazardous materials (see § 174.85), PHMSA has concluded that it is appropriate to maintain the current requirement at this time, pending further study of the issue. Non-placarded rail cars are rail cars that do not contain an amount of hazardous material that require placarding (see 49 CFR part 172 subpart F for additional information about placarding requirements). The current requirement for a flammable gas, like LNG, requires a separation distance of five cars between the engine and placarded tank car, when train length permits. If train length does not permit a separation distance of five cars, the tank car(s) must be placed near the middle of the train, but not nearer than the second car from an engine or occupied caboose. These long-standing separation distance requirements protect train crews from the releases of hazardous materials in accident conditions. PHMSA and FRA collaborated under the scope of the Rail Safety Advisory Committee Hazardous Materials Issues Working Group Task No. 15–04 to consider the separation distance issue.

Ultimately, due to an absence of consensus of the Working Group participants, as well as a lack of established incident data, the members did not reach agreement on a change to the existing regulation governing hazardous materials in train separation distances. Moreover, PHMSA worked with the Volpe Center in its review of rail accidents occurring between 2006 and 2015 where there was a release of hazardous materials near the head end of the train (occupied locomotive). The review found no reported crew injuries

---

[25] PHMSA notes that while this rulemaking does not prohibit LNG rail transportation in unit trains, the likelihood is low that there will be LNG unit trains, at least initially. Development of the necessary infrastructure, especially construction of DOT–113C120W9 tank cars, to transport LNG by railroad, particularly by unit trains, demands significant financial investment, long term commitment, and considerable planning. LNG tank car fleets would need to be built, and there is a limit to the construction capacity of the industry. As a result, FRA anticipates that industry will transport LNG in smaller configurations, at least until infrastructure is in place to allow for unit train service.

[26] See Section IV, B. *Operational Controls, 1. Braking and Routing* for a more detailed discussion.

and therefore no injuries that were potentially preventable with additional buffer cars.

Extensive research exists on separation distance of hazardous materials from train crews and locomotives, and other hazardous materials in a train. PHMSA has initiated a research project in coordination with the John A. Volpe National Transportation Systems Center (Volpe Center) as an initial step in addressing NTSB Safety Recommendations R–17–1 and –2.[27] This effort will result in a report that identifies gaps in the existing studies, areas for further research, and what conclusions can be drawn collectively from the existing knowledge base, if any. PHMSA may consider changes to the separation distance requirements in § 174.85 of the HMR for placarded rail cars and tank cars in mixed commodity freight train and unit train configurations pending the outcome of the study.

In consideration of the foregoing, PHMSA is not amending the separation distance requirement in this final rule.

## IV. Summary and Discussion of Comments to the Rulemaking Docket

The NPRM comment period closed on January 13, 2020. PHMSA received 445 comment submissions [28] to the rulemaking docket through the extended comment period. PHMSA considered all comments in the development of this final rule. The comments submitted to this docket may be accessed via *http://www.regulations.gov.* The following table categorizes the commenters by background:

### TABLE 4—NPRM COMMENTERS

| Commenter background | Count | Description and examples of category |
|---|---|---|
| Non-Government Organizations ............................... | 27 | Environmental Groups (17); Emergency Response Organizations (6); Other (4). |
| Governments .................................................... | 15 | Local (6); State (6); Federal (2); Tribal (1). |
| Private Individuals ........................................... | 391 | |
| Industry Stakeholders ........................................ | 12 | Tank Car Manufacturers (1); Trade Associations (10); Shippers (1). |

PHMSA received comments relating to tank car design, operational controls, emergency response, and potential environmental and economic impacts. These comments are summarized and discussed in greater detail below.

### A. Tank Car Design

In the NPRM, PHMSA proposed to authorize DOT–113C120W tank cars for use in the transportation of LNG by rail and to amend the ''Pressure Control Valve Setting or Relief Valve Setting'' Table in § 173.319(d)(2) by adding a column for methane as follows:

### TABLE 5—PROPOSED PRESSURE CONTROL VALVE SETTING OR RELIEF VALVE SETTING

| Maximum start-to-discharge pressure (psig) | Maximum permitted filling density (percent by weight) | | | | |
|---|---|---|---|---|---|
| | Ethylene | Ethylene | Ethylene | Hydrogen | Methane |
| 17 ................................................................ | .............................. | .............................. | .............................. | 6.60. | |
| 45 ................................................................ | 52.8. | | | | |
| 75 ................................................................ | .............................. | 51.1 .............. | 51.1 .............. | .............................. | 32.5. |
| Maximum pressure when offered for transportation. | 10 psig .................... | 20 psig ........... | 20 psig ........... | .............................. | 15 psig. |
| Design service temperature ...................... | Minus 260 °F ........... | Minus 260 °F .. | Minus 155 °F .. | Minus 423 °F ............. | Minus 260 °F. |
| Specification (§ 180.507(b)(3) of this subchapter). | 113D60W, 113C60W | 113C120W | 113D120W ...... | 113A175W, 113A60W | 113C120W. |

As discussed in the summary of amendments in this final rule in Section III, the start-to-discharge pressure setting, filling density, maximum offering pressure, and the thermal characteristics of the DOT–113 tank car in § 173.319 were selected to allow enough holding time (including loading, transit, storage incidental to movement, and unloading) such that the inner tank would not experience a pressure rise sufficient to activate the reclosing PRV during conditions normally incident to transportation. Additionally, if the pressure in the inner tank were to reach the start-to-discharge pressure of the reclosing PRV, the inlet to the valve would successfully vent vapor to relieve further pressure buildup. That is, the combination of these conditions (the start-to-discharge pressure setting, filling density, maximum offering pressure, and the thermal characteristics of the DOT–113C120W) acts as a safety measure to prevent activation of the PRV under normal conditions of transport. At the maximum offering pressure of 15 psig and the start-to-discharge pressure setting of 75 psig for the reclosing PRV adopted in this final rule, the tank car has a 60 psig pressure range before venting occurs. Using an average daily pressure rise of 0.75 to 1.5 psig as indicated by industry, even if the FRA notification requirement for tank cars in transportation for over 20 days is reached, the tank would see only a 15 to 30 psig pressure increase—meaning there would still be a 30 to 45 psig buffer remaining before venting occurs (or an aggregate 20 to 60 days of holding time). Please see *Section III. B. ''The DOT–113C120W Specification Tank Car''* for additional details on the offering pressure, set-to-discharge pressure, and the revised filling density requirements for LNG in this final rule.

---

[27] *https://www.ntsb.gov/safety/safety-recs/recletters/R-17-001-002.pdf*

[28] Some comment submissions noted additional signatories. Those were considered in the development of the final rule.

PHMSA received numerous comments about the tank car design for the transportation of LNG by rail, which it sorted into the following subtopics:

1. General Suitability of the DOT–113C120W Specification Tank Car;
2. Crashworthiness Assessment/Field Tests;
3. High Nickel Steels;
4. Maximum Permitted Filling Density;
5. Maximum Pressure When Offered;
6. Insulation;
7. Maximum Gross Rail Weight; and
8. The DOT–113C140W Tank Car Specification.

In this section, PHMSA responds to 15 sets of substantive comments related to tank car design for LNG transportation.

### 1. General Suitability of the DOT–113C120W Specification Tank Car

PHMSA received various comments regarding the general safety of the tank car design as proposed in the NPRM. Notably, the Railway Supply Institute Committee on Tank Cars (RSI–CTC) cited the regulatory history of the DOT–113C120W as an indication that DOT previously considered it for the transport of LNG and that the specification itself was originally designed to accommodate cryogenic materials, like LNG. RSI–CTC noted that the Hazardous Materials Regulations Board, a predecessor agency to PHMSA, published a notice in the **Federal Register** in 1971 as part of the HM–91[29] rulemaking docket indicating that the agency was "considering amendment of the Department's Hazardous Materials Regulations to provide for the shipment of ethylene, hydrogen, methane, [and] natural gas . . . in a cold liquefied gas state in certain tank cars." RSI–CTC further commented that the delimiter letter "C" indicates that DOT–113C120W tank cars were specifically designed for the safe transportation of cryogenic materials like LNG. They also pointed out that these cars are subject to additional operating requirements, namely thermal integrity and in-transit reporting requirements, which have led to a strong safety record of over 50 years. Similarly, the International Association of Fire Chiefs (IAFC) agreed with the NPRM's proposal to use DOT–113 tank cars, noting that other refrigerated liquids are transported safely using this specification.

Other commenters expressed concern over the tank car design, stating that there is a lack of testing on the suitability of the tank car for the transportation of LNG. The Governor of Washington State, on behalf of Washington State, claimed that PHMSA's assertion of a demonstrated safety record for DOT–113 tank cars is baseless without a completed risk assessment, because LNG is not currently authorized for transportation in DOT–113 tank cars and PHMSA and FRA may not be aware of every incident involving these cars. The Surfrider Foundation noted its belief that the proposed tank cars were never designed or intended to be used for the transport of LNG. Likewise, the California Public Utilities Commission (CPUC) expressed concern that PHMSA is moving forward with a deregulatory action without proper evaluation. CPUC also stated that transporting LNG in DOT–113 tank cars poses an unacceptable risk, further noting that an increase in pressure could trigger venting and that exposure of the newly vented gas to a heat source could result in an expanded fire or secondary explosion. Finally, CPUC also stated that the proposed modification to the HMR to authorize a DOT–113 tank car would be untested and that this is inconsistent with PHMSA's mission for safety.

Furthermore, various commenters—including the New York State Department of Transportation (NYDOT), the New York State Department of Environmental Conservation (NYDEC), the New York State Division of Homeland Security and Emergency Services (NYDHSES), and the NTSB—stated their belief that the limited number of incidents involving DOT–113 tank cars does not provide adequate evidence to ensure that they are safe for the transportation of LNG. These commenters expressed that the sample size of crashes is too small given the low number of DOT–113 tank cars in existence, and therefore, they requested additional research on the suitability of these tank cars for LNG service. Similarly, a group of environmental protection NGOs expressed their belief that PHMSA failed to provide analysis to justify its claim that the current known safety record of DOT–113 rail cars provides a meaningful comparison to their understanding of planned large-scale shipments of 100-car trains of LNG throughout the United States. They further commented that PHMSA did not provide adequate data or analysis to support its conclusions about how DOT–113 tank cars and their cargoes will behave in a potential crash on main line rail routes. Additionally, they asserted that PHMSA failed to provide data on the risk of cascading failure of tank cars, noting that the lack of data undermines PHMSA's statement that highway transportation is less safe than rail transportation. Furthermore, the Center requested that PHMSA consider the specific issues surrounding LNG tank cars, such as the placement of valves and other appendages that may be sheared off during a derailment; the puncture resistance of the tank car and potential jacketing to prevent punctures; the heat resistance of LNG tank cars to prevent explosions from fires during derailments; and braking requirements that are adequate for the weight of LNG tank cars.

With respect to concerns about the potential for explosions, the IAFC noted that the DOT–113 tank car is specifically designed to prevent a boiling liquid expanding vapor explosion (BLEVE) and that in the event of an accident, the LNG would initially spread before either warming or freezing. They further noted that if the released LNG were to catch fire, it would most likely be limited to the contents of the specific tank car that experienced the release, rather than spreading to the other tank cars. However, Earthjustice[30] expressed concern regarding two LNG motor vehicle accidents in Spain where a BLEVE was observed, and Physicians for Social Responsibility (PSR) noted that no test data or mathematical models exist to predict whether and when a LNG tank car exposed to an external fire would undergo a BLEVE.

### PHMSA Response

PHMSA agrees with RSI–CTC's comment and notes that the HM–91 rulemaking specifically considered that "methane, liquefied" (as referenced in the rulemaking) could be shipped in a DOT–113C120W specification tank car.

The safety history of DOT–113C120W tank cars is sufficient to draw a conclusion that these tank cars are appropriate for the bulk transportation of LNG. Please refer to our discussion on the DOT–113C120W tank car in *Section III. B. "The DOT–113C120W Specification Tank Car"* for further details. Also, please note that PHMSA is enhancing this already suitable packaging with additional outer tank requirements to improve crashworthiness. Although the HM–91 rulemaking published October 16, 1971 [36 FR 20166] and docket was subsequently withdrawn, PHMSA subsequently undertook a separate rulemaking published March 1, 1974

---

[29] *https://www.phmsa.dot.gov/sites/ phmsa.dot.gov/files/docs/standards-rulemaking/ rulemakings/archived-rulemakings/67251/36fr-20166.pdf.*

[30] Earthjustice's January 14, 2020 comment was filed on behalf for the Center, Clean Air Council, Delaware Riverkeeper Network, Environmental Confederation of Southwest Florida, Mountain Watershed Association, and Sierra Club.

[HM–115, 44 FR 12826] to authorize the transport of a flammable cryogenic material (ethylene) in DOT–113C120W specification tank cars. While methane (*i.e.*, LNG) was not authorized for transport in that later rulemaking, there is no indication in the record that the omission was due to safety concerns.

With respect to Earthjustice's concern, the above BLEVE incidents that occurred in Tivissa, Catalonia, Spain [31] and Zarzalico, Murcia, Spain [32] with cargo tank motor vehicles transporting LNG do not serve as an appropriate comparison to LNG rail tank cars. The tanks involved in these incidents had a single inner steel tank covered by an envelope of polyurethane foam and a lacquered aluminum jacket as opposed to the tank-within-a-tank design of the DOT–113C120W tank car consisting of an inner and outer tank made of steel. Although the cargo tanks involved in the incidents were both constructed of 304L stainless steel, the insulation material and the outer jacket (constructed of 2mm (0.080 in) of aluminum) held no vacuum. Neither the polyurethane insulation nor the thin aluminum, which were used in the construction and design of the outer tanks, are particularly fire resistant. Therefore, these envelopes around the tanks provided little fire protection in the accident scenarios.

Conversely, the DOT–113C120W tank car has a steel outer tank and a multi-layer insulation system, and is significantly superior in terms of both impact and fire resistance than the cargo tanks involved in the Spanish incidents. The annular space of the DOT–113 design with in combination with a properly functioning pressure relief system to diminish the likelihood of a high-energy event such as a BLEVE. Also, in the case of the Zarzalico accident, a significant portion of the insulation was destroyed by the fire, and in both cases the tank containing the LNG was directly exposed to the fire. Direct contact by flames resulted in increased pressure in the tank, followed by thermal tears of the unprotected tanks due to a decrease in material properties, rapid release of the contents,

and subsequent ignition of the vapor cloud. Direct contact by flames on the inner tank of a DOT–113 is significantly less likely due to the more robust design of the DOT–113 tank car.

In response to comments from CPUC and members of the public, PHMSA notes that venting of a flammable cryogenic material, other than that caused by an accident, is prohibited, and is unlikely to occur given the DOT–113C120W tank car's safety features and operational controls to expedite the movement of flammable cryogenic materials. Although there may be rare instances as a result of offeror's failure to properly operate or maintain the pressure relief system, this concern is adequately addressed by existing HMR requirements for monitoring the average daily pressure rise, requirements for routine maintenance of PRDs, and the supplemental requirement adopted in this final rule to monitor the pressure in the tank remotely so that the shipper will be aware of issues that may result in venting before the tank car reaches its destination. Please see our discussion of existing operational controls in the HMR and the tank car design features in *Section III.* ''*Amendments to the Hazardous Materials Regulations Adopted in this Final Rule*'' of this final rule for further discussion of the existing framework that ensures safe, expedited movement of flammable cryogenic materials like LNG.

CPUC's comment brought up concerns over potential secondary fires caused by the release of LNG from a tank car due to exposure to fire, and BLEVEs of tank cars exposed to fire. As stated in the NPRM, DOT–113 specification tank cars are inherently more robust when compared to other specification tank cars, due to their unique design, materials of construction, and their specific purpose to transport cryogenic materials. The tank-within-a-tank design of the DOT–113 specification tank car reduces the probability of cascading failures of other undamaged DOT–113 specification tank cars being transported in a block or unit train configuration. While it is possible that ignition of these vapors could occur if an ignition source is present, the fire would be contained to the proximity of the release point of the vapors from the tank car. Additionally, it is highly unlikely that an undamaged DOT–113 specification tank car involved in a derailment would result in explosion due to a BLEVE due to the design of the tank car, the loading pressure requirements for cryogenic materials, the mandated requirements for redundant pressure relief systems (valves and safety vents) and the

insulation systems that are built into each car. It is not possible to state with certainty whether a BLEVE is possible in the case of a LNG tank car derailment, and what conditions need to be present for such an event to occur. However, in a full-scale test [33] conducted in 2018, a double walled portable cryogenic tank was filled with liquid nitrogen (and PRDs operated as designed) and exposed to a greater than 200-minute engulfing propane pool fire. The tank was neither destroyed nor did a BLEVE occur.

Based on the suitability of the DOT–113 design and material of construction for cryogenic material, safety history of the car, and the existing framework in the HMR for hazard communication and operational control, PHMSA concludes that the DOT–113C120W tank car is a safe packaging to transport LNG by rail. PHMSA has evaluated years of LNG transportation via other modes and packagings, both international and domestic, to help assess the potential risks of LNG by rail resulting in our determination that the containment vessel is an equally safe alternative. PHMSA reaffirms that the DOT–113 tank car is suitable for use in LNG service, as it has a demonstrated safety record of over 50 years in the service of similar flammable cryogenic materials.

### 2. Crashworthiness Assessment/Field Tests

PHMSA received various comments regarding the crashworthiness and general field testing of the DOT–113C120W tank car. Notably, NTSB and other commenters requested that PHMSA and FRA complete a thorough crashworthiness and safety assessment of the DOT–113C120W tank car specification prior to authorizing it for LNG service. Further, they stated that relying on data for the accident history of similar hazardous materials transported in the small fleet of DOT–113 tank cars (as was done in the NPRM) or making engineering assumptions based on the performance of pressure tank cars with different features and operating parameters (as was done in the Exponent Report [34] referenced in the Special Permit 20534 docket) does not provide a statistically significant or valid safety assessment.

---

[31] *Explosion of a road tanker containing liquefied natural gas.* Eula'ia Planas-Cuchi, Nu'ria Gasulla, Albert Ventosa, Joaquim Casal. Journal of Loss Prevention in the Process Industries 17 (2004) 315–32. *https://www.academia.edu/7741565/Explosion_of_a_road_tanker_containing_liquefied_natural_gas.*

[32] *Analysis of the Boiling Liquid Expanding Vapor Explosion (BLEVE) of a Liquefied Natural Gas Road Tanker: The Zarzalico Accident.* E. Planas, E. Pastor, J. Casal, J.M. Bonilla. Centre for Studies on Technological Risk (CERTEC). Department of Chemical Engineering. Universitat Politècnica de Catalunya. *https://core.ac.uk/download/pdf/46606613.pdf.*

[33] FRA Full Scale Test titled: ''Fire Performance of a UN–T75 Portable Tank Phase 1: Loaded with Liquid Nitrogen''.

[34] The referenced Exponent Report is a study to examine the risks of bulk transportation of LNG by investigation the potential risk profiles for transport of LNG versus liquefied petroleum gas (LPG) by cargo tank motor vehicle and rail tank car. *https://www.exponent.com/knowledge/alerts/2015/08/bulktransportation/~/media/03b73782ec76446798c70f6ac403ef84.ashx.*

They also called into question how PHMSA determined that the specification DOT–113C120W tank car is an acceptable packaging to transport LNG. They noted their belief that the small number of DOT–113 tank cars in use and the documented 14 incidents referenced in the NPRM, in which three shell breaches occurred between 1980 and 2017, do not provide a demonstrated safety record. The Physicians for Social Responsibility cited the need to develop a new, robust tank car design. The Delaware Riverkeeper Network cited a lack of field tests on the survivability of the DOT–113 tank car loaded with LNG and the lack of simulation of the tank car ''hulls.'' The Puyallup Tribe of Indians stated its belief that PHMSA is in violation of the APA, stating that the NPRM was not supported by a complete and technically sufficient administrative record because there are ongoing and incomplete studies to determine the safety of transporting LNG in DOT–113 tank cars.

Earthjustice questioned the suitability of the DOT–113 tank car noting that ''. . . of the three specific derailments of the DOT113C120 tank car noted by the EA, all three ended up either breaching or needing to be breached and losing their entire cargoes. This represents 4.5% of the entire DOT113C120 tank car fleet.''

### PHMSA Response

As noted previously, PHMSA does not agree that Earthjustice's analysis calls into question the suitability of the DOT–113C120W tank car. PHMSA has concluded that the safety history of DOT–113C120W tank cars is sufficient to demonstrate that these tank cars are appropriate for the transportation of LNG, as the DOT–113 tank car has a demonstrated safety record of over 40 years. Since authorized in the HMR, there have been no train-accident related fatalities or serious injuries in over 100,000 shipments of cryogenic material in DOT–113 tank cars. PHMSA has reviewed the approximately 450 Incident Report Form 5800.1 filings involving releases from DOT–113 (or equivalent AAR204W [35]) tank cars. Nearly all of these filings resulted from the non-accidental release of product attributed to defective or improperly secured valves and/or associated fittings and not a breach of the tank. The HMR requirements for the design and material of construction for the DOT–113, as well as existing operational controls and handling requirements for the tank car, have contributed significantly to the strong safety history of the DOT–113.

PHMSA disagrees with the suggestion that the Exponent Report in support of the DOT–SP 20534 is irrelevant to the discussion. That study conducted a quantitative risk assessment addressing unit train movement of LNG in DOT–113 tank cars. The study creates multiple models that estimate the potential damage of an LNG incident. Specifically, transport releases were evaluated along 1-mile long segments with varying population densities. While commenters have claimed that the study does not have a large enough sample size, PHMSA notes that the study used all the available data on DOT–113 incidents. The reason for that perceived lack of data is that DOT–113 tank cars have not been involved in many incidents during the timeframe that DOT–113s have been in use. Given that the study uses all the available data on DOT–113 incidents, PHMSA believes that the study's findings are useful in informing this final rule.

After internal review and in consideration of certain substantive comments received to the NPRM, PHMSA is further enhancing the safety of these tank cars to be equipped with a 9/16th inch thick outer tank and constructed from TC–128 Grade B Normalized steel. This represents a 28% increase in outer tank thickness over the current minimum requirements for a DOT–113C120W tank car in use for other flammable cryogenic materials. PHMSA has concluded that this change will improve the crashworthiness of the tank, thereby improving its effectiveness in retaining LNG contents during a crash scenario. This conclusion is supported by modeling conducted on the DOT–117 specification tank car with a 9/16th inch thick shell and heads used in flammable liquid service when compared with the previous DOT–111 tank cars with 7/16th inch steel. See *Section III. B. ''The DOT–113C120W Specification Tank Car''* for further details on the tank car enhancements added in this final rule.

### 3. High Nickel Steels for Inner Tanks

The Puyallup Tribe stated that PHMSA failed to provide a sufficient factual basis to support its assertion that the materials used in the fabrication of DOT–113 tank car inner tanks are appropriate for the transportation of LNG. They noted that stationary LNG storage tanks use high nickel steels and that the specifications for American Society of Testing and Materials (ASTM) A240/240M 304, or 304L steels used in DOT–113C120W tank cars provide for a range of nickel content that can equal—but can also extend outside of—the range recommended for stationary LNG tanks. Therefore, they commented that there is no evidence that all steels meeting this specification will have the performance specifications appropriate for storing LNG that is being transported by rail. The Tribe further expressed their belief that PHMSA has not adequately demonstrated why ASTM A240/240M 304, or 304L steel will ensure safe transport of LNG in tank cars.

### PHMSA Response

PHMSA disagrees with the Puyallup Tribe that there is no factual basis for the existing requirements for ASTM A240/240M 304, or 304L steels. The ASTM 300 series steels required in part 179 for DOT–113 tank cars have a long, successful history demonstrating the suitability of this steel as the material of construction for the inner tank of DOT–113 tank cars.

The 300-grade austenitic stainless steels (304/304L), commonly referred to as ''18–8 grade'' stainless steels, are the only steels authorized in the HMR for use when constructing the inner tank of a DOT–113 tank car. As discussed in *Section III. B. ''The DOT–113C120W Specification Tank Car,''* ASTM A240/240M 304, or 304L steels have the best balance of toughness, strength, and weldability for transportation, along with being able to withstand extremely low temperatures.

By contrast, ASTM A553 steel, also known as ''9% Nickel'' alloy steel, has less ductility and requires special welding protocols. A553 steel can be used for static storage vessels which do not have to withstand the dynamic stress conditions experienced by the tank car during movement and the more frequent thermal cycles of loading and unloading experienced by tank cars. In tank cars, the use of A553 steel is not advisable, due to the physical properties of the steel. The HMR have not approved it for use in tank cars, in part, due to problems encountered with welded repairs.

Therefore, in this final rule, PHMSA is maintaining the requirement to construct the inner tank of a DOT–113 tank car from ASTM A240/240M 304, or 304L steels for the inner tank. Please see *Section III. B. ''The DOT–113C120W Specification Tank Car''* for further discussion of the properties of 304 and 304L steel and the material of construction requirements for the inner tank of a DOT–113 tank car.

---

[35] The AAR204W is also authorized for the transportation of non-flammable cryogenic materials and has a similar design to a DOT–113.

Add. 72

## 4. Maximum Permitted Filling Density

AAR, RSI–CTC, and Chart Inc. disagreed with the maximum filling density proposed in the NPRM. Chart Inc. recommended that the filling density be 38.1 percent for a safety relief valve set at 75 psig, thereby corresponding to the 51.1 percent tabulated value for liquid ethylene. Chart Inc. further noted that flammable cryogenic materials in tank cars are required to have a 0.5 percent outage below the inlet of the pressure relief or pressure control valve at the start-to-discharge pressure setting of the valve, with the tank car in a level altitude.

RSI–CTC commented that PHMSA did not provide an explanation as to why it is imposing a maximum filling density that results in 15 percent outage rather than the standard 0.5 percent outage identified in existing regulations for other flammable cryogenic materials authorized by rail tank car. They stated that limiting LNG to a maximum filling density of 32.5 percent would require approximately 13 percent more tank cars to move the same volume of commodity, noting that this could increase the risk in transportation. Moreover, they stated that PHMSA's proposed limit is inconsistent with Transport Canada's regulations, which impose a 37.3 percent maximum filling density. To resolve this issue, they recommended that PHMSA consider adopting a maximum filling density of 37.3 percent, which they point out would harmonize the United States and Canada, as well as reduce the overall safety risk by reducing the total number of tank cars required.

### PHMSA Response

PHMSA notes the concerns over the proposed filling density and the potential inconsistencies related to the outage requirements for flammable cryogenic materials. The filling density of 32.5% specified in the NPRM was based on a 15% outage (vapor volume) at PRV start to discharge pressure. The AAR Manual of Standards and Recommended Practices, M–1004 ''Specifications for Fuel Tenders'' requires the LNG filling of tenders used to fuel LNG powered locomotives with 15% vapor volume. The operating demands on tenders combined with the need for more vapor as a fuel and the expected refueling processes make the filling density acceptable for use with fuel tenders. In contrast, tank cars do not require these same considerations, and thus, the filling density should be aligned with other bulk packagings.

After reviewing the comments provided to the NPRM and conducting further technical analysis, PHMSA agrees that the proposed 32.5 percent filling density unnecessarily limits the amount of LNG that can be loaded into the tank car designed for commercial shipments and not locomotive fueling. Calculations were performed through linear regression analysis of authorized filling densities for cryogenic material in cargo tanks (*see* § 173.318). The equations derived during that analysis were compared with filling density values currently authorized for tank cars in § 173.319 for ethylene and hydrogen. The comparison between cargo tanks and tank cars filling density values held true for ethylene and hydrogen, so the equation was therefore used to derive the filling density for LNG in tank cars. This filling density value was compared to the results of calculations conducted by AAR, Transport Canada, and FRA. A filling density of 37.3% by weight is consistent with these four (AAR, Transport Canada, FRA, PHMSA) analyses.

Therefore, in this final rule PHMSA is adopting a 37.3 percent maximum filling density for LNG, which will require approximately 2 percent outage below the inlet of the PRD at the start-to-discharge pressure to prevent the venting of liquid material should the device activate. This represents a greater level of safety than other cryogenic packagings authorized in the HMR and internationally, which only require a 0.5% outage requirement below the PRD inlet at the start-to-discharge pressure. Additionally, a 37.3 percent maximum filling density harmonizes with Transport Canada's TDG regulations. Please see the *Section III.B. ''The DOT–113C120W Specification Tank Car''* discussion for additional discussion of filling density.

## 5. Maximum Pressure When Offered

RSI–CTC stated that the proposed offering pressure of 15 psig for the Pressure Control Valve Setting or Relief Valve Setting in § 173.319(d)(2) is inconsistent with Transport Canada's requirements, which impose a 10 psig maximum offering pressure, and departs from AAR's practice of assuming a 10 psig maximum offering pressure to determine the individual specification requirements for DOT–113C120W tank cars. They also stated that while PHMSA appears to be relying on § 173.319(e)(1) for its determination that 15 psig is consistent with the 20-day transportation requirement for cryogenic materials and the estimated 3 psig per day maximum pressure increase during transportation, current regulations for DOT–113 tank cars as set forth in part 179, subpart F do not specify a time-in-transit limit for cryogenic materials. Rather, RSI–CTC asserted that both DOT's predecessor and the AAR have historically assumed a 30-day hold time in developing the DOT–113C120W specification. Moreover, the commenter noted that the average daily pressure rise limit of 3 psig per day, as set forth in § 179.319, is an operating specification for shippers designed to trigger inspection of the tank vacuum to ensure thermal integrity and should not be imposed as a design requirement to calculate the maximum offering pressure.

### PHMSA Response

PHMSA agrees that the HMR do not specify a time-in-transit limit. However, PHMSA requires notification to FRA if a flammable cryogenic material has not reached the consignee within 20 days. FRA closely monitors any situation requiring notification of more than 20 days in transit, and our experience is that rail carriers act to expedite movement of the tank car to its destination or take swift corrective action to reduce the pressure within the tank if necessary. Therefore, PHMSA believes that the 15 psig maximum offering pressure is appropriate for the transportation of LNG and is consistent with the level of safety provided to other flammable cryogenic materials. Further, the HMR do not prohibit shippers from offering a tank car of LNG at a lower pressure. Please see *Section III.B. ''The DOT–113C120W Specification Tank Car''* and *III.C. ''Additional Operational Controls for LNG Transportation''* for additional discussion of offering pressure and the operational controls for the movement of these tank cars.

## 6. Insulation

Chart Inc. noted in their comment that Mylar is a plastic material that is incompatible with the potential for flammable gas in the annular space. They further stated that common wrapped insulation used in such tanks is often referred to as MultiLayer Insulation (MLI), Super Insulation (SI), or MultiLayer Super Insulation, which consists of alternating layers of aluminum foil and a non-conducting spacer material. Chart Inc. further explained that fiberglass or Perlite powder can be used as a potential alternative in place of or in addition to the MLI or SI.

### PHMSA Response

PHMSA agrees that use of the term Mylar in the preamble of the NPRM was inconsistent with the current design and practice. The DOT–113 construction

Add. 73

design relies on a performance standard in § 179.400–4 that does not specify the use of Mylar or any other specific type of material to be used for insulation. In the NPRM, PHMSA inadvertently represented "Mylar" as a specification requirement for MLI or SI use on a DOT–113, when in fact, it is not. Please see our discussion of the insulation system and thermal performance monitoring program in Section III of this final rule for more information on DOT–113 insulation requirements.

### 7. Maximum Gross Rail Weight

RSI–CTC and AAR commented on the existing allowable gross weight of rail tank cars. They stated the FRA provided notice in the **Federal Register** of approval of the operation of certain tank cars in hazardous materials service up to 286,000 pounds GRL, further noting that this approval does not address cryogenic tank cars.[36] Specifically, RSI–CTC recommended adding language in § 179.13 that would authorize a GRL limitation of up to 286,000 pounds, thereby removing the need for FRA approval and allowing for heavier inner or outer tanks. They further stated that authorizing cryogenic tank cars to operate with 286,000 pounds GRL would not increase the volume of commodity transported (which would still be limited to 34,500 gallons) and would enable manufacturers to increase the weight of the tank car by building it with a thicker outer shell, which would enhance the overall safety of these tank cars in cryogenic service.

### PHMSA Response

PHMSA acknowledges that the thicker outer tank, as required in this rulemaking, will have a net impact of increasing the overall weight of a loaded DOT–113C120W9 tank car. The added tank thickness is expected to increase the overall weight of the tank car by approximately 11,050 pounds. See the Table 6 below for a comparison of the DOT–113C120W and DOT–113C120W9 tank car weights. PHMSA estimates the light (empty) weight of a DOT–113 tank car for LNG to be approximately 138,050 pounds and the estimated weight of allowable LNG that can be loaded into the car at roughly 108,000 pounds. This equates to a maximum gross weight on rail of only 246,050 pounds. However, the request to remove the approval requirement for tank cars greater than 263,000 pounds GRL is beyond the scope of this rulemaking, as it is not

specific to LNG and would therefore impact all cryogenic materials transported by tank car. Additionally, while 2011 FRA Notice does not specifically mention cryogenic tank cars, PHMSA and FRA reiterate that the broad language in the FRA's January 2011 approval clearly contemplates application to cryogenic tank cars. Therefore, a DOT–113 tank car manufactured for LNG service after (the effective date of this final rule) is approved for a maximum GRL of 286,000 provided the tank car meets the following criteria:

1. Tank car is constructed in accordance with S–286.

2. The outer shell and heads are constructed with TC–128 Grade B, normalized steel.

Please see our discussion of maximum GRL in *Section III.B.* "*The DOT–113C120W Specification Tank Car*" of this final rule for additional details. PHMSA is adding a new section, § 179.400–26, to the DOT–113 specification requirements to indicate clearly that DOT–113C120W9 tank cars exceeding 263,000 lbs. gross weight are (in light of FRA's January 2011 approval) approved by FRA for a maximum gross weight of 286,000 provided they meet the two conditions above.

The following table provides a comparison of the approximate weight of a DOT113C120W tank car with an outer tank shell thickness of 7/16 (*i.e.,* the current standard) vs. 9/16 (*i.e.,* the standard adopted in this final rule) is provided in the following table. Note that stiffening ring weight changes with outer tank thickness. In this comparison, a thicker outer tank corresponds to less stiffening ring weight.

### TABLE 6—GROSS RAIL WEIGHT CALCULATION

[Approximate weights for a DOT113C120W Tank Car]

| | | |
|---|---|---|
| Outer Shell Thickness. | 7/16″ ........ | 9/16″. |
| Inner Tank Thickness. | 3/8″ .......... | 3/8″. |
| Combined Tank Weight. | 98,250 lbs. | 109,550 lbs. |
| Stiffening Ring Weight. | 1,750 lbs. | 1,550 lbs. |
| Fittings/Piping/Housing. | 3,800 lbs. | 3,800 lbs. |
| Running Gear .......... | 23,200 lbs.. | 23,200 lbs. |
| Estimated Light Weight. | 127,000 lbs.. | 138,050 lbs. |

### 8. DOT–113C140W Tank Car Specification

Consistent with its prior petition, AAR reiterated its suggestion that PHMSA adopt the DOT–113C140W tank car standard. However, AAR noted that PHMSA may require more time to evaluate the new tank car specification, as it is not currently authorized by the HMR. Therefore, AAR suggested that PHMSA proceed with authorizing the DOT–113C120W tank car for LNG service at this time and consider authorizing the DOT–113C140W tank car in a future rulemaking.

### PHMSA Response

PHMSA agrees that it would take additional time and resources to create and evaluate a new specification (*e.g.,* the DOT–113C140W) not authorized under the current HMR. Furthermore, PHMSA believes the addition of this tank car specification warrants further engineering review and evaluation, including consideration of safety risks presented by the new design specification. Increased thickness and improved outer tank materials, as required in this final rule, require minimal engineering effort; and insofar as PHMSA regulations establish *minimum* thickness requirements for DOT–113 cars, those regulations have always permitted outer tanks of varying thickness above those lower limits.

In contrast, a new inner tank design with a higher test pressure of 140 psig requires significant engineering effort that is beyond the scope of this rulemaking. An inner tank designed to withstand a test pressure of 140 psig has a thicker wall, and has different pressure relief features that would need to be tested extensively prior to authorization for use in transportation. The designs for the new inner tank, the 140 psig pressure relief system, and the new design's thermal performance would each need to be validated. The inner tank, along with the thermal protection provided by the annular space, is the most safety critical component to retaining the contents of the car during normal conditions incident to transportation. The outer tank, on the other hand, shields the inner tank from physical damage, exposure to the elements, and in-train forces, while providing structural support to the packaging. Unlike a change to the inner tank, the enhancements to the outer tank denoted by the new specification suffix would not require the extensive additional engineering review because PHMSA and FRA have access to testing and modeling data that demonstrate the

---

[36] Notice regarding FRA approval for operating certain railroad tank cars in excess of 263,000 pounds gross rail load. January 25, 2011; 76 FR 4350.

crashworthiness improvements from a thicker 9/16th inch outer tank.

9. PHMSA Determination Regarding Tank Car Design

In summary, PHMSA acknowledges the comments received addressing the appropriateness of the DOT–113C120W tank car for LNG transportation. As discussed in this section, and in Section III, PHMSA has concluded that the DOT–113C120W tank car is an appropriate packaging for LNG transportation.

The existing structure of the HMR— to include requirements for packaging design—provides for the safe transportation of all hazardous materials. The DOT–113C120W9 tank car is a variation of the DOT–113 specification currently authorized in the HMR for use as a packaging for cryogenic material, including flammable cryogenic material like LNG. The "C" delimiter for this type of tank car indicates a temperature rating for service that is suitable for LNG. Furthermore, the existing HMR include requirements for components specific to flammable cryogenic material services, such as PRDs and thermal insulation systems.

PHMSA believes that transportation of LNG by DOT–113C120W-specification rail tank car as proposed in the NPRM would be safe if LNG was transported in similar quantities to what is currently done for ethylene. Currently, because of market demand and usage patterns for ethylene, DOT–113 tank cars are transported as part of mixed commodity freight trains at one to three cars per train. However, when transported in larger fleets—in blocks of cars larger than three or in unit trains— there is a higher probability that cars containing this material will be involved in a derailment when a derailment or other accident occurs, leaving the potential for more hazardous material to be released during an incident. While PHMSA cannot predict the number of DOT–113C120W9 tank cars per train the LNG market will support, the agency does have relevant information from ETS's application for DOT SP 20534, which indicates the company plans to operate unit trains of at least 80 cars per train at some point in the future. Therefore, even though the current outer tank specifications of existing DOT–113s are appropriate for the physical properties of LNG, the potential increased risk involved in transporting LNG in blocks of more than three or in unit trains warrants the additional safety margin that is currently available from the tank car manufacturing industry. As a result,

PHMSA is amending the DOT–113 specification to require tank cars with a minimum outer tank thickness of 9/16th inch constructed from TC–128 Grade B, normalized steel (those enhancements to be indicated by the specification suffix "9"). PHMSA believes that this change will further enhance the safety of the DOT–113 tank car by significantly increasing its crashworthiness.

*B. Operational Controls*

PHMSA did not propose supplemental operational controls in the NPRM beyond the existing requirements in the HMR, but did invite comment on whether PHMSA and FRA should rely on existing regulations and the operational controls in AAR's Circular OT–55, or if additional operational controls may be warranted based on an assessment of risk. PHMSA encouraged commenters to provide data on the safety or economic impacts associated with any proposed operational controls, including analysis of the safety justification or cost impact of implementing operational controls. Further, PHMSA invited comment on the operational controls included in the special permit described above, due to the overlapping content contained in the NPRM.

Numerous commenters expressed concern about the possible operational controls associated with the transportation of LNG by rail. For example, the International Association of Fire Fighters (IAFF) suggested that PHMSA conduct a more expansive safety assessment of the DOT–113 rail car before making the decision to forgo additional operational controls. In the responses below, PHMSA has sorted these comments into the following subtopics: Braking and Routing Requirements, Maximum Train Length and Weight, Speed Restrictions and AAR Circular OT–55, and Separation Distance. Please also see *Section III.C. "Additional Operational Controls for LNG Transportation"* for more discussion.

1. Braking and Routing Requirements

NTSB, the Transportation Trades Department, AFL–CIO (TTD), New Jersey Department of Environmental Protection (NJDEP), Members of the New Jersey Senate and Assembly, NYDOT, NYDEC, NYDHSES, IAFF, and others commented that PHMSA should require braking and routing requirements for trains carrying LNG. NTSB specifically commented that PHMSA should require that trains be "equipped and operated with either electronically controlled pneumatic (ECP) brakes, a two-way end-of-train

(EOT) device as defined in 49 CFR 232.5, or a distributed power (DP) system as defined in 49 CFR 229.5."

Conversely, AAR commented that there is no justification for braking and routing requirements for trains carrying LNG shipments to be as restrictive as the requirements for HHFTs. AAR noted that if PHMSA were to apply braking and routing requirements similar to those imposed on HHFTs to trains carrying LNG, the requirements should only apply to a train transporting 20 or more loaded tank cars of LNG in a continuous block, or to a train carrying 35 or more loaded tank cars of LNG throughout the train.

PSR and the Surfrider Foundation expressed concern that the possibility of a terrorist attack has not been properly considered when looking at the security measures for LNG by rail. They further stated that the urban routing of LNG unit trains would make them highly vulnerable to attack by terrorists and that the predictability and visibility of commercial rail traffic through urban settings would make targeting easy and devastating. The Governor of Washington State, on behalf of Washington State, also expressed concern that the NPRM did not address the risk of terrorist attacks.

PHMSA Response

PHMSA agrees that requiring enhanced braking is necessary for trains meeting an LNG analog of the HHFT threshold (*i.e.,* 20 continuous tank cars of LNG or 35 tank cars of LNG throughout the train). PHMSA and FRA determined that this threshold best captures the higher-risk bulk quantities transported in unit trains, while excluding lower-risk manifest trains. PHMSA and FRA have concluded that the HHFT threshold is suitable for the transportation of LNG because these materials have similar risk profiles when transported in such configurations. If a tank car containing LNG is breached during a derailment, the LNG will behave largely the same way as crude oil or ethanol. The LNG lading will be released as a very cold liquid, creating an LNG pool and likely a fire.

The effective use of braking on a train can result in accident avoidance and can lessen the consequences of an accident by diminishing in-train forces. This can reduce the likelihood of a tank car being punctured and decrease the likelihood of a derailment. PHMSA believes that requiring enhanced braking for these train configurations provides a cost-effective way to reduce the number of cars and the energy associated with train accidents.

Add. 75

In consideration of the comments received, consistent with comments from NTSB and others, PHMSA is adding a requirement that for a single train with 20 or more loaded tank cars of LNG in a continuous block or a single train carrying 35 or more loaded tank cars of LNG throughout the train, each carrier must ensure that the train is equipped and operated with either an EOT device, as defined in 49 CFR 232.5, or a DP system, as defined in 49 CFR 229.5.

Some public commenters, including Earthjustice, noted that PHMSA did not propose a requirement that trains transporting LNG be equipped with ECP brakes, which they suggest would provide an extra measure of safety. PHMSA and FRA did consider adopting ECP brake requirements in this final rule but ultimately determined that such a braking requirement would not be practical.

Freight railroads in the U.S. overwhelmingly rely on conventional air brakes to comply with FRA regulations for stopping a train.[37] This conventional air brake system has been in use since 1869 and has proven to be reliable and effective. Conventional air brakes use air pressure to apply and release the brakes on each car in a train. When air pressure is reduced in a braking application, the air brakes will apply sequentially from the front to the back of the train. ECP brake systems are an alternative braking technology that integrate electronic and pneumatic communications hardware into one package to allow for nearly instantaneous responses to locomotive braking commands throughout an entire train. While some types of ECP brake systems overlay the air brake system, the integrative functions of ECP brakes essentially require the entire train be equipped with operable ECP brakes if the system is to be effective. Except in very rare circumstances where the railroads are capable of keeping and maintaining captive unit train fleets, railroads in the U.S. have not implemented ECP brake systems into their operations.

PHMSA previously considered and adopted ECP brake requirements for a limited subset of HHFTs in its final rule on "Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains," (HM–251; 80 FR 26643, May 8, 2015), based on the potential benefits of those trains' being operated effectively as a captive fleet. However, a subsequent re-evaluation of the HM–251 ECP brake requirements found that even the "captive" unit train

configurations operating with ECP brakes are not cost-beneficial in the HHFT environment. (HM–251F; 83 FR 48393; Sep. 25, 2018). As a result, PHMSA removed requirements pertaining to ECP brake systems on high-hazard flammable unit trains.[38] PHMSA relies on the analysis in HM–251F to inform its decision in this final rule to not require ECP brakes on trains transporting LNG.

While PHMSA is not implementing ECP brake requirements, both agencies recognize the importance of advanced braking for trains transporting large quantities of LNG. As result, PHMSA is requiring advanced braking in the form of a two-way EOT device or linked and operational DP system located at the rear of the train. The two-way EOT device or DP system at that rear of the train is more effective than conventional brakes because the rear cars can receive the emergency brake command more quickly, which allows the back of the train to start braking quicker than if the train was only equipped with conventional air brakes. This can reduce stopping distances and lessen in-train forces that can cause or contribute to the severity of certain derailments.

The action taken by PHMSA in this final rule, requiring the use of a two-way EOT device or DP unit at the end of the train for a single train with 20 or more loaded tank cars of LNG in a continuous block or a single train carrying 35 or more loaded tank cars of LNG throughout the train, is consistent with the comments of NTSB, Members of the New Jersey Senate and Assembly, and the Attorneys General for various States. It matches the current requirements for HHFTs, which apply to Class 3 flammable liquids that are transported in a single block of twenty cars or 35 cars dispersed throughout a single train. Given the comments received and the similarity in risk profiles with HHFTs, PHMSA and FRA have determined that the requirement for a two-way EOT device or a DP system in the rear of the train is an acceptable safety measure.

Regarding rail routing requirements, PHMSA agrees that requiring additional planning and route analysis will provide safety benefits to the transportation of LNG by rail. The routing requirement will reduce the severity of the consequences of a derailment by requiring that railroads transport LNG on the safest route available to them.

Accordingly, PHMSA is amending § 172.820 to require that a train carrying LNG in a rail tank car be subject to the additional planning requirements of that section. This change will require rail carriers to compile annual data on shipments of LNG and use the data to analyze safety and security risks along rail routes where LNG is transported, assess alternative routing options, and make routing decision based on those assessments.

Regarding the risk of terrorism, 49 CFR part 172, subpart I—Safety and Security Plans, prescribes security requirements for shippers and carriers while a hazardous material is in transportation. Flammables (*e.g.,* LNG) transported in large bulk quantities (*i.e.,* 3,000 liters [792 gallons]) in a single packaging such as a tank car are subject to requirements for development and implementation of plans to address security risks, including preventing unauthorized access to the material, providing for en route security, and personnel security. PHMSA believes these existing requirements adequately address the security risks associated with the transportation of LNG by rail. Please see additional discussion of existing security planning and rail routing requirements in *Section III. A. "Existing HMR Requirements for Rail Transport of Flammable Cryogenic Material."*

2. Maximum Train Length/Weight

Some commenters suggested limiting the number of LNG tank cars in a train; however, no commenters provided specific recommendations on what would constitute the preferred maximum number of cars. The National Association of State Fire Marshals (NASFM) noted that although 19 cars of LNG would not trigger the "Key Train" requirements, it would be a large enough quantity to present a significant hazard.

AAR noted that research [39] on the safety impact of operating so-called "long" trains suggests that there is no increased risk of derailment, further commenting that the use of fewer, longer trains may reduce derailment rates. AAR further stated that PHMSA should not create a limit on train length within the context of this rulemaking.

Others expressed concern that these tank cars could damage and degrade train tracks, leading to potential future derailments. Additionally, a few commenters noted that PHMSA and FRA should assess and fix damaged

---

[37] 49 CFR part 232.

[38] The HM–251 final rule defined a "high-hazard flammable unit train" (HHFUT) as a train comprised of 70 or more loaded tank cars containing Class 3 flammable liquids.

[39] *See* footnote 9, page 3—*https://www.regulations.gov/document?D=PHMSA-2018-0025-0209.*

railroad tracks prior to making any determination on whether it is safe to transport LNG by rail.

PHMSA Response

PHMSA appreciates comments regarding potential limitation of maximum weight and length for trains containing LNG. PHMSA has determined that there should not be a maximum for either in this rulemaking. PHMSA notes that the HMR do not limit the number of shipments a shipper can offer into transportation, and do not restrict the number or type of hazardous materials rail cars a carrier can transport in a train. PHMSA and FRA believe that train length is best determined by individual railroads. The function of determining an individual railroad's appropriate train operating lengths is based on multiple factors. The railroads are best positioned to determine the appropriate train lengths and weight based on multiple factors including, but not limited to, the following: Route characteristics, train make-up, train dynamics, and crew training and experience. Furthermore, FRA notes that damage and degradation to railroad tracks due to the transport of DOT–113C120W9 tank cars is unlikely. All routes used to transport hazardous materials have rail infrastructure to handle trains with rail cars with a GRL of 286,000 pounds. Railroads execute a track and rail integrity inspection program that exceed the minimum Federal requirements. In addition, they are implementing technology that enables the inspection of more miles of track per day and identifies defects with greater reliability.

3. Speed Restrictions/AAR Circular OT–55

PHMSA received several comments recommending stricter regulations regarding the transport of LNG by rail, including speed restrictions and other operational controls. Numerous commenters, such as NTSB, NASFM, Delaware Riverkeeper Network, Congressman DeFazio, and the Attorneys General for various States, expressed concern that PHMSA did not propose additional safety regulations for the transport of LNG by rail in the NPRM. NASFM noted that, regardless of current industry practice, the AAR Circular OT–55 is ''recommended,'' rather than mandated by regulation. Earthjustice commented that OT–55 is insufficient to keep LNG safe, stating that there is a lack of transparency on its use. They further noted that without further analysis, PHMSA cannot confirm railroads are following OT–55. They also claimed that even if HHFT-style operational controls were put in place, the material is still too dangerous and liable to spill in the event of a derailment and potentially cause a BLEVE or vapor cloud explosion (VCE).

Several commenters, including NTSB, recommended that PHMSA implement operational controls similar to the protections currently in place for HHFTs, as provided in § 174.310.

A few commenters, including AAR and RSI–CTC, noted that they agree with PHMSA's determination that AAR's Circular OT–55 provides a ''detailed protocol establishing recommended railroad operational practices'' for transporting hazardous materials. One commenter further noted that they do not support incorporation of Circular OT–55 by reference because it would disincentivize the development of industry standards that are more rigorous than the Federal requirement. NYDOT, NYDEC, and NYDHSES commented that they would like to see the AAR Circular OT–55 incorporated into the HMR and the HHFT requirements applied to trains carrying LNG.

PHMSA Response

PHMSA notes that AAR's Circular OT–55 is a detailed protocol establishing railroad operating practices for the transportation of hazardous materials, which was developed by the rail industry through the AAR.[40] The recommended practices were originally implemented by all Class I rail carriers operating in the United States, with short-line railroads following on as signatories. Also, since Circular OT–55 is an industry practice, new safety procedures can be adopted efficiently and implemented nationally. The industry voluntary approach allows for greater flexibility to stay abreast of fast-changing technology and changes in the market, and facilitates safety by leveraging industry incorporation of OT–55 into their operating rules and cooperation with regulators versus an adversarial enforcement relationship.

Thus, PHMSA believes the operational control recommendations in AAR Circular OT–55 address safety concerns related to train movements of hazardous materials comprehensively, including train speed restrictions in Key Train configuration. OT–55 limits Key Train speed to 50 mph. PHMSA and FRA believe that this maximum speed limit is appropriate for the transportation of LNG based on its similarity to other Division 2.1 flammables, including cryogenic materials, that are allowed to be transported at a maximum speed of 50 mph, and based on the DOT Specification 113 standards. Additionally, AAR's Manual of Standards and Recommended Practices (MSRP) establishes rail equipment standards, including equipment speed restrictions, that limits tank cars (including DOT–113 tank cars) to an operating speed of 50 MPH. This speed restriction is independent of whether they are aggregated into a Key Train configuration or not.

Further, PHMSA and FRA have verified that railroads are implementing and following Circular OT–55 through their operating rules. PHMSA and FRA believe this industry standard reduces the risk of derailments and collisions and therefore decreases the risk involved in the transportation of all hazardous materials, including LNG. Please see *Section III.C.* ''*Additional Operational Controls for LNG Transportation*'' for a full discussion of the benefits of OT–55.

4. Separation Distance

Commenters, including NTSB and the Brotherhood of Locomotive Engineers and Trainmen (BLET), noted that the transportation of LNG would also increase the safety risk for train crews. The NTSB referenced two safety recommendations issued to PHMSA in response to the December 30, 2013, collision of two Burlington Northern Santa Fe (BNSF) freight trains in Casselton, North Dakota (R–17–1 and –2) that resulted in the derailment of 20 tank cars loaded with crude oil and the release of 476,000 gallons. The safety recommendations reference risks posed to train crews and the separation distance and configuration of hazardous materials cars, locomotives, and occupied equipment to ensure the protection of train crews during both normal operations and accident conditions. In the comment to the NPRM, the NTSB urged PHMSA to implement appropriate train crew separation distance requirements, as recommended by Safety Recommendations R–17–1 and –2, issued March 9, 2017. Specifically, the Safety Recommendations are:

R–17–01

Evaluate the risks posed to train crews by hazardous materials transported by rail, determine the adequate separation distance between hazardous materials cars and locomotives and occupied equipment that ensures the protection of train crews during both normal operations and accident

---

[40] Circular OT–55, ''Recommended Railroad Operating Practices for Transportation of Hazardous Materials,'' *https://www.railinc.com/rportal/documents/18/260773/OT-55.pdf.*

conditions, and collaborate with the Federal Railroad Administration to revise 49 Code of Federal Regulations 174.85 to reflect those findings.

R–17–02

Pending completion of the risk evaluation and action in accordance with its findings prescribed in Safety Recommendation R–17–01, withdraw regulatory interpretation 06–0278 that pertains to 49 Code of Federal Regulations 174.85 for positioning placarded rail cars in a train and require that all trains have a minimum of five nonplacarded cars between any locomotive or occupied equipment and the nearest placarded car transporting hazardous materials, regardless of train length and consist.[41]

AAR commented that there should not be additional buffer car requirements for trains transporting LNG or any other hazardous material. They further noted that it is not justified from a safety and risk standpoint.

PHMSA Response

PHMSA has initiated a research project in coordination with the Volpe Center to address NTSB Safety Recommendations R–17–1 and –2. This effort will result in a report that identifies gaps in the existing studies, areas for further research, and what conclusions can be drawn collectively from the existing knowledge base, if any. PHMSA may consider changes to the separation distance requirements in § 174.85 of the HMR for placarded rail cars and tank cars in mixed commodity freight train and unit train configurations pending the outcome of the study. However, PHMSA is not amending the separation distance requirement in this final rule at this time. *See Section III.C.* "*Additional Operational Controls for LNG Transportation*" for further discussion of operational controls include consideration of separation distances.

PHMSA and FRA collaborated under the scope of the Rail Safety Advisory Committee Hazardous Materials Issues Working Group Task No. 15–04 to address the issue of separation distance. Ultimately, due to an absence of consensus of the Working Group participants, as well as a lack of established incident data, the members did not reach agreement on a change to the existing regulation governing hazardous materials in train separation distances. Moreover, PHMSA worked with the Volpe Center in its review of rail accidents occurring between 2006 and 2015 where there was a release of hazardous materials near the head end of the train (occupied locomotive). The study found no reported crew injuries

and therefore no injuries that were potentially preventable with additional buffer cars.

5. PHMSA Determination Regarding Operational Controls

The existing structure of the HMR—to include requirements for operational controls—provides for the safe transportation of all hazardous materials. In the NPRM, PHMSA and FRA considered additional operational controls specific to LNG, such as mirroring the operational controls adopted for HHFTs,[42] adopting OT–55 or "Key Train" requirements into the HMR, limiting train length, or requiring controls for train composition, speed, braking, and routing.

PHMSA acknowledges the concerns about relying on a widely adopted, voluntary industry standard, rather than imposing regulatory requirements. After internal review and in consideration of certain substantive comments, PHMSA is requiring a two-way EOT device or DP on the rear of any train consisting of 20 or more loaded tank cars of LNG in a continuous block or 35 or more loaded tank cars of LNG throughout the train. Further, PHMSA is requiring that each rail car of LNG must be remotely monitored for pressure and location. Finally, trains consisting of an LNG tank car are subject to route planning and routing analysis requirement. PHMSA believes these operational controls, in conjunction with what is already required under the HMR and the "Key Train" requirements in Circular OT–55, will ensure the safe transportation of LNG. PHMSA and FRA have verified that railroads are following and implementing Circular OT–55 through incorporation into their operating rules. PHMSA does not believe that explicit speed restrictions are necessary given the widespread adoption of Circular OT–55. PHMSA and FRA expect that Circular OT–55 will be evaluated by the rail industry regularly and that additional operational safety measures beyond the minimum requirements of the HMR will be included to address operational concerns, as appropriate. FRA actively works with AAR's Hazardous Materials Committee, which is responsible for reviewing and updating of OT–55. The Committee reviews OT–55 annually and determines if an update is warranted. If a change to OT–55 is needed, the Committee will update the document accordingly and

will published it as an AAR Casualty Prevention Circular (CPC).

C. Environmental Impacts

PHMSA received many comments recommending further analysis of the environmental impacts associated with this rulemaking. Please refer to the Final Environmental Assessment for discussion and response to comments.

D. Economic Analysis

PHMSA received several comments related to the economic analysis of the rulemaking. Please refer to the Final Regulatory Impact Analysis (RIA) for discussion and response to comments.

E. Emergency Response

Several commenters expressed concern about the perceived emergency response ramifications associated with the transportation of LNG by rail tank car. PHMSA has sorted these into the following subtopics: Training for Emergency Responders, Current Emergency Planning, Evacuation Distances, and Modeling Availability.

1. Training for Emergency Responders

Several commenters are concerned that emergency responders lack the training and expertise to respond to an LNG tank car incident, especially in unit train configurations. They commented that the current emergency response requirements may be insufficient to address an incident involving LNG, including the potential for a BLEVE in accident conditions. The Center requested proper training and notification of local responders to the presence of LNG trains. NYDOT, NYDEC, NJDEP, and NYDHSES suggested that PHMSA provide specific training, resources, and support to emergency response personnel, including cooperation with State fire training agencies to ensure training is consistent, effective, and readily available as a requirement in the final rule, similar to the special permit. NFPA cited previous comments they have submitted to regulatory actions regarding emergency response resources. Specifically, NFPA stated that adding a flammable cryogenic material, like LNG, to the existing HHFT rail shipments posed further challenges to the capabilities and resources for local responders. IAFC recommended that PHMSA work with shippers and carriers to develop and deliver critical product, container and emergency response information, and related training materials for the emergency planning and response communities. Furthermore, the Governor of Washington State, on behalf of

---

[41] "Consist" means the group of rail cars that make up the train.

[42] As defined in § 171.8, a high-hazard flammable train means a single train transporting 20 or more loaded tank cars of a Class 3 flammable liquid in a continuous block or a single train carrying 35 or more loaded tank cars of a Class 3 flammable liquid throughout the train consist.

Washington State, contended that the NPRM did not address crew training and emergency response.

PHMSA Response

PHMSA agrees that proper training and information sharing are necessary ingredients in promoting a safety transportation system and is committed to ensuring emergency responders have the information and tools they need to respond to hazardous materials incidents safely. First, PHMSA notes that Class I railroads typically provide and sponsor training for emergency responders along their routes. Additionally, while large-scale LNG incident response training is available through various organizations,[43] the currently available training is not specific to rail transportation, and PHMSA and FRA are working jointly with relevant industry experts to ensure the availability of appropriate training resources for emergency responders that include rail-specific information. For example, FRA has already provided grant funding to TRANSCAER® to develop and refine LNG by rail emergency response training.[44] Additionally, PHMSA is developing a Commodity Preparedness and Incident Management Reference Sheet similar to that which was created for crude oil transportation. This reference sheet will provide emergency response organizations with a standard incident management framework based on pre-incident planning, preparedness principles, and best practices. Furthermore, it will address transportation safety and precautions; hazard assessment and risk; rail safety procedures; logistics; and the tools, equipment, and resources necessary to prepare for and respond to incidents.

PHMSA required in DOT–SP 20534 that the grantee provide training, conforming to NFPA 472, to emergency response agencies that could be affected between the authorized origin and destination. However, due to the ongoing efforts to ensure adequate emergency response training described above, such a requirement is not necessary in this final rule.

PHMSA is also engaged in outreach activities to educate and gain input from emergency responders directly. In October 2019, PHMSA and the Federal Emergency Management Agency (FEMA) National Fire Academy (NFA) held a Town Hall Meeting in Lancaster County, Pennsylvania.[45] The purpose of the Town Hall Meeting was to seek input from and note concerns of the emergency preparedness community and its stakeholders in the mid-Atlantic region—specifically, Pennsylvania and New Jersey, related to LNG transportation. The meeting consisted of a series of technical presentations on LNG transportation risks and incident response protocols. Then, attendees participated in open discussions related to the topic of general rail transportation of LNG. While attendees provided general inputs on issues related to improving the overall effective response capability in the event of a rail incident of LNG, there was no heightened concern regarding the commodity or mode of transportation. PHMSA found that the emergency responders in attendance were well oriented to the challenges of LNG incident response, as they already have LNG transiting through their communities in other modes of transportation and have improved and adjusted their plans to include LNG.

PHMSA is committed to furthering engagement with emergency responders throughout the country regarding the transportation of LNG by rail through various forms of outreach, to include additional Town Hall Meetings, participation at the annual IAFC conference, trainings, and webinars.

2. Current Emergency Planning

Numerous commenters, to include The Village of Barrington, Illinois, expressed concern for the safety of emergency responders. Several individuals stated their belief that current emergency response plans may be insufficient to address a rail incident involving LNG, further noting that an LNG train derailment could cause severe damage to the surrounding area and that first responders would be unable to control any type of fire or explosions. Additionally, some commenters expressed specific concern that there is no way to extinguish an LNG fire, with the only option to let the fire burn out.

Additionally, the NJDEP requested that emergency response plans be in place to prepare local responders better. They also requested that the emergency response plans include the route and an alternative route analysis, developed with the State and local emergency responders impacted, identifying all sensitive receptors within the 1-mile buffer of the route and any alternative routes, with plans on how to protect public health and safety and the environment. They stated that this information should be shared with the States, providing an opportunity for States to comment on routes and planning.

PHMSA Response

PHMSA directs grant programs that are designed to improve hazardous materials safety. For example, the HMEP grants to States, Territories and Native American tribes enhance their emergency response capabilities when dealing with hazardous materials related transportation incidents. The grants, authorized under 49 U.S.C 5116, assists each recipient in performing their hazardous materials response duties and aid in the development, implementation, and improvement of emergency plans for local communities and training for emergency responders to help communities prepare for a potential hazardous materials transportation incident. The hazmat safety grant programs have helped to foster partnerships with State and local communities through ensuring emergency responders are prepared and trained to respond properly to hazmat transportation incidents nationwide. PHMSA believes that these efforts will prepare emergency responders for the risks regarding LNG transportation. PHMSA will continue to assess the effectiveness of these programs and the preparedness of emergency responders. As previously noted, FRA has provided grant funding to TRANSCAER® to develop and refine LNG emergency response training.

Finally, as discussed in Section III of this final rule, PHMSA is revising § 172.820(a) to add a condition requiring any rail carrier transporting a quantity of LNG in a rail tank car to comply with the additional safety and security planning requirements for transportation by rail, which means the rail carrier is subject to collecting commodity data, performing a route analysis, and determining alternative routes. We are further revising the additional planning requirements to add a new condition for rail carriers to factor in transport of LNG to a routing analysis prior to the onset of transport of any loaded tank car of LNG. Once transport of LNG begins for a carrier, it can revert to the standard requirement to compile commodity flow data no later than 90 days after the end of each calendar year and use that data in analyzing the safety and security risks for the transportation

---

[43] For example, the following organizations provide LNG response training: Texas A&M Extension Service (https://teex.org/program/lng-emergency-response/) and Northeast Gas Association (https://www.northeastgas.org/tql-lng-safety.php).

[44] See https://www.transcaer.com/training/online-training-courses/seconds-count-are-you-prepared for additional information on TRANSCAER®.

[45] See the LNG by Rail Transport Town Hall Meeting Report, at: https://www.regulations.gov/document?D=PHMSA-2019-0100-3005.

route(s), and subsequently identifying alternative routes.

These actions will strengthen the emergency response planning requirements and will assist in getting needed information to emergency responders.

### 3. Evacuation Distances

Other commenters cited concerns over the feasibility of imposing evacuation distances in an LNG accident. The IAFF commented that an LNG tank car fire would require the evacuation of all people within a 1-mile radius, stating that this would not be possible in most jurisdictions across the United States. They stated that any fire involving multiple LNG cars would place large numbers of the public at risk while depleting many communities of their emergency response resources. They further commented that consequences would be disastrous unless responders receive extensive training specific to an LNG-by-rail event. PSR commented that in the event of an LNG by rail fire and/or explosion, PHMSA would be unable to adequately define the hazard zone and the risk to nearby populations. PSR stated that first responders, health professionals, planners, and concerned citizens would not know the extent of the hazard zone or the nature and degree of risk it poses. PSR further expressed that the dangers clearly call for greater elaboration, including the response measures necessary to minimize harm and protect human life.

Additionally, the City of Zion Fire and Rescue noted that the Emergency Response Guidebook (ERG) uses the same response guidance for LNG and LPG. They stated that a 1-mile evacuation radius would be inadequate for a large LNG fire and that it would not be feasible to implement a larger evacuation distance. Finally, Earthjustice expressed its belief that Sandia and Lawrence Livermore National Lab testing noted that methane fires behave differently than other hydrocarbon fires, and that LNG has a potential for a ''wider than anticipated vapor cloud.''

### PHMSA Response

PHMSA disagrees that the 1-mile evacuation distance is not possible and further notes that LNG is currently authorized for transportation by cargo tank and that the recommended 1-mile evacuation distance for LNG tank car fires is consistent with response guidance for cargo tank fires involving LNG. Furthermore, ERG recommends a 1-mile evacuation distance for many hazardous materials; therefore,

emergency responders are familiar with this recommended distance, having used this guidance for decades. Additionally, PHMSA updates the ERG regularly in consultation with the response community and other experts, and adjusts recommended protective action distances as part of this process.

PHMSA and FRA are aware of, and have extensively reviewed, the available studies on LNG pool fires and evacuation distances. Specifically, PHMSA has reviewed studies conducted by Sandia National Laboratory [46] for DOE, a study conducted by ABSG for FERC [47] on the hazard characteristics of LNG released over water, and a study on LNG pool fires on land.[48]

The purpose of the ERG and the evacuation distances contained therein is to assist responders in making initial decisions upon arriving at the scene of a hazardous materials transport incident. The ERG should not be considered as substitutes for emergency response training, knowledge, experience, or sound judgment. The ERG also cannot address all possible circumstances that may be associated with a hazardous material release incident. Additionally, each guide page within the ERG provides guidance for responding to incidents involving multiple different but related hazardous materials. In the current 2016 edition of the ERG, LNG has been assigned to Guide 115, ''Gases—Flammable (Including Refrigerated Liquids).'' Guide 115 provides generalized response recommendations for over 100 different hazardous materials. Therefore, this guide page should only be used until a specific incident can be assessed and more appropriate response measures implemented.

Based on PHMSA's review of available literature on the properties of LNG releases, the current evacuation distances are appropriate. Therefore, PHMSA will make no change to the current evacuation distances for LNG.

### 4. Modeling Availability

The Delaware Riverkeeper Network expressed concern that there are no publicly available modeling estimates by PHMSA or private consultants on the downwind distances for an LNG by rail release and how it can travel into trackside communities. They further commented that there is a need for

candid emergency event training materials for rail workers and local emergency responders.

### PHMSA Response

PHMSA notes that various software programs are available to model the dispersion of gases, including LNG. Moreover, PHMSA sponsored a study by the UK Health and Safety Laboratory to develop a Model Evaluation Protocol that can be used to evaluate the suitability of vapor dispersion models for predicting hazard ranges associated with large spills of LNG.[49] Finally, the ERG provides an initial evacuation distance for flammable gases including LNG.[50] Therefore, PHMSA believes that there are sufficient tools available to the emergency response community to ensure adequate modeling in the event of an incident.

### 5. PHMSA Determination Regarding Emergency Response

The existing structure of the HMR—to include requirements for security plans, emergency response information, and training—provides for the safe transportation of all hazardous materials. Notably, 49 CFR part 172, subpart G sets forth the applicability and requirements for emergency response information which must be made immediately available to emergency responders. The HMR currently require the following information to accompany a shipment of LNG by rail:

(1) Immediate hazards to health;

(2) Risks of fire or explosion;

(3) Immediate precautions to be taken in the event of an accident or incident;

(4) Immediate methods for handling fires;

(5) Initial methods for handling spills or leaks in the absence of fire; and

(6) Preliminary first aid measures.

PHMSA believes that the current requirements for emergency response information are appropriate for future movement of LNG by rail. Additionally, PHMSA directs comprehensive grant programs that are designed to improve hazardous materials safety. The hazmat safety grant programs have helped to foster partnerships with local communities and universities to provide resources for emergency preparedness and the implementation of best

---

[46] *https://www.nrc.gov/docs/ML0933/ ML093350855.pdf.*

[47] *https://www.ferc.gov/industries/gas/indus-act/ lng/cons-model/cons-model.pdf.*

[48] *https://www.researchgate.net/publication/ 327900878_Experimental_Study_of_LNG_Pool_ Fire_on_Land_in_the_Field.*

[49] *Evaluating vapor dispersion models for safety analysis of LNG facilities.* M.J. Ivings, SE Grant, S.F. Jagger, C.J. Lea, J.R. Steward and D.M. Webber. (September 2016). *https://www.nfpa.org/-/media/ Files/News-and-Research/Fire-statistics-and-reports/Hazardous-materials/ RFLNGDispersionModelMEP.ashx.*

[50] *See* section ''*III. E. 3, Evacuation Distances*'' for further discussion.

Add. 80

practices regarding hazardous materials safety nationwide.

*F. Comments of General Opposition*

PHMSA received hundreds of comments expressing general opposition to the overall intent of the NPRM and the provisions proposed therein to authorize the transportation of LNG in rail tank cars. Many of these commenters voiced general concern about the public health, safety, and/or environmental risks of trains carrying bulk quantities of LNG. There was also opposition to the overall timeline of the rule, and PHMSA's authority to issue it.

Specifically, Theresa Pugh Consulting LLC opposed the transportation of LNG by rail in the lower 48 States, noting that Alaska may be an exception because of extreme circumstances that might require the need for LNG transportation by tank car. PSR and various others expressed concern that LNG by rail would pose risks to people living in proximity to rail lines, especially in densely populated urban and suburban areas. PSR specifically stated that it views issuing a national approval for LNG by rail as premature.

The Guardians of Martin County, Inc. and the Alliance for Safe Trains both expressed concern over LNG trains sharing the same track as passenger trains in Florida. The Guardians of Martin County, Inc. noted the age of infrastructure and population density of the area these trains would pass through. The Alliance for Safe Trains noted that a high-speed rail project will be sharing tracks or riding on parallel tracks to trains carrying LNG. Various commenters, including the Surfrider Foundation, commented that the proposals in the NPRM are extremely dangerous. The Surfrider Foundation stated that LNG is a flammable, volatile, and hazardous material with numerous examples of accidents and safety issues. The Surfrider Foundation further stated that one government study put the hazard range for a vapor cloud at more than 1.5 miles.

The Delaware Riverkeeper Network disagreed with the language in AAR's petition suggesting that DOT and Transport Canada maintain consistent requirements for LNG by rail. They stated that there is insufficient justification to change the HMR because no rail cars of LNG have been transported in Canada to date.

PHMSA Response

PHMSA notes that many of these comments did not contain sufficient information or supporting rationale that could be assessed to determine the provisions authorized in this

rulemaking. PHMSA agrees with commenters that the risks related to the transportation of LNG by rail should be assessed and properly mitigated to ensure safety for the public and the environment. As outlined above, PHMSA has assessed the risks posed by the transportation of LNG by rail. PHMSA finds that the design elements of the DOT–113C120W9 rail tank car, the operational controls required in this final rule, combined with the existing HMR requirements that would apply and the voluntary industry standards in AAR Circular OT–55, will provide a safe transportation environment for LNG by rail.

PHMSA acknowledges commenters' general opposition to the transport of LNG on routes that bring this material into close proximity to the public. To address this concern, PHMSA is applying the existing additional planning requirements to the transport of LNG in rail tank cars, which include routing analysis requirements, to factor the risk of LNG transport in route planning. In this final rule, there is no geographical limit to LNG train operations, making routing analysis beneficial. This amendment will require railroads to evaluate safety and security risk factors when assessing the potential routes to be used to transport LNG. The 27 safety and security risk factors required by the route risk assessment provide a robust framework for carrier evaluation of the routes considered for use in LNG transportation.

Trains consisting of, and in some cases made up entirely of, rail cars carrying hazardous materials are moved on the same rail lines as passenger trains across the country. For densely-populated passenger train corridors (*e.g.*, Northeast Corridor and Florida's east coast) railroads typically operate freight trains (with and without hazmat) at night to maximize efficiency and fluidity (*i.e.*, freight trains will not slow down passenger trains, and freight trains will not be placed in sidings to make way for passenger trains). On cross country routes the passenger and freight trains meet with greater frequency. In both cases, the passenger and, more likely, freight trains will be operating under positive train control, which is specifically intended to prevent collisions, or incidents resulting from misaligned switches, incursions into work zones, and overspeed derailments.

*G. Comments From the Puyallup Tribe*

PHMSA received comments from the Puyallup Tribe of Tacoma, Washington contending that the rulemaking would have potential direct and disparate

impacts on the Tribe and its members. The Puyallup Tribe submitted that the rulemaking will result in rail transportation of LNG crossing its reservation (located within the metropolitan area of Tacoma, Washington) and adjacent areas when travelling to and from Puget Sound Energy's planned Tacoma LNG facility. The Puyallup Tribe asserted that rail traffic entails a number of hazards for the Tribe and its members, including the following: Safety risks associated with the release of LNG being transported by rail; degradation of air quality in the area due to more diesel trains operating in the vicinity of the reservation; an increase in rail traffic that would frustrate quiet enjoyment of Tribal lands; and increased exposure to rising sea levels from climate change.

At the Puyallup Tribe's request, PHMSA personnel held a meeting with representatives of the Puyallup Tribe at PHMSA's headquarters in Washington, DC on February 12, 2020. Attendees at the meeting discussed the Puyallup Tribe's concerns regarding the Tacoma LNG facility, as well as the Puyallup Tribe's written comments submitted in the docket for this rulemaking. A summary of the February 12, 2020 meeting has been posted to the docket. PHMSA contacted representatives of the Puyallup Tribe and made itself available for additional meetings.

PHMSA Response

PHMSA submits that those of the Puyallup Tribe's concerns predicated on potential rail transport of LNG to and from Puget Sound Energy's Tacoma LNG facility are inapposite. The Tacoma LNG facility is regulated by Washington State and not PHMSA. Further, it does not appear that rail transportation of LNG to the Tacoma LNG facility is currently permitted by the terms of that facility's State authorization; rather, Condition 41 of the Puget Sound Air Agency Authorizing Order specifies that the "sole source of natural gas supply used in all operations" at the Tacoma LNG Facility will be from Canada via pipeline.[51] Nor does the Authorizing Order seem to contemplate rail transportation of LNG from that facility; rather, LNG transported from that facility will be transported by truck, or will be converted to natural gas for supply to customers via Puget Sound

---

[51] *See* Puget Sound Clean Air Agency, Order of Approval No. 11386 (Dec. 10, 2019) (Authorizing Order); Final Supplemental Environmental Impact Statement: Proposed Tacoma LNG Project at (Mar. 2019) (Tacoma LNG FSEIS). These and other documents in the Puget Sound Clean Air Agency docket can be found at the following link: *https://pscleanair.gov/460/Current-Permitting-Projects.*

Energy's natural gas pipeline distribution system.[52] Indeed, schematics of the Tacoma LNG facility within the Puget Sound Air Agency docket suggest that rail infrastructure neither exists nor is contemplated at the site.[53]

### H. Comments Beyond the Scope of This Rulemaking

PHMSA also received miscellaneous comments opposing the bulk transport of LNG by any mode of transportation (to include highway or pipeline), as well as numerous comments pertaining to the ethical ramifications of fossil fuel extraction and usage. Commenters questioned the ethics of, and requested an end to, fracking, use of fossil fuels, and the practice of transporting coal in open railcars near waterways. Commenters also expressed concerns with LNG trains sharing railways with high-speed trains, and high-speed trains having at grade crossings citing safety concerns. These comments either did not provide recommendations for regulatory action, exceeded the scope of PHMSA's authority, or were not within the scope of this rulemaking.

### V. Section-by-Section Review

The following is a section-by-section review of the amendments in this final rule.

### A. Section 172.101

Section 172.101 provides the HMT and instructions for its use. PHMSA is amending the entry for "UN1972, Methane, refrigerated liquid" in the HMT to add reference to the cryogenic liquids in (rail) tank cars packaging section—§ 173.319 in Column (8C). Additionally, PHMSA is amending the entry to add a special provision.

### B. Section 172.102

Section 172.102 provides the special provisions and instructions for their applications. PHMSA is amending paragraph (c)(1) to add special provision 440. Special provision 440 requires that each tank car used to transport LNG be remotely monitored for pressure and location. Additionally, the offeror must notify the carrier if the tank pressure rise exceeds 3 psig in a 24-hour period.

### C. Section 172.820

Section 172.820 prescribes additional safety and security planning requirements for transportation by rail, specifically, commodity data, a rail routing analysis, and identification of practicable alternative(s). Paragraph (a)

of this section provides the applicability for when a rail carrier must comply with the requirements of this section. In this final rule, PHMSA is revising § 172.820(a) to add a condition requiring any rail carrier transporting a quantity of UN1972 ("Methane, refrigerated liquid" (cryogenic liquid) or "Natural gas, refrigerated liquid" (cryogenic liquid)) to comply with the additional safety and security planning requirements for transportation by rail. Further, PHMSA is revising paragraph (b) to remove the initial compliance date applicable to HHFTs as these dates have since passed (*i.e.*, rail carriers subject to the additional planning requirements because of transporting HHFTs had to complete the initial commodity flow data collection by March 31, 2016, using 2015 data), and adding a new condition for rail carriers to factor in transport of LNG (UN1972) to a routing analysis prior to the onset of transport of any loaded tank car of LNG. Once transport of LNG begins for a carrier, it can revert to the standard requirement in paragraph (b) that requires it to compile commodity flow data no later than 90 days after the end of each calendar year and use that data in analyzing the safety and security risks for the transportation route(s), and subsequently identifying alternative routes.

### D. Section 173.319

Section 173.319 prescribes requirements for cryogenic liquids transported in rail tank cars. Paragraph (d) provides which cryogenic liquids may be transported in a DOT–113 tank car when directed to this section by Column (8C) of the § 172.101 HMT. PHMSA is amending paragraph (d)(2) to authorize the transport of "Methane, refrigerated liquid" (*i.e.*, LNG). Additionally, PHMSA is amending the Pressure Control Valve Setting or Relief Valve Setting Table in § 173.319(d)(2) to specify settings for methane in DOT–113C120W tank cars, specifically, a start-to-discharge pressure valve setting of 75 psig; a design service temperature of −260 °F; a maximum pressure when offered for transportation of 15 psig; and a filling density of 37.3 percent by weight.

### E. Section 174.200

Section 174.200 prescribes the special handling requirements for Class 2 materials transported by rail. PHMSA is amending this section to include the operational requirements for trains containing tank cars of LNG. PHMSA is adding paragraph (d), which states that for a single train of 20 or more loaded tank cars of "Methane, refrigerated liquid" in a continuous block or a single

train carrying 35 or more loaded tank cars of "Methane, refrigerated liquid" throughout the train, each carrier must ensure the train is equipped and operated with either an EOT device, as defined in 49 CFR 232.5, or a DP system, as defined in 49 CFR 229.5.

### F. Section 179.400–5

Section 179.400–5 prescribes the material requirements for the construction of DOT–113 tank cars. Paragraph (b) states that any steel casting, steel forging, steel structural shape or carbon steel plate used to fabricate the outer jacket or heads must be as specified in AAR Specifications for Tank Cars, appendix M. PHMSA is amending this paragraph to require that for tank cars transporting "Methane, refrigerated liquid," the outer shell must be made of AAR TC 128, Grade B normalized steel plate as specified in § 179.100–7(a).

### G. Section 179.400–8

Section 179.400–8 prescribes the requirements for plate thickness on the DOT–113 specification tank car. Paragraph (d) states that the minimum wall thickness for the outer jacket shell, after forming, must be no less than 7/16th inch and the outer jacket heads must be no less than ½ inch thick. PHMSA is amending paragraph (d) to require DOT–113 tank cars used in LNG service to have an outer shell and tank head thickness, after forming, of 9/16th inch. Additionally, the shell and heads must be made of AAR TC 128, Grade B normalized steel plate as specified in § 179.100–7(a).

### H. Section 179.400–26

PHMSA is adding § 179.400–26 to provide the authorization for a DOT–113 tank car to be loaded to a gross weight on rail of up to 286,000 pounds (129,727 kg) upon approval by the Associate Administrator for Safety, Federal Railroad Administration (FRA).

### I. Section 180.515

Section 180.515 discusses requirements for marking tank cars as part of their continuing qualification for service. In this final rule, PHMSA is adding the new specification suffix "9" to the DOT–113C120W specification to indicate compliance with enhanced outer tank steel and thickness requirements beyond the standard DOT–113C120W specification. In conformance with this change, PHMSA is adding a new paragraph (d) to § 180.515 to require that the "9" suffix always remain marked as part of the specification DOT–113C120W9 for these enhanced tank cars, to distinguish

---

[52] *See* Tacoma LNG FSEIS at 1, 2–2, 2–4 to 2–5.

[53] *See* Tacoma LNG FSEIS at Figures 1–1 and 1–2.

**45024**    **Federal Register** / Vol. 85, No. 143 / Friday, July 24, 2020 / Rules and Regulations

standard DOT–113C120W tank cars (such as those currently used to transport ethylene) from enhanced DOT–113C120W9 cars authorized for LNG. PHMSA intends this new paragraph to reduce confusion for tank car users.

## VI. Regulatory Analyses and Notices

### A. Statutory/Legal Authority for This Rulemaking

This rulemaking is published under the authority of the Federal hazmat law. Section 5103(b) of the Federal hazmat law authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." The Secretary's authority regarding hazardous materials safety is delegated to PHMSA at 49 CFR 1.97. This rulemaking authorizes the transportation of LNG by rail in DOT–113C120W tank cars, with certain enhanced outer tank requirements, subject to all applicable requirements and certain additional operational controls.

### B. Executive Order 12866 and DOT Regulatory Policies and Procedures

This rulemaking is considered a significant regulatory action under section 3(f) of Executive Order 12866, "Regulatory Planning and Review" [58 FR 51735 (October 4, 1993)], and was reviewed by the Office of Management and Budget (OMB). This rulemaking is also considered a significant rulemaking under the DOT regulations governing rulemaking procedures (49 CFR part 5). E.O. 12866 requires agencies to regulate in the "most cost-effective manner," to make a "reasoned determination that the benefits of the intended regulation justify its costs," and to develop regulations that "impose the least burden on society." Similarly, DOT regulations require that regulations issued by PHMSA and other DOT Operating Administrations "should be designed to minimize burdens and reduce barriers to market entry whenever possible, consistent with the effective promotion of safety" and should generally "not be issued unless their benefits are expected to exceed their costs." § 5.5(f)–(g).

Additionally, E.O. 12866 and DOT regulations require agencies to provide a meaningful opportunity for public participation, which also reinforces requirements for notice and comment under the APA.[54] Therefore, in the previously published NPRM, PHMSA

sought public comment on revisions to the HMR authorizing the transportation of LNG by rail tank car. PHMSA also sought comment on the preliminary cost and cost savings analyses, as well as any information that could assist in quantifying the benefits of this rulemaking. Those comments are addressed, and additional discussion about the economic impacts of the final rule are provided, within the final RIA posted in the docket.[55]

This final rule adopts the proposal in the NPRM, with certain amendments, to allow the transportation of LNG by rail in an authorized tank car. Under current regulatory standards, LNG is not authorized for transportation by tank car. Therefore, this final rule is considered an enabling rule.

In promulgating this final rule, PHMSA is providing a path for potential benefits that would not otherwise be gained in the absence of this rulemaking, such as increased transportation efficiency, increased modal safety, expanded fuel usage, improved accessibility to remote regions, and increased U.S. energy competitiveness. These benefits are described qualitatively in the Final RIA. The final rule essentially prescribes packaging for a flammable cryogenic material (*i.e.*, LNG) for shippers and rail carriers who choose to transport LNG by rail. The discretionary and voluntary decision of a shipper and railroad company to transport LNG by rail, upon implementation of this final rule, requires full compliance with all existing regulations governing the transportation of flammable cryogenic materials, and the operation of freight and other non-passenger train services; as well as the additional requirements adopted under the final rule, namely, enhanced outer tank design and material standards and operational controls supplemental to the existing operational controls in the HMR.

### C. Executive Order 13771

This rulemaking is expected to be an Executive Order 13771 deregulatory action. Details on the estimated cost savings of this final rule can be found in the final RIA posted in the docket.[56]

### D. Executive Order 13132

This rulemaking was analyzed in accordance with the principles and criteria contained in Executive Order 13132, "Federalism." This rulemaking may preempt State, local, and Tribal requirements but does not amend any

regulation that has substantial direct effects on the States, the relationship between the Federal government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, the consultation and funding requirements of E.O. 13132 do not apply.

Federal hazmat law, 49 U.S.C. 5101–5128, contains express preemption provisions relevant to this proceeding. As amended by Section 1711(b) of the Homeland Security Act of 2002 (Pub. L. 107–296, 116 Stat. 2319), 49 U.S.C. 5125(a) provides that a requirement of a State, political subdivision of a State, or Indian tribe is preempted—unless the non-Federal requirement is authorized by another Federal law or DOT grants a waiver of preemption under section 5125(e)—if (1) complying with the non-Federal requirement and the Federal requirement is not possible (dual compliance test); or (2) the non-Federal requirement, as applied and enforced, is an obstacle to accomplishing and carrying out the Federal requirement (obstacle test).

Additionally, 49 U.S.C. 5125(b)(1) provides that a non-Federal requirement concerning any of five subjects is preempted when the non-Federal requirement is not "substantively the same as" a provision of Federal hazmat law, a regulation prescribed under that law, or a hazardous materials security regulation or directive issued by the Department of Homeland Security (covered subjects test).[57] To be "substantively the same," the non-Federal requirement must conform "in every significant respect to the Federal requirement. Editorial and other similar de minimis changes are permitted." The subject areas covered under this authority are:

(1) The designation, description, and classification of hazardous materials;

(2) The packing, repacking, handling, labeling, marking, and placarding of hazardous materials;

(3) The preparation, execution, and use of shipping documents related to hazardous materials and requirements related to the number, contents, and placement of those documents;

(4) The written notification, recording, and reporting of the unintentional release in transportation of hazardous material; and

(5) The design, manufacture, fabrication, marking, maintenance, recondition, repair, or testing of a packaging or container represented, marked, certified, or sold as qualified

---

[54] 5 U.S.C. 553; 49 CFR 5.5(i).

[55] *See* Docket No. PHMSA–2018–0025 at *www.regulations.gov.*

[56] *Id.*

[57] Unless the non-Federal requirement is authorized by another Federal law or DOT grants a waiver of preemption under 49 CFR 5125(e).

for use in transporting hazardous material.

This rule addresses subject items (2) and (5) above, which are covered subjects, and therefore, non-Federal requirements that fail to meet the "substantively the same" standard are vulnerable to preemption under the Federal hazmat law. Moreover, PHMSA will continue to make preemption determinations applicable to specific non-Federal requirements on a case-by-case basis, using the obstacle, dual compliance, and covered subjects tests provided in Federal hazmat law.

Federal preemption also may exist pursuant to section 20106 of the former Federal Railroad Safety Act of 1970 (FRSA), repealed, revised, reenacted, and recodified at 49 U.S.C. 20106, and the former Safety Appliance Acts (SAA), repealed revised, reenacted, and recodified at 49 U.S.C. 20301–20304, 20306. Section 20106 of the former FRSA provides that States may not adopt or continue in effect any law, regulation, or order related to railroad safety or security that covers the subject matter of a regulation prescribed or order issued by the Secretary of Transportation (with respect to railroad safety matters) or the Secretary of Homeland Security (with respect to railroad security matters), except when the State law, regulation, or order qualifies under the section's "essentially local safety or security hazard." The former SAA has been interpreted by the Supreme Court as preempting the field "of equipping cars with appliances intended for the protection of employees." *Southern Ry. Co.* v. *R.R. Comm'n of Ind.,* 236 U.S. 439, 446 (1915). The train's power braking system is considered a safety mechanism within the terms of the former SAA. 49 U.S.C. 20302(a)(5).

### E. Executive Order 13175

This rulemaking was analyzed in accordance with the principles and criteria contained in Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments" and DOT Order 5301.1, "Department of Transportation Policies, Programs, and Procedures Affecting American Indians, Alaska Natives, and Tribes." The Department assessed the impact of the rulemaking on Indian tribal governments and determined that it would not significantly or uniquely affect Tribal communities or Indian tribal governments because it neither sets national requirements for transporting LNG via rail, nor imposes substantial compliance costs on Indian tribal governments, nor mandates Tribal action.

PHMSA is committed to satisfying its obligations under E.O. 13175 and DOT Order 5301.1 related to Tribal outreach to ensure meaningful and timely engagement of Tribal governments in PHMSA rulemaking. As discussed above, PHMSA personnel have conducted a face-to-face meeting with representatives of the Puyallup Tribe to solicit their concerns during the development of this final rule. PHMSA has addressed those concerns, as well as the written comments submitted by the Puyallup Tribe, in the final rule and final EA. Further, since the February 2020 meeting with the Puyallup Tribe, PHMSA has contacted representatives of the Puyallup Tribe and extended invitations for follow-up meetings with PHMSA leadership. The Puyallup Tribe has not accepted PHMSA's invitation to conduct further meetings.

### F. Regulatory Flexibility Act, Executive Order 13272, and DOT Policies and Procedures

This rulemaking complies with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), which requires agencies to consider whether a rulemaking would have a "significant economic impact on a substantial number of small entities" to include small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations under 50,000. This rulemaking has been developed in accordance with Executive Order 13272, "Proper Consideration of Small Entities in Agency Rulemaking", and DOT's procedures and policies to promote compliance with the Regulatory Flexibility Act to ensure that potential impacts of draft rules on small entities are properly considered.

*(1) a statement of the need for, and objectives of, the rule.*

The amendments to the HMR made in this final rule, which enable LNG to be transported by rail, are intended to provide relief by authorizing the transportation of LNG in tank cars with enhanced crashworthiness features and additional operational controls with no anticipated reduction in safety. This final rule creates options for transporting LNG, which otherwise would be limited to trucks, or maritime transportation modes; or, alternately, re-gasification and movement by pipeline in a gas state. This rule enables movement by rail, thereby giving shippers an alternate mode that may offer cost or other advantages over existing permitted modes to ship LNG. It lifts the blanket prohibition on movement of LNG by rail tank cars.

*(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.*

PHMSA addressed public comments filed under the NPRM, as well as the Special Permit. The comments were addressed by topic and addressed accordingly. Please refer to *Section IV.* "*Summary and Discussion of Comments to the Rulemaking Docket,*" of the preamble.

*(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of such comments.*

PHMSA did not receive comments filed on behalf of the Chief Counsel for Advocacy at the Small Business Administration (SBA).

*(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.*

The Regulatory Flexibility Act of 1980 requires a review of proposed and final rules to assess their impact on small entities, unless the Secretary certifies that the rule would not have a significant economic impact on a substantial number of small entities. "Small entity" is defined in 5 U.S.C. 601 as a small business concern that is independently owned and operated, and is not dominant in its field of operation. As far as the railroad industry, the SBA stipulates in its size standards that a "small entity" in the railroad industry is a for profit "line-haul railroad" that has fewer than 1,500 employees, a "short line railroad" with fewer than 1,500 employees, a "commuter rail system" with annual receipts of less than $16.5 million, or a contractor that performs support activities for railroads with annual receipts of less than $16.5 million.[58]

Federal agencies may adopt their own size standards for small entities in consultation with SBA and in conjunction with public comment. Under that authority, FRA has published a final statement of agency policy that formally establishes "small

---

[58] U. S. Small Business Administration, "Table of Small Business Size Standards Matched to North American Industry Classification System Codes, August 19, 2019. *https://www.sba.gov/sites/default/files/2019-08/SBA%20Table%20of%20Size%20Standards_Effective%20Aug%2019,%202019.pdf.*

Add. 84

entities'' or ''small businesses'' as railroads, contractors, and hazardous materials shippers that meet the revenue requirements of a Class III railroad as set forth in 49 CFR 1201.1–1, which is $20 million or less in inflation-adjusted annual revenues,[59] and commuter railroads or small governmental jurisdictions that serve populations of 50,000 or less. *See* 68 FR 24891 (May 9, 2003) (codified at 49 CFR part 209, appendix C). PHMSA is using this definition for the rule.

The final rule would be applicable to all railroads, although not all requirements would be relevant to all railroads. Railroads operating on the general system are required to use two-way EOT regardless of type of load unless exempted under 49 CFR 232.407(e). Two-way EOT devices cost approximately $4,000. As stated in the Final RIA, most Class III railroads, due to their type of train operation, are not required to have two-way EOT devices, except in certain situations. FRA regulations provide exceptions from the requirement to use two-way EOT device in 49 CFR 232.407(e). For Class III railroads that would be required to install two-way EOT devises, the monetary burden of the requirement to purchase and install those devices is less than 1% of the average annual revenue of small railroad entities. Therefore, the impact of this requirement is also minimal.

As further stated in the Final RIA, there are two other types of entities that are subject to the rule in addition to railroad companies: shippers, and tank car manufacturers (to the extent of design specifications). There are three main types of shippers: oil and gas companies, chemical companies and oil and fuel logistics companies. PHMSA estimated the number of small entities that could potentially be impacted by this rule using its own registration data and the Dun and Bradstreet data.

PHMSA first queried pipeline-related entities. The SBA definition of a small entity for those business categories is set at 1,000 employees or, in the case of annual revenue thresholds, is set at $27.5 million. PHMSA applied the following NAICS codes for this analysis: 211130 Natural Gas Extraction, 213111 Drilling Oil and Gas Wells, 213112 Support Activities for Oil and Gas

Operations, 325110 Petrochemical Manufacturing, 325199 All Other Basic Organic Chemical Manufacturing, and 486210 Pipeline Transportation of Natural Gas. PHMSA's queries identified a total of nine small entities: six under 213112 Support Activities for Oil and Gas Operations and three under 486210 Pipeline Transportation of Natural Gas.

PHMSA also conducted a similar but broader query of companies that may potentially ship LNG by rail using PHMSA's PDM system in conjunction with the Dun and Bradstreet data. The query identified several potential subsets of SBA-size small entities; however, there is considerable overlapping in definitions and variation in operations among the codes to render a specific number(s). One possibly relevant NAICS code for this rule is industrial gas manufacturing (NAICS 32512). This industry is comprised of establishments primarily engaged in the manufacturing of organic and inorganic gasses in compressed, liquid or solid forms. The industry has a 529 entities earning a total of almost $10 billion in annual sales in the U.S. (2018). The companies are comprised mainly of large well-established entities. A small entity within that industry has an annual revenue of $28.23 billion (2019). The cost burden to shippers of this rule consist of the purchase and installation expense of remote monitoring devices and of a thicker outer tank for DOT–113 Tank Car in LNG Service. As stated in the Final RIA, the current estimated cost of remote monitoring devices is approximately $2,400-$4,000 per car depending upon the vendor plus additional costs for monitoring software. The estimated cost of the requirement to install 9/16-inch outer shell on all DOT–113 tank cars in LNG service is an additional $15,000 to $20,000 for the additional and higher-quality steel, plus $3,000-$5,000 for additional construction expenses. The base cost of an existing 7/16-inch outer tank DOT–113 is approximately $725,000. PHMSA concludes that the impact of this rule is less than 1% of average annual revenue for these entities.

Therefore, PHMSA concludes that this rule does not impose a significant burden on small entities in this category.

*(5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.*

PHMSA is revising 49 CFR 172.820 to require any rail carrier transporting a tank car quantity of UN1972 (Methane, refrigerated liquid (cryogenic liquid) or Natural gas, refrigerated liquid (cryogenic liquid)) to comply with the additional safety and security planning requirements for transportation by rail. PHMSA estimates that this rule does not impose a significant information collection and recordkeeping burdens on small entities. Please refer to *Section VI.G.,* ''Paperwork Reduction Act,'' of the preamble for additional information about the potential burdens associated with this requirement.

*(6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.*

The Regulatory Flexibility Act directs agencies to establish exceptions and differing compliance standards for small entities, where it is possible to do so and still meet the objectives of applicable regulatory statutes. PHMSA considered three regulatory alternatives (including a ''no action'' alternative) when developing the NPRM. The alternatives (other than the 'no action' alternative) were designed in accordance with necessary safety, engineering and operational specifications. These specifications, as such, do not provide leeway for variation of design or degrees of stringency. The chemical characteristics of LNG combined with the potential to be transported in blocks of 20 or more tank cars or unit trains require specific packaging (*i.e.* tank car) which costs approximately $750,000 per tank car according to PHMSA and FRA estimates. The operational control specifications, as mentioned above, do not impose a significant monetary burden on small entities.

Other entities subject to this rule include rail tank car manufacturers. Although PHMSA does not regulate these entities, it does regulate the design specifications of rail tank cars. PHMSA estimates there are approximately seven rail tank car manufacturers in the U.S., none of which are considered small entities. The impact of the rule, in this case, is potentially positive, since it will generate new purchase order opportunities for those entities.

---

[59] The Class III railroad revenue threshold is $39,194,876 or less, for 2018. (The Class II railroad threshold is between $39,194,876 and $489,935,956; and the Class I railroad threshold is $489,935,956 or more.) *See* Surface Transportation Board (STB), available at *https://www.stb.gov/econdata.nsf/ d03c0c2161a050278525720a0044a825/ 1acf737531cf98ce8525841e0055e02e*.

### G. Paperwork Reduction Act

Section 1320.8(d), Title 5, Code of Federal Regulations requires that PHMSA provide interested members of the public and affected agencies an opportunity to comment on information collection and recordkeeping requests. As detailed in *Section V.C.* "*Section172.820*", PHMSA is requiring any rail carrier transporting a tank car quantity of UN1972 (Methane, refrigerated liquid (cryogenic liquid) or Natural gas, refrigerated liquid (cryogenic liquid)) to comply with the additional safety and security planning requirements for transportation by rail. PHMSA currently accounts for burden associated with safety and security planning requirements in OMB Control Number 2137–0612, "Hazardous Materials Security Plans." PHMSA estimates that this revision will lead to the following increase in burden:

*Annual Increase in Number of Respondents:* 0.

*Annual Increase in Number of Responses:* 8.

*Annual Increase in Burden Hours:* 677.

*Annual Increase in Salary Costs:* $41,170.

Under the Paperwork Reduction Act of 1995 (Pub. L. 96–511), no person is required to respond to an information collection unless it has been approved by OMB and displays a valid OMB control number. As this revision was not proposed in the NPRM, PHMSA will publish a separate 60-day and 30-day notice to provide an opportunity for public comment on the proposed estimated increase in burden.

Requests for a copy of this information collection should be directed to Steven Andrews or Shelby Geller, Office of Hazardous Materials Standards, Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, Telephone (202) 366–8553.

### H. Regulation Identifier Number (RIN)

A regulation identifier number (RIN) is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. The RIN contained in the heading of this document can be used to cross-reference this action with the Unified Agenda.

### I. Unfunded Mandates Reform Act

Unfunded Mandate Reform Act of 1995 (UMRA), 2 U.S.C. 1501 *et seq.,* requires agencies to assess the effects of Federal regulatory actions on State, local, and Tribal governments, and the private sector.[60] For any NPRM or final rule that includes a Federal mandate that may result in the expenditure by State, local, and Tribal governments, in the aggregate of $100 million or more (or $169 million adjusted for inflation) in any given year, the agency must prepare, amongst other things, a written statement that qualitatively and quantitatively assesses the costs and benefits of the Federal mandate.[61] A Federal mandate is defined, in part, as a regulation that imposes an enforceable duty upon State, local, or Tribal governments or would reduce or eliminate the amount of authorization of appropriation for Federal financial assistance that would be provided to State, local, or Tribal governments for the purpose of complying with a previous Federal mandate.[62]

The NPRM concluded that the rulemaking does not impose unfunded mandates because it does not result in costs of $169 million or more, adjusted for inflation, to either State, local, or Tribal governments, in the aggregate, or to the private sector and is the least burdensome alternative that achieves the objective of the rulemaking.

In response to the NPRM, Theresa Pugh Consulting, LLC argued that the UMRA requires that PHMSA analyze the costs that State, local, or Tribal governments might incur as a result of responding to potential emergencies caused by the transportation of LNG in rail tank cars.

The final rule, as revised based on comments received, does not include a Federal mandate that may result in an aggregate expenditure by State, local, and Tribal governments of $169 million or more. Additionally, the final rule does not impose a requirement on State, local, or Tribal governments, much less a requirement that the DOT can enforce. In the event State, local, or Tribal governments need additional resources to plan for a potential LNG-related accident, they may request grants from PHMSA's Hazardous Materials Emergency Preparedness funds, established under 49 U.S.C. 5116(h), to support development, improve, and carry out emergency plans.

In conclusion, this final rule does not impose unfunded mandates under the UMRA of 1995. It does not result in costs of $169 million or more to either State, local, or Tribal governments, in the aggregate, or to the private sector, and it is the least burdensome

alternative that achieves the objective of the rulemaking.

### J. Environmental Assessment

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.,* requires Federal agencies to consider the consequences of major Federal actions and prepare a detailed statement on actions significantly affecting the quality of the human environment. The Council on Environmental Quality (CEQ) implementing regulations (40 CFR part 1500–1508) require Federal agencies to conduct an environmental review considering (1) the need for the action, (2) alternatives to the action, (3) probable environmental impacts of the action and alternatives, and (4) the agencies and persons consulted during the consideration process (*see* 40 CFR 1508.9(b)). DOT Order 5610.1C, "Procedures for Considering Environmental Impacts," establishes departmental procedures for evaluation of environmental impacts under NEPA and its implementing regulations.

PHMSA has completed its NEPA analysis. Based on the environmental assessment, PHMSA determined that an environmental impact statement is not required for this rulemaking because it does not constitute an action meeting the criteria that normally requires the preparation of an environmental impact statement. As explained in the final EA, PHMSA has found that the selected action will not have a significant impact on the human environment in accordance with Section 102(2) of NEPA.

PHMSA issued and solicited comments on a draft EA posted to the docket along with the NPRM. The final EA and Finding of No Significant Impact has been placed into the docket addressing the comments received.

### K. Privacy Act

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *http://www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *http://www.dot.gov/privacy.*

### L. Executive Order 13609 and International Trade Analysis

Under Executive Order 13609 ("Promoting International Regulatory Cooperation"), agencies must consider whether the impacts associated with significant variations between domestic and international regulatory approaches

---

[60] 2 U.S.C. 1531.

[61] *Id.* at 1532.

[62] *Id.* at 658(5)(A), 1555.

Add. 86

are unnecessary or may impair the ability of American business to export and compete internationally. *See* 77 FR 26413 (May 4, 2012). In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

Similarly, the Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. For purposes of these requirements, Federal agencies may participate in the establishment of international standards, so long as the standards have a legitimate domestic objective, such as providing for safety, and do not operate to exclude imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards.

PHMSA participates in the establishment of international standards to protect the safety of the American public. PHMSA has assessed the effects of the rulemaking to ensure that it does not cause unnecessary obstacles to foreign trade. Insofar as the final rule authorizes rail transportation of LNG to domestic U.S. and other North American markets, it would promote foreign trade. Further, the final rule's authorization of rail transportation of LNG aligns U.S. practice with Transport Canada regulations permitting rail transportation of LNG. Accordingly, this rulemaking is consistent with Executive Order 13609 and PHMSA's obligations under the Trade Agreement Act, as amended.

## M. Executive Order 13211

Executive Order 13211 ("Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use") [66 FR 28355; May 18, 2001] requires Federal agencies to prepare a Statement of Energy Effects for any "significant energy action." Under the executive order, a "significant energy action" is defined as any action by an agency (normally published in the **Federal Register**) that promulgates, or is expected to lead to the promulgation of, a final rule or regulation (including a notice of inquiry, Advance NPRM, and NPRM) that (1)(i) is a significant regulatory action under Executive Order 12866 or any successor order and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy (including a shortfall in supply, price increases, and increased use of foreign supplies); or (2) is designated by the Administrator of the Office of Information and Regulatory Affairs (OIRA) as a significant energy action.

This final rule is a significant action under E.O. 12866 because OIRA believes it raises novel, legal, and policy issues arising out of legal mandates; however, it is expected to have an annual effect on the economy of less than $100 million. Further, this action is not likely to have a significant adverse effect on the supply, distribution or use of energy in the United States. The Administrator of OIRA has not designated the final rule as a significant energy action. For additional discussion of the anticipated economic impact of this rulemaking, please review the final RIA.

## List of Subjects

*49 CFR Part 172*

Education, Hazardous materials transportation, Hazardous waste, Incorporation by reference, Labeling, Packaging and containers, Reporting and recordkeeping requirements.

*49 CFR Part 173*

Hazardous materials transportation, Incorporation by reference, Packaging and containers, Radioactive materials, Reporting and recordkeeping requirements, Uranium.

*49 CFR Part 174*

Hazardous materials transportation, Incorporation by reference, Radioactive materials, Railroad safety.

*49 CFR Part 179*

Hazardous materials transportation, Railroad safety, Reporting and recordkeeping requirements.

*49 CFR Part 180*

Hazardous materials transportation, Incorporation by reference, Motor carriers, Motor vehicle safety, Packaging and containers, Railroad safety, Reporting and recordkeeping requirements.

In consideration of the foregoing, PHMSA amends 49 CFR chapter I as follows:

**PART 172—HAZARDOUS MATERIALS TABLE, SPECIAL PROVISIONS, HAZARDOUS MATERIALS COMMUNICATIONS, EMERGENCY RESPONSE INFORMATION, TRAINING REQUIREMENTS, AND SECURITY PLANS**

■ 1. The authority citation for part 172 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 2. In § 172.101, revise the table entry for "Methane, refrigerated liquid *(cryogenic liquid) or* Natural gas, refrigerated liquid *(cryogenic liquid), with high methane content)*" (UN1972) to read as follows:

**§ 172.101  Purpose and use of the hazardous materials table.**

\*        \*        \*        \*        \*

## § 172.101—Hazardous Materials Table

| Symbols | Hazardous materials descriptions and proper shipping names | Hazard class or division | Identification No. | PG | Label codes | Special provisions (§ 172.102) | Packaging (§ 173.***) | | | Quantity limitations (see §§ 173.27 and 175.75) | | Vessel stowage | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Exceptions | Non-bulk | Bulk | Passenger aircraft/rail | Cargo aircraft only | Location | Other |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8A) | (8B) | (8C) | (9A) | (9B) | (10A) | (10B) |
| * | * | | * | * | | | * | * | | | | | |
| | Methane, refrigerated liquid *(cryogenic liquid)* or Natural gas, refrigerated liquid *(cryogenic liquid), with high methane content).* | 2.1 | UN1972 ............ | ......... | 2.1 | T75, TP5, 440. | None ........ | None ........ | 318, 319 | Forbidden | Forbidden | D ............. | 40 |
| | * | | * | * | | | * | | | | | | |

■ 3. In § 172.102, amend paragraph (c)(1) by adding special provision 440 under "Code/Special Provisions" to read as follows:

### § 172.102  Special provisions.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

*Code/Special Provisions*

\* \* \* \* \*

440 When this material is transported by tank car, the offeror must ensure each tank car is remotely monitored for pressure and location. Additionally, the offeror must notify the carrier if the tank pressure rise exceeds 3 psig over any 24-hour period.

\* \* \* \* \*

■ 4. In § 172.820, revise paragraphs (a) and (b)(1) to read as follows:

### § 172.820  Additional planning requirements for transportation by rail.

(a) *General.* Each rail carrier transporting in commerce one or more of the following materials is subject to the additional safety and security planning requirements of this section:

(1) More than 2,268 kg (5,000 lbs.) in a single carload of a Division 1.1, 1.2 or 1.3 explosive;

(2) A quantity of a material poisonous by inhalation in a single bulk packaging;

(3) A highway route-controlled quantity of a Class 7 (radioactive) material, as defined in § 173.403 of this subchapter;

(4) A high-hazard flammable train (HHFT) as defined in § 171.8 of this subchapter; or

(5) A quantity of UN1972 (Methane, refrigerated liquid or Natural gas, refrigerated liquid) when transported in a rail tank car.

(b) \* \* \*

(1) Commodity data must be collected by route, a line segment or series of line segments as aggregated by the rail carrier. Within the rail carrier selected route, the commodity data must identify the geographic location of the route and the total number of shipments by UN identification number for the materials specified in paragraph (a) of this section.

(i) A rail carrier subject to additional planning requirements of this section

based on paragraph (a)(5) of this section that has yet to transport UN 1972, must factor in planned shipments of UN 1972 to the commodity data for use in the paragraph (c) route analysis prior to initial transport of the material.

(ii) [Reserved]

## PART 173—SHIPPERS—GENERAL REQUIREMENTS FOR SHIPMENTS AND PACKAGINGS

■ 5. The authority citation for part 173 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 6. In § 173.319, revise paragraph (d)(2) to read as follows:

### § 173.319  Cryogenic liquids in tank cars.

\* \* \* \* \*

(d) \* \* \*

(2) *Ethylene, hydrogen (minimum 95 percent parahydrogen), and methane, cryogenic liquids* must be loaded and shipped in accordance with the following table:

### Table 1 to § 173.319(d)—Pressure Control Valve Setting or Relief Valve Setting

| Maximum start-to-discharge pressure (psig) | Maximum permitted filling density (percent by weight) | | | | |
|---|---|---|---|---|---|
| | Ethylene | Ethylene | Ethylene | Hydrogen | Methane |
| 17 ............................................................... | ......................... | ......................... | ......................... | 6.60 | |
| 45 ............................................................... | 52.8 ................... | ......................... | ......................... | ......................... | |
| 75 ............................................................... | ......................... | 51.1 ............... | 51.1 ............... | ......................... | 37.3. |
| Maximum pressure when offered for transportation. | 10 psig ............... | 20 psig ............ | 20 psig ............ | ......................... | 15 psig. |
| Design service temperature ........................ | Minus 260 °F .......... | Minus 260 °F ... | Minus 155 °F ... | Minus 423 °F ............ | Minus 260 °F. |
| Specification (*see* § 180.507(b)(3) of this subchapter). | 113D60W, 113C60W | 113D120W ...... | 113D120W ...... | 113A175W, 113A60W | 113C120W9. |

Note: For DOT 113 cryogenic tank cars, delimiters indicate the following:
A—authorized for minus 423 °F loading;
C—authorized for minus 260 °F loading;
D—authorized for minus 155 °F loading.
The specification suffix "9" indicates the tank car is equipped with (minimum) 9/16 inch TC 128B normalized steel outer jacket and tank heads.

\*    \*    \*    \*    \*

## PART 174—CARRIAGE BY RAIL

■ 7. The authority citation for part 174 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128; 33 U.S.C. 1321; 49 CFR 1.81 and 1.97.

■ 8. In § 174.200, add paragraph (d) to read as follows:

### § 174.200    Special handling requirements.

\*    \*    \*    \*    \*

(d) For a single train of 20 or more loaded tank cars of Methane, refrigerated liquid in a continuous block or a single train carrying 35 or more loaded tank cars of Methane, refrigerated liquid throughout the train consist, each carrier must ensure the train is equipped and operated with either a two-way end-of-train (EOT) device, as defined in 49 CFR 232.5, or a distributed power (DP) system, as defined in 49 CFR 229.5.

## PART 179—SPECIFICATIONS FOR TANK CARS

■ 9. The authority citation for part 179 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128; 49 CFR 1.81 and 1.97.

■ 10. In § 179.400–5, revise paragraph (b) to read as follows:

### § 179.400–5    Materials.

\*    \*    \*    \*    \*

(b)(1) Any steel casting, steel forging, steel structural shape or carbon steel plate used to fabricate the outer jacket or heads must be as specified in AAR Specifications for Tank Cars, appendix M.

(2) For DOT–113C120W9 tank cars, the outer jacket shell and outer jacket heads must be made of AAR TC–128, Grade B normalized steel plate as specified in § 179.100–7(a).

\*    \*    \*    \*    \*

■ 11. In § 179.400–8, revise paragraph (d) to read as follows:

### § 179.400–8    Thickness of plates.

\*    \*    \*    \*    \*

(d)(1) The minimum wall thickness, after forming, of the outer jacket shell may not be less than $7/16$ inch. The minimum wall thickness, after forming, of the outer jacket heads may not be less than $1/2$ inch and they must be made from steel specified in § 179.16(c).

(2) For DOT 113C120W9 tank cars, the minimum wall thickness of the outer jacket shell and the outer jacket heads must be no less than $9/16$ inch after forming, and must be made of AAR TC–128, Grade B normalized steel plate.

(3) The annular space is to be evacuated, and the cylindrical portion of the outer jacket between heads, or between stiffening rings if used, must be designed to withstand an external pressure of 37.5 psig (critical collapsing pressure), as determined by the following formula:

$$P_c = [2.6E(t/D)^{2.5}]/[(L/D) - 0.45(t/D)^{0.5}]$$

Where:

$P_c$ = Critical collapsing pressure (37.5 psig minimum) in psig;
E = modulus of elasticity of jacket material, in psi;
t = minimum thickness of jacket material, after forming, in inches;
D = outside diameter of jacket, in inches;
L = distance between stiffening ring centers in inches. (The heads may be considered as stiffening rings located $1/3$ of the head depth from the head tangent line.)

\*    \*    \*    \*    \*

■ 12. Add § 179.400–26 to read as follows:

### § 179.400–26    Approval to operate at 286,000 gross rail load (GRL).

A tank car may be loaded to a gross weight on rail of up to 286,000 pounds (129,727 kg) upon approval by the Associate Administrator for Safety, Federal Railroad Administration (FRA). *See* § 179.13.

## PART 180—CONTINUING QUALIFICATION AND MAINTENANCE OF PACKAGINGS

■ 13. The authority citation for part 180 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128; 49 CFR 1.81 and 1.97.

■ 14. In § 180.515, add paragraph (d) to read as follows:

### § 180.515    Markings.

\*    \*    \*    \*    \*

(d) The specification marking for DOT 113 tank cars built in accordance with the DOT 113C120W9 specification must display the last numeral of the specification number (*i.e.,* "DOT 113C120W9").

Issued in Washington, DC, on June 19, 2020, under authority delegated in 49 CFR 1.97.

**Howard R. Elliott,**
*Administrator, Pipeline and Hazardous Materials Safety Administration.*

[FR Doc. 2020–13604 Filed 7–23–20; 8:45 am]

**BILLING CODE 4910–60–P**

agencies are seeking input on a durable definition of 'waters of the United States' not limited to the scope of the regulatory processes announced on June 9, 2021.'' The agencies offer the following clarification. During the regional roundtables, the agencies anticipate discussing issues related to ''waters of the United States'' that will be applicable to the agencies' second rulemaking. The regional roundtables will serve as one part of a robust pre-proposal outreach and engagement strategy—including but not limited to consultation and engagement with state and tribal co-regulators—to gain an understanding of the scope of potential issues to address in the second rulemaking.

The October 25, 2021 **Federal Register** document also states: ''The agencies are inviting stakeholders to organize interested parties and regional participants that comprise up to 15 representatives for these roundtables.'' The agencies offer the following clarification. The agencies are requesting that stakeholders or organizations nominate an entire group of no more than 15 people (including the organizer) who represent diverse perspectives. Individuals should not nominate themselves alone to the agencies.

The document also states: ''Each nomination for a roundtable must include a proposed slate of participants representing perspectives of: Agriculture; conservation groups; developers; drinking water/wastewater management; environmental organizations; environmental justice communities; industry; and other key interests in that region.'' The agencies offer the following clarification. The agencies will consider nominations that lack representation from one or more of the named stakeholder groups. However, the agencies will give more weight in the selection process to those nominations that include stakeholders representing a more robust and wider range of perspectives.

The **Federal Register** document also stated: ''The agencies anticipate coordinating with elected officials that represent the location of selected roundtables.'' The agencies offer the following clarification. The agencies' intent is to coordinate with relevant states, tribes, and Alaska Native Villages regarding potential participation in selected roundtables.

The **Federal Register** document further stated: ''EPA cannot hold in-person public meetings at this time. The agencies will host these roundtables virtually. . . . The agencies also intend to livestream each roundtable to make

them available for public viewing.'' The agencies offer the following clarification. Information on how to access the livestream will be posted on the agencies' websites once the roundtable dates/times have been established.

Additionally, the **Federal Register** document did not include information on roundtable agenda, format, or logistics. The agencies would like to clarify that roundtables will be run by a facilitator and will be scheduled for no more than two and a half hours in duration.

Additionally, the agencies will coordinate with roundtable organizers on further implementation planning once roundtables are selected.

**Jaime A. Pinkham,**

*Acting Assistant Secretary of the Army (Civil Works), Department of the Army.*

**Radhika Fox,**

*Assistant Administrator, Environmental Protection Agency.*

[FR Doc. 2021–24317 Filed 11–5–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

# DEPARTMENT OF TRANSPORTATION

## Pipeline and Hazardous Materials Safety Administration

### 49 CFR Part 172

**[Docket No. PHMSA–2021–0058 (HM–264A)]**

**RIN 2137–AF55**

## Hazardous Materials: Suspension of HMR Amendments Authorizing Transportation of Liquefied Natural Gas by Rail

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation (DOT).

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** PHMSA, in coordination with the Federal Railroad Administration (FRA), proposes to amend the Hazardous Materials Regulations to suspend authorization of liquefied natural gas (LNG) transportation in rail tank cars pursuant to a final rule published in July 2020, pending the earlier of either completion of a separate rulemaking under RIN 2137–AF54 evaluating potential modifications to requirements governing rail tank car transportation of LNG, or June 30, 2024.

**DATES:** Comments must be received by December 23, 2021. To the extent possible, PHMSA will consider late-filed comments as a final rule is developed.

**ADDRESSES:** You may submit comments by any of the following methods:

• *Federal Rulemaking Portal: http:// www.regulations.gov.* Follow the online instructions for submitting comments.

• *Fax:* 1–202–493–2251.

• *Mail:* Docket Management System; U.S. Department of Transportation, Docket Operations, M–30, Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

• *Hand Delivery:* U.S. Department of Transportation, Docket Operations, M–30, Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590–0001 between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

*Instructions:* Include the agency name and docket number PHMSA–2021–0058 (HM–264A) or RIN 2137–AF55 for this rulemaking at the beginning of your comment. Note that all comments received will be posted without change to *http://www.regulations.gov* including any personal information provided. If sent by mail, comments must be submitted in duplicate. Persons wishing to receive confirmation of receipt of their comments must include a self-addressed stamped postcard.

*Docket:* For access to the dockets to read background documents or comments received, go to *http:// www.regulations.gov* or the DOT Docket Operations Office (*see* **ADDRESSES**).

*Confidential Business Information:* Confidential Business Information (CBI) is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (FOIA; 5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to this NPRM contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to this NPRM, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission containing CBI as ''PROPIN.'' Submissions containing CBI should be sent to Lily Ballengee, U.S. Department of Transportation, 1200 New Jersey Avenue SE, Washington, DC 20590–0001. Any commentary that PHMSA receives which is not specifically designated as CBI will be placed in the public docket for this rulemaking.

**FOR FURTHER INFORMATION CONTACT:** Lily Ballengee, Transportation Specialist, Standards and Rulemaking Division, Office of Hazardous Materials Safety, (202) 366–8553, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

**61732**     **Federal Register** / Vol. 86, No. 213 / Monday, November 8, 2021 / Proposed Rules

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Overview
II. Background
    A. LNG by Rail Final Rule
    B. Pending Petitions for Review of the LNG by Rail Final Rule
    C. PHMSA/FRA LNG Task Force
    D. Transportation Research Board Study
    E. Executive Order 13990
III. Basis for Suspension
    A. Development of a More Complete Understanding of the Risks and Benefits Associated With Rail Tank Car Transportation of LNG
    B. No Material Adverse Impact on Reliance Interests
IV. Regulatory Analyses and Notices
    A. Statutory/Legal Authority
    B. Executive Order 12866 and DOT Regulatory Policies and Procedures
    C. Executive Order 13132
    D. Executive Order 13175
    E. Regulatory Flexibility Act and Executive Order 13272
    F. Paperwork Reduction Act
    G. Unfunded Mandates Reform Act of 1995
    H. Environmental Assessment
    I. Executive Order 12898
    J. Privacy Act
    K. Executive Order 13609 and International Trade Analysis
    L. Executive Order 13211
List of Subjects

## I. Overview

PHMSA, in coordination with FRA, proposes to suspend recent amendments to the Hazardous Materials Regulations (HMR; 49 CFR parts 171–180) authorizing transportation of "Methane, refrigerated liquid," commonly known as LNG in DOT–113C120W9 specification rail tank cars while it conducts a thorough evaluation of the HMR's regulatory framework for rail transportation of LNG in a companion rulemaking under RIN 2137–AF54, and determines if any modifications are necessary. Transportation of LNG by rail tank car has not occurred and there is considerable uncertainty regarding whether any would occur in the time it takes for PHMSA to consider potential modifications to the existing, pertinent HMR requirements. However, PHMSA's proposed temporary suspension of the HMR provisions authorizing transportation of LNG in rail tank cars guarantees no such transportation will occur before its companion rulemaking has concluded or June 30, 2024, whichever is earlier, thereby: (1) Avoiding any risks to public health and safety or environmental consequences (to include direct and indirect greenhouse gas (GHG) emissions [1]) that

are being evaluated in the companion rulemaking and in ongoing research efforts undertaken in collaboration with FRA and external technical experts; (2) assuring timely implementation of any mitigation measures and operational controls for rail tank car transportation of LNG identified in the companion rulemaking or those ongoing research efforts; (3) reducing the potential for economic burdens by ensuring that entities avoid ordering rail tank cars compliant with the current requirements when the companion rulemaking may adopt alternative requirements; and (4) enabling meaningful opportunity for consideration of the perspectives of diverse stakeholders.

PHMSA proposes to add a new special provision 439 that prohibits LNG transportation in rail tank cars until issuance of a final rule concluding the rulemaking proceeding under RIN 2137–AF54, or June 30, 2024, whichever is earlier. Therefore, if the temporary suspension is adopted in a final rule, the HMR will not authorize the transportation of LNG in rail tank cars until completion of the companion rulemaking or June 30, 2024, whichever is earlier. Rail transport of LNG may still be permitted on an *ad hoc* basis as authorized by the conditions of a PHMSA special permit (§ 107.105), or in a portable tank secured to a rail car pursuant to the conditions of an FRA approval (§ 174.63).

## II. Background

### *A. LNG by Rail Final Rule*

On May 7, 2018, PHMSA accepted a petition for rulemaking [2] from the Association of American Railroads (AAR) to allow the transportation of LNG by rail in DOT–113 tank cars and began drafting a notice of proposed rulemaking (NPRM) in consultation with FRA. On April 10, 2019, Executive Order 13868 ("Promoting Energy Infrastructure and Economic Growth") [3] was published, which directed the Secretary of Transportation to propose

regulations that "treat LNG the same as other cryogenic liquids and permit LNG to be transported in approved rail tank cars" and finalize that rulemaking within 13 months.[4] In October 2019, PHMSA issued the LNG by Rail NPRM, which proposed to amend the HMR to allow LNG to be transported in existing DOT–113 tank cars and sought comments (due within 60 days) on the potential need for additional operational controls.[5]

On December 5, 2019, PHMSA issued a DOT special permit (SP) 20534 to Energy Transport Solutions, LLC (ETS) to allow the transportation of LNG in existing DOT–113 tank cars from Wyalusing, PA, to Gibbstown, NJ, with no intermediate stops.[6] DOT–SP 20534 includes several safety control measures, including a requirement to conduct remote sensing for detecting and reporting internal pressure, location, and leakage, and a requirement to provide training to emergency response agencies that could be affected prior to the initial shipment of a tank car under the SP. ETS applied for the SP before the LNG by Rail NPRM was initiated. After issuing the SP, PHMSA re-opened the comment period on the proposed rule until January 13, 2020.[7]

On July 24, 2020, PHMSA published a final rule in the **Federal Register** revising the HMR to allow for the bulk transport of LNG in rail tank cars.[8] In the LNG by Rail final rule, the Final Environmental Assessment (FEA) and the Final Regulatory Impact Analysis (RIA), PHMSA evaluated the potential benefits of rail tank car transportation of LNG and weighed them against the potential public safety and environmental risks.[9] PHMSA coordinated with FRA to determine that those potential risks from rail tank car transportation of LNG would be at safe levels if such transportation were: (1) In DOT–113C120W specification rail tank cars—indicated by the new specification suffix "9" (DOT–113C120W9)—with

---

[1] PHMSA distinguishes between "direct" and "indirect" GHG emissions herein consistent with

the meaning of those terms in pertinent Obama-Administration Council on Environmental Quality (CEQ) guidance. *See* CEQ, "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" at 16 & n. 42 (Aug. 1, 2016); CEQ, "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions" 86 FR 10252 (Feb. 19, 2021) (encouraging agencies to use CEQ's 2016 guidance until CEQ issues an updated version of that guidance).

[2] Docket No. PHMSA–2017–0020–0002.

[3] 84 FR 15495 (Apr. 15, 2019).

[4] The Secretary has delegated such rulemaking duties to the PHMSA Administrator. *See* 49 CFR 1.97.

[5] 84 FR 56964 (Oct. 24, 2019).

[6] DOT–SP 20534 expires by its terms on November 30, 2021. However, ETS may request a renewal in accordance with § 107.109. *See https://cms7.phmsa.dot.gov/approvals-and-permits/hazmat/file-serve/offer/SP20534.pdf/2017088295/SP20534.*

[7] 84 FR 70491 (Dec. 23, 2019).

[8] 85 FR 44994 (Jul. 24, 2020) (LNG by Rail rule).

[9] *See, e.g., id.* at 45024; FEA, Docket No. PHMSA–2018–0025–0478; RIA, Docket No. PHMSA–2018–0025–0479.

enhanced outer tank requirements; (2) subject to all applicable then-extant requirements of the HMR; and (3) subject to certain additional operational controls. The LNG by Rail final rule increased the thickness of DOT–113 outer tank shells from 7/16 to 9/16 inch (a 28.5 percent increase) and mandated use of stronger TC–128 Grade B normalized steel. With respect to this increase in tank shell thickness and strength, PHMSA noted that "[w]hen divided by the large number of carloads that would be carried during a DOT–113's 50-year service life, the 9/16th inch TC–128B normalized steel outer tank is highly cost-effective in that it will mitigate the consequences of derailment involving LNG by reducing the number of tanks punctured in the unlikely event of an accident." [10] The LNG by Rail final rule also required operational controls for transportation of LNG by rail tank car, including routing analysis, improved train braking, and remote monitoring. PHMSA noted that the operational controls added in the final rule were expected to reduce the likelihood of an incident and reduce potential damages if an incident were to occur.[11] The LNG by Rail final rule went into effect on August 24, 2020.

On August 20, 2020, the Puyallup Tribe of Indians filed an administrative appeal of the LNG by Rail final rule, alleging, *inter alia,* that the rulemaking disproportionately exposed its members to environmental hazards (including those associated with climate change) and that PHMSA's engagement with the Tribe on the rulemaking was inadequate. PHMSA denied the Tribe's administrative appeal on November 13, 2020.[12]

### B. Pending Petitions for Review of the LNG by Rail Final Rule

The LNG by Rail final rule is the subject of several petitions for judicial review. A group of 6 environmental groups, a coalition of attorneys general for 14 States and the District of Columbia, and the Puyallup Tribe of Indians filed separate petitions for review challenging PHMSA's LNG by Rail final rule. All of the petitioners ask the court to vacate the rule, alleging violations of the Hazardous Materials Transportation Act (HMTA; 49 U.S.C. 5101–5127), the Administrative Procedure Act (APA; 5 U.S.C. 553 *et seq.*), and the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*). The Puyallup Tribe also alleges violations of the Tribal consultation protocols under the National Historic Preservation Act (54 U.S.C. 300101 *et seq.*) and Executive Order 13175 ("Consultation and Coordination with Indian Tribal Governments"),[13] as well as disparate impacts on the Tribe in violation of Executive Order 12898 ("Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations") [14] and Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*).

The petitions have been consolidated within a single proceeding in the U.S. Court of Appeals for the D.C. Circuit. On March 16, 2021, the court granted PHMSA's unopposed motion to place the petitions in abeyance while PHMSA reviewed the LNG by Rail final rule pursuant to Executive Order 13990 ("Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis").[15]

### C. PHMSA/FRA LNG Task Force

PHMSA established a joint LNG Task Force with FRA in January 2020 as part of its ongoing research efforts on the transportation of LNG. The LNG Task Force helped to identify areas of research that could inform potential future regulatory activity, as appropriate. To assist in identifying appropriate tasks within that effort, the LNG Task Force employed a risk-based framework directed toward:

- "knowing the risk" by improving DOT's knowledge of the types and extent of risk posed by LNG by rail transportation, with a focus on research and testing;
- "predicting the risk" by leveraging modeling and simulation software and tools to analyze LNG by rail operations and potential risk outcomes;
- "reducing the risk" by relating the possible strategies and technologies that decrease the risk of transporting LNG by rail tank cars, especially through track inspection and operational factors; and
- "preparing for the risk" by focusing on the emergency response community to ensure that—should an incident occur and the risks of LNG materialize—emergency responders have the awareness, training, and resources to keep themselves and the public safe.

The LNG Task Force ultimately identified and undertook 15 tasks to synthesize ongoing research and outreach activities. Those tasks are listed in Table 1 below.

TABLE 1—LNG TASK FORCE METHODOLOGY FOR ADDRESSING LNG BY RAIL RISK

| Know the risk | Predict the risk | Reduce the risk | Prepare for the risk |
|---|---|---|---|
| • Empirical Review of International LNG Rail Transportation.<br>• LNG Loading/Unloading Safety Evaluation.<br>• Quantitative Risk Assessment of LNG Transportation.<br>• Full-Scale Impact Testing on DOT–113 ..<br>• LNG UN T75 Portable Tank Fire-Testing | • Evaluate Likely Number of Punctures and Derailment Simulation Models.<br>• Develop Worst-Case Scenario Model ....<br>• Safety/Security Route Risk Assessment<br>• Train Energy and Dynamics Simulator (TEDS).<br>• Modal Conversion Between LNG by Truck and Rail. | • Re-Evaluate Costs and Benefits of ECP Brakes.<br>• Evaluation of Train Operational Controls.<br>• Automated Track Inspection. | • Validate Emergency Responder Opinions and Needs.<br>• Develop LNG Educational and Outreach Plan. |

The LNG Task Force initially projected completion of the above tasks by late 2021. However, much of the LNG Task Force's work was interrupted by the coronavirus disease 2019 (COVID-19) public health emergency. Consequently, several tasks—including full-scale impact testing, puncture and derailment simulation modeling, and LNG portable tank pool fire testing—are not expected to be completed until sometime in 2022.

### D. Transportation Research Board Study

Pursuant to the "Further Consolidated Appropriations Act, 2020" (Pub. L. 116–94), PHMSA and FRA partnered with the National Academy of Sciences, Engineering, and Medicine (NASEM) to conduct a study on the transportation of LNG in rail tank cars through a committee of the Transportation

---

[10] *Id.* at 45005.

[11] *Id.* at 45008.

[12] Docket No. PHMSA–2018–0025–0637.

[13] 65 FR 67249 (Nov. 9, 2000).

[14] 59 FR 7629 (Feb. 16, 1994).

[15] 86 FR 7037 (Jan. 25, 2021).

Research Board (TRB).[16] The TRB committee commenced work in mid-July 2020.

The TRB study consists of two phases, with each phase culminating in a report with findings and recommendations:

• Phase I reviews the plans and progress of the LNG Task Force to develop a report containing findings regarding the relevance, completeness, and quality of its efforts, and to offer recommendations for addressing any shortcomings.

• Phase II involves a more comprehensive assessment of topics relevant to the safe movement of LNG by rail tank car pursuant to both SP and the HMR. The Phase II Report will contain recommendations to Congress, PHMSA, FRA, industry, emergency responders, and other relevant stakeholders on necessary near- and long-term actions to improve understanding of the risks associated with transporting LNG by rail tank car, mitigate those risks, and prevent and prepare for potential incidents.

The TRB committee issued its Phase I Report on June 15, 2021.[17] Although the Phase I Report generally praised the LNG Task Force's "comprehensive as planned" program for making effective use of a "number of long standing and high quality research and testing programs," the TRB committee noted that the COVID–19 public health emergency resulted in delays in initiation and completion of several tasks. The TRB committee also noted that the interdependency of many of those outstanding tasks complicated its and the LNG Task Force's work in developing a complete understanding of the risks associated with transportation of LNG in rail tank cars. It expressed particular concern regarding the incomplete status of tasks pertaining to full-scale impact testing, portable tank pool fire testing, worst-case scenario analysis, and quantitative risk assessment.[18] The TRB committee also emphasized pending tasks necessary to understand the potential risks to public and worker safety arising from releases

during loading, unloading, and transloading of LNG tank cars, as well as in overcoming limited emergency planning and response training and resources.

The Phase I Report provided recommendations[19] for improving the assumptions, rationale, and methodology employed by the LNG Task Force in executing the outstanding tasks. The recommendations include that PHMSA and FRA should make several changes to the planned portable fire tank testing—including using LNG as the pool fire fuel and not liquefied petroleum gas—and assess the potential for cryogenic damage cascading to adjacent tanks. The report also recommends PHMSA and FRA enhance the modeling for worst-case scenarios—such as using a train speed of 50 miles-per-hour (mph) instead of 40 mph—and evaluate explosion hazards from a spill of LNG resulting in vapor dispersion in an environment with confined or congested spaces. Additionally, the report recommends PHMSA and FRA add loading and unloading operations and train assembly classification to the risk assessment for transport of LNG by rail as compared to highway.

The TRB committee plans to complete its work under Phase II in mid-2022.[20]

*E. Executive Order 13990*

Section 2(a) of Executive Order 13990 requires the review of agency regulations and other actions promulgated or adopted between January 20, 2017, and January 20, 2021, that are candidates for suspension, modification, or rescission because of inconsistency with Administration policies to improve public health, protect the environment, prioritize environmental justice, and reduce GHG emissions. The White House identified the LNG by Rail final rule in a non-exclusive list[21] of agency actions that would be reviewed in accordance with Executive Order 13990. Additionally, section 7 of Executive Order 13990 revokes Executive Order 13868, along with several other executive orders and executive actions, and directs agencies to promptly take steps, consistent with applicable law, to rescind any rules or regulations that had been issued "implementing or enforcing" those executive orders and executive actions.

On May 5, 2021, DOT issued a notice soliciting comment on potential

candidates for review under Executive Order 13990 from among existing rules and other DOT actions.[22] DOT received one comment pertaining to the LNG by Rail final rule. In that comment, the Transportation Trades Department of the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO) called for re-examination of the LNG by Rail final rule because it believes that rulemaking "neglected to include meaningful safety measures to adequately address the inherent risks to this type of operation."[23]

**III. Basis for Suspension**

*A. Development of a More Complete Understanding of the Risks and Benefits Associated With Rail Tank Car Transportation of LNG*

The LNG by Rail rulemaking considered incorporating within the HMR regulatory requirements to protect the public, property, and the environment from unreasonable risks from transportation of LNG in rail tank cars. As such, PHMSA—in consultation with FRA—determined that existing HMR requirements including the modified DOT–113 tank car and new operational requirements prescribed in the LNG by Rail final rule, along with expected compliance with widely-accepted, voluntary industry standards such as AAR Circular OT–55 for shipments of LNG in rail tank cars, would reduce risk to safety, property, and the environment to acceptable levels in light of the potential benefits of that rulemaking.[24] That decision reflected consideration of LNG's hazardous properties and the safety record of the DOT–113 tank car.[25]

However, PHMSA acknowledged in the LNG by Rail final rule that additional further data and knowledge (for example regarding potential benefits as well as safety and environmental risks) could make appropriate further mitigations for shipping LNG by rail tank car.[26] The LNG by Rail final rule, RIA, and FEA were candid about uncertainty in the future market demand for transportation of LNG by rail tank car, potential direct and

---

[16] In that legislation, Congress earmarked funds for the NASEM study for the express purpose of "inform[ing] rulemaking." NASEM maintains a website dedicated to the TRB committee's work that contains the TRB committee's charter, work product, meeting agendas, and other supporting material. *See* NASEM, "Safe Transportation of Liquefied Natural Gas by Railroad Tank Car," *https://www.nationalacademies.org/our-work/safe-transportation-of-liquefied-natural-gas-by-railroad-tank-car (last visited Jun. 16, 2021).*

[17] NASEM, "Preparing for LNG by Rail Tank Car: A Review of a U.S. DOT Safety Research, Testing, and Analysis Initiative" (Jun. 2021) (Phase I Report), *https://www.nap.edu/read/26221/chapter/1.*

[18] *Id.* at 5–6.

[19] *Id.*

[20] *Id.* at 13.

[21] U.S. White House, "Fact Sheet: List of Agency Actions for Review," *https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ (last visited Jun. 16, 2021).*

[22] 85 FR 23876.

[23] Docket No. DOT–OST–2021–0036–0025.

[24] *See, e.g.,* 85 FR 45003 (discussing reduction in risks from tank car enhancements, mandatory operational controls, and voluntary industry practices) *and* 45024 (discussing potential economic and other benefits from the LNG by Rail final rule).

[25] 85 FR 44998.

[26] *See, e.g.,* 85 FR 44995 ("PHMSA recognizes that there is ongoing and potential future research related to the transportation of LNG by all modes. The Agency will continue to use this research to inform potential future regulatory activity, as appropriate.").

indirect GHG emissions associated with authorizing LNG by rail tank car, and the adequacy of emergency planning and response resources.[27] PHMSA sought to mitigate potential risks that were affected by those uncertainties in the LNG by Rail final rule by adopting certain requirements in the LNG by Rail final rule suggested by comments in the rulemaking docket.[28] PHMSA also stated that it may adjust the HMR's regulatory framework governing rail tank car transportation of LNG as more information became available from its oversight activities.[29] In fact, PHMSA had already begun work within the LNG Task Force on a comprehensive set of tasks directed toward refining PHMSA's knowledge of the risks of rail tank car transportation of LNG when it issued the LNG by Rail final rule. PHMSA also expected that it would have the benefit of the TRB committee's study on LNG by rail that Congress had directed for the express purpose of informing pertinent PHMSA rulemakings. Lastly, PHMSA understood it would have time to amend the HMR to integrate insights from those research activities, as it could take time to build a fleet of dedicated DOT–113C120W9 tank cars, as stated in the RIA.[30]

Uncertainty regarding the potential benefits and safety and environmental risks of rail transportation of LNG under the HMR has persisted longer than PHMSA anticipated when it issued the LNG by Rail final rule, and has in fact increased as a result of the release of the TRB Phase I Report on June 15, 2021. Uncertainty has persisted longer than expected because the COVID–19 public health emergency has delayed the completion of research efforts to confirm and enhance PHMSA's and FRA's knowledge of public safety and environmental risks attendant in rail tank car transportation of LNG. As explained in the TRB Phase I Report, several of the tasks that had been scheduled for completion by early 2021 will not be completed before late 2021 or 2022. Delivery of the TRB Phase I Report was expected March 31, 2021, but the report was issued June 15, 2021.

Uncertainty also has increased because, while the TRB committee generally commended PHMSA and FRA's efforts under the LNG Task Force, the TRB committee identified a number of information gaps in its and the LNG Task Force's work that PHMSA was not aware of when it issued the LNG by Rail final rule. The gaps concern testing and the evaluation of public safety and environmental risks (*e.g.,* relating to full-scale impact testing, pool fire testing, worst-case analysis, and quantitative risk assessment)—including testing on which PHMSA had relied in the LNG by Rail final rule.[31] The data gaps identified by the TRB committee might have been resolved by this point in time, but they currently remain unresolved because of the disruptions caused by the COVID–19 public health emergency. Further, the committee identified opportunities to improve the work of the LNG Task Force in understanding the risks to the public, workers, and the environment from rail tank car transportation of LNG, which potentially could further reduce uncertainties in the future and put PHMSA in a better position to evaluate risks as it moves forward with its companion rulemaking. The TRB committee also emphasized the need for a robust understanding of the potential risks to public and worker safety arising from releases during loading, unloading, and transloading of LNG tank cars, and improved emergency planning and response training and resources, further underscoring the importance of PHMSA taking additional time to ensure it fully understands and considers uncertainties.

The COVID–19 public health emergency and other developments have also exacerbated uncertainties in near- and long-term market demand for rail transportation of LNG bounding the potential benefits and risks to public safety and the environment from the LNG by Rail final rule. The FEA supporting the LNG by Rail final rule acknowledged the complexity of the economics driving whether demand for natural gas transport outside the pipeline network as LNG would be met through the transportation in tank cars under the LNG by Rail final rule or by alternatives (one or more of highway transportation of LNG via MC–338 insulated cargo tanks, rail transportation of LNG pursuant to SP, or rail transportation of LNG via portable tank pursuant to FRA approval).[32] The COVID–19 public health emergency has complicated that calculus further by causing economic disruption throughout the natural gas industry, impacting LNG infrastructure investment directly.[33] Additionally, since the LNG by Rail final rule became effective, LNG markets have seen a number of announcements portending potentially fundamental supply and demand changes in international LNG markets.[34] Consequently, PHMSA believes there is more uncertainty now than when the LNG by Rail final rule was issued regarding whether, when, and where rail tank car transport of LNG—and by extension, any potential benefits and public safety/environmental risks—will materialize.

PHMSA believes the increased uncertainty regarding the potential benefits and safety and environmental consequences of rail transportation of LNG pursuant to the LNG by Rail final rule warrants temporary suspension while PHMSA evaluates (under RIN 2137–AF54) whether and under what circumstances the HMR should allow rail transportation of LNG. As explained above, research activity that PHMSA had expected would corroborate its understanding of the safety and environmental risks attendant in rail transportation of LNG has been delayed, while TRB's peer review of testing cited in the LNG by Rail final rule has raised additional questions.[35] Uncertainties in

---

[27] 85 FR 45016 (describing market demand uncertainties) and 45019–21 (describing ongoing efforts to improve emergency planning and emergency response training and resources); Docket No. PHMSA–2018–0025–0478 at 35 (discussing uncertainties regarding GHG emissions impacts of that rulemaking).

[28] 85 FR 44996.

[29] 85 FR 44995.

[30] Docket No. PHMSA–2018–0025–0479 at 19.

[31] *See* 85 FR 45006 (full-scale impact testing), 45012 (pool fire testing), and 45013 (quantitative risk assessment).

[32] Docket No. PHMSA–2018–0025–0478 at 11, 26–29.

[33] *See, e.g.,* Kravtsova & DiSavinio, Reuters, "LNG Investments Vanish in 2020 as Coronavirus Slashes Oil and Gas Prices," (Sep. 9, 2020), *https://www.reuters.com/article/us-lng-exports-investment-analysis/lng-investments-vanish-in-2020-as-coronavirus-slashes-oil-and-gas-prices-idUSKBN2602PY.*

[34] *See, e.g.,* DiSavinio, Reuters, "For LNG Developers, Another Year of Cancelled Projects" (May 18, 2021), *https://www.reuters.com/business/energy/lng-developers-another-year-canceled-projects-2021-05-18/;* Shiryaevskaya, Stapczynski & Ratcliffe, Bloomberg, "King of LNG Undercuts Rivals to Keep Dominating World Market" (May 19, 2021), *https://www.bloomberg.com/news/articles/2021-05-19/king-of-lng-undercuts-rivals-in-bid-to-dominate-global-market;* Stapczynski, Bloomberg, "Global LNG Market Faces Shakeup from Japan's Green Shift" (Jul. 26, 2021), *https://www.bloomberg.com/news/articles/2021-07-26/japan-s-green-ambitions-threaten-the-lng-market-it-helped-create.*

[35] PHMSA also notes that, even as there is less certainty regarding the potential benefits associated with the LNG by Rail final rule, there is greater scientific certainty that one of those potential benefits would entail significant environmental consequences. Specifically, the LNG by Rail final rule touted the potential for increased natural gas (methane) production as a potential *benefit* of that rulemaking. *See, e.g.,* 85 FR 44995. However, more recent science has underscored the urgency of limiting such additional production for avoiding the worst consequences from anthropogenic climate change from indirect emissions associated with production and transportation activity. *See, e.g.,* "Sixth Assessment Report—Working Group I: Physical Science Basis" at TS–68, 6–11, 6–73 (Aug. 2021), *https://www.ipcc.ch/report/ar6/wg1/#FullReport* (last visited Aug. 19, 2021) (explaining the urgency of reducing GHG emissions—in

Continued

the underlying economic dynamics driving the potential benefits and public safety and environmental risks considered in the LNG by Rail final rule have increased (*e.g.,* the quantity of LNG that will move by rail, the routes involved, and whether new transportation capacity would induce more natural gas extraction). PHMSA believes these increased uncertainties cast doubt on the continued validity of the balance between potential benefits and public safety and environmental risks underpinning the LNG by Rail final rule.

A temporary suspension, however, will give PHMSA and FRA the opportunity to complete a comprehensive evaluation of the benefits and risks of rail tank car transportation of LNG in the companion rulemaking before any LNG moves by rail under the HMR. Although—as explained below—PHMSA and FRA understand that rail tank car transportation of LNG is neither occurring nor expected to occur in the near future, temporary suspension of the LNG by Rail final rule ensures avoidance of potential risks to public and worker safety and the environment from such transportation while that parallel rulemaking proceeds. Suspension would also ensure HMR authorization of rail transportation of LNG reflects the ''best science'' available,[36] including additional information obtained from the ongoing and delayed research efforts of the LNG Task Force, the forthcoming TRB Phase II Report expected in mid-2022, and continuing developments in scientific understanding of the near-term risks of climate change from enhanced natural gas transportation investments. Suspension would allow consideration of additional public comment, particularly on issues such as public and worker safety, environmental risks, and environmental justice, as well as on any additional testing or other information generated by PHMSA, FRA, and the TRB.

Therefore, PHMSA proposes to add a new special provision 439 prohibiting

LNG transportation in rail tank cars until issuance of a final rule concluding the rulemaking proceeding under RIN 2137–AF54, or June 30, 2024, whichever is earlier.

*B. No Material Adverse Impact on Reliance Interests*

PHMSA does not expect temporary suspension of transporting LNG by rail tank car will have a material adverse impact on serious reliance interests. Despite issuance of the LNG by Rail final rule in July 2020, LNG has not been transported in rail tank cars, and PHMSA is unaware of any planned movements in the near future. The development of the necessary infrastructure—in particular, construction of DOT–113C120W9 tank cars—to transport LNG by rail under the HMR demands significant financial investment, long-term commitment, and considerable planning. The DOT–113C120W9 tank car was introduced for LNG transport and would be impractical for use with other hazardous materials because another, more feasible specification (*i.e.,* DOT–113C120W) is already available for other Class 2 cryogenic flammable liquids that are authorized to be transported by rail. Therefore, a dedicated LNG tank car fleet would need to be built, and there may be construction delays because of limited capacity in the rail car manufacturing industry. At this time, PHMSA is unaware of any orders having been placed for manufacture of new DOT–113C120W9 tank cars.

Nor are PHMSA and FRA aware of near-term plans to transport LNG in existing DOT–113 rail tank cards under DOT–SP 20534. ETS, the holder of DOT–SP 20534, is a subsidiary of New Fortress Energy Inc. (NFE) according to documents filed with the U.S. Securities and Exchange Commission (SEC). NFE develops and operates energy infrastructure, including LNG terminals, power generation facilities, and natural gas logistics infrastructure, and provides supply and logistics services to customers both domestically and internationally. NFE noted in its Q2–2021 Form 10–Q: Quarterly Report filed in August with the SEC that it has not yet issued a final notice to proceed to its engineering, procurement, and construction contractors for its liquefaction facility in Wyalusing, PA— an origination-point for the route authorized by PHMSA in DOT–SP 20534.[37] Further, noting the volatility of

the current LNG market, NFE admits ''there can be no assurances that [it] will complete the Pennsylvania Facility or be able to supply [its] Facilities with LNG produced at [its] own Liquefaction Facilities.'' PHMSA also understands that NFE's Wyalusing, PA, facility is the subject of a pending, contested petition for Declaratory Order filed with the Federal Energy Regulatory Commission (FERC) that may determine whether that facility requires a FERC certificate before operating as an LNG export terminal.[38]

Nevertheless, while PHMSA does not expect the transport of LNG by rail tank car in the near future for the reasons discussed above, shippers may continue to seek authorization to transport LNG by rail in rail tank cars pursuant to a DOT SP issued by PHMSA or in portable tanks subject to an approval by FRA. PHMSA's SP procedures thoroughly explain the information applicants must include in their application and PHMSA's process, which includes public docketing, an opportunity for public comment, and an explanation for why an application is granted or denied.[39] The procedures also include an opportunity for reconsideration and an appeal process, after which a decision is the final administrative action.[40] FRA's approval process has similar procedures. Indeed, FRA recently received a petition from Alaska Railroad Corporation to extend an FRA approval to ship LNG by rail in portable tanks. In response to the requested extension, FRA published a notice of conditional approval and initiated a 60-day comment period ending on August 23, 2021, to ensure that FRA had opportunity to consider any additional views or information that stakeholders provided.[41] As PHMSA is unaware of any potential near-term movement of LNG by rail tank cars and any potential shippers could avail themselves of the SP (for the potential transportation of LNG by rail tank car) or FRA approval processes (for the potential transportation of LNG by portable tank on rail cars), PHMSA expects the proposed suspension of LNG by rail transportation to have a minimal economic impact. For more

---

particular, short-term contributors such as methane); Intl. Energy Agency, ''Net Zero by 2050: A Roadmap for the Global Energy Sector'' at 99 (May 2021) (noting the urgency of avoiding new natural gas production fields in order to meet net-zero policy goals).

[36] *See* ''Presidential Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking'' (Jan. 27, 2021), *https://www.whitehouse.gov/briefing-room/ presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/ (requiring* Federal agencies to make ''evidence-based decisions'' informed by the ''best available science and data'' in their regulatory activity).

[37] New Fortress Energy Inc. 10–Q Quarterly Report for Quarter Ending June 30, 2021, (Aug. 6, 2021), *https://sec.report/Document/0001140361-21-027401/.* PHMSA also notes that ETS is required by

¶ 12 of DOT–SP 20534 to provide periodic reports on the status of efforts to manufacture and deliver tank cars intended for use pursuant to that SP.

[38] *See* FERC Docket No. CP20–524 (in re Petition for Declaratory Order of Bradford County Real Estate Partners LLC). Should FERC declare that an export facility certificate is needed, it could take an additional two years (or longer) to obtain that certificate from FERC.

[39] 49 CFR part 107, subpart B.

[40] 49 CFR part 107, subpart B.

[41] FRA, ''Notice of Conditional Approval,'' 86 FR 33472 (Jun. 24, 2021).

information, see discussion of the cost analysis in accordance with Executive Order 12866 ("Regulatory Planning and Review").[42]

However, PHMSA solicits comment from stakeholders on potential economic, public safety, and environmental benefits and adverse impacts of the proposed rulemaking. PHMSA also solicits comments on the length of its proposed suspension period and whether PHMSA should modify its proposed expiration date. PHMSA notes that it selected the proposed date (June 30, 2024) for expiration of the temporary suspension to give PHMSA adequate time to incorporate the results of the forthcoming TRB Phase II Report—expected in mid-2022—within its companion rulemaking under RIN 2137–AF54.

## IV. Regulatory Analyses and Notices

### A. Statutory/Legal Authority

This NPRM is published under the authority of the Federal Hazardous Materials Transportation Act (HMTA; 49 U.S.C. 5101–5127). Section 5103(b) of the HMTA authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." The Secretary has delegated the authority granted in the HMTA to the PHMSA Administrator at 49 CFR 1.97(b).

### B. Executive Order 12866 and DOT Regulatory Policies and Procedures

Executive Order 12866 ("Regulatory Planning and Review")[43] requires that "agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." Agencies should consider quantifiable measures and qualitative measures of costs and benefits that are difficult to quantify. Further, Executive Order 12866 requires that "agencies should select those [regulatory] approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach." Similarly, DOT Order 2100.6A ("Rulemaking and Guidance Procedures") requires that regulations issued by PHMSA and other DOT Operating Administrations should consider an assessment of the potential benefits, costs, and other important impacts of the proposed action and

should quantify (to the extent practicable) the benefits, costs, and any significant distributional impacts, including any environmental impacts.

Executive Order 12866 and DOT Order 2100.6A require that PHMSA submit "significant regulatory actions" to the Office of Management and Budget (OMB) for review. This rulemaking is considered a significant regulatory action under section 3(f)(4) of Executive Order 12866 because the temporary suspension of the LNG by Rail final rule could raise novel legal or policy issues. This NPRM has, therefore, been reviewed by OMB.

As discussed at greater length above, PHMSA does not expect that the proposed temporary suspension of the amendments adopted in the LNG by Rail final rule will have material, adverse impacts. Should the proposed rule be adopted such that HMR authorization to move LNG by rail tank car is temporarily suspended, no LNG could move under the HMR in a rail tank car until PHMSA completes its companion rulemaking under RIN 2137–AF54, or June 30, 2024, whichever is earlier. Notwithstanding the considerable uncertainties regarding the market demand for rail tank car transportation of LNG, PHMSA expects little or no LNG transportation by rail tank car would have moved during the proposed suspension period for the reasons explained above; therefore, PHMSA expects little or no direct economic impact of a temporary suspension. Indeed, PHMSA's temporary suspension may in fact reduce economic burden by discouraging a shipper from ordering rail tank cars compliant with the LNG by Rail final rule when the companion rulemaking (under RIN 2137–AF54) may adopt different requirements. Additionally, should any potential shippers need to transport LNG by rail tank car during the suspension period, they could avail themselves of the PHMSA SP or FRA approval processes for such transport. Further, as explained below, temporary suspension guarantees avoidance of potential adverse public safety and environmental impacts (including, but not limited to, contribution of direct and indirect GHG emissions) that could have arisen from rail tank car transportation of LNG under the HMR. Lastly, PHMSA notes that the limited duration of its proposed suspension would also mitigate any adverse economic, public safety, or environmental impacts that could arise.

PHMSA acknowledges that, in the (unlikely) event demand for rail tank car transportation under the LNG by Rail final rule would materialize during the

suspension period in the absence of this rule, the proposed temporary suspension could result in procedural or compliance costs, lost business opportunities, and safety and environmental risks. Obtaining and complying with the conditions imposed within PHMSA-issued DOT SPs and FRA approvals authorizing rail transportation of LNG would incur costs due to regulatory uncertainty, as well as delay and compliance burdens. Each of those consequences would entail higher procedural or compliance costs, which could in turn result in lost business opportunities, or at minimum, diminish the business benefits of rail transportation of LNG.[44] Further, the DOT SP and FRA approval alternatives would entail unique public safety and environmental risks, which are a function of the conditions imposed by each of PHMSA and FRA in each authorization.

Alternatively, the unavailability of HMR authorization for rail tank car transportation of LNG could prompt shipping LNG by highway via MC–338 insulated cargo tanks. This alternative may involve higher costs than rail transportation, as each MC–338 cargo tank (which has approximately half the capacity of a DOT–113 tank car) would have to be shipped individually, likely forfeiting the economies of scale from rail transportation via tank car (under the LNG by Rail final rule or a DOT SP) or ISO tank (under an FRA approval). For this reason, PHMSA does not expect shippers to opt for LNG transportation via MC–338 cargo tank as a substitute for rail tank car transportation pursuant to the LNG by Rail final rule. To the extent that transportation via MC–338 cargo tank does occur, it would entail different environmental risks (including, but not limited to, greater risk of accidents and more direct GHG emissions than rail transportation of the same volume of LNG) than the transportation of LNG by rail tank car.[45]

Therefore, PHMSA expects that, in the event that the proposed suspension of the LNG by Rail final rule has any adverse economic impact, it would consist largely of lost business opportunities as a result of higher procedural or compliance costs and lower economies of scale from

---

[42] 58 FR 51735 (Oct. 4, 1993).

[43] Ibid.

[44] *See, e.g.,* Docket No. PHMSA–2018–0025–00478 at 5, 30 (noting that the grantee of DOT–SP 20534 has indicated that it was unlikely to employ ISO tanks for rail transportation of LNG because of the high costs of that approach) *and* 35 (noting the potential for LNG by Rail final rule to create new business opportunities).

[45] *Id.* at 33–34, 56 (discussing higher direct GHG emissions from highway transportation) *and* 37–38 (discussing higher risk of crashes from highway transportation).

alternatives to rail transportation under the LNG by Rail final rule. Any such adverse economic impacts are expected to be unlikely and time-limited. Further, any lost business opportunities could be offset by avoided safety and environmental risks if the suspension reduces the transportation of LNG (*i.e.,* if it prevents transportation or production of LNG that would otherwise occur).

Because temporary suspension of the LNG by Rail final rule entails limited risk of adverse economic impact even as it guarantees avoidance of potential public safety and environmental impacts (including significant environmental risks such as indirect GHG emission contributions to climate change), PHMSA submits the proposed HMR amendments herein. PHMSA solicits comment from stakeholders on potential impacts of the proposed rulemaking.

*C. Executive Order 13132*

PHMSA analyzed this rulemaking in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism")[46] and its implementing Presidential Memorandum ("Preemption").[47] Executive Order 13132 requires agencies to assure meaningful and timely input by State and local officials in the development of regulatory policies that may have "substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government."

This rulemaking may preempt State, local, and Native American Tribe requirements, but does not propose any regulation that has substantial direct effects on the States, the relationship between the States, and the States, or the distribution of power and responsibilities among the various levels of government.

The Federal hazmat law contains an express preemption provision at 49 U.S.C. 5125(b) that preempts State, local, and Tribal requirements on certain covered subjects, unless the non-federal requirements are "substantively the same" as the Federal requirements, including the following:

(1) The designation, description, and classification of hazardous material;

(2) the packing, repacking, handling, labeling, marking, and placarding of hazardous material;

(3) the preparation, execution, and use of shipping documents related to

hazardous material and requirements related to the number, contents, and placement of those documents;

(4) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material; and

(5) the design, manufacture, fabrication, inspection, marking, maintenance, recondition, repair, or testing of a packaging or container represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

This rule addresses subject items (2) and (5) above, which are covered subjects, and therefore, non-federal requirements that fail to meet the "substantively the same" standard are vulnerable to preemption under the Federal hazmat law. Moreover, PHMSA will continue to make preemption determinations applicable to specific non-federal requirements on a case-by-case basis, using the obstacle, dual compliance, and covered subjects tests provided in Federal hazmat law.

This rule also incorporates certain FRA requirements under the former Federal Railroad Safety Act of 1970, as repealed, revised, reenacted, and recodified (FRSA; 49 U.S.C. 20106), and the former Safety Appliance Acts, as repealed, revised, reenacted, and recodified (SAA; 49 U.S.C. 20301–20302, 20306) that may potentially preempt certain State requirements. Such FRSA and SAA requirements would apply to certain operators and offerors of LNG by Rail tank cars, including operational requirements for distributed power or two-way end-of-train (EOT) power braking systems.

*D. Executive Order 13175*

PHMSA analyzed this rulemaking in accordance with the principles and criteria contained in Executive Order 13175 and DOT Order 5301.1 ("Department of Transportation Policies, Programs, and Procedures Affecting American Indians, Alaska Natives, and Tribes"). Executive Order 13175 and DOT Order 5301.1 require DOT Operating Administrations to assure meaningful and timely input from Native American Tribal government representatives in the development of rules that significantly or uniquely affect tribal communities by imposing "substantial direct compliance costs" or "substantial direct effects" on such communities or the relationship and distribution of power between the Federal government and Native American Tribes.

In addition to the petitions filed by the environmental groups and State attorneys general mentioned above, the

Puyallup Tribe also challenged the LNG by Rail final rule and alleged violations of the Tribal consultation protocols under the National Historic Preservation Act and Executive Order 13175 and disparate impacts on the Tribe in violation of Executive Order 12898 and Title VI of the Civil Rights Act of 1964.

PHMSA assessed the impact of this rulemaking and expects that it will not significantly or uniquely affect Tribal communities or Native American Tribal governments. This rulemaking does not impose substantial compliance costs on Native American Tribal governments, nor does it mandate Tribal action. Insofar as PHMSA expects the rulemaking would not adversely affect the safe transportation of hazardous materials generally, PHMSA does not expect it would entail disproportionately high adverse risks for Tribal communities. PHMSA submits that the proposed rulemaking could in fact reduce risks to Tribal communities, as it could avoid the release of hazardous materials by railroad in the vicinity of Tribal communities. For these reasons, PHMSA does not expect the funding and consultation requirements of Executive Order 13175 and DOT Order 5301.1 to apply. However, PHMSA solicits comment from Native American Tribal governments and communities on potential impacts of the proposed rulemaking.

*E. Regulatory Flexibility Act and Executive Order 13272*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires agencies to consider whether a rulemaking would have a "significant economic impact on a substantial number of small entities" to include small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations under 50,000. The Regulatory Flexibility Act directs agencies to establish exceptions and differing compliance standards for small businesses, where possible to do so and still meet the objectives of applicable regulatory statutes. Executive Order 13272 ("Proper Consideration of Small Entities in Agency Rulemaking")[48] requires agencies to establish procedures and policies to promote compliance with the Regulatory Flexibility Act and to "thoroughly review draft rules to assess and take appropriate account of the potential impact" of the rules on small businesses, governmental jurisdictions,

---

[46] 64 FR 43255 (Aug. 10, 1999).

[47] 74 FR 24693 (May 22, 2009).

[48] 67 FR 53461 (Aug. 16, 2002).

and small organizations. The DOT posts its implementing guidance on a dedicated web page.[49]

This rulemaking has been developed in accordance with Executive Order 13272 and DOT's procedures and policies to promote compliance with the Regulatory Flexibility Act to ensure that potential impacts of draft rules on small entities are properly considered. As explained above, PHMSA expects that the temporary suspension of the LNG by Rail final rule proposed herein will not have a significant economic impact generally, much less a significant economic impact on a substantial number of small entities. However, PHMSA solicits comments on the anticipated economic impacts to small entities.

*F. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), no person is required to respond to any information collection unless it has been approved by OMB and displays a valid OMB control number. Pursuant to 44 U.S.C. 3506(c)(2)(B) and 5 CFR 1320.8(d), PHMSA must provide interested members of the public and affected agencies an opportunity to comment on information collection and recordkeeping requests.

PHMSA has analyzed this NPRM in accordance with the Paperwork Reduction Act. PHMSA currently accounts for security plan burdens under OMB Control Number 2137–0612, "Hazardous Materials Security Plans." In the LNG by Rail final rule, PHMSA required any rail carrier transporting a tank car quantity of UN1972 (Methane, refrigerated liquid (cryogenic liquid) or Natural gas, refrigerated liquid (cryogenic liquid)) to comply with the additional rail transportation safety and security planning requirements. Following publication of the LNG by Rail final rule, PHMSA published both a 60-day[50] and 30-day[51] notice and comment to provide an opportunity for public comment on the estimated increase in burden. PHMSA did not receive comments to either notice. Subsequently, PHMSA submitted the revision to OMB and received approval for the increased burden. As PHMSA proposes a temporary suspension of the authorization to ship LNG by rail tank car, as was codified in the LNG by Rail final rule, PHMSA estimates this rulemaking would result in a decrease in the burden associated with additional rail transportation safety and security planning requirements. The following reflects this estimated decrease in burden:

| Decrease in primary route analysis | Change in number of railroads | Decrease in number of routes | Burden hours per route | Decrease in total burden hours | Salary cost per hour[52] | Decrease in total salary cost | Decrease in total burden cost |
|---|---|---|---|---|---|---|---|
| Class I Railroads ........... | 0 | (2) | 80 | (160) | $73.98 | ($11,837) | $0 |
| Class II Railroads ......... | 0 | (1) | 80 | (80) | 73.98 | (5,919) | 0 |
| Class III Railroads ........ | 0 | (1) | 40 | (40) | 73.98 | (2,959) | 0 |
| Total ..................... | 0 | (4) | .................... | (280) | .................... | (20,715) | 0 |

| Decrease in alternate route analysis | Change in number of railroads | Decrease in number of routes | Burden hours per route | Decrease in total burden hours | Salary cost per hour[53] | Decrease in total salary cost | Decrease in total burden cost |
|---|---|---|---|---|---|---|---|
| Class I Railroads ......... | 0 | (2) | 120 | (240) | $73.98 | ($17,756) | $0 |
| Class II Railroads ......... | 0 | (1) | 120 | (120) | 73.98 | (8,878) | 0 |
| Class III Railroads ........ | 0 | (1) | 40 | (40) | 73.98 | (2,959) | 0 |
| Total ..................... | 0 | (4) | .................... | (280) | .................... | (29,593) | 0 |

*Total AnnualDecrease in Number of Respondents:* 0.

*Total Annual Decrease in Number of Response:* 8.

*Total Annual Decrease in Burden Hours:* 680.

*Total Annual Decrease in Salary Costs:* $50,308.

*Total Annual Decrease in Burden Costs:* $0.

PHMSA requests comments on the information collection and recordkeeping burden that would be reduced by the temporary suspension of the LNG by Rail final rule. Address written comments to the DOT Docket Operations Office as identified in the **ADDRESSES** section of this rulemaking. Comments regarding information collection burdens must be received prior to the close of the comment period identified in the **DATES** section of this rulemaking. Requests for a copy of this information collection should be directed to Steven Andrews or Shelby Geller, (202) 366–8553, *ohmspra@dot.gov,* Standards and Rulemaking Division (PHH–10), Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590–0001. If these proposed HMR amendments are adopted in a final rule, PHMSA will submit the revised information collection and recordkeeping requirements to OMB for approval.

*G. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA; 2 U.S.C. 1501 *et seq.*) requires agencies to assess the effects of Federal regulatory actions on State, local, and Tribal governments, and the private sector. For any NPRM or final rule that includes a Federal mandate that may result in the expenditure by State, local, and Tribal governments, or by the private sector of $100 million or more in 1996 dollars in any given year,

[49] DOT, "Rulemaking Requirements Related to Small Entities," *https://www.transportation.gov/regulations/rulemaking-requirements-concerning-small-entities* (last visited Jun. 17, 2021).

[50] 85 FR 46220 (Jul. 31, 2020).

[51] 85 FR 73128 (Nov. 16, 2020).

[52] Occupation labor rates based on 2020 Occupational and Employment Statistics Survey (OES) for "Transportation, Storage, and Distribution Managers (11–3071)" in the Transportation and Warehousing industry. *See https://www.bls.gov/oes/current/oes113071.htm.* The hourly mean wage for this occupation ($50.53) is adjusted to reflect the total costs of employee compensation based on the BLS Employer Costs for Employee Compensation Summary, which indicates that wages for civilian workers are 68.3 percent of total compensation (total wage = wage rate/wage % of total compensation).

[53] Ibid.

the agency must prepare, amongst other things, a written statement that qualitatively and quantitatively assesses the costs and benefits of the Federal mandate.

This proposed rulemaking does not impose unfunded mandates under the UMRA. As explained above, it is not expected to result in costs of $100 million or more in 1996 dollars on either State, local, or Tribal governments, in the aggregate, or to the private sector in any one year, and is the least burdensome alternative that achieves the objective of the rule.

*H. Environmental Assessment*

The National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. 4321 *et seq.*), requires that Federal agencies analyze proposed actions to determine whether the action will have a significant impact on the human environment. CEQ implementing regulations (40 CFR parts 1500–1508) require Federal agencies to conduct an environmental review considering (1) the need for the action, (2) alternatives to the action, (3) probable environmental impacts of the action and alternatives, and (4) the agencies and persons consulted during the consideration process. DOT Order 5610.1C ("Procedures for Considering Environmental Impacts") establishes DOT procedures for evaluation of environmental impacts under NEPA and its implementing regulations.

(1) The Need for the Action

PHMSA has determined that the recommendations from the TRB committee, its ongoing research, and recent events stemming from the COVID–19 public health emergency predicate the need to re-evaluate the amendments authorized in the LNG by Rail final rule. Research activity that PHMSA had expected would enhance its understanding of the risks attendant rail transportation of LNG has been delayed, and uncertainties have increased in whether there will be any potential benefits, and in the underlying economic dynamics bounding those risks (*e.g.*, the quantity of LNG that will move by rail, and the routes involved). Therefore, PHMSA proposes to amend the HMR to suspend authorization of LNG transportation in a rail tank car pending further analysis and completion of a companion rulemaking that will consider changes to the conditions under which LNG could be moved by rail, to potentially include additional safety, environmental, and environmental justice protections. This action will provide PHMSA an opportunity to review recent actions

that could be obstacles to Administration policies promoting public health and safety, the environment, and climate change mitigation; and to evaluate the results of ongoing and delayed research efforts to ensure the safe transportation of LNG by rail tank car.

(2) Alternatives to the Action

In proposing this rulemaking, PHMSA is considering the following alternatives:

No Action Alternative

If PHMSA were to select the No Action Alternative, current regulations authorizing the transport of LNG in rail tank cars would remain in effect and no provisions would be amended or added. Therefore, the HMR would continue to authorize the transportation of LNG in DOT–113C120W9 tank cars with a 9/16-inch outer tank composed of TC–128B normalized steel. The following operational controls and safety measures would also remain in effect:

• Each tank car must be operated in accordance with § 173.319, which includes:

○ Testing of relief valves every 5 years

○ annual replacement of rupture discs

○ thermal integrity tests following an average daily pressure rise during any shipment exceeding 3 psig per day

○ other requirements specific to liquids in cryogenic tank cars.

• 49 CFR part 179, subpart F contains detailed design, construction, and operational requirements for DOT–113C120W tank cars with the specification suffix "9" to be used in rail transportation of LNG.

• Trains transporting 20 or more tank cars of LNG in a block, or 35 such tank cars throughout the train, must be equipped and operated with a two-way EOT device, pursuant to the requirements in 49 CFR part 232, subpart E, or a distributed-power (DP) locomotive as defined in 49 CFR 229.5.

• The offeror must remotely monitor each tank car while in transportation for pressure and location.

• The offeror must notify the carrier if the tank pressure rise exceeds 3 psig over any 24-hour period.

• Trains transporting any quantity of LNG must comply with the route planning requirements in § 172.820, which requires rail carriers transporting LNG by rail tank car to conduct an annual route analysis considering, at a minimum, 27 risk factors listed in appendix D to part 172.

• Each LNG tank car must have:

○ A reclosing pressure relief device with a start-to-discharge pressure of 75 psig;

○ a non-reclosing pressure relief device set to discharge at the tank test pressure;

○ a maximum permitted filling density (percent by weight) of 37.3 percent;

○ a design service temperature of −162 °C (−260 °F);

○ a maximum pressure when offered for transportation not to exceed 15 psig;

○ a minimum steel thickness, after forming, on the outer tank shell and tank heads of 9/16 inch, which is thicker than the requirement for other DOT–113C120W tank cars; and

○ an outer tank shell constructed of AAR TC–128, Grade B normalized steel plate as specified in § 179.100–7(a), which has a higher tensile strength of 81,000 psi which makes it stronger than that used for the existing DOT–113 outer shell.

The FEA, which—except for the finding of no significant impact therein—is adopted by reference into this NPRM, examined how the above requirements were imposed to reduce risks to human safety and the environment from the transportation of LNG in rail tank cars and incidents occurring as a result of this transportation.[54] The No Action Alternative would allow the shipment of LNG in rail tank cars, and PHMSA could continue to consider whether additional mitigations are necessary based on the expert recommendations from the TRB Phase I Report and results from ongoing and delayed research efforts.

Proposed Action Alternative

This alternative is the current proposal as it appears in this NPRM, proposing to add a new special provision to the HMR that would suspend the transportation of LNG in rail tank cars while PHMSA undergoes a comprehensive review to ensure the safe transportation of LNG by rail in accordance with ongoing research and incorporation of recommendations from the TRB, as well as the best available economic analysis and climate science. Rail transport of LNG would be permitted only on an *ad hoc* basis as authorized by the conditions of a PHMSA special permit (49 CFR 107.105) or in a portable tank secured to a rail car pursuant to the conditions of an FRA approval (49 CFR 174.63). The proposed amendments included in this alternative are more fully discussed in

---

[54] *See* Docket No. PHMSA–2018–0025–0478.

the preamble and regulatory text sections of this NPRM.

(3) Probable Environmental Impacts of the Action and Alternatives

No Action Alternative

If PHMSA were to select the No Action Alternative, current regulations would remain in place without suspension. As described in the FEA, the No Action Alternative could pose risks to public safety and the environment because the authorization under the HMR to offer shipments of LNG by rail tank car would remain in place. LNG poses potential hazards as a cryogenic liquefied flammable gas, including cryogenic temperature exposure, fire, and asphyxiation hazards. Transportation of any hazardous material introduces risk to safety and the environment, and each additional tank car theoretically increases the overall risk of an incident occurring and the quantity that could be released in the event of a derailment. While this is true for all hazardous materials transportation, PHMSA seeks to better understand the risks inherent to LNG transportation in the DOT–113C120W9, especially given the LNG by Rail final rule authorized large quantities to be transported at some point in the future. The 2020 FEA explained that transporting LNG in rail tank cars is expected to be safer than transporting LNG by truck on highways—however, it is possible that allowing LNG to be transported in rail tank cars would increase the amount of LNG transported, and therefore a direct comparison of the risks by rail and highway may be misleading. PHMSA will also consider, based on existing rail infrastructure locations and anticipated routes, whether transportation of LNG in rail tank cars could pose disproportionate harm or risk to communities of color or low-income communities. As described in the preamble to this proposed rule, various market and other uncertainties exist regarding specific routes that may be used for the transport of LNG by rail tank car.

No release of LNG vapor to the environment is allowed during the normal transportation of LNG in tank cars whether by roadway or railway. However, methane is odorless, and LNG contains no odorant, making detection of a release resulting from an incident difficult without a detection device. Releases of LNG due to venting or to accidents, without immediate ignition, involving either an MC–338 cargo tank, a portable tank, or a DOT–113C120W9 rail tank car have the potential to create

flammable vapor clouds of natural gas because recently gasified LNG does not dissipate in the atmosphere as quickly as ambient-temperature natural gas. Large releases of LNG due to the breach of the inner tank of these transport vessels could result in a pool fire, vapor fire, and explosion hazards if methane vapors become confined. These flammability hazards pose a risk of higher potential impacts than localized cryogenic hazards.

Some commenters to the LNG by Rail final rule argued that the authorization of LNG by rail would further incentivize the production of natural gas, which is a fossil fuel. Methane has much greater heat trapping potential in the atmosphere than carbon dioxide in the short term. Thus, methane is considered a potent GHG, and comprises a significant portion of the United States' GHG emissions. While methane leaks are highly unlikely during transportation in the DOT–113C120W9 due to tank car design, increased natural gas production could lead to indirect environmental impacts of increased methane emissions released during production, loading and unloading, or at other times during its life cycle. In considering whether the authorization could further incentivize the production of natural gas, PHMSA will consider the scope of existing natural gas production and transportation via natural gas pipeline and other modes of transportation.

The FEA for the LNG by Rail final rule discussed potential environmental benefits that could be associated with the authorization to transport LNG by rail tank car. First, PHMSA discussed that the authorization could allow for the delivery of natural gas to locations dependent on more polluting energy forms, such as coal, diesel, heating oil, or firewood.[55] Use of natural gas in such areas, whether foreign or domestic, could allow for a reduction in polluting and climate-warming emissions. Additionally, the authorization to transport LNG by rail tank car could potentially replace some shipments of LNG by highway. As discussed in the FEA for the LNG by Rail rule, highway

transportation is less efficient in comparison to rail transportation when considering fuel use, combustion emissions, and climate change impacts. However, in order to supplement, reduce, or replace highway transportation, rail infrastructure would need to exist between the origin and destination locations or be developed. Finally, the FEA explored industry claims that the authorization could incentivize the capture, storage, and liquefaction of natural gas over venting and flaring of natural gas during oil production and other industrial activities, in areas where natural gas pipeline capacity is unavailable. Facilitating the productive end use of by-product methane could reduce the venting and flaring of natural gas, which causes methane and carbon dioxide emissions. Similar to other above-described benefits, it is difficult to predict the extent to which industries would invest in the equipment, technology, and expertise necessary to pursue natural gas capture, storage, and liquefaction necessary to pursue LNG transportation by rail. A suspension of the authorization to transport LNG by rail could curtail these potential benefits in the near term.

Proposed Action Alternative

Under the Proposed Action Alternative, PHMSA would amend the HMR to suspend authorization of LNG transportation in rail tank cars pending further analysis and completion of a companion rulemaking or June 30, 2024, whichever is earlier. Therefore, the HMR would not authorize shippers to transport bulk quantities of LNG by rail tank car. Instead, LNG by rail would only be permitted pursuant to a DOT SP or in portable tanks subject to FRA approval. The Proposed Action Alternative would avoid the risks that transportation of LNG in rail tank cars, and particularly potential derailments of rail cars transporting LNG, could pose to public safety and the environment. PHMSA would be able to further consider whether the transportation of LNG could pose disproportionate harm or risk to communities of color and communities with low incomes, which have historically borne the brunt of deleterious Federal policy decisions. PHMSA would also be able to further consider whether shipping LNG in rail tank cars is consistent with public health and safety, environmental protection, and climate change mitigation; and to evaluate the results of ongoing and delayed research efforts and collaboration as part of an accompanying rulemaking under RIN 2137–AF54.

---

[55] *See, e.g.,* EPA, Press Release, ''State of Alaska and Fairbanks North Star Borough receive $14.7 Million EPA grant to improve air quality,'' (Nov. 2020), *https://www.epa.gov/newsreleases/state-alaska-and-fairbanks-north-star-borough-receive-147-million-epa-grant-improve-air* (''The Borough will use the grant funds to continue a woodstove changeout and conversion program focused on converting more wood burning appliances to cleaner burning liquid or gas-fueled heating appliances, which have a very low output of particulate pollution and higher fuel efficiency. Wood smoke contributes up to 60 to 80 percent of fine particle pollution levels measured in the Fairbanks North Star Borough.'').

Add. 100

However, as noted in the FEA for the LNG by Rail final rule, the use of MC–338 cargo tanks and portable tanks for LNG could increase over time if rail transport in tank cars were not authorized. Thus, shippers could have to rely on less efficient transportation mechanisms in the interim, as highway transportation requires more vehicles to move the same amount of material as rail transportation—if this occurs, the potential environmental benefits that could result from the transportation of bulk quantities of LNG by rail car discussed above would not be realized in the short term. However, as explained above, PHMSA does not expect that significant quantities of LNG would be shipped in rail tank cars during the suspension period. Further, the loss of economies of scale associated with transport of LNG by rail tank car could inhibit switching to MC–338 cargo tanks.

(4) Agencies and Persons Consulted During the Consideration Process

PHMSA has coordinated with FRA, the Federal Aviation Administration, the Federal Motor Carrier Safety Administration, and the U.S. Coast Guard in the development of this proposed rule. The NPRM has also been made available to other Federal agencies within the interagency review process contemplated under Executive Order 12866. PHMSA solicits, and will consider, comments on the NPRM's potential impacts on safety and the environment submitted by members of the public, State and local governments, Tribal communities, and industry.

(5) Proposed Finding of No Significant Impact

The adoption of the Proposed Action Alternative's proposed suspension would prohibit the transportation of LNG in rail tank cars while PHMSA and FRA undertake a comprehensive analysis of safety and environmental issues associated with the transportation of LNG by rail. As such, PHMSA expects that the HMR amendments in the NPRM would have no significant impact on the human environment. PHMSA expects that the Proposed Action Alternative would allow PHMSA to review new information to evaluate the potential impact on safety, environmental justice, and GHG emissions. Further, based on PHMSA's analysis of these provisions described above and insofar as there has been no significant progress toward the movement of LNG by rail tank car, PHMSA proposes to find that codification and implementation of the proposed rule would not result in a significant impact to the human environment.

PHMSA welcomes any views, data, or information related to environmental impacts that may result from NPRM's proposed requirements, the No Action Alternative, and other viable alternatives and their environmental impacts.

*I. Executive Order 12898*

Executive Orders 12898 ("Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations"),[56] 13985 ("Advancing Racial Equity and Support for Underserved Communities Through the Federal Government"),[57] 13990 ("Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis"),[58] 14008 ("Tackling the Climate Crisis at Home and Abroad"),[59] and DOT Order 5610.2C ("Department of Transportation Actions to Address Environmental Justice in Minority Populations and Low-Income Populations") require DOT agencies to achieve environmental justice as part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects, including interrelated social and economic effects of their programs, policies, and activities on minority populations, low-income populations, and other underserved and disadvantaged communities.

PHMSA has evaluated this proposed rule under the above Executive Orders and DOT Order 5610.2C, and expects it would not cause disproportionately high and adverse human health and environmental effects on minority, low-income, underserved, and other disadvantaged populations and communities. The rulemaking is facially neutral and national in scope; it is neither directed toward a particular population, region, or community, nor is it expected to adversely impact any particular population, region, or community. And insofar as PHMSA expects the rulemaking would not adversely affect the safe transportation of hazardous materials generally, PHMSA does not expect the proposed revisions would entail disproportionately high adverse risks for minority populations, low-income populations, or other underserved and disadvantaged communities.

The proposed rulemaking could reduce risks to minority populations, low-income populations, or other underserved and disadvantaged communities. Insofar as the proposed HMR amendments could avoid the release of hazardous materials, the proposed rule could reduce risks to populations and communities— including any minority, low-income, underserved, and disadvantaged populations and communities—in the vicinity of railroad lines. However, as noted in the FEA for the LNG by Rail final rule, access to LNG may result in potential economic benefits for underserved communities because of the efficiencies of transporting LNG by rail, and thereby domestic production, distribution, and consumption of natural gas could increase. These potential economic benefits that could result from the transportation of bulk quantities of LNG by rail car would not be realized by underserved communities in the short term. In addition, to the extent that suspending shipment of LNG by rail car could increase demand for shipping LNG by truck on highways, the proposed HMR amendments could increase risks to environmental justice communities in the vicinity of those highways.

PHMSA solicits comment on potential impacts to minority, low-income, underserved, and other disadvantaged populations and communities of the proposed rulemaking.

*J. Privacy Act*

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *http://www.regulations.gov,* as described in the system of records notice (DOT/ALL– 14 FDMS), which can be reviewed at *http://www.dot.gov/privacy.* DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000,[60] or on DOT's website at *http://www.dot.gov/privacy.*

*K. Executive Order 13609 and International Trade Analysis*

Executive Order 13609 ("Promoting International Regulatory Cooperation")[61] requires that agencies must consider whether the impacts associated with significant variations between domestic and international regulatory approaches are unnecessary or may impair the ability of American business to export and compete

[56] 59 FR 7629 (Feb. 16, 1994).

[57] 86 FR 7009 (Jan. 25, 2021).

[58] 86 FR 7037 (Jan. 25, 2021).

[59] 86 FR 7619 (Feb. 1, 2021).

[60] 65 FR 19475 (Apr. 11, 2000).

[61] 77 FR 26413 (May 4, 2012).

Add. 101

internationally. In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

Similarly, the Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Pursuant to the Trade Agreements Act, the establishment of standards is not considered an unnecessary obstacle to the foreign commerce of the United States, so long as the standards have a legitimate domestic objective, such as providing for safety, and do not operate to exclude imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards.

PHMSA participates in the establishment of international standards in order to protect the safety of the American public. PHMSA has assessed the effects of this rulemaking to ensure that it does not cause unnecessary obstacles to foreign trade. While the proposal to suspend the transport of LNG by rail tank car has potential to impact the United States' export of bulk LNG internationally, there has been no significant reliance interest or progress toward the near-term movement of LNG by rail tank cars. As such, PHMSA expects the amendments herein to pose a minimal impact to international trade if adopted. Therefore, PHMSA proposes

to amend the HMR to suspend authorization of LNG transportation in a rail tank car pending further analysis to ensure potential future regulatory actions to allow bulk transport of LNG by rail promote public health and safety, the environment, and climate change mitigation. Accordingly, this rulemaking is consistent with Executive Order 13609 and PHMSA's obligations under the Trade Agreement Act, as amended.

*L. Executive Order 13211*

Executive Order 13211 ("Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use")[62] requires Federal agencies to prepare a Statement of Energy Effects for any "significant energy action." Executive Order 13211 defines a "significant energy action" as any action by an agency (normally published in the **Federal Register**) that promulgates, or is expected to lead to the promulgation of, a final rule or regulation that (1)(i) is a significant regulatory action under Executive Order 12866 or any successor order and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy (including a shortfall in supply, price increases, and increased use of foreign supplies); or (2) is designated by the Administrator of the Office of Information and Regulatory Affairs (OIRA) as a significant energy action.

Although this proposed rule is a significant action under Executive Order 12866, PHMSA expects it to have an annual effect on the economy of less than $100 million. Further, this action is not likely to have a significant adverse effect on the supply, distribution, or use of energy in the United States. While the proposal to suspend the transport of LNG by rail tank car has potential to impact the

supply, distribution, or use of energy in the United States, PHMSA does not anticipate any near-term movement of LNG by rail tank cars. For additional discussion of the anticipated economic impact of this rulemaking, please see discussion of the cost analysis in accordance with Executive Order 12866 ("Regulatory Planning and Review").

**List of Subjects in 49 CFR Part 172**

Education, Hazardous materials transportation, Hazardous waste, Incorporation by reference, Labeling, Markings, Packaging and containers, Reporting and recordkeeping requirements.

In consideration of the foregoing, PHMSA proposes to amend 49 CFR part 172 as follows:

## PART 172—HAZARDOUS MATERIALS TABLE, SPECIAL PROVISIONS, HAZARDOUS MATERIALS COMMUNICATIONS, EMERGENCY RESPONSE INFORMATION, TRAINING REQUIREMENTS, AND SECURITY PLANS

■ 1. The authority citation for part 172 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 2. In § 172.101, amend the Hazardous Materials Table by revising the entry for "Methane, refrigerated liquid *(cryogenic liquid) or* Natural gas, refrigerated liquid *(cryogenic liquid), with high methane content)*" to read as follows:

**§ 172.101   Purpose and use of hazardous materials table.**

\*      \*      \*      \*      \*

---

[62] 66 FR 28355 (May 22, 2001).

**61744**  **Federal Register** / Vol. 86, No. 213 / Monday, November 8, 2021 / Proposed Rules

## § 172.101—HAZARDOUS MATERIALS TABLE

| Symbols | Hazardous materials descriptions and proper shipping names | Hazard class or division | Identification numbers | PG | Label codes | Special provisions (§ 172.102) | Packaging (§ 173.***) | | | Quantity limitations (see §§ 173.27 and 175.75) | | Vessel stowage | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Exceptions | Non-bulk | Bulk | Passenger aircraft/rail | Cargo aircraft only | Location | Other |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8A) | (8B) | (8C) | (9A) | (9B) | (10A) | (10B) |
| * | * | * | * | * | * | * | * | * | * | * | | | |
| | Methane, refrigerated liquid (cryogenic liquid) or Natural gas, refrigerated liquid (cryogenic liquid, with high methane content). | 2.1 | UN1972 | | 2.1 | T75, TP5, 439, 440. | None | None | 318, 319 | Forbidden | Forbidden | D | 40 |
| * | * | * | * | * | * | * | * | * | * | * | | | |

Add. 103

■ 3. In § 172.102, revise paragraph (c)(1) by adding special provision 439 in numerical order to read as follows:

### § 172.102  Special provisions.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

439   UN1972 is not authorized for transportation by rail tank car until issuance of either a final rule concluding the rulemaking action proceeding under RIN 2137–AF54, or June 30, 2024, whichever occurs first. For information and the status of RIN 2137–AF54, please refer to the Office of Management and Budget's Office of Information and Regulatory Affairs at *www.reginfo.gov.*

\* \* \* \* \*

Issued in Washington, DC, on October 19, 2021, under authority delegated in 49 CFR 1.97.

**William S. Schoonover,**

*Associate Administrator for Hazardous Materials Safety, Pipeline and Hazardous Materials Safety Administration.*

[FR Doc. 2021–23132 Filed 11–5–21; 8:45 am]

**BILLING CODE 4910–60–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R4–ES–2021–0053; FF09E21000 FXES1111090FEDR 223]

RIN 1018–BF38

### Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Miami Tiger Beetle

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule; extension of comment period, and announcement of public hearing.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), are extending the public comment period on our September 7, 2021, proposed rule to designate critical habitat for the Miami tiger beetle (*Cicindelidia floridana*) under the Endangered Species Act of 1973 (Act), as amended. We are taking this action to conduct a public hearing and to allow all interested parties additional time to comment. Comments previously submitted need not be resubmitted and will be fully considered in preparation of the final rule.

**DATES:** *Comment submission:* The comment period for the proposed rule

published on September 7, 2021 (86 FR 49945), is extended. We will accept comments received or postmarked on or before December 23, 2021. Please note that comments submitted electronically using the Federal eRulemaking Portal (see **ADDRESSES,** below) must be received by 11:59 p.m. Eastern Time on the closing date, and comments submitted by U.S. mail must be postmarked by that date to ensure consideration.

*Public hearing:* On December 2, 2021, we will hold a public hearing from 6 to 7:30 p.m., Eastern Time, using the Zoom platform (for more information, see *Public Hearing,* below).

**ADDRESSES:** *Availability of documents:* You may obtain copies of the September 7, 2021, proposed rule and associated documents on the internet at *https:// www.regulations.gov* under Docket No. FWS–R4–ES–2021–0053.

*Comment submission:* You may submit written comments by one of the following methods:

(1) *Electronically:* Go to the Federal eRulemaking Portal: *https:// www.regulations.gov.* In the Search box, enter the RIN or docket number, which are displayed in the initial headings of this document. For best results, do not copy and paste the RIN or docket number; instead, type the RIN or docket number into the Search box using hyphens. Then, click on the Search button. On the resulting page, in the Search panel on the left side of the screen, under the Document Type heading, click on the Proposed Rule box to locate this document. You may submit a comment by clicking on ''Comment.'' Please ensure you have located the correct document before submitting your comments.

(2) *By hard copy:* Submit by U.S. mail to: Public Comments Processing, Attn: FWS–R4–ES–2021–0053, U.S. Fish and Wildlife Service, MS: PRB/3W, 5275 Leesburg Pike, Falls Church, VA 22041– 3803.

We request that you send comments only by the methods described above. We will post all comments on *https:// www.regulations.gov.* This generally means that we will post any personal information you provide us (see Public Comments, below, for more information).

**FOR FURTHER INFORMATION CONTACT:** Lourdes Mena, Division Manager, Florida Classification and Recovery, U.S. Fish and Wildlife Service, Florida Ecological Services Field Office, 7915 Baymeadows Way, Suite 200, Jacksonville, FL 32256–7517; telephone 904–731–3134. Persons who use a telecommunications device for the deaf

(TDD) may call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 7, 2021, we published a proposed rule (86 FR 49945) to designate critical habitat for the Miami tiger beetle under the Act. The proposed rule established a 60-day public comment period, ending November 8, 2021. During the comment period, we received a request for a public hearing. Therefore, we are announcing a public hearing and a 45-day extension of the September 7, 2021, proposed rule's comment period (see **DATES,** above) to allow the public an additional opportunity to provide comments on the proposed rule.

For a description of previous Federal actions concerning the Miami tiger beetle and information on the types of comments that would be helpful to us in promulgating this rulemaking action, please refer to the September 7, 2021, proposed rule (86 FR 49945).

### Public Hearing

We are holding a public hearing to accept comments on the proposed rule on the date and at the time listed in **DATES.** We are holding the public hearing via the Zoom online video platform and via teleconference so that participants can attend remotely. For security purposes, registration is required. All participants must register in order to listen and view the hearing via Zoom, listen to the hearing by telephone, or provide oral public comments at the hearing by Zoom or telephone. For information on how to register, or if technical problems occur joining Zoom on the day of the hearing, visit *https://www.fws.gov/southeast/ florida.* Registrants will receive the Zoom link and the telephone number for the public hearing. If applicable, interested members of the public not familiar with the Zoom platform should view the Zoom video tutorials (*https:// support.zoom.us/hc/en-us/articles/ 206618765-Zoom-video-tutorials*) prior to the public hearing.

The public hearing will provide interested parties an opportunity to present verbal testimony (formal, oral comments) regarding the September 7, 2021, proposed rule to designate critical habitat for the Miami tiger beetle (86 FR 49945). The public hearing will not be an opportunity for dialogue with the Service, but rather a forum for accepting formal verbal testimony. In the event there is a large attendance, the time allotted for oral statements may be limited. Therefore, anyone wishing to make an oral statement at the public

high-cost areas for which it is requesting to offer the high-cost area benefit. If the Administrator finds the particularized economic hardship showing is satisfied in accordance with the Commission's rules and orders, and any guidance from the Wireline Competition Bureau and the Office of Economics and Analytics, then the Administrator will approve the request and notify the participating provider. Otherwise, the Administrator will deny the request and provide the participating provider a written explanation of the basis for the denial.

(1) The Administrator will review applications within a timeline to be determined by the Bureau.

(2) Providers may appeal the Administrator's determination as set forth in subpart I in this part of the Commission's rules.

(3) Providers may only submit claims for up to the $30.00 standard benefit amount while an appeal of an Administrator's determination is underway. Following a successful appeal, providers approved to offer the high-cost area benefit may submit revised claims for eligible households in the approved high-cost areas as set forth in § 54.1808. The provider many submit revised claims for up to $75.00 only from the start of the approval period indicated in the appeal determination letter.

(d) *Annual renewal process.* A participating provider that has been approved to provide the high-cost area benefit must request approval annually thereafter to continue to provide the enhanced benefit to eligible households in a subsequent year. The participating provider will need to demonstrate particularized economic hardship in the renewal submission, through the documentation specified by the Wireline Competition Bureau. The deadline for submitting the renewal request shall be determined by the Wireline Competition Bureau.

(e) *Notice to eligible households.* (1) Participating providers approved to offer the high-cost area benefit shall provide Affordable Connectivity Program subscribers written notice when the provider begins applying the high-cost area benefit to the subscriber's bill. The written notice must state:

(i) That the subscriber is receiving a high-cost area benefit and the difference between the standard benefit amount and the enhanced high-cost benefit being applied to the subscriber's supported service;

(ii) That the receipt of the high-cost area benefit is contingent on the provider's annual continued eligibility to offer the enhanced high-cost area benefit;

(iii) That the provider is required to provide the subscriber advance notice if the provider is no longer deemed eligible to offer the high-cost area benefit; and

(iv) That the provider is required to provide the subscriber advance notice of any changes to the subscriber's supported service rate or service plan stemming from any loss of the provider's eligibility to offer the high-cost area benefit.

(2) If a participating provider fails to timely submit the renewal submission by the deadline or no longer qualifies to offer the high-cost area benefit based on its annual resubmission, then the participating provider shall provide written notice to its Affordable Connectivity Program customers receiving the high-cost area benefit at least 30 days and at least 15 days before the expiration of its approval to offer the high-cost area benefit. Such subscriber notices shall include:

(i) A statement that the provider will no longer be offering the high-cost area benefit in the relevant high-cost area;

(ii) The effective date of the end of the high-cost area benefit;

(iii) A statement that upon the effective date of the loss of the high-cost area benefit, the Affordable Connectivity Program supported service purchased by the household will no longer be discounted at the higher subsidy amount; and

(iv) The amount the household will be expected to pay if it continues purchasing the service from the provider after the high-cost area benefit is no longer available.

(3) If a participating provider is no longer authorized to offer the high-cost area benefit, the provider may transition an eligible household to a lower-priced ACP service plan once the high-cost area benefit is no longer available, upon advance notice to the household and an opportunity for the household to opt out of the change and remain on its current service plan or select another service plan. Participating providers must include the advance transition notice in the required written notice about the end of the provider's approval to offer the high-cost area benefit. The advanced notice must:

(i) Provide details about the new plan and monthly price;

(ii) State that the subscriber may remain on its current plan or choose another plan;

(iii) Provide instructions on how the subscriber can opt out of the transition or change its service plan;

(iv) Provide the deadline for the subscriber to notify the provider that the subscriber would like to remain on its current plan or choose another plan.

[FR Doc. 2023–18621 Filed 8–31–23; 8:45 am]

**BILLING CODE 6712–01–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Pipeline and Hazardous Materials Safety Administration**

**49 CFR Part 172**

**[Docket No. PHMSA–2021–0058 (HM–264A)]**

**RIN 2137–AF55**

**Hazardous Materials: Suspension of HMR Amendments Authorizing Transportation of Liquefied Natural Gas by Rail**

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** PHMSA, in coordination with the Federal Railroad Administration (FRA), is amending the Hazardous Materials Regulations to suspend authorization of liquefied natural gas (LNG) transportation in rail tank cars pursuant to a final rule published on July 24, 2020, pending the earlier of either completion of a companion rulemaking evaluating potential modifications to requirements governing rail tank car transportation of LNG, or June 30, 2025.

**DATES:** This final rule is effective on October 31, 2023.

**FOR FURTHER INFORMATION CONTACT:** Alexander Wolcott, Transportation Specialist, Standards and Rulemaking Division, Office of Hazardous Materials Safety, (202) 366–8553, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Overview
II. Background
  A. Historical Regulation of LNG by Rail
  B. A New Regulatory Approach and Enabling Research
  C. Another Hard Look Incorporating NASEM Recommendations and Ongoing Research Efforts
  D. East Palestine, OH Derailment
III. Discussion of Comments to the NPRM and Adoption of a Temporary Suspension of the July 2020 Final Rule
  A. Comments Requesting an Immediate, Permanent Ban of LNG by Rail
  B. Comments Requesting the Removal of the June 30, 2024, Sunset Date

C. Comments of General Support for the NPRM
D. Comments Alleging Chilling of Near-Term Demand for LNG Transportation by Rail Tank Car Pursuant to the July 2020 Final Rule
E. Comments Contending That the LNG by Rail Improves Safety
F. Comments Alleging Environmental Benefits From LNG by Rail
G. Comments Alleging PHMSA Is Overstepping its Authority by Attempting To Regulate Oil and Gas Production
H. Comments Alleging PHMSA Did Not Meet its Evidentiary Burden Under the APA for Temporary Suspension of the July 2020 Final Rule
I. Comments Alleging That PHMSA's Proposal Will Have Miscellaneous Adverse Consequences for Regulated Entities, the U.S. Economy, and National Security
J. Comments Beyond the Scope of This Rulemaking
IV. Regulatory Analyses and Notices
A. Statutory/Legal Authority
B. Executive Orders 12866 and 14094, and DOT Regulatory Policies and Procedures
C. Executive Order 13132
D. Executive Order 13175
E. Regulatory Flexibility Act and Executive Order 13272
F. Paperwork Reduction Act
G. Unfunded Mandates Reform Act of 1995
H. Environmental Assessment
I. Privacy Act
J. Executive Order 13609 and International Trade Analysis
K. Executive Order 13211
L. Cybersecurity and Executive Order 14028

## I. Overview

PHMSA, in coordination with FRA, is suspending recent amendments to the Hazardous Materials Regulations (HMR; 49 CFR parts 171–180) authorizing transportation of "Methane, refrigerated liquid," commonly known as liquefied natural gas (LNG) in DOT–113C120W9 specification rail tank cars while it conducts a thorough evaluation of the HMR's regulatory framework for rail transportation of LNG in a companion rulemaking under Regulatory Identification Number (RIN) 2137–AF54, and determines whether any modifications are necessary. Transportation of LNG by rail tank car has not occurred since the July 24, 2020, publication of a final rule authorizing transportation of LNG in rail tank cars[1] and there is considerable uncertainty regarding whether any would occur in the time it takes for PHMSA to consider

potential modifications to existing, pertinent HMR requirements. However, this temporary suspension of the HMR provisions authorizing transportation of LNG in rail tank cars guarantees no such transportation will occur before its companion rulemaking has concluded or June 30, 2025, whichever is earlier, thereby: (1) avoiding potential risks to public health and safety or environmental consequences (to include direct and indirect greenhouse gas (GHG) emissions)[2] that are being evaluated in the companion rulemaking under RIN 2137–AF54; (2) allowing for the completion of ongoing testing and evaluation efforts undertaken in collaboration with FRA, as well as further consideration of the recommendations from external technical experts of the National Academy of Sciences, Engineering, and Medicine (NASEM); (3) assuring an opportunity for the potential development of any mitigation measures and operational controls for rail tank car transportation of LNG; (4) reducing the potential for economic burdens by ensuring that entities avoid ordering rail tank cars for transporting LNG compliant with current HMR requirements when the companion rulemaking may adopt alternative requirements; and (5) enabling potential opportunities for stakeholders and the public to be apprised of, and comment on, the results of ongoing testing and evaluation efforts.

Towards that end, PHMSA is adding a new special provision 439 that prohibits LNG transportation in rail tank cars until issuance of a final rule concluding the rulemaking proceeding under a companion rulemaking under RIN 2137–AF54, or June 30, 2025, whichever is earlier. Rail transport of LNG may still be permitted as authorized by the conditions of a PHMSA special permit (SP) under § 107.105, or in a portable International Organization for Standardization (ISO) tank secured to a rail car pursuant to the conditions of an FRA approval under § 174.63. PHMSA is also adopting a modest extension (until June 30, 2025, at the latest) of the sunset for the temporary suspension period identified in its November 2021 notice of proposed

rulemaking in this proceeding,[3] consistent with comments received on the NPRM and information obtained after its publication evincing greater uncertainty regarding the near-term commercial viability and potential environmental and safety risks associated with rail tank car transportation of LNG as authorized by the July 2020 Final Rule.

## II. Background

### A. Historical Regulation of LNG by Rail

LNG is a natural gas that has been cooled and converted to a liquid form for easier and more efficient transportation. In the United States, pipelines have historically delivered most natural gas, although other modes of transportation—such as rail and highway—have accounted for a relatively minor portion of natural gas transportation, typically in the form of LNG. Before PHMSA published the July 2020 Final Rule, rail transportation of LNG would have been limited to UN portable tank shipments (commonly referred to as ISO tank shipments) under an FRA approval and shipments made under SPs issued by PHMSA. This approach reflected the unique safety risks presented by rail transportation of large volumes of LNG and the historically low demand to transport LNG by rail.

### B. A New Regulatory Approach and Enabling Research

Executive Order 13868 ("Promoting Energy Infrastructure and Economic Growth")[4] was signed in April 2019 and required PHMSA to treat LNG the same as other cryogenic liquids, authorize LNG to be transported in approved rail tank cars, and to finalize that rulemaking within 13 months.[5] In response, PHMSA published a notice of proposed rulemaking titled "Hazardous Materials: Liquefied Natural Gas by Rail"[6] in which it proposed to authorize the transportation of LNG in existing DOT–113C120W specification tank cars. The initial comment period for the NPRM closed on December 23, 2019, and was subsequently extended until January 13, 2020, following PHMSA's issuance to Energy Transport Solutions, LLC (ETS) in early December 2019 of

---

[1] PHMSA final rule "Hazardous Materials: Liquefied Natural Gas by Rail," 85 FR 44994 (Jul. 24, 2020) (July 2020 Final Rule). References within to "this Final Rule" or "the Final Rule" without qualification by reference to "July 2020" are meant to refer to this notice rather than its July 2020 Final Rule.

[2] PHMSA distinguishes between "direct" and "indirect" GHG emissions herein consistent with Council on Environmental Quality (CEQ) guidance. *See* CEQ, "National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change," 88 FR 1196 (Jan. 9, 2023), which builds upon and updates CEQ's 2016 "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews," 81 FR 51866 (Aug. 8, 2016).

[3] PHMSA, "Notice of Proposed Rulemaking—Hazardous Materials: Suspension of HMR Amendments Authorizing Transportation of Liquefied Natural Gas by Rail" 86 FR 61731 (Nov. 8, 2021) (NPRM).

[4] 84 FR 15495 (Apr. 15, 2019).

[5] The Secretary has delegated such rulemaking duties to the PHMSA Administrator. *See* 49 CFR 1.97.

[6] 84 FR 56977 (Oct. 24, 2019).

DOT–SP 20534 for the transportation of LNG by rail tank car.[7]

DOT–SP 20534 allowed the transportation of LNG in existing DOT–113 tank cars from Wyalusing, PA, to Gibbstown, NJ, with no intermediate stops. This SP contained safety controls including a requirement to conduct remote sensing for detecting and reporting internal pressure, location, leakage, and (prior to the initial shipment of a tank car under the SP) a requirement to provide training to emergency response agencies that could be affected on the route. DOT–SP 20534 expired by its terms on November 30, 2021, after ETS had not filed an application for renewal until November 29, 2021. After careful consideration, PHMSA denied ETS' application for renewal on March 31, 2023.[8]

In January 2020, PHMSA established a joint LNG Task Force with FRA to undertake testing and evaluation activity on the transportation of LNG that could inform potential future regulatory actions, as appropriate. In order to identify tasks within that effort, the LNG Task Force utilized a risk-based framework focused on knowing the risk, predicting the risk, reducing the risk, and preparing for the risk. Using that framework, the LNG Task Force identified and undertook 15 tasks to synthesize ongoing research and outreach activities. Those tasks included empirical review of international LNG transportation, safety and security route risk assessments, a re-evaluation of the costs and benefits of electronically controlled pneumatic (ECP) brakes, and the validation of emergency responders' opinions and needs. Although the LNG Task Force initially projected completion of its tasks by late 2021, much of its work was interrupted or delayed because of the coronavirus disease 2019 (COVID–19) public health emergency and because of subsequent modification of the scope of its activities. The ongoing efforts of the LNG Task Force are discussed further below.

In parallel with its work under the LNG Task Force, and pursuant to a mandate in the "Further Consolidated Appropriations Act, 2020" (Pub. L. 116–94), PHMSA and FRA partnered with NASEM to conduct a study on the transportation of LNG in rail tank cars through a committee of the Transportation Research Board (TRB).[9] The TRB commenced work in mid-July 2020. Roughly contemporaneous with the TRB beginning its work, PHMSA published the July 2020 Final Rule authorizing the shipment of LNG in new DOT–113C120W9 specification rail tank cars with enhanced outer tank requirements, subject to all applicable requirements and certain new operational controls. The July 2020 Final Rule became effective on August 24, 2020 and was swiftly followed by several petitions for judicial review. Specifically, six environmental groups, a coalition of attorneys general for 14 States and the District of Columbia, and the Puyallup Tribe of Indians filed separate petitions for review challenging the July 2020 Final Rule. All the petitioners asked the court to vacate the July 2020 Final Rule, alleging violations of the Hazardous Materials Transportation Act (HMTA; 49 U.S.C. 510 2012;5127), the Administrative Procedure Act (APA; 5 U.S.C. 553 *et seq.*), and the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*). The Puyallup Tribe also alleged violations of the Tribal consultation protocols under the National Historic Preservation Act (54 U.S.C. 300101 *et seq.*) and Executive Order 13175 ("Consultation and Coordination with Indian Tribal Governments"),[10] as well as disparate impacts on the Tribe in violation of Executive Order 12898 ("Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations")[11] and Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*). The petitions were subsequently consolidated within a single proceeding in the U.S. Court of Appeals for the District of Columbia Circuit[12] with the court granting PHMSA's motion to place the petitions in abeyance while PHMSA reviewed the July 2020 Final Rule.

PHMSA submitted the latest status report in that proceeding in early June 2023. The Court lifted the abeyance on July 18, 2023.[13]

*C. Another Hard Look Incorporating NASEM Recommendations and Ongoing Research Efforts*

Immediately after taking office, the Biden-Harris Administration issued Executive Order 13990 ("Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis")[14] on January 20, 2021. Executive Order 13990 required the review of agency regulations and other actions promulgated or adopted between January 20, 2017, and January 20, 2021, that are candidates for suspension, modification, or rescission because of inconsistency with Biden-Harris Administration policies to improve public health, protect the environment, prioritize environmental justice, and reduce GHG emissions. The Biden-Harris Administration identified the July 2020 Final Rule in a non-exclusive list[15] of agency actions that would be reviewed in accordance with Executive Order 13990. Additionally, section 7 of Executive Order 13990 revoked Executive Order 13868, along with several other executive orders and executive actions, and directed agencies to promptly take steps, consistent with applicable law, to rescind any rules or regulations that had been issued "implementing or enforcing" those executive orders and executive actions.

In response to Executive Order 13990, DOT published a notice on May 5, 2021, soliciting comment on potential candidates for review under Executive Order 13990 from among existing rules and other DOT actions.[16] DOT received one comment pertaining to the July 2020 Final Rule from the Transportation Trades Department of the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO). The commenter requested a reexamination of the July 2020 Final Rule as it believed that rulemaking "neglected to include meaningful safety measures to adequately address the

---

[7] 84 FR 70492 (Dec. 23, 2019) (DOT–SP 20534).

[8] 88 FR 24844, 2846 (Apr. 24, 2023). PHMSA formally informed ETS of the denial of its renewal application by email on March 31, 2023, noting that (1) ETS's renewal application had made no attempt to address the concerns raised in the NPRM in this proceeding, (2) nearly three and a half years after issuance of DOT–SP 20534, ETS had yet to provide evidence that it had procured either new DOT–113C120W9 tank cars or existing DOT–113C120W tank cars, and (3) the origin and destination facilities specified in DOT–SP 20534 had not been built and would need additional authorizations before construction could begin. ETS did not seek judicial review of the denial.

[9] In that legislation, Congress earmarked funds for the NASEM study for the express purpose of "inform[ing] rulemaking." NASEM maintains a website dedicated to the TRB committee's work that contains the TRB committee's charter, work product, meeting agendas, and other supporting material. *See* NASEM, "Safe Transportation of Liquefied Natural Gas by Railroad Tank Car," *https://www.nationalacademies.org/our-work/safe-transportation-of-liquefied-natural-gas-by-railroad-tank-car (last visited May 15, 2023).*

[10] 65 FR 67249 (Nov. 9, 2000).

[11] 59 FR 7629 (Feb. 16, 1994).

[12] Under docket no. 20–1317 (consolidated with docket nos. 20–1318, 20–1431, & 21–1009).

[13] On May 17, 2023, Petitioners filed a Joint Motion to Lift Abeyance and requested the D.C. Circuit Court to direct the parties to submit a proposed briefing schedule. PHMSA, through the Department of Justice, filed a response opposing the motion to lift the abeyance on June 6, 2023. The Petitioners filed a reply on June 13, 2023.

[14] 86 FR 7037 (Jan. 25, 2021).

[15] U.S. White House, "Fact Sheet: List of Agency Actions for Review," *https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ (last visited May 16, 2023).*

[16] 85 FR 23876 (May 5, 2021).

inherent risks to this type of operation." [17]

The TRB issued its Phase I Report on June 15, 2021,[18] which reviewed the plans and progress of the LNG Task Force and evaluated the relevance, completeness, and quality of those efforts. The Phase I Report generally praised the LNG Task Force's "comprehensive as planned" program for making effective use of a "number of long standing and high-quality research and testing programs." However, the TRB noted that the COVID–19 public health emergency resulted in delays in initiation and completion of several tasks. The TRB also noted that the interdependency of many of those outstanding tasks complicated its and the LNG Task Force's work in developing a complete understanding of the risks associated with the transportation of LNG in rail tank cars. Specifically, it expressed concern on the incomplete status of tasks pertaining to full-scale impact testing, portable tank pool fire testing, worst-case scenario analysis, and quantitative risk assessment. The Phase I Report made several recommendations including proposing that PHMSA and FRA make changes to the planned portable fire tank testing, assess the potential for cryogenic damage cascading to adjacent tanks, enhance the modeling for worst-case scenarios, evaluate explosion hazards from a spill of LNG resulting in vapor dispersion in an environment with confined or congested spaces, and add loading and unloading operations to the risk assessment. PHMSA subsequently modified its LNG Task Force testing activity in response to the Phase I Report recommendations by, among other things, undertaking each of the following: enhanced impact testing directed toward evaluating post-weld, heat-treated seams from a DOT–113C120W9–specification tank car; enhanced worst-case scenario modeling; performing an enhanced quantitative risk assessment; modification of ISO tank pool fire testing protocols to better simulate release conditions; and enhanced train dynamic simulations to better capture effects from use of distributed power and buffer car placement within a train consist transporting LNG.

On November 8, 2021, PHMSA published the NPRM in this rulemaking proceeding. In that NPRM, PHMSA reviewed pertinent economic data,

TRB's Phase I Report recommendations, and the status of ongoing work of the LNG Task Force en route to proposing a temporary suspension of the transportation of LNG by rail tank car until the earlier of either June 30, 2024, or the publication of a companion rulemaking under RIN 2137–AF54. PHMSA's proposal reflected its understanding that uncertainties acknowledged in the July 2020 Final Rule—*e.g.,* regarding the near-term commercial viability of rail tank car transportation of LNG, as well as potential safety and environmental benefits and risks of rail tank car transportation—had only increased since issuance, thereby "casti[ng] doubt on the continued validity of the balance between potential benefits and public safety and environmental risks underpinning the [July 2020 Final Rule]." [19] PHMSA therefore proposed a temporary suspension of the July 2020 Final Rule to allow time for PHMSA to review the results of the (then-forthcoming) TRB Phase II Report, complete ongoing LNG Task Force testing and evaluation activities, and (based on the results of those efforts) modify HMR requirements as appropriate within the companion rulemaking under RIN2137–AF54. The comment period closed on December 23, 2021. PHMSA received over 10,500 comments from private individuals, environmental groups, government officials, the rail industry, and other stakeholders. See Section III for further details.

The TRB issued its Phase II Report on September 9, 2022.[20] The Phase II Report involved a more comprehensive assessment than that undertaken in connection with the Phase I Report regarding topics relevant to the safe movement of LNG by rail tank car pursuant to both SPs and the HMR following issuance of the July 2020 Final Rule. Specifically, it examined bulk shipments of LNG by other modes of transportation (including vessel and highway) to identify the basic principles used in those modes for safety assurance. It also examined the effectiveness of regulatory requirements and industry practices (*e.g.,* pertaining to speed and routing, as well as other operational controls applicable to high-hazard flammable trains) intended to assure the safe transportation of bulk rail shipments of other hazardous materials.

The Phase II Report also made recommendations on necessary near- and long-term actions to improve the understanding of the risks associated with transporting LNG by rail tank car, mitigate those risks, and prevent and prepare for potential incidents. The first recommendation suggested launching an LNG safety assurance initiative before LNG tank cars are put in service. The safety assurance initiative would actively monitor initial plans for and early patterns of LNG traffic activity, including the locations and routes of shipments, the number and configuration of tank cars in trains, and reports of incidents involving a tank car or train carrying LNG. The second and final recommendation suggested that PHMSA and FRA should review the DOT–113C120W9 tank car specification to ensure that it adequately accounts for the cryogenic and thermal properties of LNG that could contribute to a tank release in the event of a rail incident and potential cascading impacts therefrom. The TRB's elaboration on its second recommendation emphasized the value in assessing each of the following: the capacity of the pressure relief devices on the new DOT–113C120W9-specification tank cars to vent a sufficient amount of LNG when the tank car is engulfed in an LNG fire in derailment conditions, including a rollover event; the effects of adding more and different types of insulation in the annular space to ensure sufficient performance of the multilayer insulation system when the tank car is exposed to heat flux and direct flame impingement from an LNG fire; and the potential for the outer tank of the DOT–113C120W9 tank car to experience cryogenic brittle failure and loss of vacuum insulation when exposed to an LNG pool fire. PHMSA subsequently adjusted its LNG Task Force testing activity in response to the Phase II Report recommendations by modifying its ongoing worst-case analysis modeling and quantitative risk assessment efforts to address the DOT–113C120W9-specification design element concerns raised by the TRB. In light of the new information received from the TRB reports and PHMSA's completed research and ongoing tests, PHMSA suspends the regulations adopted in the July 2020 Final Rule to allow PHMSA sufficient time to complete its analysis to reconsider the determinations made in the July 2020 Final Rule.

The LNG Task Force has completed most of its testing and evaluation activities (as modified in response to the TRB Phases I and II Reports). Of those remaining activities, PHMSA expects to

---

[17] Docket No. DOT–OST–2021–0036–0025.

[18] NASEM, "Preparing for LNG by Rail Tank Car: A Review of a U.S. DOT Safety Research, Testing, and Analysis Initiative" (Jun. 2021) (Phase I Report), *https://www.nap.edu/read/26221/chapter/1.*

[19] 86 FR at 61735–36.

[20] NASEM, "Preparing for LNG by Rail Tank Car: A Readiness Review" (Sep. 2022) (Phase II Report), *https://www.nap.edu/read/26719/chapter/1.*

Add. 108

complete its enhanced quantitative risk analysis and worse case analysis modeling no later than Q3–2023. This analysis has taken longer than expected because it was modified first to address concerns in the TRB Phase I Report in June 2021 and then again in response to the TRB Phase II Report issued in September 2022. PHMSA is in the process of contracting for performance of each of the following remaining tasks: (1) enhanced impact testing directed toward evaluating post-weld, heat-treated seams on a DOT–113C120W9-specification tank car in response to the TRB Phase I Report; and (2) enhanced train dynamic simulations to better capture effects from use of distributed power and buffer car placement within a train consist transporting LNG in response to the TRB Phase I Report.

## D. East Palestine, OH Derailment

On February 3, 2023, a mixed-consist freight train operated by Norfolk Southern Railway—comprised of two head-end locomotives, 149 railcars, and 1 distributed power locomotive— derailed in East Palestine, Ohio. Thirty-eight railcars derailed, including 11 tank cars carrying combustible liquid and flammable gas hazardous materials, though none of the railcars were carrying LNG. The derailment resulted in a fire impacting the derailed tank cars and damaging 12 additional railcars that had not derailed. Included in the derailment and fire were five DOT–105 specification tank cars containing vinyl chloride—a hazardous material classified as a Division 2.1 flammable gas. These DOT–105 specification tank cars were not punctured in the derailment. PHMSA is working with the National Transportation Safety Board to learn all it can from this incident and determine whether the lessons learned should inform rail transportation of other hazardous commodities such as LNG.

## III. Discussion of Comments to the NPRM and Adoption of a Temporary Suspension of the July 2020 Final Rule

The comment period for the NPRM in this proceeding closed on December 23, 2021. PHMSA received over 10,500 sets of comments to the rulemaking docket through and after the formal comment period; consistent with § 106.70, PHMSA considers late-filed comments to the extent possible. PHMSA considered all comments received in the development of this Final Rule. The comments submitted to this docket may be accessed via *http:// www.regulations.gov*. The following table categorizes the commenters. Please note that some commentors submitted multiple comments.

| Commenter | Count | Description and examples of category |
|---|---|---|
| Non-Government Organizations | 18 | Environmental Groups; Emergency Response Organizations; Other. |
| Government Officials | 8 | Local; State; Federal; Tribal. |
| Private Individuals | 10,126 | |
| Industry Stakeholders | 3 | Trade Associations; Shippers. |

Table of Commenters to the NPRM

Comments received could generally be summarized as advancing one or more of the following positions:

• Comments requesting an immediate, permanent ban of LNG by rail;

• Comments requesting the removal of the June 30, 2024, sunset date;

• Comments of general support for the NPRM;

• Comments alleging chilling of near-term demand for LNG transportation by rail tank car pursuant to the July 2020 Final Rule;

• Comments alleging that LNG by rail improves safety;

• Comments alleging environmental benefits from LNG by rail;

• Comments alleging PHMSA is overstepping its authority by attempting to regulate oil and gas production;

• Comments alleging PHMSA did not meet its evidentiary burden under the APA for temporary suspension of the July 2020 Final Rule;

• Comments alleging that PHMSA's proposal will have miscellaneous adverse consequences for regulated entities, the U.S. economy, and national security; and

• Comments beyond the scope of this rulemaking.

Based on the comments received in response to the NPRM, the recommendations in the TRB Phases I and II Reports, the ongoing LNG Task Force testing and evaluation activities, and pertinent information regarding the near-term commercial prospects for rail tank car transportation of LNG, PHMSA has concluded that a temporary suspension of the July 2020 Final Rule's authorization for rail tank car transportation of LNG in new DOT– 113C120W9-specification tank cars is appropriate. PHMSA finds that, consistent with the analysis in the NPRM, these resources indicate that the uncertainties described in the July 2020 Final Rule (*e.g.*, regarding whether, when and how LNG by rail tank car transportation will occur, and the safety and environmental risks and benefits of such transportation) have only increased since its issuance, calling into question the balance between potential benefits and public safety and environmental risks PHMSA understood itself to be striking in that rulemaking. In contrast (and as explained at greater length below in this Section III responding to comments received on the NPRM) a temporary suspension will ensure each of the following: (1) avoidance of potential safety risks to public and worker safety and the environment while PHMSA completes its companion rulemaking under RIN 2137–AF54; (2) HMR authorization of rail tank car transportation of LNG pursuant to that companion rulemaking reflects the best science by accounting for ongoing LNG Task Force testing and evaluation activities as informed by the TRB Phases I and II Report recommendations; (3) consideration of additional public comment from diverse stakeholders in that companion proceeding; and (4) minimizing the potential for economic burdens by ensuring that entities avoid ordering rail tank cars for LNG service compliant with the requirements of the July 2020 Final Rule when the companion rulemaking may alter those requirements.[21] *See* 86 FR at 61732, 67135–36. As noted in the NPRM, stakeholders seeking to transport LNG by rail during the suspension period may seek (on an ad hoc basis) either SPs from PHMSA or approvals from FRA.

Lastly, the Final Rule extends the duration of the temporary suspension an

---

[21] The temporary suspension provided for in this Final Rule applies only to rail transportation of LNG tank cars—it does not prohibit use of the new DOT–113C120W9 tank car in connection with other hazardous, cryogenic liquids.

additional year (until June 30, 2025, at the latest) beyond the sunset date (June 30, 2024) proposed in the NPRM. This extension—which is consistent with comments received from stakeholders [22] on the NPRM discussed in section III.B below—is warranted due to delays in completion of the LNG Task Force activity (discussed in section III.C below) that will inform the companion rulemaking under RIN 2137–AF54. Also, economic information discussed in section III.D below shows that the commercial prospects for rail tank car transportation pursuant to the July 2020 Final Rule have become even more uncertain than they were when the NPRM issued in November 2021.

*A. Comments Requesting an Immediate, Permanent Ban of LNG by Rail*

PHMSA received numerous comments requesting the immediate, permanent ban of all LNG by rail in lieu of the temporary suspension as proposed in the NPRM. Many of these comments were part of write-in campaigns comprising approximately 6,650 comments in an initial campaign during the formal comment period, and an additional 3,500 comments in a second campaign coordinated by the National Resource Defense Council (NRDC) after the East Palestine derailment in early 2023 (NRDC Coordinated Write-in Campaign Comments). Other comments were stand-alone comments submitted by non-governmental organizations (*e.g.,* environmental advocacy organizations); Federal, State, and local government officials; and private citizens.

Many of these comments attributed the need for an immediate, permanent ban on the risk to public safety and the environment from LNG's material properties—specifically, pointing to its flammability, explosive potential, and GHG contributions—in the event of a release. Of particular concern for many commenters were the risks of a boiling liquid expanding vapor explosions (BLEVEs) or asphyxiation in the event of a release of LNG during an accident or incident. Some commenters elaborated on their safety concerns by highlighting the potential limitations (*e.g.,* of personnel and equipment resources and training) of emergency response personnel to respond to an incident involving rail transportation of LNG in their jurisdictions. Other commenters alleged that the new DOT–113C120W9 tank car specification was inadequate or

untested for rail transportation of LNG and that a more robust safety history—coupled with more robust, mandatory operational controls (such as limits on train length, tank car weight, and maximum allowable speed) than required in the July 2020 Final Rule—would be necessary to ensure safety. Other commenters cited safety and environmental justice concerns for those who live along rail lines that would carry LNG, stating that ''bomb trains'' would threaten the safety of those who live in these communities—many of which communities may be densely-populated or historically disadvantaged. Other commenters called for an immediate ban of LNG transportation by rail given methane's status as a potent GHG and the Biden-Harris Administration's commitments to reducing GHG emissions. And commenters from the NRDC campaign called for a ban on LNG by rail in the ''in the wake of the devastating train derailment in East Palestine, Ohio.'' [23] Lastly, some commenters contended that if the ''. . . rule was already bad enough to reconsider, it should be repealed outright.'' [24]

PHMSA Response

PHMSA acknowledges the concerns raised by these stakeholders and agrees that any risks related to the transportation of LNG by rail should be examined closely and properly mitigated to ensure safety for the public and the environment. Accordingly PHMSA is suspending LNG transportation by rail tank car pursuant to the July 2020 Final Rule until the conclusion of the companion rulemaking under RIN 2137–AF54 or June 30, 2025, whichever is earlier. This will provide PHMSA an opportunity to conduct a thorough evaluation of the HMR's regulatory framework for rail transportation of LNG based on the information received from the LNG Task Force testing and evaluation efforts, TRB Phases I and II Reports, and stakeholders' written comments. PHMSA also encourages those stakeholders to consider submitting comments in response to any future notice of proposed rulemaking issued by PHMSA in the companion rulemaking under RIN 2137–AF54.

*B. Comments Requesting the Removal of the June 30, 2024, Sunset Date*

PHMSA received comments requesting removal of the sunset date of

June 30, 2024, proposed in the NPRM so that the proposed suspension would be in effect until the companion rulemaking under RIN 2137–AF54 has concluded. Delaware Riverkeeper Network (DRN) commented that in the NPRM, PHMSA justified the sunset date by indicating that the TRB Phase II Report was expected in mid-2022 and that PHMSA needed time to incorporate those results and publish a rule. DRN argued that ''this rationale begs the question—why not wait until PHMSA *actually* incorporates the results of the Phase II Report and concludes the rulemaking process?'' They further stated that ''the unpredictability of the COVID–19 pandemic indicates that timelines are not as predictable as they were pre-2019.'' [25]

The International Association of Fire Fighters (IAFF) suggested an objective-based approach whereby the suspension would only be lifted if certain criteria have been met. IAFF further urged ''. . . the FRA to establish specific criteria to be attained prior to the lifting of the proposed suspension.'' [26] Similarly, comments from the AFL–CIO and others supported suspending LNG by rail tank car until LNG Task Force testing and evaluation efforts are complete, stating they ''. . . support PHMSA's suspension of the implementation of the rule until a time when the agencies have completed a more thorough safety review.'' [27] Other commenters proposed longer suspension periods than had been proposed in the NPRM.

PHMSA Response

PHMSA in the NPRM specifically sought comments on the proposed suspension date, including the sunset date, and whether PHMSA should modify the proposed expiration of the suspension period.[28] PHMSA appreciates and acknowledges the points made by commenters and, consistent with the discussion in the introduction to section III above, is extending the sunset date for the suspension period an additional year such that rail tank car transportation of LNG pursuant to the July 2020 Final Rule will be suspended until the earlier of either (1) a final rule concluding the companion rulemaking under RIN 2137–AF54, or (2) June 30, 2025. This one-year extension beyond the sunset date (June 30, 2024) proposed in the NPRM will give PHMSA adequate time to complete LNG Task Force testing and evaluation activities (and delays in

---

[22] PHMSA received no comments that specifically requested the June 2024 sunset date for the suspension; commenters either sought no suspension or a permanent suspension.

[23] NRDC Coordinated Write-in Campaign Comments.

[24] Beyond Extreme Energy with 198 methods Comment at 1.

[25] DRN Comment at 2.

[26] IAFF Comment at 2.

[27] TDD Comment at 1.

[28] 86 FR at 61737.

receipt of the TRB Phases I and II Reports) that had been delayed because of the COVID–19 public health emergency and additional scoping and contracting issues, and thereafter integrate those results into each of a notice of proposed rulemaking and final rulemaking in the companion rulemaking under RIN 2137–AF54.

### C. Comments of General Support for the NPRM

PHMSA received numerous comments in support of the NPRM's proposed suspension, including comments from Governor Jay Inslee of Washington State; the Attorneys General of Maryland, New York, Connecticut, Delaware, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia; and the Puyallup Tribe of Indians. Many commenters who supported the temporary suspension proposed in the NPRM also urged PHMSA to subsequently ban LNG in the companion rulemaking under RIN 2137–AF54. Commenters supporting the NPRM's proposed suspension of the July 2020 Final Rule generally articulated the same safety and environmental concerns as those calling for an immediate, permanent bans of rail tank car transportation of LNG discussed in section III.A above.

PHMSA Response

PHMSA acknowledges the thousands of comments submitted in support of the NPRM. Although some of those commenters also urged PHMSA to permanently ban rail tank car transportation of LNG in the companion rulemaking under RIN 2137–AF54, PHMSA submits that it will need to complete (and review the results of) the LNG Task Force testing and evaluation efforts before it will be in a position to speak to the contents of a forthcoming notice of proposed rulemaking in that companion rulemaking. PHMSA encourages stakeholders to consider submitting comments in response to any future notice of proposed rulemaking issued by PHMSA in the companion rulemaking under RIN 2137–AF54.

### D. Comments Alleging Chilling of Near-Term Demand for LNG Transportation by Rail Tank Car Pursuant to the July 2020 Final Rule

PHMSA received several comments [29] on the NPRM's observations of increased uncertainty regarding whether there will be near-term demand for rail tank car transportation of LNG pursuant to the July 2020 Final Rule. Specifically, CSX noted in its comments that it had several projects in development to transport LNG by rail in or before 2024, and that "[t]he continued investment in and pursuit of those projects, which require design, permitting, and construction with long lead times, would be impaired if the July 2020 Final Rule were suspended *indefinitely,* delaying them potentially for years and harming CSX's reliance interests and imposing costs and lost business opportunities on CSX and its partners" (emphasis added). CSX subsequently met with PHMSA on February 17, 2022, and elaborated on their written comments by noting that those projects had been shelved and that the issuance of the NPRM was the occasion for those decisions. The Attorney General for the State of Louisiana, Jeff Landry, joined by State Attorneys General from Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Kentucky, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming (Landry, et. al.) similarly contend that "the proposed rule itself *is* the cause of the regulatory uncertainty of which it complains" (emphasis in original) in that it "discourages companies from making any capital investment in LNG by rail, specifically the DOT–113C120W9 specification tank cars that the 2020 Rule authorized."

PHMSA Response

PHMSA finds these comments unconvincing statements of the near-term commercial viability of rail tank car transportation of LNG pursuant to the July 2020 Final Rule. The suspension proposed in the NPRM and adopted in this Final Rule is not "indefinite" as characterized by CSX; rather, it is time-limited to the earlier of a date certain (June 2025) or to the completion of the milestone of issuing a final rule in the companion rulemaking under RIN 2137–AF54. Even if the NPRM affected one or more of CSX's nascent projects exploring rail tank car transportation of LNG, CSX or other entities could have applied for, and may still apply for, an alternative regulatory vehicle (*e.g.,* an SP under § 107.105,[30] or an FRA approval for rail transportation via portable tank) to allow work to proceed on those projects during the suspension period. PHMSA is unaware of CSX, its collaborators in those projects, or any other entities having pursued alternatives. Indeed, in its written comments and again during its February 17, 2022, meeting with PHMSA, CSX personnel acknowledged that the choice of package (*i.e.,* the particular DOT-specification rail tank car or ISO tank) employed in rail transportation of LNG is merely one decision within a multi-step, multi-year project development and execution chain involving, among other things, the construction of origin facilities and off-loading facilities, and the acquisition of one or more enabling Federal and State permits. The projects CSX and others may have been pursuing were prolonged, highly contingent processes in which there are multiple potential bases for material delay or cessation of a project throughout the development cycle. That said, PHMSA understands the shelving of CSX's or any other entities' projects following the proposal of a time-limited, temporary suspension for which there could be alternative rail transportation methods evinces less an alleged "chilling" of investment than the significant uncertainty discussed in the NPRM regarding whether there would be any commercially viable projects for rail transportation of LNG in the near-term.

And PHMSA understands that a variety of forces have created—and will continue to create throughout the suspension period—headwinds for the near-term commercial viability of any project for rail transportation of LNG. The NPRM explained that the near-term commercial prospects for LNG by rail (which the July 2020 Final Rule had acknowledged were uncertain at its issuance) had grown even more uncertain due to near-term structural changes in international markets including (1) massive investment in greatly increased export capacity by competing providers such as Qatar, and (2) reduced demand for LNG customers seeking to reduce their GHG emissions.[31] The comments submitted by CSX, other industry stakeholders, and Landry, et. al. did not attempt to rebut this evidence, or PHMSA's finding that the near-term commercial uncertainty for rail transportation of LNG had increased. Further, the structural headwinds for rail transportation of LNG are likely to accelerate in the near future, as the U.S. Energy Information Administration (EIA) predicts that the capacity of

---

[29] CSX Comments at 1; PHMSA, Doc. No. PHMSA–2021–0058–7064, "Summary of CSX Listening Session" (Feb. 17, 2022); Landry, et al. Comments at 1, 4.

[30] Applications for a Special Permit submitted under § 107.105 must demonstrate that such Special Permit will achieve at least an equivalent level of safety as to what is provided under the HMR, and in particular, should address any outstanding safety questions or concerns including those raised in this rulemaking.

[31] 86 FR at 61735–36.

Add. 111

pipeline-supplied U.S. LNG export terminals are expected to increase significantly beginning around 2025 which some analysts note could depress the offtake prices for LNG in the international export market—which could divert demand for LNG exports that could have been serviced by LNG by rail.[32] Further, the supply shocks of the conflict in Ukraine have highlighted both in the United States and abroad the volatility of natural gas prices and fragility of international LNG market supply, accelerating movement among historical consumers of natural gas toward renewable energy and reduced reliance on LNG exports.[33] Meanwhile, domestic consumption of natural gas in the United States is expected to fall in the next decade due to increasing electrification driven by consumer preferences and Federal and State policy initiatives to reduce GHG emissions.[34] Durably high commodity (*e.g.,* steel) prices and interest rates [35] would also tend to discourage capital investment in the manufacture of a new fleet of DOT–113C120W9-specification tank cars for dedicated commercial LNG service.

PHMSA finds this recent evidence, coupled with the evidence discussed in the NPRM, augurs uncertainty regarding the commercial prospects for rail transportation of LNG that will continue beyond the originally proposed suspension period and into the longer suspension period adopted in this final rule.[36] Following the conclusion of the (temporary) suspension period, stakeholders would be able to evaluate

---

[32] EIA, ''U.S. LNG Export Capacity to Grow as Three Additional Projects Begin Construction,'' (Sept. 6, 2022), *https://www.eia.gov/todayinenergy/detail.php?id=53719* (last visited May 12, 2023). *See also* A. Shiryaevskaya et al., *Bloomberg,* ''World Gas Supply Shifts from Shortage to Glut with Demand Muted'' (Apr. 16, 2023); L. Hampton, *Reuters,* ''Wave of New LNG Export Plants Threatens to Knock Gas Prices'' (Mar. 14, 2023).

[33] *See* Intl. Energy Agency (IEA), *World Energy Outlook: 2022* at 3, 25–26 (Oct. 2022); *The Economist* ''War and Subsidies Have Turbocharged the Green Transition'' (Feb. 13, 2023); Inst. for Energy Economics and Financial Analysis, *Global LNG Outlook: 2023–2027* at 4–5 (Feb. 15, 2023).

[34] *See* EIA, *Annual Energy Outlook 2023* at 25 (Mar. 2023).

[35] N. Ruggiero, *S&P Global Commodity Insights,* U.S. Steel Sentiments Hit New High for 2023 As Mills Increase Finished Prices'' (Mar. 13, 2023); R. Druzin, *Argus Media,* ''U.S. Steel Price Driven Up by Multiple Factors'' (Mar. 14, 2023); M. Derby, *Reuters,* ''Premature for Fed to Call End to Rate Hikes with Inflation Still High, Williams Says (May 9, 2023).

[36] Amidst the limited domestic and international commercial prospects discussed here, it is hardly surprising that rail transportation of LNG has occurred by neither (1) existing DOT–113C120W tank cars pursuant to DOT–SP 20534 issued by PHMSA to ETS in 2019, nor (2) ISO tanks pursuant to an FRA approval issued to the Alaska Railroad Company in 2015.

whether the commercial prospects for rail tank car transportation of LNG pursuant to the July 2020 Final Rule merit pursuing.

## E. Comments Contending That the LNG by Rail Improves Safety

PHMSA received several comments arguing temporary suspension of the July 2020 Final Rule would forfeit safety benefits.[37] Some of those comments pointed to the physical properties (*e.g.,* auto-ignition temperatures) of LNG they assert make its rail transportation inherently safer than transportation of natural gas in other physical states. Others contended that, absent the July 2020 Final Rule, industry would be forced to utilize other modes of transportation of natural gas—in particular, highway transportation via MC–338 cargo tanks—which would entail more frequent accidents and incidents than rail transportation. Some comments generally praised the DOT–113C120W9-specification tank car approved for use in transporting LNG in the July 2020 Final Rule because it was an improvement on the proven, existing DOT–113C120W-specification tank cars that PHMSA had approved for use in rail tank car transportation of LNG via SP. Lastly, RSI asserted that by discouraging investment in DOT–113C120W9 tank cars for LNG service, PHMSA was discouraging construction of those enhanced tank cars for use in transporting other cryogenic liquid hazardous materials.

## PHMSA Response

PHMSA finds these contentions unconvincing. As presented, each of those arguments suggest that any potential benefits of rail tank car transportation of LNG will be lost if PHMSA suspends the July 2020 Final Rule as proposed in the NPRM. But that binary understanding confuses the *temporary, time-limited* suspension proposed in the NPRM and adopted in this final rule with a *permanent* or *indefinite* ban on rail tank car transportation of LNG. A temporary suspension would mean that any safety benefits would only be unavailable for the suspension period—*i.e.,* until the end of June 2025 (at the latest). *See* 86 FR at 61737–38. Further, any such potential, time-limited comparative advantage turns on whether any rail transportation of LNG pursuant to the July 2020 Final Rule would in fact have

---

[37] CSX Comments at 1; Landry, et al. Comments at 1, 4, 5; RSI Comments at 2, 4; ''Comments of U.S. House of Representatives Committee on Transportation and Infrastructure—Republican Minority Members'' at 2–3 (Dec. 22, 2021) (House T&I Minority Comments).

occurred during the suspension period, but, as explained above, market conditions now and in the near future do not support demand to transport LNG in rail tank cars. That demand, which was uncertain at issuance of the July 2020 Final Rule has become only more uncertain since given the commercial headwinds facing the development of that market.[38] Further, any time-limited comparative advantage from leaving the July 2020 Final Rule undisturbed would also be mitigated by the availability of other regulatory vehicles (FRA approvals and PHMSA SPs) that entities can pursue during the suspension period.

Uncertainty regarding whether the July 2020 Final Rule's authorization of rail transportation in DOT–113C120W9-specification tank cars ensures adequate protection of public safety has only increased since the time of issuance of each of the July 2020 Final Rule and the NPRM proposing its suspension. The July 2020 Final Rule itself acknowledged that its authorization of rail transportation of LNG in the new DOT–113C120W9 tank car did not turn only on the tank car itself; rather, a number of other factors (including, but not limited to, the material properties of LNG and natural gas, the quantity of LNG that will be moved by rail, the routes involved, the availability of emergency response planning resources, etc.) affected the risks involved in rail tank car transportation of LNG. *See* 86 FR at 61734.[39] Subsequently, the TRB Phase I Report highlighted gaps (discussed in section II.C above) within the LNG Task Force testing efforts undertaken to improve confidence in

---

[38] The NPRM also explains there is also significant uncertainty regarding the commercial prospects of mode-switching (from rail tank car to MC–338 cargo tanks carried by truck) given that such mode-switching would sacrifice (potentially significant) economies of scale offered by rail tank car transportation of LNG. *See* 86 FR at 61737. This observation was not addressed by any of the comments submitted by the House T&I Minority, Landry, et al., RSI, or CSX.

[39] PHMSA disagrees with Landry, et al. that PHMSA's authorization of rail transportation of LNG in existing, less robust DOT–113C120W tank cars pursuant to DOT–SP 20534 reveals PHMSA's concerns regarding safety of the DOT–113C120W9 tank cars as pretextual. Landry, et al. Comments at 4. The conditions it imposed—a defined, limited duration, a single route, and various operational controls—facilitate understanding and bounding of safety and environmental risks notwithstanding transportation within a legacy DOT–113C120W tank car. In contrast, the July 2020 Final Rule's nationwide, perpetual authorization of rail tank car transportation of LNG in a new tank car specification could entail a fundamentally different risk profile than DOT–SP 20534 or any other special permits that PHMSA may issue authorizing (on an ad hoc basis) rail tank car transportation of LNG. In addition, no LNG was ever shipped under DOT–SP 20534, which has now expired and which PHMSA has declined to renew.

the safety benefits of rail transportation of LNG. TRB's subsequent Phase II Report identified additional areas warranting additional research and evaluation to ensure the safety of rail transportation of LNG in the DOT–113C120W9-specification tank car. Although PHMSA has revised the LNG Task Force's testing and evaluation activities in response to the TRB Phases I and II Report recommendations, that work continues; and even after completing the activities PHMSA must evaluate the results and determine whether and how to make permanent modifications to the HMR governing rail transportation of LNG. Further, the comments submitted in response to the NPRM proposing suspension of the July 2020 Final Rule show a lack of consensus among stakeholders regarding whether some of the critical safety challenges known when PHMSA issued the July 2020 Final Rule have been addressed. For example, a comment submitted by IAFF on the NPRM noted that ''the capabilities of fire fighters and emergency medical responders to safely and effectively respond to hazmat incidents involving LNG rail cars has not improved since our 2019 comments'' notwithstanding any PHMSA and FRA outreach and engagement efforts in the interim.[40]

Additionally, comments touting the inherent safety advantages of rail tank car transportation of liquefied natural gas miss the larger safety issue toward which much of the LNG Task Force testing evaluation activities is directed. Natural gas in liquid form, undisturbed within a DOT–113C120W9 tank car is a very stable material that will not combust unless it vaporizes which only happens if the material warms. Further, any vapor present in the outage of the tank car will be of a concentration that is too high to combust. Rather, the principal safety concern—highlighted by PHMSA in the July 2020 Final Rule, in the NPRM and comments thereon, and in TRB's evaluation of safety risks associated with rail transportation of LNG—pertains to consequences should either there be a release of LNG to atmosphere, or a tank car be exposed to harsh conditions during an incident or accident. LNG releases can expose personnel and materials to extreme cold (as low as −120 °C or −260 °F) and can be an asphyxiant within a confined space. When released to the atmosphere (as a result of a puncture of the inner

and outer tanks during an accident or incident), liquid methane will convert to a gas that has a relatively low auto-ignition point (about 540 °C or 1000 °F) in addition to being highly combustible when exposed to an ignition source such as fire or electrical sparking. When methane ignites, it burns at very high temperatures (about 1330 °C, or 2426 °F), potentially resulting in exposure of personnel and materials—including (potentially) undisturbed DOT–113C120W9 tank cars adjacent to an LNG pool fire to significant radiant heat hazards. Although PHMSA had undertaken (via the LNG Task Force) a robust testing regime to develop a fulsome understanding of those potential, significant hazards of LNG when transported by rail tank car in parallel with the development and issuance of the July 2020 Final Rule, the subject matter expert recommendations within each of the TRB's Phases I and II Reports underscore the value in obtaining that understanding from completing enhanced testing and evaluation activities *before* LNG begins moving in DOT–113C120W9 rail tank cars pursuant to the July 2020 Final Rule. A temporary suspension gives the LNG Task Force and PHMSA an opportunity to complete that critical work.

PHMSA also disagrees that suspension of the July 2020 Final Rule would discourage investment in enhanced, DOT–113C120W9-specification tank cars for use in rail transportation of any cryogenic liquid hazardous materials—not just LNG. PHMSA acknowledges that the HMR (at 49 CFR part 179 Subpart F) contemplates use of DOT–113C120W9-specification tank cars for transportation of other materials authorized for transportation in the DOT–113 series tank cars in that DOT–113C120W9 tank cars will also meet and exceed the minimum DOT–113C120W standard. However, factors influencing whether to invest in new DOT–113C120W9-specification tank cars for use in transporting those other cryogenic liquids are very different from the factors driving decision making on investing in those tank cars for LNG service. For example, those other cryogenic liquid hazardous materials would likely be destined for more mature domestic and international markets than the (currently) speculative domestic and international market for LNG transported by rail tank car. Perhaps for this reason, PHMSA is aware of at least one entity having submitted an order for construction of new DOT–113C120W9-specification

tank cars for cryogenic ethylene service—even as, over three years after the July 2020 Final Rule issued, PHMSA is unaware of a single order from a commercial entity for a new DOT–113C120W9 specification tank car for LNG service.[41]

For the reasons discussed above and in section III.D, PHMSA concludes that uncertainty on critical issues regarding the safety profile of rail tank car transportation of LNG pursuant to the July 2020 Final Rule has increased since its issuance—and will persist through the suspension period adopted in this final rule until PHMSA and FRA have had an opportunity to complete and review the results of the LNG Task Force's testing and evaluation activities and implement any necessary regulatory amendments in the companion rulemaking under RIN2137–AF54.

*F. Comments Alleging Environmental Benefits From LNG by Rail*

PHMSA received several comments arguing temporary suspension of the July 2020 Final Rule would forfeit important environmental benefits. Comments describe several mechanisms for such environmental benefits including potential reduction in flaring from oil and gas production activities and reduced GHG emissions compared to highway transportation of the same volume of LNG in MC–338 cargo tanks.[42]

PHMSA Response

For largely the same reasons discussed in section III.E above, PHMSA finds these arguments unconvincing. The statements in those comments regarding the environmental benefits of the July 2020 Final Rule were offered without any evidentiary support and little analysis, frustrating evaluation against the comments submitted in response to the NPRM attributing potential environmental harms (including those pertaining to commodity releases and lifecycle and indirect GHG emissions) to rail tank car

---

[40] IAFF, Doc. No. PHMSA–2021–0058–6442, ''Comments Regarding Suspension of Hazardous Materials Regulations Amendments Authorizing Transportation of Liquefied Natural Gas (LNG) by Rail'' at 1–2 (Dec. 23, 2021).

[41] In addition, DOT–113C120W9-specification tank cars constructed for cryogenic ethylene (or other cryogenic liquid) service could not be converted for LNG service easily or immediately: each tank car would have to be cleaned and purged; the physical configuration of critical, installed components of each tank car (*e.g.,* pressure relief valve piping, valves, and other service equipment) would have to be changed; and the re-configured tank car would have to obtain a design certification from the American Association of Railroads Tank Car Committee. Mechanically converting one car—separate from the approval process for the Tank Car Committee—could take several months to over a year.

[42] House T&I Minority Comments at 2–3; Landry, et al. Comments at 5–7; CSX Comments at 1–2; RSI Comments at 2, 5.

Add. 113

transportation of LNG. As explained in the NPRM, both environmental benefits and risks of rail tank car transportation of LNG are a function of whether, when, and where viable market opportunities for such transportation develops. The July 2020 Final Rule acknowledged considerable uncertainty regarding those questions—and as explained in the section III.D above, the commercial prospects for rail tank car transportation of LNG are more speculative now than in July 2020 or even when the NPRM in this proceeding issued in November 2021.

These considerations are particularly relevant to the mechanisms for environmental benefits identified in those comments characterizing the environmental benefits of the July 2020 Final Rule. Whether a market will emerge during the suspension period (or for that matter, may ever emerge) for capture of methane that would be otherwise be flared from oil and gas production operations and transported by rail tank car is not a straightforward proposition. In addition to the non-trivial capital investment for rail tank cars, such an approach would require, among other things, liquefaction equipment at the production site and gasification equipment at the destination and enabling Federal or state regulatory authorizations—and each of those elements may need to be procured sooner at break-even or lower cost than alternatives such as capture and transportation via pipeline or MC–338 cargo tank carried by truck (or, by extension, by rail tank car via FRA approval or PHMSA SP). And even if such a market opportunity would have arisen, meaningful evaluation of the GHG emissions benefits would inevitably involve myriad assumptions (*e.g.,* accident/incident rates for rail and highway transportation; lifecycle emissions from construction and operation of the tank cars and related equipment; potential indirect effects such as emissions associated with upstream production induced by newly-available takeaway capacity) that increase uncertainty regarding GHG impacts. Similarly, modal shifting between highway transportation of LNG via MC–338 cargo tank and rail tank car may not be as easy or as desirable as those comments assume. As discussed above in section III.D, highway transportation sacrifices economies of scale that is among the principal advantages of rail tank car transportation of LNG.

For the reasons discussed above, PHMSA concludes that uncertainty regarding the potential environmental benefits and harms from rail tank car

transportation of LNG pursuant to the July 2020 Final Rule will continue throughout the suspension period adopted in this Final Rule. This persistent uncertainty on a critical potential benefit identified for the July 2020 Final Rule militates in favor of its temporary suspension as the LNG Task Force completes its testing and evaluation activity and PHMSA implements any necessary regulatory amendments in the companion rulemaking under RIN 2137–AF54.

### G. Comments Alleging PHMSA Is Overstepping Its Authority by Attempting To Regulate Oil and Gas Production

PHMSA received comments alleging that PHMSA's proposed suspension of the July 2020 Final Rule overstepped its statutory authority under the HMTA by attempting to discourage oil and gas production activity.[43]

#### PHMSA Response

Those arguments mischaracterize PHMSA's intentions and misapprehend pertinent law.[44] Indeed, PHMSA nowhere in either the NPRM or in this Final Rule identifies decreasing oil and gas production activity as an explicit goal of its suspension of the July 2020 Final Rule. Instead, Landry, et al. divines that intention from a reference to ''[induced] natural gas extraction'' within a list of several considerations in the NPRM that are probative to the safety and environmental risks attendant to rail tank car transportation of LNG.[45] But PHMSA's acknowledgement in the NPRM of the common-sense proposition that new oil and gas production activity—and any attendant environmental benefits as well as risks (including release to atmosphere of methane lost during extraction and transportation) associated with those activities—could be a reasonably foreseeable consequence of authorizing new takeaway capacity is consistent with its obligations under NEPA. *See* 86 FR 61735–36 & n. 35. It is also consistent with the reasoning supporting the July 2020 Final Rule,

which (along with its supporting documentation) explicitly identified potential indirect effects on each of upstream production activity and downstream fuel switching from coal as justifications for that rulemaking.[46]

Nor, moreover, would any indirect effect on production activity from PHMSA's exercise of its authority under the HMTA to regulate interstate rail transportation of hazardous material implicate, as suggested by Landry, et al., the ''major questions'' concerns articulated in *Utility Air Regulatory Group* v. *EPA* (573 U.S. 302 (2014)), and in *West Virginia* v. *EPA* (597 U.S. 2022)). Neither case disturbed the longstanding tolerance of minor, incidental, or accidental effects when an agency takes actions within the core of its statutory responsibilities. And here, PHMSA is doing just that: imposing a temporary suspension of a recent (July 2020) exercise of its authority under the HMTA to prescribe regulations governing interstate transportation by rail of hazardous materials to temporarily restore the status quo ex ante preceding the July 2020 Final Rule. Lastly, given that (as explained in section III.D above) there is considerable uncertainty regarding the commercial viability of rail tank car transportation of LNG, the limited-duration suspension adopted in this Final Rule hardly resembles the fact sets before the Supreme Court in either of the above decisions in which EPA was said to have ''discover[ed] . . . an unheralded power to regulate 'a significant portion of the American economy.' ''

### H. Comments Alleging PHMSA Did Not Meet Its Evidentiary Burden Under the APA for Temporary Suspension of the July 2020 Final Rule

PHMSA also received comments claiming that the NPRM did not make the required showing under the APA for suspension of currently-effective regulations.[47] Landry, et al. in particular characterizes controlling precedent as establishing a uniquely high burden for temporary suspension of existing regulations. PHMSA must, in their view, provide ''a detailed justification of new facts that contradict facts underlying . . . prior policy'', as well as ''a more 'reasoned explanation' to justify suspension of a regulation'' than merely the ''inauguration of a new President.'' PHMSA must also demonstrate an

---

[43] Landry, et al. Comments at 1, 4.

[44] This argument is also in tension with exhortations elsewhere in the Landry, et al. comments for PHMSA to consider policy issues (pertaining to US national security and consumers' home heating bills) that are arguably more ''attenuated'' and less ''tethered'' to PHMSA's authority under the HMTA. *See* Landry, et al. Comments at 1, 7–10. Indeed, Landry, et al. also urges PHMSA to consider the indirect relationship between the rulemaking and production activity by claiming that rail tank car transportation could yield reductions in flaring from oil and gas production activities. *Id.* at 7.

[45] Landry, et al. Comments at 4 (*citing* 86 FR at 61736).

[46] *See* 85 FR at 44995. *See also* Final Regulatory Impact Assessment, Doc. No. PHMSA–2018–0025–0479, at 4, 32–33 & n. 48; Final Environmental Assessment, Doc. No. PHMSA–2018–0025–0478 at 35–36, 52.

[47] House T&I Minority Comments at 2 & n.8; Landry, et al. Comments at 3–4.

Add. 114

"awareness that it is changing position." Landry, et al. ultimately concluded that PHMSA "had not provided any . . . explanations" demonstrating compliance with those purported requirements.

PHMSA Response

These criticisms misapprehend controlling precedent. Indeed, PHMSA does not understand the cited decisions to stand for the proposition suggested in those comments that "reasoned decision-making" in the context of suspension of currently effective regulations necessarily entails a heightened evidentiary burden. Rather, the Supreme Court explicitly stated that the evidentiary burden for agency action is not heightened when that action is a change. *F.C.C.* v. *Fox Studios,* 556 U.S. at 502, 514–15 (2009). And although agencies suspending currently effective regulations must acknowledge a change in their position, address any tensions between conflicting factual findings, and confront any serious reliance interests on the old policy, those common-sense expectations do not constitute a different, uniquely higher evidentiary standard for suspending a currently-effective regulation; rather, those are the sort of issues an agency may need to address (as applicable) when adopting *any* change in its regulations. *See Motor Veh. Mfrs. Ass'n* v. *State Farm Ins.,* 463 U.S. 29, 51–52 (1983).

Nor did Landry, et al.'s comments provide any analysis explaining how PHMSA had run afoul of judicial guardrails for suspending currently-effective regulations. They simply asserted that PHMSA had failed to "explain[ ]" its compliance with pertinent APA requirements. But the NPRM acknowledged that it proposed a change in position from the July 2020 Final Rule: it stated in multiple places that rail tank car transportation of LNG authorized by the July 2020 Final Rule would be temporarily suspended. *See, e.g.,* 86 FR at 61731–32. Further, PHMSA described at length its rationale and the evidence relied on in making that change. Specifically, information (including the TRB Phase 1 Report, COVID-related delays in the execution of LNG Task Force testing and evaluation efforts that had been expected to corroborate the conclusions in the July 2020 Final Rule, and potential fundamental shifts in the domestic and international market dynamics) that had emerged following issuance of the July 2020 LNG Final Rule cast doubt on the validity of PHMSA's understanding of the potential benefits and risks on which that rulemaking's policy decisions rested. *See* 86 FR at 61735–36. And (as explained in section III.D above) because uncertainty on these considerations has only increased since the NPRM's issuance in November 2021, PHMSA has now decided to impose that suspension with a marginally longer (but still time-limited) duration. Lastly, this decision does not rest, as Landry, et al. suggests, on specious reasoning that "no policy is better than the old policy solely because a new policy might be put in place . . ."; rather, temporary suspension ensures that no rail car transportation of LNG pursuant to the July 2020 Final Rule will occur during the time needed for PHMSA to develop confidence regarding its potential risks and benefits within the companion rulemaking under RIN 2137–AF54.

*I. Comments Alleging That PHMSA's Proposal Will Have Miscellaneous Adverse Consequences for Regulated Entities, the U.S. Economy, and National Security*

PHMSA also received a handful of comments warning of miscellaneous adverse effects from the NPRM's proposed suspension of the July 2020 Final Rule.[48] Certain members of the U.S. House Transportation and Infrastructure Committee and Landry, et al. caution suspension of the July 2020 Final Rule could increase household energy expenses and compromise U.S. energy independence and geopolitical influence. Meanwhile RSI warns that the NPRM's invocation of economic uncertainty and "hypothetical concerns" as considerations when tailoring HMR requirements could portend shifting regulatory requirements for the transportation of other hazardous materials. RSI also contends that a more appropriate tool for addressing PHMSA's concerns with the July 2020 Final Rule would be to exercise its authority under § 107.339 to obtain emergency orders from a U.S. District Court to address "imminent hazards."

*PHMSA Response*

PHMSA finds these comments unconvincing. The claim that temporary suspension of the July 2020 Final Rule could affect U.S. household energy prices or the geopolitical balance of power strains credulity given that no DOT–113C120W9 tank cars intended for commercial LNG service have been sold and the commercial viability of such rail tank car transportation is increasingly uncertain. Additionally, RSI's concern that PHMSA could invoke changing market dynamics to modify longstanding HMR requirements for other hazardous materials is misplaced. Unlike other hazardous materials, the rail tank car transportation of LNG is not a mature market—in fact, as discussed elsewhere in this Final Rule, no such market has emerged in over three years since the July 2020 Final Rule issued and a market may not emerge at all. Nor does PHMSA's decision to temporarily suspend the July 2020 Final Rule hardly address merely "hypothetical concerns"; rather, (as discussed in sections III.E and F above) the potential safety and environmental hazards associated with LNG could be significant, and it is PHMSA's responsibility under the HMTA to evaluate and adjust the HMR to ensure its transportation by rail tank car is conducted in a manner that protects public safety and the environment. Additionally, PHMSA's decision in this Final Rule to adjust pertinent HMR requirements on a time-limited basis and before any rail tank car transportation of LNG commences (or is likely to commence), minimizes the risk of stranded investments or lost business opportunities for regulated entities should PHMSA's ongoing evaluation of the safety and environmental risks and benefits merit imposing additional or conflicting safety requirements in the companion rulemaking under RIN 2137–AF54.

In addition, the final rule addresses any potential public safety and environmental risks from rail tank car transportation of LNG via a generic, nationwide, time-limited suspension following notice-and-comment rulemaking is a more appropriate approach than utilizing the emergency order authority recommended by RSI. The July 2020 Final Rule was a legislative rule that itself was the product of notice-and-comment rulemaking, and the APA establishes a presumption that a subsequent legislative rule providing for its modification (to include its temporary suspension) should similarly involve notice-and comment rulemaking. *See* 5 U.S.C. 553. In addition, PHMSA's emergency order authority may be difficult to assert on a time-limited, precautionary, nationwide basis like the temporary suspension adopted in this Final Rule. Each of PHMSA's § 107.339 emergency order authority and the Secretary's authority to address imminent hazards under 49 U.S.C. 5122(b) are seldom exercised. A finding of "imminent harm" may make it more difficult for any controls addressing that harm to be removed later based on

---

[48] House T&I Minority Comments at 1, 3; Landry, et al. Comments at 7–8; RSI Comments at 3.

PHMSA's evaluation of whether and how to amend pertinent HMR requirements in a companion rulemaking under RIN 2137–AF54.

### J. Comments Beyond the Scope of This Rulemaking

PHMSA received miscellaneous comments beyond the scope of this rulemaking. These comments pertained to concerns regarding PHMSA's process in developing, and reasoning in adopting, the July 2020 Final Rule; concerns with the adequacy of conditions imposed by PHMSA within DOT–SP 20534 issued to ETS in 2019; a requested ban on fracking (the process of hydraulic fracturing to extract oil or gas) and all fossil fuels; and additional miscellaneous comments unrelated to this rulemaking or rail tank car transportation of LNG. A number of commentors requested repeal of any existing regulatory approvals or regulatory provisions—whether by FRA or PHMSA—authorizing rail transportation of LNG.

### PHMSA Response

Although PHMSA appreciates the concerns raised by the commenters that the NPRM's proposal to suspend the transportation of LNG by rail tank car authorized by the July 2020 Final Rule did not go far enough to protect public safety and the environment, PHMSA declines to adopt their far-reaching recommendations in this proceeding. However, PHMSA encourages those stakeholders to consider submitting comments in response to any future notice of proposed rulemaking in PHMSA's companion rulemaking under RIN 2137–AF54, as well as to engage other Federal and State regulatory authorities with jurisdictional responsibilities for the issues they asked PHMSA to address.

## IV. Regulatory Analyses and Notices

### A. Statutory/Legal Authority

Statutory authority for this final rule is provided by the HMTA. Section 5103(b) of the HMTA authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." The Secretary has delegated the authority granted in the HMTA to the PHMSA Administrator at § 1.97(b).

### B. Executive Orders 12866 and 14094, and DOT Regulatory Policies and Procedures

Executive Order 12866 ("Regulatory Planning and Review"),[49] as amended by Executive Order 14094 ("Modernizing Regulatory Review"),[50] requires that agencies "should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." Agencies should consider quantifiable measures and qualitative measures of costs and benefits that are difficult to quantify. Further, Executive Order 12866 requires that "agencies should select those [regulatory] approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach." Similarly, DOT Order 2100.6A ("Rulemaking and Guidance Procedures") requires that regulations issued by PHMSA and other DOT Operating Administrations should consider an assessment of the potential benefits, costs, and other important impacts of the proposed action and should quantify (to the extent practicable) the benefits, costs, and any significant distributional impacts, including any environmental impacts.

Executive Order 12866 and DOT Order 2100.6A require that PHMSA submit "significant regulatory actions" to the Office of Management and Budget (OMB) for review. Executive Order 14094 amended Executive Order 12866, which defines significant regulatory actions. This rulemaking is considered a significant regulatory action under section 3(f) of Executive Order 12866 as amended by Executive Order 14094. This final rule has, therefore, been reviewed by OMB.

PHMSA concludes that the temporary suspension of transporting LNG by rail tank car is not expected to have an economic impact because LNG transport by rail tank car is not expected to occur during the suspension period. As explained in section III.D above, since issuance of the July 2020 Final Rule, the commercial prospects for rail tank car transportation of LNG have become increasingly unlikely. LNG has not been transported in any rail tank cars (whether pursuant to the July 2020 Final Rule, SP issued by PHMSA, or FRA approval), and PHMSA is unaware of any planned movements in the near future. Indeed, the development of the necessary infrastructure—including

construction of DOT–113C120W9 tank cars, loading and unloading facilities, vessel handling facilities if sea transport is required, liquification facilities, and regasification facilities—to transport LNG by rail as authorized by the July 2020 Final Rule demands significant financial investment, long-term commitment, and considerable planning associated with constructing a new LNG tank car fleet (which construction may itself be subject to delays because of limited capacity in the rail car manufacturing industry). PHMSA is unaware of any orders having been placed for the manufacture of new DOT–113C120W9 tank cars for commercial LNG service. This absence of commercial demand occurred despite the highest prices for domestic U.S. natural gas markets and LNG export markets in nearly a decade.[51] Additionally, it appears LNG export prices have risen faster than the domestic price which has resulted in a substantial increase in US LNG exports over the last decade. However, the increase in export capacity does not appear to have translated into increased demand for tank cars, possibly due to the majority of the increase in liquefaction capacity occurring at waterfront LNG facilities.[52]

PHMSA expects no economic impact due to the temporary suspension. Indeed, PHMSA's temporary suspension may in fact reduce economic burden by discouraging a shipper from ordering rail tank cars compliant with the July 2020 Final Rule when the companion rulemaking (under RIN 2137–AF54) may adopt different requirements. Additionally, should any potential shippers need to transport LNG by rail tank car during the suspension period, they could avail themselves of the PHMSA SP or FRA approval processes for such transport.[53] Further, temporary

[49] 58 FR 51735 (Oct. 4, 1993).
[50] 88 FR 21879 (April 11, 2023).

[51] *See* EIA, "Price of U.S. Liquefied Natural Gas Exports", *https://www.eia.gov/dnav/ng/hist/ n9133us3m.htm* (last accessed May 24, 2023); EIA, "Average Cost of Wholesale U.S. Natural Gas in 2022 Highest Since 2008", *https://www.eia.gov/ todayinenergy/detail.php?id=55119#:~:text= In%202022%2C%20the%20wholesale %20U.S.,on%20data%20from %20Refinitiv%20Eikon* (last accessed May 24, 2023).

[52] For approved and under construction U.S. LNG projects see EIA, "U.S. LNG export capacity to grow as three additional projects begin construction", *https://www.eia.gov/todayinenergy/ detail.php?id=53719* (last accessed June 28, 2023).

[53] As noted earlier in this final rule, PHMSA previously denied an application for renewal of a special permit, in part, on the basis that the application for renewal did not discuss any of the concerns raised in the NPRM in this proceeding. PHMSA will consider all applications for a special permit that meet the requirements set forth in 49
Continued

suspension guarantees avoidance of potential adverse public safety and environmental impacts (including, but not limited to, contribution of direct and indirect GHG emissions) that could have arisen from rail tank car transportation of LNG under the HMR. Lastly, the limited duration of the suspension will also mitigate any potential adverse economic, public safety, or environmental impacts that could arise in the unlikely event that demand for rail tank car transportation under the July 2020 Final Rule would have materialized during the suspension period in the absence of this final rule.

In addition to the PHMSA SP and FRA approval alternatives, shippers could transport LNG by highway via MC–338 insulated cargo tanks. All of these alternatives for LNG shippers would involve higher costs than rail transportation, but they are available in the unlikely case that market conditions evolve to warrant LNG transportation prior to June 30, 2025, or the completion of the companion rulemaking.[54]

### C. Executive Order 13132

PHMSA analyzed this rulemaking in accordance with the principles and criteria contained in Executive Order 13132 ("Federalism")[55] and its implementing Presidential Memorandum ("Preemption").[56] Executive Order 13132 requires agencies to assure meaningful and timely input by State and local officials in the development of regulatory policies that may have "substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government."

This rulemaking may preempt State, local, and Native American Tribe requirements, but does not contain any regulation that has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government.

The HMTA contains an express preemption provision at 49 U.S.C.5125(b) that preempts State, local, and Tribal requirements on certain covered subjects, unless the non-Federal requirements are "substantively the

same" as the Federal requirements, including the following:

(1) the designation, description, and classification of hazardous material;

(2) the packing, repacking, handling, labeling, marking, and placarding of hazardous material;

(3) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents;

(4) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material; and

(5) the design, manufacture, fabrication, inspection, marking, maintenance, recondition, repair, or testing of a packaging or container represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

This final rule addresses subject items (2) and (5) above, which are covered subjects, and therefore, non-Federal requirements that fail to meet the "substantively the same" standard are vulnerable to preemption under the Federal hazmat law. Moreover, PHMSA will continue to make preemption determinations applicable to specific non-Federal requirements on a case-by-case basis, using the obstacle, dual compliance, and covered subjects tests provided in Federal hazmat law.

### D. Executive Order 13175

PHMSA analyzed this rulemaking in accordance with the principles and criteria contained in Executive Order 13175 and DOT Order 5301.1 ("Department of Transportation Policies, Programs, and Procedures Affecting American Indians, Alaska Natives, and Tribes"). Executive Order 13175 and DOT Order 5301.1 require DOT Operating Administrations to assure meaningful and timely input from Native American Tribal government representatives in the development of rules that significantly or uniquely affect Tribal communities by imposing "substantial direct compliance costs" or "substantial direct effects" on such communities or the relationship and distribution of power between the Federal government and Tribes.

In addition to the petitions filed by the environmental groups and State attorneys general mentioned above, the Puyallup Tribe also challenged the July 2020 Final Rule and alleged violations of the Tribal consultation protocols under the National Historic Preservation Act and Executive Order 13175 and disparate impacts on the Tribe in

violation of Executive Order 12898 and Title VI of the Civil Rights Act of 1964.

PHMSA assessed the impact of this final rule and concluded that it will not significantly or uniquely affect Tribal communities or Tribal governments. This rulemaking does not impose substantial compliance costs on Tribal governments or communities, nor does it mandate Tribal action. Insofar as PHMSA expects the final rule will not adversely affect the safe transportation of hazardous materials generally, PHMSA does not expect it will entail disproportionately high adverse risks for Tribal communities. This final rule could in fact reduce risks to Tribal communities, as it could avoid the release of hazardous materials (in particular, LNG) by railroad in the vicinity of Tribal communities. For these reasons, PHMSA has concluded that the funding and consultation requirements of Executive Order 13175 and DOT Order 5301.1 do not apply.

### E. Regulatory Flexibility Act and Executive Order 13272

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires agencies to consider whether a rulemaking would have a "significant economic impact on a substantial number of small entities" to include small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations under 50,000. The Regulatory Flexibility Act directs agencies to establish exceptions and differing compliance standards for small businesses, where possible to do so and still meet the objectives of applicable regulatory statutes. Executive Order 13272 ("Proper Consideration of Small Entities in Agency Rulemaking")[57] requires agencies to establish procedures and policies to promote compliance with the Regulatory Flexibility Act and to "thoroughly review draft rules to assess and take appropriate account of the potential impact" of the rules on small businesses, governmental jurisdictions, and small organizations. The DOT posts its implementing guidance on a dedicated web page.[58]

This rulemaking has been developed in accordance with Executive Order 13272 and DOT's procedures and policies to promote compliance with the Regulatory Flexibility Act and ensure that potential impacts of draft rules on

---

CFR 107, Subpart B and notes that each special permit application is considered on its own merits.

[54] *Id.* at 33–34, 56 (discussing higher direct GHG emissions from highway transportation) *and* 37–38 (discussing higher risk of crashes from highway transportation).

[55] 64 FR 43255 (Aug. 10, 1999).

[56] 74 FR 24693 (May 22, 2009).

[57] 67 FR 53461 (Aug. 16, 2002).

[58] DOT, "Rulemaking Requirements Related to Small Entities," *https://www.transportation.gov/regulations/rulemaking-requirements-concerning-small-entities* (last visited Jun. 17, 2021).

small entities are properly considered. Consistent with the analysis above, PHMSA certifies that the temporary suspension of the July 2020 Final Rule will not have a significant economic impact on a substantial number of small entities.

### F. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), no person is required to respond to any information collection unless it has been approved by OMB and displays a valid OMB control number. Pursuant to 44 U.S.C. 3506(c)(2)(B) and 5 CFR 1320.8(d), PHMSA must provide interested members of the public and affected agencies an opportunity to comment on information collection and recordkeeping requests.

PHMSA has analyzed this rulemaking in accordance with the Paperwork Reduction Act. PHMSA currently accounts for security plan burdens under OMB Control Number 2137–0612, "Hazardous Materials Security Plans." In the July 2020 Final Rule, PHMSA required any rail carrier transporting a tank car quantity of UN1972 (Methane, refrigerated liquid (cryogenic liquid) or Natural gas, refrigerated liquid (cryogenic liquid)) to comply with the additional rail transportation safety and security planning requirements. Following publication of the July 2020 Final Rule, PHMSA published both a 60-day [59] and 30-day [60] notice and comment period to provide an opportunity for public comment on the estimated increase in burden. PHMSA did not receive comments to either notice. Subsequently, PHMSA submitted the revision to OMB and received approval for the increased burden. As PHMSA implements a temporary suspension of the authorization to ship LNG by rail tank car pursuant to July 2020 Final Rule, PHMSA estimates this rulemaking would result in a decrease in the burden associated with additional rail transportation safety and security planning requirements imposed by the July 2020 Final Rule. Because this final rule contains revisions to an information collection approved under OMB control number 2137–0612 that are subject to review by OMB under the PRA Act, PHMSA has submitted the revised information collection to OMB and will publish a subsequent **Federal Register** notice to advise the public when OMB has approved the revisions. The following reflects this estimated decrease in burden:

| Decrease in primary route analysis | Change in number of railroads | Decrease in number of routes | Burden hours per route | Decrease in total burden hours | Salary cost per hour [61] | Decrease in total salary cost | Decrease in total burden cost |
|---|---|---|---|---|---|---|---|
| Class I Railroads | 0 | (2) | 80 | (160) | $75.88 | ($12,141) | $0 |
| Class II Railroads | 0 | (1) | 80 | (80) | 75.88 | (6,071) | 0 |
| Class III Railroads | 0 | (1) | 40 | (40) | 75.88 | (3,035) | 0 |
| Total | 0 | (4) | ............... | (280) | ............... | (21,248) | 0 |

| Decrease in alternate route analysis | Change in number of railroads | Decrease in number of routes | Burden hours per route | Decrease in total burden hours | Salary cost per hour [62] | Decrease in total salary cost | Decrease in total burden cost |
|---|---|---|---|---|---|---|---|
| Class I Railroads | 0 | (2) | 120 | (240) | $75.88 | ($18,212) | $0 |
| Class II Railroads | 0 | (1) | 120 | (120) | 75.88 | (9,106) | 0 |
| Class III Railroads | 0 | (1) | 40 | (40) | 75.88 | (3,035) | 0 |
| Total | 0 | (4) | ............... | (400) | ............... | (30,354) | 0 |

*Total Annual Decrease in Number of Respondents:* 0.

*Total Annual Decrease in Number of Response:* 8.

*Total Annual Decrease in Burden Hours:* 680.

*Total Annual Decrease in Salary Costs:* $51,598.

*Total Annual Decrease in Burden Costs:* $0.

### G. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA; 2 U.S.C. 1501 *et seq.*) requires agencies to assess the effects of Federal regulatory actions on State, local, and Tribal governments, and the private sector. For any notice of proposed rulemaking or final rule that includes a Federal mandate that may result in the expenditure by State, local,

and Tribal governments, or by the private sector of $100 million or more in 1996 dollars in any given year, the agency must prepare, amongst other things, a written statement that qualitatively and quantitatively assesses the costs and benefits of the Federal mandate.

This rulemaking does not impose unfunded mandates under the UMRA. As explained above, it is not expected to result in costs of $100 million or more in 1996 dollars on either State, local, or Tribal governments, in the aggregate, or to the private sector in any one year, and is the least burdensome alternative that achieves the objective of the rule.

### H. Environmental Assessment

The National Environmental Policy Act of 1969 (NEPA), as amended (42

U.S.C. 4321 *et seq.*),[63] requires federal agencies to consider the environmental impacts of their actions in the decision-making process. NEPA requires Federal agencies to assess the environmental effects of proposed Federal actions prior to making decisions and involve the public in the decision-making process. Agencies must prepare an environmental assessment (EA) for an action for which a categorical exclusion is not applicable and is either unlikely to have significant effects or when significance of the action is unknown. In accordance with these requirements, an EA must briefly discuss: (1) the need for the action; (2) the alternatives considered; (3) the environmental impacts of the action and alternatives; and (4) a listing of the agencies and persons consulted. If, after reviewing the EA and public comments if

---

[59] 85 FR 46220 (Jul. 31, 2020).

[60] 85 FR 73128 (Nov. 16, 2020).

[61] Occupation labor rates based on 2022 Occupational and Employment Statistics Survey (OES) for "Transportation, Storage, and Distribution Managers (11–3071)" in the Transportation and

Warehousing industry. *See https://www.bls.gov/oes/current/oes113071.htm.* The hourly mean wage for this occupation ($52.36) is adjusted to reflect the total costs of employee compensation based on the BLS Employer Costs for Employee Compensation Summary, which indicates that wages for civilian

workers are 69.0 percent of total compensation (total wage = wage rate/wage % of total compensation).

[62] Ibid.

[63] See also 40 CFR parts 1501 to 1508.

Add. 118

applicable, in response to a draft EA (DEA), an agency determines that a proposed action will not have a significant impact on the human or natural environment, it can conclude the NEPA analysis with a finding of no significant impact (FONSI).

**(1) The Need for the Action**

PHMSA has determined that the recommendations from the TRB, its ongoing research, and recent events stemming from the COVID–19 public health emergency predicate the need to re-evaluate the amendments authorized in the July 2020 Final Rule. Research activity that PHMSA had expected would enhance its understanding of the risks attendant in rail transportation of LNG has been delayed, and uncertainties have increased in whether there will be any potential benefits, and in the underlying economic dynamics bounding those risks (*e.g.,* the quantity of LNG that will move by rail, and the routes involved). Therefore, PHMSA is amending the HMR to suspend authorization of LNG transportation in a rail tank car pending further analysis and completion of a companion rulemaking that will consider changes to the conditions under which LNG could be moved by rail, to potentially include additional safety, environmental, and environmental justice protections. This action will provide PHMSA an opportunity to review recent actions that could be obstacles to Administration policies promoting public health and safety, the environment, and climate change mitigation; and to evaluate the results of ongoing and delayed research efforts to ensure the safe transportation of LNG by rail tank car.

**(2) Alternatives to the Action**

In this rulemaking, PHMSA considered the following alternatives:

*No Action Alternative*

If PHMSA were to select the No Action Alternative, current regulations authorizing the transport of LNG in rail tank cars would remain in effect and no provisions would be amended or added. Therefore, the HMR would continue to authorize the transportation of LNG in DOT–113C120W9 tank cars with a 9/16-inch outer tank composed of TC–128B normalized steel. The following operational controls and safety measures would also remain in effect:

• Each tank car must be operated in accordance with § 173.319, which includes:
○ testing of relief valves every 5 years
○ annual replacement of rupture discs

○ thermal integrity tests following an average daily pressure rise during any shipment exceeding 3 psig per day
○ other requirements specific to liquids in cryogenic tank cars.

• 49 CFR part 179, subpart F contains detailed design, construction, and operational requirements for DOT–113C120W tank cars with the specification suffix "9" to be used in rail transportation of LNG.

• Trains transporting 20 or more tank cars of LNG in a block, or 35 such tank cars throughout the train, must be equipped and operated with a two-way EOT device, pursuant to the requirements in 49 CFR part 232, subpart E, or a distributed-power (DP) locomotive as defined in 49 CFR 229.5.

• The offeror must remotely monitor each tank car while in transportation for pressure and location.

• The offeror must notify the carrier if the tank pressure rise exceeds 3 psig over any 24-hour period.

• Trains transporting any quantity of LNG must comply with the route planning requirements in § 172.820, which requires rail carriers transporting LNG by rail tank car to conduct an annual route analysis considering, at a minimum, 27 risk factors listed in appendix D to part 172.

• Each LNG tank car must have:
○ a reclosing pressure relief device with a start-to-discharge pressure of 75 psig;
○ a non-reclosing pressure relief device set to discharge at the tank test pressure;
○ a maximum permitted filling density (percent by weight) of 37.3 percent;
○ a design service temperature of −162 °C (−260 °F);
○ a maximum pressure when offered for transportation not to exceed 15 psig;
○ a minimum steel thickness, after forming, on the outer tank shell and tank heads of 9/16 inch, which is thicker than the requirement for other DOT–113C120W tank cars; and
○ an outer tank shell constructed of AAR TC–128, Grade B normalized steel plate as specified in § 179.100–7(a), which has a higher tensile strength of 81,000 psi which makes it stronger than that used for the existing DOT–113 outer shell.

The final environmental analysis (FEA), which—except for the finding of no significant impact therein—is incorporated by reference into this final rule, examined how the above requirements were imposed to reduce risks to human safety and the environment from the transportation of LNG in rail tank cars and incidents occurring as a result of this

transportation.[64] The No Action Alternative would allow the shipment of LNG in rail tank cars, and PHMSA could continue to consider whether additional mitigations are necessary based on the expert recommendations from the TRB Phase I and Phase II Reports and results from ongoing, delayed testing and evaluation activity by the LNG Task Force.

*Selected Action Alternative*

This Selected Action Alternative as it appears in this final rule, adding a new special provision to the HMR that would suspend the transportation of LNG in rail tank cars while PHMSA undergoes a comprehensive review to ensure the safe transportation of LNG by rail in accordance with ongoing research and incorporation of recommendations from the TRB, as well as the best available economic analysis and science. Rail transport of LNG would be permitted only as authorized by the conditions of a PHMSA special permit (49 CFR 107.105) that would apply only to the railroad(s) operating under such a permit or in a portable tank secured to a rail car pursuant to the conditions of an FRA approval (49 CFR 174.63). The amendments included in this alternative are more fully discussed in the preamble and regulatory text sections of this final rule.

**(3) Probable Environmental Impacts of the Action and Alternatives**

*No Action Alternative*

If PHMSA selected the No Action Alternative, current regulations would remain in place without suspension. As described in the FEA, the No Action Alternative could pose risks to public safety and the environment because the authorization under the HMR to offer shipments of LNG by rail tank car would remain in place. LNG poses potential hazards as a cryogenic liquefied flammable gas, including cryogenic temperature exposure, fire, and asphyxiation hazards. Transportation of any hazardous material introduces risk to safety and the environment, and each additional tank car increases the overall risk of an incident occurring and the quantity that could be released in the event of a derailment. While this is true for all hazardous materials transportation, PHMSA seeks to better understand the risks inherent to LNG transportation in the DOT–113C120W9, especially given that the July 2020 Final Rule authorized large quantities to be transported in rail cars. The July 2020 Final Rule FEA

---

[64] *See* Docket No. PHMSA–2018–0025–0478.

explained that transporting LNG in rail tank cars is expected to be safer than transporting LNG by truck on highways—however, it is possible that allowing LNG to be transported in rail tank cars would increase the amount of LNG transported, and therefore a direct comparison of the risks by rail and highway may be misleading. PHMSA will also consider, based on existing rail infrastructure locations and anticipated routes, whether transportation of LNG in rail tank cars could pose disproportionate harm or risk to communities of color or low-income communities. As described in the preamble to this final rule, various market and other uncertainties exist regarding specific routes that may be used for the transport of LNG by rail tank car.

No release of LNG vapor to the environment is allowed during the normal transportation of LNG in tank cars whether by roadway or railway. However, methane is odorless, and LNG contains no odorant, making detection of a release resulting from an incident difficult without a detection device. Releases of LNG due to venting or to accidents/incidents, without immediate ignition, involving either an MC–338 cargo tank, a portable tank, or a DOT–113C120W9 rail tank car have the potential to create flammable vapor clouds of natural gas because recently gasified LNG does not dissipate in the atmosphere as quickly as ambient-temperature natural gas. Large releases of LNG due to the breach of the inner tank of these transport vessels could result in a pool fire, vapor fire, and explosion hazards if methane vapors become confined. These flammability hazards pose a risk of higher potential impacts than localized cryogenic hazards.

Some commenters on the July 2020 Final Rule argued that the authorization of LNG by rail would further incentivize the production of natural gas, which is a fossil fuel. Methane has much greater heat trapping potential in the atmosphere than carbon dioxide in the short term. Thus, methane is considered a potent GHG, and comprises a significant portion of the United States' GHG emissions. While methane leaks are highly unlikely during transportation in the DOT–113C120W9 due to tank car design, increased natural gas production could lead to indirect environmental impacts of increased methane emissions released during production, loading and unloading, or at other times during its life cycle. In considering whether the authorization could further incentivize the production of natural gas, PHMSA will consider the scope of existing natural gas production and transportation via natural gas pipeline and other modes of transportation.

The FEA for the July 2020 Final Rule discussed potential environmental benefits that could be associated with the authorization to transport LNG by rail tank car. First, PHMSA discussed that the authorization could allow for the delivery of natural gas to locations dependent on more polluting energy forms, such as coal, diesel, heating oil, or firewood.[65] Use of natural gas in such areas, whether foreign or domestic, could allow for a reduction in polluting and climate-warming emissions. Additionally, the authorization to transport LNG by rail tank car could potentially replace some shipments of LNG by highway. As discussed in the FEA for the July 2020 Final Rule, highway transportation is less efficient in comparison to rail transportation when considering fuel use, combustion emissions, and climate change impacts. However, in order to supplement, reduce, or replace highway transportation, rail infrastructure would need to exist between the origin and destination locations or be developed. Finally, the FEA explored industry claims that the authorization could incentivize the capture, storage, and liquefaction of natural gas over venting and flaring of natural gas during oil production and other industrial activities, in areas where natural gas pipeline capacity is unavailable. Facilitating the productive end use of by-product methane could reduce the venting and flaring of natural gas, which causes methane and carbon dioxide emissions. Similar to other above-described benefits, it is difficult to predict the extent to which industries would invest in the equipment, technology, and expertise necessary to pursue natural gas capture, storage, and liquefaction necessary to pursue LNG transportation by rail. A suspension of the authorization to transport LNG by rail could curtail these potential benefits in the near term.

[65] *See, e.g.,* EPA, Press Release, "State of Alaska and Fairbanks North Star Borough receive $14.7 Million EPA grant to improve air quality," (Nov. 2020), *https://www.epa.gov/newsreleases/state-alaska-and-fairbanks-north-star-borough-receive-147-million-epa-grant-improve-air* ("The Borough will use the grant funds to continue a woodstove changeout and conversion program focused on converting more wood burning appliances to cleaner burning liquid or gas-fueled heating appliances, which have a very low output of particulate pollution and higher fuel efficiency. Wood smoke contributes up to 60 to 80 percent of fine particle pollution levels measured in the Fairbanks North Star Borough.").

Selected Action Alternative

Under this Selected Action Alternative, PHMSA will amend the HMR to suspend authorization of LNG transportation in rail tank cars pending further analysis and completion of a companion rulemaking or June 30, 2025, whichever is earlier. Therefore, the HMR will not authorize shippers to transport bulk quantities of LNG by rail tank car. Instead, LNG by rail will only be permitted pursuant to a DOT SP or in portable tanks subject to FRA approval. The Selected Action Alternative will avoid the risks that transportation of LNG in rail tank cars, and particularly potential derailments of rail cars transporting LNG, could pose to public safety and the environment. PHMSA will be able to further consider whether the transportation of LNG could pose disproportionately high or adverse effects on minority and low income communities, which have historically borne the brunt of deleterious Federal policy decisions. PHMSA will also be able to further consider whether shipping LNG in rail tank cars is consistent with public health and safety, environmental protection, including climate change mitigation; and to evaluate the results of ongoing and delayed research efforts and collaboration as part of an accompanying rulemaking under RIN 2137–AF54.

However, as noted above and in the FEA for the July 2020 Final Rule, the authorization to transport LNG in DOT–113C120W9 specification tank cars could have yielded some environmental benefits or improvements, which will not be realized during the suspension period. The scope of potential environmental effects of suspending the July 2020 Final Rule depend on whether use of MC–338 for transportation of LNG increases as a result of the suspension of the DOT–113C120W9 or whether environmental benefits of the authorization have been realized that would not occur during the suspension. PHMSA is unaware of any order from a commercial entity for a new DOT–113C120W9-specification tank car for LNG service. Thus, no increased use of MC–338 tank cars for LNG service is expected as a result of this suspension.

In the unlikely event that the use of MC–338 cargo tank cars for LNG transportation increases due to the inability to transport LNG in rail tank cars, a few environmental effects could result. First, highway transportation of LNG requires more diesel engine vehicles and would result in more emissions, including volatile organic compounds, carbon dioxide, nitrogen

Add. 120

oxides, sulfur oxides, and particulate matter of 10 microns or less. Next, increased highway congestion also increases the potential for a highway incident involving LNG, depending on the extent of the increase. In the event highway transportation increases as a result of this rule, these environmental effects would be speculative and minor, and PHMSA finds that they are warranted during the suspension period while PHMSA undertakes a full analysis of risks inherent in transporting LNG in rail tank cars.

The July 2020 Final Rule FEA noted that the transportation of LNG could allow natural gas to reach markets that lack this access and could potentially reduce and replace the burning of more polluting and carbon-intensive sources of energy such as coal, wood, and diesel. As noted above, the July 2020 Final Rule has not resulted in these replacements or emissions reductions, such that the suspension would not reverse any such benefits. The July 2020 Final Rule FEA also explained that authorization to transport LNG in rail tank cars had the potential to reduce the wasteful and carbon-intensive practice of natural gas flaring because it could provide a market for by-product natural gas in areas where natural gas pipeline transportation is not available. The July 2020 Final Rule has not resulted in this benefit, and there is no indication that this benefit would have occurred anytime in the foreseeable future in the event that it remained available. Thus, PHMSA does not anticipate negative environmental effects from the suspension of the July 2020 Final Rule.

### (4) Agencies and Persons Consulted During the Consideration Process

PHMSA has coordinated with FRA, the Federal Aviation Administration, the Federal Motor Carrier Safety Administration, and the U.S. Coast Guard in the development of this rule. The final rule has also been made available to other Federal agencies within the interagency review process contemplated under Executive Order 12866.

### (5) Environmental Justice

Executive Order 12898 ("Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations"),[66] directs Federal agencies to take appropriate and necessary steps to identify and address disproportionately high and adverse effects of Federal actions on the health or environment of minority and low-income populations to the greatest

extent practicable and permitted by law. DOT Order 5610.2C ("U.S. Department of Transportation Actions to Address Environmental Justice in Minority Populations and Low-Income Populations") establishes departmental procedures for effectuating Executive Order 12898 promoting the principles of environmental justice through full consideration of environmental justice principles throughout planning and decision-making processes in the development of programs, policies, and activities—including PHMSA rulemaking.

PHMSA has evaluated this final rule under DOT Order 5610.2C and Executive Order 12898 and has determined it will not cause disproportionately high and adverse human health and environmental effects on minority and low-income populations. The final rule is national in scope; it is neither directed toward a particular population, region, or community, nor is it expected to result in any adverse environmental or health impact to any particular population, region, or community.

This final rule could reduce risks to minority populations, low-income populations, or other underserved and disadvantaged communities. Insofar as these HMR amendments could avoid the release of hazardous materials, the final rule could reduce risks to populations and communities—including any minority, low-income, underserved, and disadvantaged populations and communities—in the vicinity of railroad lines. However, as noted in the FEA for the July 2020 Final Rule, access to LNG may result in potential economic benefits for underserved communities because of the efficiencies of transporting LNG by rail, and thereby domestic production, distribution, and consumption of natural gas could increase. These potential economic benefits that could result from the transportation of bulk quantities of LNG by rail car would not be realized by underserved communities in the short term. In addition, to the extent that suspending shipment of LNG by rail tank car could increase demand for shipping LNG by truck on highways, these HMR amendments could increase risks to environmental justice communities in the vicinity of those highways.

Further, this rule advances the policy goals of the most recent environmental justice Executive Order 14096— *Revitalizing Our Nation's Commitment*

*to Environmental Justice for All,*[67] which deepens the Administration's whole-of-government approach to environmental justice to better protect communities from pollution and other environmental justice concerns.

### (6) Finding of No Significant Impact

The adoption of the Selected Action Alternative's suspension will prohibit the transportation of LNG in rail tank cars while PHMSA and FRA undertake a comprehensive analysis of safety and environmental issues associated with the transportation of LNG by rail. As such, the HMR amendments in this final rule will have no significant impact on the human environment. The Selected Action Alternative will allow PHMSA to review new information to evaluate the potential impact on safety, environmental justice, and GHG emissions. Further, based on PHMSA's analysis of these provisions described above and insofar as there has been no significant progress toward the movement of LNG by rail tank car, PHMSA finds that codification and implementation of this rule will not result in a significant impact to the human environment.

### *I. Privacy Act*

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its rulemaking process. DOT posts these comments, without edit, including any personal information the commenter provides, to *http:// www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed on DOT's website at *http://www.dot.gov/ privacy* or DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000.[68]

### *J. Executive Order 13609 and International Trade Analysis*

Executive Order 13609 ("Promoting International Regulatory Cooperation")[69] requires that agencies must consider whether the impacts associated with significant variations between domestic and international regulatory approaches are unnecessary or may impair the ability of American business to export and compete internationally. In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those

---

[66] 59 FR 7629 (Feb. 11, 1994).

[67] 88 FR 25251 (Apr. 21, 2023). Executive Order 14096 supplemented the efforts of Executive Order 12898.

[68] 65 FR 19475 (Apr. 11, 2000).

[69] 77 FR 26413 (May 4, 2012).

Add. 121

that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

Similarly, the Trade Agreements Act of 1979 (Pub. L. 96–39), as amended by the Uruguay Round Agreements Act (Pub. L. 103–465), prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Pursuant to the Trade Agreements Act, the establishment of standards is not considered an unnecessary obstacle to the foreign commerce of the United States, so long as the standards have a legitimate domestic objective, such as providing for safety, and do not operate to exclude imports that meet this objective. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards.

PHMSA participates in the establishment of international standards in order to protect the safety of the American public. PHMSA has assessed the effects of this rulemaking to ensure that it does not cause unnecessary obstacles to foreign trade. While the suspension the transport of LNG by rail tank car has potential to impact the United States' export of bulk LNG internationally, there has been no significant reliance interest or progress toward the near-term movement of LNG by rail tank cars. As such, PHMSA expects the amendments herein to pose a minimal impact to international trade if adopted. Therefore, PHMSA is amending the HMR to suspend authorization of LNG transportation in a rail tank car pending further analysis to ensure potential future regulatory actions to allow bulk transport of LNG by rail promote public health and safety, the environment, and climate change mitigation. Accordingly, this rulemaking is consistent with Executive Order 13609 and PHMSA's obligations

under the Trade Agreement Act, as amended.

### K. Executive Order 13211

Executive Order 13211 ("Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use")[70] requires Federal agencies to prepare a Statement of Energy Effects for any "significant energy action." Executive Order 13211 defines a "significant energy action" as any action by an agency (normally published in the **Federal Register**) that promulgates, or is expected to lead to the promulgation of, a final rule or regulation that (1)(i) is a significant regulatory action under Executive Order 12866 or any successor order and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy (including a shortfall in supply, price increases, and increased use of foreign supplies); or (2) is designated by the Administrator of the Office of Information and Regulatory Affairs (OIRA) as a significant action.

Although this rule is a significant action under Executive Order 12866, PHMSA expects it to have an annual effect on the economy of less than $200 million. Further, this action is not likely to have a significant adverse effect on the supply, distribution, or use of energy in the United States. While the amendment to suspend the transport of LNG by rail tank car has potential to impact the supply, distribution, or use of energy in the United States, PHMSA does not anticipate any near-term movement of LNG by rail tank cars. For additional discussion of the anticipated economic impact of this rulemaking, please see section IV.B above.

### L. Cybersecurity and Executive Order 14028

Executive Order 14028 ("Improving the Nation's Cybersecurity")[71] directed the Federal government to improve its efforts to identify, deter, and respond to "persistent and increasingly

sophisticated malicious cyber campaigns." Consistent with Executive Order 14028, the Transportation Security Administration (TSA) in October 2022 issued a Security Directive to reduce the risk that cybersecurity threats pose to critical railroad operations and facilities through implementation of layered cybersecurity measures that provide defense-in-depth.[72] PHMSA has considered the effects of the final rule and determined that its regulatory amendments will not materially affect the cybersecurity risk profile for rail transportation of hazardous materials.

### List of Subjects in 49 CFR Part 172

Education, Hazardous materials transportation, Hazardous waste, Labeling, Markings, Packaging and containers, Reporting and recordkeeping requirements.

In consideration of the foregoing, PHMSA is amending 49 CFR chapter I as follows:

## PART 172—HAZARDOUS MATERIALS TABLE, SPECIAL PROVISIONS, HAZARDOUS MATERIALS COMMUNICATIONS, EMERGENCY RESPONSE INFORMATION, TRAINING REQUIREMENTS, AND SECURITY PLANS

■ 1. The authority citation for part 172 continues to read as follows:

**Authority:** 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

■ 2. In § 172.101, amend the § 172.101 Hazardous Materials Table, by revising the entry for "Methane, refrigerated liquid *(cryogenic liquid) or* Natural gas, refrigerated liquid *(cryogenic liquid), with high methane content)*" to read as follows:

### § 172.101   Purpose and use of the hazardous materials table.

\*    \*    \*    \*    \*

---

[70] 66 FR 28355 (May 22, 2001).

[71] 86 FR 26633 (May 17, 2021).

[72] TSA, Security Directive No. 1580/82–2022–01, "Rail Cybersecurity Mitigation Actions and Testing" (Oct. 24, 2022).

§ 172.101   HAZARDOUS MATERIALS TABLE

| Symbols | Hazardous materials descriptions and proper shipping names | Hazard class or division | Identification Nos. | PG | Label codes | Special provisions (§ 172.102) | Packaging (§ 173.***) | | | Quantity limitations (see §§ 173.27 and 175.75) | | Vessel stowage | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Exceptions | Non-bulk | Bulk | Passenger aircraft/rail | Cargo aircraft only | Location | Other |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8A) | (8B) | (8C) | (9A) | (9B) | (10A) | (10B) |
| * | * | * | * | * | * | * | * | * | * | * | * | | |
| | Methane, refrigerated liquid *(cryogenic liquid)* or Natural gas, refrigerated liquid *(cryogenic liquid, with high methane content)*. | 2.1 | UN1972 | ......... | 2.1 ..... | T75, TP5, 439, 440 | None ......... | None ......... | 318, 319 ...... | Forbidden ... | Forbidden ... | D | 40 |
| | * | * | * | * | * | * | * | * | * | * | | | |

■ 3. In § 172.102, amend paragraph (c)(1) by adding special provision 439 in numerical order to read as follows:

### § 172.102   Special provisions.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

439 UN1972 is not authorized for transportation by rail tank car until either issuance of a final rule concluding the rulemaking action proceeding under RIN 2137–AF54, or June 30, 2025, whichever occurs first. For information and the status of RIN 2137–AF54, please refer to the Office of Management and Budget's Office of Information and Regulatory Affairs at *www.reginfo.gov.*

\* \* \* \* \*

Issued in Washington, DC, on August 23, 2023, under authority delegated in 49 CFR 1.97.

**Tristan H. Brown,**

*Deputy Administrator, Pipeline and Hazardous Materials Safety Administration.*

[FR Doc. 2023–18569 Filed 8–31–23; 8:45 am]

**BILLING CODE 4910–60–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 20

[Docket No. FWS–HQ–MB–2022–0090; FF09M32000–234–FXMB1231099BPP0]

**RIN 1018–BF64**

**Migratory Bird Hunting; Migratory Game Bird Hunting Regulations on Certain Federal Indian Reservations and Ceded Lands**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** As part of the rulemaking process for the 2023–2024 season for migratory game bird hunting, the U.S. Fish and Wildlife Service (hereinafter, Service or we) has revised the process for establishing regulations for certain Tribes on Federal Indian reservations, off-reservation trust lands, and ceded lands. The Service recognizes Tribal treaty rights and the reserved hunting rights and management authority of Indian Tribes and seeks to strengthen Tribal sovereignty. We will no longer require that Tribes annually submit a proposal to the Service for our review and approval and no longer publish in the **Federal Register** the annual Tribal migratory bird hunting regulations. Instead, the regulations now include

elements of our current guidelines for establishing migratory game bird hunting regulations on Federal Indian reservations (including off-reservation trust lands) and ceded lands. Since 1985, Tribal migratory bird harvest has been small with negligible impact to bird population status, and we anticipate that Tribal hunting of migratory birds will continue to have similar negligible impacts to bird populations in the future. This rule will reduce administrative burdens on both the Tribes and the Service while continuing to sustain healthy migratory game bird populations for future generations.

**DATES:** This rule takes effect September 1, 2023.

**ADDRESSES:** You may inspect comments received on the migratory bird hunting regulations at *https:// www.regulations.gov* at Docket No. FWS–HQ–MB–2022–0090. You may obtain copies of referenced reports from the Division of Migratory Bird Management's website at *https:// www.fws.gov/program/migratory-birds* or at *https://www.regulations.gov* at Docket No. FWS–HQ–MB–2022–0090.

**FOR FURTHER INFORMATION CONTACT:** Jerome Ford, U.S. Fish and Wildlife Service, Department of the Interior, (703) 358–2606. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point of contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## Background

Migratory game birds are those bird species so designated in conventions between the United States and several foreign nations for the protection and management of these birds. Under the Migratory Bird Treaty Act (16 U.S.C. 703–712), the Secretary of the Interior is authorized to determine when ''hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg'' of migratory game birds can take place and to adopt regulations for this purpose. These regulations must give due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds (16 U.S.C. 704(a)). The Secretary of the Interior has delegated to the Service the

lead Federal responsibility for managing and conserving migratory birds in the United States; however, migratory bird management is a cooperative effort of Federal, Tribal, and State governments. Federal regulations pertaining to migratory bird hunting are located in title 50 of the Code of Federal Regulations in part 20.

Acknowledging regional differences in hunting conditions, the Service has administratively divided the United States into four Flyways for the primary purpose of managing migratory game birds. Each Flyway (Atlantic, Mississippi, Central, and Pacific) has a Flyway Council, a formal organization generally composed of one member from each State within the Flyway, as well as Provinces in Canada that share migratory bird populations with the Flyway. The Flyway Councils, established through the Association of Fish and Wildlife Agencies, assist in researching and providing migratory game bird management information for Federal, Tribal, State, and Provincial governments, as well as private conservation entities and the general public.

The Service annually develops migratory game bird hunting outside limits (hereinafter, Federal outside limits or Federal limits) for season dates, season lengths, shooting hours, bag and possession limits, and areas where migratory game bird hunting may occur. Hunting seasons selected by the States and Tribes within these Federal limits are set forth in regulations at 50 CFR part 20, subpart K. Because the Service is required to take abundance of migratory game birds and other factors into consideration, the Service undertakes several surveys throughout the year in conjunction with Service Regional Offices, the Canadian Wildlife Service, Tribes, and State and Provincial wildlife management agencies. For each annual regulatory cycle, Service biologists gather, analyze, and interpret biological survey data and provide this information through a series of published status reports and presentations to the Flyway Councils and other interested parties. The August 6, 2015, **Federal Register** at 80 FR 47388 provides a detailed overview of this process.

The Federal outside limits are necessary to allow harvest at levels compatible with migratory game bird population status and habitat conditions. To determine the appropriate outside limits for each species, we consider factors such as population size and trend, geographical distribution, annual breeding effort, condition of breeding and wintering