NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 20-1317 (consolidated with Nos. 20-1318, 20-1431, & 21-1009)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

SIERRA CLUB, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*.

---

On Review of a Final Rule by the
Pipeline and Hazardous Materials Safety Administration

---

**PROOF BRIEF FOR RESPONDENTS**

---

TODD KIM
*Assistant Attorney General*

ROBERT LUNDMAN
JUSTIN HEMINGER
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

Of Counsel:

CHARLES E. ENLOE
*Attorney*
U.S. Department of Transportation

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Petitioners in No. 20-1317 are the Sierra Club, Center for Biological Diversity, Clean Air Council, Delaware Riverkeeper Network, Environmental Confederation of Southwest Florida, and Mountain Watershed Association.

Petitioners in No. 20-1318 are the States of Maryland, New York, California, Delaware, Illinois, Minnesota, New Jersey, Oregon, Rhode Island, Vermont, and Washington; the Commonwealths of Massachusetts and Pennsylvania; the People of the State of Michigan; and the District of Columbia.

Petitioner in Nos. 20-1431 and 21-1009 is The Puyallup Tribe of Indians.

Respondents are the Pipeline and Hazardous Materials Safety Administration (PHMSA); the United States Department of Transportation (DOT); Pete Buttigieg, U.S. Secretary of Transportation; Tristan Brown, Deputy Administrator of PHMSA; and the United States of America.

### B.    Rulings Under Review

Petitioners challenge PHMSA's regulation titled *Hazardous Materials: Liquefied Natural Gas by Rail*, 85 Fed. Reg. 44,994 (July 24, 2020) (Rule). Petitioner in No. 21-1009 also challenges PHMSA's November 13, 2020 decision denying Petitioner's administrative appeal of the Rule.

## C.    Related Cases

There are several petitions challenging the Rule, all of which were consolidated in this matter.  *Sierra Club v. DOT*, No. 20-1317; *Maryland v. DOT*, No. 20-1318; *Damascus v. DOT*, No. 20-1387, which was dismissed on November 24, 2020; *Puyallup Tribe of Indians v. PHMSA*, No. 20-1431; and *Puyallup Tribe of Indians v. PHMSA*, No. 21-1009, which challenges PHMSA's denial of the Tribe's administrative appeal of the Rule.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Respondents

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................i

TABLE OF AUTHORITIES .................................................. vii

GLOSSARY ........................................................................ xvii

INTRODUCTION ...................................................................1

STATEMENT OF JURISDICTION.........................................2

STATEMENT OF THE ISSUES.............................................3

PERTINENT STATUTES AND REGULATIONS ..................4

STATEMENT OF THE CASE................................................4

    A.   Statutory and regulatory background ....................................4

        1.   Hazardous Materials Transportation Act and Hazardous Materials Regulations .................................4

        2.   National Environmental Policy Act ...........................5

        3.   National Historic Preservation Act ...........................6

    B.   Factual background .............................................................7

        1.   Liquefied natural gas.................................................7

        2.   Notice of proposed rulemaking..................................8

        3.   PHMSA's efforts to consult with the Puyallup Tribe ..........................................................................9

        4.   Final Rule ................................................................10

    C.   Procedural background......................................................10

D.      Developments after PHMSA issued the Rule ....................................11

SUMMARY OF ARGUMENT .............................................................................13

STANDARD OF REVIEW ...................................................................................18

ARGUMENT .......................................................................................................19

I.      PHMSA complied with the Hazardous Materials Transportation
        Act.............................................................................................................19

        A.      PHMSA reasonably relied on existing protections from
                the Hazardous Materials Regulations.......................................20

                1.      PHMSA rationally chose DOT-113 cars to
                        transport LNG because of their design and safety
                        record.......................................................................20

                        a.      DOT-113 cars are designed to safely
                                transport cryogenic liquefied gases like
                                LNG. ................................................................21

                        b.      PHMSA reasonably selected the 120W
                                model of DOT-113 cars for transporting
                                LNG. ................................................................23

                        c.      DOT-113 cars have an excellent safety
                                record. ..............................................................25

                        d.      PHMSA reasonably concluded that if a
                                DOT-113 car derails, explosions are
                                unlikely. ..........................................................28

                2.      The Hazardous Materials Regulations'
                        requirements for communication, training,
                        security, and operational controls provide
                        additional protection. ...............................................31

        B.      PHMSA reasonably relied on railroads' operating rules. ...................35

iv

C.   PHMSA mandated additional safety measures to ensure the safe transportation of large quantities of LNG by rail. ................37

1.   PHMSA required thicker outer tanks made from higher-quality steel to prevent punctures. ................38

2.   PHMSA required LNG-specific operational controls to mitigate risks. ................45

3.   PHMSA imposed maximum-pressure requirements to increase the safety of LNG transportation. ................49

II.   PHMSA satisfied the APA's notice-and-comment requirements. ................51

A.   The 120W9 car is a logical outgrowth of the proposed 120W car. ................52

B.   The filling-density requirement is a logical outgrowth of the proposed rule. ................56

III.   PHMSA complied with NEPA. ................59

A.   PHMSA satisfied NEPA's public-participation requirements. ................59

1.   PHMSA provided opportunity for public comment. ................60

2.   PHMSA did not need to supplement its NEPA analysis because the 120W9 car did not substantially change potential environmental impacts. ................62

B.   PHMSA reasonably concluded that the Rule will have no significant environmental impacts. ................64

1.   PHMSA took a hard look at potential environmental impacts. ................65

a.   PHMSA analyzed potential safety impacts. ................65

b.  PHMSA analyzed potential impacts from greenhouse-gas emissions.................................................69

c.  PHMSA analyzed potential impacts on communities with environmental justice concerns. .........................................................74

2.  The NEPA intensity factors show that the Rule will have no significant impacts. ...............................77

IV.  PHMSA satisfied any obligation it had to consult with the Tribe.........................................................................80

A.  The Tribe's view of consultation exceeds any legally binding and judicially enforceable requirement.................................81

1.  The Tribe failed to exhaust the NHPA Section 106 issue before the agency. ...........................................81

2.  Executive Order 13175 and DOT Order 5301.1 are not legislative rules nor are they otherwise judicially enforceable.................................87

B.  PHMSA fulfilled any applicable obligation to consult with the Tribe. ...................................................91

1.  PHMSA offered the Tribe reasonable opportunities to consult. ...................................................92

2.  The Tribe failed to take advantage of the ample consultation opportunities that PHMSA offered. ....................98

CONCLUSION ...................................................102

CERTIFICATE OF COMPLIANCE...................................103

ADDENDUM ...................................................104

# TABLE OF AUTHORITIES

## Cases

*Advocates for Highway & Auto Safety v. FMCSA*,
  429 F.3d 1136 (D.C. Cir. 2005) ................................................................83

*All. for the Wild Rockies, v. Petrick*,
  68 F.4th 475 (9th Cir. 2023) ..................................................................87

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ....................................................................93

*Am. Chemistry Council v. DOT*,
  468 F.3d 810 (D.C. Cir. 2006) ..................................................................4

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017) ..................................................................30

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) ..............................................................18

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ..............................................................102

*Appalachian Power Co. v. EPA*,
  249 F.3d 1032 (D.C. Cir. 2001) ..............................................................83

*ATK Launch Sys., Inc. v. EPA*,
  669 F.3d 330 (D.C. Cir. 2012) ................................................................55

*Baltimore Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ..................................................................................19

*Bhd. of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020) ..................................................................18

*Blau v. Comm'r of Internal Revenue Serv.*,
  924 F.3d 1261 (D.C. Cir. 2019) ..............................................................28

*Blue Ridge Env't Def. League v. Nuclear Regul. Comm'n,*
  716 F.3d 183 (D.C. Cir. 2013) ...................................................................64

*Brennan v. Dickson,*
  45 F.4th 48 (D.C. Cir. 2022) ............................................................... 52, 59

*California v. EPA,*
  72 F.4th 308 (D.C. Cir. 2023) ............................................................. 89, 90

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................102

*CBD v. FERC,*
  67 F.4th 1176 (D.C. Cir. 2023) ................................................................85

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
  341 F.3d 961 (9th Cir. 2003) ....................................................................62

*City of N. Miami v. FAA,*
  47 F.4th 1257 (11th Cir. 2022) ..............................................................100

*City of Stoughton, Wis. v. EPA,*
  858 F.2d 747 (D.C. Cir. 1988) ..................................................................53

*Cmtys. Against Runway Expansion v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ..................................................................90

*Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.,*
  279 F. Supp. 3d 898 (D. Ariz. 2017) ......................................................100

*Cone v. Caldera,*
  223 F.3d 789 (D.C. Cir. 2000) ................................................................102

*CSX Transp., Inc. v. STB,*
  584 F.3d 1076 (D.C. Cir. 2009) .......................................................... 52, 59

*Ctr. For Sustainable Economy v. Jewell,*
  779 F.3d 588 (D.C. Cir. 2015) ..................................................................86

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ..................................................... 25, 85

*Del. Riverkeeper Network v. FERC*,
   45 F.4th 104 (D.C. Cir. 2022) ............................................... 71, 72, 74

*DOT v. Pub. Citizen*,
   541 U.S. 752 (2004) ......................................................................87

*Eagle Cnty., Colo. v. STB*,
   82 F.4th 1152 (D.C. Cir. 2023) ............................................ 7, 18, 94

*Esch v. Yeutter*,
   876 F.2d 976 (D.C. Cir. 1999) ......................................................102

*Friends of the Bow v. Thompson*,
   124 F.3d 1210 (10th Cir. 1997) .......................................................63

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ..........................................................3

*Gulf Restoration Network v. Haaland*,
   47 F.4th 795 (D.C. Cir. 2022) ........................................................78

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) .........................................................102

*Hoopa Valley Tribe v. Christie*,
   812 F.2d 1097 (9th Cir. 1986) .........................................................91

*Koretoff v. Vilsack*,
   707 F.3d 394 (D.C. Cir. 2013) .................................................. 86, 87

*Lilliputian Sys., Inc. v. PHMSA*,
   741 F.3d 1309 (D.C. Cir. 2014) ......................................................18

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ................................................ 89, 90

ix

*Midwest Ozone Grp. v. EPA*,
    61 F.4th 187 (D.C. Cir. 2023) ............................................................... 31

*Morton v. Ruiz*,
    415 U.S. 199 (1974) ............................................................................ 92

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ......................................................................... 18, 19

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*,
    134 F.3d 1095 (D.C. Cir. 1998) ..................................................... 85, 86

*Nat'l Parks Conservation Ass'n v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) ........................................................... 80

*Nat'l Small Shipments Traffic Conference, Inc. v. ICC*,
    725 F.2d 1442 (D.C. Cir. 1984) ........................................................... 92

*New York v. Nuclear Regul. Comm'n*,
    681 F.3d 471 (D.C. Cir. 2012) ..................................................... 65, 79

*Oglala Sioux Tribe of Indians v. Andrus*,
    603 F.2d 707 (8th Cir. 1979) ............................................................. 101

*Ohio v. EPA*,
    997 F.2d 1520 (D.C. Cir. 1993) ........................................................... 85

*Okla. Dep't of Envtl. Quality v. EPA*,
    740 F.3d 185 (D.C. Cir. 2014) ............................................................. 83

*Pueblo of Sandia v. United States*,
    50 F.3d 856 (10th Cir. 1995) ............................................................. 101

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .............................................................................. 5

*Roth v. Norfalco LLC*,
    651 F.3d 367 (3d Cir. 2011) .............................................................. 4, 5

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. 182 (2012) ........................................................................... 91, 92

*Sierra Club v. EPA*,
  884 F.3d 1185 (D.C. Cir. 2018) ..............................................................30

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ................................... 70, 71, 72, 75, 76

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ..............................................................66

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ..................................................... 60, 61

*United Keetoowah Band v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .................................................................6

*W. Watersheds Project v. BLM*,
  76 F.4th 1286 (10th Cir. 2023) ..............................................................83

*Wash. Ass'n for Television & Child. V. FCC*,
  712 F.2d 677 (D.C. Cir. 1983) ...............................................................88

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.
  5 U.S.C. § 553 .........................................................................................51

  5 U.S.C. § 553(b)(3).................................................................................51

  5 U.S.C. § 706(2)(A)................................................................................18

Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301 et seq.
  25 U.S.C. § 450a(a)............................................................................ 91, 92

  25 U.S.C. § 5302(a) .................................................................................91

Hobbs Act, 28 U.S.C. §§ 2341 et seq. ....................................................2

    28 U.S.C. § 2342(7) ...........................................................................2

    28 U.S.C. § 2344 ................................................................................2

National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.

    42 U.S.C. § 4332(2)(C) ......................................................................5

    42 U.S.C. § 4332(C) .........................................................................65

Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq.

    49 U.S.C. § 5101 ......................................................................... 4, 42

    49 U.S.C. § 5103 ..............................................................................19

    49 U.S.C. § 5103(b)(1) .......................................................................4

    49 U.S.C. §§ 5121-24 .........................................................................5

    49 U.S.C. § 5127(a) ...........................................................................2

    49 U.S.C. § 20114(c) ..........................................................................2

National Historic Preservation Act, 54 U.S.C. §§ 300101 et seq.

    54 U.S.C. § 300320(3) .......................................................................6

    54 U.S.C. § 302706(a) .......................................................................6

    54 U.S.C. § 302706(b) .......................................................................6

    54 U.S.C. § 306108 ............................................................................6

**Rules & Regulations**

36 C.F.R. Pt. 800 ..............................................................................6

    36 C.F.R. § 800.16(f) ...................................................................94

    36 C.F.R. § 800.2(c)(2)(ii)(A) ............................................... 94, 99

    36 C.F.R. § 800.2(c)(2)(ii)(B).................................................. 94, 99

    36 C.F.R. § 800.2(c)(2)(ii)(C)................................................. 94, 99

National Environmental Policy Act, 40 C.F.R. Parts 1500

    40 C.F.R. § 1501.4(b) ..................................................................60

    40 C.F.R. § 1502.9(c)(1)(i) ...........................................................62

    40 C.F.R. § 1502.16(b) ................................................................70

    40 C.F.R. § 1508.8(b) ..................................................................70

    40 C.F.R. § 1508.9(a)......................................................................5

    40 C.F.R. § 1508.27 .....................................................................78

    40 C.F.R. § 1508.27(b) ................................................................78

    40 C.F.R. § 1508.27(b)(4)............................................................80

Hazardous Materials Regulations, 49 C.F.R. parts 171-180 ...................................4

    49 C.F.R. § 1.97(b) ........................................................................4

    49 C.F.R. § 171.1(c)(1) ..................................................................4

    49 C.F.R. § 171.8 ...........................................................................7

    49 C.F.R. § 172.704 .....................................................................32

    49 C.F.R. § 172.800(b) ................................................................32

49 C.F.R. § 172.802(a)(1) .................................................................33

49 C.F.R. § 172.802(a)(2) .................................................................33

49 C.F.R. § 172.802(a)(3) .................................................................33

49 C.F.R. § 172.820(a)-(b) ...............................................................48

49 C.F.R. § 172.820(d) .....................................................................48

49 C.F.R. § 172.820(e) .....................................................................48

49 C.F.R. § 172.820(h) .....................................................................48

49 C.F.R. § 173.319 ..........................................................................21

49 C.F.R. § 173.319(b)(1) ........................................................... 57, 58

49 C.F.R. § 173.319(e)(1) .................................................................23

49 C.F.R. § 173.319(e)(3) .................................................................23

49 C.F.R. § 173.319(e)(4)-(5) ...........................................................23

49 C.F.R. § 174.14(a) .......................................................................34

49 C.F.R. § 174.14(b) .......................................................................34

49 C.F.R. § 174.85 ............................................................................34

49 C.F.R. § 174.85(d) .......................................................................34

49 C.F.R. § 179.13 ............................................................................57

49 C.F.R. § 179.400-4 .......................................................................22

49 C.F.R. § 179.400-18(a) ................................................................54

49 C.F.R. § 179.401-1 ................................................................ 49, 54

49 C.F.R. pt. 172 App'x D § D ........................................................48

49 C.F.R. pt. 217 ........................................................35

*Miscellaneous Amendments*,
  28 Fed. Reg. 4,495 (May 4, 1963) ........................................26

*Cryogenic Liquids*,
  48 Fed. Reg. 27,674 (June 16, 1983) ....................................26

*Operating Certain Railroad Tank Cars in Excess of 263,000 Pounds
  Gross Rail Load; Approval*,
  76 Fed. Reg. 4,250 (Jan. 25, 2011) ................................ 44, 45

*Hazardous Materials: Enhanced Tank Car Standards and Operational Controls
  for High-Hazard Flammable Trains*,
  80 Fed. Reg. 26,644 (May 8, 2015) ............................ 40, 41, 46

*Update to the Regulations Implementing the Procedural Provisions
  of NEPA*,
  85 Fed. Reg. 43,304 (July 16, 2020) ....................................5

*NEPA Implementing Regulations Revisions*,
  87 Fed. Reg. 23,453 (Apr. 20, 2022) ....................................5

*Hazardous Materials: Notice of Actions on Special Permits*,
  88 Fed. Reg. 24,844 (Apr. 24, 2023) ..................................38

*Hazardous Materials: Suspension of HMR Amendments
  AuthorizingTransportation of LNG by Rail*,
  88 Fed. Reg. 60,356 (Sept. 1, 2023) ........................ 11, 12, 13

## Other Authorities

DOT Order 5301.1 (Nov. 16, 1999) ............................ 89, 91, 93

DOT Order 5301.1(4)(3) ........................................................91

Executive Order 13175 § 10,
  65 Fed. Reg. 67,249 (Nov. 6, 2000) ....................................89

Executive Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021) ........................................................................11

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DOT | Department of Transportation |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |

# INTRODUCTION

The Hazardous Materials Transportation Act directs the U.S. Department of Transportation (DOT), acting through the Pipeline and Hazardous Materials Safety Administration (PHMSA), to promulgate regulations that ensure the safe transportation of hazardous materials.  Over several decades, PHMSA has promulgated and revised the Hazardous Materials Regulations, a comprehensive set of regulations that govern the packaging, handling, and transportation of myriad hazardous materials.

In the rulemaking challenged here, PHMSA authorized the transportation of liquefied natural gas (LNG) by rail.  *Hazardous Materials: LNG by Rail* (Rule), 85 Fed. Reg. 44,994 (July 24, 2020) (JA___-___).  Before the Rule, LNG could already be shipped by other methods, such as truck or ship.  The Rule added rail tank cars to the permissible methods of LNG shipment.  LNG transportation by rail is subject not only to the Hazardous Materials Regulations' extensive requirements but also to specific safety measures the Rule prescribes.

The Puyallup Tribe of Indians and coalitions of states (State Petitioners) and environmental groups (Environmental Petitioners) each petitioned for review of the Rule.  The Court should deny the petitions because PHMSA complied with the Hazardous Materials Transportation Act, the Administrative Procedure Act (APA),

the National Environmental Policy Act (NEPA), and any tribal-consultation obligation.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to review the Rule under the Hobbs Act, 28 U.S.C. § 2341 et seq., which grants courts of appeals exclusive jurisdiction to review "all final agency actions described in section 20114(c) of title 49." 28 U.S.C. § 2342(7). Section 20114(c), in turn, provides that a proceeding to review a final PHMSA action under the Hazardous Materials Transportation Act that is "applicable to railroad safety" "shall be brought in the appropriate court of appeals as provided in" the Hobbs Act. 49 U.S.C. § 20114(c). The Rule is such a final action.

Petitioners cite the mutually exclusive judicial-review provisions of the Hobbs Act, 28 U.S.C. § 2342(7), and the Hazardous Materials Transportation Act, 49 U.S.C. § 5127(a). Env. Br. 1; State Br. 2; Tribe Br. 1. The latter provision is inapplicable because it authorizes judicial review of certain DOT final actions "[e]xcept as provided in section 20114(c)." 49 U.S.C. § 5127(a). As explained above, Section 20114(c) provides for Hobbs Act review of the Rule.

PHMSA published the Rule on July 24, 2020. 85 Fed. Reg. at 44,994 (JA____). Petitioners all timely challenged the Rule on August 18, 2020. *See* 28 U.S.C. § 2344 (mandating 60-day statute of limitations).

Respondents do not challenge Petitioners' Article III standing but note that State Petitioners cannot establish standing based on "the health and safety of their residents."  State Br. 11.  "[A] State lacks standing as *parens patriae* to bring an action against the federal government."  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).

## STATEMENT OF THE ISSUES

1.    Whether the Rule complies with the Hazardous Materials Transportation Act by prescribing "safe transportation" of LNG by rail based on existing protections in the Hazardous Materials Regulations, existing protections in railroads' operating rules, and LNG-specific safety measures.

2.    Whether the Rule is a logical outgrowth of the notice of proposed rulemaking, such that PHMSA satisfied the APA's notice-and-comment requirements.

3.    Whether PHMSA complied with NEPA by providing for public participation, taking a hard look at potential impacts, and reasonably concluding that the Rule will not have significant impacts.

4.    Whether, if PHMSA was required to consult with the Puyallup Tribe, it fulfilled that obligation by considering the Tribe's views and offering reasonable opportunities for consultation.

3

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes and regulations are in the Addendum following this brief.

**STATEMENT OF THE CASE**

**A.     Statutory and regulatory background**

**1.     Hazardous Materials Transportation Act and Hazardous Materials Regulations**

Congress enacted the Hazardous Materials Transportation Act to "protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material" in commerce. 49 U.S.C. § 5101. A "key feature" of the Act is its "broad mandate" directing that DOT "shall prescribe regulations for the safe transportation, including security, of hazardous material" in commerce. *Am. Chemistry Council v. DOT*, 468 F.3d 810, 812 (D.C. Cir. 2006) (quoting 49 U.S.C. § 5103(b)(1)). DOT has delegated to PHMSA the authority to promulgate regulations for transporting hazardous materials. 49 C.F.R. § 1.97(b).

PHMSA has promulgated the Hazardous Materials Regulations, 49 C.F.R. parts 171-180, which govern the "transportation of hazardous material in commerce," including "[m]ovement of a hazardous material by rail car." 49 C.F.R. § 171.1(c)(1). Those regulations are "detailed and comprehensive." *Roth v. Norfalco LLC*, 651 F.3d 367, 377 (3d Cir. 2011). They list each material considered to be "hazardous"; specify requirements for classifying, packaging,

4

marking, and labeling hazardous materials; and mandate a series of training and security requirements for those who work with hazardous materials. *Id.* at 371.

Failure to comply with the Hazardous Materials Regulations can result in administrative sanctions, civil penalties, or criminal punishment. *See* 49 U.S.C. §§ 5121-24.

### 2.    National Environmental Policy Act

NEPA facilitates informed decisionmaking by requiring agencies to consider the environmental impacts of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). It "does not mandate particular results, but simply prescribes" procedures. *Id.* at 350. Agencies prepare different types of NEPA analyses, including environmental impact statements and environmental assessments, depending on the significance of the proposed action and its potential impacts. Agencies produce environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Environmental assessments are concise documents that agencies use to determine whether an environmental impact statement is necessary or to comply with NEPA when an environmental impact statement is unnecessary, in which case the agency prepares a finding of no significant impact. 40 C.F.R. § 1508.9(a).[1]

--------

[1] The NEPA regulations were amended in 2020 and 2022. *Update to the Regulations Implementing the Procedural Provisions of NEPA*, 85 Fed. Reg. 43,304 (July 16, 2020); *NEPA Implementing Regulations Revisions*, 87 Fed. Reg.

### 3.    National Historic Preservation Act

The NHPA requires federal agencies to consider the effect of a proposed federal or federally assisted "undertaking" on any historic property.  54 U.S.C. § 306108.  The term "undertaking" means "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," including "those requiring a Federal permit, license, or approval."  *Id*. § 300320(3). The statute "requires that an agency consider the impacts of its undertaking and consult various parties, not that it necessarily engage in any particular preservation activities."  *United Keetoowah Band v. FCC*, 933 F.3d 728, 734 (D.C. Cir. 2019) (cleaned up).

Section 106 of the NHPA, 54 U.S.C. § 306108, is a "'stop, look, and listen' provision; it requires federal agencies to take into account the effect of their actions on structures eligible for inclusion in the National Register of Historic Places." *Eagle Cnty., Colo. v. STB*, 82 F.4th 1152, 1189 (D.C. Cir. 2023) (cleaned up).  The Section 106 process includes consultation with any Indian tribe that attaches religious and cultural significance to property that may be eligible for inclusion on the National Register.  54 U.S.C. § 302706(a), (b); *see also* 36 C.F.R. pt. 800.

---

23,453 (Apr. 20, 2022).  Because PHMSA finished its NEPA analysis before the NEPA regulations were amended, PHMSA used—and this brief cites—the regulations in effect before the amendments.

**B.     Factual background**

**1.     Liquefied natural gas**

LNG is the liquid form of natural gas (methane).  LNG is 600 times more compact than natural gas in its vapor state.  *Hazardous Materials: LNG by Rail*, 84 Fed. Reg. 56,964, 56,965 (Oct. 24, 2019) (JA___) (proposed rule).  Because LNG is so much more compact than natural gas in its vapor state, LNG can be economically stored and transported.  *Id*.  To keep the gas in liquid form, it must be refrigerated below minus 260 degrees (−260°) Fahrenheit.  *Id*.  This low boiling point means that LNG is a cryogenic liquid.  *Id*.

Before PHMSA issued the Rule, the Hazardous Materials Regulations did not authorize LNG transport by rail tank car.  84 Fed. Reg. at 56,966 (JA____).  LNG could only be transported by rail if shippers obtained a special permit from PHMSA or used a portable tank and obtained approval from the Federal Railroad Administration.[2]  *Id*.  The Hazardous Materials Regulations did, however, allow LNG transportation by truck.  *Id*.  LNG could also be exported from the United States by ship.  84 Fed. Reg. at 56,967 (JA____).  LNG has been transported by trucks and ships for over 40 years in the United States.  85 Fed. Reg. at 44,995 (JA____).

---

[2] Portable tanks are designed to be loaded onto transport vehicles, such as flatbed rail cars.  49 C.F.R. § 171.8.

## 2.    Notice of proposed rulemaking

PHMSA issued a notice of proposed rulemaking and draft environmental assessment in October 2019, soliciting comment on allowing LNG transportation by rail.  PHMSA proposed allowing LNG transportation in a specific class of rail tank car called the DOT-113 class.  84 Fed. Reg. at 56,967 (JA____).  DOT-113 cars are designed to transport cryogenic liquefied gases by rail.  *Id*.  PHMSA proposed authorizing LNG transportation in a specific model of tank car within the DOT-113 class: the DOT-113C120W car (120W car).  *Id*.  PHMSA had already allowed transportation by rail in 120W cars of ethylene, a flammable cryogenic liquid similar to LNG.  *Id*.  PHMSA solicited comment on potential safety or environmental impacts from authorizing LNG transportation by rail.  84 Fed. Reg. at 56,975 (JA____).

PHMSA planned to rely on the existing Hazardous Materials Regulations, as well as private industry standards that are not incorporated into the Hazardous Materials Regulations.  84 Fed. Reg. at 56,969 (JA____).  PHMSA invited comment on that approach, asking commenters whether additional operational controls might be warranted and encouraging commenters to provide data regarding safety justifications or costs associated with any potential operational controls.  *Id.*

PHMSA originally provided 60 days for the public to comment, 84 Fed. Reg. at 56,964 (JA____), and later extended the comment period by 21 days, 85 Fed. Reg. at 44,996 (JA____).  PHMSA received 445 sets of comments.  85 Fed. Reg. at 45,010 (JA____).

### 3.    PHMSA's efforts to consult with the Puyallup Tribe

During the rulemaking process, PHMSA made efforts to consult with the Puyallup Tribe.  In the proposed rule, PHMSA noted that it did not expect the proposed rule would have substantial direct tribal implications, but it invited tribal governments to comment on any effects that the proposed rule might cause.  84 Fed. Reg. at 56,970 (JA____).  The Tribe submitted extensive comments on the proposed rule.  JA___-___PHMSA-2018-0025-0159_1-25.  The Tribe also requested consultation with PHMSA.  JA___-___[1,3].  PHMSA met with the Tribe in February 2020.  JA___PHMSA-2018-0025-0512_1; JA___PHMSA-2018-0025-0472; JA___PHMSA-2018-0025-0514.  Subsequently, PHMSA invited the Tribe to submit more information about the proposed rule's impacts on the Tribe and offered the Tribe additional opportunities for consultation.  JA___PHMSA-2018-0025-0514; JA___PHMSA-2018-0025-0518_1-5; JA___PHMSA-2018-0025-0519_1-2.  The Tribe did not respond to some of those communications and did not take PHMSA up on offers for more consultation.

### 4.    Final Rule

In July 2020, PHMSA issued the Rule authorizing LNG transportation by rail in 120W cars. 85 Fed. Reg. at 44,994 (JA____). To provide additional safety and improve crashworthiness, PHMSA required that any 120W cars used to transport LNG have an outer tank that is thicker and made of higher-quality steel than normal 120W cars. Cars complying with these more stringent requirements are called DOT-113C120W9 cars (120W9 cars). 85 Fed. Reg. at 44,995 (JA____). In addition, PHMSA prescribed enhanced braking requirements for trains transporting LNG, required remote pressure and location monitoring for each car containing LNG, and required carriers transporting LNG to use the practicable routes posing the least overall safety and security risk. *Id*.

Along with the Rule, PHMSA published a final environmental assessment analyzing the Rule's impacts under NEPA. PHMSA concluded that authorizing LNG transportation by rail would cause no significant environmental impacts. JA____EA_62.

After PHMSA issued the Rule, the Tribe filed an administrative appeal, which PHMSA denied. PHMSA-2018-0025-0627_1-6.

### C.    Procedural background

This case consists of four petitions for review that the Court consolidated. Three petitions challenged the Rule. *Sierra Club v. DOT*, No. 20-1317; *Maryland*

*v. DOT*, No. 20-1318; *Puyallup Tribe of Indians v. PHMSA*, No. 20-1431.  The

fourth petition challenged PHMSA's denial of the Tribe's administrative appeal of

the Rule.  *Puyallup Tribe of Indians v. PHMSA*, No. 21-1009.

At PHMSA's request, the Court placed this case into abeyance in March

2021, before merits briefing.  In May 2023, Petitioners moved the Court to lift the

abeyance, PHMSA opposed their motion, and the Court lifted the abeyance in July

2023.

### D.      Developments after PHMSA issued the Rule

In January 2021, President Biden directed PHMSA to consider suspending,

revising, or rescinding the Rule and various other actions of DOT and other federal

agencies.  Executive Order 13990, *Protecting Public Health and the Environment*

*and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20,

2021); https://perma.cc/4CM3-UY4D.

In September 2023, PHMSA published a final regulation that suspended the

Rule from October 31, 2023, until the earlier of June 30, 2025, or the date PHMSA

completes a rulemaking to consider modified requirements for transporting LNG

by rail.  *Hazardous Materials: Suspension of HMR Amendments Authorizing*

*Transportation of LNG by Rail*, 88 Fed. Reg. 60,356 (Sept. 1, 2023) (Suspension

Rule).  Thus, the Rule is presently suspended and does not currently authorize

LNG transportation by rail.  LNG has never been transported by rail tank car under

the Rule.  PHMSA has announced plans for, and is now working on, a rulemaking that would consider amending the Rule.  https://perma.cc/3VW6-RBCR.

PHMSA suspended the Rule because uncertainties—e.g., regarding the near-term commercial viability of rail tank car LNG transportation, as well as potential safety and environmental benefits and risks of such transportation—had increased since the Rule issued.  88 Fed. Reg. at 60,359.  PHMSA explained that these uncertainties "cast[] doubt on the continued validity of the balance between potential benefits and public safety and environmental risks underpinning the [Rule]."  88 Fed. Reg. at 60,359 (cleaned up).  The Suspension Rule (1) avoids potential risks to public health and safety or environmental consequences (including direct and indirect greenhouse-gas emissions) that PHMSA will evaluate in the companion amendment rulemaking; (2) allows PHMSA and the Federal Railroad Administration to complete ongoing testing and evaluation efforts and consider recommendations from technical experts at the National Academy of Sciences, Engineering, and Medicine; (3) assures an opportunity to develop potential mitigation measures and operational controls for rail transportation of LNG; (4) reduces potential economic burdens by ensuring that entities avoid ordering LNG cars compliant with current requirements when the companion rulemaking may adopt alternative requirements; and (5) enables potential

opportunities for stakeholders and the public to be apprised of, and comment on, the results of ongoing testing and evaluation efforts.  88 Fed. Reg. at 60,357.

PHMSA and the Federal Railroad Administration have pursued research and testing through their joint LNG Task Force, established in 2020, that could inform potential future regulatory actions, as appropriate.  88 Fed. Reg. at 60,358.  To identify tasks within that effort, the LNG Task Force used a risk-based framework focused on knowing the risk, predicting the risk, reducing the risk, and preparing for the risk.  *Id.*  Using that framework, the LNG Task Force identified and undertook 15 tasks to synthesize ongoing research and outreach activities.  *Id.*  Those tasks included empirically reviewing international LNG transportation, assessing route safety and security risks, re-evaluating the costs and benefits of electronically controlled pneumatic brakes, and validating emergency responders' opinions and needs.  *Id.*  The LNG Task Force has completed most of its testing and evaluation activities (as modified in response to recommendations from the National Academy of Sciences, Engineering, and Medicine).  88 Fed. Reg. at 60,359.

## SUMMARY OF ARGUMENT

1. The Rule does not violate the mandate in the Hazardous Materials Transportation Act to ensure the safe transportation of hazardous materials. PHMSA relied on three distinct elements to address safety.

First, the Hazardous Materials Regulations include detailed specifications for DOT-113 cars, which are used for transporting cryogenic liquefied gases. DOT-113 cars, including the 120W model, have a strong safety record and are designed to prevent explosions, including the Boiling Liquid Expanding Vapor Explosions highlighted by Environmental Petitioners. The Hazardous Materials Regulations also have extensive requirements for communication, training, security, and operational controls. These operational controls include specifications for loading and unloading hazardous materials, for coupling and uncoupling cars containing hazardous materials, for placing cars containing hazardous materials in appropriate locations in trains, and for expediting transportation of hazardous materials.

Second, the industry has its own standards for safely transporting hazardous materials. These standards include speed limits, track inspection requirements, and minimum separation distances between hazardous-materials cars in railyards. Petitioners are correct that these standards are voluntary, but PHMSA and the Federal Railroad Administration confirmed that all railroads follow these standards and have incorporated them into their operating rules.

Third, because LNG might be transported in large quantities, the Rule mandates additional LNG-specific protections that exceed the safety requirements in the Hazardous Materials Regulations. LNG cars must have thicker outer tanks

14

that are made from higher-quality steel.  The enhanced outer tanks make LNG cars more puncture-resistant during accidents.  PHMSA also mandated operational controls for LNG transportation.

The Rule further provides that trains with more than 20 continuous LNG cars or 35 LNG cars dispersed throughout the train must have enhanced braking systems.  Railroad carriers must also have real-time location and pressure monitoring for all cars carrying LNG.  And railroad carriers must analyze the safety and security risks of potential routes and choose the practicable routes posing the least overall safety and security risk.  Finally, PHMSA mandated that the maximum pressure under which a DOT-113 car can begin transporting LNG is 15 pounds per square inch.

PHMSA reasonably concluded, based on the record before the agency in 2020, that LNG could be safely transported by rail when the three safety elements—the existing Hazardous Materials Regulations, industry standards incorporated into railroads' operating rules, and the Rule's additional protections—are combined.  State and Environmental Petitioners disagree with PHMSA's record-based safety conclusion, but that highly technical judgment is properly reserved to the expert safety agency.

2.    The Rule is a logical outgrowth of the proposed rule.  The proposed rule notified the public that PHMSA was considering authorizing LNG

15

transportation by rail in 120W cars; in the final Rule, PHMSA authorized LNG transportation in 120W9 cars, a type of 120W car.  In addition, PHMSA modified the Rule's filling-density requirement (which pertains to the amount of LNG that can be loaded into each car) after commenters urged PHMSA to depart from its proposal.  PHMSA reasonably considered public comments and modified the Rule in response, without running afoul of the APA's notice-and-comment requirements.

3.    PHMSA complied with NEPA.  PHMSA complied with NEPA's public-participation requirements by providing an opportunity for public comment on the draft environmental assessment.  PHMSA did not need to provide additional opportunities for comment or to supplement its NEPA analysis based on the 120W9 car because the 120W9 car did not present a seriously different picture of potential environmental impacts.  In particular, the record showed that the 120W9 car *reduced* the potential for significant environmental impacts relative to the 120W car that PHMSA initially proposed and analyzed.

PHMSA reasonably concluded that the Rule will not have significant environmental impacts and, thus, that an environmental impact statement was not required.  PHMSA considered and disclosed potential environmental impacts, particularly in terms of safety, greenhouse-gas emissions, and environmental justice.  PHMSA also analyzed the factors that indicate whether an action will have

significant impacts.  These factors include safety impacts, the degree to which

effects may be highly controversial, and the extent to which the action involves

uncertain or unknown risks.  None of those factors indicated that the Rule would

have significant impacts.  PHMSA concluded that the safety risks were not

uncertain, unknown, or controversial because it has a strong, decades-long safety

record overseeing the transportation of hazardous materials, including flammable

cryogenic liquids.  PHMSA reasonably concluded that the protections in the

Hazardous Materials Regulations, along with the additional safeguards in the Rule

for LNG transportation will mitigate any risks such that the Rule's impacts will not

be significant.

4.    PHMSA fulfilled any obligation to consult with the Puyallup Tribe.

At the threshold, no commenter adequately raised with PHMSA whether the

proposed rule was an "undertaking" subject to Section 106 of the NHPA.  The

Tribe referenced the NHPA in a single sentence buried in a footnote of its

comments; even there, it did not assert that the Rule was an undertaking.  That

fleeting reference was insufficient to bring the issue to PHMSA's attention and

give PHMSA a reasonable opportunity to consider the issue.  Thus, the Tribe's

NHPA claim is forfeited for failure to administratively exhaust the issue.  And

while the Tribe references other consultation requirements, those requirements are

contained in an Executive Order and a DOT order, neither of which is enforceable in court.

Further, PHMSA did consult with the Tribe.  PHMSA carefully considered the Tribe's comments on the proposed rule and met in person with the Tribe to hear its concerns.  PHMSA offered the Tribe more opportunities to consult on the Rule, but the Tribe never took advantage of those invitations.

### STANDARD OF REVIEW

In reviewing final agency actions (such as the Rule) under the Hobbs Act, courts use the standard of review set forth in the APA.  *Bhd. of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020); *see also Eagle Cnty.*, 82 F.4th at 1174 (applying APA standards to NEPA and NHPA claims); *Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (applying APA standards to a Hazardous Materials Transportation Act regulation).

Under the APA, a court may set aside agency action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court "is highly deferential to the agency's decision and presumes that the agency action is valid."  *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023) (cleaned up).  This scope of review "is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,

463 U.S. 29, 43 (1983).  When examining "scientific determination[s], . . . a reviewing court must generally be at its most deferential."  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

**ARGUMENT**

## I.    PHMSA complied with the Hazardous Materials Transportation Act.

The Rule authorized LNG transportation by rail subject to the general requirements of the Hazardous Materials Regulations, plus several LNG-specific requirements.  PHMSA complied with its duty, under the Hazardous Materials Transportation Act, to prescribe regulations for the safe transportation of hazardous materials.  49 U.S.C. § 5103.  Environmental Petitioners claim that PHMSA violated that Act by overlooking or underestimating certain risks of transporting LNG by rail.  Env. Br. 21-36.  But the administrative record shows PHMSA exercised its technical expertise and carefully analyzed potential safety risks based on the data available.  PHMSA grounded its conclusion in three components. First, PHMSA relied on the existing protections within the Hazardous Materials Regulations.  Second, PHMSA relied on existing protections from railroads' operating rules.  And third, PHMSA imposed additional requirements—beyond the existing Hazardous Materials Regulations—for safely transporting LNG by rail.

### A.    PHMSA reasonably relied on existing protections from the Hazardous Materials Regulations.

The Hazardous Materials Regulations cover 435 million shipments of hazardous materials every year.  85 Fed. Reg. at 45,003 (JA____).  Despite that large number, there are on average only 20 hazardous material incidents causing death or serious injury each year, and most of those incidents are from highway transportation.  *Id*.  These regulations are robust, comprehensive, and protective.

The existing Hazardous Materials Regulations help ensure the safety of rail transportation of cryogenic flammable materials like LNG.  Two categories of existing protections bear emphasis here: (1) the specifications for DOT-113 cars; and (2) the requirements for communication, training, security, and operational controls.

### 1.    PHMSA rationally chose DOT-113 cars to transport LNG because of their design and safety record.

Environmental Petitioners contend (Br. 23-36) that the DOT-113 cars are unsafe for transporting LNG, but the record before PHMSA at the time of its action showed otherwise.  DOT-113 cars, with their detailed design specifications and extensive safety record, are a core component of PHMSA's approach to safe LNG transportation by rail.

### a. DOT-113 cars are designed to safely transport cryogenic liquefied gases like LNG.

Selecting proper packaging for hazardous materials is a critical component of the Hazardous Materials Regulations. 85 Fed. Reg. at 44,999 (JA____). The packaging must be chemically and physically compatible with the material being transported and able to withstand all conditions normally encountered during transportation, including humidity, pressure changes, shocks, and vibrations. *Id*. DOT-113 cars are the packaging that PHMSA requires for cryogenic flammable materials transported by rail. *See* 49 C.F.R. § 173.319.

DOT-113 cars are built with a tank-within-a-tank design. 85 Fed. Reg. at 44,999 (JA____). The inner tank contains the cryogenic material. *Id*. The outer tank shields the inner tank from physical damage, exposure to the elements, and in-train forces,[3] while providing structural support. *Id*. The space between the inner and outer tanks is maintained as a vacuum with specific pressure requirements to provide thermal insulation. *Id*. This design ensures that the cryogenic material remains at the requisite cold temperatures to minimize pressure increases. *Id*.

The inner tanks of DOT-113 cars are constructed from steel that retains its strength at extreme low temperatures. *Id*., 85 Fed. Reg. at 45,004 (JA____). The

---

[3] In-train forces are the physical forces that act on the train cars as the train accelerates, decelerates, or goes around curves—basically train cars pushing and pulling on each other.

steel is also resistant to corrosion and brittle failure.[4]  85 Fed. Reg. at 45,004

(JA____).

The outer surface of the inner tank is wrapped with high-grade insulation.

85 Fed. Reg. at 44,999 (JA____).  The Hazardous Materials Regulations specify

precise requirements—based on formulas evaluating heat transfer, evaporation,

and other factors—for the insulation used in cryogenic cars.  49 C.F.R. § 179.400-

4.  The insulation is designed to ensure that the heat transfer from the ambient air

to the cryogenic material in the inner tank causes pressure increases less than three

pounds per square inch per day.  JA____EA_12.  This insulation is several inches

thick.  JA____EA_18.

The Hazardous Materials Regulations mandate minimum thickness

requirements for the inner and outer tanks, testing and inspection requirements,

welding standards, and myriad other rigorous engineering standards for DOT-113

cars.  85 Fed. Reg. at 44,999 (JA____).

DOT-113 cars have two types of pressure-relief devices to vent cryogenic

material in a controlled manner to prevent the inner tank from suffering a

catastrophic failure or explosion.  *Id*.  The cars have pressure-relief valves (called

reclosing pressure-relief valves) that operate temporarily to relieve pressure and

_____

[4] Steel can become brittle when it is exposed to temperatures below those for
which it is designed.  Brittle steel is more likely to crack and fail.

can close after opening.  *Id*.  The cars also have vents called rupture discs that open at a higher pressure than the valves and remain open once the disc ruptures.  *Id*.  The rupture discs are a failsafe in case the valves do not operate properly.  *Id*.  Car owners must test pressure-relief valves every five years and replace rupture discs every 12 months.  49 C.F.R. § 173.319(e)(4)-(5).

The Hazardous Materials Regulations prohibit using a DOT-113 car if the average daily pressure rise in that car exceeded three pounds per square inch during the prior shipment.  85 Fed. Reg. at 45,000 (JA____); 49 C.F.R. § 173.319(e)(1).  In that circumstance, the tank's thermal integrity must be tested. 85 Fed. Reg. at 45,000 (JA____); 49 C.F.R. § 173.319(e)(1).  If a tank fails the thermal integrity test, it cannot be used until it has been repaired and passes the test.  85 Fed. Reg. at 45,000 (JA____); 49 C.F.R. § 173.319(e)(3).

### b.  PHMSA reasonably selected the 120W model of DOT-113 cars for transporting LNG.

PHMSA selected the 120W model of DOT-113 cars for LNG transportation for two reasons.  First, the construction specifications in the Hazardous Materials Regulations for 120W cars require the steel used for the inner tank to retain strength at −260° Fahrenheit, which is LNG's boiling point.  85 Fed. Reg. at 45,000 (JA____).  In fact, this steel is also suitable for use at −423° Fahrenheit, the temperature of liquefied hydrogen, which is far lower than any temperatures the steel would be exposed to in LNG service.  *Id*.

23

Second, 120W cars have a long history of safely transporting flammable cryogenic materials similar to LNG. 85 Fed. Reg. at 45,003 (JA____). In particular, 120W cars have been used for transporting ethylene for over 40 years. *Id*.

PHMSA explained that it used ethylene as a comparison for LNG because ethylene's cryogenic and hazardous properties are similar to LNG. JA____EA_12. In fact, ethylene has a greater ignition range than LNG. JA____EA_13; JA____PHMSA-2018-0025-0479_25. LNG vapors are flammable when mixed with air in vapor concentrations between five and 15 percent by volume. JA____EA_13. Outside of this range, LNG vapors will not burn. *Id*. By contrast, ethylene's ignition range is much broader, from 2.7 to 36 percent by volume. *Id*. Also, ethylene is more reactive and more energy-dense than LNG, which means that it is more likely to explode after igniting if vapors reach a confined space. *Id*.

Environmental Petitioners object to PHMSA's comparison of LNG to ethylene, arguing that liquid ethylene has different storage and ignition temperatures. Env. Br. 27-28. But the question is not whether ethylene is identical to LNG in all respects; the question is whether PHMSA permissibly used ethylene as a comparison to LNG when evaluating hazardous materials transportation. The comparison was reasonable on this record, particularly because PHMSA assessed ethylene's flammability limits, energy density, and ignition range. JA____-

24

_____EA_ 12-13.  Evaluating the characteristics of hazardous materials is squarely within PHMSA's area of expertise, and "on such matters of technical expertise," the Court owes PHMSA "substantial deference."  *CTS Corp. v. EPA*, 759 F.3d 52, 61 (D.C. Cir. 2014).

Environmental and State Petitioners emphasize that ethylene ships in smaller quantities than those expected for LNG.  Env. Br. 28; State Br. 25.  But PHMSA acknowledged that LNG may ship in larger quantities than ethylene.  JA_____EA_13.  As explained below, (pp. 37-38), that potential for larger shipments led PHMSA to mandate the Rule's additional safety protections.

### c.    DOT-113 cars have an excellent safety record.

Environmental and State Petitioners question the safety and crashworthiness of DOT-113 cars since DOT-113 cars have no history of carrying large volumes (many cars per train) of flammable, cryogenic gases.  Env. Br. 33-34; State Br. 19-21.  But PHMSA reasonably explained that, for over 50 years, DOT-113 cars have been used to safely transport flammable cryogenic materials in the United States.  85 Fed. Reg. at 45,005 (JA_____).

To be sure, the DOT-113 car fleet is small.  85 Fed. Reg. at 45,012 (JA_____).  There are 405 DOT-113 cars in North America, and 67 of those are 120W cars.  JA_____PHMSA-2018-0025-0244_ 3.  But there have been over 100,000 shipments of cryogenic material in DOT-113 cars without any fatalities or

serious injuries from releases of cryogenic material.  85 Fed. Reg. at 45,005,

45,012 (JA____, ____).  And DOT-113 cars have a lengthy service history.  In

1963, the Interstate Commerce Commission Safety and Service Board (DOT's

predecessor in regulating hazardous materials transportation) authorized

transportation of liquefied hydrogen in DOT-113 cars, then called ICC-113 cars.

85 Fed. Reg. at 45,000 (JA____); *see also Miscellaneous Amendments*, 28 Fed.

Reg. 4,495, 4,498 (May 4, 1963).  In 1983, DOT authorized the transportation of

cryogenic liquid ethylene in DOT-113 cars, specifically 120W cars.  *Cryogenic*

*Liquids*, 48 Fed. Reg. 27,674 (June 16, 1983).

    PHMSA acknowledged that DOT-113 cars have not been involved in many

accidents, but it evaluated all available data on DOT-113 accidents.  85 Fed. Reg.

at 45,013 (JA____).  Since 1971, approximately 450 reports have been filed with

PHMSA involving releases from DOT-113 cars and a similar car model called

AAR204W, which also has a tank-within-a-tank design to carry cryogenic

materials.  85 Fed. Reg. at 45,013 (JA____), JA____EA_14.  PHMSA reviewed all

these reports.  85 Fed. Reg. at 45,013 (JA____), JA____EA_14.

    Nearly all incidents (99 percent) involved non-accidental releases of

cryogenic material because of defective or improperly secured valves or fittings,

not because of tank breaches.  85 Fed. Reg. at 45,013 (JA____), JA____EA_14.

Despite this long history, there have only been two accidents when the inner tank

of a DOT-113 car breached and released cryogenic material during an accident. 85 Fed. Reg. at 45,005 (JA____). Those accidents (discussed below at p. 68) did not cause any injuries or deaths from hazardous materials. JA____EA_14. PHMSA concluded that the Hazardous Materials Regulations' requirements for DOT-113 cars' design and materials, as well as the Hazardous Materials Regulations' operational controls, contributed to this strong safety history. 85 Fed. Reg. at 45,013 (JA____).

Before the Rule, carriers could transport LNG by rail with approval from the Federal Railroad Administration in T-75 UN portable tanks, which are comparable to DOT-113 cars because they have a tank-within-a-tank design for transporting cryogenic materials. 85 Fed. Reg. at 45,005 (JA____). The Federal Railroad Administration has granted two approvals for shipping LNG by rail in T-75 UN portable tanks, and the first approval was in 2015. JA____, ____PHMSA-2018-0025-0479_11, 29. PHMSA acknowledged that the history of LNG shipments in T-75 UN portable tanks was brief. 85 Fed. Reg. at 45,005 (JA____). Nonetheless, PHMSA had no record of any rail incidents involving T-75 UN portable tanks carrying LNG. *Id*; JA____PHMSA-2018-0025-0479_29.

PHMSA reasonably concluded that DOT-113 cars, and the 120W model in particular, have an established safety record of transporting cryogenic flammable materials similar to LNG. 85 Fed. Reg. at 45,000 (JA____). PHMSA "ma[de] the

27

most of the available data," and the Court should defer to its analysis. *Blau v. Comm'r of Internal Revenue Serv.*, 924 F.3d 1261, 1276 (D.C. Cir. 2019).

> **d.    PHMSA reasonably concluded that if a DOT-113 car derails, explosions are unlikely.**

PHMSA reasonably determined based on the available data that explosions are unlikely if trains carrying LNG in DOT-113 cars derail.  Petitioners emphasize the risks of explosions called Boiling Liquid Expanding Vapor Explosions.  *E.g.*, Env. Br. 30.  This type of explosion occurs when a container holding pressurized liquid is exposed to heat (such as a fire), the pressurized liquid reaches temperatures higher than the liquid's boiling point, the container cannot hold the pressures, and an explosion ensues.  PHMSA concluded based on the record that such explosions were unlikely.

In 2018, the Federal Railroad Administration conducted a live test involving a T-75 UN portable tank filled with liquid nitrogen exposed to a 200-minute fire.  85 Fed. Reg. at 45,012 (JA____).[5]  The portable tank was on a flatbed rail car and there was a burning pool of propane below the rail car.  JA____EA_21.  The flatbed car bent from the fire's heat, but the portable tank had no significant damage.  JA____-____EA_21-22.  During this test, the pressure-relief devices

---

[5] As noted above (p. 27), T-75 UN portable tanks have been used to transport LNG and they, like DOT-113 cars, have a tank-within-a-tank design.  85 Fed. Reg. at 45,012 (JA____).

operated properly, the container was not destroyed, and a Boiling Liquid

Expanding Vapor Explosion did not occur.  85 Fed. Reg. at 45,012 (JA____).

PHMSA reasonably concluded, based on this test, as well as the over 50-

year history of transporting flammable cryogenic materials in DOT-113 cars, that

Boiling Liquid Expanding Vapor Explosions were highly unlikely.  *Id*.  In

comments responding to the proposed rule, the International Association of Fire

Chiefs supported PHMSA's proposal to use 120W cars and noted that DOT-113

cars are designed to prevent Boiling Liquid Expanding Vapor Explosions.

JA____PHMSA-2018-0025-0299_1; 85 Fed. Reg. at 45,011 (JA____).

Environmental Petitioners contend that PHMSA should have done more

tests and dispute the validity of this live test, arguing that liquid nitrogen is not

flammable, that wind conditions affected the test, and that the fire lasted only 200

minutes.  Env. Br. 31, 34-35.  But PHMSA acknowledged that wind conditions

prevented the fire from completely engulfing the container.  JA____EA_22.

PHMSA reasonably concluded that the test provided relevant information in

assessing the likelihood of a Boiling Liquid Expanding Vapor Explosion.  *Id*.

Environmental Petitioners note that "limited data do not justify unlimited

inferences," *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 70 (D.C. Cir. 2017); *see*

Env. Br. 35-36.  That is, of course, true, but PHMSA did not make unlimited

inferences here.  It reasonably concluded that Boiling Liquid Expanding Vapor

Explosions were unlikely based on a live fire test performed on a packaging that has a comparable tank-within-a-tank design—the key feature of DOT-113 cars. The Court should "defer to [the agency]'s decision to proceed on the basis of imperfect scientific information, rather to invest the resources to conduct the perfect study." *Sierra Club v. EPA*, 884 F.3d 1185, 1201 (D.C. Cir. 2018) (cleaned up).

Environmental Petitioners cite two accidents in Spain involving LNG trucks where Boiling Liquid Expanding Vapor Explosions occurred. Env. Br. 31. PHMSA studied those incidents but found that neither incident undermined its conclusions about DOT-113 cars. 85 Fed. Reg. at 45,012 (JA____). Neither accident involved a DOT-113 car; rather, both incidents involved containers with a single steel tank covered with foam and a thin aluminum jacket. *Id*. The containers were not tanks-within-tanks. Those containers held no vacuum, and the outer jackets were only 0.080 inches thick. *Id*. Neither the foam insulation nor the aluminum outer jackets were particularly fire resistant. *Id*.

By contrast, DOT-113 cars have a tank-within-a-tank design, the insulation system has multiple layers, both tanks are made of steel, and there is a vacuum between the tanks. *Id*. In other words, DOT-113 cars are much more robust than the containers involved in the incidents in Spain. *Id*. And the tank-within-a-tank

design of the DOT-113 cars reduces the probability of cascading failures of other undamaged DOT-113 cars if a derailment occurs. *Id*.

PHMSA reasonably concluded that a DOT-113 car involved in a derailment was highly unlikely to experience a Boiling Liquid Expanding Vapor Explosion because of the car's design, the redundant pressure-relief systems, and the insulation systems. *Id*., JA____EA_21. PHMSA's determination on this technical issue is entitled to deference. *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023) (cleaned up).

> ## 2. The Hazardous Materials Regulations' requirements for communication, training, security, and operational controls provide additional protection.

The Hazardous Materials Regulations prescribe extensive requirements for communication, training, security, and operational controls to ensure the safe transportation of hazardous materials. PHMSA reasonably relied on these requirements to ensure safe LNG transportation by rail.

First, communications requirements ensure that information about the type and location of hazardous materials is available to transportation employees, emergency responders, and the public. 85 Fed. Reg. at 45,000 (JA____). Cars containing hazardous materials must display placards on each side and each end of the cars. *Id*. The placards have different colors, symbols, and numbers that identify the types of hazardous material being transported. *Id*. In addition, cars

carrying flammable gases, like LNG, must be marked on two sides with the name of the material being transported.  *Id*.  For LNG, the markings would read "Methane, refrigerated liquid" or "Natural gas, refrigerated liquid."  *Id*.

Train crews must maintain documents identifying the position in the train of each car carrying hazardous material and emergency response information for each hazardous material carried in the train.  *Id*.  The response information must include information about immediate health hazards; fire or explosion risks; precautions to take if an accident occurs; methods for handling fires, spills, or leaks; first aid measures; and emergency contacts for each hazardous material on the train.  85 Fed. Reg. at 45,000-01 (JA____-____).

Second, the Hazardous Materials Regulations also mandate training for all employees involved in transporting hazardous material.  49 C.F.R. § 172.704.

Third, the Hazardous Materials Regulations require carriers to develop security plans for hazardous materials if they are carrying over 3,000 liters of hazardous liquids in a single car.  49 C.F.R. § 172.800(b); *see also* 85 Fed. Reg. at 45,001, 45,017.  This requirement applies to cars carrying LNG because those cars hold over 3,000 liters.  *See* JA____EA_30 (explaining that LNG cars can carry up to 34,500 gallons).  Security plans must include measures to prevent unauthorized people from accessing either hazardous materials or the equipment used to transport them.  49 C.F.R. § 172.802(a)(2).  Carriers must also verify information

provided by job applicants that will have access to or handle hazardous materials. 49 C.F.R. § 172.802(a)(1).  Finally, security plans must assess and address security risks to hazardous materials en route from origin to destination.  49 C.F.R. § 172.802(a)(3).

Fourth, the Hazardous Materials Regulations mandate operational controls, including specific requirements for flammable cryogenic materials.  85 Fed. Reg. at 45,002 (JA____).  These requirements include extensive specifications for loading and unloading hazardous material.  *Id*.  For example, there are instructions that personnel must follow and specific provisions to prevent cars from moving while loading or unloading and to prevent other rail equipment from approaching cars that are loading or unloading.  *Id*.

Operational controls also include special requirements for DOT-113 cars when carriers are assembling trains in railyards: the DOT-113 cars must be stationary and level when coupled or uncoupled to other cars and they cannot be coupled or uncoupled with more force than necessary.  *Id*.  These special handling requirements protect DOT-113 cars from unnecessary impacts.  *Id*.

Operational controls also involve requirements for where cars carrying hazardous materials may be located within a train.  49 C.F.R. § 174.85.  When train length permits, there must be at least five cars between cars carrying flammable gases (like LNG) and the engine.  49 C.F.R. § 174.85(d).  If train length

33

does not permit a separation distance of five cars, then cars with flammable gases must be near the middle of the train and no closer than the second car from an engine or occupied caboose.  49 C.F.R. § 174.85(d).  These separation requirements protect train crews from hazardous material releases during accidents.  85 Fed. Reg. at 45,009 (JA____).  PHMSA reviewed rail accidents that occurred between 2006 and 2015 where there was a release of hazardous materials near occupied locomotives.  *Id*.  It did not find any reported crew injuries.  85 Fed. Reg. at 45,009-10 (JA____-____).

Another operational control in the Hazardous Materials Regulations that PHMSA relied on is the requirement for expedited movement of hazardous materials.  85 Fed. Reg. at 45,002-03 (JA____-____).  Carriers must forward shipments of hazardous materials promptly—within 48 hours of receiving the hazardous materials unless limited exceptions apply.  49 C.F.R. § 174.14(a).  Flammable gases (like LNG) must have a final destination when shipped; carriers cannot meet the 48-hour requirement simply by forwarding the flammable gases onward.  49 C.F.R. § 174.14(b).

In sum, to ensure safe LNG transportation by rail, PHMSA reasonably relied on existing protections in the Hazardous Materials Regulations, particularly the DOT-113 car specifications and the communication, training, security, and operational control requirements.

34

**B.    PHMSA reasonably relied on railroads' operating rules.**

In addition to relying on the Hazardous Materials Regulations, PHMSA

reasonably relied on industry requirements that mitigate risk for trains transporting

hazardous materials.

The Association of American Railroads, an industry trade group, has issued

a document called Circular OT-55 that mandates myriad operational controls.

Railroads must establish operating rules, and the most recent edition of the Circular

has been incorporated into railroads' operating rules.  85 Fed. Reg. at 45,008

(JA____); *see also* 49 C.F.R. pt. 217 (requiring railroads to have operating rules).

The Federal Railroad Administration regularly reviews railroads and their

operating rules, and it was not aware of any instances in which a railroad failed to

follow the Circular's requirements.  85 Fed. Reg. at 45,008 (JA____).  The

Circular's operational controls are thus an additional core component of mitigative

measures that help ensure the safe LNG transportation by rail.  85 Fed. Reg. at

45,018-19 (JA____-____).

The Circular mandates that "key trains," which are trains transporting at

least 20 cars of hazardous material, have a maximum speed of 50 miles per hour.

85 Fed. Reg. at 45,007 (JA____).  If there are any potential defects in a rail car

(flagged by automatic detectors along the tracks), then the maximum speed is 30

miles per hour until the car reaches a terminal for mechanical inspection.  *Id*;

JA____PHMSA-2018-0025-0525_2.  Environmental Petitioners fault PHMSA for not imposing mandatory speed limits in the Rule, but the Circular imposes them. Env. Br. 24.

The Circular also addresses "key routes," which are tracks on which 10,000 carloads of hazardous material or 4,000 carloads of flammable gas (such as LNG) travel over one year.  85 Fed. Reg. at 45,007 (JA____); JA____EA_9.  The Circular mandates additional inspection and equipment requirements for key routes.  85 Fed. Reg. at 45,007 (JA____).  For example, main tracks on key routes must be inspected at least twice a year by inspection cars that use technology to find any internal defects and to assess track surfaces and alignment.  85 Fed. Reg. at 45,007-08 (JA____-____).  At least once a year, these inspection cars must also inspect sidings, which are short tracks on the side of main tracks that allow trains to pass each other.  85 Fed. Reg. at 45,008 (JA____).  Main tracks and sidings must also have periodic visual track inspections to identify defects.  *Id*.  The Circular also requires detectors at least every 40 miles on key routes along the tracks to detect defective bearings in train wheels.  *Id*.

In addition, the Circular prescribes operating practices at railyards. JA____PHMSA-2018-0025-0525_2.  It provides minimum separation distances between cars carrying hazardous materials when they are being loaded, unloaded, or stored.  JA____PHMSA-2018-0025-0525_3.  And it describes best practices for

coupling or uncoupling cars carrying hazardous materials.  JA____PHMSA-2018-0025-0525_2.

Environmental Petitioners emphasize that the Circular is only voluntary. *E.g.*, Env. Br. 24.  But PHMSA did not need to incorporate the Circular into the Hazardous Materials Regulations because railroads have incorporated it into their operating rules, and no record evidence indicated that railroads do not comply with it.  85 Fed. Reg. at 45,008, 45,018 (JA____, ____).

### C.   PHMSA mandated additional safety measures to ensure the safe transportation of large quantities of LNG by rail.

PHMSA found that the existing Hazardous Materials Regulations, along with the Circular, provided robust protection against accidents involving trains with small numbers of cars carrying hazardous materials.  85 Fed. Reg. at 45,008 (JA____).  Currently, trains carrying ethylene have one to three ethylene cars per train.  85 Fed. Reg. at 45,005, 45,016 (JA____, ____).  PHMSA recognized, however, that as the number of cars carrying flammable cryogenic materials increases, there is a higher probability that a car carrying flammable cryogenic material could be involved in an accident.  85 Fed. Reg. at 45,005 (JA____).

PHMSA could not predict the number of LNG cars that the market would support.  But PHMSA had received an application from a company seeking a special permit to transport LNG on trains with at least 80 cars of LNG.  85 Fed.

Reg. at 44,998, 45,005 (JA____, ____).[6]  PHMSA thus recognized the possibility

that large numbers of cars could be involved in LNG transportation by rail.  85

Fed. Reg. at 45,005 (JA____).

To ensure safe transportation regardless of the number of LNG cars,

PHMSA prescribed additional safety measures in the Rule beyond the existing

requirements in the Hazardous Materials Regulations and the Circular.  85 Fed.

Reg. at 45,008 (JA____).  Petitioners argue that PHMSA failed to address the

dangers of transporting LNG in large quantities.  Env. Br. 29-34; *see also* State Br.

24-26.  But the possibility of LNG being shipped in large quantities is precisely

why PHMSA included additional safety measures in the Rule.  These measures—

enhanced outer tanks, operational controls, and maximum pressures—will reduce

the likelihood and impact of any derailment.  85 Fed. Reg. at 45,008 (JA____).

### 1.    PHMSA required thicker outer tanks made from higher-quality steel to prevent punctures.

PHMSA required that shippers transporting LNG use 120W cars with

enhanced outer tanks.  85 Fed. Reg. at 45,013 (JA____).  These cars have the

suffix "9" to denote those enhancements, making them 120W9 cars.  85 Fed. Reg.

---

[6] PHMSA granted the special permit in December 2019.  85 Fed. Reg. at 44,998
(JA____).  The company did not transport LNG under the special permit, and the
permit expired in November 2021.  The company applied to renew its permit, but
PHMSA denied the renewal.  *Hazardous Materials: Notice of Actions on Special
Permits*, 88 Fed. Reg. 24,844, 24,845 (Apr. 24, 2023).

at 45,004 (JA____).  Specifically, 120W9 cars have a minimum outer tank

thickness of 9/16 inch compared to 7/16 inch for other 120W cars.  *Id*.  In addition,

the outer tanks of 120W9 cars must be made from TC-128 Grade B steel, which is

a high-strength steel.  *Id*.  TC-128 Grade B steel is normalized (heated to 1600°

Fahrenheit and then air cooled), which significantly improves its performance

during impacts.  *Id*.  It can withstand higher impact forces than the steel that is

normally used for DOT-113 cars (81,000 pounds per square inch compared to

70,000 pounds per square inch).  JA____, ____EA_7, 43.  These enhancements

improve a 120W9 car's resistance to puncture and reduce the likelihood of tank

failure during a derailment.  85 Fed. Reg. at 45,004 (JA____).

PHMSA noted that TC-128 Grade B steel does not maintain its strength at

cryogenic temperatures, but this fact was not a safety concern because TC-128

Grade B steel is for the outer tank, not the inner tank that actually holds the

cryogenic material.  *Id*.  The steel used to construct the outer tanks of other tank-

within-a-tank cryogenic packages, including other 120W cars, is also not resistant

to cryogenic temperatures.  *Id*; JA____EA_7-8.  In an accident, an inner tank can

only puncture if the outer tank is breached, in which case any LNG released from

the inner tank would be released into the environment even if the outer tank were

designed to withstand cryogenic temperatures.  85 Fed. Reg. at 45,004 (JA____).

PHMSA did not change the requirements for the inner tanks of 120W9 cars, and the safety features, including the vent requirements, remained the same as other 120W cars.  85 Fed. Reg. at 45,005 (JA____).  The 120W and 120W9 cars are identical except that 120W9 cars have enhanced outer tanks to increase crashworthiness.  *Id*.

PHMSA based these outer tank requirements for 120W9 cars on solid data available at the time.   In 2015, PHMSA issued a regulation to reduce and mitigate accidents involving trains called high-hazard flammable trains that transport large quantities of certain flammable liquids, such as crude oil and ethanol.  *Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains*, 80 Fed. Reg. 26,644 (May 8, 2015).  In its analysis for that regulation, which involved single-tank cars rather than tank-within-a-tank cars, PHMSA determined that there was a reduction in punctures when cars were 9/16 inch thick and made of TC-128 Grade B steel, instead of 7/16 inch thick.  80 Fed. Reg. at 26,673.  Modeling showed this reduction in punctures from increased tank thickness at all speeds evaluated (30, 40, and 50 miles per hour) and with any braking system.  JA____PHMSA-2018-0025-0479_26.  In the 2015 regulation, PHMSA required that cars for high-hazard flammable trains be 9/16 inch thick and made from TC-128 Grade B steel.  80 Fed. Reg. at 26,715.  In the Rule, PHMSA included those same requirements for 120W9 cars.  85 Fed. Reg. at 45,005

(JA____).  PHMSA reasonably concluded, based on the analysis in the 2015 regulation, that those requirements would provide similar safety benefits to LNG transportation.

PHMSA and the Federal Railroad Administration also compared data from three derailments that involved cars with different tank thicknesses.  85 Fed. Reg. at 45,005-06 (JA____-____).  The three derailments were in Guernsey, Saskatchewan in 2020; Casselton, North Dakota in 2013; and Arcadia, Ohio in 2011.  85 Fed. Reg. at 45,005-06 (JA____-____).  The cars in the Casselton and Arcadia derailments had outer shells that were 7/16 inch thick, while the cars in the Guernsey derailment had outer shells that were 9/16 inch thick.  85 Fed. Reg. at 45,005 (JA____).  The cars in the Guernsey derailment had 5 shell punctures out of 32 derailed cars—62 percent fewer punctures than the Casselton cars (13 shell punctures out of 20 derailed cars) and 69 percent fewer than the Arcadia cars (16 shell punctures out of 32 derailed cars).  85 Fed. Reg. at 45,005-06 (JA____-____).  This data validated PHMSA's determination that requiring outer tanks to be 9/16 inch thick would provide substantial safety benefits.  85 Fed. Reg. at 45,005 (JA____).

PHMSA and the Federal Railroad Administration also conducted extensive modeling and simulations of impacts and derailments for different car specifications.  85 Fed. Reg. at 45,006 (JA____).  They used a program called

41

Finite Element Models that tests the effects of stresses on equipment. *Id*. In

November 2019, the Federal Railroad Administration also conducted a full-scale

impact test of a 120W car. *Id*. The data from that test, as well as the Finite

Element Model results, led PHMSA and the Federal Railroad Administration to

anticipate that increasing outer tank thickness from 7/16 inch to 9/16 inch would

reduce punctures during accidents by 20 to 30 percent. *Id.*; JA____-____PHMSA-

2018-0025-0479-29-30.

State and Environmental Petitioners observe that this derailment data does

not show that the 120W9 car's thicker outer shell will "eliminate" the risk of tank

punctures in accidents. State Br. 23; *see also* Env. Br. 24, 32. But PHMSA did not

claim that the enhanced outer tank for the 120W9 cars would *eliminate* all risks; it

said that the enhanced outer tank would provide a "substantial safety benefit." 85

Fed. Reg. at 45,005 (JA____). In the Hazardous Materials Transportation Act,

Congress recognized the "risks to life, property, and the environment that are

inherent in the transportation of hazardous material." 49 U.S.C. § 5101.

PHMSA's mission is to provide for the safe transportation of hazardous materials,

but it cannot eliminate all risks. PHMSA reasonably concluded that the 120W9

cars' outer tank enhancements would improve safety.

Environmental Petitioners contend that the thicker outer tank will increase

car weights, exceed weight limits in the Hazardous Materials Regulations, and thus

create other kinds of safety risks.  Env. Br. 24-27.  But Environmental Petitioners ignore both PHMSA's weight analysis and PHMSA's implementation of the Federal Railroad Administration's requirements for heavier cars.

PHMSA recognized that the 9/16-inch-thick outer shell would increase the weight of 120W9 cars by approximately 11,050 pounds.  85 Fed. Reg. at 45,015 (JA____).  The Hazardous Materials Regulations limit each car's gross weight (measured as the weight of the car itself plus the contents) to 263,000 pounds.  85 Fed. Reg. at 45,007 (JA____).  PHMSA anticipated that using 9/16-inch-thick outer shells would not cause cars to exceed the gross weight limit of 263,000 pounds.  *Id*.  An empty 120W9 car would weigh approximately 138,050 pounds and the LNG would add approximately 108,000 pounds, leading to a gross weight of 246,050 pounds—still within the 263,000-pound limit.  85 Fed. Reg. at 45,015 (JA____).

PHMSA acknowledged that some carriers might select designs that cause cars to exceed 263,000 pounds gross weight.  85 Fed. Reg. at 45,007 (JA____).  In 2011, the Federal Railroad Administration issued a notice that cars can weigh up to 286,000 pounds gross weight if those cars are built according to an Association of American Railroads standard called S-286 and are built with TC-128 Grade B steel.  *Operating Certain Railroad Tank Cars in Excess of 263,000 Pounds Gross Rail Load; Approval*, 76 Fed. Reg. 4,250, 4,253 (Jan. 25, 2011).  Standard S-286

sets forth industry-tested practices for designing, building, and operating rail cars at gross weights over 263,000 pounds and up to 286,000 pounds.  76 Fed. Reg. at 4,251.  The Federal Railroad Administration has determined that cars built to meet standard S-286 are *at least* equivalent in safety to cars that weigh no more than 263,000 pounds gross weight.  *Id.*

PHMSA ensured that the Rule's requirements were consistent with the Federal Railroad Administration's standards.  85 Fed. Reg. at 45,007 (JA____).  PHMSA mandated that any LNG car weighing over 263,000 pounds gross weight must (1) weigh no more than 286,000 pounds, (2) be constructed in accordance with Association of American Railroads standard S-286, and (3) be built with TC-128 Grade B steel.  *Id*.

To challenge PHMSA's weight analysis, Environmental Petitioners cite a white paper from 1999 that is not in the record and that the Court should disregard.  Env. Br. 25-27.  The Federal Railroad Administration relied on this white paper when it issued its 2011 notice regarding requirements for cars up to 286,000 pounds gross weight.  76 Fed. Reg. at 4,251.  Environmental Petitioners assert that this white paper shows that PHMSA failed to mandate necessary requirements for cars that weigh more than 263,000 pounds and that the white paper requires analytical and test evidence before cars weighing up to 286,000 pounds can be approved.  Env. Br. 25-27.  But in 2011, the Federal Railroad Administration

concluded that cars may weigh up to 286,000 pounds gross weight if the cars are constructed in accordance with standard S-286 and constructed of TC-128 Grade B steel.  76 Fed. Reg. at 4,253.  It did not require any additional evidence so long as cars are built in accordance with those two requirements.  76 Fed. Reg. at 4,253. PHMSA reasonably followed the Federal Railroad Administration's requirements.

### 2.    PHMSA required LNG-specific operational controls to mitigate risks.

In the proposed rule, PHMSA proposed to rely on the existing operational controls in the Hazardous Materials Regulations for flammable cryogenic materials.  84 Fed. Reg. at 56,969 (JA____).  In the final Rule, however, PHMSA required additional operational controls for safely transporting LNG: requirements for braking, pressure and location monitoring for each car, and route security planning.  85 Fed. Reg. at 45,007 (JA____).  State and Environmental Petitioners overlook these measures, which reduce safety risks.

First, PHMSA mandated that trains with 20 continuous LNG cars or 35 LNG cars dispersed throughout the train must have enhanced braking systems, either two-way end-of-train devices or distributed power systems.  *Id*.  Two-way end-of-train devices have two pieces of equipment linked by radio; the front unit in the lead locomotive initiates emergency brake commands and the unit at the rear of the train activates within one second.  80 Fed. Reg. at 26,650.  Two-way end-of-train devices are slightly more effective than conventional brakes because the rear

brakes receive emergency brake commands more quickly.  80 Fed. Reg. at 26,650.
Distributed power systems use multiple locomotives to distribute braking effort
throughout the train and create more uniform braking than conventional brakes.  80
Fed. Reg. at 26,650.

These enhanced braking systems reduce the likelihood and severity of any
derailments.  85 Fed. Reg. at 45,008 (JA____).  They quickly slow trains to either
avoid accidents altogether or decrease impacts if accidents do occur.  *Id*.  They are
more effective than conventional brakes because they provide emergency braking
from the front and rear of trains, which can reduce stopping distances and lessen
in-train forces that can cause derailments or make derailments more severe.  85
Fed. Reg. at 45,009 (JA____).  For example, data from simulations involving
DOT-117 cars (a different class than DOT-113 cars that does not have the tank-
within-a-tank design) showed that a train with 100 cars that derails while traveling
at 50 miles per hour would likely have 9.7 punctures with conventional brakes and
8.2 punctures with either distributed power or a two-way end-of-train device.
JA____EA_44-45, JA____PHMSA-2017-0102-0018_10.

PHMSA decided on the threshold of 20 continuous LNG cars or 35 LNG
cars dispersed throughout the train because it established that threshold for high-
hazard flammable trains and the record showed that requirement had proven
effective.  85 Fed. Reg. at 45,008 (JA____).  LNG trains and high-hazard

flammable trains have similar risk profiles.  85 Fed. Reg. at 45,016 (JA____).  In addition, data showed that distributed power or two-way end-of-train devices do not reduce punctures in shorter trains where latent transmission time in communicating braking signals between train cars has less effect.  For example, the simulations with DOT-117 cars showed that trains with 50 or 20 cars would have the same number of punctures with conventional brakes or enhanced braking systems (distributed power or two-way end-of-train devices).  JA____-____EA_44-45, JA____PHMSA-2017-0102-0018_10.

Second, each car containing LNG must have real-time location and inner-tank pressure monitoring.  85 Fed. Reg. at 45,007 (JA____).  The Hazardous Materials Regulations do not require real-time pressure and location monitoring for other cryogenic, flammable materials, but PHMSA required this monitoring for LNG cars.  The location monitoring will decrease the possibility of LNG cars becoming lost during transport.  85 Fed. Reg. at 45,008 (JA____).  The pressure-monitoring requirement mandates that carriers must be notified if the pressure rise in any LNG car exceeds three pounds per square inch in a 24-hour period.  85 Fed. Reg. at 45,023 (JA____).  With pressure monitoring, carriers will be able to identify adverse conditions and prevent LNG releases.  85 Fed. Reg. at 45,009 (JA____).

Third, carriers transporting LNG must comply with the route-planning requirements in Section 172.820 of the Hazardous Materials Regulations to ensure that railroads use the safest practicable routes.  85 Fed. Reg. at 45,007-08 (JA_____-_____).  Section 172.820 requires carriers transporting particular materials, such as explosives or poisonous materials, to analyze safety and security risks for their routes.  49 C.F.R. § 172.820(a)-(b).  Carriers must consider 27 different factors, including the volume of hazardous material being transported, environmentally sensitive or significant areas, population density, and emergency response capabilities along the route.  49 C.F.R. pt. 172 App'x D § D.  Carriers must select the practicable routes posing the least overall safety and security risk.  49 C.F.R. §§ 172.820(d), 172.820(e).  Section 172.820 also requires carriers to develop safety and security plans that mitigate risks to population centers.  49 C.F.R. § 172.820(h).

These route-planning requirements will reduce the severity of any potential effects from derailments.  85 Fed. Reg. at 45,008 (JA_____).  The Federal Railroad Administration regularly evaluates railroads' route risk assessments to ensure adherence to these requirements.  85 Fed. Reg. at 45,009 (JA_____).

PHMSA reasonably concluded that these additional operational controls would add a greater margin of safety to LNG transportation by rail.  85 Fed. Reg. at 45,007 (JA_____).

48

### 3.    PHMSA imposed maximum-pressure requirements to increase the safety of LNG transportation.

In the Rule, PHMSA mandated that the maximum pressure under which DOT-113 cars can begin transporting LNG is 15 pounds per square inch.  85 Fed. Reg. at 45,010 (JA____).  Pressures increase as cryogenic materials are transported.  Pressure-release valves in LNG cars begin opening at pressures of 75 pounds per square inch.  85 Fed. Reg. at 45,010 (JA____); *see also* 49 C.F.R. § 179.401-1.  So LNG cars have a 60 pound-per-square-inch range of pressure before venting occurs.  85 Fed. Reg. at 45,010 (JA____).  The second pressure-relief device—the rupture disc—ruptures and begins venting at 120 pounds per square inch.  49 C.F.R. § 179.401-1.  The inner tanks of 120W cars are built to withstand pressures up to at least 300 pounds per square inch before bursting, which means that pressure-relief devices begin venting well below the pressures that the tanks can withstand.  49 C.F.R. § 179.401-1.  PHMSA does not permit venting of LNG vapor during normal transportation, but the pressure-relief devices are an important safety protection for non-normal situations, like accidents.  JA____EA_12.

On average, DOT-113 cars have a daily pressure increase of 0.75 to 1.5 pounds per square inch.  85 Fed. Reg. at 45,010 (JA____).  The Rule mandates that carriers must be notified if the pressure rise in any car carrying LNG exceeds three pounds per square inch in a 24-hour period.  85 Fed. Reg. at 45,023 (JA____).

Although the Hazardous Materials Regulations do not limit the time that cars can spend in transit, shippers must notify the Federal Railroad Administration if a car transporting flammable cryogenic material has not reached its destination within 20 days. 85 Fed. Reg. at 45,014 (JA____). The Federal Railroad Administration closely monitors any situation when a flammable, cryogenic material is in rail transit for more than 20 days. *Id*. Its experience is that carriers expedite such cars to their destinations or take swift action to reduce pressures if necessary. *Id*. In addition, within that 20-day period, LNG cars would see only a 15 to 30 pounds-per-square-inch increase, meaning that there would still be a 45 to 30 pounds-per-square-inch buffer before any venting occurs. 85 Fed. Reg. at 45,010 (JA____).

To sum up, contrary to Petitioners' assertions, PHMSA considered the risks of transporting LNG by rail in large quantities. It addressed those risks based on record evidence available at the time, by imposing additional safety measures—enhanced outer tanks, operational controls, and maximum-pressure requirements—to ensure that LNG could be transported safely by rail even in large quantities.

\* \* \*

PHMSA satisfied its obligation, under the Hazardous Materials Transportation Act, to prescribe regulations for safe LNG transportation.

## II.    PHMSA satisfied the APA's notice-and-comment requirements.

PHMSA complied with the APA's notice-and-comment requirements. Environmental Petitioners incorrectly contend that they had no notice of two provisions in the Rule: the 120W9 car and the filling-density requirement (which pertains to the amount of material that can be loaded into the car).  Env. Br. 36-39. PHMSA provided notice that it was contemplating authorizing LNG transportation by rail in 120W cars, and the 120W9 car is a type of 120W car—albeit a safer type with a more puncture-resistant outer tank.  PHMSA changed the filling-density requirement in response to comments, but the final requirement is a logical outgrowth of the proposed requirement.

The APA requires agencies to provide notice and an opportunity to comment on rulemakings.  5 U.S.C. § 553.  The notice must provide "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  To comport with notice-and-comment requirements, a final rule must be a "logical outgrowth" of the version in the proposed rule.  *Brennan v. Dickson*, 45 F.4th 48, 68-69 (D.C. Cir. 2022).  A final rule is a logical outgrowth of the proposed rule "if interested parties should have anticipated that the change was possible," for example, "where the [proposed rule] expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change."  *CSX Transp., Inc. v. STB*, 584

F.3d 1076, 1081 (D.C. Cir. 2009) (cleaned up). But "the APA does not require that rules be subjected to multiple cycles of notice and comment until the version adopted as final is identical to the last notice of proposed rulemaking." *Brennan*, 45 F.4th at 69. "[T]he very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that rules evolve from conception to completion." *Id.*

### A.    The 120W9 car is a logical outgrowth of the proposed 120W car.

The proposed rule notified the public that PHMSA was contemplating allowing LNG transportation in 120W cars and, in the final Rule, PHMSA required a type of 120W car (the 120W9 car).

The 120W9 car is a 120W car, with the 120W car's inner-tank pressure, pressure-relief device, construction, and insulation requirements. 85 Fed. Reg. at 45,005 (JA____). But the 120W car used for transporting LNG must have an enhanced outer tank. The suffix "9" indicates the enhancements PHMSA required for 120W cars used to transport LNG. 85 Fed. Reg. at 44,994 (JA____).

Petitioners insist that the 120W9 car is "a wholly new tank car design." *E.g.*, Env. Br. 37. But as PHMSA explained, it authorized LNG transportation "in DOT-113C120W specification rail tank cars with enhanced outer tank requirements. . . . The enhancements to the outer tank are indicated by the new specification suffix '9' (DOT-113C120W9)." 85 Fed. Reg. at 44,994 (JA____).

The Hazardous Materials Regulations establish *minimum* thickness requirements for DOT-113 cars, and manufacturers have always been allowed to build outer tanks that are thicker than the minimum requirements. 85 Fed. Reg. at 45,015 (JA____). As discussed above (pp. 40-42), outer shells that are 9/16 inch thick had fewer punctures when PHMSA compared derailment data, so PHMSA reasonably required that thickness for LNG cars. 85 Fed. Reg. at 45,005-06 (JA____-____). The thicker outer shell requirement does not morph the 120W9 car into a completely different car; it simply makes the car safer. "The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different and improved from the rules originally proposed by the agency." *City of Stoughton, Wis. v. EPA*, 858 F.2d 747, 753 (D.C. Cir. 1988) (cleaned up). That is what PHMSA did here; it improved the Rule in response to comments (including from Petitioners) questioning the safety of transporting large quantities of LNG by rail.

Environmental Petitioners claim that PHMSA violated the APA's notice-and-comment requirements with the 120W9 car because PHMSA declined to consider a different car, the DOT-113C140W (140W) car, without further review, thus showing that the 120W9 car was not a logical outgrowth. Env. Br. 37. This argument misses the mark. PHMSA has never approved 140W cars for transportation of any hazardous materials. 85 Fed. Reg. at 45,015 (JA___).

PHMSA's reasonable decision not to select a new tank car for LNG transportation is entirely distinguishable from its decision to select 120W9 cars, which are a type of 120W car.

In January 2017, the Association of American Railroads petitioned PHMSA to authorize LNG transportation by rail in 120W and 140W cars. JA____P-1697_4. The Rule did not authorize 140W cars because, unlike 120W cars, 140W cars are not currently authorized in the Hazardous Materials Regulations. 85 Fed. Reg. at 45,015 (JA___). PHMSA concluded that 140W cars required an engineering review before PHMSA could authorize them. *Id*. 140W cars are designed to handle test pressures of 140 pounds per square inch, whereas 120W cars are designed for test pressures of 120 pounds per square inch.[7] *Id*. Inner tanks designed for test pressures up to 140 pounds per square inch would need thicker walls and would have different pressure-relief features. *Id*. PHMSA concluded that 140W cars' pressure-relief devices and thermal performance would need to be tested extensively. *Id*.

By contrast, the outer tank enhancements that PHMSA required for 120W9 cars do not require the extensive additional engineering review required for 140W cars, which have different inner-tank pressures, inner-tank walls, pressure-relief

---

[7] Test pressures are the pressures under which cars are tested during the manufacturing process. 49 C.F.R. § 179.400-18(a) (test pressure process); 49 C.F.R. § 179.401-1 (test pressure for 120W cars).

devices, and thermal performance. *Id.* This determination—that 120W9 cars are a type of 120W car and that they do not require the extensive engineering review that 140W cars would require—is within PHMSA's realm of technical expertise, and the Court "gives an extreme degree of deference to [an agency] when it is evaluating scientific data within its technical expertise." *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 336 (D.C. Cir. 2012) (cleaned up).

PHMSA did not make any changes to the 120W car other than enhancing the outer tank. Environmental Petitioners say that they would have made various suggestions for further modifications, such as redesigning the insulation or adding additional pressure-relief devices. Env. Br. 39. But they did not share those suggestions in response to the proposed rule.[8] PHMSA clearly announced in the proposed rule that it was considering authorizing LNG transportation by rail in 120W cars, *e.g.*, 84 Fed. Reg. at 56,964 (JA____), and it solicited comment on "all relevant aspects of this [proposed rule]," 84 Fed. Reg. at 56,966 (JA____). If commenters had concerns about the 120W car's specifications, or suggestions for modified specifications, they should have shared them during the comment period.

Insofar as Environmental Petitioners complain about the additional weight of the 120W9 car's outer tank enhancements (Br. 39), PHMSA expected that most

---

[8] Environmental Petitioners can share their suggestions in comments on PHMSA's impending rulemaking that will consider modifying the Rule.

120W9 cars would be within the Hazardous Materials Regulations' standard gross weight limit of 263,000 pounds and prescribed additional requirements in accordance with the Federal Railroad Administration's rules for cars weighing up to 286,000 pounds. *See supra* pp. 42-45.

**B.    The filling-density requirement is a logical outgrowth of the proposed rule.**

Environmental Petitioners also complain that PHMSA changed filling-density requirements between the proposed rule and the final Rule. Env. Br. 38. Filling-density requirements prevent carriers from overloading cars; they limit the amount of product with which carriers can fill the car.[9] The Hazardous Materials Regulations prohibit cars from exceeding a capacity of 34,500 gallons of cryogenic material. 49 C.F.R. § 179.13. Filling-density requirements specify how much of that capacity carriers can use in each car.

These requirements ensure that there is sufficient "outage," which is the space between the liquid and the intakes for the pressure-relief devices. Having sufficient outage means that cars have room for cryogenic material to expand and that, even if pressure-relief devices begin venting, they will vent only vapors, not

---

[9] The term "filling density" means the percent ratio of the weight of material in the tank to the weight of water that the tank will hold. 49 C.F.R. § 173.319(d)(1). So if a tank car filled with water would weigh 10,000 pounds, and the filling-density requirement for a specific material is 50%, then the tank car can hold 5,000 pounds of that particular material.

liquid material.  Typically, the Hazardous Materials Regulations mandate a minimum 0.5 percent outage for cars transporting flammable cryogenic liquids, which means that at least 0.5 percent of the tank's capacity below the pressure-relief-device intakes remains empty.  49 C.F.R. § 173.319(b)(1).

In the proposed rule, PHMSA proposed to allow LNG transportation in cars with a maximum filling density of 32.5 percent.  84 Fed. Reg. at 56,968 (JA____). Three different commenters, including the Railway Supply Institute Committee on Tank Cars, a railroad car industry trade group, and the Association of American Railroads objected to the 32.5 percent filling density.  85 Fed. Reg. at 45,014 (JA____).  The Committee on Tank Cars said that a 32.5 percent maximum filling density would create a 15 percent outage, rather than the standard 0.5 percent outage for other flammable cryogenic materials.  *Id.*; JA____PHMSA-2018-0025-0161_5.  The Committee on Tank Cars also noted that limiting LNG to a maximum filling density of 32.5 percent would require approximately 13 percent more cars to move the same volume of LNG, which could increase transportation risks.  JA____-____PHMSA-2018-0025-0161_5-6.  In addition, a 32.5 percent filling-density limit would be inconsistent with Canada's regulations, which impose a 37.3 percent maximum filling density for cars carrying LNG by rail. JA____PHMSA-2018-0025-0161_6.

PHMSA agreed with these commenters and imposed a 37.3 percent filling-density limit in the final Rule.  85 Fed. Reg. at 45,014 (JA____).  PHMSA calculated filling densities for cryogenic material in different containers, using ethylene and hydrogen for comparison.  *Id*.  It determined that 37.3 percent was the appropriate filling density.  *Id*.  That filling density would ensure a two percent outage, which means that LNG will remain below the pressure control devices even when pressures increase to the point that the devices begin discharging vapors.  *Id*.  The two-percent-outage level is more protective than the 0.5-percent-outage level that the Hazardous Materials Regulations prescribe for other cryogenic flammable gases.  JA____EA_10; *see also* 49 C.F.R. § 173.319(b)(1).

In addition, a 37.3 percent maximum filling density is consistent with the outages determined to be safe for LNG in other packages, such as T-75 UN portable tanks.  JA___EA_10.  Those other packages have different filling densities, but they have the same outage percentages that LNG rail cars will have.

PHMSA reasonably responded to comments objecting to the proposed rule's 32.5 percent filling density and suggesting 37.3 percent instead.  "[T]he [proposed rule] and the final rule need not be identical."  *CSX Transp.,* 584 F.3d at 1079.  Nor must PHMSA engage in endless rounds of notice-and-comment until the proposed rule is identical to the final Rule.  *Brennan*, 45 F.4th at 69.

Environmental Petitioners argue that the higher filling density will substantially increase the weight of cars carrying LNG. Env. Br. 24. But as explained above, PHMSA considered the gross weight of LNG cars, expected that most of them would be within the standard Hazardous Materials Regulations limit of 263,000 pounds, and prescribed requirements for cars that exceed that limit. *Supra* pp. 42-45.

*   *   *

PHMSA satisfied the APA's notice-and-comment requirements because the final Rule is a logical outgrowth of the proposed rule.

## III.   PHMSA complied with NEPA.

PHMSA fulfilled NEPA's requirements. It satisfied NEPA's public-participation requirements and reasonably did not prepare a supplemental environmental analysis. PHMSA also considered and disclosed the Rule's potential impacts, including impacts related to safety, greenhouse-gas emissions, and environmental justice. And PHMSA reasonably determined that the Rule would not have significant impacts and, thus, that an environmental impact statement was not warranted.

### A.   PHMSA satisfied NEPA's public-participation requirements.

State Petitioners claim that PHMSA's decision to require 120W cars with enhanced outer tanks violated NEPA's public-participation requirements. State Br.

59

14-16.  This argument lacks merit.  First, PHMSA satisfied NEPA's public-participation requirements by providing the draft environmental assessment for public comment.  Second, PHMSA then analyzed its decision to approve 120W cars with enhanced outer tanks in the final environmental assessment, and NEPA does not require anything more.

### 1.    PHMSA provided opportunity for public comment.

PHMSA satisfied NEPA's public-participation requirements when it solicited comment in the proposed rule *and* provided a draft environmental assessment for comment.

When agencies prepare environmental assessments, they must involve the public "to the extent practicable."  40 C.F.R. § 1501.4(b).  Agencies "need not include the public in the preparation of every [environmental assessment]," and they have "significant discretion in determining when public comment is required with respect to [environmental assessments]."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 519 (D.C. Cir. 2010) (cleaned up).  This Court has upheld an agency's efforts to provide for public participation in environmental assessments when the agency posted notices about the proposed action without "suppl[ying] any specific environmental information."  *Id.*

In the proposed rule, PHMSA included a draft environmental assessment considering the proposed rule and assessing three alternatives.  84 Fed. Reg. at

56,970-75 (JA____-____).  Alternative 1 was the no action alternative where PHMSA would not allow LNG transportation by rail.  84 Fed. Reg. at 56,971 (JA____).  Alternative 2 would allow LNG transportation by rail in 120W and 140W cars.  *Id*.  Alternative 3 would allow LNG transportation by rail in 120W cars only.  *Id*.  PHMSA then explained the hazards of transporting LNG by rail and the characteristics of DOT-113 cars.  84 Fed. Reg. at 56,971-73 (JA____-____).

In the final environmental assessment, PHMSA considered the same alternatives except Alternative 3—the preferred alternative—discussed the safer 120W9 cars.  JA____EA_6.  PHMSA also analyzed LNG's characteristics, ways in which LNG could be released into the environment, risks in different derailment scenarios, and past derailments involving DOT-113 cars.  JA____-____EA_12-26.  And it responded to comments.  JA____-____EA 38-62.

PHMSA satisfied NEPA's public-participation requirements with the proposed rule, the draft environmental assessment that it provided for comment, and the final environmental assessment, which responded to comments.  Unlike the cases that State Petitioners cite, this was not a situation where the agency evinced "a complete failure to involve or even inform the public about an agency's preparation of an [environmental assessment]."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003); *see* State Br. 15 (citing *Citizens for Better Forestry*, 341 F.3d at 970).

>    **2.    PHMSA did not need to supplement its NEPA
>         analysis because the 120W9 car did not substantially
>         change potential environmental impacts.**

State Petitioners contend that PHMSA should have provided additional

opportunities for public comment because it selected the 120W9 car.  State Br. 14-

16.  But as explained above, NEPA does not require an agency to always provide

an opportunity for public comment on an environmental assessment, and in any

event PHMSA did so here.

Petitioners also err in relying on a NEPA regulation regarding

supplementation.  State Br. 14-15 (citing 40 C.F.R. § 1502.9(c)(1)(i)).  This

regulation provides that an agency must supplement either draft or final

environmental impact statements if the agency "makes substantial changes in the

proposed action that are relevant to environmental concerns."  40 C.F.R.

§ 1502.9(c)(1)(i).  As an initial matter, this regulation concerns supplementation of

*environmental impact statements* rather than environmental assessments.  The

regulation thus does not impose any requirement on the environmental assessment

process.

State Petitioners cite the regulation as support for the contention that

"[w]here a final rule takes an unforeseeable turn from the proposal, NEPA requires

an agency to provide additional opportunities for public participation."  State Br.

15.  Even assuming that the regulation has some application here, additional

opportunities for comment were unnecessary, because the final rule did *not* take an "unforeseeable turn." Supplemental NEPA analysis "must be prepared only where new information provides a *seriously* different picture of the environmental landscape." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (cleaned up).

As explained above (pp. 52-55), the 120W9 car is a 120W car with a thicker outer shell made from stronger steel. The 120W9 car does not present a "*seriously* different picture of the environmental landscape." *Id.* The 120W9 car reduces potential environmental impacts from derailments because of its increased puncture resistance. *Supra* pp. 40-42. And a reduction in potential impacts does not warrant supplemental NEPA analysis. *See Friends of the Bow v. Thompson*, 124 F.3d 1210, 1219 (10th Cir. 1997) (upholding agency's decision not to prepare a supplemental NEPA analysis because "a reduction in environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact").

Insofar as State Petitioners argue that the increased weight of 120W9 cars warrants supplemental NEPA analysis, State Br. 16, PHMSA noted that most 120W9 cars would be within the Hazardous Materials Regulations' standard gross weight limit of 263,000 pounds, and it prescribed additional requirements for cars weighing up to 286,000 pounds. *See supra* pp. 42-45.

PHMSA exercised its technical expertise in requiring the 120W9 car and in determining that the 120W9 car was a safer version of the 120W car, not a wholly different car as Petitioners contend. The Court "must generally be at [its] most deferential" when reviewing the agency's "technical judgments and predictions." *Blue Ridge Env't Def. League v. Nuclear Regul. Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013) (cleaned up). Supplementation and additional public comment were not warranted here because the 120W9 car is a type of 120W car that does not present a seriously different picture of the Rule's impacts.

### B. PHMSA reasonably concluded that the Rule will have no significant environmental impacts.

Contrary to State Petitioners' contentions (State Br. 16-20), PHMSA reasonably concluded that the Rule will not have significant environmental impacts and, thus, an environmental impact statement was not required.

NEPA requires a federal agency to prepare an environmental impact statement only for "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(C). Courts give "considerable deference to an agency's decision regarding whether to prepare an [environmental impact statement]." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012). In evaluating the agency's decision, the Court considers whether the agency: 1) "accurately identified the relevant environmental concern," 2) took a "hard look at the problem" in preparing its environmental assessment, 3) made "a

convincing case for its finding of no significant impact," and 4) showed that even if a significant impact will occur, "changes or safeguards in the project sufficiently reduce the impact to a minimum." *Id.* (cleaned up).

PHMSA satisfied these requirements. It disclosed and took a hard look at the Rule's potential impacts, particularly as to safety, greenhouse-gas emissions, and environmental justice. And PHMSA showed that there would be no significant impacts, especially given the Rule's additional safety measures.

### 1. PHMSA took a hard look at potential environmental impacts.

#### a. PHMSA analyzed potential safety impacts.

Contrary to State Petitioners' contentions, PHMSA adequately considered safety issues under NEPA. State Br. 22-26.

PHMSA acknowledged that LNG poses potential hazards if it is released, and it considered potential release scenarios. JA____EA_12. Under NEPA, an agency "must look at both the probabilities of potentially harmful events and the consequences if those events come to pass." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1049 (D.C. Cir. 2021) (cleaned up). "A finding of no significant impact is appropriate only if a grave harm's probability is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal." *Id.* (cleaned up). PHMSA satisfied this

requirement, examining potential release scenarios and concluding that the probabilities of the most dangerous scenarios were low.

PHMSA estimated three possible release scenarios that could occur during LNG transportation by rail. JA____EA_22. First, an equipment failure unrelated to a rail accident could release LNG. *Id.* PHMSA estimated that the probability of such releases was moderate and the consequences would be low. *Id.* Second, a rail accident could cause outer tank damage and the pressure-relief devices could release LNG to reduce any pressure build-up. *Id.* PHMSA estimated that the probability of such releases was low and the consequences would be low to high. *Id.* Third, a rail accident could damage both the inner and outer tanks and cause a large release of LNG. *Id.* The probability of such releases was low and the consequences would be low to high. *Id.* PHMSA noted that the risk of outer- and inner-tank punctures increases with train speed. JA____EA_20.

PHMSA noted that the probability of the third scenario (a large release) was reduced by the 120W9 cars' enhanced outer tank. JA____EA_22. But PHMSA acknowledged that the third scenario could have high consequences. *Id.* Large releases of LNG could spill on the ground in a pool or vaporize. *Id.* If the released LNG encountered an ignition source, then it could ignite. *Id.* Ignition sources from a derailment could include sparks from electrical systems on the train, hot metal heated by the friction of the derailment, or fires from the locomotive fuel

tanks.  *Id*.  There could be different types of fires, such as pool fires (where a pool of liquid LNG ignites) or vapor fires (where LNG vapors ignite).  JA____EA_14.  The number of cars that could be exposed to a fire depends on several factors, including whether the fire involved a burning pool of LNG, the duration of the fire, whether flames touch neighboring cars, and the impact of defensive actions taken by first responders.  JA____EA_25.  PHMSA explained the risks from LNG fires, from the spread of LNG vapors, and from spills of cryogenic material.  JA____-____, ____-____, ____-____EA_13-14, 16-17, 22-24.

State Petitioners contend that PHMSA did not consider the possibility that escaped LNG from a derailed car could cause the outer tanks of adjacent cars to fail.  State Br. 24.  But PHMSA did address that, explaining that outer tanks can embrittle when exposed to cryogenic liquids.  JA____EA_25.  The inner tank will not embrittle because it is designed to handle cryogenic temperatures.  *Id.*; 85 Fed. Reg. at 45,004 (JA____).  If the outer tank fails, the DOT-113 car would lose its insulating vacuum and eventually pressure would build in the inner tank.  JA____EA_25.  This pressure increase would activate the pressure-relief devices, and LNG would vent in a controlled manner.  *Id*.

State Petitioners contend that DOT-113 cars do not have a strong safety record (Br. 22-24), but PHMSA found otherwise based on the record.  *See supra* pp. 25-28.  Despite the long history of hazardous materials transportation in DOT-

113 cars, there have been only two incidents when the inner tank of a DOT-113 car breached and released material.  85 Fed. Reg. at 45,005 (JA____).  PHMSA examined the two incidents.

The first incident occurred in 2011 in Moran, Kansas.  Three 120W cars carrying refrigerated ethylene derailed, and 44,306 gallons of ethylene were released.  JA____, ____, ____PHMSA-2018-0025-0571_6, 8, 14.  Neither the train crew nor any civilians sustained injuries.  *Id*.  The second incident occurred in 2014 in Mer Rouge, Louisiana.  JA____EA_15.  Two cars carrying cryogenic liquid argon derailed, and 47,233 gallons of argon spilled.  *Id*.  One car was a DOT-113 car and one car was an AAR204W car, which is similar to a DOT-113 car.  *Id*.  No injuries or fatalities from the hazardous material were reported.  *Id*.

PHMSA acknowledged that cryogenic ethylene and cryogenic argon are transported in smaller quantities than the quantities that are possible for LNG transportation.  *Id*.  PHMSA also acknowledged that each additional car transporting hazardous material increases the potential of a hazardous material release if a derailment occurs.  JA____EA_13.  It noted that serious incidents involving DOT-113 cars have been rare but that, given the quantity of hazardous materials, accidents can be high-consequence events.  JA____EA_15.

PHMSA took a hard look at the risks of transporting LNG by rail.  However, given the safety history of 120W cars, PHMSA reasonably concluded that the risks

of derailment, breach of both inner and outer tanks, and ignition were low.

JA____EA_25.  Moreover, breaches are less likely under the Rule because 120W9

cars have enhanced outer tanks that improve crashworthiness.  JA____,

____EA_12, 14.

### b.    PHMSA analyzed potential impacts from greenhouse-gas emissions.

Though State Petitioners suggest otherwise, PHMSA reasonably considered

greenhouse-gas emissions.  State Br. 26-28.  Under NEPA, agencies must consider

indirect effects of their actions.  40 C.F.R. § 1502.16(b).  Indirect effects are

caused by the action and are reasonably foreseeable, although they may be later in

time or removed in distance.  40 C.F.R. § 1508.8(b).  Greenhouse-gas emissions

from burning natural gas are a reasonably foreseeable effect of some natural gas

infrastructure and transportation projects.  *Sierra Club v. FERC*, 867 F.3d 1357,

1371 (D.C. Cir. 2017).  "Nonetheless, there will inevitably be some limits on the

foreseeability of emissions, and the court has rejected the notion that downstream

emissions are always reasonably foreseeable effects."  *Del. Riverkeeper Network v.*

*FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022).  For example, when "natural gas would

be delivered for further transportation on the interstate grid to an unknown

destination and for an unknown end use," then emissions "were not reasonably

foreseeable."  *Id.* at 110.

PHMSA did not "ignore[]" greenhouse-gas emissions, as State Petitioners claim. State Br. 27. PHMSA gave qualitative discussions of potential greenhouse-gas emissions (and reductions) related to the Rule. State Petitioners fault PHMSA for not quantifying emissions (Br. 26-28), but PHMSA reasonably explained that such quantification was not possible. Instead, PHMSA qualitatively explained different potential impacts from the Rule relating to greenhouse-gas emissions.

The Court has recognized the complexity of modeling greenhouse-gas emissions, particularly in comparison to other fuel sources, because of energy market dynamics and the "many uncertainties in modeling such market dynamics." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 202 (D.C. Cir. 2017). Given the unpredictability regarding destinations, end uses, demand, and volumes, there was "nothing arbitrary" about PHMSA's decision to do a qualitative analysis of greenhouse-gas emissions instead of a quantitative analysis. *Id.* And, in any event, State Petitioners "make no attempt to identify a method that the [agency] could have used" to calculate greenhouse-gas emissions. *Del. Riverkeeper Network*, 45 F.4th at 110 (cleaned up).

First, PHMSA compared rail transportation to highway transportation. PHMSA explained that rail transportation is superior to highway transportation in terms of fuel efficiency and emissions. JA____EA_28. A train transporting LNG emits less greenhouse gases than the same volume of LNG transported by highway

trucks.  JA____EA_11.  In fact, motor vehicle transportation generates 6.9 times more carbon dioxide (a greenhouse gas) than rail transportation over the same distance.  JA____EA_28.  PHMSA acknowledged the Rule could increase rail transportation by providing a different mode to bring methane to markets, potentially facilitating delivery from stranded sources or to underserved areas that could not receive natural gas without rail delivery.  JA____, ____EA_34, 52.  But without the Rule, there could be more LNG transportation by highway.  JA____EA_34.

In addition, rail cars remain in service for approximately 50 years, whereas the cargo tanks used for transporting LNG by highway are in service for eight years or less.  JA____EA_56.  Rail cars' long service life means that less materials and energy will be spent manufacturing replacements.  *Id*.

Second, PHMSA acknowledged that shippers must construct 120W9 cars if they want to ship LNG.  JA____EA_54.  Producing these rail cars would cause some greenhouse-gas emissions, but less than a typical interstate gas pipeline (although pipelines can transport greater quantities and last longer).  JA____-____EA_54-55.

Third, PHMSA did not anticipate any emissions would occur from venting LNG since pressure-relief valves should not activate during normal transportation.  JA____EA_29.  If any venting did occur, PHMSA anticipated that the duration of

venting would be short and the valve would close again, thus limiting the emissions.  JA____EA_30.

Fourth, PHMSA acknowledged that emissions could occur if LNG cars are involved in accidents or if they are lost during transport.  JA____EA_29.  PHMSA concluded that it was unlikely cars could be lost during transport because LNG cars must be remotely monitored and because carriers must notify the Federal Railroad Administration immediately if LNG cars have not reached their destinations within 20 days.  *Id*.  In fact, 120W cars are designed to provide 40 days of transportation without venting—double the amount of time requiring Federal Railroad Administration notification.  JA____EA_30.

Fifth, PHMSA acknowledged that allowing LNG transportation by rail might create business opportunities that might, in turn, cause production, distribution, and consumption of natural gas to increase.  JA____EA_35.  These opportunities could include power plants or LNG export facilities.  *Id*.  PHMSA acknowledged that production, transportation, and consumption of LNG related to the Rule could contribute to greenhouse-gas emissions.  *Id*.

Finally, PHMSA explained that various economic and practical unknowns frustrated its ability to meaningfully predict the Rule's effects on natural gas production and transportation.  *Id*.  For example, shippers can transport natural gas via pipeline, and natural gas or LNG via truck, ship, rail in portable tanks with

Federal Railroad Administration approval, or in rail tank cars under the Rule, making it hard to pinpoint the Rule's specific impacts.  JA____PHMSA-2018-0025-0479_15.  It was also difficult for PHMSA to forecast indirect and cumulative greenhouse-gas emissions because of different operating practices and various state, federal, and international regulatory requirements.  JA____EA_35. For example, in certain markets, natural gas could replace coal, wood, and diesel, which emit more greenhouse gases than natural gas.  JA____-____EA_53-54. PHMSA's reasoning was "sound" because it explained that natural gas would be delivered to "unknown destination[s]" and for "unknown end use[s]."  *Del. Riverkeeper Network*, 45 F.4th at 110.

In addition, increased use of natural gas in recent years in the United States reduced carbon dioxide emissions, even while energy needs increased, because natural gas was replacing other energy sources that emit more carbon dioxide. JA____-____EA_53-54.  So facilitating the transportation of natural gas could reduce greenhouse-gas emissions, depending on the extent to which natural gas replaced other energy sources.  JA____EA_54.  PHMSA also noted that domestic production, consumption, and export of LNG were increasing substantially— independent of the Rule—so it was difficult for PHMSA to assess the Rule's potential impacts.  JA____EA_35.

And the COVID-19 pandemic disrupted energy markets, and the LNG market in particular, which further complicated PHMSA's ability to forecast greenhouse-gas emissions. *Id*. PHMSA said that these unknowns could not be clarified through preparing an environmental impact statement. *Id*. At bottom, PHMSA did not have a concrete method of reasonably forecasting potential greenhouse-gas emissions that could result from the Rule. JA____EA_53. Its qualitative analysis was reasonable.

### c.  PHMSA analyzed potential impacts on communities with environmental justice concerns.

PHMSA reasonably analyzed environmental justice issues presented in the record. State Petitioners' contrary argument lacks merit. State Br. 28-30. "An environmental justice analysis is measured against the arbitrary-and-capricious standard" and the Court evaluates whether the agency took a "hard look at environmental justice issues." *Sierra Club v. FERC*, 867 F.3d at 1368 (cleaned up).

PHMSA acknowledged that the Rule might facilitate LNG transportation through communities with environmental justice concerns, but it also might reduce highway transportation of LNG through those communities. JA____EA_42. Nonetheless, PHMSA acknowledged that the fixed location of rail infrastructure prevents full avoidance of communities with environmental justice concerns. *Id*.

PHMSA emphasized, however, that the Rule's safety requirements reduce the likelihood of an LNG release during an accident.  *Id*.

PHMSA noted that lower-income families and economically-distressed areas could potentially benefit from lower gas prices based on the Rule improving access in areas that lack natural gas pipelines.  JA____PHMSA-2018-0025-0479_42.  But there could be impacts from increased traffic along rail lines near communities with environmental justice concerns.  *Id.*

State Petitioners fault PHMSA for not analyzing the composition of communities along rail lines likely to support LNG traffic.  State Br. 29.  But PHMSA did not know the routes that shippers would use because routing decisions depend on natural gas production, pipeline capacity, demand, and other factors.  JA____EA_60.  The Rule does not dictate the routes that carriers transporting LNG may use.  JA____-____EA_41-42.  PHMSA also explained that it has no authority over the siting or construction of rail infrastructure.  JA____EA_42.  PHMSA noted, however, that the Rule requires railroads to use the practicable routes posing the least overall safety and security risk.  *Id.*; *see also infra* p. 48 (explaining required safety and security analysis).  In making that determination, railroads must consider factors such population density; this requirement thus protects populations along rail corridors.  JA____EA_42.

The Tribe contends that PHMSA failed to consider its environmental justice concerns, namely that the Tribe is "uniquely located between an LNG plant and virtually all of the continental United States." Tribe Br. 52. But PHMSA considered the Tribe's concerns and concluded that they were "inapposite" because they were predicated on potential rail transport to Puget Sound Energy's Tacoma LNG facility. 85 Fed. Reg. at 45,022 (JA____). PHMSA explained that rail transportation of LNG to the Tacoma facility was not permitted; rather, under that facility's authorization order from the state regulator, the "sole source of natural gas supply used in all operations" will be from Canada by pipeline. *Id.* If the facility ships out any LNG, it will ship by truck or will convert LNG to natural gas to supply customers through pipelines. 85 Fed. Reg. at 45,022-23 (JA____-____). PHMSA examined schematics for the Tacoma facility and determined that "rail infrastructure neither exists nor is contemplated at the site." 85 Fed. Reg. at 45,023 (JA____). The Tribe asserts that the Tacoma facility could make different plans in the future. Tribe Br. 51. But "NEPA does not require an agency to work through every remote and speculative possibility." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 802 (D.C. Cir. 2022) (cleaned up). PHMSA examined the Tacoma facility's authorization and schematics and saw no indication that rail infrastructure was contemplated. It reasonably considered the Tribe's concerns.

### 2.    The NEPA intensity factors show that the Rule will have no significant impacts.

State Petitioners assert (Br. 16-20) that an environmental impact statement was required, but PHMSA analyzed the regulatory factors assessing significance under NEPA and reasonably determined that an environmental impact statement was not required.

Agencies determine whether an action will have significant impacts by examining the context of the action and the intensity of potential environmental impacts.  40 C.F.R. § 1508.27.  Ten factors inform the intensity inquiry.  40 C.F.R. § 1508.27(b).  These factors include whether impacts may be both beneficial and adverse, public health or safety impacts, the degree to which effects may be highly controversial, the degree to which possible effects are highly uncertain or involve unique or unknown risks, and potential impacts to significant cultural resources. 40 C.F.R. § 1508.27(b).

PHMSA considered the intensity factors and determined that the Rule would have no significant impacts and, in fact, could have beneficial impacts.  JA____-____EA_57-58.  The Rule may benefit society by facilitating the use of natural gas, which has less greenhouse-gas emissions than some other fuels. JA____EA_58.  The Rule also could improve energy security during winter months in areas with limited or no pipeline capacity.  *Id*.  In addition, public health conditions can improve in areas where natural gas replaces other fuels that pollute

more.  *Id.*  The Rule could also reduce shipments of LNG by highway, which involves more accidents than rail.  JA____EA_26.

State Petitioners argue that transporting LNG by rail presents "extreme danger" from derailments, but PHMSA's analysis showed otherwise.  State Br. 16. PHMSA acknowledged that derailments could cause public health or safety impacts but determined that such risks are low.  JA____EA_58.  While derailments are possible, 120W cars have a strong safety record, have been used for decades, and have not been linked to any fatalities.  JA____EA_57.  Derailments risks are reduced by the Rule's requirements for thicker outer tanks, higher-quality steel, enhanced braking technology, and route planning.  JA____EA_58; *see also supra* pp. 38-50 (describing the Rule's additional safety measures).  These "safeguards" in the Rule "sufficiently reduce the impact to a minimum," and thus support PHMSA's decision not to prepare an environmental impact statement.  *New York v. Nuclear Regul. Comm'n*, 681 F.3d at 477 (cleaned up).

State Petitioners assert that PHMSA needed to prepare an environmental impact statement because the Rule's impacts are highly controversial.  State Br. 18-20 (citing 40 C.F.R. § 1508.27(b)(4)).  Under NEPA, potential impacts are only controversial when there is a substantial dispute as to the size, nature, or effect of the action, not simply when people oppose the action.  *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1083 (D.C. Cir. 2019).  For decades, PHMSA,

the Federal Railroad Administration, and their predecessor agencies have had a strong safety record of overseeing rail transportation of hazardous materials, including flammable cryogenic liquids. JA____EA_59. Many of these hazardous materials, such as butane, liquid petroleum gas, and cryogenic ethylene, have similar risk profiles as LNG. *Id.* Some of these materials have greater risk profiles than LNG. *Id.* But LNG transportation will benefit from 120W9 cars and other tailored safety measures, such as real-time pressure monitoring. EA at 59. PHMSA thus concluded that a substantial dispute does not exist regarding the risks from transporting LNG by rail. JA____EA_59.

PHMSA also reasonably concluded, contrary to State Petitioners' argument (Br. 17), that the risks from transporting LNG by rail are not uncertain, unique, or unknown. PHMSA explained that the risks from transporting cryogenic flammable gases are well known. JA____EA_59. And flammable gases are commonly transported in single-walled cars, but the tank-within-a-tank design of 120W cars offers superior protection against puncture and failure. *Id.*

PHMSA also found that an environmental impact statement would not be useful to inform decisionmakers or the public. PHMSA did not know how much LNG would be transported by rail because quantities would depend on market forces and practical constraints. JA____-____EA_59-60. PHMSA also did not know the routes that shippers would use, since routing decisions would depend on

79

various factors, including production, pipeline capacity, and demand.

JA____EA_60.  Shippers could transport LNG by an almost infinite combination

of existing or future rail routes.  JA____EA_61.  Preparing an environmental

impact statement would not illuminate these unknowns related to quantity and

routing.  JA____EA_60.  PHMSA acknowledged that the risks from transporting

hazardous materials increase as the quantities increase.  *Id*.  But the Rule's

safeguards will mitigate any risks so that transporting LNG by rail does not

significantly impact human health or the environment.  *Id*.

*       *       *

In summary, PHMSA satisfied NEPA's requirements with its environmental

assessment, which enabled public participation and through which PHMSA took a

hard look at the Rule's potential environmental impacts.

## IV.    PHMSA satisfied any obligation it had to consult with the Tribe.

PHMSA strives to consult with Indian tribes on a government-to-

government basis on issues that may affect their interests.  PHMSA made

reasonable efforts to consult with the Puyallup Tribe on the Rule.  The Tribe

disagrees, but it does not point to any legally binding and judicially enforceable

consultation requirements that it appropriately raised during the rulemaking

process.  And PHMSA's efforts satisfied any applicable consultation obligation.

**A.    The Tribe's view of consultation exceeds any legally binding and judicially enforceable requirement.**

The Tribe points to three sources for its claim that PHMSA had a consultation obligation—the NHPA, Executive Order 13175, and DOT Order 5301.1.  Tribe Br. 28, 36-37.  But the Tribe did not assert that the NHPA applied to the rulemaking or properly exhaust the NHPA issue with the agency.  And while PHMSA fully complied with Executive Order 13175 and DOT Order 5301.1, those Orders are not judicially enforceable.

**1.    The Tribe failed to exhaust the NHPA Section 106 issue before the agency.**

The Tribe contends that PHMSA had a consultation obligation under the NHPA because the Rule is an undertaking under Section 106 of the NHPA.  Tribe Br. 29-30.  But the Tribe's comments during the rulemaking made only a passing reference to the NHPA in a footnote and did not assert whether or how the law applied to the rulemaking.  Thus, the Tribe failed to properly raise or exhaust this issue before PHMSA, and PHMSA did not address whether the Rule was an undertaking.

Under ordinary principles of administrative law, a party "will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration."  *Advocates for Highway & Auto Safety v. FMCSA*, 429 F.3d 1136, 1150 (D.C. Cir. 2005); *see also*

*Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed.").

Courts "enforce the exhaustion requirement for good reason." *W. Watersheds Project v. BLM*, 76 F.4th 1286, 1294 (10th Cir. 2023). The reason for the forfeiture rule is to ensure the agency has "an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Okla. Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014). The rule deters litigants from "sandbag[ging] agencies by withholding legal arguments for tactical reasons until they reach the courts of appeal." *Id*. (cleaned up). "[C]ourts often cast a skeptical eye towards plaintiffs that have been involved throughout the administrative process yet rely on a peripheral or newfound theory only when thrust before a federal court." *W. Watersheds Project*, 76 F.4th at 1294.

Administrative exhaustion applies to bar the Tribe's argument here. In its notice of proposed rulemaking, PHMSA indicated that it saw no need for consultation under Executive Order 13175 but invited Indian tribes to identify any impacts to tribes. 84 Fed. Reg. at 56,970. The Tribe submitted 20 pages of comments on the proposed rule. JA___PHMSA-2018-0025-0159_1-25. Among its comments, the Tribe asserted that the rulemaking was subject to the consultation requirements in Executive Order 13175. JA___[3].

In its opening brief, the Tribe asserts that it "invoked NHPA consultation" and cites to two pages from those comments. Tribe Br. 31 (citing JA____PHMSA-2018-0025-0159_1; JA___[20]). But neither of those pages cited or discussed the NHPA. JA___[1,20]. The closest that the Tribe came was a general reference to "applicable federal law": "The purpose of this consultation, which would be ongoing, would be to further inform PHMSA of the concerns identified above and to permit the Tribe and PHMSA to engage in the type of meaningful and mutually informative government-to-government consultation required by *applicable federal law*." JA___[20] (emphasis added). But the Tribe did not identify what federal law applied.

Although the Tribe does not reference it in its opening brief, the Tribe did cite the NHPA in a single footnote in its comments. The footnote stated: "Also consider NHPA Section 106 and most notably whether there is an undertaking that could potentially affect historic properties and thus require meaningful consultation with affected Tribes." JA____[3n.3.] (citations omitted).

This footnote was insufficient to alert PHMSA to the Tribe's position. The Tribe asserted no clear position or explanation regarding the applicability of NHPA Section 106 to the rulemaking. Rather the Tribe suggested considering *whether* there was an undertaking. JA____[3.n3] (citations omitted). If a footnote is "no place to make a substantive legal argument on appeal," *CTS Corp. v. EPA*, 759

F.3d 52, 64 (D.C. Cir. 2014), it is also no place to raise an issue with an agency.  In this Court, "hiding an argument" in a footnote "and then articulating it in only a conclusory fashion results in forfeiture."  *Id*.

The same principle applies to agency proceedings.  "The fact that, buried in hundreds of pages of technical comments . . . some mention is made" of an issue is "insufficient to preserve the issue for review on appeal."  *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998).  And administrative exhaustion applies not just to factual issues but to purely legal issues.  *See Ohio v. EPA*, 997 F.2d 1520, 1528-29 (D.C. Cir. 1993) (argument that rule violated statute was waived for failure to raise before agency); *see also CBD v. FERC*, 67 F.4th 1176, 1184-85 (D.C. Cir. 2023) (citing a regulation one time in a "see, e.g.," was insufficient to put agency on notice).

This Court has explained that "[o]ur cases . . . require complainants, before coming to court, to give the [agency] a *fair opportunity* to pass on a legal or factual argument."  *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1111.  PHMSA lacked a fair opportunity to evaluate the NHPA issue because the Tribe articulated no clear position that the NHPA applied to the rulemaking and provided no explanation or analysis in support of such a claim.

Whether an objection is fairly raised "depends on, among other things, the size of the record, the technical complexity of the subject, and the clarity of the

objection." *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 602 (D.C. Cir. 2015).  PHMSA received hundreds of comments on its proposed rule covering numerous highly technical issues.  One sentence from one commenter among hundreds—buried in a footnote in a twenty-page letter—is insufficient to give PHMSA a fair opportunity to consider the NHPA issue.  *See Nat'l Ass'n of Mfrs.*, 134 F.3d at 1111 (declining to find that "scattered references . . . in a voluminous record addressing myriad complex technical and policy matters suffices to provide an agency . . . with a 'fair opportunity' to pass on the issue").

Nor did the Tribe's invocation of consultation under Executive Order 13175—which addresses policy implications for tribes—exhaust any issues concerning NHPA Section 106, which addresses impacts on historic properties. This Court requires "the argument [petitioner] advances" before the Court "to be raised before the agency, not merely the same general legal issue." *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (per curiam) (cleaned up).  Put differently, "challengers to government action cannot avoid waiver with 'cryptic and obscure' objections or issues presented at a very high level of generality." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023) (cleaned up); *see id*. at 489-90 (finding administrative exhaustion when commenter included a "vague and generalized statement" on the issue "contained within more than a hundred pages of comments").

To sum up, the Tribe was required to structure its participation so that it "alert[ed] the agency to the [party's] position and contentions" to allow the agency to give the issue "meaningful consideration." *DOT v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Having failed to do so, it cannot now raise for the first time its claim that PHMSA was required to comply with Section 106 of the NHPA.

This result is reinforced by the Tribe's administrative appeal. Even after reviewing the final Rule, the Tribe did not assert in its appeal that PHMSA had violated Section 106 of the NHPA. JA___PHMSA-2018-0025-0495_1-34. Instead, the Tribe reattached its comments on the proposed rule (with the footnote suggesting in a single sentence that PHMSA consider whether there was an NHPA undertaking). JA___[2]. And the Tribe stated that in "promulgating the Final Rule, PHMSA also failed to engage in legally sufficient government-to-government consultation with . . . the Puyallup Tribe of Indians." JA___[2]. The Tribe also stated that it "wants PHMSA to consider more facts with regard to its purported consultation with the Puyallup Tribe of Indians." JA___[2]. Given that PHMSA had only identified consultation under Executive Order 13175 and had not referenced the NHPA, the Tribe's administrative appeal failed to fairly inform PHMSA of the Tribe's position. Thus, the Tribe forfeited a *second* (and last) opportunity to bring the NHPA issue to PHMSA's attention. *See Wash. Ass'n for Television & Child. V. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983) (noting that if the

86

petitioner believed that the agency had misconstrued its petition, "it could easily have pointed out that error in a petition for rehearing").

Despite failing to give PHMSA a fair opportunity to consider the issue, the Tribe contends before this Court that the Rule is an undertaking under Section 106 of the NHPA and that PHMSA has violated the NHPA.  Tribe Br. 29-30.  But PHMSA did not address whether the rulemaking was an NHPA undertaking.  And the Court should not determine that issue in the first instance when it was neither adequately raised during the administrative proceedings nor addressed by PHMSA in the record.  In any event, the record shows that PHMSA made reasonable efforts to consult with the Tribe.  *See below* Argument Point III.B.

### 2. Executive Order 13175 and DOT Order 5301.1 are not legislative rules nor are they otherwise judicially enforceable.

The Tribe tries to identify a different source for a binding obligation to consult, but none exists.  Tribe Br. 36-48.  The Tribe contends that PHMSA violated legally binding consultation obligations found in Executive Order 13175 and DOT Order 5301.1,[10] but both Orders establish *internal*, non-judicially enforceable procedures for the Executive Branch.  Those types of internal

---

[10] In August 2023, DOT Order 5301.1 was updated and superseded by DOT Order 5301.1A.  This brief cites to the prior order in effect during the rulemaking.

management procedures create no private rights and are not subject to judicial review.

Both Executive Order 13175 and DOT Order 5301.1 specifically disclaim any intent to create enforceable rights against the federal government.[11] "Petitioners' claims are explicitly foreclosed by" this language. *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023).  This Court has long held that "an executive order 'devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not subject to judicial review.'" *Id.* (quoting *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993)).  "Such orders simply serve as presidential directives to agency officials to consider certain policies when making regulatory decisions.  They do not create free-standing private rights to enforce such policies because an executive order is not 'law' within the meaning of the Constitution or the APA." *Id.*  And the Court has recognized that the same principles that apply to executive orders should apply to

---

[11] E.O. 13175 § 10, 65 Fed. Reg. 67,249, 67,252 (Nov. 6, 2000) ("This order is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person."); DOT Order 5301.1 at 10 (Nov. 16, 1999) (This Order is intended to improve the internal management of the Department . . . and is not intended to create any right enforceable in any cause of action by any party against the U.S., its agencies, officers or any person.  In addition, this Order should not be construed to create any right to judicial review involving the compliance or noncompliance with this Order.").

comparable agency orders.  *See Cmtys. Against Runway Expansion v. FAA*, 355

F.3d 678, 688-689 (D.C. Cir. 2004) (noting that executive order and Department of

Transportation order "both expressly state that they do not create a private right to

judicial review").

 As in *California*, 72 F.4th at 318, the Tribe attempts to "bootstrap private

enforcement of executive orders" and agency-management directives into the

APA's arbitrary and capricious review.  *See* Tribe Br. 39-40.  The Tribe cites

*Communities Against Runway Expansion*, 355 F.3d at 688-89, but the claim at

issue in *Communities Against Runway Expansion* was judicially reviewable "only

because it did not arise under the Executive Order, but rather under NEPA, which

imposes statutory obligations that agencies must execute consistent with the

requirements of the APA."  *California*, 72 F.4th at 318 (discussing *Communities

Against Runway Expansion*).

 Next, the Tribe argues that DOT Order 5301.1 and Executive Order 13175

are "binding norms" because they are "legislative rules, which have present

binding effect."  Tribe Br. 37-45.  But as discussed above, DOT Order 5301.1 and

Executive Order 13175 are expressly *not* legally binding and *not* judicially

enforceable; they therefore are *not* legislative rules.  The Tribe cites no case in

which any court has interpreted or applied either Order as a legislative rule.

Indeed, the Ninth Circuit has held that another agency's consultation guidelines did

not establish legal standards that could be enforced against the agency.  *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1103 (9th Cir. 1986).

The Tribe gives three reasons why DOT Order 5301.1 is a legislative rule, but none is correct.  Tribe Br. 40-43.  First, the Tribe highlights (Br. 40) imperative language in the Order, but the Order provides needed context to that language by explicitly stating that it creates no private rights and is not subject to judicial review.  *See* DOT Order 5301.1 at 10.

Second, the Tribe incorrectly asserts (Br. 41) that DOT Order 5301.1 implements a congressional mandate in the Indian Self-Determination and Education Assistance Act, Public Law 93-638.  In its background, the Order quotes that Act's congressional policy declaration.  *See* DOT Order 5301.1(4)(3) (quoting 25 U.S.C. § 5302(a)).  But that Act is not focused on consultation; the Act is directed at achieving "maximum Indian participation in the direction of educational as well as other Federal services to Indian communities."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185-86 (2012) (quoting 25 U.S.C. § 450a(a)).

Third, the Tribe contends that "*PHMSA has repeatedly admitted that consultation is obligatory*."  Tribe Br. 42-43.  But the cited statements merely evince PHMSA's recognition that it is subject to Executive Order 13175 and DOT

Order 5301.1, not that those Orders are binding legislative rules that create judicially enforceable rights.

Nor is the Tribe correct when it claims that the Orders bind PHMSA because they protect individual rights and wards of the federal government. Tribe Br. 43-44. The Tribe misplaces reliance on *Morton v. Ruiz*, 415 U.S. 199 (1974), in which the Supreme Court observed that when "the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Id.* at 235. The "rights of individuals" are *not* affected by the Orders because they grant no private rights and merely govern the agency's own activities. *See Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (distinguishing *Morton* when the nonmandatory procedure "was not designed to protect either individual rights or wards of the federal government").

**B. PHMSA fulfilled any applicable obligation to consult with the Tribe.**

Even if PHMSA had a legally binding and judicially enforceable obligation to consult with the Tribe, it met that obligation here. The Tribe contends only that PHMSA did not conduct an adequate and timely consultation with the Tribe. Tribe Br. 28, 32-36, 45-48. But the record shows that PHMSA made good faith efforts to give the Tribe reasonable opportunities to consult.

### 1.    PHMSA offered the Tribe reasonable opportunities to consult.

The Tribe claims that PHMSA violated Section 106 of the NHPA by failing to adequately consult with the Tribe.  Tribe Br. 32-36.  The Tribe has not identified other specific requirements in the NHPA or its implementing regulations that PHMSA failed to comply with during the rulemaking.  Tribe Br. 28-48.  By failing to raise any of those issues in its opening brief (or during the administrative proceedings), the Tribe has forfeited those issues.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in [its] opening brief." ).  As to the specific issue raised by the Tribe, the record shows that PHMSA sought to follow Executive Order 13175 and DOT Order 5301.1.  In so doing, PHMSA repeatedly attempted in good faith to consult with the Tribe in a manner that also comports with the NHPA.

As this Court recently recognized, it has "little precedent concerning what standards the agencies must use to comply with their NHPA consultation obligations."  *Eagle Cnty.*, 82 F.4th at 1189.  The NHPA regulations define consultation as the "process of seeking, discussing, and considering the views of other participants, and where feasible, seeking agreement with them."  36 C.F.R. § 800.16(f).  An agency must provide an Indian tribe with a "reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional

religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A). Given the "unique legal relationship" between the federal government and Indian tribes, consultation with Indian tribes "should be conducted in a sensitive manner respectful of tribal sovereignty." *Id*. § 800.2(c)(2)(ii)(B). "Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes." *Id*. § 800.2(c)(2)(ii)(C). Thus, the federal agency official "shall consult with representatives designated or identified by the tribal government." *Id*.

The record reveals PHMSA's extensive efforts to provide the Tribe with a "reasonable opportunity" to consult, while respecting tribal sovereignty and the government-to-government relationship.

In the October 2019 notice of proposed rulemaking, PHMSA noted that it had analyzed the proposed rule under Executive Order 13175. 84 Fed. Reg. at 56,970 (JA___). PHMSA did not anticipate that the rule would have substantial direct tribal implications, so it did not expect the Executive Order's funding and consultation requirements to apply. *Id*. But PHMSA invited Indian tribal governments to comment on any effects that the proposed rule might cause. *Id*.

In December 2019, the Tribe submitted comments on the proposed rule. JA___-___PHMSA-2018-0025-0159_1-25. In those comments, the Tribe

"demand[ed] consultation" and asserted that PHMSA had "failed to satisfy its obligation to conduct government-to-government consultation with affected Indian Tribes."  JA___[1], JA____[3].  The Tribe asserted that the proposed rule would create health and safety risks, degrade air quality on its Reservation, and increase traffic on and adjacent to its Reservation.  JA____[4].  It also argued that the proposed rule "neglect[ed] to mention the communities, cities, and Tribes who would be directly impacted by safety incidents."  JA____[6].  Finally, the Tribe stated that it was "disappointed that PHMSA ha[d] failed to properly exercise its public trust obligation to the community and its special government-to-government relationship with the Puyallup Tribe."  JA____[20].

In January 2020, the Tribe asked to meet with PHMSA about multiple topics, including the proposed rule, while members of the Tribe's Council were visiting Washington, D.C.  JA___PHMSA-2018-0025-0512_1,3.  PHMSA hosted the meeting at its office.  JA____[1].

On February 12, 2020, PHMSA representatives met with two members of the Tribe's Council, the Tribe's lawyer, and another representative of the Tribe.  JA___PHMSA-2018-0025-0512_1; JA___PHMSA-2018-0025-0472; JA___PHMSA-2018-0025-0514.  The meeting included PHMSA's Director of Governmental, International, and Public Affairs, who is a member of PHMSA's executive leadership team.  *Id.* at 1; JA____PHMSA-2018-0025-0472.

PHMSA prepared notes summarizing the February 12, 2020 meeting. JA___PHMSA-2018-0025-0472.  PHMSA understood the meeting's purpose was in part to "conduct a consultation and discuss comments" on the proposed rule. JA___.  Although the meeting focused on other topics of interest to the Tribe, PHMSA also asked if the Tribe had more comments or input on the proposed rule. JA____.  The Tribe reiterated its opposition to the proposed rule, noted that it had submitted comments to PHMSA, and told PHMSA that it did not have more comments to submit.  JA____.  The Tribe also requested a follow-up government-to-government consultation regarding the proposed rule.  JA____.

The next day, February 13, 2020, PHMSA emailed the Tribe's lawyers to follow-up on the meeting.  JA___PHMSA-2018-0025-0514.  PHMSA acknowledged the Tribe's opposition to the proposed rule.  JA____.  PHMSA also invited the Tribe to submit its concerns in writing and offered to provide a written response.  JA____.

Later in February 2020, PHMSA followed up by leaving a voicemail for the Tribe's lawyer.  JA___PHMSA-2018-0025-0518_4-5.  The Tribe's lawyer responded, stating that she had not received the February 13, 2020 email.  JA___-____[4-5].  The Tribe's lawyer stated that the Tribe "may have more information" and was "still seeking meaningful consultation, with the decision maker."  JA___-___[4-5].  The Tribe assured PHMSA that it would "follow up."  JA____[5].

95

What followed was a series of attempts by PHMSA to consult with the Tribe. On February 26, 2020, the same day that the Tribe's lawyer indicated the Tribe was seeking meaningful consultation, PHMSA offered times for a meeting on February 28, 2020 between the Tribe and PHMSA's Chief Counsel regarding the proposed rule. JA___PHMSA-2018-0025-0518_4. The next day, PHMSA emailed and called the Tribe again, seeking to confirm the February 28, 2020 consultation. JA___[3]. Then the Tribe asked to reschedule and emphasized that it wanted a "leadership level discussion." JA____[2-3]. On February 28, 2020, PHMSA responded with alternative meeting dates in March 2020 that its Chief Counsel was available for a consultation. JA____[1]. PHMSA explained that its Chief Counsel was a member of PHMSA's senior leadership team. JA____[1]. PHMSA received no response to its February 28, 2020 email.

On March 26, 2020, PHMSA reached out again to offer the Tribe an opportunity to meet with PHMSA's Chief Counsel to "continue your consultation that occurred in early February." JA___PHMSA-2018-0025-0519_2. Given the nascent pandemic, PHMSA offered to consult by phone. JA____[2].

The Tribe's lawyer replied, "I had this on my list of items to revisit." JA___PHMSA-2018-0025-0519_2. The Tribe's lawyer stated that she would "look into setting up a call or zoom meeting" but that it was difficult to do so with "most of our people working at home" and staff responding to the pandemic.

JA___[2].  The Tribe's lawyer reiterated that "consultation needs a leadership level discussion."  JA___[2].

PHMSA responded that, since the February 12, 2020 meeting, the agency had "offered to set up a follow up meeting and have checked in with you multiple times over the last month offering meetings with our Chief Counsel, who is part of the PHMSA Executive Leadership Team."  JA___PHMSA-2018-0025-0519_1-2.  PHMSA repeated its offer to make its Chief Counsel available for a meeting and indicated flexibility on the timing.  JA___[1].  PHMSA concluded by noting that it "looked forward to scheduling a follow-up meeting at your earliest convenience."  JA____[1].  The Tribe requested times on three specific days for a meeting with staff (but not leadership), while reiterating that "consultation needs a leadership level discussion."  JA___[1].  PHMSA offered four blocks of time on two of those days when its Chief Counsel was available.  JA____[1].  The Tribe did not respond, and there were no further communications.  The Tribe never met with PHMSA's Chief Counsel.

In the Rule's preamble, PHMSA recounted its consultation efforts.  85 Fed. Reg. at 45,022-23.  PHMSA concluded that the Rule and the final environmental assessment had addressed the Tribe's concerns as reflected in the February 2020 in-person meeting and the Tribe's written comments.  *Id*. at 45,022, 45,025.  Since the February 2020 meeting with the Tribe, PHMSA had extended multiple

invitations for follow-up meetings with PHMSA leadership.  *Id*. at 45,025.  But the Tribe had not accepted PHMSA's invitations.  *Id*.

To sum up, PHMSA offered the Tribe multiple opportunities to consult at a leadership level.  *See* 36 C.F.R. § 800.2(c)(2)(ii)(A).  PHMSA (1) respected the Tribe's sovereignty, (2) recognized the government-to-government relationship between the Tribe and PHMSA, (3) invited the Tribe to submit relevant materials, and (4) considered the Tribe's concerns.  *See id*. § 800.2(c)(2)(ii)(B), (C).  These efforts are sufficient to satisfy any obligation to consult.

> **2.    The Tribe failed to take advantage of the ample consultation opportunities that PHMSA offered.**

The Tribe contends that PHMSA's efforts are inadequate, but the record shows that the Tribe did not take advantage of the opportunities that PHMSA offered.  Tribe Br. 31-36.

PHMSA invited the Tribe's Tribal Council to meet with the PHMSA's Chief Counsel for a leadership-level consultation—precisely what the Tribe insisted was necessary to constitute an adequate consultation.  The Tribe claims that the *fourth* such offer came too late (Br. 35), but PHMSA extended the *first* such offer on the same day that the Tribe insisted that it needed a leadership level meeting.  JA___PHMSA-2018-0025-0518_4-5.  Despite PHMSA offering a leadership meeting five times in total, the Tribe never accepted any of those offers.  And the Tribe did not respond to several of the agency's invitations, including the last one.

This is not PHMSA's fault.  An agency "cannot drag all stakeholders to the proverbial consulting table—it can only set the table and send the invitations." *City of N. Miami v. FAA*, 47 F.4th 1257, 1275 (11th Cir. 2022) (discussing consultation under the Department of Transportation Act); *see also Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942 (D. Ariz. 2017) (observing that consultation is a "two-way street").

The Tribe also criticizes PHMSA for extending the fourth invitation "while it knew the Tribe's main contact was unavailable for medical reasons and while PHMSA was already 'working to finalize the final rule.'"  Tribe Br. 48 (quoting JA__PHMSA-2018-0025-0613).  One of the Tribe's attorneys was on medical leave at the end of February into March 2020, and PHMSA expressed best wishes for the attorney's recovery.  JA___PHMSA-2018-0025-0519_1-5.  During this period, PHMSA continued to communicate with the Tribe's *other* representatives in a reasonable effort to schedule a leadership-level consultation.  JA___PHMSA-2018-0025-0519_1-5; JA__PHMSA-2018-0025-0518_1 (email to five other individuals with email addresses associated with the Tribe and the Tribe's outside counsel).  And PHMSA's statement that it was "working to finalize the final rule" notified the Tribe that any further consultation had to take place sooner rather than later.  And, in any event, PHMSA had extended three invitations *before* this contact was on medical leave.  PHMSA took reasonable steps to communicate.

The Tribe relies on two decisions from other circuits to assert that PHMSA's consultation efforts are insufficient, but those cases involve starkly different facts and legal issues.  *See* Tribe Br. 33-36, 46-48. For example, in *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995), the Ninth Circuit found a lack of good faith consultation efforts when the agency "withheld relevant information" during the consultation process, *id*. at 862-63; the Tribe makes no such allegation here. Likewise, in *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979), the court found consultation was insufficient when an agency official "acknowledged at trial" that the challenged decision "had already been made prior to" the first meeting between tribal members and agency officials, *id*. at 710.  Here, the record shows the opposite—that PHMSA's consultation efforts happened *before* it issued the Rule.

Seeking to bolster its consultation claim, the Tribe asks the Court to supplement the record for its petition challenging the Rule with a declaration (the Anderson Declaration) that its lawyer prepared in October 2020—four months *after* PHMSA issued the Rule.  Tribe Br. 22-27.  PHMSA included a similar declaration from September 2020 in the record for its denial of the Tribe's administrative appeal.  *See* Revised Certified Index, ECF No. 2012635, Case No. 20-1009 (Aug. 15, 2023).  But the Tribe has failed to meet the demanding standard for supplementing the record in its challenge to the Rule.

Judicial review of the Rule must be based on the "administrative record already in existence"—not on a "new record" first created in this Court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). This Court disfavors the creation of litigation affidavits to challenge an agency decision. *See, e.g.*, *Cone v. Caldera*, 223 F.3d 789, 795 (D.C. Cir. 2000). And the Court does "not allow parties to supplement the record unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (cleaned up). The Tribe has not shown any unusual circumstances. *See* Tribe Br. 25-26. And the Tribe misplaces reliance on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1999), which has been given a "limited interpretation" and at most "may be invoked to challenge gross procedural deficiencies." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013). The Tribe has failed to identify any gross procedural deficiencies (and there were none).

In all events, the Anderson Declaration does not undermine PHMSA's compliance with any consultation obligation. The Declaration merely confirms the Tribe was dissatisfied with its February 12, 2020 meeting with PHMSA. But even PHMSA's notes from that meeting—on which the Tribe seeks to cast doubt with the Anderson Declaration—note that the Tribe "requested a follow up government-to-government consultation with PHMSA regarding the LNG by Rail rulemaking."

JA___PHMSA-2018-0025-0472.  Though PHMSA disputes the Declaration's characterization of the meeting, the record shows that PHMSA understood the Tribe's interest in more consultation.  Thus, PHMSA offered the Tribe more opportunities to consult, including with PHMSA's leadership, but the Tribe did not take advantage of those opportunities.

In sum, PHMSA reasonably consulted with the Tribe on the Rule.

## CONCLUSION

For these reasons, the Court should deny the petitions.

Respectfully submitted,

/s/ *Rebecca Jaffe*
TODD KIM
*Assistant Attorney General*

ROBERT LUNDMAN
JUSTIN HEMINGER
REBECCA JAFFE
*Attorneys*

Of Counsel:

CHARLES E. ENLOE
*Attorney*
U.S. Department of Transportation

Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

January 12, 2024
DJ 90-13-1-16143

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of the Court's order of September 18, 2023 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 22,042 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for Respondents

103

# ADDENDUM

28 U.S.C. § 2342 ................................................................................. 1a

42 U.S.C. § 4332 ................................................................................. 3a

49 U.S.C. § 5101 ................................................................................. 5a

49 U.S.C. § 5103 ................................................................................. 6a

49 U.S.C. § 5127 ................................................................................. 8a

49 U.S.C. § 20114 .............................................................................. 9a

40 C.F.R. § 1501.4 ............................................................................ 10a

40 C.F.R. § 1502.9 ............................................................................ 12a

40 C.F.R. § 1502.16 .......................................................................... 14a

40 C.F.R. § 1508.8 ............................................................................ 15a

40 C.F.R. § 1508.9 ............................................................................ 16a

40 C.F.R. § 1508.27 .......................................................................... 17a

49 C.F.R. § 171.1 .............................................................................. 19a

49 C.F.R. § 172.800 .......................................................................... 23a

49 C.F.R. § 172.802 .......................................................................... 24a

49 C.F.R. § 172.820 .......................................................................... 26a

49 C.F.R. pt. 172 App'x D ................................................................ 32a

49 C.F.R. § 173.319 .......................................................................... 35a

49 C.F.R. § 174.14 ............................................................................ 40a

49 C.F.R. § 174.85 ............................................................................ 41a

49 C.F.R. § 179.400-4 ............................................................................44a

49 C.F.R. § 179.401-1 ............................................................................47a

*Operating Certain Railroad Tank Cars in Excess of 263,000 Pounds*
    *Gross Rail Load; Approval*, 76 Fed. Reg. 4,250 (Jan. 25, 2011)...............49a

*Hazardous Materials: Enhanced Tank Car Standards and*
    *Operational Controls for High-Hazard Flammable Trains*, 80
    Fed. Reg. 26,644 (May 8, 2015)..................................................................53a

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 158. Orders of Federal Agencies; Review (Refs & Annos)

28 U.S.C.A. § 2342

§ 2342. Jurisdiction of court of appeals

Effective: October 6, 2006
Currentness

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

**(1)** all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

**(2)** all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

**(3)** all rules, regulations, or final orders of--

  **(A)** the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

  **(B)** the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

**(4)** all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

Addendum 1a

**(5)** all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

**(6)** all final orders under section 812 of the Fair Housing Act; and

**(7)** all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## CREDIT(S)

(Added Pub.L. 89-554, § 4(e), Sept. 6, 1966, 80 Stat. 622; amended Pub.L. 93-584, § 4, Jan. 2, 1975, 88 Stat. 1917; Pub.L. 95-454, Title II, § 206, Oct. 13, 1978, 92 Stat. 1144; Pub.L. 96-454, § 8(b)(2), Oct. 15, 1980, 94 Stat. 2021; Pub.L. 97-164, Title I, § 137, Apr. 2, 1982, 96 Stat. 41; Pub.L. 98-554, Title II, § 227(a)(4), Oct. 30, 1984, 98 Stat. 2852; Pub.L. 99-336, § 5(a), June 19, 1986, 100 Stat. 638; Pub.L. 100-430, § 11(a), Sept. 13, 1988, 102 Stat. 1635; Pub.L. 102-365, § 5(c)(2), Sept. 3, 1992, 106 Stat. 975; Pub.L. 103-272, § 5(h), July 5, 1994, 108 Stat. 1375; Pub.L. 104-88, Title III, § 305(d)(5) to (8), Dec. 29, 1995, 109 Stat. 945; Pub.L. 104-287, § 6(f)(2), Oct. 11, 1996, 110 Stat. 3399; Pub.L. 109-59, Title IV, § 4125(a), Aug. 10, 2005, 119 Stat. 1738; Pub.L. 109-304, § 17(f)(3), Oct. 6, 2006, 120 Stat. 1708.)

28 U.S.C.A. § 2342, 28 USCA § 2342
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

**Addendum 2a**

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 55. National Environmental Policy (Refs & Annos)
      Subchapter I. Policies and Goals (Refs & Annos)

This section has been updated. Click here for the updated version.

42 U.S.C.A. § 4332

§ 4332. Cooperation of agencies; reports; availability of information;
recommendations; international and national coordination of efforts

Effective: [See Text Amendments] to June 2, 2023

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

Addendum 3a

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 127 of 180

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

Addendum 4a

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 128 of 180

United States Code Annotated
   Title 49. Transportation (Refs & Annos)
      Subtitle III. General and Intermodal Programs (Refs & Annos)
         Chapter 51. Transportation of Hazardous Material (Refs & Annos)

49 U.S.C.A. § 5101

§ 5101. Purpose

Effective: August 10, 2005
Currentness

The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce.

**CREDIT(S)**

(Pub.L. 103-272, § 1(d), July 5, 1994, 108 Stat. 759; Pub.L. 109-59, Title VII, § 7101(b), Aug. 10, 2005, 119 Stat. 1891.)

49 U.S.C.A. § 5101, 49 USCA § 5101
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Addendum 5a**

United States Code Annotated
    Title 49. Transportation (Refs & Annos)
        Subtitle III. General and Intermodal Programs (Refs & Annos)
            Chapter 51. Transportation of Hazardous Material (Refs & Annos)

49 U.S.C.A. § 5103

§ 5103. General regulatory authority

Currentness

**(a) Designating material as hazardous.**--The Secretary shall designate material (including an explosive, radioactive material, infectious substance, flammable or combustible liquid, solid, or gas, toxic, oxidizing, or corrosive material, and compressed gas) or a group or class of material as hazardous when the Secretary determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property.

**(b) Regulations for safe transportation.--(1)** The Secretary shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce. The regulations--

  **(A)** apply to a person who--

    **(i)** transports hazardous material in commerce;

    **(ii)** causes hazardous material to be transported in commerce;

    **(iii)** designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce;

    **(iv)** prepares or accepts hazardous material for transportation in commerce;

**Addendum 6a**

**(v)** is responsible for the safety of transporting hazardous material in commerce;

**(vi)** certifies compliance with any requirement under this chapter; or

**(vii)** misrepresents whether such person is engaged in any activity under clause (i) through (vi); and

**(B)** shall govern safety aspects, including security, of the transportation of hazardous material the Secretary considers appropriate.

**(2)** A proceeding to prescribe the regulations must be conducted under section 553 of title 5, including an opportunity for informal oral presentation.

**(c) Federally declared disasters and emergencies.**--

**(1) In general.**--The Secretary may by order waive compliance with any part of an applicable standard prescribed under this chapter without prior notice and comment and on terms the Secretary considers appropriate if the Secretary determines that--

**(A)** it is in the public interest to grant the waiver;

**(B)** the waiver is not inconsistent with the safety of transporting hazardous materials; and

**(C)** the waiver is necessary to facilitate the safe movement of hazardous materials into, from, and within an area of a major disaster or emergency that has been declared under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

**(2) Period of waiver.**--A waiver under this subsection may be issued for a period of not more than 60 days and may be renewed upon application to the Secretary only after notice and an opportunity for a hearing on the waiver. The Secretary shall immediately revoke the waiver if continuation of the waiver would not be consistent with the goals and objectives of this chapter.

**Addendum 7a**

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle III. General and Intermodal Programs (Refs & Annos)
      Chapter 51. Transportation of Hazardous Material (Refs & Annos)

49 U.S.C.A. § 5127

§ 5127. Judicial review

Effective: August 10, 2005
Currentness

**(a) Filing and venue.**--Except as provided in section 20114(c), a person adversely affected or aggrieved by a final action of the Secretary under this chapter may petition for review of the final action in the United States Court of Appeals for the District of Columbia or in the court of appeals for the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not more than 60 days after the Secretary's action becomes final.

**(b) Judicial procedures.**--When a petition is filed under subsection (a), the clerk of the court immediately shall send a copy of the petition to the Secretary. The Secretary shall file with the court a record of any proceeding in which the final action was issued, as provided in section 2112 of title 28.

**(c) Authority of court.**--The court has exclusive jurisdiction, as provided in subchapter II of chapter 5 of title 5, to affirm or set aside any part of the Secretary's final action and may order the Secretary to conduct further proceedings.

**(d) Requirement for prior objection.**--In reviewing a final action under this section, the court may consider an objection to a final action of the Secretary only if the objection was made in the course of a proceeding or review conducted by the Secretary or if there was a reasonable ground for not making the objection in the proceeding.

**CREDIT(S)**

(Added Pub.L. 109-59, Title VII, § 7123(b), Aug. 10, 2005, 119 Stat. 1907.)

Addendum 8a

United States Code Annotated
   Title 49. Transportation (Refs & Annos)
     Subtitle V. Rail Programs
      Part A. Safety
        Chapter 201. General (Refs & Annos)
         Subchapter I. General

49 U.S.C.A. § 20114

§ 20114. Judicial procedures

Currentness

**(a) Criminal contempt.**--In a trial for criminal contempt for violating an injunction or restraining order issued under this chapter, the violation of which is also a violation of this chapter, the defendant may demand a jury trial. The defendant shall be tried as provided in rule 42(b) of the Federal Rules of Criminal Procedure (18 App. U.S.C.).

**(b) Subpenas for witnesses.**--A subpena for a witness required to attend a district court of the United States in an action brought under this chapter may be served in any judicial district.

**(c) Review of agency action.**--Except as provided in section 20104(c) of this title, a proceeding to review a final action of the Secretary of Transportation under this part or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28.

**CREDIT(S)**

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 870.)

49 U.S.C.A. § 20114, 49 USCA § 20114
Current through P.L. 118-30. Some statute sections may be more current, see credits for details.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Addendum 9a**

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>       Part 1501. NEPA and Agency Planning (Refs & Annos)

This section has been updated. Click here for the updated version.

40 C.F.R. § 1501.4

§ 1501.4 Whether to prepare an environmental impact statement.

Effective: [See Text Amendments] to September 13, 2020

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

USCA Case #20-1317     Document #2035619     Filed: 01/12/2024     Page 134 of 180

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514, (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

---

                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.   Addendum 11a

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter V. Council on Environmental Quality
            Part 1502. Environmental Impact Statement (Refs & Annos)

This section has been updated. Click here for the updated version.

40 C.F.R. § 1502.9

§ 1502.9 Draft, final, and supplemental statements.

Effective: [See Text Amendments] to September 13, 2020

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

Addendum 12a

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1502. Environmental Impact Statement (Refs & Annos)

This section has been updated. Click here for the updated version.

40 C.F.R. § 1502.16

§ 1502.16 Environmental consequences.

Effective: [See Text Amendments] to September 13, 2020

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C) (iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

Addendum 14a

# Code of Federal Regulations - 2019

Code of Federal Regulations
> Title 40. Protection of Environment
>> Chapter V. Council on Environmental Quality
>> Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.8

§ 1508.8 Effects.

Currentness

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Addendum 15a

# Code of Federal Regulations - 2019

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.9

§ 1508.9 Environmental assessment.

Currentness

Environmental assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

# Code of Federal Regulations - 2019

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
    Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.27

§ 1508.27 Significantly.

Currentness

Significantly as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

Addendum 17a

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

**Credits**
[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Addendum 18a

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter C. Hazardous Materials Regulations
          Part 171. General Information, Regulations, and Definitions (Refs & Annos)
            Subpart A. Applicability, General Requirements, and North American Shipments (Refs & Annos)

49 C.F.R. § 171.1

§ 171.1 Applicability of Hazardous Materials Regulations (HMR) to persons and functions.

Effective: December 28, 2023
Currentness

Federal hazardous materials transportation law (49 U.S.C. 5101 et seq.) directs the Secretary of Transportation to establish regulations for the safe and secure transportation of hazardous materials in commerce, as the Secretary considers appropriate. The Secretary is authorized to apply these regulations to persons who transport hazardous materials in commerce. In addition, the law authorizes the Secretary to apply these regulations to persons who cause hazardous materials to be transported in commerce. The law also authorizes the Secretary to apply these regulations to persons who manufacture or maintain a packaging or a component of a packaging that is represented, marked, certified, or sold as qualified for use in the transportation of a hazardous material in commerce. Federal hazardous material transportation law also applies to anyone who indicates by marking or other means that a hazardous material being transported in commerce is present in a package or transport conveyance when it is not, and to anyone who tampers with a package or transport conveyance used to transport hazardous materials in commerce or a required marking, label, placard, or shipping description. Regulations prescribed in accordance with Federal hazardous materials transportation law shall govern safety aspects, including security, of the transportation of hazardous materials that the Secretary considers appropriate. In 49 CFR 1.53, the Secretary delegated authority to issue regulations for the safe and secure transportation of hazardous materials in commerce to the Pipeline and Hazardous Materials Safety Administrator. The Administrator issues the Hazardous Materials Regulations (HMR; 49 CFR parts 171 through 180) under that delegated authority. This section addresses the applicability of the HMR to packagings represented as qualified for use in the transportation of hazardous materials in commerce and to pre-transportation and transportation functions.

Addendum 19a

(a) Packagings. Requirements in the HMR apply to each person who manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a packaging or a component of a packaging that is represented, marked, certified, or sold as qualified for use in the transportation of a hazardous material in commerce, including each person under contract with any department, agency, or instrumentality of the executive, legislative, or judicial branch of the Federal government who manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a packaging or a component of a packaging that is represented, marked, certified, or sold as qualified for use in the transportation of a hazardous material in commerce.

(b) Pre-transportation functions. Requirements in the HMR apply to each person who offers a hazardous material for transportation in commerce, causes a hazardous material to be transported in commerce, or transports a hazardous material in commerce and who performs or is responsible for performing a pre-transportation function, including each person performing pre-transportation functions under contract with any department, agency, or instrumentality of the executive, legislative, or judicial branch of the Federal government. Pre-transportation functions include, but are not limited to, the following:

(1) Determining the hazard class of a hazardous material.

(2) Selecting a hazardous materials packaging.

(3) Filling a hazardous materials packaging, including a bulk packaging.

(4) Securing a closure on a filled or partially filled hazardous materials package or container or on a package or container containing a residue of a hazardous material.

(5) Marking a package to indicate that it contains a hazardous material.

(6) Labeling a package to indicate that it contains a hazardous material.

(7) Preparing a shipping paper.

Addendum 20a

(8) Providing and maintaining emergency response information.

(9) Reviewing a shipping paper to verify compliance with the HMR or international equivalents.

(10) For each person importing a hazardous material into the United States, providing the shipper with timely and complete information as to the HMR requirements that will apply to the transportation of the material within the United States.

(11) Certifying that a hazardous material is in proper condition for transportation in conformance with the requirements of the HMR.

(12) Loading, blocking, and bracing a hazardous materials package in a freight container or transport vehicle.

(13) Segregating a hazardous materials package in a freight container or transport vehicle from incompatible cargo.

(14) Selecting, providing, or affixing placards for a freight container or transport vehicle to indicate that it contains a hazardous material.

(c) Transportation functions. Requirements in the HMR apply to transportation of a hazardous material in commerce and to each person who transports a hazardous material in commerce, including each person under contract with any department, agency, or instrumentality of the executive, legislative, or judicial branch of the Federal government who transports a hazardous material in commerce. Transportation of a hazardous material in commerce begins when a carrier takes physical possession of the hazardous material for the purpose of transporting it and continues until the package containing the hazardous material is delivered to the destination indicated on a shipping document, package marking, or other medium, or, in the case of a rail car, until the car is delivered to a private track or siding. For a private motor carrier, transportation of a hazardous material in commerce begins when a motor vehicle driver takes possession of a hazardous material for the purpose of transporting it and continues until the driver relinquishes possession of the package containing the hazardous material at its destination and is no longer responsible for

Addendum 21a

performing functions subject to the HMR with respect to that particular package. Transportation of a hazardous material in commerce includes the following:

(1) Movement. Movement of a hazardous material by rail car, aircraft, motor vehicle, or vessel (except as delegated by Department of Homeland Security Delegation No. 0170 at 2(103)).

(2) Loading incidental to movement of a hazardous material. Loading of packaged or containerized hazardous material onto a transport vehicle, aircraft, or vessel for the purpose of transporting it, including blocking and bracing a hazardous materials package in a freight container or transport vehicle, and segregating a hazardous materials package in a freight container or transport vehicle from incompatible cargo, when performed by carrier personnel or in the presence of carrier personnel. For a bulk packaging, loading incidental to movement is filling the packaging with a hazardous material for the purpose of transporting it when performed by carrier personnel or in the presence of carrier personnel (except as delegated by Department of Homeland Security Delegation No. 0170 at 2(103)), including transloading.

(3) Unloading incidental to movement of a hazardous material. Removing a package or containerized hazardous material from a transport vehicle, aircraft, or vessel; or for a bulk packaging, emptying a hazardous material from the bulk packaging after the hazardous material has been delivered to the consignee when performed by carrier personnel or in the presence of carrier personnel or, in the case of a private motor carrier, while the driver of the motor vehicle from which the hazardous material is being unloaded immediately after movement is completed is present during the unloading operation. (Emptying a hazardous material from a bulk packaging while the packaging is on board a vessel is subject to separate regulations as delegated by Department of Homeland Security Delegation No. 0170 at 2(103).) Unloading incidental to movement includes transloading.

(4) Storage incidental to movement of a hazardous material. Storage of a transport vehicle, freight container, or package containing a hazardous material by any person between the time that a carrier takes physical possession of the hazardous material for the purpose of transporting it until the package containing the hazardous material has been delivered to the destination indicated on a shipping document, package marking, or other medium, or, in the case of a private motor carrier, between the time that a motor vehicle driver takes physical possession of the hazardous material for the purpose of transporting it until the driver relinquishes possession of the package at its destination and is no longer responsible for performing functions subject to the HMR with respect to that particular package.

Addendum 22a

Code of Federal Regulations
    Title 49. Transportation
        Subtitle B. Other Regulations Relating to Transportation
            Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of
            Transportation (Refs & Annos)
                Subchapter C. Hazardous Materials Regulations
                    Part 172. Hazardous Materials Table, Special Provisions, Hazardous Materials
                    Communications, Emergency Response Information, Training Requirements, and
                    Security Plans (Refs & Annos)
                        Subpart I. Safety and Security Plans (Refs & Annos)

49 C.F.R. § 172.800

§ 172.800 Purpose and applicability.

Effective: January 21, 2021
Currentness

(a) Purpose. This subpart prescribes requirements for development and implementation of plans to address security risks related to the transportation of hazardous materials in commerce.

(b) Applicability. Each person who offers for transportation in commerce or transports in commerce one or more of the following hazardous materials must develop and adhere to a transportation security plan for hazardous materials that conforms to the requirements of this subpart. As used in this section, "large bulk quantity" refers to a quantity greater than 3,000 kg (6,614 pounds) for solids or 3,000 liters (792 gallons) for liquids and gases in a single packaging such as a cargo tank motor vehicle, portable tank, tank car, or other bulk container.

(1) Any quantity of a Division 1.1, 1.2, or 1.3 material.

(2) A quantity of a Division 1.4, 1.5, or 1.6 material requiring placarding in accordance with subpart F of this part.

(3) A large bulk quantity of Division 2.1 material.

Addendum 23a

Code of Federal Regulations
   Title 49. Transportation
      Subtitle B. Other Regulations Relating to Transportation
         Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
            Subchapter C. Hazardous Materials Regulations
               Part 172. Hazardous Materials Table, Special Provisions, Hazardous Materials Communications, Emergency Response Information, Training Requirements, and Security Plans (Refs & Annos)
                  Subpart I. Safety and Security Plans (Refs & Annos)

49 C.F.R. § 172.802

§ 172.802 Components of a security plan.

Effective: October 1, 2010<br/>Currentness

(a) The security plan must include an assessment of transportation security risks for shipments of the hazardous materials listed in § 172.800, including site-specific or location-specific risks associated with facilities at which the hazardous materials listed in § 172.800 are prepared for transportation, stored, or unloaded incidental to movement, and appropriate measures to address the assessed risks. Specific measures put into place by the plan may vary commensurate with the level of threat at a particular time. At a minimum, a security plan must include the following elements:

(1) Personnel security. Measures to confirm information provided by job applicants hired for positions that involve access to and handling of the hazardous materials covered by the security plan. Such confirmation system must be consistent with applicable Federal and State laws and requirements concerning employment practices and individual privacy.

(2) Unauthorized access. Measures to address the assessed risk that unauthorized persons may gain access to the hazardous materials covered by the security plan or transport conveyances being prepared for transportation of the hazardous materials covered by the security plan.

Addendum 24a

(3) En route security. Measures to address the assessed security risks of shipments of hazardous materials covered by the security plan en route from origin to destination, including shipments stored incidental to movement.

(b) The security plan must also include the following:

(1) Identification by job title of the senior management official responsible for overall development and implementation of the security plan;

(2) Security duties for each position or department that is responsible for implementing the plan or a portion of the plan and the process of notifying employees when specific elements of the security plan must be implemented; and

(3) A plan for training hazmat employees in accordance with § 172.704 (a)(4) and (a)(5) of this part.

(c) The security plan, including the transportation security risk assessment developed in accordance with paragraph (a) of this section, must be in writing and must be retained for as long as it remains in effect. The security plan must be reviewed at least annually and revised and/or updated as necessary to reflect changing circumstances. The most recent version of the security plan, or portions thereof, must be available to the employees who are responsible for implementing it, consistent with personnel security clearance or background investigation restrictions and a demonstrated need to know. When the security plan is updated or revised, all employees responsible for implementing it must be notified and all copies of the plan must be maintained as of the date of the most recent revision.

(d) Each person required to develop and implement a security plan in accordance with this subpart must maintain a copy of the security plan (or an electronic file thereof) that is accessible at, or through, its principal place of business and must make the security plan available upon request, at a reasonable time and location, to an authorized official of the Department of Transportation or the Department of Homeland Security.

**Credits**
[75 FR 10989, March 9, 2010]

Addendum 25a

Code of Federal Regulations
 Title 49. Transportation
  Subtitle B. Other Regulations Relating to Transportation
   Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of
   Transportation (Refs & Annos)
    Subchapter C. Hazardous Materials Regulations
     Part 172. Hazardous Materials Table, Special Provisions, Hazardous Materials
     Communications, Emergency Response Information, Training Requirements, and
     Security Plans (Refs & Annos)
      Subpart I. Safety and Security Plans (Refs & Annos)

49 C.F.R. § 172.820

§ 172.820 Additional planning requirements for transportation by rail.

Effective: August 24, 2020
Currentness

(a) General. Each rail carrier transporting in commerce one or more of the following materials is
subject to the additional safety and security planning requirements of this section:

(1) More than 2,268 kg (5,000 lbs.) in a single carload of a Division 1.1, 1.2 or 1.3 explosive;

(2) A quantity of a material poisonous by inhalation in a single bulk packaging;

(3) A highway route-controlled quantity of a Class 7 (radioactive) material, as defined in §
173.403 of this subchapter;

Addendum 26a

(4) A high-hazard flammable train (HHFT) as defined in § 171.8 of this subchapter; or

(5) A quantity of UN1972 (Methane, refrigerated liquid or Natural gas, refrigerated liquid) when transported in a rail tank car.

(b) Not later than 90 days after the end of each calendar year, a rail carrier must compile commodity data for the previous calendar year for the materials listed in paragraph (a) of this section. The following stipulations apply to data collected:

(1) Commodity data must be collected by route, a line segment or series of line segments as aggregated by the rail carrier. Within the rail carrier selected route, the commodity data must identify the geographic location of the route and the total number of shipments by UN identification number for the materials specified in paragraph (a) of this section.

(i) A rail carrier subject to additional planning requirements of this section based on paragraph (a)(5) of this section that has yet to transport UN 1972, must factor in planned shipments of UN 1972 to the commodity data for use in the paragraph (c) route analysis prior to initial transport of the material.

(ii) [Reserved]

(2) A carrier may compile commodity data, by UN number, for all Class 7 materials transported (instead of only highway route controlled quantities of Class 7 materials) and for all Division 6.1 materials transported (instead of only Division 6.1 poison inhalation hazard materials).

(c) Rail transportation route analysis. For each calendar year, a rail carrier must analyze the safety and security risks for the transportation route(s), identified in the commodity data collected as required by paragraph (b) of this section. The route analysis must be in writing and include the factors contained in appendix D to this part, as applicable.

Addendum 27a

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 151 of 180

(1) The safety and security risks present must be analyzed for the route and railroad facilities along the route. For purposes of this section, railroad facilities are railroad property including, but not limited to, classification and switching yards, storage facilities, and non-private sidings. This term does not include an offeror's facility, private track, private siding, or consignee's facility.

(2) In performing the analysis required by this paragraph, the rail carrier must seek relevant information from state, local, and tribal officials, as appropriate, regarding security risks to high-consequence targets along or in proximity to the route(s) utilized. If a rail carrier is unable to acquire relevant information from state, local, or tribal officials, then it must document that in its analysis. For purposes of this section, a high-consequence target means a property, natural resource, location, area, or other target designated by the Secretary of Homeland Security that is a viable terrorist target of national significance, the attack of which by railroad could result in catastrophic loss of life, significant damage to national security or defense capabilities, or national economic harm.

(d) *Alternative route analysis.*

(1) For each calendar year, a rail carrier must identify practicable alternative routes over which it has authority to operate, if an alternative exists, as an alternative route for each of the transportation routes analyzed in accordance with paragraph (c) of this section. The carrier must perform a safety and security risk assessment of the alternative routes for comparison to the route analysis prescribed in paragraph (c) of this section. The alternative route analysis must be in writing and include the criteria in appendix D of this part. When determining practicable alternative routes, the rail carrier must consider the use of interchange agreements with other rail carriers. The written alternative route analysis must also consider:

(i) Safety and security risks presented by use of the alternative route(s);

(ii) Comparison of the safety and security risks of the alternative(s) to the primary rail transportation route, including the risk of a catastrophic release from a shipment traveling along each route;

**Addendum 28a**

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 152 of 180

(iii) Any remediation or mitigation measures implemented on the primary or alternative route(s); and

(iv) Potential economic effects of using the alternative route(s), including but not limited to the economics of the commodity, route, and customer relationship.

(2) In performing the analysis required by this paragraph, the rail carrier should seek relevant information from state, local, and tribal officials, as appropriate, regarding security risks to high-consequence targets along or in proximity to the alternative routes. If a rail carrier determines that it is not appropriate to seek such relevant information, then it must explain its reasoning for that determination in its analysis.

(e) Route Selection. A carrier must use the analysis performed as required by paragraphs (c) and (d) of this section to select the route to be used in moving the materials covered by paragraph (a) of this section. The carrier must consider any remediation measures implemented on a route. Using this process, the carrier must at least annually review and select the practicable route posing the least overall safety and security risk. The rail carrier must retain in writing all route review and selection decision documentation and restrict the distribution, disclosure, and availability of information contained in the route analysis to covered persons with a need-to-know, as described in parts 15 and 1520 of this title. This documentation should include, but is not limited to, comparative analyses, charts, graphics or rail system maps.

(f) Completion of route analysis.

(1) The rail transportation route analysis, alternative route analysis, and route selection process required under paragraphs (c), (d), and (e) of this section must be completed no later than the end of the calendar year following the year to which the analyses apply.

(2) The initial analysis and route selection determinations required under paragraphs (c), (d), and (e) of this section must include a comprehensive review of the entire system. Subsequent analyses and route selection determinations required under paragraphs (c), (d), and (e) of this section must include a comprehensive, system-wide review of all operational changes, infrastructure modifications, traffic adjustments, changes in the nature of high-consequence targets located along, or in proximity to, the route, and any other changes affecting the safety

Addendum 29a

USCA Case #20-1317      Document #2035619      Filed: 01/12/2024      Page 153 of 180

or security of the movements of the materials specified in paragraph (a) of this section that were implemented during the calendar year.

(3) A rail carrier need not perform a rail transportation route analysis, alternative route analysis, or route selection process for any hazardous material other than the materials specified in paragraph (a) of this section.

(g) Rail carrier point of contact on routing issues. Each rail carrier must identify a point of contact (including the name, title, phone number and e-mail address) on routing issues involving the movement of materials covered by this section in its security plan and provide this information to:

(1) State and/or regional Fusion Centers that have been established to coordinate with state, local and tribal officials on security issues and which are located within the area encompassed by the rail carrier's rail system; and

(2) State, local, and tribal officials in jurisdictions that may be affected by a rail carrier's routing decisions and who directly contact the railroad to discuss routing decisions.

(h) Storage, delays in transit, and notification. With respect to the materials specified in paragraph (a) of this section, each rail carrier must ensure the safety and security plan it develops and implements under this subpart includes all of the following:

(1) A procedure under which the rail carrier must consult with offerors and consignees in order to develop measures for minimizing, to the extent practicable, the duration of any storage of the material incidental to movement (see § 171.8 of this subchapter).

(2) Measures to prevent unauthorized access to the materials during storage or delays in transit.

(3) Measures to mitigate risk to population centers associated with in-transit storage.

(4) Measures to be taken in the event of an escalating threat level for materials stored in transit.

Addendum 30a

(5) Procedures for notifying the consignee in the event of a significant delay during transportation; such notification must be completed within 48 hours after the carrier has identified the delay and must include a revised delivery schedule. A significant delay is one that compromises the safety or security of the hazardous material or delays the shipment beyond its normal expected or planned shipping time. Notification should be made by a method acceptable to both the rail carrier and consignee.

(i) Recordkeeping.

(1) Each rail carrier must maintain a copy of the information specified in paragraphs (b), (c), (d), (e), and (f) of this section (or an electronic image thereof) that is accessible at, or through, its principal place of business and must make the record available upon request, at a reasonable time and location, to an authorized official of the Department of Transportation or the Department of Homeland Security. Records must be retained for a minimum of two years.

(2) Each rail carrier must restrict the distribution, disclosure, and availability of information collected or developed in accordance with paragraphs (c), (d), (e), and (f) of this section to covered persons with a need-to-know, as described in parts 15 and 1520 of this title.

(j) Compliance and enforcement. If the carrier's route selection documentation and underlying analyses are found to be deficient, the carrier may be required to revise the analyses or make changes in route selection. If DOT finds that a chosen route is not the safest and most secure practicable route available, the FRA Associate Administrator for Safety, in consultation with TSA, may require the use of an alternative route. Prior to making such a determination, FRA and TSA will consult with the Surface Transportation Board (STB) regarding whether the contemplated alternative route(s) would be economically practicable.

**Credits**
[73 FR 20771, April 16, 2008; 73 FR 72193, Nov. 26, 2008; 76 FR 56314, Sept. 13, 2011; 80 FR 26746, May 8, 2015; 85 FR 45029, July 24, 2020]

SOURCE: Amdt. 172–29, 41 FR 15996, Apr. 15, 1976; 51 FR 23078, June 25, 1986; 51 FR 25639, July 15, 1986; 51 FR 42177, Nov. 21, 1986; 52 FR 36671, Sept. 30, 1987; 54 FR 27144, June 27, 1989; 55 FR 20796, May 21, 1990; 55 FR 33711, Aug. 17, 1990; 55 FR 39979, Oct. 1, 1990; 55 FR 52474, Dec. 21, 1990; 56 FR 66162, Dec. 20, 1991; 58 FR 6871, Feb. 2, 1993; 58 FR 33305,

Addendum 31a

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter C. Hazardous Materials Regulations
          Part 172. Hazardous Materials Table, Special Provisions, Hazardous Materials Communications, Emergency Response Information, Training Requirements, and Security Plans (Refs & Annos)

49 C.F.R. Pt. 172, App. D

APPENDIX D TO PART 172—RAIL RISK ANALYSIS FACTORS

Effective: June 1, 2008
Currentness

A. This appendix sets forth the minimum criteria that must be considered by rail carriers when performing the safety and security risk analyses required by § 172.820. The risk analysis to be performed may be quantitative, qualitative, or a combination of both. In addition to clearly identifying the hazardous material(s) and route(s) being analyzed, the analysis must provide a thorough description of the threats, identified vulnerabilities, and mitigation measures implemented to address identified vulnerabilities.

B. In evaluating the safety and security of hazardous materials transport, selection of the route for transportation is critical. For the purpose of rail transportation route analysis, as specified in § 172.820(c) and (d), a route may include the point where the carrier takes possession of the material and all track and railroad facilities up to the point where the material is relinquished to another entity. Railroad facilities are railroad property including, but not limited to, classification and switching yards, storage facilities, and non-private sidings; however, they do not include an offeror's facility, private track, private siding, or consignee's facility. Each rail carrier must use best efforts to communicate with its shippers, consignees, and interlining partners to ensure the safety and security of shipments during all stages of transportation.

C. Because of the varying operating environments and interconnected nature of the rail system, each carrier must select and document the analysis method/model used and identify the routes to be analyzed.

Addendum 32a

D. The safety and security risk analysis must consider current data and information as well as changes that may reasonably be anticipated to occur during the analysis year. Factors to be considered in the performance of this safety and security risk analysis include:

1. Volume of hazardous material transported;

2. Rail traffic density;

3. Trip length for route;

4. Presence and characteristics of railroad facilities;

5. Track type, class, and maintenance schedule;

6. Track grade and curvature;

7. Presence or absence of signals and train control systems along the route ("dark" versus signaled territory);

8. Presence or absence of wayside hazard detectors;

9. Number and types of grade crossings;

10. Single versus double track territory;

11. Frequency and location of track turnouts;

12. Proximity to iconic targets;

13. Environmentally sensitive or significant areas;

14. Population density along the route;

15. Venues along the route (stations, events, places of congregation);

16. Emergency response capability along the route;

17. Areas of high consequence along the route, including high consequence targets as defined in § 172.820(c);

Addendum 33a

18. Presence of passenger traffic along route (shared track);

19. Speed of train operations;

20. Proximity to en-route storage or repair facilities;

21. Known threats, including any non-public threat scenarios provided by the Department of Homeland Security or the Department of Transportation for carrier use in the development of the route assessment;

22. Measures in place to address apparent safety and security risks;

23. Availability of practicable alternative routes;

24. Past incidents;

25. Overall times in transit;

26. Training and skill level of crews; and

27. Impact on rail network traffic and congestion.

**Credits**
[73 FR 20772, April 16, 2008; 73 FR 72193, Nov. 26, 2008]

SOURCE: Amdt. 172–29, 41 FR 15996, Apr. 15, 1976; 51 FR 23078, June 25, 1986; 51 FR 25639, July 15, 1986; 51 FR 42177, Nov. 21, 1986; 52 FR 36671, Sept. 30, 1987; 54 FR 27144, June 27, 1989; 55 FR 20796, May 21, 1990; 55 FR 33711, Aug. 17, 1990; 55 FR 39979, Oct. 1, 1990; 55 FR 52474, Dec. 21, 1990; 56 FR 66162, Dec. 20, 1991; 58 FR 6871, Feb. 2, 1993; 58 FR 33305, June 16, 1993; 58 FR 50501, Sept. 27, 1993; 58 FR 51528, Oct. 1, 1993; 59 FR 48549, Sept. 21, 1994; 69 FR 75215, Dec. 15, 2004; 70 FR 8302, Feb. 18, 2005; 72 FR 44947, 44948, Aug. 9, 2007; 73 FR 57005, Oct. 1, 2008; 78 FR 42475, July 16, 2013; 78 FR 45892, July 30, 2013, unless otherwise noted.

AUTHORITY: 49 U.S.C. 5101–5128, 44701; 49 CFR 1.81, 1.96 and 1.97.

Addendum 34a

Code of Federal Regulations
   Title 49. Transportation
      Subtitle B. Other Regulations Relating to Transportation
         Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
            Subchapter C. Hazardous Materials Regulations
               Part 173. Shippers—General Requirements for Shipments and Packagings (Refs & Annos)
                  Subpart G. Gases; Preparation and Packaging (Refs & Annos)

49 C.F.R. § 173.319

§ 173.319 Cryogenic liquids in tank cars.

Effective: August 24, 2020
Currentness

(a) General requirements.

(1) A tank car containing a flammable cryogenic liquid may not be shipped unless it was loaded by, or with the consent of, the owner of the tank car.

(2) The amount of flammable cryogenic liquid loaded into a tank car must be determined, either by direct measurement or by calculation based on weight, to verify that the tank has not been filled to a level in excess of the limits specified in paragraph (d)(2) of this section. The weight of any flammable cryogenic liquid loaded, except hydrogen, must be checked by use of scales after disconnecting the loading line.

(3) The shipper must notify the Federal Railroad Administration whenever a tank car containing any flammable cryogenic liquid is not received by the consignee within 20 days from the date of shipment. Notification to the Federal Railroad Administration may be made by email to HMassist@dot.gov or telephone call to (202) 493–6245.

(4) A tank car may not be loaded with any flammable cryogenic liquid:

Addendum 35a

(i) That may combine chemically with any residue in the tank to produce an unsafe condition,

(ii) That is colder than the design service temperature of the tank,

(iii) If the average daily pressure rise in the tank exceeded 3 psig during the prior shipment,

(iv) Unless it is marked with the name of contents, in accordance with § 172.330 of this subchapter.

(b) When a tank car containing a flammable cryogenic liquid is offered for transportation:

(1) At least 0.5 percent outage must be provided below the inlet of the pressure relief or pressure control valve at the start-to-discharge pressure setting of the valve, with the tank car in a level attitude, and

(2) The absolute pressure in the annular space must be less than 75 microns of mercury.

(c) Temperature. A flammable cryogenic liquid must be loaded into a tank car at such a temperature that the average daily pressure rise during transportation will not exceed 3 psig (see paragraph (a)(4)(iii) of this section).

(d) A Class DOT–113 tank car is authorized for the shipment of the following cryogenic liquids subject to the following additional requirements:

(1) For purposes of this section, "filling density" is defined as the percent ratio of the weight of lading in the tank to the weight of water that the tank will hold at the design service temperature (one pound of water = 27.737 cubic inches at 60°F., or one gallon of water = 231 cubic inches at 60°F. and weighs 8.32828 pounds).

(2) Ethylene, hydrogen (minimum 95 percent parahydrogen), and methane, cryogenic liquids must be loaded and shipped in accordance with the following table:

**Addendum 36a**

**Table 1 to § 173.319(d)—Pressure Control Valve Setting or Relief Valve Setting**

| Maximum start-to-discharge pressure (psig) | Maximum permitted filling density (percent by weight) | | | | |
|---|---|---|---|---|---|
| | Ethylene | Ethylene | Ethylene | Hydrogen | Methane |
| 17 | | . | | 6.60 | |
| 45 | 52.8 | | . | | |
| 75 | | 51.1 | 51.1 | | 37.3. |
| Maximum pressure when offered for transportation | 10 psig | 20 psig | 20 psig | | 15 psig. |
| Design service temperature | Minus 260 °F | Minus 260 °F | Minus 155 °F | Minus 423 °F | Minus 260 °F. |
| Specification (see § 180.507(b)(3) of this subchapter) | 113D60W, 113C60W | 113C120W | 113D120W | 113A175W, 113A60W | 113C120W9. |

Note: For DOT 113 cryogenic tank cars, delimiters indicate the following:

A—authorized for minus 423 °F loading;

C—authorized for minus 260 °F loading;

Addendum 37a

D—
authorized
for minus
155 °F
loading.

The
specification
suffix "9"
indicates
the tank car
is equipped
with
(minimum)
9/16 inch
TC 128B
normalized
steel outer
jacket and
tank heads.

(e) Special requirements for class DOT 113 tank cars.

(1) A class DOT–113 tank car need not be periodically pressure tested; however, each shipment must be monitored to determine the average daily pressure rise in the tank car. If the average daily pressure rise during any shipment exceeds 0.2 Bar (3 psig) per day, the tank must be tested for thermal integrity prior to any subsequent shipment.

(2) Thermal integrity test. When required by paragraph (e)(1) of this section, either of the following thermal integrity tests may be used:

(i) Pressure rise test. The pressure rise in the tank may not exceed 0.34 Bar (5 psig) in 24 hours. When the pressure rise test is performed, the absolute pressure in the annular space of the loaded tank car may not exceed 75 microns of mercury at the beginning of the test and may not increase more than 25 microns during the 24–hour period; or

(ii) Calculated heat transfer rate test. The insulation system must be performance tested as prescribed in § 179.400–4 of this subchapter. When the calculated heat transfer rate test is performed, the absolute pressure in the annular space of the loaded tank car may not exceed 75 microns of mercury at the beginning of the test and may not increase more than 25 microns during the 24–hour period. The calculated heat transfer rate in 24 hours may not exceed:

Addendum 38a

USCA Case #20-1317     Document #2035619     Filed: 01/12/2024     Page 162 of 180

(A) 120 percent of the appropriate standard heat transfer rate specified in § 179.401–1 of this subchapter, for DOT–113A60W and DOT–113C120W tank cars;

(B) 122.808 joules (0.1164 Btu/day/lb.) of inner tank car water capacity, for DOT–113A175W tank cars;

(C) 345.215 joules (0.3272 Btu/day/lb.) of inner tank car water capacity, for DOT–113C60W and 113D60W tank cars; or

(D) 500.09 joules (0.4740 Btu/day/lb.) of inner tank car water capacity, for DOT–113D120W tank cars.

(3) A tank car that fails a test prescribed in paragraph (e)(2) of this section must be removed from hazardous materials service. A tank car removed from hazardous materials service because it failed a test prescribed in paragraph (e)(2) of this section may not be used to transport a hazardous material unless the tank car conforms to all applicable requirements of this subchapter.

(4) Each rupture disc must be replaced every 12 months, and the replacement date must be marked on the car near the pressure relief valve information.

(5) Pressure relief valves and alternate pressure relief valves must be tested every five years. The start-to-discharge pressure and vapor tight pressure requirements for the pressure relief valves must be as specified in § 179.401–1 of this subchapter. The alternate pressure relief device values specified in § 179.401–1 of this subchapter for a DOT–113C120W tank car apply to a DOT–113D120W tank car.

**Credits**

[Amdt. 173–166, 48 FR 27698, June 16, 1983; 48 FR 50440, Nov. 1, 1983; Amdt. 173–245, 60 FR 49075, 49076, Sept. 21, 1995; 65 FR 58630, Sept. 29, 2000; 66 FR 45184, 45380, 45383, Aug. 28, 2001; 70 FR 34076, June 13, 2005; 77 FR 60942, Oct. 5, 2012; 81 FR 3681, Jan. 21, 2016; 85 FR 45029, July 24, 2020]

Code of Federal Regulations
    Title 49. Transportation
        Subtitle B. Other Regulations Relating to Transportation
            Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
                Subchapter C. Hazardous Materials Regulations
                    Part 174. Carriage by Rail (Refs & Annos)
                        Subpart A. General Requirements

49 C.F.R. § 174.14

§ 174.14 Movements to be expedited.

Currentness

(a) A carrier must forward each shipment of hazardous materials promptly and within 48 hours (Saturdays, Sundays, and holidays excluded), after acceptance at the originating point or receipt at any yard, transfer station, or interchange point, except that where biweekly or weekly service only is performed, a shipment of hazardous materials must be forwarded on the first available train.

(b) A tank car loaded with any Division 2.1 (flammable gas), Division 2.3 (poisonous gas) or Class 3 (flammable liquid) material, may not be received and held at any point, subject to forwarding orders, so as to defeat the purpose of this section or of § 174.204 of this subchapter.

**Credits**
[55 FR 52677, Dec. 21, 1990]

SOURCE: Amdt. 174–26, 41 FR 16092, Apr. 15, 1976; 50 FR 45731, Nov. 1, 1985; 51 FR 23079, June 25, 1986; 52 FR 8592, March 19, 1987; 58 FR 6871, Feb. 2, 1993; 58 FR 33305, June 16, 1993; 58 FR 51533, Oct. 1, 1993; 59 FR 48549, Sept. 21, 1994; 70 FR 8302, Feb. 18, 2005; 75 FR 5395, Feb. 2, 2010; 78 FR 60754, Oct. 2, 2013; 84 FR 6952, Feb. 28, 2019, unless otherwise noted.

AUTHORITY: 49 U.S.C. 5101–5128; 33 U.S.C. 1321; 49 CFR 1.81 and 1.97.

Addendum 40a

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter C. Hazardous Materials Regulations
          Part 174. Carriage by Rail (Refs & Annos)
            Subpart D. Handling of Placarded Rail Cars, Transport Vehicles and Freight Containers (Refs & Annos)

49 C.F.R. § 174.85

§ 174.85 Position in train of placarded cars, transport vehicles, freight containers, and bulk packagings.

Currentness

(a) Except as provided in paragraphs (b) and (c) of this section, the position in a train of each loaded placarded car, transport vehicle, freight container, and bulk packaging must conform to the provisions of this section.

(b) A car placarded "RADIOACTIVE" must comply with train positioning requirements of paragraph (d) of this section and must be separated from a locomotive, occupied caboose, or carload of undeveloped film by at least one non-placarded car.

(c) A tank car containing the residue of a hazardous material must be separated from a locomotive or occupied caboose by at least one rail car other than a placarded tank car.

(d) Position of rail cars in a train. In the following table:

**POSITION IN TRAIN OF PLACARDED CARS TRANSPORTING HAZARDOUS MATERIALS**

| | Placard Group 1 | Placard Group 2 | Placard Group 3 | Placard Group 4 |
|---|---|---|---|---|

| RESTRICTIONS | Rail Car | Tank Car | Rail Car | Tank Car | Rail Car | Rail Car |
|---|---|---|---|---|---|---|
| 1. When train length permits, placarded car may not be nearer than the sixth car from the engine or occupied caboose......................................................... | X | X | | X | | |
| 2. When train length does not permit, placarded car must be placed near the middle of the train, but not nearer than the second car from an engine or occupied caboose............ | X | X | | X | | |
| 3. A placarded car may not be placed next to an open-top car when any of the lading in the open top car protrudes beyond the car ends, or if the lading shifted, would protrude beyond the car ends.................................... | X | X | | X | | |
| 4. A placarded car may not be placed next to a loaded flat car, except closed TOFC/COFC equipment, auto carriers, and other specially equipped cars with tie-down devices for securing vehicles. Permanent bulk head flat cars are considered the same as open-top cars................................... | X | X | | X | | |
| 5. A placarded car may not be placed next to any transport vehicle or freight container having an internal combustion engine or an open-flame device in operation........................ | X | X | | X | | |
| 6. Placarded cars may not be placed next to each other based on the following: | | | | | | |
|     Placard Group 1.......................................................... | | X | X | X | X | X |
|     Placard Group 2.......................................................... | X | | | X | X | X |
|     Placard Group 3.......................................................... | X | X | X | | | X |
|     Placard Group 4.......................................................... | X | X | X | X | X | |

PLACARD GROUP:

Group 1—Divisions 1.1 and 1.2 (explosive) materials.

Group 2—Divisions 1.3, 1.4, 1.5 (explosive), Class 2 (compressed gas; other than Div 2.3, PG I, Zone A), Class 3 (flammable liquid), Class 4 (flammable solid), Class 5 (oxidizing), Class 6 (poisonous liquid; other than Div 6.1, PG I, Zone A), and Class 8 (corrosive) materials.

Group 3—Divisions 2.3 (Zone A; poisonous gas) and 6.1 (PG I, Zone A; poisonous liquid) materials.

Group 4—Class 7 (radioactive) materials.

(1) Where an "X" appears at the intersection of a Placard Group column and a Restriction row, the corresponding restriction applies.

Addendum 42a

USCA Case #20-1317      Document #2035619      Filed: 01/12/2024      Page 166 of 180

(2) "Rail Car" means a car other than a tank car.

(3) For purposes of this subpart, each unit of an articulated intermodal rail car shall be considered as one car.

**Credits**

[55 FR 52680, Dec. 21, 1990; 57 FR 45464, Oct. 1, 1992; Amdt. 174–83, 61 FR 28678, June 5, 1996; 61 FR 50255, Sept. 25, 1996; Amdt. 174–83, 61 FR 51339, Oct. 1, 1996; 64 FR 51919, Sept. 27, 1999; 66 FR 45383, Aug. 28, 2001]

SOURCE: Amdt. 174–26, 41 FR 16092, Apr. 15, 1976; 50 FR 45731, Nov. 1, 1985; 51 FR 23079, June 25, 1986; 52 FR 8592, March 19, 1987; 55 FR 52680, Dec. 21, 1990; 58 FR 6871, Feb. 2, 1993; 58 FR 33305, June 16, 1993; 58 FR 51533, Oct. 1, 1993; 59 FR 48549, Sept. 21, 1994; 70 FR 8302, Feb. 18, 2005; 75 FR 5395, Feb. 2, 2010; 78 FR 60754, Oct. 2, 2013; 84 FR 6952, Feb. 28, 2019, unless otherwise noted.

AUTHORITY: 49 U.S.C. 5101–5128; 33 U.S.C. 1321; 49 CFR 1.81 and 1.97.

Current through Jan. 8, 2024, 89 FR 891. Some sections may be more current. See credits for details.

Addendum 43a

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of
      Transportation (Refs & Annos)
        Subchapter C. Hazardous Materials Regulations
          Part 179. Specifications for Tank Cars (Refs & Annos)
            Subpart F. Specification for Cryogenic Liquid Tank Car Tanks and Seamless
            Steel Tanks (Classes Dot–113 and 107a) (Refs & Annos)
              § 179.400. General Specification Applicable to Cryogenic Liquid Tank Car
              Tanks.

49 C.F.R. § 179.400–4

§ 179.400–4 Insulation system and performance standard.

Currentness

(a) For the purposes of this specification—

(1) Standard Heat Transfer Rate (SHTR), expressed in Btu/day/lb of water capacity, means
the rate of heat transfer used for determining the satisfactory performance of the insulation
system of a cryogenic tank car tank in cryogenic liquid service (see § 179.401–1 table).

(2) Test cryogenic liquid means the cryogenic liquid, which may be different from the lading
intended to be shipped in the tank, being used during the performance tests of the insulation
system.

(3) Normal evaporation rate (NER), expressed in lbs. (of the cryogenic liquid)/day, means
the rate of evaporation, determined by test of a test cryogenic liquid in a tank maintained
at a pressure of approximately one atmosphere, absolute. This determination of the NER is
the NER test.

(4) Stabilization period means the elapsed time after a tank car tank is filled with the test
cryogenic liquid until the NER has stabilized, or 24 hours has passed, whichever is greater.

Addendum 44a

USCA Case #20-1317   Document #2035619   Filed: 01/12/2024   Page 168 of 180

(5) Calculated heat transfer rate. The calculated heat transfer rate (CHTR) is determined by the use of test data obtained during the NER test in the formula:

$$q=[N(\Delta h)(90-t_l)]/[V(8.32828)(t_s-t_f)]$$

Where:

q=CHTR, in Btu/day/lb., of water capacity;

N=NER, determined by NER test, in lbs./day;

$\Delta h$ = latent heat of vaporization of the test cryogenic liquid at the NER test pressure of approximately one atmosphere, absolute, in Btu/lb.;

90 = ambient temperature at 90°F.;

V = gross water volume at 60°F. of the inner tank, in gallons;

$t_l$ = equilibrium temperature of intended lading at maximum shipping pressure, in °F.;

8.32828 = constant for converting gallons of water at 60°F. to lbs. of water at 60°F., in lbs./gallon;

$t_s$=average temperature of outer jacket, determined by averaging jacket temperatures at various locations on the jacket at regular intervals during the NER test, in °F.;

$t_f$ = equilibrium temperature of the test cryogenic liquid at the NER test pressure of approximately, one atmosphere, absolute, in °F.

(b) DOT–113A60W tank cars must—

(1) Be filled with hydrogen, cryogenic liquid to the maximum permitted fill density specified in § 173.319(d)(2) table of this subchapter prior to performing the NER test; and

(2) Have a CHTR equal to or less than the SHTR specified in § 179.401–1 table for a DOT–113A60W tank car.

Addendum 45a

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 169 of 180

(c) DOT–113C120W tank cars must—

(1) Be filled with ethylene, cryogenic liquid to the maximum permitted fill density specified in § 173.319(d)(2) table of this subchapter prior to performing the NER test, or be filled with nitrogen, cryogenic liquid to 90 percent of the volumetric capacity of the inner tank prior to performing the NER test; and

(2) Have a CHTR equal to or less than 75 percent of the SHTR specified in § 179.401–1 table for a DOT–113C120W tank car.

(d) Insulating materials must be approved.

(e) If the insulation consists of a powder having a tendency to settle, the entire top of the cylindrical portion of the inner tank must be insulated with a layer of glass fiber insulation at least one-inch nominal thickness, or equivalent, suitably held in position and covering an area extending 25 degrees to each side of the top center line of the inner tank.

(f) The outer jacket must be provided with fittings to permit effective evacuation of the annular space between the outer jacket and the inner tank.

(g) A device to measure the absolute pressure in the annular space must be provided. The device must be portable with an easily accessible connection or permanently positioned where it is readily visible to the operator.

**Credits**
[49 FR 24318, June 12, 1984; 66 FR 45186, Aug. 28, 2001]

SOURCE: 29 FR 18995, Dec. 29, 1964; 32 FR 5606, April 5, 1967; 179.400 through 179.401–1 appear at 48 FR 27708, June 16, 1983 (Amdt. 179–32); 52 FR 36672, Sept. 30, 1987; 58 FR 51534, Oct. 1, 1993; 59 FR 49135, Sept. 26, 1994; 63 FR 52850, Oct. 1, 1998; 70 FR 8302, Feb. 18, 2005; 73 FR 57008, Oct. 1, 2008; 77 FR 37985, June 25, 2012; 77 FR 60945, Oct. 5, 2012; 78 FR 60755, Oct. 2, 2013, unless otherwise noted.

Addendum 46a

Code of Federal Regulations
   Title 49. Transportation
      Subtitle B. Other Regulations Relating to Transportation
         Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of
         Transportation (Refs & Annos)
            Subchapter C. Hazardous Materials Regulations
               Part 179. Specifications for Tank Cars (Refs & Annos)
                  Subpart F. Specification for Cryogenic Liquid Tank Car Tanks and Seamless
                  Steel Tanks (Classes Dot–113 and 107a) (Refs & Annos)
                     § 179.401. Individual Specification Requirements Applicable to Inner Tanks
                     for Cryogenic Liquid Tank Car Tanks.

49 C.F.R. § 179.401–1

§ 179.401–1 Individual specification requirements.

Currentness

In addition to § 179.400, the individual specification requirements for the inner tank and its appurtenances are as follows:

| DOT specification | 113A60W | 113C120W |
|---|---|---|
| Design service temperature, °F.................. -423.................................... | | -260. |
| Material | | |
| | § 179.400-5....................... | § 179.400-5. |
| Impact test (weld and plate material)......... | § 179.400-5(c)................... | § 179.400-5(c). |
| Impact test values | | |
| | § 179.400-5(d)................... | § 179.400-5(d). |
| Standard heat transfer rate. (Btu per day per lb. of water capacity, max.) (see § 179.400-4)................................ 0.097................................... | | 0.4121. |
| Bursting pressure, min. psig..................... 240................................... | | 300. |
| Minimum plate thickness shell, inches (see § 179.400-7(a))................................... $^3/_{16}$ .................................... | | $^3/_{16}$. |

Addendum 47a

USCA Case #20-1317    Document #2035619    Filed: 01/12/2024    Page 171 of 180

| | | |
|---|---|---|
| Minimum head thickness, inches (see § 179.400–8(a), (b), and (c)) | $^3/_{16}$ | $^3/_{16}$. |
| Test pressure, psig (see § 179.400-16) | 60 | 120. |
| Safety vent bursting pressure, max. psig | 60 | 120. |
| Pressure relief valve start-to-discharge pressure, psig (± 3 psi) | 30 | 75. |
| Pressure relief valve vapor tight pressure, min. psig | 24 | 60. |
| Pressure relief valve flow rating pressure, max. psig | 40 | 85. |
| Alternate pressure relief valve start to discharge pressure, psig (± 3 psi) | | 90. |
| Alternate pressure relief valve vapor tight pressure, min. psig | | 72. |
| Alternate pressure relief valve flow rating pressure, max. psig | | 100. |
| Pressure control valve Start-to-vent, max. psig (see § 179.400-20(c)(4)) | 17 | Not required. |
| Relief device discharge restrictions | § 179.400-20 | 179.400-20. |
| Transfer line insulation | | |
| | § 179.400-17 | Not required. |

**Credits**

[65 FR 58632, Sept. 29, 2000; 66 FR 45390, Aug. 28, 2001]

SOURCE: 29 FR 18995, Dec. 29, 1964; 32 FR 5606, April 5, 1967; 179.400 through 179.401–1 appear at 48 FR 27708, June 16, 1983 (Amdt. 179–32); 52 FR 36672, Sept. 30, 1987; 58 FR 51534, Oct. 1, 1993; 59 FR 49135, Sept. 26, 1994; 63 FR 52850, Oct. 1, 1998; 70 FR 8302, Feb. 18, 2005; 73 FR 57008, Oct. 1, 2008; 77 FR 37985, June 25, 2012; 77 FR 60945, Oct. 5, 2012; 78 FR 60755, Oct. 2, 2013, unless otherwise noted.

AUTHORITY: 49 U.S.C. 5101–5128; 49 CFR 1.81 and 1.97.

Current through Jan. 8, 2024, 89 FR 891. Some sections may be more current. See credits for details.

(Authority: 38 U.S.C. 101(2), 1802–1803, 1811–1813, 1831)

*  *  *  *  *

■ 24. Amend § 17.904 by revising the authority citation at the end of the section to read as follows:

§ 17.904  Review and appeal process.

*  *  *  *  *

(Authority: 38 U.S.C. 101(2), 1802–1803, 1811–1813, 1831)

*  *  *  *  *

■ 25. Amend § 17.905 by revising the authority citation at the end of the section to read as follows:

§ 17.905  Medical records.

*  *  *  *  *

(Authority: 38 U.S.C. 101(2), 1802–1803, 1811–1813, 1831

PART 21—VOCATIONAL REHABILITATION AND EDUCATION

Subpart M—Vocational Training and Rehabilitation for Certain Children of Vietnam Veterans and Veterans with Covered Service in Korea—Spina Bifida and Covered Birth Defects

■ 26. The authority citation for part 21, subpart M, continues to read as follows:

Authority: 38 U.S.C. 101, 501, 512, 1151 note, ch. 18, 5112, and as noted in specific sections.

■ 27. Revise the heading of Subpart M as set forth above.

■ 28. Amend § 21.8010:
■ a. In paragraph (a) in the definition of ''Eligible child'' by removing ''3.814(c)(2)'' and adding, in its place, ''3.814(c)(3)''.
■ b. In paragraph (a) in the definition of ''Spina bifida'' by removing ''§ 3.814(c)(3)'', and adding, in its place, ''§ 3.814(c)(4)''.
■ c. In paragraph (a), by adding in alphabetical order, the definition of ''Veteran with covered service in Korea''.
■ d. Revising the authority citation for paragraph (a).
■ e. Revising the authority citation for paragraph (b).

The addition and revisions read as follows:

§ 21.8010  Definitions and abbreviations.
(a) *  *  *
*Veteran with covered service in Korea* means a veteran defined at § 3.814(c)(2) of this title.

*  *  *  *  *

(Authority: 38 U.S.C. 101, 1802, 1804, 1811–1812, 1814, 1821, 1831)

(b) *  *  *
Authority: 38 U.S.C. 1804, 1811, 1814, 1831.

■ 29. Amend § 21.8012 by:
■ a. Revising the section heading.
■ b. Revising the authority citation at the end of the section.

The revisions read as follows:

§ 21.8012  Vocational training program for certain children of Vietnam veterans and veterans with covered service in Korea—spina bifida and covered birth defects.

*  *  *  *  *

(Authority: 38 U.S.C. 1804, 1812, 1814, 1821)

■ 30. Amend § 21.8014 by:
■ a. In paragraph (a) introductory text, first sentence, removing ''Vietnam veteran'', and adding, in its place, ''Vietnam veteran or veteran with covered service in Korea''.
■ b. In paragraph (a)(2), removing ''Vietnam veteran's'', and adding, in its place, ''Vietnam veteran or veteran with covered service in Korea's''.
■ c. Revising the authority citation for paragraph (a).
■ d. Revising the authority citation for paragraph (b).

The revisions read as follows:

§ 21.8014  Application.
(a) *  *  *

(Authority: 38 U.S.C. 1804(a), 1821, 1832, 5101)

(b) *  *  *

(Authority: 38 U.S.C. 1804, 1811, 1811 note, 1812, 1814, 1831)

■ 31. Amend § 21.8016 by revising the authority citation for paragraphs (a), (b), and (d) to read as follows:

§ 21.8016  Nonduplication of benefits.
(a) *  *  *

(Authority: 38 U.S.C. 1804(e)(1), 1814, 1834)

(b) *  *  *

(Authority: 38 U.S.C. 1804(e)(1), 1814, 1834)

*  *  *  *  *

(d) *  *  *

(Authority: 38 U.S.C. 1804, 1814, 1834)

■ 32. Amend § 21.8022(b) by revising the authority citation at the end of the paragraph to read as follows:

§ 21.8022  Entry and reentry.

*  *  *  *  *

(b) *  *  *

(Authority: 38 U.S.C. 1804, 1814, 1832)
[FR Doc. 2011–1342 Filed 1–24–11; 8:45 am]
BILLING CODE P

DEPARTMENT OF TRANSPORTATION

Federal Railroad Administration

49 CFR Part 179

Operating Certain Railroad Tank Cars in Excess of 263,000 Pounds Gross Rail Load; Approval

AGENCY: Federal Railroad Administration (FRA), Department of Transportation (DOT).

ACTION: Notice regarding FRA approval for operating certain railroad tank cars in excess of 263,000 pounds gross rail load.

SUMMARY: On May 14, 2010, the Pipeline and Hazardous Materials Safety Administration (PHMSA) published a final rule amending the Hazardous Materials Regulations (HMR) to incorporate provisions contained in several widely used or longstanding special permits that have an established safety record. 75 FR 27205 (Final Rule). The Final Rule titled, Hazardous Materials: Incorporation of Special Permits into Regulations, in part, amended the HMR to allow certain rail tank cars, transporting hazardous materials, to exceed the gross weight on rail limitation of 263,000 pounds upon approval of the Federal Railroad Administration (FRA). This document provides notice of FRA's approval pursuant to the Final Rule of the operation of certain tank cars in hazardous materials service that exceed 263,000 pounds and weigh up to 286,000 pounds gross rail load (GRL).

FOR FURTHER INFORMATION CONTACT: Mr. Karl Alexy (*Karl.Alexy@dot.gov* or (202) 493–6245) or Mr. William Schoonover (*William.Schoonover@dot.gov* or (202) 493–6229), Office of Railroad Safety Assurance and Compliance.

SUPPLEMENTARY INFORMATION: Prior to the Final Rule, Title 49 Code of Federal Regulations Section 179.13 of the HMR limited rail tank cars transporting hazardous materials to a maximum capacity of 34,500 gallons (130,597 L) and, with certain exceptions, a GRL of 263,000 pounds (119,295 kg).

As noted in the preamble to the Final Rule, PHMSA has granted several special permits allowing tank cars subject to the 263,000 pound GRL limit of § 179.13 to weigh up to 286,000 pounds (129,727 kg) GRL subject to certain conditions. The Final Rule amended § 179.13 to allow, upon approval by FRA's Associate Administrator for Railroad Safety, rail tank cars that are not transporting materials poisonous by inhalation (PIH) materials to exceed the 263,000 GRL

limit and weigh up to 286,000 pounds GRL without a special permit. Revised § 179.13(a) further provides that FRA may impose conditions on these approvals and the tank cars "must be operated only under controlled interchange conditions agreed to by participating railroads." In adopting this amendment, PHMSA noted that FRA has already established safety-based guidelines for applications for authority to transport rail tank cars that exceed 263,000 pounds and rationalized that providing for FRA approval of these tank cars will simplify and expedite the regulatory process while at the same time maintain safety.

This document provides notice of FRA's approval pursuant to revised § 179.13(a) for the use in hazardous materials transportation of certain tank cars which exceed 263,000 pounds GRL and that may be loaded up to 286,000 pounds GRL, provided the cars are not loaded with PIH materials. Specifically, this document provides notice of FRA's approval pursuant to § 179.13(a) of (1) existing tank cars that are approved to operate in accordance with a PHMSA special permit allowing a GRL over 263,000 pounds; (2) cars that have been built, rebuilt, or otherwise modified for operation with a maximum GRL above 263,000 pounds, but not currently approved to operate in accordance with a special permit allowing the increased GRL; and (3) newly manufactured tank cars designed to operate with a GRL above 263,000 pounds.

Subject to the conditions specified below, railroad tank cars meeting the requirements in Sections II, III and IV, below, are approved, pursuant to § 179.13(a), to be loaded to a GRL of up to 286,000 pounds. No additional approval is required.

## I. Background

Since 1995, the Association of American Railroads (AAR) has maintained an industry standard in the form of an interchange rule related to freight cars (including hazardous materials tank cars) that weigh over 263,000 pounds GRL and up to 286,000 pounds GRL. That standard, AAR Standard S–259 (S–259)—Rail Car, 286,000-Lb Gross Weight, became effective January 1, 1995. In accordance with S–259, the design of a freight car's body must be based on a GRL of 286,000 pounds and the standard weight-related design loads for 100-ton cars used for fatigue-design criteria must be multiplied by 1.09, with the exception of longitudinal fatigue-design loads. S–259 also established minimum equipment requirements for brakes, bearings, axles, wheels, draft systems,

springs and trucks. S–259, however, does not allow for the free interchange among carriers of cars meeting its requirements. In 2002, AAR adopted a revised industry standard related to railroad freight cars weighing over 263,000 pounds[1] GRL and weighing up to 286,000 pounds. This revised industry standard, AAR Standard S–286 (adopted 2002, revised 2003, 2005, 2006), Free/Unrestricted Interchange for 286,000 Lb Gross Rail Load Cars (S–286), is applicable to rail freight cars manufactured, rebuilt or modified on or after January 1, 2003, and is the existing industry standard for designing, building, and operating rail cars at gross weights over 263,000 pounds and up to 286,000 pounds. S–286 sets forth industry-tested practices for designing, building, and operating rail cars at gross weights over 263,000 pounds and up to 286,000 pounds. S–286 provides for the free interchange among carriers of cars built to meet its requirements.

As noted in the preamble to the Final Rule, FRA's guidelines, applicable to rail tank cars exceeding 263,000 pounds GRL, are found in a document titled, "Maximizing Safety and Weight, A White Paper on 263K+ Tank Cars." This document is available for review on FRA's Web site at *http://www.fra.dot.gov/Pages/1800.shtml*. In sum, FRA's guidelines address the following topics: (1) Puncture resistance, (2) controlling longitudinal loading, (3) structural-worthiness, (4) track-worthiness, (5) service equipment, (6) service reliability and maintenance management, and (7) maximizing safety and weight.

Although FRA's guidelines address more aspects of tank car design than either of the AAR standards (including the puncture resistance of tank car tanks and the reliability of service equipment on the cars), existing tank cars built to meet the AAR standards have an excellent safety record. To date, special permits issued by PHMSA, related to GRL, in excess of 263,000 pounds GRL have required that the tank cars conform to either S–286 or S–259. In granting these special permits, PHMSA, with FRA's input, determined that in each instance, operating the tank cars with increased GRLs under the terms of the special permit would provide at least an equivalent level of safety as tank cars built to the minimum requirements of the HMR, but limited to a GRL of 263,000 pounds. In fact, in evaluating

several special permits related to increased GRLs, PHMSA and FRA found that the commodities shipped in the tank cars were overpackaged.[2] Similarly, the agencies found that the specifications of the tank cars covered by other special permits indicate that the tanks were constructed of materials with mechanical properties superior to the minimum requirements of the HMR.

In the preamble to the Final Rule, PHMSA identified the following special permits as those that would be affected by the rule's revisions to § 179.13 and thus subject to FRA approval as far as the GRL limitations: DOT–SP 11241, 11654, 11803, 12423, 12561, 12613, 12768, 12858, 12903, 13856, 13936, 14004, 14038, 14442, 14505, 14520, 14570, and 14619. In addition, FRA notes that there are five other special permits related to tank cars with a GRL in excess of 263,000 pounds. These include DOT–SP 14167, 14173, 14207, 14398, and 14734.

Of the 23 special permits listed above, seven authorize the transportation of PIH materials in tank cars exceeding 263,000 pounds. These include special permits 12858 (ethylene oxide), 13856 (Division 6.1 HMs), 14442 (anhydrous ammonia), 14520 (chlorine), 14167 (chlorine), 14173 (ethylene oxide), and 14570 (titanium tetrachloride). Because the Final Rule revised § 179.13(a) to provide FRA approval authority for tank cars "other than" those that contain PIH materials, as the regulation is currently written, FRA cannot provide approval to continue these cars in PIH materials transportation without the existing special permits. However, as demonstrated by the discussion in the preamble of the Final Rule identifying the special permits that would be affected by the revisions to § 179.13, FRA believes that the inconsistency in the revised regulatory text is the result of a technical drafting error. Accordingly, FRA is working with PHMSA to develop and publish a correction to the Final Rule that would provide FRA authority to approve the loading of tank cars up to 286,000 pounds GRL when transporting any regulated hazardous material, including PIH materials.

All but three of the 16 special permits identified above that do not involve the transportation of PIH materials authorize the manufacturing, sale, and/or use of particular DOT-specification tank cars with a GRL of 286,000 pounds

---

[1] This AAR standard actually references tank cars with a "GRL greater than 268,000 lbs," but FRA understands that the reference to "268,000 lbs" is a typographical error and the intent of the standard is to address tank cars with a GRL greater than 263,000 lbs.

[2] "Overpackaged" means the specification of the tank car was above the minimum requirements of the HMR. For example, a commodity that is allowed to be transported in a general purpose tank car is transported in a pressure car with a thicker tank shell.

for the transportation of particular hazardous materials identified in the permits. Special permits 11654 and 14619 authorize the transportation of certain Class 3 hazardous materials in DOT 105S tank cars with a maximum GRL of up to 270,000 pounds, while special permit 14207 authorizes the transportation of sodium hydroxide solution, a Class 8 hazardous material, in certain identified DOT 111A100W tank cars with a maximum GRL of up to 268,000 pounds.

The regulations from which grantees have been exempted in these special permits related to GRL include: § 173.26 (quantity limitations); and the GRL limit of 263,000 pounds in § 179.13. In five of these special permits (11241, 11654, 11803, 12613, and 14619), the grantees have been exempted from regulations not related to the GRL of the car, and these special permits must be maintained relative to these additional exemptions (*i.e.,* special permits must be maintained for relief from regulations other than from §§ 173.26 and 179.13).

Although FRA believes that tank cars, which have already been demonstrated to provide an equivalent level of safety to those specified by the HMR and existing tank cars built or retrofitted to similar standards, should be allowed to continue in HM transportation service, with the promulgation of a final rule designed to improve the crashworthiness and structural integrity of tank cars that transport highly hazardous materials such as PIH materials (HM–246; 74 FR 1770 (Jan. 13, 2009) (the "Tank Car Rule")), FRA notes that there is a widening performance gap in crashworthiness between the most robust tank cars designed to transport certain hazardous materials and general purpose tank cars designed to transport other hazardous materials. Accordingly, subject to certain conditions, FRA is providing its approval under § 179.13(a) to continue in service certain existing tank cars at GRLs in excess of 263,000 pounds and up to 286,000 pounds. At the same time, FRA is providing its approval for certain newly manufactured railroad tank cars to be loaded at an increased GRL of up to 286,000 pounds, provided certain additional conditions are met (*e.g.,* conditions related to the puncture resistance and reliability of the service equipment on the cars). Approval of newly constructed railroad tank cars meeting these additional requirements will, over time, narrow the performance gap between the most robust tank cars in hazardous materials service and other tank cars in hazardous materials service while research continues to develop and implement a crashworthiness performance standard as discussed in the Tank Car Rule. *See* 74 FR at 1771.

## II. FRA Approval of Existing Railroad Tank Cars Approved To Operate in Accordance With a PHMSA Special Permit Providing for a GRL Over 263,000 Pounds

Pursuant to § 179.13(a), the terms of existing special permits 11241, 11654, 11803, 12423, 12561, 12613, 12768, 12903, 13856, 13936, 14004, 14038, 14207, 14398, 14505, and 14734, related to railroad tank cars transporting hazardous materials other than PIH materials and currently approved to operate in accordance with a special permit providing for a GRL in excess of 263,000 pounds, are approved, subject to the following conditions:

1. Tank cars constructed, rebuilt, or otherwise modified to meet the requirements of S–259 shall be operated only in controlled interchange in accordance with that standard.

2. Tank cars constructed, rebuilt, or otherwise modified to meet the requirements of S–286 shall be permitted to operate in unrestricted interchange in accordance with that standard.

3. Tank car owners are responsible for determining which standard their tank cars meet. Tank car owners shall maintain records demonstrating compliance with that standard and make those records available to FRA upon request. Tank car owners shall also ensure that cars subject to this approval are appropriately marked in accordance with the HMR (*i.e.,* marked with the relevant tare weight) and that the records of the cars in AAR's Universal Machine Language Equipment Register (UMLER) clearly indicate the standard applicable to each car.

4. In accordance with S–286, if a tank car constructed in accordance with S–259 is rebuilt or otherwise modified to meet the requirements of S–286, that car shall be permitted to operate in unrestricted interchange. Tank car owners shall maintain records of the engineering analysis and upgrades performed that demonstrate compliance with S–286, and the tank car owner must file an R–1 with the AAR prior to the tank car being operated in unrestricted interchange. (*See* Appendix R of AAR's Manual of Standards and Recommended Practices, Section C–III, Specifications for Tank Cars (Specification M–1002)).

5. The GRL limit for tank cars subject to special permits 11654 and 14619 shall remain 270,000 pounds, and the GRL limit for tank cars subject to special permit 14207 shall remain 268,000 pounds; unless the cars are modified

and a subsequent request for approval is made to FRA.

The "terms" of the special permits referred to in this approval are the "packaging" safety control measures specified in paragraph 7 of each special permit. For example, special permit 11241 authorizes the operation of DOT-specification 105J300W tank cars that meet certain technical specifications outlined in paragraph 7 of the permit and have a maximum GRL of up to 286,000 pounds. Consistent with the terms of that special permit, FRA's approval, per § 179.13(a), is limited to the identified DOT-specification cars meeting the technical specifications outlined in the permit. FRA's approval, however, is not limited to the specific commodities identified in the permit; instead, FRA's approval extends to the use of the identified tank cars with a GRL of up to 286,000 pounds for the transportation of any regulated hazardous material that would otherwise be permitted to be transported in that type of specification car. Copies of the relevant special permits will be maintained by the Hazardous Materials Division of FRA's Office of Safety Assurance and Compliance. Copies of the special permits may be obtained by contacting the individuals listed in the "For Further Information Contact" section above.

Each of the special permits listed above require the special permit (or SP) number be stenciled on the sides of tank cars operating under its terms. For tank cars operating under a special permit related only to GRL and subject to this approval, that stencil must be removed or obliterated at the car's first shopping event after the date of this approval, or no later than January 25, 2012, whichever occurs first.

## III. FRA Approval of Existing Railroad Tank Cars Built to S–286 or Rebuilt, or Otherwise Modified for Operation With a Maximum GRL Above 263,000 Pounds, but Not Currently Authorized To Operate at a GRL Above 263,000 Pounds

Existing tank cars built, rebuilt, or otherwise modified to meet the requirements of either S–259 or S–286 may be loaded to a GRL of up to 286,000 pounds subject to the following conditions:

1. Tank cars constructed, rebuilt, or otherwise modified to meet the requirements of S–259 shall be operated only in controlled interchange in accordance with that standard.

2. Tank cars constructed, rebuilt, or otherwise modified to meet the requirements of S–286 shall be permitted to operate in unrestricted

interchange in accordance with that standard.

3. Tank cars shall meet the following design specifications or be retrofitted as follows:

a. Jacketed and non-jacketed tank cars constructed with ASTM 516–70 steel and having only the minimum plate thickness required by §§ 179.101–1 and 179.201–1 (no additional thickness allowance) must be retrofitted with a 7-gauge steel jacket (constructed of A–572 steel).

b. Jacketed and non-jacketed tank cars constructed with ASTM B209 (Alloy 5052 and 5652) aluminum and having only the minimum plate thickness required by §§ 179.101–1 and 179.201–1 (no additional thickness allowance) must be retrofitted with a 7-gauge steel jacket (constructed of A–572 steel).

c. Jacketed and non-jacketed 111A100W tank cars constructed with TC–128 steel or an aluminum alloy, listed in § 179.200–7 (other than Alloy 5052 or 5652 listed in b above) and having at least the minimum plate thickness required by §§ 179.101–1 and 179.201–1, do not require retrofitting.

4. Tank car owners are responsible for determining which standard their tank cars meet and whether their tank cars meet the requirements of Condition 3 above. Tank car owners shall maintain records demonstrating compliance with the relevant AAR standard and the requirements of Condition 3. Tank car owners shall make those records available to FRA upon request. Tank car owners shall also ensure that cars subject to this approval are appropriately marked in accordance with the HMR (i.e., marked with the relevant tare weight) and that the records of the cars in AAR's UMLER clearly indicate the standard applicable to each car.

5. In accordance with S–286, if a tank car constructed in accordance with S–259 is rebuilt or otherwise modified to meet the requirements of S–286, that car shall be permitted to operate in unrestricted interchange. Tank car owners shall maintain records of the engineering analysis and upgrades performed that demonstrate compliance with S–286 and the tank car owner must file an R–1 with the AAR prior to the tank car being operated in unrestricted interchange. (*See* Appendix R of AAR's Manual of Standards and Recommended Practices, Section C–III, Specifications for Tank Cars (Specification M–1002)).

## IV. FRA Approval of Maximum GRL of 286,000 Pounds for Newly Manufactured Railroad Tank Cars

Tank cars manufactured after January 25, 2011 may be loaded to a maximum GRL of 286,000 pounds provided the tank cars meet the following criteria:

1. Tank cars must be constructed in accordance with S–286.

2. Puncture resistance:

a. Tank car tanks must be constructed of TC–128 steel (normalized).

b. A jacketed tank car must be equipped with an 11-gauge jacket constructed of A–572 steel and the shell and head of the tank must meet the minimum plate thickness required by §§ 179.101–1 and 179.201–1. Alternate thicknesses, based on material properties indicated in the notes of § 179.101–1, are not approved.

c. For a non-jacketed tank car, the shell and head of the tank must meet the minimum plate thickness of that required by §§ 179.101–1 and 179.201–1. Alternate thicknesses, based on material properties indicated in the notes of § 179.101–1, are not approved.

3. Service Equipment:

a. Top fittings protection must meet the requirements of § 10.2 of Appendix E to Specification M–1002 for general purpose tank cars.

b. A tank car must be equipped with a reclosing pressure relief device.

The minimum plate thicknesses specified in paragraph 2 above were determined in the following manner. Using finite elements analysis of side impact simulations, a relationship between the puncture velocity and shell thickness was derived. Factors affecting puncture velocity were incorporated into the analysis, including gross weight, ultimate tensile strength of the shell material, tank and jacket thickness, tank diameter, and internal pressure and indenter size (which for this comparative analysis was assumed to be 12″ x 12″). The puncture velocities of representative baseline tank cars were calculated. The baseline tank cars were grouped according to the specified thickness requirements of the HMR. Additionally, the diameter of each grouping was based on a survey of tank car specifications. The specification grouping, respective diameters, thicknesses, materials of construction, and working pressures were as follows:

| Tank car specification | Minimum plate thickness (in) | Material of construction | Diameter (in) | Working pressure (psig) |
|---|---|---|---|---|
| 111A100W1 | 7/16 | A516–70 | 94 | 50 |
| 105A200W | 9/16 | A516–70 | 100 | 100 |
| 105A300W | 11/16 | A516–70 | 117 | 100 |
| 112A340W | 11/16 | A516–70 | 117 | 100 |
| 111A60ALW1 | 1/2 | ASTM B209 (Alloy 5052) | 9 | 50 |
| 111A100ALW1 | 5/8 | ASTM B209 (Alloy 5052) | 94 | 50 |

Through an iterative process, the thickness of a tank car with similar characteristics, with the exception of a GRL of 286,000 pounds, was increased until the puncture velocity was the same as that for the 263,000 GRL tank car. In a similar manner, the equivalent single-layer thickness was determined for tank cars not equipped with a jacket. The same analysis was not performed on the head because § 2.5 of AAR's Specification M–1002, requires the tank cars to be equipped with ½″ thick head shields.

Failure of a tank car owner to comply with any condition of the above approvals will deprive the owner of the benefit of the approval and, in any such instances, FRA reserves the right to take appropriate enforcement action, which may result in FRA revoking such approval. If a party desires to manufacture or use a tank car not meeting the above criteria, FRA will consider such alternative designs upon application in accordance with § 179.13.

Issued in Washington, DC on January 19, 2011.

**Jo Strang,**

*Associate Administrator for Railroad Safety/ Chief Safety Officer.*

[FR Doc. 2011–1414 Filed 1–24–11; 8:45 am]

**BILLING CODE 4910–06–P**

**Addendum 52a**

## DEPARTMENT OF TRANSPORTATION

## Pipeline and Hazardous Materials Safety Administration

**49 CFR Parts 171, 172, 173, 174, and 179**

**[Docket No. PHMSA–2012–0082 (HM–251)]**

**RIN 2137–AE91**

**Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains**

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Pipeline and Hazardous Materials Safety Administration (PHMSA), in coordination with the Federal Railroad Administration (FRA), is adopting requirements designed to reduce the consequences and, in some instances, reduce the probability of accidents involving trains transporting large quantities of flammable liquids. The final rule defines certain trains transporting large volumes of flammable liquids as "high-hazard flammable trains" (HHFT) and regulates their operation in terms of speed restrictions, braking systems, and routing. The final rule also adopts safety improvements in tank car design standards, a sampling and classification program for unrefined petroleum-based products, and notification requirements. These operational and safety improvements are necessary to address the unique risks associated with the growing reliance on trains to transport large quantities of flammable liquids. They incorporate recommendations from the National Transportation Safety Board (NTSB) and from the public comments, and are supported by a robust economic impact analysis.

**DATES:** *Effective Date:* This final rule is effective July 7, 2015.

*Incorporation by reference Date:* The incorporation by reference of the publication listed in this rule is approved by the Director of the Federal Register as of July 7, 2015.

**ADDRESSES:** You may find information on this rulemaking (Docket No. PHMSA–2012–0082) at Federal eRulemaking Portal: *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Rob Benedict and Ben Supko, (202) 366–8553, Standards and Rulemaking Division, Pipeline and Hazardous Materials Safety Administration or Karl Alexy, (202) 493–6245, Office of Safety Assurance and Compliance, Federal Railroad Administration, 1200 New Jersey Ave. SE., Washington, DC 20590.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents of Supplementary Information

I. Executive Summary
II. Background and Approach to Rail Safety
  A. Braking
  B. Speed Restrictions
  C. Track Integrity, Securement, Engineer and Conductor Certification, Crew Size and the Safety of Freight Railroad Operations
  D. Routing
  E. Notification
  F. Oil Spill Response Planning
  G. Classification
  H. Packaging/Tank Car
III. Recent Regulatory Actions Addressing Rail Safety
  A. Rulemaking Actions
  B. Emergency Orders
IV. Non-Regulatory Actions Addressing Rail Safety
  A. Safety Alerts and Advisories
  B. Operation Classification
  C. Call to Action
  D. Stakeholder Outreach
V. NTSB Safety Recommendations
VI. Incorporation by Reference Discussion Under 1 CFR part 51
VII. Summary and Discussion of Public Comments
  A. Miscellaneous Relevant Comments
  1. Harmonization
  2. Definition of High-Hazard Flammable Train
  3. Crude Oil Treatment
  4. Scope of Rulemaking
  B. Tank Car Specification
  1. New Tank Car Construction
  2. Retrofit Standard
  3. Performance Standard
  4. Implementation Timeline
  C. Speed Restrictions
  D. Advanced Brake Signal Propagation Systems
  E. Classification
  F. Routing
  G. Notification
VIII. Section by Section Review
IX. Impact of Adopted Regulation on Existing Emergency Orders
X. Regulatory Review and Notices
  A. Executive Order 12866, Executive Order 13563, Executive Order 13610, and DOT Regulatory Policies and Procedures
  B. Unfunded Mandates Reform Act
  C. Executive Order 13132
  D. Executive Order 13175
  E. Regulatory Flexibility Act, Executive Order 13272, and DOT Policies and Procedures
  F. Paperwork Reduction Act
  G. Environmental Assessment
  H. Privacy Act
  I. Executive Order 13609 and International Trade Analysis
  J. Statutory/Legal Authority for this Rulemaking
  K. Regulation Identifier Number (RIN)
  L. Executive Order 13211
XI. Regulatory Text

## I. Executive Summary

The Pipeline and Hazardous Materials Safety Administration (PHMSA), in coordination with the Federal Railroad Administration (FRA), is issuing this final rule, titled "Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for HHFTs," in order to increase the safety of flammable liquid shipments by rail. The final rule is necessary due to the expansion in United States (U.S.) energy production, which has led to significant challenges for the country's transportation system. PHMSA published a notice of proposed rulemaking (NPRM) on August 1, 2014. See 79 FR 45015. This final rule addresses comments to the NPRM and amends the existing hazardous materials regulations (HMR; 49 CFR parts 171–180) pertaining to tank car designs, speed restrictions, braking systems, routing, sampling and classification, and notification requirements related to certain trains transporting large quantities of flammable liquids.

Expansion in oil production has resulted in a large volume of crude oil being transported to refineries and other transport-related facilities, such as transloading facilities throughout the country. With a growing domestic supply, rail transportation has emerged as a flexible alternative to transportation by pipeline or vessel, which have historically delivered the vast majority of crude oil to U.S. refineries. The volume of crude oil carried by rail increased 423 percent between 2011 and 2012.[1][2] In 2013, the number of rail carloads of crude oil surpassed 400,000.[3][4] Further, based on information provided by the Association of American Railroads (AAR), the U.S. Energy Information Administration (U.S. EIA) asserts the amount of crude oil and refined petroleum products moved by U.S. railroads continued to increase by nine percent during the first seven months of 2014, when compared with the same period in 2013.

---

[1] See U.S. Rail Transportation of Crude Oil: Background and Issues for Congress; *http://fas.org/sgp/crs/misc/R43390.pdf.*

[2] See Table 9 of EIA refinery report *http:// www.eia.gov/petroleum/refinerycapacity/.*

[3] *http://www.stb.dot.gov/stb/industry/econ_waybill.html.*

[4] *http://www.eia.gov/todayinenergy/detail.cfm ?id=17751.*

- Notification Requirements
- Classification of unrefined petroleum-based products

In this final rule, the proposals in the NPRM have been revised in response to the comments received and the final RIA has been revised to align with the changes made to the final rule. Specifically, the RIA explains adjustments to the methodology used to estimate the benefits and costs resulting from the final rule.

The revised RIA is in the docket and supports the amendments made in this final rule. Table 4 shows the costs and benefits by affected section and rule provision over a 20-year period, discounted at a 7% rate. Table 4 also shows an explanation of the comprehensive benefits and costs (*i.e.,* the combined effects of individual provisions), and the estimated benefits, costs, and net benefits of each amendment.

Please also note that, given the uncertainty associated with the risks of HHFT shipments, Table 4 contains a range of benefits estimates. The low-end of the range of estimated benefits estimates risk from 2015 to 2034 based on the U.S. safety record for crude oil and ethanol from 2006 to 2013, adjusting for the projected increase in shipment volume over the next 20 years. The upper end of the range of estimated benefits is the 95th percentile of a Monte Carlo simulation.

TABLE 4—20 YEAR COSTS AND BENEFITS BY STAND-ALONE REGULATORY AMENDMENTS 2015–2034 [13]

| Affected section [14] | Provision | Benefits (7%) | Costs (7%) |
|---|---|---|---|
| 49 CFR § 172.820 | Rail Routing+ | Cost effective if routing were to reduce risk of an incident by 0.41%. | $8.8 million. |
| 49 CFR § 173.41 | Classification Plan | Cost effective if this requirement reduces risk by 1.29%. | $18.9 million. |
| 49 CFR § 174.310 | Speed Restriction: 40 mph speed limit in HTUA*. | $56 million–$242 million ** | $180 million. |
| | Advanced Brake Signal Propagation Systems. | $470.3 million–$1,114 million ** | $492 million. |
| 49 CFR part 179 | Existing Tank Car Retrofit/Retirement | $426 million–$1,706 million ** | $1,747 million. |
| | New Car Construction | $23.9 million–$97.4 million ** | $34.8 million. |
| Cumulative Total | | $912 million–$2,905 million ** | $2,482 million. |

"*" indicates voluntary compliance regarding crude oil trains in high-threat urban areas (HTUA)
"+" indicates voluntary actions that will be taken by shippers and railroads
"**" Indicates that the low end of the benefits range is based solely on lower consequence events, while the high end of the range includes benefits from mitigating high consequence events.

## II. Background and Approach to Rail Safety

As noted above the HMR provide safety and security requirements for shipments valued at more than $2.3 trillion annually.[15] The HMR are designed to achieve three goals: (1) To ensure that hazardous materials are packaged and handled safely and securely during transportation; (2) to provide effective communication to transportation workers and emergency responders of the hazards of the materials being transported; and (3) to minimize the consequences of an incident should one occur. The hazardous material regulatory system is a risk management system that is prevention-oriented and focused on identifying a safety or security hazard, thus reducing the probability and quantity of a hazardous material release.

Under the HMR, hazardous materials are categorized by analysis and experience into hazard classes and, for some classes, packing groups based upon the risks that they present during transportation. The HMR specify appropriate packaging and handling requirements for hazardous materials based on such classification, and require an offeror to communicate the material's hazards through the use of shipping papers, package marking and labeling, and vehicle placarding. The HMR also require offerors to provide emergency response information applicable to the specific hazard or hazards of the material being transported. Further, the HMR (1) mandate training for persons who prepare hazardous materials for shipment or who transport hazardous materials in commerce, and (2) require the development and implementation of plans to address the safety and security risks related to the transportation of certain types and quantities of hazardous materials in commerce.

The HMR also include operational requirements applicable to each mode of transportation and the FRA inspects and audits railroads, tank car facilities, and offerors of hazardous materials for compliance with PHMSA regulations as well as its own rail safety regulations. Additionally FRA's research and development program seeks to enhance all elements of railroad safety, including hazardous materials transportation.

To address our shared concerns regarding the risks associated with rail carriage of flammable liquids, and the large volumes of flammable liquids transported in HHFTs, PHMSA and FRA are focusing on three areas: (1) Proper classification and characterization; (2) operational controls to lessen the likelihood and consequences of accidents; and (3) improvements to tank car integrity. This approach is designed to minimize the occurrence of train accidents and mitigate the damage caused should an accident occur.

This overview section provides a general discussion of the major regulations currently in place that affect the safe transportation of hazardous materials by rail. These regulations pertain to issues such as: (1) Braking; (2) speed restrictions; (3) routing; (4) notification requirements; (5) oil spill response planning; (6) classification; and (7) packaging requirements.

### A. Braking

The effective use of braking on a freight train can result in accident avoidance. In addition, the effective use of braking on a freight train can potentially lessen the consequences of an accident by diminishing in-train forces, which can reduce the likelihood of a tank car being punctured and

---

[13] All costs and benefits are in millions over 20 years, and are discounted to present value using a seven percent rate and rounded.

[14] All affected sections of the Code of Federal Regulations (CFR) are in Title 49.

[15] 2012 Commodity Flow Survey, RITA, BTS. See *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=CFS_2012_00H01&prodType=table.*

decrease the likelihood of a derailment. The FRA has promulgated brake system safety standards for freight and other non-passenger trains and equipment in 49 CFR part 232. Specifically, part 232 provides requirements for (1) general braking, (2) inspection and testing, (3) periodic maintenance and testing, (4) end-of-train (EOT) devices, (5) introduction of new brake system technologies and (6) electronically controlled pneumatic braking (ECP) systems.

FRA's brake system safety standards incorporate longstanding inspection and maintenance requirements related to a train's braking systems—air brakes and handbrakes—that have been in existence for well over 100 years. However, FRA's brake system safety standards also anticipate and allow for new technology. See 49 CFR part 232, subpart F. In 1996, FRA published regulations establishing requirements pertaining to the use and design of two-way EOT devices. 62 FR 278 (Jan. 2, 1997). In 2008, FRA published subpart E to part 232, which established design, inspection, maintenance, and training standards for railroads implementing ECP brake system technology. 73 FR 61512 (Oct. 16, 2008). Two-way EOT devices and ECP braking systems have the potential to provide enhanced braking during emergency braking and ECP brakes allow for enhanced braking and better train control during normal operational brake applications. Moreover, in recent years, certain railroads, particularly those in the western half of the U.S., have shifted to using distributed power (DP), to move longer trains. While DP is technically not a braking system, it can provide some enhanced braking during an emergency braking application over conventional braking systems because it provides an additional signal source to speed the application of air brakes.

Three types of braking systems relevant to this rulemaking, two-way end-of-train (EOT) devices, distributed power (DP) systems, and electronically controlled pneumatic (ECP) braking systems, and briefly introduced below. They are discussed in greater detail in the "Advanced Braking Signal Systems" section of this rulemaking.

Two-way EOT devices include two pieces of equipment linked by radio that initiate an emergency brake application command from the front unit located in the controlling ("lead") locomotive, which then activates the emergency air valve at the rear of the train within one second. The rear unit of the device sends an acknowledgment message to the front unit immediately upon receipt of an emergency brake application

command. A two-way EOT device is slightly more effective than conventional air brakes because the rear cars receive the emergency brake command more quickly in an engineer induced emergency brake application.

DP systems use multiple locomotives positioned at strategic locations within the train consist (often at the rear of the train) to provide additional power and train control in certain operations. For instance, a DP system may be used to provide power while climbing a steep incline and to control the movement of the train as it crests the incline and begins its downward descent. The DP system works through the control of the rearward locomotives by command signals originating at the lead locomotive and transmitted to the remote (rearward) locomotives. While distributed power technically is not a braking system, the additional power source in or at the rear of the train consist do provide enhanced braking for a train. The addition of a DP locomotive allows for the braking effort to be distributed throughout the train and allows for a more uniform braking effort than with a conventional air brake system.

ECP brake systems simultaneously send an electronic braking command to all equipped cars in the train, reducing the time before a car's pneumatic brakes are engaged compared to conventional air brakes. They can be installed as an overlay to a conventional air brake system or replace it altogether; however, FRA regulations do require that ECP brake systems be interoperable pursuant to the AAR S–4200 standard, which allows for interchange among the Class I railroads. 49 CFR 232.603.

The simultaneous application of ECP brakes on all cars in a train also significantly improves train handling by substantially reducing stopping distances as well as buff and draft forces within the train, which under certain conditions can result in a derailment. Because ECP brakes do not rely on changes in air pressure passing from car to car, there are no delays related to the depletion and recharging of a train's air brake system. These factors provide railroads with the ability to decrease congestion or to increase volume by running longer trains closer together.

### B. Speed Restrictions

High speeds can increase the kinetic energy involved in and the associated damage caused by an accident. With respect to operating speeds, FRA has developed a system of classification that defines different track classes based on track quality. The track classes include Class 1 through Class 9 and "excepted

track." See 49 CFR 213.9 and 213.307. Freight trains transporting hazardous materials currently operate at track speeds associated with Class 1 through Class 5 track and, in certain limited instances, at or below "excepted track" speed limits. Section 213.9 of the FRA regulations on Track Safety Standards provides the "maximum allowable operating speed" for track Class 1 through Class 5 and "excepted track." The speed limits range from 10 mph or less up to 80 mph; however, AAR design specifications effectively limit most freight equipment to a maximum allowable speed of 70 mph.

In addition, the rail industry, through the AAR, implements a detailed protocol on recommended operating practices for the transportation of hazardous materials. This protocol, set forth in AAR Circular OT–55–N includes a 50-mph maximum speed for any "key train," including any train with 20 car loads of "any combination of hazardous material." In February 2014, by way of Secretary Foxx's *Letter to the Association of American Railroads,* AAR's Railroad Subscribers further committed to a 40-mph speed limit for certain trains carrying crude oil within the limits of any High-Threat Urban Area (HTUA), as defined by TSA regulations (49 CFR 1580.3).

### C. Track Integrity, Securement, Engineer and Conductor Certification, Crew Size and the Safety of Freight Railroad Operations

FRA carries out a comprehensive railroad safety program pursuant to its statutory authority. FRA's regulations promulgated for the safety of railroad operations involving the movement of freight address: (1) Railroad track; (2) signal and train control systems; (3) operating practices; (4) railroad communications; (5) rolling stock; (6) rear-end marking devices; (7) safety glazing; (8) railroad accident/incident reporting; (9) locational requirements for the dispatch of U.S. rail operations; (10) safety integration plans governing railroad consolidations, mergers, and acquisitions of control; (11) alcohol and drug testing; (12) locomotive engineer and conductor certification; (13) workplace safety; (14) highway-rail grade crossing safety; and other subjects.

Train accidents are often the culmination of a sequence of events that are influenced by a variety of factors and conditions. Broken rails or welds, track geometry, and human factors such as improper use of switches are leading causes of derailments. Rail defects have caused major accidents involving HHFTs, including accidents in New

RLBA recommended that the development of structures to contain and protect the over pressure device be continued including recessing the device in an inverted dome fastened to the shell.

Earthjustice, an environmental group, strongly urged "PHMSA to require existing tank cars to have additional top-fittings protections (which the Canadian proposed rule would do)."

AAR's comments on top fittings protection were consistent with many other commenters. In particular the AAR noted the importance of top fittings protections yet stressed concern with overly burdensome top fittings standards. AAR stated it "supports enhanced top-fittings protection, but not the 9 mph standard."

Because there was little substantive opposition to the adoption of enhanced top fittings protection for new construction of the DOT–117 specification tank car, PHMSA and FRA are adopting such requirements consistent with the AAR's specification for Tank Cars, M–1002, appendix E, paragraph 10.2.1 as opposed to dynamic top fittings protections meeting a 9-mph performance standard.

Under proposed Option 1, the DOT Specification 117 tank car would be required to be equipped with a top fittings protection system and nozzle capable of sustaining, without failure, a rollover accident at a speed of 9 mph, in which the rolling protective housing strikes a stationary surface assumed to be flat, level, and rigid and the speed is determined as a linear velocity, measured at the geometric center of the loaded tank car as a transverse vector. Generally this (TIH top fittings protection) requirement was not supported by the regulated community but was supported by those endorsing the most robust tank car possible. Below are a few selected comments to provide some idea of the overall comments.

Dow stated with regard to the top fittings on Option 1 that, "[o]ne rail tank car manufacturer indicated at least $8,000 additional cost for § 179.102–3 dynamic load roll-over protection . . . . The thicker $^{9}/_{16}$-inch steel tank shell indicated in the NPRM may also require even larger nozzle reinforcement pads at additional cost."

Another opposing commenter, Greenbrier, stated that it does not support TIH rollover protection, claiming it is an unproven technology. It does, however, support AAR specification M–1002, appendix E, Paragraph 10.2.1 Top Protection.

ADM asserted, "PHMSA assumes without any supporting data that top fittings will decrease the damage to service equipment by 50 percent."

PHMSA and FRA agree with commenters opposed to the TIH style rollover protection system proposed in Option 1 for new construction of the DOT–117 specification tank car. We disagree that it is "unproven technology." Specifically, this is not a specific technology but rather a performance standard. Also, the standard exists and is used for tank car transporting PIH commodities. There are thousands of tank cars in operation that meet this standard. We do not believe this is a matter of technology but rather a matter of whether a practical design could be developed, one that will not introduce excessive stresses elsewhere in the tank in the event of a roll-over.

Therefore, while we disagree that it is "unproven technology," we do not feel the effectiveness of the TIH rollover protection is justified when considering the cost of such a system and thus, we are not adopting such standards in this final rule.

### Braking

For comprehensive analyses, conclusions, and regulatory codification on the braking proposal, see "Advanced Brake Signal Propagation Systems."

### Supporting Analyses and Conclusions

The discussion below provides some of the supporting analysis that shaped PHMSA and FRA's decisions on the requirements for the new construction of the DOT–117 specification tank cars. For further detail and a more comprehensive discussion of our analysis, see the final RIA for this rulemaking. This section highlights particular areas that were the focus of numerous comments.

### Puncture Resistance

Effective October 1, 2015, for new car construction, the adopted specification requirements are the same as proposed Option 2. See the "Advanced Braking Signal Propagation Systems" section for discussion on ECP braking. Industry is currently building DOT–111 tank cars constructed to the CPC–1232 standard. The primary difference between Option 2 and the jacketed DOT/CPC–1232 car is that the former has a $^{9}/_{16}$ inch thick shell. Additional required thickness provides improved shell puncture resistance ranging from 7% to 40% depending on the initial speed and brake system employed as indicated in the following table:

TABLE 16—REDUCTION IN THE NUMBER OF PUNCTURES GIVEN TANK CAR DESIGN, INITIAL SPEED, AND BRAKE SYSTEM, WHEN COMPARED TO AN UNJACKETED DOT 111 TANK CAR WITH A TWO-WAY EOT DEVICE

| Tank car option | Two-way EOT device | | ECP | |
| --- | --- | --- | --- | --- |
| | 40 mph | 50 mph | 40 mph | 50 mph |
| DOT 111 no jacket | 0 | 0 | 2.3 | 1.4 |
| $^{7}/_{16}$-inch w/jacket | 5.0 | 6.5 | 6.8 | 7.2 |
| $^{8}/_{16}$-inch w/jacket | 5.6 | 7.3 | 7.3 | 8.0 |
| $^{9}/_{16}$-inch w/jacket | 6.2 | 8.1 | 7.8 | 8.7 |

Tank cars with a jacket are equipped with a one-half inch thick full height head shield. A two-way EOT device is applied to the end of the last car in a train to monitor functions such as brake line pressure and accidental separation of the train using a motion sensor. The two-way EOT device is also able to receive a signal from the lead locomotive of the train to initiate emergency braking from the rear of the train. ECP brakes are electronically controlled from the locomotive and can be used to initiate braking on all ECP-equipped cars in a train at substantially the same time. *See* "Advanced Brake Signal Propagation Systems," below, for additional discussion.

Based on these effectiveness and the associated incremental cost, PHMSA and FRA have chosen the 9/16 thickness due to its increased puncture resistance. See the RIA for this final rule for further analysis.

### Conditional Probability of Release

Many commenters who provided data and analysis in an effort to refute PHMSA and FRA modeling data did so with the use of the Conditional Probability of Release (CPR) modeling. In addition, some commenters challenged PHMSA and FRA modeling as a weakness in our analysis. In July 2014, FRA released a study conducted by Sharma and Associates entitled

**Addendum 56a**

used to transport hazardous materials when directed to this section by Column (8C) of the § 172.101 HMT. In this final rule, we are revising paragraph (a) to add an authorization for DOT Specification 117 tank cars and to prohibit the use of DOT Specification 111 tank cars for Class 3 (flammable liquids) in Packing Group II and III, in HHFT service, after the dates in the following table unless they meet the performance standard DOT–117P or are retrofitted to meet the requirements of the DOT–117R specification as specified:

| Packing group | DOT 111 not authorized after | DOT 111 built to the CPC–1232 industry standard not authorized after |
|---|---|---|
| II | May 1, 2023 (non-jacketed and jacketed) | July 1, 2023 (non-jacketed) May 1, 2025 (jacketed). |
| III | May 1, 2025 | May 1, 2025. |

Finally, the section notes that conforming retrofitted tank cars are to be marked "DOT–117R" and conforming performance standard tank cars are to be marked "DOT–117P."

### Section 173.243

Section 173.243 prescribes the bulk packaging requirements for certain high-hazard liquids and dual hazard materials which pose a moderate risk. Paragraph (a) provides which specifications of rail cars may be used to transport hazardous materials when directed to this section by Column (8C) of the § 172.101 HMT. In this final rule, we are revising paragraph (a) to add an authorization for DOT Specification 117 tank cars and to prohibit the use of DOT Specification 111 tank cars for Class 3 (flammable liquids) in Packing Group I, in HHFT service, after the dates in the following table unless they are retrofitted to meet the performance standard DOT–117P or the requirements of the DOT–117R specification as specified:

| Packing group | DOT 111 not authorized after | DOT 111 built to the CPC–1232 industry standard not authorized after |
|---|---|---|
| I | January 1, 2017 (non-jacketed report trigger) | April 1, 2020 (non-jacketed). |
| | January 1, 2018 (non-jacketed) | May 1, 2025 (jacketed). |
| | March 1, 2018 (jacketed) | |

Finally, the section notes that conforming retrofitted tank cars are to be marked "DOT–117R" and conforming performance standard tank cars are to be marked "DOT–117P."

### Section 174.310

In this final rule, we are adding a new section 174.310 prescribing requirements for the operation of HHFTs. A rail carrier must comply with these additional requirements if they operate an HHFT (as defined in § 171.8). Paragraph (a)(1) requires that any rail carrier operating an HHFT is subject to the additional safety and security planning requirements in § 172.820 (i.e. routing). Additionally, Paragraph (a)(2) requires that all trains are limited to a maximum speed of 50 mph. The train is further limited to a maximum speed of 40 mph while that train travels within the limits of high-threat urban areas (HTUAs) as defined in § 1580.3 of this title, unless all tank cars containing a Class 3 flammable liquid meet or exceed the retrofit standard DOT Specification 117R, the DOT Specification 117P performance standards, or the standard for the DOT Specification 117 tank car. Paragraph (a)(3) requires HHFTs and HHFUTs must also be equipped with advanced brake signal propagation systems as specified. Paragraph (a)(4) states this new section also requires that a tank car manufactured for use in a HHFT must meet DOT Specification 117, or 117P in part 179, subpart D of this subchapter or an authorized tank specification as specified in part 173, subpart F of this subchapter. Finally, Paragraph (a)(5) requires owners of Non-Jacketed DOT–111 tank cars in PG I service in an HHFT, who are unable to meet the January 1, 2017 retrofit deadline specified in § 173.243 (a)(1) to submit a report by March 1, 2017 to Department of Transportation. The report must include information regarding the retrofitting progress.

### Section 179.200

The heading for § 179.200 is revised to include the DOT–117 specification.

### Section 179.200–1

The heading for § 179.200–1 is revised by stating that tank cars built under the DOT–117 specification must meet the applicable requirements of §§ 179.200, 179.201, and 179.202.

### Section 179.202–1

Section 179.202–1 prescribes the applicability of the DOT–117 tank car standards and specifies that each tank built under such specification must conform to the general requirements of § 179.200 and the prescriptive standards in §§ 179.202–1 through 179.202–11, or the performance standard requirements of § 179.202–12.

### Section 179.202–3

Section 179.202–3 authorizes a DOT–117 tank car to be loaded to a gross weight on rail of up to 286,000 pounds (129,727 kg) upon approval by the Associate Administrator for Safety, Federal Railroad Administration (FRA). This section also provides a reference to § 179.13 which provides authorization for a gross weight on rail of up to 286,000 pounds (129,727 kg).

### Section 179.202–4

Section 179.202–4 specifies that the wall thickness after forming of the tank shell and heads on a DOT–117 tank car must be, at a minimum, 9/16 of an inch of AAR TC–128 Grade B normalized steel. Although not proposed in the NPRM, in this final rule, we are also authorizing 5/8 of an inch of ASTM A 516–70 in accordance with § 179.200–7(b) that is currently allowed by the HMR. Both grades of steel must be normalized.

### Section 179.202–5

Section 179.202–5 specifies that the DOT–117 specification tank car must have a tank head puncture resistance system constructed in conformance with the requirements in § 179.16(c). Additionally, the section specifies the tank car must be equipped with full height head shields with a minimum thickness of ½ inch.

### Section 179.202–6

Section 179.202–6 specifies that the DOT–117 specification tank car must be equipped with a thermal protection system. The thermal protection system